NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NXIVM CORPORATION, formerly known as EXECUTIVE SUCCESS PROGRAMS, INC.; and FIRST PRINCIPLES, INC., | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 06-cv-1051 (DMC) |
| MORRIS SUTTON; ROCHELLE SUTTON; THE ROSS INSTITUTE; RICK ROSS a/k/a "RICKY ROSS"; STEPHANIE FRANCO; PAUL MARTIN, PH.D.; and WELLSPRING RETREAT, INC., | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendants Morris and Rochelle Sutton (collectively the "Suttons")[1] for dismissal of the Second, Fourth, Fifth, Sixth and Seventh Counts of Plaintiff's Amended Consolidated Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(c). Pursuant to Rule 78 of the Federal Rules of Civil Procedure no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that the Suttons' motion to dismiss is **granted** as to Counts Two, Five,

---

[1] Additionally, in a letter sent on August 24, 2006, counsel for the Ross and Wellspring Defendants stated that they join the Suttons' motion to dismiss, except as to the claim for copyright infringement. The letter simply states that Counts Two, Three, Four, Five and Six should be dismissed against the Ross and Wellspring Defendants "for substantially the same reasons they must be dismissed against the Suttons."

Six as to all Defendants, **granted** as to Count Seven as to the Suttons and **denied** as to Count Four.

I.   BACKGROUND

    A.   **Factual Background**

        1.   Parties

Plaintiff NXIVM Corporation ("NXIVM") was formerly known as Executive Success Programs, Inc.  Compl. ¶6.  NXIVM's primary business involves conducting Executive Success training programs designed primarily for managers, chief executives and other business professionals. Compl.¶6.  Plaintiff First Principles, Inc. ("First Principles") has developed many of the proprietary materials that are used by NXIVM in its business.  Compl. ¶7.  NXIVM has a license agreement with First Principles for the trade secret and patent pending technology underlying the work.  Compl. ¶7.  Both NXIVM and First Principles are corporations formed and existing under the laws of the State of Delaware and are authorized to do business in the State of New York, with their principal place of business located at the same address in Albany, New York.  Compl. ¶¶6, 7.

Plaintiffs' training programs provide training in areas such as logical analysis and problem-solving skills and are based primarily on the Rational Inquiry™ system developed by Keith Raniere ("Raniere").  Compl. ¶16.  The Rational Inquiry™ theory and practice allegedly involves analyzing and optimizing how the mind handles data.  Compl. ¶18.  These training programs utilize comprehensive proprietary written materials developed by Plaintiffs. Compl. ¶18.  The proprietary materials are trademarked, patent pending, copyrighted and are proprietary in nature (collectively the "protected materials").  Compl. ¶18.  Additionally, Plaintiffs allege that they have taken extensive steps to safeguard the protected materials, including placing the materials offsite, in a single computer, and limiting access to only three individuals within Plaintiffs' organizations.

Compl. ¶20.  Additionally, Plaintiffs require all enrollees in their training programs to sign a Confidentiality Agreement and to refrain from any disclosure of Plaintiffs' proprietary materials. Compl. ¶20.

Defendants Morris and Rochelle Sutton are individuals residing in the state of New Jersey. The Suttons' son, Michael Sutton, enrolled in one of Plaintiffs' courses in the fall of 2000, eventually becoming one of Plaintiffs' coaches.  Compl. ¶25.  When Michael Sutton first enrolled in Plaintiffs' programs he was employed as an executive of Lollytogs, Inc. ("Lollytogs"), a company owned by Defendant Morris Sutton.  Compl. ¶22.

Defendant Stephanie Franco, daughter of Defendant Morris Sutton and half-sister to Michael Sutton, is an individual residing in the state of New Jersey.  Compl. ¶11.  Defendant Franco is also a former participant in Plaintiffs' training programs.  Compl. ¶11.  Like her half-brother, Franco was accepted into several increasing levels of Plaintiffs' coaching program to learn the Rational Inquiry™ method.  Compl. ¶31.  From this additional training, Franco acquired portions of Plaintiffs' protected materials that are available only through the coaching program to clients who represented their intent to become trainers exclusively for Plaintiffs.  Compl. ¶31.  Franco signed a confidentiality agreement with Plaintiffs that prohibited her from sharing or disclosing the protected materials to third parties.  Compl. ¶31.

Defendant Rick Ross is an individual residing in the State of New Jersey.  Ross is the founder and Executive Director of The Ross Institute, also a Defendant in this case (collectively the "Ross Defendants").  Compl. ¶9.  The Complaint alleges that The Ross Institute is Ross's "for-profit" business, although it has advertised itself as a not-for-profit entity since 1996.  Compl. ¶¶9, 10. Additionally, Ross allegedly holds himself out as "an internationally known expert on cults and other

radical, extreme and often unsafe groups." Compl. ¶9. The Complaint states that Ross appears to earn revenue primarily from conducting "cult deprogrammings" of individuals and through the sales of related products such as audio and video tapes. Compl. ¶43. Specifically, Ross was hired by the Suttons to conduct an "intervention" concerning Michael Sutton's association with Plaintiffs, part of an effort by the Suttons and Stephanie Franco to encourage Michael Sutton to disassociate himself from Plaintiffs. Compl. ¶28.

Additionally, the Ross Defendants operate several websites. Compl. ¶45. According to the Complaint, the Ross Defendants represent that their websites contain "a database of information about cults, destructive cults, controversial groups and movements." Compl. ¶45. However, the Complaint concedes that "[i]n actuality, however, the sites are a mere advertisement and marketing tool for the Ross Defendants and their services and products." Compl. ¶45.

Defendant Paul Martin, Ph.D., is a licensed psychologist, with a principal place of business located in Albany, Ohio, and is the acting Chief Executive Officer of Wellspring Retreat, Inc. ("Wellspring"), also a defendant in this case. Compl. ¶12. Wellspring operates a "retreat and cult recovery resource center" located in Albany, Ohio. Compl. ¶13. Defendants Martin and Wellspring allegedly provided materials containing or referring to Plaintiffs' protected trade secrets on the Ross Defendants' websites. Compl. ¶¶12, 13. More broadly, Plaintiff contends that the Ross Defendants and Defendants Martin and Wellspring are collaborators in "deprogramming" and other "anti-cult" business and marketing activities. Compl. ¶35.

### 2.   Ross's "Interventions" with Michael Sutton

This dispute originated with the Suttons' alleged employment of Ross. As stated above, the

Suttons hired Ross to conduct "interventions" with Michael, in an attempt to urge him to disassociate himself from Plaintiffs. Compl. ¶28. Beginning in or about November 2002, Ross conducted several "interventions" with Michael Sutton on three separate occasions. Compl. ¶29. The first "intervention" took place over the course of five days, during a family vacation in Florida. Next, the Complaint alleges that a one day "intervention" took place at the Suttons' home in New Jersey. Compl. ¶29. The Suttons were present during both of these interventions. Compl. ¶29. Defendant Franco was present during the New Jersey "intervention." Compl. ¶31.

During the "interventions," Ross allegedly requested that Michael Sutton provide him with Plaintiffs' protected materials. Compl. ¶30. Michael Sutton refused to provide the protected materials to Ross, stating that they were confidential. Compl. ¶30. The Complaint further alleges that the Suttons were present for these discussions and were aware of the confidential nature of Plaintiffs' protected materials. Compl. ¶30. At some point, Ross obtained from Franco a copy of all of Plaintiffs' protected materials in her possession, allegedly in violation of Franco's confidentiality agreement with Plaintiffs. Compl. ¶33.

3.   Ross Websites and Martin/Hochman Articles

The Complaint further alleges that Michael Sutton eventually told his father that he would not disassociate from Plaintiffs and would continue to reduce his role at Lollytogs. Compl. ¶32. Morris Sutton allegedly responded angrily and indicated to Michael that he would do whatever was necessary to destroy Plaintiffs' business. Compl. ¶32. The Complaint alleges that the Suttons "directed their agents, the Ross Defendants, to engage in a series of activities . . . to disparage and damage Plaintiffs' business." Compl. ¶34. Such acts included obtaining and distributing Plaintiffs'

protected materials to others; and hiring individuals to write articles disparaging Plaintiffs' and their programs.  Compl. ¶¶ 33-36.

The Suttons hired Defendant Martin and non-party John Hochman, M.D.[2], to provide negative and damaging written analyses of Plaintiffs and Plaintiffs' training courses.  Compl. ¶34. The Ross Defendants, at the direction of the Suttons, provided all or some of Plaintiffs' protected materials to Defendants Martin and Wellspring as well as to Hochman.  Compl. ¶35.  The Complaint further alleges that the Suttons paid Martin and Hochman to use the protected materials to write analyses of Plaintiffs' training programs, concluding that Plaintiffs are a "cult" or are "cult-like." Compl. ¶35.  Specifically, Defendant Martin authored two pieces: *A Critical Analysis of the Executive Success Programs, Inc*., and *Robert Jay Lifton's Eight Criteria of Thought Reform as Applied to the Executive Success Programs* ("the Martin articles").  Compl. ¶36.  The Martin article quotes from portions of Plaintiffs' protected materials, allegedly mischaracterizing the nature of Plaintiffs' materials and Plaintiffs' training programs.  Compl. ¶36.  Plaintiffs allege that Martin's articles have the effect of misleading readers into believing that Plaintiffs and their programs constitute a "cult."  Compl. ¶36.  Hochman authorized a piece entitled, *A Forensic Psychiatrist Evaluates ESP* ("the Hochman article").  Compl. ¶39.  The Complaint alleges that this piece also mischaracterizes Plaintiffs' materials and training programs, misleading readers regarding the nature of Plaintiffs and their programs.  Compl. ¶39.

_____

[2] Dr. Hochman was originally a party to this case; however, Plaintiffs voluntarily dismissed those claims after Dr. Hochman challenged personal jurisdiction in the Northern District of New York.  Plaintiffs have re-filed the claims against him in California, where Hochman lives.

Both the Martin articles and the Hochman article were published on the Ross Defendants' websites.  Compl. ¶¶38, 40.  Specifically, the Complaint alleges that Defendants Martin and Wellspring authorized the Ross Defendants to publish the Martin articles on their websites.  Compl. ¶38.  Moreover, the Ross Defendants allegedly intended to obtain commercial gain through the use of Plaintiffs' protected materials and disparagement of Plaintiffs and their programs and services.  Compl. ¶41.  The Ross Defendants obtained such commercial gain by receiving payment from Defendant Morris Sutton and by attracting more potential buyers of the Ross Defendants' merchandise or services through their websites.  Compl. ¶41.  Additionally, Defendants Martin and Wellspring allegedly obtained commercial gain by receiving payment from Defendant Morris Sutton and by the advertising exposure gained by the publication of the Martin and Hochman articles on the Ross Defendants' websites.  Compl. ¶42.

The Martin and Hochman articles are not the only place on the Ross Defendants' websites where Plaintiffs are mentioned.  The Ross Defendants have also included Plaintiffs on a list of organizations contained on the websites, designating the included organizations as "cults."  Compl. ¶47.  Additionally, the Ross Defendants' websites contain sections including "Warning Signs," and "Intervention," which are allegedly designed to frighten family members and friends into seeking intervention and deprogramming services by Ross.  Compl. ¶47.

4.   Agreements Between Plaintiffs and Defendant Franco

On or about May 5, 2001, Defendant Franco completed and submitted an application for enrollment in Plaintiffs' training program.  Compl. ¶50.  The application required Franco to represent, *inter alia* that she does not compete with Plaintiffs and will return all of Plaintiffs'

materials upon leaving the program.  Compl. ¶50.  However, the Complaint alleges that Franco was acting in competition with Plaintiffs in two different capacities.  Compl. ¶¶51-52.  First, prior to enrolling in Plaintiffs' training program, Franco completed a five-day training course administered by Taibi Kahler Associates, Inc. ("Taibi Kahler") through which she received her master training certification and was thereafter marketed as a certified trainer on the Taibi Kahler website.  Compl.¶51.  Second, Franco is the sole officer and director for the Center for Personal Growth, Inc., a New Jersey for-profit corporation, which is allegedly a competitor of Plaintiffs.  Compl. ¶52.

Additionally, Defendant Franco signed confidentiality agreements in conjunction with her participation in Plaintiffs' program.  <u>See</u> Certification of Harold L. Kofman, Esq. ("Kofman Cert.") Ex. B and Certification of Gage Andretta, Esq. ("Andretta Cert.") Ex. B.  These confidentiality agreements prohibited Franco from distributing the materials she received through her training.

### B.    Procedural Background

This case was originally commenced as two separate actions in the Northern District of New York in August 2003, alleging that Franco, among others, violated the Lanham Act and is liable for copyright infringement.  Both actions sought *ex parte* temporary restraining orders to remove the Hochman and Martin articles from the Ross Institute's websites.  The District Court denied both *ex parte* applications.  Additionally, the District Court denied Plaintiffs' applications for preliminary injunctions.  The Second Circuit Court of Appeals affirmed the District Court's denial of the preliminary injunction applications, finding that Plaintiffs could not demonstrate a likelihood of success on the merits.  <u>See</u> <u>NXIVM v. Ross Inst.</u>, 364 F.3d 471 (3d Cir. 2004).  The United States Supreme Court denied Plaintiffs' petition for a writ of certiorari.  543 U.S. 1000 (2004).

Thereafter, the District Court granted Defendant Franco's motion to dismiss Plaintiffs' Lanham Act, Copyright Act, tortious interference and common-law fraud claims.  Additionally, the District Court granted in part and denied in part Plaintiffs' motion to amend their pleadings and to add the Suttons as defendants.  Specifically, the District Court denied Plaintiffs leave to plead fraud, conversion and prima facie tort claims and granted Plaintiffs leave to assert breach of contract and misappropriation of trade secrets claims.  The District Court denied Plaintiffs leave to file claims against the Suttons for conversion, Lanham Act violations, unfair competition and prima facie tort. Plaintiffs were granted leave to assert claims against the Suttons for product disparagement, tortious interference with contract, interference with prospective contractual relations and copyright infringement.

On April 19, 2005, Plaintiffs filed their Amended and Consolidated Complaint.  Thereafter, the District Court granted the Suttons' motion to transfer this action pursuant to 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406.

### C.      Plaintiffs' Claims

Plaintiffs seek relief on the following claims: misappropriation of trade secrets (Count One), product disparagement (Count Two), breach of contract (Count Three), interference with contractual relations (Counts Four and Five), tortious interference with prospective contractual relations (Count Six), and copyright infringement (Count Seven).  The Sutton Defendants do not seek dismissal of Counts One or Three.  Joining in the arguments of the Sutton Defendants, the Ross and Wellspring Defendants also seek dismissal of the product disparagement and tortious interference claims.

## II.  STANDARD OF REVIEW

The standard that a court applies on a motion for judgment on the pleadings is the same standard on a motion to dismiss pursuant to Rule 12(b)(6).  See Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004).  In reviewing a motion to dismiss on the pleadings made pursuant to Federal Rule of Civil Procedure 12(c), a Court must take all allegations in the Complaint as true, viewed in the light most favorable to the plaintiff.  See Gomez v. Toledo, 446 U.S. 635, 636 n.3 (1980); Robb v. Philadelphia, 733 F.2d 274, 277 (3d Cir. 1984).  If no relief could be granted under any set of facts that could prove consistent with the allegations in the Complaint, the Court may dismiss the Complaint for failure to state a claim.  See Hishon v. Spalding, 467 U.S. 69, 73 (1984); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986).  Additionally, the Supreme Court recently clarified the Rule 12(b)(6) standard in Bell Atlantic Corporation v. Twombly.  127 S.Ct. 1955 (2007).  Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  Id. at 1968 (citing Conley, 355 U.S. at 45-46).  Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 1965.

Ordinarily, a motion to dismiss must be decided only upon the allegations set forth in the complaint, without considering any outside documents or available facts.  If on a 12(b)(6) motion to dismiss, a party "presents matters outside the pleadings, the district court must convert the motion to dismiss into a motion for summary judgment, and give all parties a reasonable opportunity to

present all material pertinent to such a motion under Rule 56." <u>In re Bayside Prison Litig.</u>, 190 F. Supp. 2d 755, 760 (D.N.J. 2002).  In deciding a 12(b)(6) motion to dismiss, the district court may only consider the complaint and limited categories of documents in order to "protect plaintiffs against, in effect, summary judgment by ambush." <u>Id.</u> (citing <u>Bostic v. AT & T of the Virgin Islands</u>, 166 F. Supp. 2d 350, 354-55 (D.V.I. 2001)).  However, conversion to a motion for summary judgment is not required when a district court considers the following documents: (1) matters attached to the complaint; (2) matters incorporated into the pleadings by reference; (3) matters of public record; (4) matters integral to or upon which plaintiff's claim is based." <u>In re Bayside</u>, 190 F. Supp. 2d at 760 (internal citations omitted).  The Third Circuit allows district courts to consider such documents because "neither party can claim prejudice or surprise by the court's reliance on the document." <u>Id.</u>

        In this case, the Court may consider several documents outside the pleadings because they are either incorporated into the pleadings by reference or integral to or upon which the claim is based.  Such documents include the Franco Confidentiality Agreements and the Hochman and Martin articles published on the Ross Defendants' websites.  <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997)

## III.   CHOICE OF LAW

        Several of Plaintiffs' claims assert state causes of action.  Both parties recognize that there is a colorable question as to whether the Court should apply New York or New Jersey law to Plaintiffs' state claims.  However, where no actual conflict of law exists, no choice of law need be made.  <u>See</u> <u>IBM Corp. v. Liberty Mut. Ins. Co.</u>,363 F.3d 137, 143 (2d Cir. 2004); <u>Zavala v. Wal-</u>

Mart Stores, Inc., 393 F. Supp. 2d 295, 333 (D.N.J. 2005).

In this case, there is no apparent conflict of law regarding the state law claims at issue.  In fact, New York and New Jersey law concerning product disparagement and tortious interference are virtually identical.  See The Score Board, Inc. v. Upper Deck Co., 959 F. Supp. 234, 238, n.1 (D.N.J. 1989); IBM Corp.,363 F.3d at 143.  Accordingly, this Court need not engage in a choice of law analysis.

## IV.   PRODUCT DISPARAGEMENT OR TRADE LIBEL (SECOND COUNT)

New Jersey and New York[3] generally recognize the same elements for a claim of "product disparagement" or trade libel: (1) publication; (2) with malice; (3) of false allegations concerning the property, product or business; and (4) special damages such as pecuniary loss.  See Mayflower Transit, LLC v. Prince, 314 F. Supp. 2d 362 (D.N.J. 2004); See also C.R. Bard, Inc. v. Wordtronics, Corp., 235 N.J. Super. 168 (Law Div. 1989); DeMarco-Stone Funeral Home Inc. v. WRGB Broad. Inc., 610 N.Y.S.2d 666, 667-68 (3d Dep't 1994); Redeye Grill, L.P. v. Rest. Opportunities Ctr. of N.Y., Inc., No. 117382/05, 2006 WL 2726823, *2 (N.Y. Sup. Aug. 16, 2006) (citing Gucci Am., Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269-76 (S.D.N.Y. 2003)).

### A.   Liability of Suttons

As an initial matter, the Suttons make the unsupported argument that Plaintiffs' product disparagement claim must fail as a matter of law because "none of the views were expressed by the Suttons."  Defs. Br. at 23.  Contrary to the Suttons' argument, the Complaint repeatedly alleges that

_____

[3]Both Plaintiffs and the Sutton Defendants agree that New Jersey and New York law concerning product disparagement and tortious interference claims are virtually identical.  See Defs. Br. at 18 n.6; Pls. Opp'n Br. at 17.  Thus, no choice of law analysis is necessary.

the Suttons hired Ross and Martin to engage in activities on their behalf.  See Compl. ¶¶ 34-36, 41-42.  The Complaint adequately alleges that the Ross Defendants and Martin were engaging in activities at the behest of the Suttons.  Moreover, Defendants cite no cases stating that liability on a product disparagement claim requires that the defendant personally express the allegedly disparaging statements.  Accordingly, this argument is unavailing.

### B.  Constitutional and State Law Protections

In order for Plaintiffs to prevail on the product disparagement claim, Defendants' statements may not be pure expressions of opinion.  See Cassidy v. Merin, 244 N.J. Super. 466, 479 (App. Div. 1990); Themed Restaurants, Inc. v. Zagat Survey, LLC, 801 N.Y.S.2d 38, 39-40 (1st Dep't 2005).  This requirement derives from both constitutional and state law protections for speech.  As the New Jersey Supreme Court explained, "[i]nsofar as defenses to product disparagement are concerned, a qualified privilege should exist whenever it would exist for a defamation action . . . it follows that the right to make a statement about a product should exist whenever it is permissible to make such a statement about the reputation of another."  Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc., 104 N.J. 125, 137 (1986); see also Guerrero v. Carva, 779 N.Y.S.2d 12, 17 (1st Dep't 2004) (recognizing constitutional protection for statements of opinion); Penn Warranty Corp. v. DiGiovanni, 810 N.Y.S.2d 807, 814 (N.Y. Sup. 2005) (noting that courts have been "loathe to stifle's one's criticism of goods or services").

Nevertheless, there is no "wholesale defamation exception" for anything that is capable of being labeled as "opinion."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990).  Rather, "[h]arm from a defamatory opinion statement is redressable when the statement implies underlying

-13-

objective facts that are false."  Ward v. Zelikovsky, 136 N.J. 516, 531 (1994) (citing Milkovich, 497 U.S. at 18-20).  See also Long v. Marubeni Am. Corp., 406 F. Supp. 2d 285, 296 (S.D.N.Y. 2005).  Here, Plaintiffs argue that the Martin and Hochman articles imply additional "facts" unknown to the readers; and accordingly, are not pure opinion and are actionable as defamatory statements.  Pls. Opp'n Br. at 24-25 (quoting "[t]here is much in the content and the format of ESP that is not at all original, and is quite similar to aspects of a number of cults and cult-like organizations *with which I am familiar*."  Kofman Cert. Ex. C at 1 (emphasis added)).

In this case, the Court must decide whether the opinions contained in the Martin and Hochman articles are non-actionable opinions, actionable opinions mixed with fact or actionable opinions that are impliedly based upon unknown facts.  Generally, the question of whether a communication is defamatory is a question of law.  See Farber v. City of Paterson, No. 03-4535, 2006 WL 3485919, *4 (D.N.J. Nov. 29, 2006) (citing Restatement (Second) of Torts (1977) § 614; DeAngelis v. Hill, 180 N.J. 1, 14 (2004); Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 189 (3d Cir. 1998)); Mayflower Transit, 314 F. Supp. 2d at 372.  However, "[i]f the words are susceptible of either a defamatory or non-defamatory meaning . . . resolution must be left to the trier of fact."  Farber, 2006 WL 3485919 at *4.  Critical to the question of whether or not Defendants' statements are actionable are three factors: "(1) the content, (2) the verifiability, and (3) the context of the challenged statement."  Id. (citing Ward, 136 N.J. 516); see also Brian v. Richardson, 87 N.Y.2d 46, 51 (1995).

1.   Content of Statements

First, the Court must evaluate the content of the allegedly defamatory statements.  "The

content analysis requires an evaluation of the language in question according to the fair and natural meaning that would be given it 'by reasonable persons of ordinary intelligence.'" Farber, 2006 WL 3485919 at *4 (quoting Romaine v. Kallinger, 109 N.J. 282, 290 (1988)). Here, the Court must pay close attention to whether the opinions contained in the Martin and Hochman articles "purport[] to be based on actual facts, and to be pointing out their implications." Church of Scientology Int'l v. Eli Lilly & Co., 778 F. Supp. 661, 668 (S.D.N.Y. 1991). Particularly, the Court must be concerned with whether "[t]he impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion." Id. As explained by the New York Court of Appeals, "[i]n making this inquiry, courts cannot stop at literalism," but consider the impression created by the words used." Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, 243 (1991). Specifically, the Court should look at the "content of the whole communication, its tone and apparent purpose." Id. (citing Seinhilber v. Alphonse, 68 N.Y.2d 283, 293 (1986)).

Plaintiffs argue that the content of the Martin and Hochman articles is defamatory because they contain assertions of fact and/or mixed fact and opinion. Pls. Opp'n Br. at 18. Specifically, Plaintiffs allege that "the central defamatory statement - that Plaintiffs constitute a cult - is not presented as the mere opinion of the authors; rather, this statement is presented as a fact capable of being proven to the readers on the basis of the criteria provided by the writings themselves." Pls. Opp'n Br. at 21-22. On this basis, Plaintiffs argue that a reasonable reader would assume that the authors have reviewed Plaintiffs' programs and that they have undisclosed evidence that supports the conclusion that Plaintiffs' organization constitutes a cult. Pls. Opp'n Br. at 25. Finally, Plaintiffs

-15-

argue that "reasonable readers of the Ross Defendants' website and the Hochman and Martin writings are likely to understand that scholars in the field are revealing to them scientific facts or 'truths' about Plaintiffs, not mere opinions." Pls. Opp'n Br. at 22 (citing New Testament Missionary Fellowship v. E.P. Dutton & Co., 491 N.Y.S.2d 626, 627-28 (1st Dep't 1985)).

Upon review of the Hochman and Martin articles it is the conclusion of this Court that a reasonable reader would not believe that the articles contain assertions of fact that Plaintiffs' organization constitutes a cult. As discussed more thoroughly below, this finding is supported by the context of the alleged defamatory statements. See Farber, 2006 WL 3485919 at *5 (stating that the determination of whether the content of an article was defamatory could not be made without examining the context within which the statements were made). Moreover, the content of the Hochman and Martin articles, while including statements of fact from their respective fields of study, do not explicitly state that Plaintiffs' organization constitutes a cult. Rather, the articles state that NXIVM has some characteristics of a cult and cult-like elements. In fact, Martin's articles do not state any conclusions about NXIVM and do not state that NXIVM is a cult. Rather, Martin's articles quote from Robert Jay Lifton's academic writing listing characteristics of cults and quote from Plaintiffs' own materials. See Kofman Certif. Ex. D, E. Thus, the articles adequately state the facts upon which the authors' opinions are based.

More importantly, the context of the articles would inform a reasonable reader that these articles constitute an academic critique or analysis of Plaintiffs' program. This type of academic critique is bolstered by research from the authors' respective fields; however, it is evident that the authors are offering their opinions based on their academic and occupational training. A reasonable

-16-

reader would discern that the authors' conclusions do not constitute fact, but rather, the opinion of an individual who is writing from a particular perspective.

        2.    Verifiability

The verifiability factor requires the Court to determine whether describing a group as a "cult" constitutes a verifiable statement of fact; or instead, if characterizing a group as a "cult" is an non-actionable expression of opinion.  "An analysis of verifiability requires distinguishing between statements of fact and opinion.  Only if a statement suggests 'specific factual assertions that could be proven true or false' can it qualify as actionable defamation."  Farber, 2006 WL 3485919 at *4 (internal citations omitted).  Thus, for Plaintiffs to prevail, Defendants' allegedly false statements must be verifiable statements of fact.  See  Mayflower Transit, 314 F. Supp. 2d at 372; Singer v. Beach Trading Co., Inc., 379 N.J. Super. 63, 80 (App. Div. 2005); Immuno AG, 77 N.Y.2d at 243.

This Court does not find that the Martin articles contain any statements that could be characterized as facts regarding NXIVM.  The Martin articles do not identify NXIVM as a cult at any point.  Martin's articles merely compare the scholarly work of Robert Jay Lifton on cults and their common, shared characteristics with the materials distributed by NXIVM to its enrollees. Accordingly, in the absence of any statements of fact contained in the Martin articles, this Court need not engage in a verifiability analysis.

Next, this Court must determine whether there are statements of fact contained in Hochman's articles that are verifiable and thereby actionable.  In regard to the Hochman article, Plaintiffs allege

that the following statements are defamatory[4]:

G.     "ESP Intensive participants are signing up for sixteen ten-hour days, which will either be experienced successively, or in five-day segments." *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

H.     "Participants are told to promise not to tell non-participants of what they learn in the Intensive, as well as its methods . . . They will be unable to respond to routine questions they would be expected to receive, such as, 'What did you learn today?' or 'What's going on at the seminar you are attending?'." *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

I.      "[O]ngoing participants are required to make a daily brief phone call to 'check-in' with a 'coach'." *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

J.      Section heading: "Cult-Like Elements of the ESP Intensive." *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

K.     "The group claims unprecedented results training over 400,000 individuals." *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

L.      That "emotional appeals or any other manipulation" occur to encourage participants in Plaintiffs' seminars to stay longer at the end of the day or to return for successive days of training. *A Forensic Psychiatrist Evaluates ESP*, John Hochman, M.D., www.rickross.com (accessed December 20, 2004).

M.     That Plaintiffs' program involves "a kingdom of sorts, ruled by a Vanguard, who writes his own dictionary of the English language, has his own moral

---

[4]Plaintiffs may only seek relief based on the statements that are pled in their Second Amended Complaint.  Both New York and New Jersey law require plaintiffs to identify in their pleadings the particular statements that they allege are defamatory.  See <u>Nanavati v. Burdette Tomlin Mem'l Hosp.</u>, 857 F.2d 96, 109 (3d Cir. 1988) <u>cert. denied</u>, 489 U.S. 1078 (1989); <u>FDIC v. Bathgate</u>, 27 F.3d 850, 875 (D.N.J. 1996); <u>Reserve Solutions v. Vernaglia</u>, 438 F. Supp. 2d 290 (S.D.N.Y. 2006).

> code, and the ability to generate taxes on subjects by having them participate
> in his seminars.  It is a kingdom with no physical borders, but with
> psychological borders - influencing how his subjects spend their time,
> socialize, and think . . ." *A Forensic Psychiatrist Evaluates ESP*, John
> Hochman, M.D., www.rickross.com (accessed December 20, 2004).

Compl. ¶48.  Plaintiffs contend that these statements are "demonstrably false and were disseminated

and published by the Ross Defendants solely with the intent to disparage Plaintiffs' products and

services and to convince readers that Plaintiffs' programs are "cult-like" and emotionally harmful

to participants."  Compl. ¶49.

It is the finding of this Court that the statements contained in paragraphs 48J, L and M of the

Complaint are not verifiable statements of fact.  First, the section-heading cited in paragraph 48J is

clearly part of the author's scholarly critique of Plaintiffs' programs.  Moreover, as set forth more

fully below, it is the finding of this Court that "cult" is not a verifiable assertion of fact.  Next, it

should be noted that the Complaint misquotes Hochman's article in paragraph 48L.  Specifically,

the Hochman article states that the long hours of Plaintiffs' programs "*suggests to me* that emotional

appeals or manipulation may occur to get everyone to stay around even longer."  Kofman Cert., Ex.

C, p.1 (emphasis added).  This statement, especially in the context of a scholarly article, is a

statement of opinion, not fact.  Finally, the rhetorical and metaphorical language cited in paragraph

48M of the Complaint also is non-verifiable opinion, and not a statement of fact.  Much like the

articles in question in Church of Scientology of Cal. v. Siegelman, "[n]one of these statements go

beyond what one would expect to find in a frank discussion of a controversial religious movement

. .  and thus none of these statements may be the basis for an action in defamation."  475 F. Supp.

950, 956 (S.D.N.Y. 1979).

-19-

The statements cited in paragraph 48G, H, I and K of the Complaint appear to be verifiable statements of fact.  However, even if these statements are false statements of fact, they do not disparage Plaintiffs' program.  Even more importantly, these statements are found in a scholarly critique of Plaintiffs' program.

Plaintiffs also argue that the articles as a whole imply that NXIVM is a cult or has cult-like characteristics.  Plaintiffs set forth a unique argument as support for this theory of relief: they do not argue that calling a group a "cult" or "cult-like" is a verifiable statement of fact and thereby actionable.  Instead, Plaintiffs argue that "the statement that Plaintiffs constitute a cult that employs mind control techniques is not pure opinion in this context because it is 'capable of being proven true or false' . . . by matching up Plaintiffs' characteristics against those defined and described in the writings themselves."  Pls. Opp'n Br. at 23 (citing New Testament Missionary Fellowship, 491 N.Y.S.2d 626; Landmark Educ. Corp. v. Conde Nast Publication, No. 114814/93, 1994 WL 836356 (N.Y. Sup. July 7, 1993)).  Specifically, Plaintiffs rely heavily on Landmark Education Corporation, wherein the New York trial court found that

> cult has a precise meaning which is readily understood as it was defined in the article.
> The statements made are capable of being proven true or false as 'the Forum's'
> procedures can be matched against the defined qualities of cults as described in the
> article, any consistency will establish the claimed truth or falsity.

1994 WL 836356 at *3.  The Court is unpersuaded by this argument.  As Defendants note, Landmark Education is a distinguishable case because the article at issue therein "accused plaintiff of brainwashing, fraud in fundraising, harassment and causing physical and emotional damage."  Defs. Reply Br. at 10-11 (citing Landmark, 1994 WL 836356  at *2).  No such similar statements are at issue here.  Additionally, the context of the statements at issue in Landmark was identified as a piece

-20-

of reporting.  Here, the articles on the Ross Defendants' websites do not purport to be pieces of reporting.  Rather, the articles are written from a scholarly perspective by individuals with an academic background.

Moreover, this Court is unpersuaded by Plaintiffs' theory that the characterization of NXIVM as a cult is verifiable because it can be verified by the criteria provided in the Martin and Hochman articles.  The Hochman and Martin articles respectively offer a psychiatrist and clinical psychologist's evaluations of Plaintiffs' programs.  That they must offer criteria by which to define or describe cult-like behavior underscores the fact that "cult" is a term without a universal or concrete meaning and is not a verifiable fact.

Moreover, as recognized by other jurisdictions, the term "cult" is not an easily verifiable term because "the truth or falsity of the statement depends upon one's religious beliefs, an ecclesiastical matter which cannot and should not be tried in a court of law."  Harvest House Publishers v. Local Church, 190 S.W.3d 204, 212 (Tex. App. 1 2006); (citing *inter alia* Sands v. Living Word Fellowship, 34 P.3d 955, 960 (Alaska 2001); Serbian E. Orthodox Diocese for U.S. of Am. & Can v. Milivojevich, 426 U.S. 696, 707 (1976); United States v. Ballard, 322 U.S. 78, 86 (1944)).  Even though NXIVM does not identify itself as a religious group, the overarching point of these cases is still relevant.  "Cult" is not a term with a concrete meaning.  Thus, when an individual states or opines that a group constitutes a "cult" or is "cult-like," no verifiable fact is communicated to the listener or reader.  For these reasons, this Court concludes that the alleged statements of fact or implied statements of fact contained in the Hochman and Martin articles are not verifiable statements of fact.

-21-

3.      Context

The context of alleged defamatory statements may be the most important of the three factors used to assess a reasonable reader's impression.  See Brian, 87 N.Y.2d at 51 (stating that the context factor "lends both depth and difficult to the analysis"); Nanavati, 857 F.2d at 107; Eli Lilly & Co., 778 F. Supp. at 667.  Evaluating what a reader's reasonable impression would be "involves assessing the 'impression created by the words used, as well as the general tenor of the expression, as experienced by a reasonable person.'"  Farber, 2006 WL 3485919 at *5 (quoting Ward, 136 N.J. at 532; see also Immuno AG, 77 N.Y.2d 235.  Furthermore, the New York Court of Appeals has stated that "courts are required to take into consideration the larger context in which the statements were published, including the nature of the particular forum."  Brian, 87 N.Y.2d at 51.  The context of the alleged defamatory statements as well as the nature of the forum are relevant to the meaning a reasonable reader would attribute to the statement in question.

Plaintiffs contend that Defendants' characterization of Plaintiffs' organization as a "cult" is in a context that would lead a reasonable reader to believe that Defendants' statements are not opinions but facts.  Pls. Opp'n Br. at 20.  Specifically, Plaintiffs claim that the Ross Defendants' website purports to provide readers with factual information concerning certain groups that the website identifies as cults."  Pls. Opp'n Br. at 20.  Further, the Hochman and Martin articles "present themselves as scholarly or academic analyses by professionals with advanced degrees in psychiatry and bio-behavioral sciences (Hochman) and clinical psychology (Martin)."  Pls. Opp'n Br. at 20.  Plaintiffs liken the context of the Hochman and Martin articles to the context of the article at issue in Eli Lilly, which the Southern District of New York described as "substantially equivalent to an

-22-

internal memo, and its tone is business-like and solemn."  778 F. Supp. at 668.

To properly evaluate the context of the statements contained in the Hochman and Martin articles, the Court must consider not only the tone and tenor of the articles but also the broader context of the Ross Defendants' website.  Tellingly, the Complaint itself alleges that "[i]n actuality, however, the sites are a mere advertisement and marketing tool for the Ross Defendants and their services and products."  Compl. ¶45.  A person that accesses the Ross Defendants' websites would understand that it offers a particular viewpoint on cults and their techniques.  The Ross Defendants' websites do not purport to offer reporting coverage or news on cults.  In fact, the disclaimer contained on the website indicates that the materials therein offer viewpoints: "[t]he Ross Institute, its Advisory Board and/or Rick Ross do not specifically endorse or support any of the *views expressed* within the documents, articles, reports and testimonies archived within this website, with the exception of those specifically attributed."  Supplemental Certification of Harold L. Kofman, Esq. ("Supp. Kofman Cert.") Defs. Ex. A. (emphasis added).  Thus, the broader context of the Hochman and Martin articles indicates to a reasonable reader that information contained on the website is rife with opinions and viewpoints.  It does not contain statements of fact.

Additionally, the Hochman and Martin articles themselves are of an analytical tone and tenor, filled with opinions.  A reasonable reader would understand that the articles are scholarly critiques. For example, the titles of two of the articles indicate that the author is evaluating Plaintiffs' programs and offering his opinion: *A Forensic Psychiatrist Evaluates ESP*, *A Critical Analysis of the Executive Success Programs Inc* and *A Critical Analysis of the Executive Success Programs*.  See Kofman Cert. Exs. D, E. (emphasis added).  Furthermore, the Martin articles contain disclaimers, indicating

-23-

to the reader that the author is offering his opinion from a particular viewpoint.[5]   For all the foregoing reasons, this Court concludes that a reasonable reader would not be under the impression that the Hochman and Martin articles contain assertions of fact regarding Plaintiffs' programs. Accordingly, these statements are not actionable as defamatory and Plaintiffs have failed to state a claim for product disparagement.

As previously stated, the Ross and Wellspring Defendants join in this motion to dismiss Plaintiffs' product disparagement claim.  The Court's above conclusion that the allegedly defamatory statements constitute protected speech compels the conclusion that Plaintiffs also may not prevail on this claim against any Defendants.

Because the Court finds that Plaintiffs have failed to state a claim for product disparagement based on the protected nature of the speech at issue, the Court will not address Defendants' additional arguments for dismissal of this claim: that Plaintiff First Principles may not assert a claim for product disparagement, that Plaintiffs' claims are time barred on statute of limitations grounds, and that Plaintiffs lack standing to recover on a product disparagement claim based on statements relating to non-party Keith Raniere.

## V.    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS (FIFTH COUNT) & TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (SIXTH COUNT)

Claims for tortious interference with contractual relations and prospective economic advantage cannot lie where plaintiffs may not prevail on a product disparagement claim.  See

_____

[5]Both of Martin's articles indicate that he is the Director of Wellspring Retreat and contain the following additional note:  "Wellspring Retreat & Resource Center is a licensed residential treatment facility that provides a program of counseling and instruction to victims of abuse, religious abuse and/or thought reform."  See Kofman Cert. Exs. D, E.

Cassidy, 244 N.J. Super. at 483 (citing Dairy Stores, 104 N.J. at 137; Binkewitz v. Allstate Ins. Co., 222 N.J. Super. 501, 515-16 (App. Div.) certif. denied, 113 N.J. 378 (1988)); In re Quality Botanical Ingredients, Inc., 249 B.R. 619, 628-29 (Bankr. D.N.J. 2000).   Where a claim for tortious interference with contractual relations or prospective economic advantage implicates constitutionally protected speech, the same qualified privilege is applicable.   As explained by the New Jersey Appellate Division,

> [t]he libel action privilege grows out of the public policy favoring free expression in statutorily-required informal dispute resolution proceedings, without fear of ensuing libel action, short of outright lies or reckless disregard of falsity.   An action for tortious interference based on the same verbal conduct would equally chill the free expression we seek to protect.

Binkewitz, 222 N.J. Super. at 515.   Accordingly, Plaintiffs' claims for relief contained in the Fifth and Sixth Counts depend upon the viability of Plaintiffs' product disparagement claim. Notably, Plaintiffs fail to contest this point in their Opposition Brief.

It is the finding of this Court that Plaintiffs' Fifth and Sixth Counts fail to state a claim upon which relief can be granted.   Plaintiffs' Fifth and Sixth Counts allege tortious interference based on the statements contained on the Ross Defendants' websites.   See Compl.¶¶96, 104.   As set forth above, these statements constitute protected speech and thus, may not be the basis for either product disparagement or tortious interference claims.

Also, as was the case with the product disparagement claim,  the Court's finding that these statements constitute protected speech requires dismissal of these claims against all Defendants.

**VI.   TORTIOUS INTERFERENCE WITH CONFIDENTIALITY AGREEMENT (COUNT FOUR)**

New York and New Jersey law on tortious interference are essentially the same and in accord.

See Marks v. Struble, 347 F. Supp. 2d 136, 142 (D.N.J. 2004) (citing DiGiorgio Corp. v. Mendez & Co. Inc., 230 F. Supp. 2d 552, 557-58 (D.N.J. 2002); Hidden Brook Air, Inc. v. Thabet Aviation, Int'l, Inc., 241 F. Supp. 2d 246, 278 (S.D.N.Y. 2002)).  Accordingly, no choice of law analysis is necessary.  Under both states' laws the essential elements for a claim for tortious interference with contractual relations are: (1) existence of a contract; (2) defendant's knowledge of that contract; (3) defendant's intentional and improper procuring of the breach; and (4) damages.  Id. at 144.  See also Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989); Lama Holding Cop. v. Smith Barney Inc., 88 N.Y.2d 413, 423 (1996).

The contested element in this case is the third element: the impropriety of Defendants' conduct and/or whether Defendants acted with malice when they interfered with Plaintiffs' contract with Defendant Franco.  Defendants do not contest the existence of the confidentiality agreement, do not deny having knowledge of the contract and do not dispute that Plaintiffs allege damages resulting from the breach.  Malice, for purposes of a claim for tortious interference with contract, "is not used in the literal sense requiring ill will towards the plaintiff.  Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart-Morristown, 116 N.J. at 751 (internal citations omitted).  In other words, to prevail on this claim, Plaintiffs must show legal malice.  See id. at 756 (quoting Louis Schlesinger Co. v. Rice, 4 N.J. 169, 181 (1950)).

In this case, there is no question that Defendants' actions were done intentionally.  As alleged in the Complaint, Defendants acted "with the intent to influence or induce Defendant Franco to breach the confidentiality agreement."  Compl. ¶87.  Thus, the next question is whether Defendants

acted without justification or excuse.  The New Jersey Supreme Court has explained that "the ultimate inquiry is whether the conduct was both injurious and transgressive of generally accepted standards of common morality or of law.  In other words, was the interference by defendant sanctioned by the rules of the game." Printing Mart-Morristown, 116 N.J. at 756 (quoting Sustick v. Slatina, 48 N.J. Super. 134, 144 (App. Div. 1958)) (quotation marks omitted); see also Woods Corp. Assocs. v. Signet Star Holdings, Inc., 910 F. Supp. 1019, 1031 (D.N.J. 1995).

In this case, the Complaint alleges that Defendants intentionally sought to induce and influence Franco to breach the confidentiality agreement.  Moreover, as to Defendant Morris Sutton, at least, such intentional actions were taken as part of an effort to "do whatever was necessary to destroy Plaintiffs' business."  Compl. ¶32.  The Complaint alleges that Defendants urged and successfully influenced Franco to breach the confidentiality agreement so that she would provide Plaintiffs' protected materials to Ross and ultimately to Hochman and Martin.  Compl. ¶¶33-34.  Further, Defendants allegedly hired Martin and Hochman to "provide negative and damaging written analyses of Plaintiffs and Plaintiffs' training courses in furtherance of their intention to cause harm to Plaintiffs." Compl. ¶34.  From a review of the Hochman and Martin articles, it is evident that the "protected materials" play a key role in the authors' analysis of Plaintiffs' program.  Accepting these allegations as true, it is the finding of this Court that Plaintiffs' adequately claim that Defendants acted with malice by intentionally interfering with the contractual relationship between Plaintiffs and Franco.  Specifically, these allegations adequately state a claim for tortious interference with contractual relations because urging a party to a contract to breach a confidentiality agreement in order to destroy another's business is outside of the "rules of the game."  Accordingly, this Court

denies Defendants' Rule 12(b)(6) motion as to Plaintiffs' Fourth Count.

Additionally, Defendants argue that First Principles may not assert a claim for tortious interference with the Franco confidentiality agreement because First Principles is not a party to that contract.  However, as Plaintiffs note, First Principles is explicitly listed as a party to the Second Confidentiality Agreement signed by Franco.  See Andretta Cert., Ex. B.  Contrary to Defendants argument, this Court may consider this document because it is referenced in and is integral to the Complaint: Plaintiffs claim a right to relief based on the violation of the Confidentiality Agreements between Plaintiffs and Franco.  See In re Bayside, 190 F. Supp. 2d at 760.

## VII.   COPYRIGHT INFRINGEMENT (COUNT SEVEN)

To state a claim for copyright infringement under a theory of vicarious liability Plaintiffs must satisfy two elements.  First, Defendants must have a right and ability to control the infringing conduct.  Second, Defendants must have a direct financial interest in the exploitation of the copyrighted materials.  See Shapiro, Bernstein & Co. v. H.L. Green, 316 F.2d 304, 307 (2d Cir. 1963); Artista Records v. Flea World, Inc., 356 F. Supp. 2d 411, 423 (D.N.J. 2005).  In this case, Plaintiffs do not adequately plead that the Sutton Defendants are vicariously liable for the alleged infringement of Plaintiffs' copyright.  The Complaint fails to allege that the Sutton Defendants had any ability to control the distribution of Martin and Hochman's articles on the Ross Defendants' websites.  Moreover, there is no indication that the Sutton Defendants had any direct or even an indirect financial interest in the distribution and alleged exploitation of Defendants' copyrighted materials.

Plaintiffs argue that the Court must consider additional theories for the Sutton Defendants'

liability on the copyright claim, including theories of contributory infringement and inducement. However, as the Sutton Defendants note, the Complaint fails to set forth such theories of relief. Defs. Reply Br. at 13-14.  Specifically, the Complaint alleges that "[t]he Suttons are liable for the Ross Defendants' conduct, both vicariously and because these Defendants were acting as their agents."  Compl. ¶115.  Contrary to Plaintiffs' argument, contributory copyright infringement and inducement are not a form of vicarious liability.  See Pls. Opp'n Br. at 27.  Rather, "related defendants become liable indirectly either . . . through theories of vicarious liability, contributory infringement, or inducement."  3 Nimmer on Copyright Law § 12.04(A)(1997); see also MGM Studios, Inc. v. Grokster, Ltd., 543 U.S. 913, 930, 125 S.Ct. 2764, 2776 (2005) (identifying and defining contributory infringement and vicarious infringement as separate theories of relief).

This Court concludes that it is inappropriate for Plaintiffs to attempt to set forth an additional theory for relief for the first time in their Opposition Brief.  Plaintiffs may not attempt to amend their Complaint through their brief in opposition to a motion to dismiss.   See Commonwealth of Pa. ex. rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir. 1988); see also In re Oneprazole Patent Litig., 258 F. Supp. 2d 221, 235 (S.D.N.Y. 2001).

## VIII.   OPPORTUNITY TO AMEND

Plaintiffs' request to amend their Complaint is meritless.  Plaintiffs have had ample opportunity to assert properly pled, cognizable claims.  This Court will not give Plaintiffs an additional opportunity to assert grounds for relief.

## IX.   CONCLUSION

For the reasons stated, it is the finding of this Court that Suttons' motion to dismiss is

**granted** as to Counts Two, Five, Six as to all Defendants, **granted** as to Count Seven as to the

Suttons and **denied** as to Count Four.  An appropriate Order accompanies this Opinion.

                    S/ Dennis M. Cavanaugh

                    Dennis M. Cavanaugh, U.S.D.J.

Date:       June  _27_, 2007
Orig.:      Clerk
cc:        Counsel of Record
            The Honorable Mark Falk, U.S.M.J.
            File