**<u>NOT FOR PUBLICATION</u>**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NXIVM CORPORATION, f/k/a/ EXECUTIVE SUCCESS PROGRAMS, INC., and FIRST PRINCIPLES, INC., | |
| *Plaintiffs*, | Civil No. 2:06-1051 (KSH) (MF) |
| v. | |
| ESTATE OF MORRIS SUTTON, ESTATE OF ROCHELLE SUTTON, THE ROSS INSTITUTE, RCK ROSS a/k/a/ "RICKY ROSS," STEPHANIE FRANCO, PAUL MARTIN, PH.D., and WELLSPRING RETREAT, INC., | **<u>OPINION</u>** |
| *Counterclaim-Defendants*. | |

| |
|---|
| RICK ROSS., |
| *Counterclaim-Plaintiff*, |
| v. |
| KEITH RANIERE, NANCY SALZMAN, KRISTIN KEEFFE, INTERFOR, INC., JUVAL AVIV, JANE DOE, and JOHN DOES 1-10, |
| *Counterclaim-Defendants*. |

INTERFOR, INC. and JUVAL AVIV,

*Crossclaimants*,

v.

NXIVM   CORPORATION.,   KEITH   RANIERE,
NANCY

*Counterclaim-Defendants*.

**<u>Katharine S. Hayden, U.S.D.J.</u>**

These matters come before the court by way of summary judgment motions by defendants and counterclaim defendants arising from a set of related events and facts. This case has a long history in the District of New Jersey and elsewhere, and has been the subject of failed mediations and numerous judicial rulings. Not surprisingly, the docket reflects a host of filings. This Court has carefully reviewed the docket and this opinion addresses all open dispositive motions. For ease of reference, the Court has compiled a chart, immediately below. *See Figure* 1 and *Figure* 2. The take-away from an exhaustive review of interlocking personal feuds undertaken by the undersigned and other judicial officers, is that those issues suitable for trial that are identified in this opinion will be promptly tried.

**Complaint**

Filed in the Northern District of New York August 22, 2003
Transferred to the District of New Jersey on February 16, 2006

NXIVM CORPORATION, f/k/a/ EXECUTIVE SUCCESS PROGRAMS, INC., and FIRST
PRINCIPLES, INC.  v.

ESTATE OF MORRIS SUTTON, ESTATE OF ROCHELLE SUTTON, THE ROSS INSTITUTE, RCK
ROSS a/k/a/ "RICKY ROSS," STEPHANIE FRANCO, PAUL MARTIN, PH.D., and WELLSPRING
RETREAT, INC.

*Figure* 1

| Count | Claim | Defendant | Dismissed | Pending |
|---|---|---|---|---|
| One | Misappropriation of Trade Secrets | Suttons | X | |
| | | Franco | | Def. motion for SJ |
| | | Ross | | Def. motion for SJ |
| | | Ross Institute | | Def. motion for SJ |
| | | Martin | | Def. motion for SJ |
| | | Wellspring Retreat | | Def. motion for SJ |
| | | | | |
| Two | Product Disparagement | Suttons | X | |
| | | Ross | X | |
| | | Ross Institute | X | |
| | | Martin | X | |
| | | Wellspring Retreat | X | |
| | | | | |
| Three | Breach of Contract | Franco | | NXIVM motion for SJ |
| | | | | Def. motion for SJ |
| Four | Interference with Contractual Relations | Suttons | | Def. motion for SJ |
| | | Ross | | Def. motion for SJ |
| | | Ross Institute | | Def. motion for SJ |
| | | | | |
| Five | Interference with Contractual Relations | Suttons | X | |
| | | Ross | X | |
| | | Ross Institute | X | |
| | | | | |
| Six | Interference with Prospective Contractual Relations | Suttons | X | |
| | | Ross | X | |
| | | Ross Institute | X | |
| | | | | |
| Seven | Copyright Infringement | Ross | | Def. motion for SJ |
| | | Ross Institute | | Def. motion for SJ |
| | | Martin | | Def. motion for SJ |
| | | Wellspring Retreat | | Def. motion for SJ |
| | | Suttons | X | |
| | | | | |

**Counterclaim**

Filed in the District of New Jersey on January 11, 2007

RICK ROSS.,

v.

KEITH RANIERE, NANCY SALZMAN, KRISTIN KEEFFE, INTERFOR, INC., JUVAL AVIV, JANE DOE, and JOHN DOES 1-10

Figure 2

| Count | Claim | Defendant | Dismissed | Pending |
|-------|-------|-----------|-----------|---------|
| One | Intrusion Upon Seclusion | Keith Raniere | | Def. motion for SJ |
| | | NXIVM | | Def. motion for SJ |
| | | Nancy Salzman | | Def. motion for SJ |
| | | Kristin Keeffe | | |
| | | Interfor, Inc. | | Def. motion for SJ |
| | | Juval Aviv | | |
| | | Anna Moody | | |
| | | Jane Doe | | Never identified |
| | | John Does 1-10 | | Never identified |
| | | | | |

## I.      Background

In the opinions previously filed, the basic record evidence is discussed and the narrative of

the facts emerges.[1]  NXIVM, formerly known as First Principles, Inc, was founded in 1998 as a

---

[1] There have been several dispositive opinions in this case, all issued by Judge Dennis Cavanaugh (ret.) during the period the case was assigned to him.  The first opinion was on June 27, 2007, addressing the defendants' motion to dismiss.  (D.E. 90 ("Cavanaugh Opinion 2007").) That opinion dismissed counts two (product disparagement), five (one of two counts of interference with contractual relations), and six (interference with prospective contractual relations) as to all defendants.  It also dismissed count seven (copyright infringement) against the Suttons.  The second opinion, on November 20, 2009, denied plaintiffs' motion to replead those counts that were previously dismissed.  (D.E. 288 ("Cavanaugh 2009 Opinion").)  The third opinion, on June 26, 2013, denied crossclaimant defendants Interfor and NXIVM's motions for summary judgment.  (D.E. 504 "Cavanaugh Opinion June 2013").)  The fourth, and most recent, opinion, on December 18, 2013, granted Suttons' motion for summary judgment as to count one (misappropriation of trade secrets) and denied it as to count four (tortious interference with a contract).  (D.E. 518 ("Cavanaugh December 2013 Opinion").)  Judge Cavanaugh also denied

"human potential company" that engages its students to reach their full potential. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶¶ 6, 9, 12.) These disputes arise out of plaintiff NXIVM's personal-growth seminars. The seminars were given as part of the Executive Success training programs developed by NXIVM's founder Keith Raniere, which were aimed at high-level business professionals. (D.E. 90 ("Cavanaugh Opinion 2007") at 2.) Raniere based the Executive Success programs on his "Rational Inquiry" system. (D.E. 90 "Cavanaugh Opinion 2007" at 2.) NXIVM provides written, copyrighted materials to the participants. (*Id.*) First Principles is the business organization that licenses the rights to the Rational Inquiry method. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 14.)[2] It is those written materials, and their dissemination by defendants, that generated this litigation.

Michael Sutton, the son of defendants Morris and Rochelle Sutton, began attending NXIVM's courses around the fall of 2000. (D.E. 90 ("Cavanaugh Opinion 2007") at 3.) He continued to participate in more programs and courses, eventually becoming a coach for NXIVM. (*Id.*) After some encouragement from Michael, his half-sister, defendant Stephanie Franco, enrolled in the program as well. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶¶ 40-43; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 17.) During the year 2000, Michael Sutton traveled to New Jersey to meet with his sister and parents and brought along Nancy Salzman, NXIMV's president and Keith Raniere's long-time business partner. (D.E. 614-1 ("Ross et al. Statement of Material Fact

---

Franco's motion for summary judgment on count one (misappropriation of trade secrets) and count three (breach of contract). *See also Figure* 1 and *Figure* 2.

[2] Plaintiffs, NXIVM, formerly known as the Executive Success Program, and First Principles, are referred to collectively as NXIVM.

in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 42,43.) After that visit, Franco decided to attend a five-day NXIVM course in Albany, New York, which began on June 23, 2001. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 45; D.E. 625-2 ("Suttons Statement of Material Fact") ¶18.) Approximately six months before the course was to begin Franco signed an application to attend and paid a $2,160.00 fee. (*Id.*) The application included a confidentiality agreement that prohibited NXIVM participants from distributing course materials.

Franco attended the course as scheduled. At Salzman's suggestion, she extended her stay for an additional 10 days, paying an additional $4,590.00 fee. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 45; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 19.) Franco attended another five-day NXIVM course in August 2001. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 47; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 21.) But this time Franco did not sign an application or confidentiality agreement. (*Id.*; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 21-25.) August 2001 was the last time Franco attended a NXIVM seminar. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 48; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 21.)

Franco asserts that no NXIVM personnel ever asked her to return the written course materials provided to her as part of the program. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 49; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 23.)

Although Franco parted with NXIVM, Michael Sutton became increasingly involved, to the alarm of his family.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 50-53; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 24-27.)  His cousin, Danny Betesh, hired Rick Ross, an anti-cult blogger and personality, to participate in an effort to break up Michael's association with NXIVM.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 1, 5; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 30, 32.)  Ross heads the Ross Institute, a nonprofit organization "devoted to public education and research concerning cults."  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 2.)

Betesh suggested to Michael that he meet with Rick Ross.  Subsequently, Betesh and Ross signed an agreement for Ross to provide intervention services.   (D.E.   625-2   ("Suttons Statement of Material Fact") ¶ 32.)  Although Michael's parents did not hire Ross, they arranged for him to meet with Michael in Florida.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 59; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 36.)  Over the course of four or five days, Ross and Michael had meetings, and the parents were present some of the time.   (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 60-61; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 42.)

Also during this time period, Michael phoned NXIVM president Nancy Salzman.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 62; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 42.)  He

was concerned that NXIVM might be a cult and Salzman allegedly told him he should seek an independent opinion.  (*Id.*)

In December 2002, the Suttons, their son Jeffrey Sutton, Franco, and Ross gathered for an intervention for Michael, this time at the Sutton parents' home in New Jersey.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 65; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 45.)  Franco denies any involvement with the decision to hire Rick Ross, but admits that she gave Jeffrey Sutton her binder of NXIVM course materials. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 69; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 49.)  In turn, Jeffrey gave the binder of materials to Ross.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 71; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 55.)

Shortly after that, in January 2003, Ross forwarded the NXIVM materials to two psychologists, defendant Paul Martin, owner of defendant Wellspring Retreat, and Dr. John Hochman.[3] (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 72; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 58. )  On February 13, 2003, Martin wrote two articles, both critical of NXIVM: "Robert Jay Lifton's Eight Criteria of Thought Reform as applied to the Executive Success Programs Inc. [NXIVM]" and "A Critical Analysis of the Executive Success Programs, Inc. [NXIVM]." (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 74; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 59.)  Hochman wrote

---

[3] Hochman was not sued and is not a party to this litigation.

an article as well.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 73.)

All three articles characterized NXIVM's Executive Success Program as a cult that had brainwashed program participants.  (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 75.)  These articles excerpted passages from some of the copyrighted NXIVM materials, but did not include the full text or substantial portions of it. (D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 64-65.)  In July 2003, Ross posted the three articles on www.rickross.com and www.cultnews.com. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 78, 80; D.E. 625-2 ("Suttons Statement of Material Fact") ¶ 65.) He did not tell the Suttons in advance about the postings and the Suttons never read the articles prior to their publication on the websites.  (D.E. 625-2 ("Suttons Statement of Material Fact") ¶¶ 66-68.).

In August 2003, NXIVM filed two complaints, which were later consolidated, against Morris and Rochelle Suttons (collectively the "Suttons"), Rick Ross, the Ross Institute, the Estate of Paul Martin, and Wellspring Retreat (collectively "the Ross Defendants"), and Stephanie Franco.[4] The remaining claims are: count one (misappropriation of trade secrets) against Franco and the Ross defendants; count three (breach of contract) against Franco; count four (interference with contractual relations) against the Suttons and the Ross defendants; count seven (trademark infringement) against the Ross defendants. *See also* Figure 1 and Figure 2. Additionally, Rick Ross filed a one-count counterclaim against NXIVM, its President Nancy Salzman, and its founder

---

[4] Since commencement of litigation Morris and Rochelle Sutton and Paul Martin have died.

9

Keith Raniere, plus other individuals no longer part of this litigation.[5]   That one count, intrusion upon seclusion, still remains.

## II.   Jurisdiction

This complaint was filed with a federal cause of action based on alleged copyright infringement.  However, aside from that single federal count the Court maintains jurisdiction based upon diversity. NXIVM is a Delaware Corporation with its principle place of business located in New York. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶¶ 6, 9, 12.) Defendants Morris and Rochelle Sutton, Stephanie Franco, and Rick Ross are residents of New Jersey and defendant Paul Martin was a resident of Ohio before his death. (D.E. 625-2 ("Suttons Statement of Material Fact") ¶1; D.E. 626-2 ("Franco Statement of Material Fact") ¶ 1.)  The amount in controversy alleged is over $75,000.

## III.   NXVIM Claims against defendants

### A.  Misappropriation of Trade Secrets (count one)

*Ross Defendants (Ross, Ross Institute, Martin, and Wellspring Retreat) and Franco's motion for summary judgment*

In a prior opinion, in December 2013, Judge Cavanaugh determined that New York law applies to the misappropriation of trade secrets claim and that New Jersey law applies to the tortious interference claim. (D.E. 504 ("Cavanaugh December Opinion 2013") at 7.) Judge Cavanaugh reached that conclusion by applying New Jersey's choice-of-law test put forth in *P.V.*

---

[5] The original counterclaim defendants were Keith Raniere, Nancy Salzman, Kristin Keeffe, Interfor, Inc., Juval Aviv, Anna Moody, Jane Doe and John Does 1-10.  (D.E. 70).  Interfor, Inc., Juval Aviv, and Anna Moody were dismissed with prejudice on September 23, 2008.  (D.E. 194).  Ross's sole claim against Keeffe was dismissed with prejudice on December 8, 2014. (D.E. 581.)

*ex rel. T.V. vs. Camp Jaycee*, 197 N.J. 132 (2008), which applies a modified governmental interest test based on contacts each party has with the competing jurisdictions. However, this case was originally transferred from the Northern District of New York pursuant to a §§ 1404(a) transfer of venue. Generally, a transfer of venue does not affect the application of the original jurisdiction's underlying state law. *See Van Dusen v. Barrack*, 376 U.S. 612, 623-24 (1964). Therefore, the Court applies New York law uniformly to all the claims.  That said, this is a distinction without a difference; as Judge Cavanaugh noted, only the misappropriation of trades secret claim requires different tests under New York and New Jersey law, and he applied New York law to that claim.

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp.2d 778, 787 (S.D.N.Y. 2008) (citations omitted); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

New York defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 302 (E.D.N.Y. 2012) (quoting *Restatement (Second) of Torts* § 757). A trade secret, however, "is not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business." *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)). "The most important consideration remains whether the information was secret." *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F.Supp.2d 477, 481 (S.D.N.Y. 2007) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)) (internal quotation marks omitted).

None of the parties meaningfully addresses the misappropriation of trade secrets claim in their legal arguments.  The Ross defendants argue that New Jersey law applies, which requires the alleged tortfeasor to be a competitor, and say therefore they win; they do not argue in the alternative under New York law, which does *not* require a tortfeasor to be a competitor. (D.E. 614-2 ("Ross Defendant's Joint Motion for Summary Judgment").) And NXIVM's opposition to summary judgment devotes one paragraph stating that New York law applies, Ross does not need to be a competitor, and therefore he is liable. (D.E. 621 ("NXIVM's Summary Judgment Opp. Br.") at 6.) Neither party attempts to define a trade secret or state why the materials at issue do or do not classify as such.

In this case there are two critical facts that drive the proper legal conclusion: (1) the alleged protected materials were obtained by Franco, who was a *consumer*; and (2) the protected materials were not posted or otherwise circulated on the websites, albeit they were quoted in articles that were subsequently published. Even though New York law does not limit the misappropriation of trade secrets claims to competitors, whether a competitor is involved is unquestionably a consideration.  Here, Franco purchased self-help materials.  She did not obtain private information about how NXIVM's business ran, or how it marketed its products to consumers. Franco passed on what the company sold to her and others, not the production secrets behind the sale. NXIVM gave, and charged money for, a course with course materials open to the public for enrollment. The materials constitute a product that can hardly be called a secret.

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Friedman*, 848 F. Supp. 2d at 302. Examples of trade secrets include, but are not limited to, a machine, a formula, a code for determining discount, price

lists, customer lists, bookkeeping methods, salaries of employees, and security investments. *See Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir. 1986) (citing 1 Milgrim, *Milgrim on Trade Secrets* § 2.01, at 2–3 n. 2 (1985)). The defining characteristic of these examples is that they represent an internal company practice or method not exposed to the public. The Court is satisfied that neither Franco nor any of the people who attended NXIVM seminars over the years obtained a trade secret when they obtained binders of course materials. With that finding, it follows that none of the Ross defendants possessed trade secrets and the second element of the tort − dissemination of trade secrets −  is necessarily missing and need not be addressed.

Summary judgment is granted in favor of Franco, Ross, the Ross Institute, Martin, and Wellspring retreat and count one is dismissed.

## B.  Breach of Contract (count three)

### *NXIVM's motion for summary judgment against Franco*

As to NXIVM's claim that Franco breached contractual obligations and it was thereby damaged, Judge Cavanaugh was presented with the same arguments as are made here, and NXIVM offers no additional evidence to disturb his rulings.  The Court finds now, as Judge Cavanaugh did in 2013, that there is a genuine issue of material fact and accordingly Franco's summary judgment is denied.  (D.E. 518 ("Cavanaugh December 2013 Opinion") at 10.)

First, there was a "clearly disputed fact" about which agreement Franco signed with NXIVM and there are disputed witness  accounts of her signing  the  agreement. In addition, Judge Cavanaugh identified numerous factual disputes, such as "whether NXIVM allowed its students to keep the course materials after they left," and "whether NXIVM was damaged by Franco's actions."  The Court finds that these factual disputes still exist, that no new evidence has been put forth to solve the disputes, and that it is up to a jury to decide whether Franco breached the contract and if so what damages NXIVM is entitled to.

NXIVM's summary judgment is denied, and the parties to count three are directed to appear before Magistrate Judge Cathy Waldor forthwith to attend to outstanding pretrial issues.

### C.  Interference with Contractual relations (count four)

*The Suttons, Ross, and Ross Institute's motions for summary judgment in their favor*

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996).  That means NXIVM must prove: (1) a valid contract between Franco and NXIVM; (2) the Suttons' and Ross's knowledge of that contract; (3) intentional procurement of breach of that contact; and (4) resulting damages.  As indicated, there are disputed facts about whether an enforceable contract between NXIVM and Franco exists. For purposes of examining the viability of this count, the Court will assume there is a contract and go on to see if the other elements have been supported with competent evidence.

As to the second element, intentional interference with that relationship, the record is devoid of evidence that the Suttons intended to interfere with any contractual relationship between Franco and NXIVM. To establish that, NXIVM would have to show that the Suttons were aware of a contract between Franco and NXIVM, and the Suttons argue that after years of discovery there is no evidence of that.  (D.E. 625-3 ("Sutton's Br. In Support of Motion for Summary Judgment") at 12.) Franco has stated that she told no one about the confidentiality agreement, and NXIVM has not adduced evidence that the Suttons knew about the confidentiality provision in the application that Franco filled out.

Although NXIVM disputes the Suttons' narrative of the adduced facts, it fails to point to record evidence.   Instead, NXIVM relies on statements and assertions in its briefs filed in

14

connection with other motions. Significantly, NXIVM does not provide evidence that contradicts the testimony of the individuals present at the meeting among Ross, Franco, the Suttons, and Betesh.[6]

For the same reasons as expressed above, Rick Ross and the Institute cannot be held liable for tortious interference due to a failure of evidence that Ross had knowledge about a contract between Franco and NXIVM. The first element requires awareness of the contract and Franco stated in her deposition that she told no one, neither the Suttons nor Ross, that she had signed a confidentiality agreement with NXIVM. (D.E. 614-1 ("Ross et al. Statement of Material Fact in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 70.)  There is nothing in the record that suggests Ross was aware of the contract or that he intentionally interfered with it. Without knowledge, any interference would by definition be unintentional.

Summary judgment is granted in favor of the Suttons, Ross, and the Ross Institute and count four is dismissed.

### D.  Copyright Infringement (count seven)

*Ross defendants' motion for summary judgment*

When this case was pending in the Northern District of New York, NXIVM sought a preliminary injunction from the district court that would require defendants to remove the copyrighted information from Ross's website. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 475 (2004).  The application was denied, and the Second Circuit affirmed the denial, finding no

---

[6] By way of example, on page seven of NXIVM's opposition brief, it lists bullet-pointed statements alleging a conspiracy by Sutton to engage in illegal and revengeful tactics against NXIVM.  (D.E. 620 at 7).  These bullet points are without citations or attribution and do constitute record evidence.

likelihood of success on the merits because defendants' fair use defense was likely to succeed. Against this backdrop, the Court examines the copyright claims.

NXIVM alleges that the Ross defendants committed copyright infringement, in violation of 17 U.S.C. §§ 106 & 106A, trademark disparagement under the Lanham Act, 15 U.S.C. § 1125(a), by publishing three articles on www.rickross.com and www.cultnews.com. Defendants argue in their motion that the articles, which quoted from NXIVM course materials, were a fair use of the copyrighted materials. The fair use doctrine protects certain reproduction of copyrighted materials and is codified in federal law. 17 U.S.C. §§ 107 provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

This test is not rigidly applied and it takes into account the totality of the circumstances. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

### 1. Purpose and inquiry

This factor concerns whether the subsequent use of the work was merely a recreation or it transformed the work into something "transformative" with a "further purpose or different character." *Id.* at 579. Here, the Ross defendants' use of the NXIVM materials was transformative. The use was to criticize NXIVM and the culture of devotion to its leader. As the

16

Second Circuit noted, when "the defendants' use is for the purposes of 'criticism, comment …

scholarship, or research,' 17 U.S.C. § 107, factor one will normally tilt in the defendants' favor."

*NXIVM*, 364 F.3d at 477.

2. Nature of the copyrighted work

If the copyrighted materials at issue are unpublished, then this element favors plaintiff, but

is not a bar to finding fair use. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 at

564 (1985). It is undisputed that NXIVIM's course materials were unpublished, meaning that

although they were registered, they were not publicly available for anyone to access. Therefore,

this factor weighs in favor of NXIVM.

3. Amount and substantiality of the portion used

 Defendants did not wholesale publish the NXIVM materials; instead, the psychologists

selectively quoted from them in writing their articles. In affirming the denial of NXIVM's

application for injunctive relief in the Northern District of New York, the Second Circuit found

that defendants quoted – at most – 13 pages out of 191 in the NXIVM materials. *NIXVM*, 364

F.3d at 480. But even that is generous. The Court has carefully reviewed the articles and while

they do quote from NXIVM materials, the excerpts are integrated into analysis; they are for a

limited purpose that serves the larger narrative of the articles.  What is also important in examining

this factor is whether the copied portion of the work is the "heart" or the "core" of the copyrighted

work. *Id.* (citing Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1263 (2d Cir. 1986)). As the

Second Circuit stated, NXIVM "could not have taken the core of the copyrighted work, because

[it does] not see the manual as having a core, but rather as an assemblage of 'modules.'"  *Id.* at

481.  This factor weighs in favor of defendants.

4. Market effect

17

The fourth factor evaluates the "economic impact of the allegedly infringing use upon the copyrights owner." *Id.* at 481. When a work is transformative, as it is here, and particularly when it is critical of the original copyrighted work, there might be a negative effect on the original work. "[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act." *Campbell*, 510 U.S. at 591-92.

The Second Circuit held that this fourth factor "weigh[ed] heavily in defendants' favor." *NXIVM*, 364 F.3d at 482. "It is plain that, as a general matter, criticisms of a seminar or organization cannot substitute for the seminar or organization itself or hijack its market." *Id.* The Court agrees, and finds that defendants' use of NXIVM materials was limited and protected critical reporting under the fair use doctrine. Defendants did not attempt to use the copyrighted work for commercial profits, for unfair business advantage, or as an attempt to compete. Insofar as plaintiffs characterize the psychologists' articles as an attempt to undermine NXIVM's business, the Court notes there are First Amendment concerns to be reckoned with. "If criticisms on defendants' websites kill the demand for plaintiffs' service, that is the price that, under the First Amendment, must be paid in the open marketplace for ideas." *NIXVM*, 364 F.3d at 482.

## IV. Counterclaim

### A. Intrusion upon seclusion (sole count)

*Raniere, Salzman, and NXIVM's motions for summary judgment*

Ross filed a one-count counterclaim against Raniere, Salzman, NXIVM, and other defendants no longer a part of this litigation on January 1, 2007. After 30 paragraphs and 9 pages, he alleges the tort of intrusion upon seclusion. (D.E. 70 "Ross Counterclaim".) Although the counterclaim (which was permitted after three years had gone by since the filing of this litigation) describes in painful detail a bizarre series of events that include an alleged attempted kidnapping,

the specific alleged conduct that would evoke the tort is that NXIVM directed certain individuals to go through Ross's garbage that was put out on the curb outside his home.

Common law intrusion on seclusion holds an actor liable when he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" and the intrusion would be "highly offensive to a reasonable person." *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 200, 316 (2010) (quoting the *Restatement (Second) of Torts* § 652B).[7] The elements are both objective and subjective. *Id.* at 317. NXIVM, Salzman, and Raniere's moving briefs provide legal arguments why the counterclaim must be dismissed for failure to establish the essential elements of the tort.

In opposition, Ross filed a two-page memorandum with a two paragraph statement of facts and law. (D.E. 624-2 ("Ross Memo. In Opp. To Summary Judgment").) The first paragraph indicates that he is relying on submissions dating back to 2014 in response to other motions filed by various parties in this case, some of whom have been dismissed. (*Id.*) Ross also points to factual assertions in a certification filed by his attorney. (*Id.*) He has not laid out his arguments in an organized manner, instead inviting the Court to follow a labyrinthine path through the docket.

The second and concluding paragraph of the statement of facts and law states that these various submissions and "the facts that they provide from former NXIVM insiders . . establish unequivocally that several material facts . . . remain disputed." (*Id.* at 4.) In reply, Raniere points out that Ross fails to address at all the extensive case law cited in the movants' briefs. (D.E. 632 "(Raniere Reply Br.") at 1).) The Court agrees that Ross's patently defective opposition brief concedes that he has failed to establish the elements of a claim for intrusion of seclusion. The

---

[7] The Court applies New Jersey law for this claim because the counterclaim arose out of events when the litigation was solely in the District of New Jersey. However, New York law requires that same elements.

Court need not decide whether private actors are subject to same constitutional restraints as law enforcement, *State v. Hempele*, 120 N.J. 182 (1990) (notwithstanding reasoned arguments offered by Raniere), because the record is clear that the subjective element of the tort is entirely absent. Ross was not particularly concerned about the rummaging through his garbage, stating: "there was no confidential information that I was concerned about in the garbage" and "I wasn't deeply concerned about [the garbage]." (D.E. 622-4 ("Ross Deposition") Ex I 625:24 to 626:1; 628:2-4.) At best, Ross describes his mental state as "mildly curious" in reaction to the news that his garbage had been sifted. (D.E. 622-1 ("Raniere Br. in Support of Summary Judgment").) Further, and significantly, Ross failed to connect his banking records, and potential intrusions upon them, to anything done by counterclaim defendants.

This late-filed, weakly defended and unsupported counterclaim is ripe for dismissal against the remaining counterclaim defendants, and the Court grants summary judgment in their favor.

## V.        Conclusion

The motion for summary judgment on count one filed by Stephanie Franco is granted. The motion for summary judgment on count one filed by Rick Ross, the Ross Institute, Paul Martin, and Wellspring Retreat is granted. Count one is dismissed. The motion for summary judgment on count three filed by NXIVM is denied and will be set down for trial. The motion for summary judgment on count four filed by the Suttons, Ross, and the Ross Institute is granted. Count four is dismissed. The motion filed by Ross, Ross Institute, Martin, and Wellspring Retreat's motion for summary judgment on count seven is granted. Count seven is dismissed.

As a consequence of the above rulings, NXIVM's claims against the Suttons, Ross, the Ross Institute, Martin, and Wellspring Retreat are dismissed in full.

The motions for summary judgment filed by Raniere, Salzmann, and NXIM's are granted.

The counterclaim is dismissed.

An appropriate order will follow.


s/ Katharine S. Hayden_____
Katharine S. Hayden, U.S.D.J.


Dated:  December 30, 2016