**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NXIVM CORPORATION, f/k/a/ EXECUTIVE SUCCESS PROGRAMS, INC., and FIRST PRINCIPLES, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> ESTATE OF MORRIS SUTTON, ESTATE OF ROCHELLE SUTTON, THE ROSS INSTITUTE, RCK ROSS a/k/a/ "RICKY ROSS," STEPHANIE FRANCO, PAUL MARTIN, PH.D., and WELLSPRING RETREAT, INC., <br><br> *Counterclaim-Defendants*. | Civil No. 2:06-1051 (KSH) (CLW) <br><br><br> **OPINION** |
| RICK ROSS., <br><br> *Counterclaim-Plaintiff*, <br><br> v. <br><br> KEITH RANIERE, NANCY SALZMAN, KRISTIN KEEFFE, INTERFOR, INC., JUVAL AVIV, JANE DOE, and JOHN DOES 1-10, <br><br> *Counterclaim-Defendants*. | |

| |
|---|
| INTERFOR, INC. and JUVAL AVIV, |
|                        *Crossclaimants*, |
|     v. |
| NXIVM CORPORATION., KEITH RANIERE, NANCY SALZMAN, |
|                    *Counterclaim-Defendants*. |

**Katharine S. Hayden, U.S.D.J.**

Before the Court is NXIVM's motion to "alter or amend the grant of summary judgment" in favor of the Estates of Morris and Rochelle Sutton. (D.E. 660.) NXIVM filed this motion pursuant to Rule 59(e), which governs alterations or amendments of judgments, arguing that the Court failed to consider certain evidence that would create a genuine issue of material fact.

The parties are abundantly familiar with the facts of this case, a recitation of which can be found in the Court's recent opinion of December 30, 2016. (D.E. 642 at 3-9.) This motion addresses a discrete issue related to one claim against one collective party, the Estates of Morris Sutton and Rochelle Sutton. The Suttons, both deceased,[1] were the parents of Stephanie Franco; they were charged in count four of NXIVM's complaint with interference with the contractual relationship alleged to exist between Stephanie Franco and NXIVM. Their Estates successfully moved for summary judgment against NXIVM before this Court, which entered an order of dismissal. (D.E. 643.) Through this motion, NXIVM asks the Court to reconsider.

Timeliness of NXIVM's motion is an issue according to the opposition filed by the Estates of the Suttons, which argues the motion is substantively seeking reconsideration and was improperly

---

[1] Morris Sutton died in 2012 and Rochelle Sutton died in 2016.

filed outside the 14-day limit prescribed in Local Rule 7.1(i) governing motions for reconsideration. However, under Fed. R. Civ. P. Rule 59(e), a party has 28 days to bring a motion to amend or alter the judgment. Although the Court's December 2016 opinion was not a final order as to all of the parties, it was as to Estates of the Suttons, and as a practical matter, the lawsuit against Stephanie Franco is pending trial. The Third Circuit has stated that where there is a motion seeking reconsideration, courts often construe such a request for relief as the functional equivalent of a Rule 59(e) motion. *Wiest v. Lynch*, 710 F.3d 121, 127 (3d Cir. 2013). With this guidance, and appreciating the procedural posture of the parties, the Court shall apply the standard applicable to a motion for reconsideration bearing in mind that the only difference in this motion being brought under Fed. R. Civ. P. 59 (e) is the timing. *Id.* (construing plaintiff's motion for reconsideration as a Fed. R. Civ. P. 59(e) motion and noting their equivalency for purposes of review).

"Reconsideration of a judgment after its entry is an extraordinary remedy and is only to be granted sparingly." *S.C. v. Deptford Twp. Bd. of Educ.*, 248 F. Supp. 2d 368, 381 (D.N.J. 2003). Motions for reconsideration permit a party to file a concise brief putting forth matters that "the party believes the Judge or Magistrate Judge has overlooked." L. Civ. R. 7.1(i). The moving party bears a high burden and must demonstrate: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010). The court will grant a motion for reconsideration only if "the matters overlooked might reasonably have resulted in a different conclusion." *Rush v. Portfolio Recovery Assocs. LLC*, 977 F. Supp. 2d 414, 438 (2014) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n.*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001) *rev'd on other grounds by* 475 F.3d 524 (3d Cir. 2007)). A party may not use reconsideration to reargue matters the court has already considered or to take "a second bite at the apple." *Id.* (quoting *Tischio v. Bontex, Inc.*, 16 F. Supp. 2d 511, 532 (D.N.J. 1998).

The core of NXIVM's reconsideration motion is the Court's dismissal of NXIVM's tortious interference claim against the Estates of Morris and Rochelle Sutton.

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996). Accordingly, NXIVM must prove: (1) a valid contract between Franco and NXIVM; (2) the Suttons' knowledge of that contract; (3) intentional procurement of breach of that contract; and (4) resulting damages. [2] The key factor to which the Court looked in its December 2016 Opinion is whether the Suttons knew that Franco and NXIVM had an alleged confidentiality agreement. The Court found from the record that "Franco has stated that she told no one about the confidentiality agreement, and NXIVM has not adduced evidence that the Suttons knew about the confidentiality provision in the application that Franco filled out." (D.E. 642 at 14.) The Court went on to state that: "NXIVM relies on statements and assertions in its briefs filed in connection with other motions. Significantly, NXIVM does not provide evidence that contradicts the testimony of the individuals present at the meeting among Ross, Franco, the Suttons, and Betesh." (*Id.* at 14-15.)

Relative to that determination, NXIVM argues now that there was evidence to support its argument that the Suttons did have prior knowledge of the alleged contract between NXIVM and Franco, thus creating a material dispute of fact with respect to element number two.

NXIVM first argues that it was procedurally correct to incorporate, in its original summary judgment brief in opposition, purported evidence from other filings. NXIVM takes issue with the Court's rejection of its reliance on "statements and assertions in its briefs filed in connection with

---

[2] As the Court noted in its December 2016 Opinion, the test for tortious interference is the same under New York and New Jersey law. (D.E. 642 at 11.)

other motions." (D.E. 642 at 14-15.) By way of example, the Court pointed to a bullet-point list of "facts" in NXIVM's brief that contained not a single citation. (*Id.*) NXIVM's present argument that it had "the right to incorporate by reference" does not alter the reasons for the Court's expressed displeasure at unhelpful and confusing references to what is a voluminous record. NXIVM offered no specifics about the origins of its list of "facts," which were unsubstantiated with citations. (D.E. 642 at 7.) In any event, the Court's observation was not dispositive to the decision it reached and in no way suggested that the Court failed to consider all the record evidence.

As to record evidence, NXIVM points to (1) statements by Aaron Kassin (the Suttons' son-in-law), which appear in a 2003 affidavit attached to a motion for a preliminary injunction in the Northern District of New York; and (2) deposition testimony of Michael Sutton, their son. From this, and in response to Suttons' statement of material facts Nos. 31, 44, 51, 53, 54, 55, 57, 66, 67, and 69, NXIVM argues that Kassin and Michael Sutton established that the Suttons knew NXIVM's course materials were confidential, that they were present during a discussion with Franco about the course materials, that they were aware Franco agreed to the confidentiality provision, and that they hired Ross to induce Franco to breach her confidentiality contract.

NXIVM relies on paragraphs 10-16, which, even if they are true and accurate statements, establish only that *Ross* knew the materials were confidential and protected. (English Decl. Ex. 6 ("Kassin Affidavit") at ¶¶ 10-16.

> 10. Following completion of the program, and in or around December 2002, my parents-in law arrived unannounced at my home accompanied by Rick Ross, also known as "Ricky Ross," who I understand is the Executive Director of the Ross Institute, a defendant in this action.
>
> 11. My parents-in-law paid Rick Ross a sum of money to obtain protected information on the Executive Success Program.
>
> 12. Rick Ross presented himself to me as someone who was questioning me about my participation in the training program, and

> was attempting to obtain from me information on the trademarked Executive Success programs. I did not know at the time he was a convicted felon.
>
> 13. Rick Ross, at the time he met with me, attempted to elicit information from me about the workings of the Executive Success Programs, Inc., and the type of programs that were presented. Rick Ross questioned me about my experiences with the Executive Success Programs, Inc., and inquired as to whether I would provide him copies of the confidential materials I had obtained as a result of my training with Executive Success Programs, Inc. I would not provide any Executive Success Programs, Inc. materials to Rick Ross due to their confidential and proprietary nature.
>
> 14. Rick Ross informed me that defendant Stephanie Franco had provided to him the confidential trademarked materials including the confidential Executive Success Programs, Inc. materials that she had obtained during her training at Executive Success Programs, Inc. I told him she should not have given the materials to Rick Ross because they were trademarked and confidential.
>
> 15. Rick Ross told me he operated a website and that he intended to publish the Executive Success materials on his website. I specifically informed him that the materials were confidential and trademarked, and he could not use Stephanie's Executive Success materials on the website.
>
> 16. I refused to provide him with any confidential materials, and eventually asked him and my parents-in-law to leave my home.

As an initial matter, it is not in dispute that Franco turned over the NXIVM materials, which then came into the possession of Ross, on December 22, 2002, at the Suttons' home. (D.E. 614-1 ("Ross et al. Statement of Material Facts in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 65; D.E. 625-2 ("Suttons Statement of Material Facts") ¶ 45; D.E. 660-10 ("NXIVM's Response to Franco Statement of Material Facts") at ¶ 45.) Kassin describes a meeting at his house, not at the Suttons' house where Franco turned over the NXIVM materials. Further, nowhere in that proffered evidence does Kassin state that the Suttons knew of Franco's alleged contract with NXIVM and that they intentionally sought to induce a breach. The Court recognizes NXIVM's theory that Ross acted as an agent of the Suttons and thus his knowledge runs to them. NXIVM

does not point to any objective record evidence that established Ross knew of a contract between Franco and NXIVM and told the Suttons about it and then the Suttons intentionally sought to interfere with such contract. Knowing that the materials are confidential does not necessarily establish the two necessary elements of the tort of contractual interference: knowledge of a contract and intentional interference with it. That argument presumes that confidential materials necessarily entail a confidentiality agreement. One could unilaterally mark materials as confidential without executing a valid, binding contract. Furthermore, there is testimony from Morris and Rochelle Sutton that they were unaware Franco had signed an alleged confidentiality provision. (D.E. 625-5 ("Morris Dep. Ex. A") at 154:7-13; ("Rochelle Dep. Ex. B") at 142:1-5.) And, Franco stated that she never discussed such a provision with anyone. (D.E. 625-4 ("Franco Certification") at ¶ 26.)

In short, the "evidence" to be gleaned from Kassin's affidavit does not provide a basis from which to draw the desired inference; at best Kassin establishes the presence of the Suttons at his home at a time when he had a meeting with Rick Ross, whom the Suttons had paid to obtain information about the Executive Success Program. Absent that specific knowledge, the Suttons could not have possibly interfered with a contract they did not know existed.

The bigger problem with NXIVM's argument is that Kassin changed his statements in a 2011 deposition. (D.E. 671 ("Suttons' Opposition to Motion to Amend") at Ex. A.) Kassin told NXIVM's lawyer on cross-examination that he signed the affidavit in 2003 only because he feared being sued "for the rest of [his] life" in connection with the NXIVM/Sutton litigation and he did not want to be involved so he "did what Michael [Sutton] told me to do." *Id.* at 4-6. Kassin's statements in the affidavit are a poor enough basis to establish that the Suttons knew of and intended to interfere with a contractual relationship between Franco and NXIVM. His later retraction eviscerates NXIVM's position that Kassin is a source of credible, competent record evidence.

NXIVM also relies on statements by Michael Sutton to establish a claim against the Suttons.

7

First, it points Michael Sutton's affidavit statement on February 24, 2008, stating:

> As part of this effort [to destroy NXIVM], Defendant Rick Ross was hired by my parents. On several occasions he requested from me copies of NXIVM's confidential program materials. I informed him that the materials were confidential and that I could not provide them to him.
>
> (D.E. 620-3 (English. Decl. ¶ 8, Ex. 8 at ¶ 17 ("Michael Sutton Affidavit")).)

Then, NXIVM highlights various statements from Michael Sutton in his deposition. Below is the full text of the deposition cites relied on and bolded are the statements NXIVM selectively quotes in its brief and pieces together to support its argument.

> Q. What were the circumstances where you first heard of Rick Ross?
>
> A. I was invited by **my family** to join them on a vacation to play golf and tennis and spend time together, and when I arrived there, they **introduced me to Rick Ross and said they wanted me to talk to him**.
>
> Q. Did your parents indicate that they'd hired Rick Ross?
>
> A. When?
>
> Q. Did your parents – at that time.
>
> A. I don't remember the exact language that they used at that time.
>
> Q. Did they tell you why Ross was there?
>
> A. I don't remember the exact language. Something to the effect of he knows a lot about training companies and wanting to educate me about NXIVM.
>
> **Q. Who from your family was down in Florida with you and Rick Ross?**
>
> **A. My mother, my father**, my brother Jeffrey, his wife Beatrice. I believe that's it.
>
> Q. Was Stephanie Franco there?
>
> A. I don't believe so.

Q. What did Rick Ross tell you about NXIVM during your meetings in Florida?

A. He asked me a lot of questions about the training and he read a lot of materials about what defines, I believe it was brainwashing.

**Q. Were members of your family present when you were talking to Ross?**

**A. Yes, usually**.

When asked about his conversations with Ross, Michael Sutton stated:

**A. He asked for any course materials and anything I could give him regarding the course.**

**Q. This was while you were down in Florida?**

**A. Yes.**

**Q. And what did you say**?

**A. I said, to the best of my recollection, they're protected by confidentiality and I couldn't give them to him,** but he was certainly welcome to go take the training or at least call NXIVM company and – if he wants to investigate them.

Q. Were any of your family members there when you told him that the material was protected by Confidentiality Agreements.

A. I'm not sure.

(D.E. 620-3 (English. Decl. ¶ 25, Ex. 25 ("Michael Sutton Deposition") 120:17-125:24).)

Critically, NXIVM omitted from its brief Michael Sutton's statement that he was unsure if any of his family members knew of the confidentiality agreements. Following its selective citations to the above statements of Kassin and Sutton, NXIVM offers the following description of what they said:

> The testimony of Michael Sutton is that the Suttons were present during discussion about Franco's course materials, did know that the NXIVM materials were protected by confidentiality agreements, did know that Franco had agreed to keep NXIVM materials confidential; and that Ross was the Sutton's agent.

(D.E. 660-1 at 7.)

9

Again, Michael Sutton never stated in his affidavit or deposition that the Suttons were aware of an alleged contract between Franco and NXIVM and also stated that Franco was not present during the meeting. Michael Sutton describes a meeting in Florida, not at his parents' house where Franco handed the NXIVM materials to Ross. Franco turned over the NXIVM materials to Ross on December 22, 2002, at the Suttons' home. (D.E. 614-1 ("Ross et al. Statement of Material Facts in Support of Joint Motion for Summary Judgment Against NIXVM") ¶ 65; D.E. 625-2 ("Suttons Statement of Material Facts") ¶ 45.) Put simply, none of this testimony relates to whether the Suttons were aware of a contract between Franco and NXIVM. At best, the testimony shows that Ross was aware of a contract between *Michael Sutton and NXIVM*. This evidence is too attenuated to satisfy the elements of a claim for contractual interference against the Estates of Morris and Rochelle Sutton.

The Court also notes that although NXIVM now puts forth record citations to statements made by Kassin in an affidavit for a preliminary injunction in 2003 in the Northern District of New York and a deposition of Michael Sutton, these did not appear anywhere in its brief in opposition to the Estates' summary judgment motion. In fact, the Court's example of the deficiencies in NXIVM's brief in its December 2016 opinion highlights the problematic nature of the argument it now advances. (D.E. 642 at 15 n.6.) Regarding whether the Suttons knew of a contract between Franco and NXIVM, NXIVM's only evidence set forth was a bullet-pointed "fact" that stated "[t]he Suttons were warned by family members that the NXIVM materials that Franco gave Ross were protected by a confidentiality agreements." (D.E. 620 ("NXIVM Opposition to Summary Judgment") at 7.) Absent is any citation to either the record or its Rule 56.1 statements of material facts. It is not the Court's task to scour the record and the party's Rule 56.1 statement to find citations and facts that are not included in the party's brief.

Furthermore, NXIVM's suggestion that its opposition to the Estates of Morris and Rochelle Sutton's motion for summary judgment used "incorporation" to "reduce the burden on the court" is

10

disingenuous. Many of the references NXIVM makes to other briefs did not provide docket entries for reference. There were scant citations to the Rule 56.1 statement of material facts. As demonstrated in the discussion above, NXIVM's papers on this motion are at best strained, and at worst, border on the misleading. The motion is denied.

An appropriate order will follow.

                                                              s/ Katharine S. Hayden
                                                              Katharine S. Hayden, U.S.D.J.

Dated: May 5, 2017