1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
 2                          CIVIL NO. 06-01051
    NXIVM CORPORATION, formerly known as:
 3  EXECUTIVE SUCCESS PROGRAMS, INC. and:
    FIRST PRINCIPLES, INC.,              :
 4                          Plaintiffs, :
            -against-                    :
 5  STEPHANIE FRANCO                     :
                                         :
 6                                       :
                                         :
 7                          Defendants. :
    ─────────────────────────────────x
 8
                                 Newark, New Jersey
 9                               June 9, 2017 2 p.m.
    B E F O R E:
10          THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
    A p p e a r a n c e s:
11

12

13  TOMPKINS, MCGUIRE, WACHENFELD & BARRY, LLP

14  Attorneys for NXIVM CORPORATION-- PLAINTIFFS

15  3 Becker Farm Road

16  Suite 402

17  Roseland, New Jersey 07068-1726

18  BY: GRANT W. MCGUIRE, ESQ.

19
```

```
20          Pursuant to Section 753 Title 28 United States Code,

21  the following transcript is certified to be an accurate

22  record as taken stenographically in the above-entitled

23  proceedings.

24                          s\ RALPH F. FLORIO

25                          Official Court Reporter


        U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101
```

2

```
1
2   I N D E X
3
4   WITNESSES:                          PAGES:
5   DONALD SMITH                          43
6
7
8
9          E X H I B I T S
10  NUMBER        DESCRIPTION        PAGE
11  SEE ATTACHED INDEXING
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1           THE COURT:  Good morning.  Let's have appearances

2  on the record first.

3           MR. MCGUIRE: Good morning, your Honor. Grant W.

4  McGuire, Thompkins, McGuire, Wachenfeld & Barry on behalf of

5  the NXIVM parties-- the plaintiffs.

6           THE COURT:  Thank you.

7           MR. SYLVESTER:  Good morning, your Honor. Sherman

8  Wells, Anthony Sylvester.

9           May it please the Court, joining me at counsel

10  table, and are our colleagues Ms. Shadek and Mr. Valenziano.

11          THE COURT:  Thank you.  Mr. McGuire.

12          MR. MCGUIRE:  Thank you, your Honor.  A couple of

13  issues.  I was just hoping to establish something of a

14  batting order for today's proceeding, since there are quite

15  frankly a number of issues, whether it is a Daubert hearing.

16          Mr. Sylvester's Rule 26 application, Mr.

17  Sylvester's Rule 41 application yesterday, just to get an

18  idea of how we're going to deal with that.

19          THE COURT:  Well, I think we've got two basic

20  procedural issues.  One I would call the Daubert, a

21  substantive issue.  So we'll do the procedural issues first.

22  It seems to me that an involuntary dismissal should be our

23  first order of business, because if it's successful then we

24  don't have to do anything else.

25          And then to the extent the Rule 26 is bound up in a

1  Daubert hearing, I'll hear the arguments on the Rule 26 and

2  see how much they affect the Daubert issue.  Are the experts

3  here?

4          MR. MCGUIRE:  Mr. Smith is here.

5          THE COURT:  And Mr. Sylvester.

6          MR. SYLVESTER:  We are not presenting an expert,

7  your Honor.

8          THE COURT:  You will be cross examining and raising

9  the issues based upon Mr. Smith's testimony.  Is that it?

10          MR. SYLVESTER:  That's correct.

11          THE COURT:  Okay.  That's fine.  Let's start with

12  the involuntary dismissal.

13          MR. MCGUIRE:  Your Honor, there are two other minor

14  housekeeping issues, if I may.

15          THE COURT:  Go right ahead.

16          MR. MCGUIRE:  First, the letter submitted on

17  December 27, inquiring as to whether or not Mr. Crockett

18  could be involved in today's proceedings-- remotely.  And it

19  was my understanding that it was the Court's preference not

20  to involve Mr. Crockett via skype on an examination of a

21  witness.  So that is off the table.

22          Does the Court have a position on Mr. Crockett's

23  ability to argue legal issues via telephone.

24          THE COURT: Why would he do that?  He is not here.

25          You mean argue the Rule 26 and the other legal

```
 1  issues?

 2          MR. MCGUIRE:  Yes, your Honor.

 3          THE COURT:  No.  Mr. McGuire, you have my complete

 4  respect.  I believe that you are perfectly capable of doing

 5  that.  I think you know that you are perfectly capable of

 6  doing that.  And if there is some unhappiness in terms of

 7  NXIVM clients, your firms been involved with them for

 8  ten-plus years.  So there's no basis for us to go through

 9  that kind of a cumbersome accommodation.

10          MR. MCGUIRE:  Just so the Court understands where I

11  am coming from, your Honor, and trying to keep complete

12  candor with the Court.  My motivation, and the client's

13  motivation, quite frankly, it's their preference to have Mr.

14  Crockett involved as much as possible.  And I understand the

15  Court's ruling.  I will be arguing and presenting Mr. Smith.

16          The final housekeeping issue has to do with two

17  pending motions sealed, and some of the materials that will

18  be addressed via Mr. Smith's testimony, such as his report

19  and his declarations are under seal.

20          This case has been proceeding under a

21  confidentiality protective order since nearly the very

22  beginning.  I believe it's Docket Number 81.

23          My concern is that if Mr. Smith is going to be

24  testifying as to the specifics of what are in those

25  materials, I am able and somehow waiving that motion to
```

1  seal.  So I have concerns about the courtroom.

2          THE COURT:  Well this case is so old that the law

3  of sealing records and confidentiality and protective orders

4  has literally undergone, at least from my prospective, a sea

5  of change.  It may well be that counsel, both sides, if both

6  sides are anxious to seal, counsel may have to represent the

7  issue to Magistrate Judge Waldor with respect to whether we

8  continue that order or how we should deal with the transcript

9  of today's proceedings and so on.

10          Right now it's an open court.  Who is here?  Why--

11  do we have people?  Are members of the public pushing through

12  the door?  Or is everybody attached to each side?  Tell me

13  who is here?

14          MR. MCGUIRE: Very well, your Honor. Obviously,

15  Magistrate Waldor and her staff I have zero concerns about,

16  which are part of the court.

17          JUDGE WALDOR: I am glad to hear that.

18          MR. MCGUIRE:  We have Mr. Englander, who I am sure

19  the Court would remember is counsel for Interfor.

20          THE COURT:  Right.

21          MR. MCGUIRE:  Interfor was part of the protective

22  order.  So I am certain Mr. Englander would subscribe to the

23  existing protective order.

24          MR. ENGLANDER: That's correct.

25          THE COURT:  Yes.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1            MR. MCGUIRE:  Mr. Skolnik, who is counsel for Mr.

2    Ross, is also subject to confidentiality order.

3            MR. SKOLNIK: Good morning, your Honor.

4            THE COURT:  And next to Mr. Skolnik is Philip

5    Elberg, who was in this case quite sometime ago.  To be

6    honest with you, I am sure, if he was-- if he ever subscribed

7    to the protective order.  And I am not asking Mr. Elberg to

8    go under oath, or anything like that, but hopefully get a

9    representation as to his status.

10           MR. ELBERG: Good morning, your Honor.  I represent

11   a witness in this case who was served with-- who was deposed

12   and I represented her through a deposition and several

13   proceedings before Judge Cavanaugh and Judge Falk.

14           I don't recall being subjected to a

15   confidentiality--

16           THE COURT:  And what's the name of your witness?

17           MR. ELBERG: Her name was Barbara Bouchet.

18           At a later point, I also represented briefly

19   another individual associated with this case.  But do not any

20   longer represent either of those individuals.  I am here

21   purely as a member of the public at this point.

22           THE COURT:  Okay.  And Ms. Bouchet and who is the

23   other person that you represented?

24           MR. ELBERG: I briefly represented Kristin Keeffe.

25           THE COURT:  Okay. And the litigation issues that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   each of those witnesses were involved in have been, at least

2   as I understand, dismissed.  Am I correct about that?

3           MR. ELBERG: That's correct, your Honor.

4           THE COURT:  Keeffe has no role to play in the

5   Franco versus NXIVM versus Franco proceedings, correct?

6           MR. MCGUIRE:  Keeffe could be -- in event this

7   matter went to trial, your Honor, I believe Kristin Keeffe

8   through deposition readings would be a witness.

9           THE COURT:  There's a motion to exclude her

10  testimony?

11          MR. ELBERG: I did not represent Ms. Keeffe in

12  connection, with anything associated with this case in

13  connection with another matter.

14          Ms. Bouchet, I did represent in connection with

15  this matter.

16          THE COURT:  I'll take that representation.  And who

17  else?  We have a gentleman sitting next to -- or in the

18  second row?

19          MAGISTRATE WALTER:  That's my deputy, Mr. Gorman.

20          THE COURT:  His warm gear through me.  He just came

21  from across the street, fine, it looks as if everybody has

22  either had a role-- or has a role to play, Mr. Sylvester.

23          It looks as if everybody had a role or has a role.

24  Mr. Sylvester.

25          MR. SYLVESTER:  If I might, your Honor.  I just

9

1    wanted to make one clarification for the record.  I believe

2    counsel stated that Ms. Keeffe would be presented at -- if

3    there were to be a trial.  My recollection of the pretrial

4    proceedings and conference before the magistrate on 15th of

5    December, was that her name was voluntarily removed from the

6    list by NXIVM.

7              THE COURT:  That's why I was hopeful that Judge

8    Waldor could rearrange her calendar and she graciously has.

9    So that when we have procedural pretrial matters raised or

10   matters raised that are subject to other court orders, she

11   will be able to confirm one way or the other. And I saw you

12   nod, Judge Waldor, with respect to Keeffe being no longer

13   part of this trial.

14             MAGISTRATE WALTER:  That's correct, your Honor.

15             MR. MCGUIRE:  Your Honor, I am nodding as well.

16   And I thank Mr. Sylvester for correcting me on that issue.

17   That was certainly not intentionally misstated.

18             THE COURT:  That's fine.

19             That's why we're on the record so we're not having

20   any kind of mistakes or assumptions and we stay strictly that

21   way because this case is way too old and way too studded with

22   orders pinning people down, and I don't want us to forget

23   what they are and I don't want us to stumble.

24             All right.  It seems to me that we start with Mr.

25   Sylvester's motion for involuntary dismissal based upon what

10

1   is called in his papers that were filed yesterday-- the

2   Crockett declaration.

3           If you would come forward to the podium, Mr.

4   Sylvester.

5           MR. SYLVESTER:  Of course, your Honor.

6           MR. MCGUIRE: Your Honor, just so I am clear and so

7   I could report back to my client.  My application to seal the

8   courtroom is denied.  Is that correct?

9           THE COURT:  I didn't know that that was where we

10  were going.  Yes.  To the extent that you wanted to seal the

11  courtroom, it's denied.

12          MR. MCGUIRE:  Thank you, your Honor.

13          THE COURT:  Okay.  Mr. Sylvester.

14          MR. SYLVESTER:  Thank you, your Honor.  One doesn't

15  need to engage in too much hyperbolae here.  I think your

16  Honor knows the background very, very well.

17          THE COURT:  And of course, I read your brief.

18          MR. SYLVESTER:  Yes.

19          THE COURT:  And, Mr. McGuire, there was no response

20  on NXIVM's part, correct?

21          MR. MCGUIRE:  That's correct, your Honor.

22          MR. SYLVESTER:  And, your Honor, I think that's the

23  starting point.  I think the response is essentially my

24  motion.  Because what prompted the motion was something

25  that's called a declaration and notice of un-readiness.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

 1  Frankly, I am not familiar with such a pleading, perhaps it's

 2  practiced in California in federal court.  I am not aware.

 3          THE COURT:  Well, let's refer to it as do in the

 4  papers, as the Crockett declaration.  Will somebody fill me

 5  in on the docket entry number of that matter?

 6          MR. SYLVESTER:  Yes, your Honor.

 7          COURTROOM DEPUTY: 793.

 8          THE COURT: DE 793.  I think probably an historic

 9  moment in this courthouse that we are referring-- casually we

10  are referring to Documentary 793. But we will let that pass.

11          MR. SYLVESTER:  I wouldn't let it pass in one

12  respect, your Honor. I think I am the only one here who's

13  been around for all 793 files in this case.  I have been

14  around in this matter since August of '03.

15          So our papers, and this motion, is a response to

16  what we've received.

17          THE COURT: Okay.

18          MR. SYLVESTER: I think, and your Honor is obviously

19  familiar with the papers.  The rule is really a perfect

20  guidepost for why this case should be dismissed for want of a

21  prosecution.

22          Now, I was thinking about it this morning.  In

23  addition, there is an estoppel arm which is powerful here.  A

24  15-year old case, papers up to here, I could assure you that

25  the weekend before the trial would begin, I would be

1  preparing for trial.  My family wouldn't know who I was and I

2  would be, you know, a hermit somewhere.

3         THE COURT:  That's called being a trial lawyer.

4         MR. SYLVESTER:  It is. This weekend we didn't do

5  that. My daughter was home and we went out to dinner a couple

6  of times. I was celebrating my son's birthday. I did not

7  prepare for this trial.  We prepared the motion.  The simple

8  fact is, it was stated to me in no uncertain terms, we are

9  not trying this case on January 16th.  Go fishing.  Because

10 we want to tell you that there is no point in preparing.

11        So that's really the backdrop.  So that's really

12 the motion for all intent and purposes is a response to what

13 was presented to me.

14        And the cases, I believe, from the Third Circuit

15 support the position that a plaintiff not willing to go to

16 trial, and indeed telling your Honor that despite the trial

17 date, it's not showing up, that that is want of prosecution.

18        Let's think about the 16th of this month.  I show

19 up with my erstwhile colleagues, the brains of the operation,

20 and the jury--

21        THE COURT:  The last time you were here-- that's

22 out of his mouth, but it's good we have a record.

23        MR. SYLVESTER:  That's true.  They'll probably

24 expedite the transcript.  But we have everyone here except

25 the plaintiff.  And I dare say I must be a little cynical, if

                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

13

1  your Honor would permit me to be so.  Because I did not

2  believe that's the sole reason.  I put this in my papers,

3  that Mr. Crockett is not going to come to Newark.  There are

4  a myriad reasons.

5        THE COURT:  You know, having read your brief and

6  the brains of the operation, both sets of brains, anything to

7  do with the writing, had a very well-written brief.

8        MR. SYLVESTER:  Thank you.

9        THE COURT:  I think given your history with the

10 case, and you kept a muzzle on it reasonably well, because

11 this case has raised all kinds of emotional filings.

12        I don't want to get into punitive motives.  I don't

13 want to get into the history, the recent history and events

14 of the last couple of months.  When we pick a jury, we're

15 going to make sure that they're thinking about this too.

16        It's just as well keeping that part of it out of my

17 observations and rulings on this motion.  Let's stick to what

18 the law is.

19        And let me say one of the problems that I have that

20 I need to you address is, the cases most relied on, three

21 cases that are on page 8, which kind of form the reassurance

22 to the Court, hey, Judge, you're not the only one faced with

23 behavior that is subject to complaining about.  These are

24 either Civil Rights cases.  And one of the things, and I say

25 this as often as I can, one of the secret downfalls of our

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

14

 1   Civil Rights litigation is that if you took the temperature

 2   of dispositions, which was done way back in 2000, or based

 3   upon the Crocketts in 2000 and 2001, by a law professor,

 4   Jillian Hatfield, and she examined-- the brains of her

 5   operation examined all kinds of filings.  And her point was

 6   that this notion that we have that civil cases settle, has

 7   got to be nuanced to accommodate the fortunes of Civil Rights

 8   litigation.  And what she discovered was that, yes, the vast

 9   majority of Civil Rights cases are not tried, but that's not

10   because they're settled.  It's because they're dismissed on a

11   motion to dismiss or on summary judgment.  So these are non

12   trial dispositions.  But they're not settlement.

13          So I kind of throw that out for us all to kind of

14   chew on when we talk about the glory of the, you know, 1983

15   litigation and everything like that, because it's a rocky,

16   rocky road that a plaintiff has to traverse.

17          When I see the judges that are dismissing that kind

18   of a litigation on involuntary grounds, and I know how I

19   can't say disfavor, but I know how hard the road is for a

20   plaintiff to travel.  I could see the dismissal, involuntary

21   dismissal being used by the Court, much as dispositive motion

22   practice is used by the defendants to whittle through a vast

23   amount of litigation, a substantial percentage of which may

24   be either frivolous or non meritorious.  We use our

25   procedural tools so that courts are available for what are

15

1  considered to be the substantive cases.

2          So that's -- I have been as long winded as I can

3  be.  But I think we have to be nuanced about this whole thing

4  and say, what authority is there, when essentially a litigant

5  is putting its thumb in the Court's eye and saying, you

6  didn't want to give me an adjournment because my lawyer can't

7  travel.  All I'm asking for is a couple of weeks and you

8  wouldn't do it, so I'm not going to show up.  All right.

9  That's what I am doing.  And I am stamping my foot and

10  saying, you know what, I am not going to show up when you

11  told me too and there's nothing you can do.

12          So that's what I see the Crockett declaration

13  saying to the Court.  And my response back will be colored by

14  your arguments.  But understand, you have a lot of other

15  quivers in your bow or arrows in your quiver, or whatever

16  they are.  I am not Robin Hood. And you can, you know, hit me

17  with your best shot perhaps down the line as opposed to both

18  of us walk right into -- we get right on the edge of the

19  diving boards and do our double flip and there's no water in

20  the pool according to the circuit.

21          MR. SYLVESTER:  If I might, your Honor, maybe let

22  me put some water in the pool then.  I am not interested in

23  talking about the events of the last few months.  Because it

24  doesn't matter to me, and I believe it wouldn't matter to the

25  Court, if the events of the last couple of months, or if the

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

16

1  necessary witness just hit the lottery and won 400 million

2  and now owns a country of her own, is just not showing up.

3          My point is that in addition to the Crockett

4  declaration, where Mr. Crockett is saying, I can't get there,

5  putting aside whatever your Honor's viewpoint is.  I share

6  your viewpoint with regards to the Crockett firm which has

7  been in the case forever. But putting that aside, there's a

8  very important second component which I am trying to flesh

9  out with my esteemed adversaries, and that is, is Ms. Salzman

10 coming to the trial or not?

11         THE COURT:  Why don't we ask Mr. McGuire who

12 represents her as to whether she's showing up.  And also to

13 represent, because it would be helpful for the Daubert piece

14 of this in terms of an assessing it, what are these other

15 witnesses that don't appear in the pretrial order that are

16 going to testify as to damages? Maybe Salzman is one of

17 them.

18         Mr. McGuire, is she showing up for trial?

19         MR. MCGUIRE:  I'm going to give you an answer that

20 I am very, very hesitant to give which is, I don't know.

21         THE COURT:  Can you help us out -- now, let me make

22 sure that you're answering the question because I didn't

23 phrase it well.

24         Is she coming to trial ever?  Is she going to show

25 up ever?  No matter when we try this case, is she going to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  show up? I'm not talking about Crockett being here or not.

2  Let's hypothesis Crockett's here. Is she going to show up?

3          MR. MCGUIRE:  I think this is what is called-- what

4  people call being put on the spot.

5          THE COURT:  I am doing it to you.  Right.

6          MR. MCGUIRE:  I do not have an answer, your Honor.

7          THE COURT:  And my second issue is--

8          MR. MCGUIRE:  If I may be heard.

9          THE COURT:  On the damages.  If she showed, would

10 she be testifying to damages?  And is that what Mr. Crockett

11 meant when he said, I have other witnesses to testify as to

12 damages?

13         MR. MCGUIRE:  That I can answer.  I have fleshed

14 that specific question out with Mr. Crockett.  What I was

15 trying to rudely interrupt the Court before about, was my

16 answer is not due to lack of due diligence.  However, there's

17 been a break down in communications, I don't want to either

18 violate attorney-client privilege or bore the Court with the

19 particulars of the client relationship.

20         THE COURT:  Would Mr. Crockett be in possession of

21 that information as to whether Nancy Salzman intends to come

22 and prosecute her case in person?

23         MR. MCGUIRE:  As of last night, I do not believe

24 so.  There are moving pieces in play that I am happy to speak

25 to the Court off the record about.  But I'm not at liberty to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

18

1  speak about openly.

2          THE COURT:  Fair enough.  Thank you.

3          MR. MCGUIRE:  In fairness, I have to say some of

4  these issues that I'm referring to by innuendo too with Mr.

5  Sylvester.

6          THE COURT:  I'm not going to probe that because I

7  don't want to have discussions off the record.  Use it in

8  your argument without divulging it.

9          MR. SYLVESTER:  True.  And I don't intend to

10  discuss it at all about the off-the-record comments.  But my

11  point to this Court is, I first came to this courthouse 34

12  years ago.  My first federal court appearance before Judge

13  Sarokin Albester (ph) and I've been coming here forever.

14          THE COURT:  They were in this courtroom.

15          MR. SYLVESTER:  It was.  I was sitting right there

16  and Mr. Albester was sitting right here (indicating).

17          THE COURT:  We have a little plaque right in the

18  back of the chair that you sat in.

19          MR. SYLVESTER:  I'll take the chair with me when I

20  retire.  My point is, my representations to the Court, I have

21  a good-faith basis to asking this with regard to the actual

22  party that would be here.  And as far as I know, given

23  multiple requests for a confirmation of same, there's been no

24  confirmation that the actual party will be in this

25  courtroom.

19

1          THE COURT:  I think we might be able to deal with

2    that by requiring -- let's put it this way.  Everybody should

3    know that I intend to give both sides the jury trial that

4    their complaint and counterclaim asks for.

5          If the matter is not resolved either by way of

6    pretrial motions or stipulations by counsel, there will come

7    a day where members of the public will drive to Newark, a lot

8    of them very unhappy, and we will start the process of jury

9    selection.

10          If at that time, a necessary party, according to

11   your feelings about it isn't here, prepared to prosecute the

12   case, and there's a representation by counsel, no, they are

13   not going to show up, then the costs of getting that jury

14   here and your costs of preparing the case are certainly

15   something that can be presented to the Court.

16          So you do have remedies, in terms of our not being

17   sure.  And I think probably, given the history of the case

18   and the warble board we are all on, what's going to happen

19   next, it's probably best to use these tools for discernment

20   by just firm dates, jurors in the jury room, prepared to come

21   in here for jury selection.  Where's the plaintiff?  Not

22   here.  Then you start talking about what you're talking about

23   now.

24          MR. SYLVESTER:  Your Honor, I am hopeful that some

25   of the other arrows in my quiver will avoid that necessity.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1        But I do want to address one issue with regard to

2   whether or not there will be another witness on damages.

3            THE COURT:  Meaning Salzman?

4            MR. SYLVESTER:  That's correct.

5            THE COURT:  Okay.

6            MR. SYLVESTER:  There cannot be a presentation on

7   damages in this case, even if she shows up.

8        If I could hand up to your Honor, I have their

9   trial exhibit list.  There are only six items on the trial

10  list.  None of them relate to damages.  And, in fact, this is

11  going to be the subject of an argument with regard to the

12  Daubert, because Mr. Smith has no record by which to opine on

13  anything, because no damage information has been produced in

14  this case and he certainly can't be both the source of the

15  information and the arbiter of the information.  The

16  information has to come from the client and that has never

17  happened in this case.  And the trial exhibit list-- it's

18  clear that those proofs are never going to be before your

19  Honor.

20           THE COURT:  What's on the trial list?

21           MR. SYLVESTER:  Can I hand it up to your Honor?

22           THE COURT:  Put it on the record.

23           MR. SYLVESTER:  There are as of December 15, with

24  the conference with Magistrate Waldor, plaintiff's reduced

25  their trial exhibit list to the following.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1        The May 5, 2001, executives success programs

2   student enrollment, signed by Ms. Franco.

3        Secondly, they're going to introduce the June 27,

4   2001 executive success program enrollment signed by Ms.

5   Franco.

6        They're going to introduce as a third exhibit, the

7   NXIVM course manual which is in a binder that Ms. Franco

8   purchased when she went to it intensive, and had it in her

9   home subsequent.

10        They are going to introduce what they've identify

11   as Ms. Franco's August 28, 2001 certification.

12        And lastly, they say that they are going to

13   introduce the intellectual property definitions and

14   protection programs of two different training businesses.

15   Which I don't think, by the way, is admissible for a lot of

16   reasons.  But that's the sum and substance of the entire

17   list.  There's no financial information.  There's no tax

18   returns.  There's no financial data.  There's no audit or

19   unaudited materials.

20        So as we sit here, even if Ms. Salzman comes and

21   she's given all of the exhibits, which we are now called on

22   the exhibits list, there's no damage case to be put on

23   through her.

24        THE COURT:  Okay.

25        MR. SYLVESTER:  That's why frankly -- to digress

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

22

1   for a moment since I am making a point.  Your order yesterday

2   said necessary for witnesses--

3          THE COURT:  For today.

4          MR. SYLVESTER:  It's plural.  I think appropriately

5   so.  Because Mr. Smith really can't get on the witness stand,

6   in my view, until there is some sort of a record by which he

7   can start making his opinions known to the Court.

8          And the way I would read this frankly, I would say,

9   I'd better get my client here, and run and get her here to

10  put the financial information in the record, despite the fact

11  that we know that Ms. Franco's counsel is going to argue, it

12  was never in the Rule 26 disclosures.  It was never produced

13  in discovery.  It was first seen by me after close of

14  discovery in the context of this report in February of last

15  year.

16         So, I never had an opportunity to examine any

17  witnesses on this.  In fact, when I did examine the 30(b)(6)

18  witnesses, they said on question of damages, the entire

19  universe of our damages are contained in Exhibits A, B and C

20  to the amended complaint.  And when she was asked, she said,

21  that is all of it.

22         So the first step, and since Mr. Smith doesn't

23  address A, B and C at all.  In fact, he says I can't do

24  anything with A, B and C being impossible to make any link.

25  There is a complete disconnect.  And this is why I am arguing

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

23

 1  ahead.  But everything is sort of a ball here, if you will,

 2  your Honor.

 3           Mr. Smith does not fit this case.  Because he has,

 4  for all intent and purposes, rejected the damage theory that

 5  the plaintiff has posited for 15 years and said it doesn't

 6  work.  I can't do it.  It's an impossibility.  So I got my

 7  own.  The problem is he can't do his own.  There has to be

 8  some record.  I was entitled, if they were going to use

 9  financial statements, to examine a witness for a lot of

10  reasons, if we go forth with the Daubert hearing, and I am

11  unsuccessful on my procedural motion, you're going to want an

12  understanding of why I wanted an opportunity to interact with

13  their witnesses at deposition, we wouldn't even be here.  As

14  simple as that. I say that with no false bravado.  I just

15  think it's a reality.

16           So we are really at a very important point that I

17  read this necessary witnesses must appear to be very

18  important.  Because the first witness has to be the client,

19  getting on the stand over my objection about prejudice and

20  undue surprise and Rule 26 problems.  And the fact that they

21  blew the discovery deadline, still take their shot in getting

22  the financial information before your Honor.  This is not

23  happening.  She's not here.

24           I make a representation to the Court, Ms. Salzman

25  and no one on behalf of NXIVM is in this court.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

24

```
 1            THE COURT:  Well, give me a kind of a -- not really
 2   an offer of proof, but give me the equivalent of an offer of
 3   proof as to what you think will happen if Mr. Smith testifies
 4   and you zero right in on the fact that he's opining over a
 5   chasm insofar as there's no financial information from which
 6   he can extrapolate his damage theory.
 7            MR. SYLVESTER:  Gladly, your Honor.  Yes.  I will
 8   make the following offer.  I believe the testimony would
 9   establish that Mr. Smith never spoke to the client directly.
10   Never spoke to the accountant directly.  And completely was
11   spoon fed information from the Latham Watkins firm through
12   Mr. Crockett.  Did no independent verification.  The exact
13   things he was called out by in the Southern District of New
14   York judges for having unreliable information.
15            And the importance of that is, he says in his
16   report, I cannot vouch for the professionalism and accuracy
17   of a CPA who I am told did these financials.
18            So he can't vouch for the accuracy.  He has never
19   spoken to the accountant.
20            And what I will present, as well, is a letter from
21   the accountant, during that window period that he claims is
22   his damages, in which the accountant's letter says, I can't
23   vouch for accuracy of my client's information; this is a
24   compilation; this isn't an audit. This is a compilation.  I
25   took their numbers and they didn't make disclosures to me.  I
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  didn't go into their books and records.  I just took whatever

2  they gave me and put it in some form so it looks like

3  something.

4           So let's think about what that means.  My offer of

5  proof for your Honor is that this expert is going to say, I

6  can't vouch for the CPA and I never did anything to

7  independently verify the number.  And the CPA is going to say

8  the same thing.  I can't vouch for the information and I

9  can't independently verify the numbers.

10          So how on earth do we get to a point where your

11  Honor could find that the important critical information upon

12  which he opines is reliable in any way, shape or form?

13  Everyone is saying this is unreliable.

14          THE COURT:  Or it's unverified.

15          MR. SYLVESTER:  Unverified.  And there's no witness

16  here to say, as you point out, the chasm, we will fill that

17  hole by saying this is reliable.  So there's no accountant in

18  the room.

19          And by the way, if he got on the stand, he would

20  say, I didn't verify it.  This is a pure compilation and uses

21  the words in his letter which, your Honor, would say, I make

22  no assurances about the accuracy.  So that's the level of

23  reliability of this information.

24          THE COURT:  I'm going to stop you.  I get it.  In

25  arguing what I would hear if I had a Daubert hearing, I am

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

26

 1  all the more satisfied that we should have a Daubert

 2  hearing.  Because to the extent that accusations and concerns

 3  that you've raised about the good faith of the plaintiff, are

 4  in fact going to play any role at all in rulings in your

 5  favor.  I think that the circuit deserves a full record from

 6  which it can make just, you know, transparency, why did the

 7  judge rule against NXIVM?  If that is what you think I should

 8  be doing.  Well, because X, Y and Z happened and there was a

 9  hearing.

10          When we have all of the players and we have good

11  briefing on the issues and we have an expert report and

12  somebody here prepared to defend it, and lawyers who are

13  well-versed in the case, boom, let's do it.  We are here.

14  Okay.

15          MR. SYLVESTER:  Your Honor, I don't disagree, your

16  Honor.  We are prepared and we're going to hand up the

17  exhibit books.  And I think that your Honor would find that

18  the qualifications are want, and you will find unreliable

19  information.  And you will also find that he doesn't fit

20  their entire theory of the case going back to '03.  But I

21  would remark, if I might, there is this chasm, it is the

22  Emperor's New Clothes.  He can't be the source, conduit and

23  arbiter of your information, because the simple fact is if I

24  were to put myself in your Honor's robe for a moment, okay,

25  say, counsel, where was this financial information ever put

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

27

1   into the record of this case?  This gentleman is opining on a

2   vast array of financial information, which just doesn't

3   exist.

4           THE COURT:  Let's see how he handles it.  I am

5   taking everything that you're saying, but I prefer to hear

6   those arguments after I see whatever effort is made.

7           MR. SYLVESTER:  True enough.

8           THE COURT:  It could be far more wins than you're

9   telling me.

10          MR. SYLVESTER: I did get ahead of myself.  This is

11  a Rule 41 motion.  And I getting back to the Rule 41.

12          THE COURT:  Right.

13          MR. SYLVESTER:  Again, I think what's been made

14  very clear here is my Rule 41 isn't the impetus for us being

15  here and arguing.  It's just a reaction of which-- what is

16  reality.

17          I must point out also -- that this is a backdrop

18  that your Honor might want to consider.  Is how many times

19  for putting aside 793, or how many times you get to that

20  number, how many times with respect to parties have you

21  granted two Rule 41 motions?  Because you already granted a

22  motion under Rule 41.  So I think that is important for your

23  Honor to recognize.

24          Because in the other case there was a state court

25  case that started in Niagara County for whatever reason.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

28

 1   Obviously, it was the most inconvenient place in the world

 2   for my client to have to defend a case. It was removed to the

 3   Western District of New York, transferred down here.  My

 4   clients, with all due respect to counsel, were never served.

 5            And by the way, I want to make a point, the

 6   Tompkins firm and Mr. McGuire never appeared in that case at

 7   all.  But it wasn't prosecuted in any way, shape or form and

 8   it was just there.  And I am not getting into the

 9   machinations of why it may have occurred, nor the motivation,

10   nor the litigation strategy that has been spoken about with

11   regard to NXIVM over the years.  But the simple fact is, we

12   had to use Rule 41 to get rid of that.  And we are back with

13   Rule 41.  And I must say, that given the fact that we have an

14   absolute representation that they're not starting-- and I'm

15   not so sure this is a thumb in the eye.  But it's your eye,

16   so you have to be the judge of that.

17            I look at it more, with all due respect to my

18   esteemed counsel in California, as a lawyer trying to protect

19   his client-- perhaps.  And I think on the 16th that door will

20   not swing open and Ms. Salzman will not walk in.  But in the

21   meantime, what are we doing?  This is costing a fortune.

22            THE COURT:  I understand.  What we are doing is

23   doing--

24            MR. SYLVESTER:  That's a rhetorical question.

25            THE COURT:  I know.  We have to be clear.  We are

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  marching along because people have filed a complaint and

2  counterclaim and they have asked for a jury trial.  I am

3  sitting here doing my thing, you know, the baseball game was

4  scheduled and the ump showed up, maybe none of the team may

5  not be on the bus, but the ump is here and we have the

6  jurors.

7          So I believe that we're establishing a record in

8  good faith reliance on the way things work is a fairer way to

9  go for both sides.  Is it more expensive?  Yes.  But so much

10 blood and money has been spilled so far.  Let's see if we

11 could spill some blood and money and get results.

12         MR. SYLVESTER:  Your Honor, in that latter regard,

13 I want to remark on one thing you said and that is, there's a

14 complaint counterclaim jury demand and such.

15         With the permission and authority of my client, I

16 will tell this Court that if the claim against Ms. Franco is

17 dismissed, she will, and this is with again, we firmly

18 believe that we could establish the proofs.  She doesn't want

19 any more of this.  She is happy, believe me, to just say, you

20 know, let me just not show up in court and I don't need that

21 counterclaim in my life.

22         This isn't necessarily a legal argument, but this

23 is the truth.  I want your Honor to understand that we are

24 not going to march and try a counterclaim without a main

25 claim.  And I have an affidavit from the client that I could

30

1  present up whenever your Honor wants.  She would be happy to

2  get on the phone with your Honor.  We would want, of course,

3  sort of without prejudice if anything ever shows up again, I

4  guess we will pursue.

5          But if the main claims goes, that door couldn't hit

6  me in the you know what fast enough.  And I will not be here

7  on the 16th.  I can assure you.

8          THE COURT:  Okay.  Thank you.  Mr. McGuire.

9          MR. MCGUIRE:  I will be brief, your Honor.  And

10  I'll try to limit myself to the Rule 41 issue.

11         THE COURT:  And you don't have to say too much.  I

12  pretty well made myself clear.  That my feeling may well be

13  as meritorious as these motions get.  And in fact, the rule

14  has been employed in the case historically.  But having all

15  the players in front of me, and a good-faith position taken

16  in the papers on the Daubert hearing portion of this, and

17  however the Rule 26 issue plays a role that to me get folded

18  into the Daubert rulings, I am not prepared at this point to

19  grant the 41(b).  So that's how brief you could be.

20         Thank you.

21         MR. MCGUIRE:  I would like to, your Honor. Number

22  one, I don't think I can respond to the Rule 41 application

23  since it was via a mechanism of the Crockett declaration.

24         THE COURT:  You don't have to respond.  I just said

25  it's denied.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          MR. MCGUIRE:  One thing I would like to respond to

2   though with respect would be any inference that the Court may

3   draw that the Crockett declaration was a thumb in the Court's

4   eye-- that was not the motivation.

5          THE COURT:  It's very hard to avoid a link up

6   between the two requests for a delay of the trial that were

7   denied and the client's position that without Mr. Crockett,

8   we're not showing up.  Because the impetus for the client's

9   position, without Mr. Crockett, we are not showing up, is the

10  Court's denial of a request for an adjournment.

11         So that's where I am coming from, and I think I am

12  entitled to put that on the record.  It's not the clients.  I

13  am really saying something in your client's favor.  It's not

14  the clients saying, I am stamping my foot, I won't hold it

15  up.  It's the client saying, you pierced my heart and I won't

16  show up because I have a right to counsel of my choice.  And

17  in defending that position, or presenting that position,

18  albeit obliquely, Mr. Crockett has torn the veil off a

19  position that he held earlier in this case, which is he was

20  Keeffe's lawyer.  He had nothing to do with what was going

21  on.

22         So faced with protecting the client now, or setting

23  up the client the way the client wants to be setup, which is

24  with him by its side, he has had to reverse course.  This was

25  all hashed out, I believe, before Judge Waldor at the pro hoc

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  vice argument.

2          Am I right about that, Mr. Sylvester?  Wasn't that

3  the point that was being made?

4          MR. SYLVESTER:  In great detail.  Your Honor.

5          THE COURT:  Yes.  So if Mr. Crockett feels that

6  intensely that he's got to look like he comes from both sides

7  before the Court as an officer of the court because the

8  client feels that strongly, and I am the one who said, we are

9  going forward on the 16th, what else can I think, other than

10 that this is an adept way of saying, you deny my jury

11 request, I ain't showing up.

12          I could grant the 41(b) on those grounds, I could

13 prevail when?  Not if it's appealed.  But I am not going to

14 walk into that.  I have other things to consider.  Because if

15 in fact I am reversed, we're going to be that much older and

16 that much grayer and then we'll be doing the Daubert

17 hearing.  So let's get it done now. Okay?  You made your

18 record.

19          Let's get the Daubert hearing under way.

20          MR. MCGUIRE: Thank you.

21          MR. SYLVESTER:  Your Honor, do you want to hear the

22 Rule 26?

23          THE COURT:  Quickly.  Yes.

24          MR. SYLVESTER:  I will very be quick.  The Rule 26

25 motion really starts and ends with what I mentioned before,

1  that is, from day-one there was a damage theory which was

2  presented and it was all about exhibits A, B and C in the

3  complaint.

4          THE COURT:  Again, the record is empty on the A, B

5  and C.  Give us briefly A, B and C.

6          MR. SYLVESTER:  Exhibit A was a list of individuals

7  who stopped attending classes, purportedly as a result of

8  something Ms. Franco did.

9          THE COURT:  Now, just how that list was compiled.

10 Was there any information that was a matter of record or that

11 came up in the course of discovery as to were these people

12 came from?

13         MR. SYLVESTER:  Let me just say, Exhibit B was a

14 list of people who decided not to go.  And Exhibit C were a

15 list of individuals who stopped having any services provided

16 to NXIVM vendors, if you will.

17         THE COURT:  So presumably NXIVM could take the

18 position, these are the costs or fees would have been paid to

19 us, we add them up and that is our-- complaint.

20         MR. SYLVESTER:  They did that.  What was done and

21 it's interesting, because the complaint was filed and there

22 was not upon information and belief.  It was definitive.

23 That these are the people.  As if they did what Mr. Smith

24 said was impossible, and that is just talk to people and were

25 able to compile a list of those who ran from the

34

1   organization, what they claim as a direct result of something

2   that Ms. Franco did.  And were fervent about that, and

3   continued to be fervent throughout the Rule 26 disclosures

4   saying, Exhibits A, B and C.  By the way, there's at least

5   three disagreements before the Court over whether they should

6   remained sealed.  And they have been.  So they have been

7   sealed and they have been protected and proprietary.  The

8   30(b)(6) witness in this case testified that A, B and C were

9   the-- all of its entire universe of damages.

10          THE COURT:  And that's Ms. Salzman.

11          MR. SYLVESTER:  Ms. Salzman.

12          Kristin Keeffe, who acted as legal liaison,

13   whatever title that necessarily connotes for the

14   organization, nonetheless had information about Exhibits A, B

15   and C, and she asserted to this Court that damages would be

16   easy to prove as a result of what they believed to be these

17   individuals who discontinued their association.

18          And they actually went through the math.  You know,

19   in my view, whether a scheme or not, they went through the

20   math, and said, this person would have brought this much in

21   and then we'd have these others.  Here's how much we lost on

22   every person is on the exhibits.

23          This was the entire framework for the damages case

24   for the entirety of this case.  The discovery ends.  That's

25   it.  That is what the damages are.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

35

1          Now what I may have done independently to call

2  someone on the list was to find out that it was a lot of

3  mularky.  That's my business.  But I thought -- again, to use

4  a legal phrase, a lot of mularky, frankly.

5          But the documents that were presented supported my

6  proposition, because there was nothing presented on Exhibits

7  A, B and C.

8          So it's very easy.  So this is where Mr. Smith, I

9  don't understand, just called the people up, send them a

10  questionnaire, which was very easy.  But they were fervent

11  and they did not follow that pleading on information and

12  belief, under penalty of Rule 11, they asserted without

13  question, that these are the people that ran from us because

14  of you.  This is our damages theory.

15          I've defended this case for a decade or more on the

16  basis of this:  Only on February of last year to get

17  something that takes Exhibits A, B and C and throws in the

18  garage.  No amendment of Rule 26.  No modification.  So I

19  guess, I suppose I should say, you know, Rule 26 doesn't

20  cover this situation.  Then what could it conceivably cover

21  in terms of prohibiting and changing course at the last

22  minute?  At what point is it that I've wasted ten years and

23  umpteen, umpteen thousands and thousands of dollars, plus

24  going through all depositions and investigating a rock solid

25  damages theory that they were so cock sure about?  I spent a

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

36

1   lifetime, if you will.  My son was three when I started this

2   case.  I celebrated his 18th birthday on Sunday.  It's

3   absurd.  But I spent the lion's share of that time, up until

4   February last year, battling Exhibits A, B and C, all the way

5   down the line.

6           Now that I'm at eve of trial where there is nothing

7   to support Exhibits A, B and C, they say, well, never mind,

8   let me give this a shot.

9           THE COURT:  Remind me of something.

10          MR. SYLVESTER:  Sure.

11          THE COURT:  We had several rounds of summary

12  judgment motions.  And this is the one claim of NXIVM that

13  was preserved, correct?

14          MR. SYLVESTER:  That is correct.

15          THE COURT:  And again, I have to rely upon, even

16  though I was the one that made this decision.  Did the

17  decision rest upon the theory that you were battling against

18  that NXIVM had suffered losses and therefore it has something

19  to say.  In other words, there wasn't a failure of a-- there

20  wasn't a summary judgment to be had because of the failure of

21  a damage theory?  Or put another way.

22          MR. SYLVESTER:  I understand.

23          THE COURT:  Yes.

24          MR. SYLVESTER:  Your Honor, after 34 years, which

25  that modifies, pushes a thumb sort of towards your eye a

37

1  smidgen, and into the court, I suppose.

2        You had the second round of summary judgment

3  motions on Count I.  We made the point that there is no

4  damage.  There's nothing.  And the Court shouldn't concern

5  itself with a trifle.  What are we doing here in a sense

6  that's there's no damage?  I'll give you everything that they

7  said and there isn't anything.

8        So there's no claim because of a necessary prong.

9  But you had a second time around.

10       Judge Cavanaugh decided it the first time around.

11  And he just found that there was a fact issue on damages in

12  the context of what he had before him.  And you agreed with

13  that.

14       THE COURT:  All right.  So at that time he had

15  before him the now Court's abandoned A, B, and C structure?

16       MR. SYLVESTER:  He also had a certification of Mr.

17  Smith, a declaration, which, with all due respect to the

18  Court, I don't think got him over the hump.  Because when I

19  saw that I said I won, pure and simple.  Because all Mr.

20  Smith spoke about in his declaration, was gross revenues,

21  which is not a cognizable element of damage in a breach

22  contract case.  It all comes down to lost net profits.

23       Revenues, could you make one billion dollars.  But

24  if costs all revenue, you have no damage. In fact, I did you

25  a favor.  You lost less money.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

38

1          So I thought when I saw that certification that it

2   wasn't a retreating from Exhibits A, B and C, because he

3   wasn't clear that he was calling all of these people and

4   raised proofs.  Even though I didn't think there was any.

5   But his theory just didn't line up with what was permissible

6   under the law.

7          So in my view, with all due respect to the Court on

8   summary judgment, that there was no fact issue because A, B

9   and C wasn't presented.  And, there was no affidavits and no

10  non hearsay evidence before the Court to permit introduction

11  of any damage theory.  And Mr. Smith was a throwaway.  He

12  helped me.  Pennies from heavy, if you will.  The fact that

13  he was off on a dalliance on lost revenue.

14          THE COURT:  We're going off.

15          MR. SYLVESTER:  We are.

16          THE COURT:  Before Judge Cavanaugh, there was a

17  dispute damages provable or proven, or asserted, or revealed,

18  and he said that there was a fact issue.

19          MR. SYLVESTER:  True.

20          THE COURT:  And then my summary judgment motion,

21  basically said Judge Cavanaugh said there was a fact issue,

22  and here we go.

23          MR. SYLVESTER:  That's correct.  I do have a

24  wrinkle to it, your Honor, if you don't mind.

25          THE COURT:  This case has nothing about wrinkles.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    We've all gotten wrinkled while the case has been going on.

2    But go ahead.

3              MR. SYLVESTER:  My earnest colleagues, this may

4    actually be the winning argument as they see it.  No matter

5    how you slice it now, there isn't any way that plaintiff can

6    sustain its burden to show there's damages that exceed $75

7    thousand dollars.  That's the truth.  No way.  No how.  And

8    the Court must always -- I remember Judge Greenberg in the

9    Third Circuit starting right out saying, we always have to

10   search the record for jurisdiction to be able to show that

11   you have a right to be here.

12             THE COURT:  I have to share a Judge Greenberg's

13   story.  He pulled that and he means it.  That's the beginning

14   of a moot court argument at my alma mate, Seton Hall Law

15   School.  You had these innocent shaking third year law

16   students about to open their mouths and Judge Greenberg

17   explained how there was no jurisdiction at federal court

18   based upon the problem.  There was like silence in the

19   courtroom.  And then Judge Barry, just put her hand on his

20   and said, Morty, don't do that.  But he's right.  So we could

21   be on as we have been a couple of days on the eyes here.  But

22   what I'm going to do--

23             MR. SYLVESTER:  May I say one thing? Since we're

24   telling Judge Greenberg stories.  It was in this august room

25   down in the Third Circuit.  I had an answer because Justice

40

1   Scriber (ph) had warned me.  He said, Tony, you have to

2   always remember jurisdiction.  I had actually an answer.

3          But the answer for the Court on that is, it's just

4   another -- you know what, it's another quiver in your

5   supposed arrow or bullet in your holster.  Because if I had

6   Judge Greenberg on appeal--

7          THE COURT:  The bullet is not in the holster.  The

8   bullet is in the gun.

9          MR. SYLVESTER:  In a gun.  I am mixing it up.

10  Anyway, that's my argument on Rule 26.  I am prepared to

11  argue the motion to strike the expert.  But if your Honor

12  wants to dispense and go to Daubert, that's fine too.

13         THE COURT:  You raised a host of issues that would

14  suggest that if you are successful on even a fraction of

15  them, Mr. Smith will not be testifying and then we move to

16  whether or not there's such a hole that the plaintiff doesn't

17  go forward.

18         But again, having that many arguments, having Mr.

19  Smith cooling his heels, waiting to testify, recognizing we

20  are all here together, I believe that's a better record to

21  present to the Third Circuit-- is that we go forward with the

22  hearing.

23         MR. SYLVESTER:  Yes.  For what it's worth, your

24  Honor, I actually agree with that, and I'm looking forward to

25  going forward.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

41

```
1              THE COURT:  Let's take a break and then you will

2  present your witness.  And we'll go from there.

3              Off the record.

4              MR. MCGUIRE:  Thank you.

5              (RECESS TAKEN).

6              THE COURT:  Good afternoon.  We'll do the direct of

7  Mr. Smith and do the cross and then break for lunch.

8              We'll bring Mr. Smith up.

9              MR. MCGUIRE:  Mr. McGuire.

10             Your Honor, I'm going to be working off two

11 documents-- or however the Court wishes to proceed.

12             THE COURT:  Right.  And the direct, as I understand

13 it is, that you will basically be giving Mr. Smith's

14 qualifications through his testimony and then just background

15 for preparation of his report and relied on-- is that what

16 we're talking about pretty much?

17             MR. MCGUIRE:  As well as his conclusions.

18             THE COURT:  Fine.

19             MR. MCGUIRE:  If the Court wishes to address his

20 qualifications first, then hand it off to Mr. Sylvester.

21             THE COURT:  Let's put on what you want to put on

22 and then we'll see where we're at approximately five after

23 one.  Okay?

24             MR. MCGUIRE:  Okay.  Smith-1 will be Mr. Smith's

25 report and Smith-2 will be his 2017 declaration.
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

42

1        MR. SYLVESTER:  If I may, your Honor.  With regard

2  to documents that are going to will be marked.  I think I've

3  already foreshadowed my objection.  Because again, there is

4  simply no foundation in the record for specific information

5  in those reports.  It's sui generous.  It's just there

6  because he wrote them there.  There's nothing I could point

7  to in the record which is -- I don't know.  75 boxes in my

8  office that includes this information.  So an expert can't

9  stand alone.  I am entitled, with all due respect to counsel,

10  to have an expert who draws conclusions from the facts of the

11  case.  The evidence in the case.  Nothing in this report, as

12  it relates to financial data is in the case.

13        THE COURT:  All right.  I'm going to permit Mr.

14  McGuire to use the documents with respect to the foundational

15  questioning that he wants to put forward.

16        To the extent that Mr. Smith has written a report,

17  or has put in his declaration -- you know what?  Let me stop

18  right there.  We've got to qualify him.  Let's qualify him

19  first.

20        MR. SYLVESTER:  Thank you.

21        MS. GARCIA: Would you stand and raise your right

22  hand, please.

23

24

25


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

43

1  ^^ DON SMITH, the witness herein, having been first duly

2  sworn by the Courtroom Deputy, was examined and testified as

3  follows:

4          MS. GARCIA: State your full name and spell your

5  last name for the record please.

6          THE WITNESS:  My name is Don Smith.  First name

7  D O N, middle initial E for Elsworth

8  E-L-S-W-O-R-T-H.  Last name Smith S-M-I-T-H.

9          THE COURT:  Thank you, Mr. Smith.

10          Your witness.

11          MR. MCGUIRE:  Thank your, your Honor.

12  ^^ DIRECT EXAMINATION

13  BY MR. MCGUIRE:

14  Q.   Mr. Smith, thank you for being here today.  Where do you

15  live, sir?

16  A.   What?

17  Q.   Where do you live?

18  A.   I live in Ithaca, New York.

19  Q.   Address?

20  A.   1329 T-A-U-G-H-A-N-N-O-C-K Boulevard, Ithaca, New York.

21  Q.   Mr. Smith, I would ask that you begin your testimony

22  today by sharing with the Court your formal educational

23  background.

24  A.   Yes.  In summary, I have a BS, Bachelor of Science car

25  Degree in Mechanical Engineering from Carnegie Melon

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

44

1  University 1965.  I have a Masters in Business with

2  specialization in marketing from the University of Pittsburg

3  1966.

4  Q.   Mr. Smith, is it fair to say that after you've received

5  your MBA from Pittsburg and that you went into the work

6  force?

7  A.   Yes.

8  Q.   Could you please provide the Court with a chronological

9  summary of your work experience, let's say from 1966 moving

10  forward?

11  A.   Yes.  Concisely I had a career with a Fortune One

12  Thousand Companies and privately held companies from 1967 to

13  1989.  And I began a full-time independent consultant,

14  primarily focused upon new products.  In relation to my

15  preconsulting career, I was in middle senior management

16  Fortune One Thousand in family owned companies.

17        The first job I held was a market analysis for

18  Johnson Control.  They do environmental control systems,

19  commercial industrial buildings.  My responsibilities there

20  included primarily business analysis, forecasting, sales

21  analysis, intellectual property.  And if I didn't mention new

22  products, a lot of time in new products programs.  And I

23  spent five years there.

24        I went down the street.  This is in Milwaukee

25  Wisconsin to a company by the name of Johnson Control.  I'm

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  sorry.  Coca Cola.  Coca Cola had a business unit that

2  handled commercial and residential boilers and other heating

3  systems.  My responsibility there was the manager of market

4  research and new product planning.  Our responsibilities

5  there again included business analysis, new products and

6  forecasting and intellectual property and I had some line

7  management responsibility for some small business units and I

8  was there for seven years in Milwaukee.

9         I moved from there to Baltimore, Maryland and I

10 became the director of marketing and sales.  My first

11 responsibility, profits and loss responsibilities because I

12 had responsibility for three business units and primarily

13 filtration related issues.  Primarily commercial, industrial,

14 some residential.  That gave me profits and loss

15 responsibilities.  I had direct responsibility for entire

16 sales force, domestic and international.  I had direct

17 responsibility for marketing, and all other as specifics.

18        This is just as a brief explanation.  A lot of

19 people think that marketing is advertising.  That's one small

20 portion of marketing.  Marketing concisely includes the

21 products, the existing and new products.  It includes the

22 pricing of new products and all commissions and discounts and

23 terms and condition related that deals with promotion and

24 advertising and publicity.  It also deals with sales

25 channels, and selling direct or indirect or international

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

46

1  etc.

2          It also includes intellectual property.  It also

3  all for forecasting and all business planning and sales

4  analysis, competitive intelligence, a whole range of

5  activities.  It's simply more than advertising.  Of course, I

6  did all of those things when I was with the systems group.

7  They sold that business and I was there for nine years.

8          I then moved, relocated to Elmira, New York.  I'm

9  sorry.  A particular company located in E-L-M-I-R-A.  That

10  was a privately held business, about 13 million dollars in

11  sales at that time.  And my responsibilities there were

12  director of marketing and sales.  Again, I had full products

13  line responsibility, responsible for all sales and all of the

14  marketing and all the IP, business case analysis and new

15  products, and all the others.  And I was there for about

16  three years.

17          THE COURT:  You may have told me, but I missed

18  it..  What did that business do, the particular Elmira

19  business.

20          THE WITNESS:  I'm sorry.  The Elmira business had

21  two primary business units.  One was filtration primarily

22  focused in oil filtration on the industrial side.

23          They also had a motion control group, which sold

24  primarily crutches and drives and fan motors for builders of

25  machinery.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

47

```
 1            THE COURT:  Okay, thank you.

 2            THE WITNESS:  Thank you.

 3  A.   From there I became a consultant.  What actually

 4  occurred, it was a nice transition is that I got a part time

 5  faculty position at Cornell Graduate School of Management,

 6  which I developed and taught a credit semester class to

 7  typically second year MBA program people at Cornell.  My

 8  program dealt with all issues of marketing.  We discussed

 9  talking about product management and new products business,

10  case financial and financial and forecasting industrial

11  production.  I'm sorry.  Intellectual property.  Forecasting,

12  if I didn't mention that.  All the aspects of marketing.

13  Q.   Go ahead.

14  A.   I did that for three years.  And so in 1989, I became a

15  full-time business consultant.  And I was really at that time

16  until about 2000, there was really two aspects of my

17  business.  One on consulting activities.  The second dealt

18  with training.

19            If I could talk briefly about the consulting, and

20  I'm still a consultant.  I'm semi-retired and I still have

21  primarily two clients that I have been working with for 30

22  years, just really love and I am continuing to work with.

23            Those client, by the way, New York State Economic

24  Development Programs and Lutron (ph), which is in

25  Pennsylvania.  They lighting control systems.
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

48

1          From the consulting prospective, my primary focus

2   was new products, revitalizing existing business.  I look at

3   market opportunities, strategy, markets requirements

4   competition, forecasting, profit and loss.

5          I will typically work with the senior management

6   executive team.  I will typically work on a short shirt-

7   sleeve basis with their team.  The team would be VP,

8   director, manager of marketing and sales and new products,

9   engineering, etc. And my primary focus typically, as

10  independent objective, let's launch this new product

11  correctly.

12         Because the downside of launching a new products

13  and failing is huge and very significant number of new

14  products fail, so I am there as an independent person to just

15  be objective and clean and in some cases talk to the

16  executive and say we may be going to the wrong direction.  I

17  am unfortunately a barer of bad news many times.

18         Again, because I am an engineer, I do market

19  research.  I am fact and I am just factoring that's only

20  thing I can do.  You can't do, especially for executive, is

21  to launch a new product and it fails, and then they look at

22  me.  So I have to be objective and I try to bring that single

23  objective to this case.

24         The clients on the Fortune One Thousand companies

25  would include Borax, Ingersoll Rand, Motorola, Lockeeh (ph)


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

49

1  Martin, New York State Electric and Gas, Pittsburg, Pittsburg

2  Corning, Rubber Maid.  I try to pickup some of those

3  clients.  You might be familiar.  And all of these are

4  included in my CV, which is included in my report on my

5  website.

6  Q.   Mr. Smith, those client that you just referred to with

7  respect to your consulting; is that correct?

8  A.   That's correct.  That's correct.  Those are the Fortune

9  One Thousand companies.  Some are a little smaller than that.

10 Primarily Fortune One Thousand would include Lutron (ph).

11 You wouldn't think of it as privately owned company.  They

12 have sales of over one billion dollars, out in the Allentown,

13 Pennsylvania area.  Horton.  Clancy.  New York Revitalization

14 Client.  We could talk about that if you want.

15         I have three family owned businesses that involved,

16 all of which are very successful.  Two with my son.  One

17 consider sense up in Albany, New York.  We established and

18 formed that business and worked with him very closely for

19 about five years on that and then he sold that portion of the

20 business and went on to another business called Cobra Firing

21 Systems.  Cobra Firing Systems is a business that ignites

22 fireworks.  He doesn't sell or ignite the fireworks.  He just

23 sells electronic equipment that does.  It's a very successful

24 business.

25         And my son-in-law also involved in his businesses

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  also.  And he lives here in New York with my daughter.

2          So that's primarily my consulting activity yes.  If

3  you would like, I could talk to you about my training.

4          MR. MCGUIRE:  Please.

5  A.   Training.  Typically, those different with a lot of

6  different organization, the themes are very similar.

7  Q.   Mr. Smith, I'm going to interrupt you right.  Now when

8  you speak to training, is this training that you provide for

9  others or training that you've received?

10  A.   Both.  Both.

11  Q.   Let's talk about the training you received.  Could you

12  explain to the Court what training you received.

13  A.   Of course.  I'm sorry.  Say again, please.

14  Q.   Could you please explain to the Court what kind of

15  training you received over the course of your professional

16  career.

17  A.   Training that I have received?

18  Q.   Yes.

19  A.   Beyond my education?

20  Q.   Correct.

21  A.   Um, oh, my goodness.

22  Q.   I am only asking because you just said, the training you

23  were to explain, had to do with both with training that

24  you've given and that you received?

25  A.   That's right.  I understand.  Right.  I don't know how

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

51

1   many professional seminars I have attended.  Probably, I

2   don't know.  I've attended so many seminars over the years,

3   especially when in corporate life.

4           THE COURT:  Well, I think you did race the training

5   as other half of your consulting career.

6           THE WITNESS: That's correct.

7           THE COURT:  Why don't we stick to that.

8           THE WITNESS: Okay.

9           MR. MCGUIRE:  Thank you, your Honor.

10          THE WITNESS: My training typically, product

11  management, new products, forecasting, market research

12  financial and intellectual property.  They fall in, place.

13  If you start to see what I was teaching and to whom.

14          First of all, I have already mentioned Cornell's

15  program.  I had two separate programs.  One was official

16  called industrial marketing.

17          Again, marketing is all of those things that we

18  discussed.  And also had a business strategy program.  The

19  primary reason Cornell brought me into their program is they

20  wanted a practitioner.  I am clearly a practitioner.  That's

21  what I do for a living.  And I did that for three years.  I

22  also did some special programs for them, and for on site

23  clients that they would have.  Typically 15 to 20 people in

24  executive education, three to five day programs.

25          I also, for American-- University of North

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

52

1   Carolina, briefly mentioning them.  For three years, I

2   developed and taught three-year program there called product

3   management.  Very, very common with other programs I'll talk

4   about.  Typically, specifically -- I'm sorry.  The UNC

5   program, three days long entitled Product Management,

6   included all of those issues we talked about.  Typically 15

7   to 20 students I was the only non UNC on faculty.

8           Cornell, I was very proud, I received top ten

9   awards from the students' instruction.

10          American Management, New York City headquarters

11  42nd and Broadway.  They are single largest producer of

12  business executives seminars in the United States, possibly

13  in the world.  I worked with them for 19 years.  I developed

14  four separate programs.

15          Developed, what that means, is they would want a

16  program, for example, one of the programs was called New

17  Products Developing Evaluation and Launched of Successful New

18  Products.  That was a four-day program that included all of

19  the things we are talking about:

20          How big is the market?

21          Who is the competition?

22          How do you evaluate the market?

23          How do you forecast your sales, the profits and

24  intellectual properties, and sales chance.  All of those

25  things were included within four days.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

53

1          Typically 15 to 20 people.  Typically, literally

2  from 7 o'clock in the morning until 10 o'clock at night.

3  In-depth street-smart knowledgable people, product managers,

4  vice presidents of sales, directors of marketing and sales

5  engineers and new products, etc.

6          I did that for 19 years.  Typically once a month

7  someplace in the world.

8          Again, there was 4 separate programs.  I'll give

9  you the details of all four.  There are just variations of

10  the them.

11          I was not only the trainer -- I not only wrote the

12  book, but since they would have other people conduct the

13  seminars, I was also the trainer of the trainers.

14          Over those 19 years, I had a score -- because every

15  time you teach a seminar, you get a score.  I had 3.85 of 4.

16  I received an award I am very proud.

17          THE COURT:  Those 19 years were between when and

18  when?

19          THE WITNESS:  That was -- hang on just one second.

20  1989 to 2007.

21          THE COURT:  Thank you.

22          THE WITNESS:  In my CV you will see the details of

23  the programs.

24          THE COURT:  Yes.

25          THE WITNESS:  Association, organizations with AMA

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

54

1   American Management Association also the management center in

2   Europe.  I did a number of programs for them, variations of

3   AMA programs.  I also did a lot of work for the Management

4   Center, 14 years with them and 14 years with the management

5   center.  And all my clients, I have very commonly would do

6   some form of a seminar with workshop, everything focused to

7   their specific organization.

8           So that's a summary in relation to the training.  I

9   had one third part, if I might.  What happened in 2000 I

10  became expert witness.  Since 2000, I was been involved in a

11  number of expert witness cases.

12          THE COURT:  So we'll call that the forensic part of

13  your career, is that fair?

14          THE WITNESS: Yes, ma'am.

15          MR. MCGUIRE:  Very well.  Would you like to speak

16  in general terms of the forensic part of your career?

17          THE WITNESS:  Sure.  18 years I have been involved

18  as an expert witness.  Since 2000.  I have been involved in

19  56 cases, 43 written reports, 17 depositions.  Three trials,

20  and three arbitrations.

21          Of those 56 cases, 32 involved economic loss.  And

22  28 involved intellectual property I would define as

23  copyright, trade secrets, some patents, and some trade

24  marks.  That would be a summary.  That would be a high level

25  summary of my activity.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

55

1  Q.   Mr. Smith, we talked about your experience with respect

2  to training, your experience professional experience in

3  general.  Do you have any experience in calculating damages

4  for loss profits?

5  A.   Yes, I do.

6  Q.   If you could speak to that, please, sir.

7  A.   I think the most relevant would be my expert witness

8  experience that I already mentioned, the cases for economic

9  loss.  14 involved trial and/or depositions.

10         My consulting client projects, some people would

11 argue that there is a huge difference between defining

12 economic loss and a pro forma forecast of sales and profits,

13 be it for existing and business and new products.  The

14 similarities are huge.  They are really huge.

15         What you are looking at -- you are looking at

16 identification of variables.  You are looking at facts.  You

17 are looking at how big is the market.  Who's the competition?

18 What is my offering?  Who is the competition offering?  You

19 have all the price issues, and all competitive issues.  All

20 those complexities that go forward.

21         What is challenging, especially challenging when

22 talking about new products, is you have challenge because you

23 are looking forward.  In many respects calculation of an

24 economic loss is a lot easier, because you are looking at the

25 past.  There is far fewer variables so it makes it easier to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

56

1    quantify variables.  Because so many of the facts are either

2    known or could be quantified to some reasonable degree of

3    accuracy.

4            The third level would be my university teaching,

5    which I went through, suffered detail for you to understand

6    that that the Cornell MBA, University of North Carolina,

7    talking about second year MBA or executive level people, we

8    are talking not just about my having a seminar in which I am

9    providing information.  These are 15 to 20 people.  So these

10   are interactive dealing with their issues.  Real issues.  It

11   gives you a different level of understanding, when you are

12   not just simply talking at them, but listening and working

13   with them.

14           THE COURT: So there's sort of harmonizing various

15   of your career with respect to the economic issue.

16           Do you feel that you adequately laid the ground

17   work to request that your witness would be qualified?

18           MR. MCGUIRE:  I do, your Honor.

19           THE COURT:  Okay.  It's ten after one.  I said we

20   will have cross examination.  You are not finished with your

21   direct.  We will have any cross on the qualifications of this

22   witness as the first order of business, and then we will

23   continue with the direct.  Okay?

24           MR. MCGUIRE:  Thank you.

25           MR. SYLVESTER:  Sure.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

57

```
 1          THE COURT:  Have a nice lunch.  See you back at ten
 2  after two.
 3          MR. SYLVESTER:  Thank you.
 4          THE COURT:  Thank you.
 5          (RECESS TAKEN).
 6          THE COURT:  Back on the record.
 7          You may come forward, Mr. Smith.  Thank you.  You
 8  may be seated, Mr. Smith.  We are at that point in the
 9  presentation of this witness's testimony where he's been
10  offered as an expert based upon his background and education
11  and experience.
12          So any cross examination?
13          MR. SYLVESTER:  Yes, your Honor.  First, could I
14  ask for a clarification?
15          THE COURT:  Yes.
16          MR. SYLVESTER:  This is from counsel.  I don't
17  believe that this witness is being offered in a current
18  context of this case on any intellectual property issues or
19  any trade secret issues, and the like.  Although, there's
20  some reference to that in his report, but I didn't hear him
21  being qualified in any regard to those topics.  I just want
22  to be clear that I will not cross examine him with regard to
23  those topics if he's not being offered for those.
24          THE COURT:  Those issues are being dismissed.
25          Right?
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

58

1          MR. SYLVESTER:  But there's still some aspect of

2 his report which addresses it.

3          MR. MCGUIRE:  That's fair enough, your Honor. The

4 court and Mr. Sylvester are absolutely correct.  The one

5 remaining claim in this case is breach of contract.  Mr.

6 Smith has been offered as a witness.  At least his

7 credentials have been offered at this point, strictly with

8 respect to his analysis as to damages, the association with

9 the breach of contract claim.

10          THE COURT:  Okay.  Thank you.

11          MR. SYLVESTER:  Thank you.

12          MR. SYLVESTER:  Your Honor, I may.  I have two sets

13 of binders.  What I propose to do, if it's okay with the

14 Court, is some of these things I won't be using.  But it's in

15 here.  To the extent it's not used, I'll pull it out of this

16 binder at the conclusion of the hearing.  So the only thing

17 that remains in the binders stays with your Honor, whatever I

18 referred to or asked to be admitted into evidence.

19          THE COURT:  Fair enough.

20          MR. SYLVESTER:  I'm not going to wean it out now.

21 I do have a set for your Honor and the witness.

22          THE COURT:  Okay.  Thank you.

23          MR. MCGUIRE:  Counsel has also be kind enough to

24 provide me with copies.

25          THE COURT:  I figured that.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

59

1          MR. SYLVESTER:  Your Honor, may I approach the

2   witness and hand it up?

3          THE COURT:  Yes. Off the record.

4          (Discussion held off the record).

5

6   CROSS EXAMINATION

7   BY MR. SYLVESTER:

8   Q.   Good afternoon, Mr. Smith.  How are you?

9   A.   Good, thank you.

10  Q.   My name is Tony Sylvester of counsel of record for Ms.

11  Franco.  I would like to ask you a few questions regarding

12  your qualifications.  If you don't mind?

13  A.   Okay.

14  Q.   Sir, if you take a look at Tab 1 in the binder.  That's

15  your current CV; is that right?

16  A.   Yes.

17  Q.   All right.  And as far as you know, that's accurate in

18  all respects?

19  A.   Yes.

20  Q.   And sir, let me ask you, isn't it true you never served

21  as a chief financial officer of a company?

22  A.   I have not.  I've never served as a chief financial

23  officer of a company.  No.

24  Q.   Thank you.  And isn't it also a fact, sir, that you are

25  not an accountant?

60

1  A.   I'm not an accountant.

2  Q.   And is it also the case obviously, that you are not a

3  certified public accountant are you?

4  A.   I'm not a CPA, no.

5  Q.   Would you agree with me that the industry that NXIVM is

6  engaged in can be called the professional success training

7  industry?

8  A.   That would be one description, yes.

9  Q.   And are you comfortable with that description?

10  A.   I am not an expert in relation to their subject

11  material.

12  Q.   Sir, isn't it true that you've never been employed by a

13  company in the professional success training industry?

14  A.   I just don't know what -- I am just not comfortable with

15  what the personal success training industry is.  I have been

16  involved in training for 30 years and significant portions of

17  the seminars that I have written and taught and still teach

18  deal with personal success.

19  Q.   Have you ever been employed by any of the companies that

20  you identified as comparable in this case?

21  A.   Define comparable.

22  Q.   The companies you identified in your report.

23  A.   Recognize that the American Management Association and

24  associated companies of management center in Europe and

25  Canadian Management Association, I worked with them for

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

61

1   decades and they includes within their reservoir of seminars

2   just whole range of programs, including narrowly defined

3   personal success programs, if you will.  I'm not sure I am

4   answering your question.

5   Q.    Perhaps the infirmities are in the question.  Have you

6   ever been employed by Dale Carnegie company?

7   A.    No.

8   Q.    Ever been employed by Franklin Koby (ph)?

9   A.    No.

10  Q.    Have you ever been employed by Tony Robbins's company?

11  A.    No.

12  Q.    Have you ever been employed by NCP?

13  A.    No.

14  Q.    All right.  Now, sir, you made reference to the fact

15  that you have testified at three trials; is that right?

16  A.    Correct.

17  Q.    And were any of those in federal court?

18  A.    One moment.  Let me look.

19  Q.    You don't need to.  Is it fair to say that you don't

20  recall whether you ever testified in federal court, as you

21  sit here right now?

22  A.    I could look in a moment if you'd like.

23  Q.    Please do then?

24  A.    I could be factual.

25  Q.    Thank you.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

62

1  A.   No.  I have not testified in a federal court at a trial.

2  Q.   Yes.  Thank you.  Now, you are familiar with the case

3  that is called RFMAS v SO, So?

4  A.   Yes.

5  Q.   Isn't it a fact you were offered as an expert on behalf

6  of the plaintiff in that case; isn't that true?

7  A.   Yes.

8  Q.   And isn't it a fact that your testimony qualifications

9  were challenged in that case, were they not?

10  A.   Yes.

11  Q.   And isn't it so that federal magistrate, Judge Dolinger

12  issued a report and recommendation in recommending that you

13  would be precluded from testify at trial as to whether

14  defendant's actions damaged RFMAS and recommended that

15  entirety of your report be stricken.  Is that true?

16  A.   That is true.  The other expert was also disqualified.

17  Q.   The other plaintiff's expert was disqualified as well?

18  A.   Yes.

19  Q.   And isn't it a fact that Federal District Judge Minero

20  adopted the report recommendation of Magistrate Dolinger and

21  precluded you from testifying as an expert in that case?

22  A.   I'm sorry.  Restate it.

23  Q.   Sir, isn't it a fact that Federal District Court Judge

24  Minero adopted the report of the magistrate judge, and

25  precluded you from testifying as an expert in that case?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

63

1  A.   I don't know the specific of the judges or what the

2  other people.  I don't know the details.

3  Q.   Have you ever read the opinion of which Judge Minero

4  precluded you from testifying?

5  A.   I remember reading some documents.  I don't remember the

6  specifics.

7  Q.   Well, perhaps if you could turn to Tab 2, if you don't

8  mind.

9  A.   Okay.

10  Q.   And you would agree with me that that's the federal

11  court opinion in RFMAS?

12  A.   I don't recall seeing this document before, sir.  I'm

13  not sure I understand the question.

14  Q.   Well, let me withdraw it.  Let me ask you this

15  question.  Is your testimony under oath that you never read

16  the opinion of the federal district court judge wherein you

17  were precluded from testifying as an expert?

18  A.   I reviewed some documents on my exclusion from

19  testimony.  I just don't recall what specifics documents they

20  were.  This is for prospective of time.  This was over ten

21  years.  This is about ten years ago.

22  Q.   It was 2010.  Is that right?

23  A.   I had in my record, this was a 2008, 2009 case.  So this

24  is from my records, it was ten years old.  I don't know the

25  specific date of this document.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

64

1          THE COURT:  Well the date of your report seems to

2    be September 15, 2009?

3          THE WITNESS: Okay.

4    Q.    Sir.  Didn't you recently prepare a declaration that was

5    filed with this court?

6    A.    I'm sorry.  Ask the question again.

7    Q.    Yes sir didn't you reason I will prepare and sign a

8    declaration which was filed with this federal court?

9    A.    Yes, sir, I did.

10   Q.    And didn't you in that declaration discuss this very

11   case?

12   A.    Yes.

13   Q.    And so isn't it fair to say that in connection with

14   preparing that declaration and discussing this case, that you

15   read the opinion?

16   A.    In writing the declaration, I am assuming you are

17   referring to a 11, 30, 17 declaration?

18   Q.    Yes, I am sir.

19   A.    I did not read this specific document, no.

20   Q.    Okay.  So just to be clear then.  When you prepared your

21   declaration, that was recently filed in this case, wherein

22   you discussed among other things the RFMAS case, you hadn't

23   even bothered to read the opinion; is that right?

24   A.    I went through my notes of the case so that I accurate.

25   But I did not specifically read this document that's in front

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  of me.

2  Q.   And sir--

3         THE COURT:  Wait.  Where in the declaration is the

4  reference to the case?  What page?

5         THE WITNESS:  Is that a question for me?

6         THE COURT:  No.

7         MR. SYLVESTER:  Tab 5, your Honor.

8         THE COURT:  Just in the declaration.  I have a copy

9  of it here.

10        MR. SYLVESTER:  Tab 31, page 15 and 16.  And they

11 just proved my point.  Am I right?

12        THE COURT:  Yes, exactly.

13 A.   Yes.  It's on page 15, starts on it page 15, my 11, 30,

14 17 declaration, that's correct.

15 Q.   And sir, are you aware that in that opinion, the federal

16 district court judge, struck you as an expert for various

17 reasons, including that your findings rested almost

18 exclusively on documents that had been provided to you by the

19 client; isn't that rights?

20 A.   That's what the judge stated, yes.

21 Q.   And isn't it also the case that the federal district

22 court judge precluded you from testifying, because you had

23 not reviewed your client's tax returns in that case?

24 A.   I just don't recall the specifics.  This is ten years

25 old.  I just don't recall the specific of the reasons for the

66

1   exclusion.

2   Q.   Well, do you recall that the federal district court

3   judge struck you as an expert because it was found that you

4   had not independently verified any of the financial

5   statements that was provided to you from counsel?

6   A.   Again, this is ten years ago, I do not recall the

7   specifics of the judge's conclusions.

8   Q.   And so, would it be fair then to say, that you don't

9   recall that the judge also struck you as an expert because he

10  found that you had no expertise at all in the industry that

11  was at issue?

12  A.   Again, I don't recall the specific of that statement of

13  the Judge.

14  Q.   But I believe you say, you had read it at some point; is

15  that fair to say?

16  A.   Again, I don't recall what specific documents I read.  I

17  read a specific document ten years ago that dealt with my

18  execution from testimony.

19  Q.   Do you recall at that case that the federal court said

20  that your testimony is so riddled with logical errors that a

21  jury might be better equipped to understand the evidence

22  without exposure to your proffered testimony?  Do you

23  remember the judge saying that?

24  A.   I don't recall the specific.

25  Q.   Well, do you recall the Court also criticized your

67

1   methodology?

2   A.   Was that a question?

3   Q.   Yes.

4   A.   What was your question?

5   Q.   Isn't it also a fact that the federal court in that case

6   also criticized the methodology that you used in reaching

7   your opinion?

8   A.   I don't recall the specifics.

9   Q.   Do you recall that the federal court found that your

10  opinion was inadmissible because you did not control and

11  consider other possible causes of your client's damages?

12  A.   I don't recall the specifics of the judgment.

13  Q.   Do you recall that the federal court there determined

14  you were unqualified to make financial projections?

15  A.   I don't recall the specifics.

16  Q.   So therefore you don't recall that the federal court

17  made the statement that you were not qualified to offer a

18  calculation of plaintiff's loss sales or profits?

19  A.   I know that I was excluded from testimony.  I don't

20  recall the specifics of the ruling.

21  Q.   One of your opinions in that case had to do with

22  profits, didn't it?

23  A.   Yes.

24  Q.   And so part of the opinion that was precluded by the

25  federal court, because it found thank you were not qualified,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

68

 1  was your opinions on profits; isn't that right?

 2  A.    Again, I don't recall the specific of the reason for the

 3  exclusion.

 4  Q.    Well let's turn to another federal court case, Southern

 5  District.  Do you have a better recollection of the case

 6  whole among Moolsan v. Monito Mineral Water?

 7  A.    I am not sure how to answer that question?

 8  Q.    Well, take a look at Tab 3, please.

 9  A.    I'm looking at my 11, 30, 17 report, and I remember that

10  case.  I just don't know what your questions are.

11  Q.    Take a look at Tab 3 in my binder if you don't mind.

12  A.    Okay.

13  Q.    Have you read that opinion at any point in time?

14  A.    No.

15  Q.    So your testimony, that despite the fact that you were

16  precluded by that federal judge, you never bothered reading

17  the opinion?

18  A.    It was not available to me.

19  Q.    And it's true that you were retained by a plaintiff in

20  that case as a damage expert, correct?

21         THE COURT:  What's the date of that opinion?

22  Sorry.  The second case you're talking about.

23         MR. SYLVESTER:  December 2, 2010.

24         THE COURT:  2010.  Okay.  Thank you.

25  Q.    You were engaged as an expert to serve as a damages

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

69

1   experts; isn't that right?

2   A.   That's correct.

3   Q.   And the other side moved in limine to preclude your

4   testimony, just like Ms. Franco is doing here; isn't that

5   right?

6   A.   I don't know how to answer that question.  I was not

7   aware-- I wrote a written a report for this case.  The

8   attorney dealt with a company in Korea.  The attorney was

9   Korean.  The client was Korean--

10  Q.   Sir, I don't understand what that would have to do with

11  anything.  I'm sorry.

12  A.   And there was very limited communication.

13  Q.   Okay.

14  A.   What I am saying here, I was provided some information.

15  I wrote a report.  I was never deposed and I was not even, I

16  did not even realize that there was a challenge or that I was

17  not permitted to testify.  I didn't know any of that.  It

18  simply disappeared.  I wrote a report and I heard nothing

19  more.

20  Q.   In that report, you offered five separate opinions;

21  isn't that right?

22  A.   I don't recall.

23  Q.   So you don't recall if the court struck all five of your

24  opinions?

25  A.   Again, I knew nothing about it.  I was aware of nothing

1   that occurred after a report.

2   Q.   Are you aware that the federal court in that case struck

3   your opinion regarding economic loses because they found that

4   ever bit of evidence that you cited was speculative,

5   contradictory or unreliable?

6   A.   I don't know the specifics, sir.

7   Q.   Are you aware that disqualification was affirmed by the

8   Second Court of Appeals?

9   A.   I don't know the specifics.

10  Q.   To be clear though, you were aware that you were

11  stricken as an expert, true?

12  A.   I only learned that three or four years ago.

13  Q.   And in last three or four years, you didn't bother to

14  read the opinion to find out why you were stricken?

15  A.   I don't have, I don't have a page or account.  I don't

16  have access to that information.

17  Q.   You have access to internet?

18  A.   I do.

19  Q.   Are you aware that you can search a case on the internet

20  and get the opinion?

21  A.   I did not know that that was available.

22  Q.   In connection with declaration that you just filed with

23  the court, did you read the opinion?

24  A.   I'm sorry.  What was the question.

25  Q.   Well, I think identified your declaration as being in

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

71

1  the November time frame, isn't that right, last year?

2  A.    Yes, that's correct.

3  Q.    And in that declaration, you gave some commentary about

4  the Monito Mineral Water case, didn't you?

5  A.    I did.

6  Q.    Are you telling me and telling this Court, that despite

7  that commentary, you still hadn't read the opinion during

8  that point in time, that's your testimony?

9  A.    The opinion, the judge's?

10  Q.    Yes. The judge's findings?

11  A.    No, I have not.

12  Q.    To this date, you still haven't read it?

13  A.    No, I have not.

14  Q.    Well, you also, 2014 offered as an expert in a federal

15  court case called Triboro Quill (ph); isn't that right?

16  A.    Yes.

17  Q.    And that is Tab 4 in your binder, sir.  Take a look.

18         THE COURT:  Could I interrupt?  I am on the wrong

19  page.  On page 16 of Monito, little v paragraph 5?

20         THE WITNESS:  Yes.

21         THE COURT:  Challenged comments.  Did you write,

22  made communication difficult.  The client was very pleased

23  with my report.  I was never informed about the Daubert

24  challenge.  So when you wrote that paragraph that was you did

25  know that it was stricken?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

72

1          THE WITNESS:  No.  When I wrote this?  When I wrote

2  this report dated 11, 30, 17, I did know.

3          THE COURT:  You did know.

4          THE WITNESS:  I only learned of this, I don't know

5  the exact time frame, three or four years ago I learned.

6          THE COURT:  And you did not read the judge's

7  opinion.

8          THE WITNESS:  No, ma'am.  No.

9          THE COURT:  All right.  Just getting my head

10  straight.

11          Thank you.

12

13  BY MR. SYLVESTER:

14  Q.   Sir, we are talking about the Triboro Quill case.  Do

15  you recall that case?

16  A.   Yes.

17  Q.   And in that case, weren't you retained as an expert to

18  offer an opinion on contract interpretation as well as

19  projection of damages; isn't that right?

20  A.   Yes.

21  Q.   And are you aware that in connection with the motion for

22  summary judgment, the other side moved to strike your report

23  in its entirety?

24  A.   I don't know the specifics.  I know I was excluded from

25  my testimony.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

73

1  Q.   So you do know that the federal court in that case

2  struck your opinion in its entirety; isn't that right?

3  A.   I don't know that it was in its entirety.  Yes, I was

4  not permitted to testify at trial.

5  Q.   Are you aware that federal court in that case rejected

6  your damages opinion because it found that there was no

7  assurance that it was grounded in sufficient or reliable data

8  or principles or methodologies; isn't that true?

9  A.   I don't recall the specifics of the ruling.

10 Q.   Isn't it a fact that that case-- that's the source of

11 data was the counsel of record?

12 A.   An one-- if there were a thousand pages of information

13 provided, the attorney provided one half of one page on the

14 telephone because he wasn't able to provide me with the

15 written document.

16 Q.   Sir, would you agree with me that it seems like one of

17 the of lessons of three opinions was that the Court was

18 looking to you as an expert to independently verify the data

19 that you were relying upon?  Isn't that fair?

20 A.   You do the best you can with the information provided,

21 and try to be as objective and as thorough and effective as

22 you possibly can.

23 Q.   I appreciate that, sir.  I need an answer to my

24 question.  Isn't it a fact that a lesson to be drawn from

25 those three opinions, is that is the Court looks to you as an

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

74

1   expert to independently verify the data and information that

2   you are relying upon?

3   A.   You cannot independently verify every piece of

4   information that you are provided.  It just isn't possible.

5   Q.   Okay.

6   A.   You do the best you can to be certain that it is quality

7   information, that it's independently verified, if you will,

8   but there's no way in what you can verify every piece of

9   information.  Otherwise, you would have to replicate the

10  profit and loss statement.  It's just impossible for you to

11  look even and ever data point within a P and L and reconfirm

12  the data points.

13  Q.   You are familiar with the fact that companies have

14  original books and records; isn't that true?

15  A.   Yes.

16  Q.   In any of those other three cases, where you were

17  stricken as an expert, did you ever look at the original

18  books and records of any of your clients?

19  A.   I looked at all data, working data in all three of those

20  cases.  Yes.

21  Q.   In this particular case, where you are being offered

22  here, did you look at any of the original books and records

23  of NXIVM?

24          MR. MCGUIRE:  Your Honor, I am going to object.

25  This is getting beyond the scope of Mr. Smith's

1   qualifications.  I did not yet get into the data that Mr.

2   Smith reviewed and/or methodology.

3           THE COURT:  I think Mr. Sylvester has tied the

4   question into the qualifications of the witness, because he's

5   talked about three different cases and he's asking the

6   witness whether or not a core problem with each opinion was a

7   failure to look at raw data.

8           And then the witness was asked whether -- sorry--

9   to have verifiable data.

10          And the witness said he did look at raw working

11  data on those three.  And I think it's fair to ask whether he

12  look at NXIVM.  So I'll overrule the objection for that

13  reason.

14  Q.   Sir, do you have the question in your mind?

15  A.   Please, ask the question again.

16  Q.   Yes.  Sir, isn't it a fact that in this case you did not

17  look at any original books and records related to the

18  financial of NXIVM?

19  A.   Define original?

20  Q.   Documents, books and records in the possession of

21  NXIVM?

22  A.   If you will refer-- I want to answer your question.  If

23  you look at my report dated February 3, 2017, page 26, many

24  of these documents are-- Sorry.  One second.  I'm sorry.  Go

25  20, page 25, I believe.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

76

1   Q.   Is that the list of documents' page?

2   A.   These are the documents that were provided-- I'm sorry.

3   You had a question.

4   Q.   You are referring to the appendix; is that right?

5   A.   Yes.

6   Q.   I am with you.  Page 25.

7   A.   If you go to page 26.  First of all-- I'm sorry.  On

8   page 25, if that is a complete listing of the documents that

9   were not attached.  And many of these documents, including

10  depositions, had detailed listings of exhibits which I drew

11  upon for my analysis and some of those.  I don't have right

12  in front of me.  Some of those were original documents from

13  NXIVM.  If you look at page 26--

14  Q.   Sir, on that, do you recall if any of those were

15  financial data or information?

16  A.   Not as I sit here today.

17  Q.   All right.

18  A.   If you go to page 26, these documents I did include in

19  my appendix.

20       Again, not to repeat myself.  But many of the

21  documents that I listed on page 25, I didn't completely list

22  each and every exhibit that they had included.  But some

23  portions of those were financials and raw data, etc.  On page

24  26--

25  Q.   May I stop you there, sir.  You're not suggesting that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   you looked at something relevant to your opinion, but didn't

2   identify it on page 25, are you?

3   A.   Plus 26.

4   Q.   And you are not suggesting that you relied upon

5   something that didn't identify, are you?

6   A.   No.  No.

7   Q.   Okay.

8   A.   If you look at page 26 in my a appendix, it says NXIVM's

9   profit and loss statements 1998 through 2013.  And I included

10  those as attachments.

11        If you look at number 4, NXIVM's seminar records,

12  2002 to 2018.

13        If you would look at number 6, NXIVM seminar

14  participants.

15        MR. MCGUIRE:  Your Honor. I'm just getting -- Mr.

16  Smith, I believe you've misspoken with respect to NXIVM

17  seminar records, 2000 to 2008, not 2018.

18        THE WITNESS:  Okay.

19        THE COURT:  Thank you.

20  Q.   Sir, these were provided to you by counsel?

21  A.   They came through counsel.

22  Q.   Would that be Mr. Crockett?

23  A.   They were provided to me through counsel, yes.

24        MR. SYLVESTER:  Your Honor, I have nothing

25  further.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

78

1       I think at this point, we would urge the Court to

2  disqualify him for lack of qualifications, based on what you

3  just heard and based upon the facts.  That's what happened

4  here, despite the teachings of those three federal court

5  cases, this is exactly the same.

6       We are dealing with an expert who received

7  materials from client counsel, however it may be, did nothing

8  independently to verify it.  Didn't go and look at original

9  books of entry.

10      And it seems to me, that perhaps he, with all due

11  respect to the witness, had not learned a lesson because the

12  proposed expert hadn't read those three opinions.

13  Nonetheless, three federal judges, plus federal Justice

14  Dolinger laid out is precisely where we are stuck here now in

15  terms of information.  And I think it does go to

16  qualifications.  Because if you have a situation where

17  somebody is stricken three times by three separate federal

18  courts over a pattern of conduct, and yet walks into this

19  courtroom and has the exact same pattern in place, then that

20  goes to qualifications.

21      As far as I am concerned, you know, that was, fool

22  me once, shame on you.  Fool me twice, shame on me. How about

23  the third time when you have been instructed that you've done

24  things wrong, but you're going to stubbornly stick to your

25  way of doing things. I think that goes to qualifications.   It

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

79

1  doesn't go to reliability and methodology.  I submit that he

2  isn't qualified to testify based upon my presentation.

3          THE COURT:  I have a question. Kind of tailing off

4  of what Mr. Sylvester said.

5          How do you view your role when you are engaged to

6  provide a forensic report on loss profits?  What do you think

7  you're supposed to be doing in terms of presenting a report?

8          THE WITNESS:  I'm looking to secure accurate

9  company data, which is the source of that data.

10          In most cases, I was able to do this also within

11  the NXIVM case, I'm looking for several documents that are

12  reporting the same information but in different formats,

13  hopefully in different time frames.

14          For example, within the NXIVM's case, I was able to

15  look at individual financial profit and loss statements

16  prepared for the year.

17          I was then able to identify other internal working

18  spreadsheets that would include the same categories of sales,

19  revenues categories, expenses, both on a profits and loss and

20  balance statement, which I was then able to prepare that

21  statements often times I think in the NXIVM case I think it

22  was eight or ten year time frame.  I would compare that

23  document, prepare extra layer with some of the internal

24  working documents that were prepared for the year.  And then

25  I was able in NXIVM's case I was provided access to three

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  separate profits and loss statements, and then able to then

2  cross connect the sales and expenses to those internal

3  documents.

4          THE COURT: When you say, "I was able to, in NXIVM's

5  case, was provided access to three separate profit and loss

6  statements," you indicates that--

7          THE WITNESS:  Tax returns.  That was my

8  misstatement.

9          THE COURT:  Oh, tax returns. I see.  And those were

10 not attached to your report, correct?  Page 25 has documents

11 not attached, documents reviewed and attached, correct?

12         THE WITNESS:  That's correct.  I have them here.

13 But yes.

14         THE COURT:  Okay.  And Mr. Sylvester, those are

15 part of the record, but you said, I think, there was an

16 objection to not having been signed, was that the issue with

17 these?

18         MR. SYLVESTER:  There's a number of issues.  Issue

19 number one:  Those tax returns, by the way, 99, 2000, 2001.

20 Before the damage period that this witness is even being

21 offered on.  That's number one.

22         Number two:  They are unsigned, which is a red

23 flag for anyone in terms of having verifiable accurate data.

24 Because if it's not signed, you cannot be certain that this

25 is the return that got filed.

81

1          But more to the point, to go back to a fundamental

2    problem, and that is a Rule 703 problem.  And that is, how

3    can the expert rely upon something that I never got in this

4    case?  Pull the IRS returns out, there's no Bates numbers on

5    them.  It never came to me in discovery.  So I was not ever

6    able to cross examine the person who should have been signing

7    this.

8          Frankly, talking about this chasm.  It's really, I

9    am the one that's left in the lurch here as litigator and

10   trial counsel, because I don't even have the information at

11   my disposal in order to properly prepare the case.  And it

12   was never provided.

13         So 703 is a firewall against this witness, because

14   everything that he's relying upon are things that were not

15   provided in discovery.  Pure and simple.

16         I could demonstrate that until the cows come home

17   to the satisfactory-- to your Honor. Everything, as you know,

18   gets Bates numbered and so forth.  This simply didn't happen

19   in this case and it simply wasn't the subject of testimony by

20   the 30(b)(6) witness.  I know I'm lapsing back.  It's what I

21   talked about earlier.

22         But my problems with those tax returns and this

23   witness talking them in any way, shape or form, it runs smack

24   into the 703 problem.

25         In order for him qualify himself, or I should say,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    in order for the parties to try to qualify him, that he did

2    things right, that he did not lapse into the same problems

3    that three federal judges identified as being reasons to

4    preclude him, he's relied upon documents which he can't rely

5    upon.  It's unfair.

6              THE COURT:  Well, you understand Mr. Sylvester's

7    problem.  That he's saying that you had access to documents

8    that (a) were not provided to him in the format that the

9    court would want; that they are verifiable documents.

10             Did that bother you when you were given you

11   unsigned tax returns for those three prior years?

12             THE WITNESS:  First of all, 1999 was signed by the

13   CPA.  All of the tax returns that I received and reviewed

14   were indicated who prepared them.  And they were all CPA's in

15   all years.  And number one was actually signed by the CPA

16   which was here.  It was not signed by NXIVM -- in my

17   experience, that is pretty common.  When someone provides a

18   tax return coming from their files, they sign those that go

19   to the government, but do not sign those that are in their

20   files, very common.

21             THE COURT:  So you were not bothered by the fact

22   that they weren't signed?

23             THE WITNESS:  We always want the best possible

24   information.  And this was the best possible information I

25   could get.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

83

1           THE COURT:  Did you request signed ones? If you

2   remember.

3           THE WITNESS:  I do remember.  I requested the best

4   information I could.  I requested additional tax returns and

5   just simply weren't available.

6           Again though, what was important, because the only

7   thing I can do is try to get reliable solid information.  We

8   talked about before.  So independently checked where you

9   possibly can to cross and recross.  For example, this is --

10  I've already described, if you will, as to how I was able to

11  verify different documents prepared in different time-frames

12  by different people with profit and loss, and then crossed

13  that with the tax return.

14          So when you start to see things that are not

15  precisely the same, but plus or minus one percentage point,

16  then it gives you comfort in many, many cases that were to

17  the exact penny.  And this gives you great comfort, seeing

18  something that developed in one year and eight years later

19  you see the same exact number on a different document, most

20  probably prepared by someone else, it gives you comfort.

21          THE COURT:  What did you consider the dispute

22  between the parties to be when you were engaged to provide a

23  forensic report?

24          THE WITNESS:  Sure.  Sure.  Ms. Franco took a

25  confidential report.  I recall it was 386 pages of -- I could

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

84

1   check, it was either 386 or 286.  I forget.  But it was a

2   confidential that was developed and copyrighted and protected

3   aggressively by their internal intellectual property

4   procedures.

5          By the way, I visited NXIVM in Albany after I

6   received a set of documents.  That gave me an opportunity to

7   directly talk with the financial individual and several other

8   individuals in Albany, to have the documents in front of me,

9   to please help me to understand this and that.  Do you have

10  the additional documents that I could have here to revalidate

11  this information is accurate.  And during that meeting, some

12  additional information, through counsel, was also provided

13  based upon my very specific request.

14         And those we could talk about later if you want all

15  the specifics and the when and where.

16         Also independent, this is separate from the

17  financials, but I think it's important.  When we get into

18  the, looking at the relationship between Ms. Franco's taking

19  of the confidential documents, which then ended up with may

20  be not precise with the sequence, but ended up with Rick Ross

21  and then ended up with Dr. Hoffman and Dr. Martin who wrote

22  papers based upon the documents, based upon Franco's

23  documents, 386 pages, including her notes which was

24  confidential.

25         Based upon those notes and based upon that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   notebook, they then wrote a very scathing report, using such

2   words as halt and halt-like, etc., which then picked up by

3   the Times Union, which had been a series of articles.  Then

4   it was picked up by Forbes Magazine, and we can talk about

5   this later.  And through those articles, we started to have a

6   salacious kind of words, where news makes news and it spread

7   out very rapidly.  But for Ms. Franco taking the notebook and

8   providing it to Rick Ross who then provided it to individuals

9   who wrote the papers and then went to Rick Ross for

10  additional publication and additional Time Union articles and

11  a whole range of other negatives.

12          As you might imagine, these negatives concerning

13  news had an impact of the seminar attendance.  And my

14  assignment was to, from an economic prospective, was there a

15  substantial relationship between her taking of this manual

16  and the impact to NXIVM's seminar sales.  And my conclusion

17  was yes, there is a substantial relationship and I am happy

18  to show you specifically as to how I define that relationship

19  and what that was relationship was.  It's then translated

20  into lost sales and lost profits, which I hope answers your

21  question.

22          THE COURT:  Insofar as you were offering an expert

23  opinion on the relationship between the turnover of the

24  notebook, the Franco material, this is from the seminar, you

25  opined that there was a direct relationship between that

86

1  event and the lost sales?

2          THE WITNESS:  Yes.

3          THE COURT:  What in your background gives you an

4  expertise to interpret that, as opposed to a post hoc proctor

5  hoc, dangerous kind of conclusions in terms of your own

6  expertise?

7          THE WITNESS:  I have in-depth expertise in

8  relationships-- to defining relationships, in relationships

9  to physical analysis and in relationship to business

10  analysis, in relationship to competitive analysis.

11          THE COURT:  What else?

12          THE WITNESS: It's a business analysis case in many

13  respects.  You are looking at relationships and you are

14  looking at cause and effect.  You are looking at the

15  financials.  And you're looking at time and series of

16  analysis.  And you're looking at correlations.  And again,

17  I'll be very happy when we get into the details of how I did

18  that.  And how that occurred.

19          If I could go back for one other second. I wanted

20  to go back to the point in relation to being able to validate

21  data that really, really portends to me personally.

22          One of the data points that was important in

23  defining relationship between Ms. Franco's actions and the

24  impact through NXIVM's business was the number of people

25  attending seminars.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

87

1          NXIVM provided me two sources of raw data, internal

2     working documents data on the attendance of seminars.  One of

3     the documents dealt with a concise summary by month as to

4     where the seminar was and the title of seminar and the dates

5     in which it was held and how many people attended.  That was

6     independently confirmed by some additional summary data.  For

7     example, if you look at a month, and they have X numbers of

8     seminars, and you have detail as what was the seminar and

9     where was it, and what was the date and how many attended,

10    you will see additional documents then summarize that in

11    different formats.

12          In addition to validate some of this, I went and

13    there is a site called The Way Back Machine.  You may be

14    familiar with it.  It permits you go back in time and pick up

15    websites X years ago.

16          What I did, I went back in time and I looked at the

17    NXIVM's annual -- looked at the NXIVM's website to see when

18    they in fact were advertising these specific seminars.

19          So I found those seminars, cross checked that with

20    seminars that they had actually presented, and that gave me a

21    confirmation that that made sense.  That was a good

22    independent data check.

23          THE COURT:  Okay.  All right.

24    BY MR. SYLVESTER:

25    Q.   On the data check you just mentioned.  You confirmed the

                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

88

1  dates seminars took place; is that right?

2  A.   I confirmed-- let me think.  I want to be precise.  I

3  was able to confirm with The Way Back Machine seminar was

4  advertised.  I, through NXIVM records, saw raw data -- not

5  raw data, but a summary as to how many people attended each

6  seminar and it was by date and by city, etc. And then I saw

7  some additional summaries, which then put it with that.

8            No.  The answer your question, I do not recall

9  seeing a specific X verifiable data point to confirm that the

10  seminar took place.

11  Q.   Sir, take a look at Tab 22.  I think you told me that

12  this is important that financial information would be

13  accurate and verifiable, true?

14  A.   Yes.

15  Q.   Take a look at Tab 22, sir.

16  A.   Okay.

17  Q.   You've seen that document before?

18  A.   Yes.

19  Q.   All right.  And can you identify for me the amount of

20  sales of NXIVM in 1999?

21  A.   ███████████

22  Q.   And you got this information from NXIVM, I presume?

23  A.   One moment please.

24            MR. MCGUIRE:  Mr. Sylvester, so we are not

25  operating in a vacuum.  The reference Tab 22.  This is page

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

89

1   22 of Mr. Smith's record?

2          MR. SYLVESTER:  It is.

3          THE WITNESS:  Yes.  That was an internal document,

4   ▮▮▮▮▮▮▮

5   Q.   And you relied upon this, I presume.

6   A.   Well, if you go to my 2017 report, page 23, figure 17.

7   This is a comparison of sales between the data prepared by a

8   CPA, internal document from NXIVM, and the federal tax

9   return, and I used ▮▮▮▮▮ the federal tax return was

10  ▮▮▮▮▮▮

11  Q.   Sir, I simply asked did you rely upon this document?

12  A.   Yes.

13  Q.   And I want to refer you back to 1999 tax return, which

14  is Tab 18.

15  A.   Okay.

16  Q.   Do you have it?

17  A.   One moment please.  Okay.

18  Q.   So now looking at Tap 18, 1999 return?

19  A.   Yes.

20  Q.   Isn't it a fact ▮▮▮▮▮ does not appear on that tax

21  return?

22  A.   Yes.

23  Q.   All right.  Now let's go back to Exhibit 22, and tell me

24  what the sales figure is for year 2000?

25  A.   I'm sorry.  Start me again.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

90

1  Q.   Please tell me what is the same figure for the year

2  2000?

3  A.   Where are you?

4  Q.   On page 22?

5  A.   Page 22.

6  Q.   Look at Tab 22, if you prefer?

7  A.   Sure.  2000.

8  Q.   2000, please.

9  A.   1597205.

10  Q.   And look at the 2000 return.  Just Tab 19.

11  A.   One moment, please.

12  Q.   Do you have that in front of you?

13  A.   Okay.

14  Q.   Does the number ▮▮▮▮▮▮▮▮▮▮ appear on the 2000 tax

15  return?

16  A.   No.  On the tax return is ▮▮▮▮▮▮

17  Q.   Let's go back to the chart now.  Tell me what the sales

18  were for the year 2001?

19  A.   The chart meaning?

20  Q.   The chart-- that is Tab 22.

21  A.   Page 22.  Year 2001.

22  Q.   2001 please.

23  A.   ▮▮▮▮▮▮▮

24  Q.   And please turn to Tab 20, the 2001 tax return.

25  A.   Okay.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  Q.   And isn't it true that the number ████████ doesn't appear

2  on the tax return?

3  A.   Yes.

4  Q.   Okay.  Thank you.

5       MR. SYLVESTER:  Your Honor, the point here is I

6  haven't seen -- by the way, the discovery to complete a dead

7  horse, which I can do better than anyone as my teenagers will

8  tell you in a heart beat, even though I didn't see either the

9  internal spread sheets with the sales, which I never did.  Or

10  the tax returns, which I never did.  Or ever examined the

11  witnesses with regard to these documents.  The fact that they

12  don't fit is the end of this.

13       Because we're not playing horse shoes here.  It

14  can't be close.  And the point is -- that goes to the

15  prejudice, if I had had these materials in discovery, you

16  could only imagine the deposition which, one-- what was the

17  disparity, it was kept of me.  And the reason kept from me is

18  because it's married to a totally different damages theory.

19  That's why I suppose I am not a contributing any ill-conduct

20  to anyone.

21       THE COURT:  You're saying it wasn't kept from you

22  out of malingering and it wasn't relevant to the case?

23       MR. SYLVESTER:  It wasn't relevant.  Because there

24  was a clear linkage and marriage, if you will, to a

25  well-formulated damage theory, which was from the amended

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

92

1   complaints onward.  And the point is that this goes to

2   qualifications because we're talking about someone who is

3   faced with disparities in all three years.  And I don't care

4   if it's one percent.  I don't care if it's five percent.  The

5   numbers don't work.

6           The immediate thing to do causes-- this causes

7   someone to say it's an inaccurate period-- end of story.  And

8   goes to qualifications against the backdrop of three federal

9   judges and federal magistrates relying on unreliable

10  information-- which is a no, no and cause for preclusion and

11  methodology preclusion and all those things that were there.

12          When faced with two fact numbers that don't match.

13  I don't care 2 or 5 percent, it makes no difference-- they

14  have to match precisely.  That's the whole point.  And by the

15  way, this goes to reliability in spades.  Later, if he ever

16  got there that goes to the core question and that goes to

17  qualifications.

18          I implore the Court, if you don't mind look at it

19  from our perspective.  We're dealing with somebody that's

20  disqualified and was given almost a menu of things that he

21  did wrong as a road map.  Don't do this again.  Here we are

22  again.

23          Thank you.  I don't have anything further.

24          THE COURT:  Any redirect on the issue of

25  qualifications?


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          MR. MCGUIRE:  Your Honor, briefly.  And I'll just

2  get into this bit with respect to what Mr. Sylvester was just

3  asking the questions about the alleged disparities between

4  the calendar years and exact revenues.

5          THE COURT:  Yes.

6  ^^ BY MR. MCGUIRE:

7  Q.   Mr. Smith, do you recall being asked to flip back and

8  forth between Tab 22 and the various tax years that you were

9  asked questions along and the lines.  You would agree that

10 what was in-- what was in Tab 22, that number did not show up

11 in a given tax year; do you remember that?

12 A.   Yes.

13 Q.   Could you give the Court an explanation as to why the

14 exact number would not correspond?

15 A.   Sure.  This is not only a economic loss, you need to

16 estimate lost sales.  You also need to estimate lost

17 profits.  And when you look at lost profits, tax returns are

18 prepared under different accounting standards than internal

19 documents that are verified by a CPA.  And you don't want to

20 mix up apples and oranges.  You end up in trouble very

21 quickly.

22          So it was a decision to make as to whether I use or

23 for these three precise years for sales, the tax return

24 numbers or the numbers that came from the CPA.  Recognizing,

25 if you look at page 23 figure 17 in total, 3.4 percent

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

94

1  below.

2          If you go to-- I don't mean to jump ahead, but I

3  think this is significant.  If you go to it in my report page

4  18, figure 11.  You will see a graph like this.  One of the

5  ways in which I forecasted the but for sales was a best fit

6  historic curve-- customer practice.  As a point of interest

7  the correlation with this best fit line and the sales

8  history, as could you see it is a .99 that's almost a perfect

9  correlation.

10          Now, if I would have used the tax return

11  information my sales forecasts would have been higher.  An

12  unaudited number from the CPA was lower than the tax return.

13  So to use unaudited rather than the audited-- rather than the

14  tax return had two advantages.  One, it gave me a better

15  number for the percent gross profit.  And from a prospective

16  of importance, the percent profit is significantly more

17  important than the revenues forecast.  Because there's a

18  leverage there.

19          Secondly, the use of internal data prepared by the

20  CPA, it gave me a conservative forecast.  So I had a point

21  error on the low side from the sales forecast.  And it's

22  going to increase my accuracy from the estimate of the

23  percent lost profits.

24          THE COURT:  All right.

25          THE WITNESS:  This was not given in any way, shape

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

95

1   or form, I'm demonstrating clearly in this report that this

2   is what I did and why I did it.  As one other data point.

3   And right at the last minute of my report.  I didn't have a

4   chance to bring it in, I received the 2002 tax returns.  And

5   the 2002 tax returns were 0.0 percent difference between the

6   internal documents and the federal tax return.

7              THE COURT:  Okay.  Anything else on this, Mr.

8   McGuire?

9              MR. MCGUIRE:  One point?

10             THE COURT:  Sure.

11  BY MR. MCGUIRE:

12  Q.   Mr. Smith, Mr. Sylvester asked you at some length, and I

13  suspect that it was at some discomfort to you about those

14  cases in the Southern District of New York where you were

15  disqualified.

16  A.   Sure.

17  Q.   You spoke to all of those cases in a declaration that

18  you provided in 2017, correct?

19  A.   Yes.  Yes.

20  Q.   It was not your intent to come before this Court and

21  pretends-- it was not your intent to come before this Court

22  and hope that nobody found out about those prior

23  disqualifications was it?

24  A.   No.

25             MR. MCGUIRE:  Your Honor, on the subject of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

96

1   qualifications I rest.

2           MR. SYLVESTER:  One question, your Honor.

3           THE COURT: Yes.

4   ^^ BY MR. SYLVESTER:

5   Q.   Sir, isn't it a fact that-- don't you state so on page

6   23 of your report that you declined to vouch for this CPA's

7   professional performance?

8           THE COURT:  You're speaking the same CPA that was

9   involved in the--

10          MR. SYLVESTER:  Unaudited financials.

11          THE COURT:  Yes.

12  Q.   Do you have page 23 of your report, sir?

13  A.   Yes, I do.

14  Q.   Do you see in the first paragraph that you make the

15  statement, I do not vouch for the CPA's professional

16  performance as I'm not a CPA.

17          Do you see that statement, sir?

18  A.   Yes.

19  Q.   And would you agree with me that by vouch, you mean you

20  are not contending that that is accurate?  Let me withdraw

21  that.

22          By vouch, don't you mean that you're not

23  guaranteeing the accuracy of the CPA's performance?

24  A.   I also state in that report that the CPA has an ethical

25  obligation to insure unaudited financials comply with certain

                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

97

1  public standards and I am relying on those financial

2  statements.

3  Q.    Sir, do you know what a compilation is?

4  A.    Yes.

5  Q.    What is it?

6  A.    Pardon?

7  Q.    What is a compilation?

8  A.    I'm not sure I am comfortable to give you a precise

9  definition of a compilation.

10  Q.    To be clear.  How long have you been in the business

11  world?

12  A.    50 plus years.

13  Q.    And you're not prepared under oath in this federal court

14  to give me a definition of what a compilation is-- is that

15  not true?

16        MR. MCGUIRE:  If we could get what a compilation in

17  what context objection.

18        THE COURT:  Let's see if the witness can respond to

19  the question.  If you want to offer your own professional

20  experience as a definition I would like to hear it.

21        THE WITNESS:  No, I'm not comfortable in trying to

22  speak a definition as to that.

23        THE COURT:  Okay.

24  Q.    Would you agree by the use of the word vouch you are

25  stating you are not guaranteeing the accuracy of the CPA's

98

1  professional performance?

2  A.    I'm not sure how to answer that question.

3           MR. SYLVESTER:  I'll withdraw it.  I am prepare to

4  argue this because I think this goes to the core elements,

5  your Honor.

6           THE COURT:  I have just a question.

7           You have testified at three trials?

8           THE WITNESS:  Yes.

9           THE COURT:  Were they jury trials?

10          THE WITNESS:  Yes.

11          THE COURT:  And what was the purpose of your

12  testimony in these jury trials?

13          THE WITNESS:  Well--

14          THE COURT:  No, I don't mean individual.  What did

15  you view you were there to do visa via the jury?

16          THE WITNESS:  As an expert in a specific subject,

17  my objective is to help the jury understand with my

18  professional education and experience the subjects at-hand.

19          THE COURT:  Okay.

20          THE WITNESS:  Number two--

21          THE COURT:  And the jurors, I'm sure you've heard

22  the judges say any number of times to their jurors that, you

23  are the finders of-- you are the factfinders.

24          Have you heard that term before?

25          THE WITNESS:  Yes, I have.

99

1         THE COURT:  To the extend that you were offering

2   your experience and training as an aid to the jurors, you

3   were aware that they were going to use what you said, and if

4   they believed what you said, that they were going to find as

5   facts that something or other happened.

6         THE WITNESS:  Yes.

7         THE COURT:  Correct, they weren't there.  And

8   normally a witness testifies what as to that witness saw or

9   smelled or touched, or could testify about what it heard or

10  saw.  You couldn't do that.  But you were permitted to

11  testify as a result of your experience and training with

12  respect to documents that were not necessarily within the

13  jurors' kin, correct?

14        THE WITNESS:  Yes.

15        THE COURT:  Okay.  Is it fair to say that if they

16  believed you that they had the right to accept that what you

17  were talking about was based upon real facts-- truth.

18        THE WITNESS:  Absolutely, yes.

19        THE COURT:  Okay.  In this case there will be

20  anywhere between eight and ten folks sitting in that jury box

21  and they can't decide the case based upon a majority rule.

22  In federal court they have to be unanimous as to their

23  findings.  And if your report were to influence a decision in

24  favor of NXIVM and the jurors, who will never have to tell us

25  if they ruled in favor or find in favor of NXIVM, nobody asks

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  them, how come you made up your mind.  All we do is, how do

2  you find and they tell us and they go home.

3          THE WITNESS:  Sure.  I understand.

4          THE COURT:  But if they in fact turned out to be

5  persuaded in large part by your report, are you prepared to

6  say to all of us that you're satisfied that you did not lead

7  them astray, because you gave them not your opinion based

8  upon numbers that somebody else gave you, but your opinion

9  based upon the real revenues, the real numbers in terms of

10  the attendance, or really the business results year by year

11  post revelation of the Franco binder.  And if you're prepared

12  to say that they found correctly because your expert report

13  was based on real numbers-- tell us why.  Why is your report

14  based on real numbers?

15          What I'm hearing Mr. Sylvester saying is and

16  correct me if I am wrong, Mr. Sylvester.  Is that other

17  courts wouldn't let you get up and attempt to give the jury

18  an opinion that they could rely on or use in their findings.

19  Those judges said, no, we can't let Don Smith testify because

20  what he was relying on wasn't shown to be accurate

21  information.  And Mr. Sylvester is saying, here you go, you

22  are doing it again-- am I correct?

23          MR. SYLVESTER:  That is correct, your Honor.  That

24  is what those courts did.  They found that under the prongs

25  of 702, you have to look at the reliability and information.

                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  And the courts in each of those situations, troubled by the

2  mode in which this particular expert obtained the information

3  and recognizing that it was either for counsel and client,

4  wasn't an independent verification and sign post there that

5  permitted the court to be not comfortable.  That this expert

6  could do just what you've described.  That is to say these

7  numbers are rock solid-- I'm going with it.

8          In fact, there was one court, with all due respect

9  said, what had happened here was simply a graphing exercise

10 that could be done, because it was a straight line in terms

11 of sales and increases.  And chastised experts to try to

12 opine along those lines.  But the fundamental principles was,

13 what are we doing here.  We don't know for sure that these

14 numbers are accurate and we're relying upon data that has not

15 been individually and personally verify.  We're relying on

16 data which could be inaccurate.

17         And this individual, in addition does not have

18 specialized expertise in the industry.  In fact, the case in

19 which I am thinking it was in the jewelry industry.  We are

20 in the same situation here.  You have no descriptions of

21 specialized expertise in what Ms. Salzman says is a very

22 specialized area.  A very specialized world.

23         THE COURT:  You're bringing in another line of

24 arguments now.

25         MR. SYLVESTER:  Yes. It goes to qualifications and

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

102

 1  lots of those reasons the court said that.

 2          THE COURT:  I am just sticking with the question I

 3  asked Mr. Smith.

 4          MR. SYLVESTER:  The answer is yes.

 5          THE COURT:  So my job here is to do what these

 6  judges refused to do-- or not.  I either say that there's the

 7  same fundamental failure to use verifiable reliable

 8  information, reliable information.  Because these folks are

 9  going to rely on. Imagine that members of the public-- none

10  of whom want to drive to Newark and none of whom want to

11  perform jury service, no matter what I tell them.  My court

12  reporter and deputy know this. We get lunch for them and we

13  try to keep them from running out of the courtroom.  And it's

14  fair for them to feel that this is not their problem.  And

15  that life is tough and that they're asked to interrupt their

16  lives and sit here in Newark in a drafty courtroom and do the

17  best that they can.

18          So it's a noble and difficult duty of citizenship.

19  And therefore we have to be-- particularly in the case of

20  expert testimony, we have to be very careful that our expert

21  witnesses don't beguile jurors with their expertise, in terms

22  of their careers and experiences, but rather serve as

23  rigorously reliable interpreters of data that to these people

24  it means absolutely nothing.  You're the one that pulls it

25  together and explains it.  But that's why the evidence rule

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

 1  requires reliable data.

 2          So my question to you is, can you sit here today or

 3  do you want to take an overnight and read those cases and

 4  read your report and think about the arguments that Mr.

 5  Sylvester made and come back and tell me tomorrow morning?  I

 6  will give you more time.  But if you don't need the time--

 7  are you prepared to say, I would take a citizen before me and

 8  in his duty of citizenship make a fair decision based on the

 9  evidence in the courtroom.  Not what he's read about NXIVM

10  and Stephanie Franco or you or me, or anybody in the

11  courtroom.  They can't do any independent research.  We make

12  sure no one has read any of the articles that Mr. Sylvester

13  was talking about.  We keep people in a peaceful bubble and

14  give them information.

15          Are you prepared to say that you're comfortable

16  that it is a responsible thing for to you say to them, I have

17  reliable information and here is how I looked at it and

18  here's how I extrapolated my findings?

19          THE WITNESS:  Two points, if I may.  One

20  absolutely.  I been working for 52 years in which the most

21  important thing in my job as a engineer in market research is

22  quality information objectively reviewed-- period.

23          So this is my absolutely my best judgment.  And

24  when, in fact, they don't agree it was a conscience decision

25  because I wanted best quality margins and information and

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1051fourteen

1  using CPA numbers, I knew that there was a modest

2  difference.  I told everyone in the report that there was a

3  modest difference, and quantified the specifics of the modest

4  difference with the important caveat of why I showed you one

5  of the three forecasting tools used that creates a lower

6  economic loss than I would have received otherwise.

7           Number two.  I am really not trying to make excuses

8  at all.  The Daubert decisions were extraordinarily

9  frustrating to me.  But may I give you several data points in

10  which will may be--

11           THE COURT:  You put some in.  But understand, I am

12  not free, I don't have luxury of going behind a decision.  I

13  couldn't do my job if I went behind what people say about my

14  decision--

15           THE WITNESS:  I understand.

16           THE COURT:  --I couldn't get out of bed.  The point

17  is I look at what they wrote, if it weren't reversed or in

18  some cases if we have an appellate thing and it's reviewed,

19  again I have to go with what they say.

20           THE WITNESS:  Okay.

21           THE COURT:  Now, it does bother me, and I am saying

22  it right now that you did not as somebody working in the

23  field of forensics read and absorbed it-- even if you had

24  forget about it over a glass of wine, or a bottle of wine to

25  get through it.  We all have to do it.  I have to read my

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

105

1   reversals.  That was a reversal.  You don't learn from what

2   you did well but from your mistakes.  Would you agree with

3   me?

4           THE WITNESS:  Yes.

5           THE COURT:  So to the extent that they're part of

6   the mosaic of my assessments of the weight to give your

7   opinion, it certainly does bear upon my evaluation of how

8   serious a professional you are, if you haven't even-- if you

9   disagree with me as to with the mistakes and said to

10  yourself, well, I know I have it right apparently the way I

11  put it together.  I couldn't get to have this guy agree with

12  me and so I'd better figure out-- not a wrong way of

13  presenting the data, but a clearer way of presenting the

14  data-- so that a judge doesn't make that same mistake.  And

15  low and behold two other people followed that same suit.

16  That is something I will be considering-- is the failure to

17  really grapple with this as Mr. Sylvester puts it a theme.

18          I am not saying that I agree with it as a theme.

19  But at this point you've made logical arguments based upon

20  what these folks and colleagues of mine wrote.  So that it

21  just sits there and it's something to think about for the

22  future.

23          THE WITNESS:  I understand.

24          THE COURT:  But that whole issue of reliability and

25  the information, what I'm distilling everything down to is

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

106

1  Mr. Smith is prepared to stand behind his report on the basis

2  that he got numbers from the CPA and he got numbers off the

3  tax returns.  And what I'm hearing you say is that they

4  harmonize sufficiently from your purposes to use them in

5  going forward and making judgments and offering opinions

6  regarding the effect of the Franco document on the fortunes

7  of NXIVM, correct?  Is that fair to say what happened?

8           THE WITNESS:  That's correct.

9           THE COURT:  Okay.  It's 25 of 4 p.m. unless counsel

10  has anything to say that is different from what was both

11  effective examination, Mr. Sylvester, and argument, and you

12  have both presented your witness and offered as it were

13  rebuttal.  Unless there's anything more from either side, I

14  would like to be able to give you a ruling so that you could

15  go forward with the next step.

16           Anything else?  Mr. Sylvester?

17           MR. SYLVESTER:  Yes, your Honor.

18           THE COURT:  Why did I know you were going to say

19  yes.  Come up to the podium.

20           MR. SYLVESTER:  I will thank you.

21  BY MR. SYLVESTER:

22  Q.   Sir, could you please turn to Tab 17.

23  A.   Okay.

24  Q.   Do you see that?

25  A.   Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

107

1   Q.    Do you recognize that the accountants for NXIVM?

2   A.    Yes.

3   Q.    And do you see the second paragraph, it identifies its

4   job was to prepare a compilation.  Do you see that?

5   A.    Yes.

6   Q.    And do you see also where the accountants say, they have

7   not audited or reviewed the accompanied financial statements

8   and accordingly do not express an opinion or any other form

9   of assurances on them.  Do you see that?

10  A.    Please let me read this?

11  Q.    Sure.

12  A.    Okay.  Okay.

13  Q.    Do you agree with me what the accountant was saying it

14  does not in any way, shape or form, guarantee the accuracy of

15  the compilation?

16  A.    I don't see those statements.

17  Q.    What do you understand the words any form of assurance

18  on them to mean?

19          THE COURT:  Well, why don't we put the whole

20  context in.

21          MR. SYLVESTER:  Okay.

22          THE COURT:  What one of three paragraphs do you

23  feel is the statement that you want this witness to respond

24  to?

25          MR. SYLVESTER:  Well, yes, your Honor, the point

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

108

1   here is that-- well let me establish this.

2   Q.   You have not seen this document before today have you?

3   A.   No.

4   Q.   So NXIVM never provided this to you-- is that fair to

5   say?

6   A.   No, I don't recall this document.

7   Q.   Do you have an understanding of what the accountant was

8   referring to with reference to an assurance as used in the

9   second paragraph?

10  A.   This is not an audited statement.  This is very common

11  for organizations to not have a CPA put that they're also not

12  audited.

13  Q.   Which means that the accounting firm is not vouching for

14  the accuracy of the numbers; isn't that right?

15  A.   I don't know that's what they're saying.  They're saying

16  it's not-- this has not been audited.

17  Q.   What does that mean to you, sir?

18  A.   Well, a series of steps and procedures that you must go

19  through to be certain that the financials are accurate.  And

20  in this particular case, NXIVM's common with many of the

21  privately held organizations I work with, their books are not

22  audited-- it's expensive to have your books audited.

23          THE COURT:  Is this the same accountants that

24  signed the unsigned tax returns?

25          MR. SYLVESTER:  I am not certain.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

109

 1            MR. MCGUIRE:  I don't believe so.

 2            MR. SYLVESTER:  That was later in time.

 3            MR. MCGUIRE:  That was Dagostino that provided the

 4  signed 1999 return.

 5            MR. SYLVESTER:  Here's the point, your Honor.

 6            Isn't it a fact that the period of time in which

 7  this accountant is working falls smack in the middle of your

 8  damages period?

 9            THE WITNESS:  Yes.

10            MR. SYLVESTER:  Your Honor, I am prepared to hand

11  up the definitions of what assurance means-- if we wants to

12  go that far.

13            THE COURT:  No.  Again, I am trying to get to the

14  facts behind this.

15            MR. SYLVESTER:  The point I am making is--

16            THE COURT:  Let me make one comment.

17            MR. SYLVESTER:  I apologize.

18            THE COURT:  We have three tax returns, correct?

19  1999, 2000, 2001?

20            THE WITNESS:  That's correct.  Plus 2002, which was

21  available shortly thereafter.

22            THE COURT:  That's right.  So we have a run of tax

23  returns.  We have unaudited financial statements?

24            THE WITNESS:  Correct.

25            THE COURT:  From the same years or from later

                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

110

1   years?

2           THE WITNESS:  From the same years.

3           THE COURT:  Prepared by these folks or prepared by

4   different people?

5           THE WITNESS:  Two separate CPAs.

6           THE COURT:  Mr. Sylvester is asking you whether or

7   not you agree that these CPAs, who compiled accompanying

8   statements of income as of June 30, 2007, what were the years

9   that these folks-- how do you pronounce this name? F-R-U-C-I.

10          MR. SYLVESTER:  Fruci.

11          THE COURT:  The Fruci firm looked at what years for

12  purposes of giving you financials?

13          THE WITNESS:  May I?

14          THE COURT:  Yes.

15          THE WITNESS:  1999 it was Dagostino that was

16  signed.  Fiscal 2000 was Fruci unsigned.  2001 is Fruci.  And

17  2002 was Fruci.

18          THE COURT:  Okay.  And then Fruci says so far you

19  have financial-- unaudited financials from them-- they have

20  compiled accompanying statements of income.  Are those the

21  same years they say as of June 3, 2007, sounds if they did

22  all but one year beginning in 1999.  I don't care who wants

23  to answer this-- everything up to 2007?

24          MR. SYLVESTER:  Your Honor, if you take a look at

25  tab starting 6.  6, 7, 8, 9, 10, 11, 12, 13, 14.  All

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

111

1  subsequent even tab 15 subsequent tax returns were prepared

2  by Fruci.

3          THE COURT:  Okay.

4          MR. SYLVESTER:  If I might ask the witness.  Can

5  you take a look at those later tax returns please.

6          THE COURT:  Starting with which tab?

7          MR. SYLVESTER:  Tab 6.  Before you do that I'll ask

8  you a question.

9  Q.   Sir, did you state in 2013 in a declaration that you

10  would have like to have seen returns for years other than

11  1999 2000, 2001?

12  A.   Yes.

13  Q.   And between 2013, when you rendered the report in 2017,

14  did the client or Mr. Crockett provide you with any of those

15  returns?

16  A.   No.

17  Q.   I didn't hear you?  I'm sorry.

18  A.   No.

19  Q.   And after you rendered your report in February last

20  year, if I recall you said in that report you would have

21  preferred to have seen the tax returns for all subsequent

22  years-- didn't you say that?

23  A.   Yes.

24  Q.   And since February of last year until today, has Mr.

25  Crockett or NXIVM provided you with any of those returns?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

112

1  A.   No.

2  Q.   Okay.  Now, sir, with regard to-- I want to ask you a

3  question with regard to page 21 of your report.

4  A.   Okay.

5  Q.   You identified on page 21 the sales of the NXIVM company

6  for fiscal year 2006?

7  A.   Okay.

8  Q.   What is the number 1234?

9  A.   ████████

10 Q.   And you also identified the gross profits?

11 A.   Yes.

12 Q.   And what is that number?

13 A.   ████████

14 Q.   And turn back to the Fruci letter please.

15 A.   Sorry?  Tab 17.

16 Q.   Yes.  Can you turn to page 2 of the Fruci letter?

17 A.   Okay.

18 Q.   Is that not an income statement for the fiscal year

19 ending 2006?

20 A.   This would be their 2006 fiscal year.

21 Q.   Fiscal year 2006?

22 A.   It appears so.

23 Q.   And those were the numbers that you just gave me of page

24 21 from your report; isn't it the same year?

25 A.   Yes.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

113

1   Q.   Now, tell me if the numbers in your report a▮▮▮▮▮▮

2   if it shows up on page 2 of the Fruci letter?

3   A.   No.

4   Q.   And what about the gross profits.  You had in your

5   report ▮▮▮▮▮▮▮▮▮▮▮▮ true?

6   A.   Yes.

7   Q.   And doesn't the Fruci income statements for the very

8   same fiscal year identify gross profits of ▮▮▮▮▮▮▮

9   A.   Yes.

10  Q.   Okay.  Do you have a calculator or accept my

11  representation that you're off by 32 percent?

12  A.   For what?

13  Q.   In terms of the gross profits for fiscal year '06?

14  A.   I don't know.  I have to calculate it.

15  Q.   I'll withdraw that.

16           THE COURT:  We have all phones.

17           MR. SYLVESTER:  I have done it and it's 32

18  percent.

19           Sir, if I can direct your attention-- if you don't

20  mind.

21  Q.   This is to Tab 7.

22  A.   Okay.

23  Q.   I presume you prepared your tax return on your own for

24  year 2005?

25  A.   I have accountants do it for me, but yes.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

114

1  Q.    Would it be fair to say that you probably signed it

2  somewhere in April 2006 or thereabouts?

3  A.    Yes.

4  Q.    Tell me what was the date that the accountant prepared

5  this 2005 tax return?

6  A.    10/30/13.

7  Q.    Did you say 2013?

8  A.    Yes.

9  Q.    And can you tell me when this one was signed by the

10  NXIVM?

11  A.    I'm not sure.  What specific date are you looking for?

12  Q.    It says--

13  A.    If I understand correctly the CPA was the first

14  request?

15  Q.    Yes, the CPA please.

16  A.    Fruci signed it 10/30/13.  And your question was then?

17  Q.    When was it signed by the taxpayer?

18  A.    It's hard to read.  It looks like 10/31 2015.

19  Q.    And let's turn to Exhibit 8.  One was a 2006 return

20  signed by the accounting firm?

21  A.    12, 3, 2013.

22  Q.    And when did the tax preparer sign it?

23  A.    February 28, 2014.

24  Q.    Excuse me you said 2014?

25  A.    Yes.

115

1  Q.   And I could go on and show you others, but my question

2  sir is, would it have given you some pause that the return

3  wasn't signed for many, many years after the tax year?

4          MR. MCGUIRE:  Objection, your Honor, this is well

5  beyond the scope of qualifications.  Which is what was my

6  understandings that we're dealing with-- with respect to this

7  witness.

8          He's already testified that he did not take into

9  consideration any of these later tax returns in corroboration

10 with the Court or in a declaration.  If we're going to get

11 back into the question of data relied upon and methodology--

12 I'll direct him on it.

13         However, my understanding is that the Court

14 provided this with rulings on qualifications.

15         THE COURT:  Well, we're still within the zone of

16 the reliability of the information.  And the practice that

17 Mr. Sylvester is exploring is relying on data that has been

18 criticized by federal jurists in the past.

19         I'll permit the question.

20         THE WITNESS:  What was your question?

21 Q.   I think the question was, you know, I think I made the

22 points in terms of the dates?

23         THE COURT:  No, you were asking whether or not he

24 was concerned about the--

25 Q.   If you had seen-- right, if you had seen the large

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

116

1   disparity between the date that was signed and the tax year

2   would that have given you pause?

3   A.   Yes, this would have been a concern.

4   Q.   And the other returns as well I presume?  Where there

5   was a disparity?  They-- there would have been a concern as

6   well though, right?

7   A.   I am not sure I fully understand that question.  Based

8   upon this 2006 fiscal year with those dates, yes, I would

9   would-- I would have had a lot of questions.

10  Q.   You've said you had a lot of questions, true?

11  A.   Sure.

12  Q.   And this fiscal year is smack dab in the middle of your

13  damage periods-- isn't it?

14  A.   Yes.

15  Q.   Again, to make this point.  As far back as 2013, you

16  were declaring to this Court under oath that you wanted to

17  see these tax returns true?

18  A.   Yes.

19  Q.   And when you rendered the report you similarly made the

20  statement that you wanted to see these returns; isn't that

21  true?

22  A.   Yes.

23  Q.   And at no point from 2013 until right this minute has

24  NXIVM done anything to show you the returns that you were

25  looking for; isn't that true?

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

117

1  A.    That I can answer that is right.

2          MR. SYLVESTER:  I have nothing further on whether

3  or not this witness is qualified.

4          THE COURT:  I could beat dead horses too.  I'll go

5  back a couple of questions that I've asked you.

6          I'm taking seriously what you said because I think

7  it is a credible way to go.  If you have various ways of

8  double checking on information given to you, by looking at

9  another source of similar information and they appear to

10 harmonize there's a self-proofing?

11         THE WITNESS:  You have to be careful but it helps.

12         THE COURT:  It helps?

13         THE WITNESS:  It helps, yes.

14         THE COURT:  And you employed that approach when you

15 look at the unaudited financial statements for those early

16 years 99, 2000, 2001 and the late presented 2002?

17         THE WITNESS:  Yes.

18         THE COURT:  And the financial statements, unaudited

19 financial statements, and then you had these tax returns?

20         THE WITNESS:  That's correct.

21         THE COURT:  Which gave you some comfort that you

22 could rely on those financials when you started working

23 within the post Franco-- I call it Franco, really it's the

24 articles that prompted the pleaded-- when I say pleaded this

25 was advanced in the complaints that, hey, we have this fall

118

1   off of folks that just didn't go, right?

2           THE WITNESS:  Right.

3           THE COURT:  Now, you can't however and you will be

4   troubled now, but the inability to match up financial

5   statements up to 2007 from Fruci with tax returns related to

6   those years is, because you really didn't have those tax

7   returns, correct?

8           THE WITNESS:  That's correct.

9           THE COURT:  What's presented to you now in the

10  tab-- I believe Tabs 7 and 8 are tax returns from 2005 and

11  2006 that show years in between the taxable year and the

12  final tax return?

13          THE WITNESS:  Yes.

14          THE COURT:  As far as 2007 goes, whatever is

15  presented is not signed by anybody, correct?

16          THE WITNESS:  Correct.

17          THE COURT:  And 2008 there's a lapse of nine years,

18  correct?

19          THE WITNESS:  That's correct.

20          THE COURT:  Does that give you some concern about

21  the reliability of your approach so far it appears to be an

22  extrapolation of what you could see for earlier years to what

23  you were asked to look at?

24          THE WITNESS:  I would have loved to have had the

25  additional tax returns.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

119

```
 1          THE COURT:  Now you do.

 2          THE WITNESS:  Now I do.  And specifically I

 3  included in my report, I wrote February 3, 2017, if

 4  additional tax returns are presented and available I would

 5  love to be able to look at them and modify my report, if in

 6  fact appropriate-- if that answers your question.  I wanted

 7  more data and always wanted more and was hungry for it and

 8  independent data.

 9          THE COURT:  And in the same ways your numbers are

10  kind of creeping across your vision-- I'm looking at my empty

11  jury box and fractious citizens that I am bringing to Newark,

12  and again I ask you the reliability of the data that you

13  used, given what clearly is something that got your attention

14  and those are those time lapses that come and now fresh the

15  data-- what the devil was going on.  Are you now comfortable

16  looking them in the eye and offering the report without

17  modifications that you've presented-- up until now?

18          THE WITNESS:  I want to answer your question, but

19  this is first time today-- and I've only been able to glance

20  at the data that I have had a chance to look at the

21  additional tax returns.  And I really can't answer your

22  questions unless I look at it in more detail.

23          THE COURT:  Fair enough.  Fair enough that's fine.

24  All right--

25          MR. MCGUIRE:  Your Honor, perhaps if the Court
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

120

 1  would ask in the form of hypotheticals which might be

 2  appropriate because he's an expert.

 3          THE COURT:  Ask it.

 4          MR. MCGUIRE:  ████████████████████████████

 5  ████████████████████████████████████████████████████

 6  ████

 7          THE WITNESS:  I couldn't hear you very well.

 8          THE COURT:  Come up to the podium which it's hard

 9  to hear from there.

10          MR. MCGUIRE:  And late.

11          THE COURT:  And late to hear, right.

12          MR. MCGUIRE:  I am trying to assist the Court in

13  terms of a hypothetical.  ██████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████

18          THE WITNESS:  ████████████████████████████

19  ████

20  BY MR. MCGUIRE:

21  Q.  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████

24  A.  ██████████

25  Q.  ████████████████████████████████████████████████

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101



1

2

3

4

5      A.

6

7

8

9

10

11

12

13

14

15              MR. MCGUIRE:  Fair enough.  Nothing further.

16              THE COURT:  Okay.  Thank you.

17              MR. SYLVESTER:  May I make one point if you don't

18      mind.

19              THE COURT:  Yes.

20              MR. SYLVESTER:  I am good at getting back to where

21      I started.  Where we're on the trial and these tax returns

22      were only provided recently and weren't provided before and I

23      have them and he doesn't.  This is the nub of the problem.

24      So what am I doing over the next week is figuring this out.

25      This goes to a core issue.  Rule 703, which doesn't permit

1   the expert to rely upon something not in the case.  Rule 26--

2   this was never in the case, nothing Bates stamped, and the

3   fundamental prejudice and unfairness to me and my client to

4   be dealing with these things on the fly from a case that was

5   filed in August of '03.  This goes to that fundamental point

6   of the changing horses not midstream which they're about to

7   get on the other side of the river and now I have a whole new

8   theory.

9           This is something that at its core.  Can you

10  imagine sitting with Ms. Salzman and me cross examining her

11  at deposition to try to determine why there was an eight year

12  gap between tax years and signing it.  I mean could you just

13  imagine that.  I didn't get that opportunity because this

14  wasn't even part of the case.  I am totally beating a dead

15  horse.  Even the exercise of something overnight that's

16  putting me further behind the eight ball.

17          THE COURT:  No.

18          MR. SYLVESTER:  This to point out the problem that

19  I'm alluding to all day and which now I'm pointing out.

20          THE COURT:  I have criminal matters in the

21  morning.  And we'll continue this matter tomorrow at 1

22  o'clock.

23          We will take an early lunch among ourselves and

24  starting at 1 o'clock everybody.  Have brunch or a late

25  breakfast or hardy 12 noon farmer lunch.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

123

```
1              Thank you very much for today.

2              MR. MCGUIRE:  Thank you.

3              THE COURT:  Off the record.  Yes?

4              MR. MCGUIRE:  Mr. Smith is coming back?

5              THE COURT:  Unless you want Mr. Smith, if either

6    lawyer wants him he's here tomorrow then.

7              MR. SYLVESTER:  I do, your Honor.

8              THE COURT:  Thank you all.  Okay.

9              MR. SYLVESTER:  Thank you.

10             MR. MCGUIRE: Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

IN THE UNITED STATES DISTRICT COURT


FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 06-01051

NXIVM CORPORATION, formerly known as:
EXECUTIVE SUCCESS PROGRAMS, INC. and:
FIRST PRINCIPLES, INC.,                   :
                         Plaintiffs, :
        -against-                         :
                                          :
                                          :
STEPHANIE FRANCO, et al                   :
                                          :
                                          :
                         Defendants. :
_____x
                         Newark, New Jersey
                         January 10, 2018 2:00 p.m.
B E F O R E:
        THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
A p p e a r a n c e s :
TOMPKINS, MCGUIRE, WACHENFELD & BARRY, LLP
Attorneys for Plaintiffs NXIVM & NANCY SALZMAN
3 Becker Farm Road
Suite 402
Roseland, New Jersey 07068-1726
BY: GRANT W. MCGUIRE, ESQ.


SHERMAN WELLS SYLVESTER & STAMELMAN LLP
Attorneys for STEPHANIE FRANCO
210 Park Avenue
2nd Floor
Florham Park, New Jersey 07932
BY: ANTHONY J. SYLVESTER, ESQ.
    ANTHONY C. VALENZIANO, ESQ.
    CAITLIN T. SHADEK, ESQ.


_____
        Pursuant to Section 753 Title 28 United States Code, the following
transcript is certified to be an accurate record as taken stenographically
in the above-entitled proceedings.

                         s\ RALPH F. FLORIO
                         Official Court Reporter

I N D E X

WITNESSES:                                          PAGES:

DONALD SMITH (BY MR. SYLVESTER)              5

E X H I B I T S

NUMBER          DESCRIPTION          PAGE

SEE ATTACHED INDEXING

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

            THE COURT:  Good afternoon.

            We're back on the record in the matter of NXIVM Corporation v.
Stephanie Franco.

            May I have counsel appearances please.

            MR. MCGUIRE:  Good afternoon, your Honor.

            Grant W. McGuire, from the law firm of Tompkins, McGuire,
Wachenfeld & Barry, on behalf of the NXIVM plaintiffs.

            THE COURT:  Good afternoon.

            MR. SYLVESTER:  Good afternoon, your Honor.

            Anthony Sylvester, from the law firm of Sherman Wells Sylvester
& Stamelman. And again with me is Anthony Valenziano and Ms. Caitlin Shadek
on behalf of Ms. Stephanie Franco.

            THE COURT:  Okay.  Thank you.  We are continuing with the
testimony of the plaintiff's proffered expert Mr. Donald Smith-- is that
correct?

            MR. SYLVESTER:  It is.

            MR. MCGUIRE:  That is correct, your Honor.

            THE COURT:  And is he here?

            MR. MCGUIRE:  He is here.

            THE COURT:  Bring him forward then please.

            MR. MCGUIRE:  Your Honor, if I could ask for a five minute
continuance.  I've received some information that may prove fruitful to
this matter and the Court.  I just need  five minutes to really digest it,
your Honor.

            THE COURT: Sure, of course, take your time.  It is five after
two.

            We will adjourn until 2:15, okay.

            MR. MCGUIRE:  Thank you, it is most appreciated, your Honor.

THE COURT:  Okay.  Thank you.

MR. SYLVESTER:  Thank you, your Honor.

THE COURT:  Thank you. Off the record.

(RECESS TAKEN).

THE COURT:  Back on the record.

Mr. Smith is here now?

MR. MCGUIRE:  Yes, your Honor.

THE COURT:  Come forward please.  Thank you.

You may be seated.  You continue to be under oath and we continue to have cross examination?

MR. SYLVESTER:  That is correct.

THE COURT:  Off you go then.

MR. SYLVESTER:  Thank you, your Honor.

THE COURT:  And we're still crossing on qualifications.  And I do want to get into-- that Mr. McGuire hasn't really had a chance to at least develop his argument and that we're sort of veering into methodology, and I don't want us to just fail to permit direct on the methodology as well.

MR. SYLVESTER:  I understand.  And, your Honor, I'm prepared as well to cross on issues of methodology and causation-- the fit which is part of 702 as well as the witness's conclusions regarding gross profits.

But before I get into that, I would like to pick up as to a piece of the examination that was conducted yesterday, and I think your Honor also was involved in the discussion.

THE COURT:  All right.

MR. SYLVESTER:  Yes.

^ BY MR. SYLVESTER:

Q.   Mr. Smith, I am correct that prior to yesterday you had not seen income

tax returns for the years 2004 through 2009; isn't that right?

A.   Yes.

Q.   And yesterday during your--

        THE COURT:  Let's put the tabs in.

        MR. SYLVESTER:  Yes, beginning at Tab 6.

        THE COURT:  Okay.

Q.   This is through Tab 11.  I am correct, am I not, sir, that you had
not seen the income tax returns which are Tabs 6 through Tabs 11 before
yesterday?

A.   Without referring to the tabs-- your question before I believe was
2004 through 2009-- is that correct?

Q.   Yes.

A.   Yes.

Q.   Sir, am I also correct, and I think we've established this yesterday,
that as far back as the year 2013 it was your desire to review those tax
returns-- if they were available, right?

A.   I desired that and I requested it several times-- yes.

Q.   And, in fact, you said yesterday quite candidly, sir, that the more
data the better as far as you're concerned; isn't that right?

A.   Yes, right.

Q.   When you rendered your report in February of last year, you reiterated
your desire consistent with your concept that the more data is better, that
you would like to have seen the available tax returns for the years that
we've just mentioned-- isn't that right?

A.   Yes.

Q.   And yesterday I showed you those returns-- true?

A.   Yes.

Q.   And I believe yesterday you agreed with me that there was disparities,

if you will, between what was in the tax returns and what was in your report;

isn't that a fact?

A.   Yes.

Q.   And isn't it true, sir, that the years that we are talking

about-- specifically '04 to '09 are really smack dab in the middle of the

heart of your damages model; isn't that  true?

A.   Yes.

Q.   And, sir, I happen to notice that when you walked up to the podium

just a minute ago you had with you the binders that had you before you

yesterday during your examination; isn't that true?

A.   Yes.

Q.   And included in those binders, in fact are the tabs that we just

mentioned, which are tax returns 2004 to 2009; isn't that true?

A.   Yes, I reviewed those last evening.

Q.   And is it fair to say that when you left this courtroom yesterday you

took with you the binders, true?

A.   Yes, I did.

Q.   And last evening and through this morning, would it be fair to say

that had you an opportunity to review in detail Tabs 6 through 11-- the

tax returns at issue?

A.   What I did last evening is I sat at my hotel desk and I went through

each.  I created a spreadsheet, summarizing key elements, comparing the

gross sales from the tax returns, the gross sales which were unaudited and

which was included in my report-- for each of those years.  And some

additional years you provided data for that I had not seen yet.  And I also

did the same for gross margins, both in dollars and in percentages.

        I also did put on my spreadsheet the-- by fiscal year the date

that the CPA signed preparation of the report.  And the date that a NXIVM

officer signed the report.  That was my spreadsheet that I did last evening.

Q.   And let's take the ladder point first if you don't mind.

With regard to this parity and the date which you mentioned between the year of the return and the date that the CPA prepared it and it was signed by the tax preparer, isn't it true that that gives you great pause?

A.   Yes.

Q.   All right.  And, sir, with regard to the figures that you mentioned that were put on the spreadsheet that you worked on last night at your hotel desk here in Newark; isn't it a fact that that confirmed to your satisfaction that there were disparities between the numbers in your report and what appeared on the tax returns?

A.   It varied by year.  Some years it was essentially zero and some years it was very significant.

Q.   Now, during the-- would you agree with me, that key years in your damage model are the fiscal years 2006 and 2007?

A.   Yes.

Q.   And isn't it true that for those key years, you determined from your review of the tax returns that there  were significant disparities between the numbers in the return and the numbers in your report?

A.   Yes.

Q.   Now, sir, I think that you probably recall yesterday afternoon the Court-- Her Honor asked you if you understood quite clearly the role and the obligations you have as an expert with regard to a jury that may be empaneled here; do you recall that?

A.   Yes.

Q.   And I take it, sir, given your long history as a consultant and as an expert that you take those responsibilities as articulated by Her Honor quite seriously?

A.   Very seriously.  Personal integrity in my business-- especially the consulting business that I described yesterday is absolutely critical.  Yes.

        MR. SYLVESTER:  And I appreciate that and I thank you for that.

Q.   And along those lines, if you recall the Court asked you if you were comfortable, if called upon as an expert in this case, looking at the jury, looking them in the eye and testifying with certainty as to your findings-- do you recall the Court asking you that?

A.   Yes.

Q.   Now, sir, based upon what you were able to determine last evening, from your review of the returns which you only  first saw yesterday.  Are you comfortable serving as an expert, looking at the jury in the eye at a trial and asserting that the numbers in your report are reliable and accurate numbers?

A.   I would not be comfortable.  I do not have sufficient information at this moment to prepare an economic loss.

        MR. SYLVESTER:  Your Honor, I have many things to talk about on substance and I know that you want Mr. McGuire to direct this witness on the substance of his report.

        THE COURT:  May I just follow-up.

        MR. SYLVESTER:  Thank you.

        THE COURT:  Following up with your answer, Mr. Smith.

        You said, I do not have sufficient information at this moment to prepare an economic loss?

        THE WITNESS:  Yes.

        THE COURT:  Okay. I misheard you.  Fine.

        I don't have a question-- I misheard him.

        MR. SYLVESTER:  So, your Honor, I think that-- if I might.

I appreciate what your Honor said about the balance of this inquiry relating to the substance of the report, clearly methodology and causation, and that Mr. McGuire would conduct the direct and I would have an opportunity to cross. But since your Honor pointed out at the outset of this  afternoon's proceeding that we at the qualification stage.

May I respectfully submit that given what this witness just testified to, that your Honor could make a ruling on qualification based upon his inability, if you will, to say that his numbers are reliable and accurate as it stands right now, based upon his review of information that I only provided to him for the first time yesterday afternoon.

I appreciate that he had saw it for the first time yesterday afternoon.  If your Honor wants to make that ruling perhaps we don't need to do the rest.

THE COURT:  Well, you know, one of the things that strikes me-- I am not prepare to rule that from what I have heard about his qualifications, Mr. Smith is not qualified, as a sitting here today as an expert.  I believe that if you asked me for a pure ruling is that he is qualified to offer an opinion as an expert on loss profits-- in the abstract I would say yeah.  I would say yes.

The evidence rule that we are dealing with has a particular provision that I want to ask you about, Mr. Smith, given your candor and your clear commitment to as you put it integrity and how important it is that it is for your professional life, right?

THE WITNESS:  Right.

THE COURT:  But I've been with you long enough in this crucible to believe that it applies to your personal  life as well--right?

THE WITNESS:  Absolutely.

THE COURT:  702 says.  A witness who is qualified as an expert

by knowledge, skill, experience, training or education, and I've already said that I think you are there. Okay.  May testify and form an opinion or otherwise if, A, the expert's scientific technical or other specialized knowledge will help the trier of fact to understand the evidence.  Or to determine a fact in issue.  B.  And these are all conjunctives-- they all have to be satisfied.

THE WITNESS:  Yes.

THE COURT:  B, the testimony is based on sufficient facts or data.  C, the testimony is the product of reliable principles and methods.  And D, the expert has reliably applied the principles and methods to the facts of the case.

I'm asking you, do you believe that if you were to-- if I rolled in that jury today you could offer an opinion based on sufficient facts or data?

THE WITNESS:  I received significant additional information yesterday.

THE COURT:  Right.

THE WITNESS:  Tax returns, during the actual period of the economic loss.  Some of the years, not all, but some were significantly different.  Some of the dates in relation to the numbers of years prepared after the fiscal year--  raises just a number of questions.  And for me to develop an economic loss I would be comfortable with I would need to have answers and documents-- of an entire range of subject.

THE COURT:  So that that's really the basis for your saying in answer to Mr. Sylvester's question, I would not be comfortable looking the jury in the eye and offer my opinion?

THE WITNESS:  Not with-- no, I just had a first look at those tax returns last evening.  That is right.

THE COURT:  And those tax returns were not provided to you by the plaintiffs in this case?

THE WITNESS:  No, they were not.

THE COURT:  Correct.

THE WITNESS:  No.

THE COURT:  And I read your report again last night, armed with the information that I have heard about, and of course I read before, but I really concentrated on where in the report you said I would be-- I asked for tax returns-- they were not provided to me.  And I thought to myself, you know, this is not the conventional cover your rear end stuff.  This is because this man is trying to be as you said, I love data, and the all lawyers went, we can't even read the data that he loves.

But my point is, I am compelled to find based upon the testimony that you've given that you don't have  sufficient facts or data to testify and offer this jury an opinion sitting here today?

THE WITNESS:  That's correct.

THE COURT:  Okay.  Okay.  That is the argument you're making.

MR. SYLVESTER:  I only wish I had done it in the fashion that you had done it, your Honor.  I was taking notes and I know for the next time.  That is the argument that I am making.

THE COURT:  It really is.  And I think that one of the anomalies in this case is the facility with which we can eviscerate expert reports.  And I am speaking of my colleagues in the Southern District.  Without the benefit of an interaction with the person who authored it.  And I frankly learned a little bit about how to deal with this issue.  Because the qualifications are really there.  And we're not going to get into the methodology.  We don't have to because we have a candid, careful, honorable witness.  Who happens to have an expertise that is very useful.

So I will dismiss you from further testimony, Mr. Smith.  But I will thank you for a lesson in integrity-- if I could be so smaltzy.

THE WITNESS:  Thank you very much.

MR. SYLVESTER:  Your Honor, if I might.  I will join in saying the same to Mr. Smith in that regard.

THE COURT:  Thank you very much.

THE WITNESS:  Thank you.  My pleasure.

THE COURT:  Safe back to your Utica.  Which I think we will let you leave today.

Off the record.

(PAUSE).

THE COURT:  Back on the record.  I'm letting Mr. Smith go.  Thank you.

MR. SYLVESTER:  Your Honor, would it be okay with the Court-- that we take the binders back from you, and we pull out what was not used.  But I know that and I think Mr. McGuire will come up and address this.  Like, for instance, even in the tax returns I happen to see a social security number.

THE COURT:  You have to redact them.

MR. SYLVESTER:  Yes. It's more an omnibus issue that Mr. McGuire will address with regard to the confidentiality of some these documents.

THE COURT:  Okay.

MR. MCGUIRE:  Your Honor, two quick housekeeping issues.

Number one, would be what Mr. Sylvester just previewed.  A lot of the materials I wasn't taking notes on as to each and every exhibit, but the financials were almost entirely marked as confidential.  I should have probably put  something on the record yesterday, but no harm no foul.  Just if the record could be temporarily sealed while we just go about the

business of formally filing a motion to seal on that issue.  Mr. Sylvester
and I worked together on-- probably we've driven Magistrate Waldor crazy
with these motions to seal, but we should be able to get that done relatively
quickly.

THE COURT:  Mr. Florio is skilled at working with counsel as to
how to redact the record that ultimately gets filed.  And I know that in
Mr. Smith's response to the motion to exclude his testimony substantial
parts of his certifications were redacted.  I am assuming that they relate
to hard numbers much as your applications relates.  So I will leave it in
your hands.  But I will not give you a lot of time.  All right.

MR. MCGUIRE:  Understood.

THE COURT:  Figure it out with Mr. Florio when a comfortable time
is without any lag time.  Okay.

MR. MCGUIRE:  Very well.

The second issue speaks to the witnesses that NXIVM had on their
witness list.  There was some question as to whether or not Nancy Salzman
would be testifying next week in the event this matter goes to trial.  I
have an affirmative answer on that which is no.

THE COURT:  She would be the-- I'll ask you.  Is  she the "other
witnesses on damages" that are referred to in the Crockett declaration?

MR. MCGUIRE:  Yes.  Without the-- and the reason I've paused,
your Honor, is that it is dangerous to try to put one self in another's
mind, when the other person is a declarant.  But that is my best
understanding.  Yes.

THE COURT:  And I think Mr. Sylvester would say, everybody's
understanding based on the witness list.  What is the witness list?  Who
is on the witness list?

MR. MCGUIRE:  That is a very funny question.  I asked the brains

of the operation that--

        THE COURT:  A moment ago.  Because if we could get a representation as to who will testify to what.  And-- and it's clear no one else could but Ms. Salzman I need to do just a couple of quick questions with counsel on that issue.

        Mr. Sylvester, do you want to say something?

        MR. SYLVESTER:  Yes. It's easy, your Honor.  This is where I step back and I let Mr. Valenziano answer this-- because he knows the answers.

        MR. VALENZIANO:  Your Honor, in terms of witnesses on-- your Honor, in terms of witnesses on the witness list for NXIVM.

        Ms. Salzman was the only witness who identified who actually is employed or an agent of NXIVM.

        The other individual was Kristin Keefe who has  withdrawn during the December 15th phone call.

        The other witnesses were Jeffrey Sutton, who is Justin Frankel's (ph) half brother, who certainly has no knowledge of that.

        THE COURT:  Give me just a moment.  I'm sorry.

        Off the record.

        (PAUSE).

        THE COURT:  Back on the record.  You were speaking about Jeffrey Sutton-- who would not know-- I agree.

        MR. VALENZIANO:  Yes. And also running down the list. Obviously, Ms. Franco would have no knowledge.

        Mr. Hochman (ph), who is one of the authors of the articles that were posted on the Ross websites and would be read in by us. And obviously he has no information.

        Mr. Ross himself would have no information.  And then Michael Sutton, who is Jeffrey's brother and Stephanie's half brother, who obviously

has no information.  He would be done by a read-in.

So, your Honor, there's no witnesses on this list who could talk about that besides Ms. Salzman.

THE COURT:  Yes.  And from the information that I have at hand, Nancy Salzman is the company's CEO and obviously she would have this kind of information.  All right.

MR. VALENZIANO:  Thank you, your Honor.

MR. SYLVESTER:  Your Honor, is it possible to just to amplify this point also.

THE COURT: Sure.

MS. SHADEK:  Yes, your Honor.

I just wanted to reiterate the point that Mr. Sylvester made yesterday, that on the exhibit list which has been paired down to six exhibits.

We want to reiterate that not a single one of them has as to and relates to damages or to loss profits.

So to the extent that some additional witness who could testify that has not been represented, there's not a single exhibit listed that could relate to an issue of damages.

THE COURT:  Insofar as opposing counsel that is interpreting or in making inferences from the exhibits, can you confirm that characterization of the exhibit list, Mr. McGuire?

MR. MCGUIRE:  Well--

THE COURT:  Is that a fair characterization?

MR. MCGUIRE:  I would agree with the Court.

MS. SHADEK:  Thank you.

THE COURT:  Thank you.

We're inching toward the issue of whether or not this case must

be dismissed for lack of prosecution.  I have a question.  The

representation that Nancy Salzman is not  coming has been made by Mr.

McGuire.  And you have authorization to make that?

        MR. MCGUIRE:  I do.

        THE COURT:  I would make one point to counsel and just see if

it still holds.

        In researching this case and looking at the whole issue of 701

and 702 testimony.  And I'm kind of blurring the two together.  For this

purpose, in the case of Lightning Lube-- all the way back to 1993.

        Off the record.

        (PAUSE).

        THE COURT:  Back on the record.

        Lightning Lube v. Witco, 4 F.3d, 1153, 1175, 76 for the pin

cite-- Third Circuit 1993.

        In that case, it was decided by the Third Circuit that the trial

judge did not abuse its discretion, in permitting the business owner to

offer an opinion as to loss profits.  Albeit, the business owner was not

an expert and so on.

        Ms. Salzman therefore is admissable as a witness to offer an

opinion, now that Mr. Smith is no longer the expert.  And I want to make

that very clear, she can in fact testify to that-- it's almost an advisory

ruling that I am making but it's the law of the circuit.

        Is Ms. Salzman aware that her presence is such that  she could

in fact fill the gap that has occurred today?

        MR. MCGUIRE:  Again, your Honor, you hear the word candor with

the Court a great deal, which means a great deal to me.

        The fact of the matter is that I have not had direct communications

with Ms. Salzman.  I also recognize that I am tiptoeing around the

attorney/client privilege. But I do not wish to make any representations
to the Court.

I have made communications with people who have advised that Ms.
Salzman is quote unquote in the loop.  This information, as to Ms. Salzman
not being present to testify next Tuesday, was conveyed both with the
possibility that Mr. Smith would be testifying as an expert witness as well
as with the-- not preconceived notion but the possibility.

THE COURT: Possibility.

MR. MCGUIRE:  Possibility that he would not be testifying as has
happened.  So my client is armed with information under both possibilities.

THE COURT:  Is your client-- I am not going to ask you a question
that I know what the answer is.

I don't have a stipulation of dismissal from a client by all
intensive purposes would give a stipulation of dismissal under the
circumstances. I have oddly enough a representation from an officer of the
court standing at the podium, Mr. Sylvester, that if there is a voluntary
dismissal  of the complaint there will be a voluntary dismissal of the
counterclaim.

MR. SYLVESTER:  That's correct.

THE COURT:  Okay.  In the absence of either a certification from
Nancy Salzman, I know I could testify in this issue.  I know that without
damages being proven my case is not prosecutable.  I know, I know, I know
and I'm not going to be there anyway.  Or a stipulation of dismissal.  I
want to see you all.  I will have my jurors downstairs or across the hall
muttering.  I have told you that there will be muttering, and we'll see
what happens on Wednesday.

I would prefer to have under these grave circumstances effecting
a 15 year litigation that Ms. Salzman has been heavily involved in-- I rather

have her feet on the floor or not on the floor, as opposed to I think a very careful and candid representation from a lawyer whom I have great respect.  I know you don't want to lead me into error and I don't want to put you on the spot.

So we keep our date.

MR. SYLVESTER:  Your Honor, yes, to things. First, I believe it is a Tuesday date.

THE COURT:  I have to change it to Wednesday.

MR. SYLVESTER:  Okay.  That's fine.  That's good. But secondly, there's just another issue which I would like to raise.  Without running the risk of wearing out my welcome  I do want to make would be point.  And it is in the context of renewal of the application for dismissal on the following point.

What Ms. Salzman could testify about is not in fact anything that Mr. Smith could testify about.  She has made her bed with regard to her view of damages.  And that is Exhibits A, B and C.  She was 30(b)(6) on this issue.  She testified under oath already that the entirety of the universe of damages that NXIVM was seeking amounted to what flowed from Exhibits A, B and C.  There is a motion before your Honor with regard to precluding that because a record has firmly been established that there is no evidence that anyone of Exhibits A, B and C, in fact stopped going to NXIVM or refused to go.  So there is no evidence of damage in the record-- pursuant to her own testimony.

One other thing, your Honor.  That is that the exhibit list no longer-- does not have on it Exhibits A, B and C.

So I just don't want to blurt a line.  She couldn't come in and step in the shoes Mr. Smith.  Her theory is something that is entirely different.

THE COURT:  All of that is pretrial motions with the jurors cooling

their heals after they have been chosen to sit on the trial.

I will not deprive you of the ability to make that  point.

MR. SYLVESTER:  Thank you.

THE COURT:  Thank you very for your hard work today.

Thank you everybody.

MR. SYLVESTER:  Thank you.

MR. MCGUIRE:  Thank you, your Honor.