

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------*
NXIVM CORPORATION, formerly known as
EXECUTIVE SUCCESS PROGRAMS, INC. And
FIRST PRINCIPLES, INC.,
              No. 2:06-cv-01051
    Plaintiffs,    (DMC/MF)
    vs.
MORRIS SUTTON, ROCHELLE SUTTON, THE
ROSS INSTITUTE, RICK ROSS a/k/a "RICKY"
ROSS, STEPHANIE FRANCO, PAUL MARTIN,
Ph.D., and WELLSPRING RETREAT, INC.,

    Defendants.
-----------------------------------*
RICK ROSS,

    Counterclaim-Plaintiff,

    vs.

KEITH RANIERE, NANCY SALZMAN,
KRISTIN KEEFFE INTERFOR, INC.,
JUVAL AVIV, ANNA MOODY, JANE DOE
and JOHN DOES 1-10,
    Counterclaim-Defendants.
-----------------------------------*
(Caption continued on following page)

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF:  KEITH A. RANIERE
(Volume I)
DATE TAKEN:  WEDNESDAY, MARCH 11, 2009

COMPUTER-AIDED TRANSCRIPT PREPARED BY:
FITZSIMMONS REPORTING & VIDEOCONFERENCE CENTER
570 West Mount Pleasant Avenue
Livingston, New Jersey 07039
PHONE:  (973) 994-3510
FAX:  (973) 994-3621

**Page 2**

1  (Continued)
2  INTERFOR, INC., JUVAL AVIV, and
   ANNA MOODY,
3
    Cross-Claimants,
4
5    vs.
 
NXIVM CORPORATION, KEITH RANIERE,
6  NANCY SALZMAN and KRISTIN KEEFFE,
7    Cross-Claim Defendants.
  -----------------------------------*
8
9
10     T R A N S C R I P T of the stenographic
11  notes of the proceedings in the above-entitled
12  matter, as taken by and before CHERYL McGANN, a
13  Certified Court Reporter and Certified Realtime
14  Reporter of the State of New Jersey, held
15  at the offices of DRINKER BIDDLE & REATH LLP,
16  500 Campus Drive, Florham Park, New Jersey, on
17  Wednesday, March 11, 2009, commencing at
   10:24 a.m.
18
19
20  A P P E A R A N C E S :
21
   TOMPKINS McGUIRE WACHENFELD & BARRY LLP
22    BY:  WILLIAM B. McGUIRE, ESQ.
      -and-
      RICHARD B. ULSAMER, ESQ.
23    4 Gateway Center
    100 Mulberry Street
24    Newark, New Jersey  07102
    Attorneys for Plaintiffs and Cross-Claim
25    Defendants, NXIVM Corp., Nancy Salzman
    and Kristin Keeffe

**Page 3**

1
2  A P P E A R A N C E S (Continued) :
3
   DRINKER BIDDLE & REATH LLP
4   BY:  ROBERT M. LEONARD, ESQ.
      -and-
5    THOMAS F. CAMPION, ESQ.
    500 Campus Drive
6    Florham Park, New Jersey  07932-1047
    (973) 549-7370
7   Attorneys for Keith Raniere
8   RIKER DANZIG SCHERER HYLAND PERRETTI LLP
   BY:  HAROLD L. KOFMAN, ESQ.
9      -and-
    ANTHONY J. SYLVESTER, ESQ.
10    Headquarters Plaza
    One Speedwell Avenue
11    Morristown, New Jersey  07962-1981
    (973) 538-0800
12   Attorneys for Morris Sutton,
   Rochelle Sutton and Stephanie Franco
13
   LOWENSTEIN SANDLER PC
14   BY:  PETER L. SKOLNIK, ESQ.
      -and-
15    THOMAS S. DOLAN, ESQ.
    65 Livingston Avenue
16    Roseland, New Jersey  07068
    (973) 597-2508
17   Attorneys for The Ross Institute, Rick Ross,
   Paul Martin and Wellspring Retreat, Inc.
18
   FRIEDMAN KAPLAN SEILER & ADELMAN LLP
19   BY:  ROBERT S. LANDY, ESQ.
    1633 Broadway
20    New York, New York  10019-6708
    (212) 833-1100
21   Attorneys for Interfor, Inc., Juval Aviv
22
23  ALSO PRESENT:
    Nancy Salzman
24    Rick Ross
25    Karl Petry, Videographer

**Page 4**

1         I N D E X
2  WITNESS     DIRECT    CROSS   REDIRECT
3  KEITH ALAN RANIERE
    By Mr. Kofman:  8
4
5        E X H I B I T S
6
   Exhibit   Description   For Identification
7  Raniere-1  Document headed Biography on Keith
    Raniere, Founder & Developer of
    Rational Inquiry, Highly Confidential
8    Bates stamped P000004995-4996   6
9  Raniere-2  Affidavit of Keith Raniere signed
    8/18/03 consisting of six pages  66
10
11  Raniere-3  United States Patent and Trademark
    Office Documents Bates stamped
    P00000209 through 231   93
12
13  Raniere-4  Document entitled Assignment Bates
    stamped P000000689   97
14  Raniere-5  Three-page document entitled A Forensic
    Psychiatrist Evaluates ESP   107
15
16  Raniere-6  Robert Jay Lifton's eight criteria
    of thought reform as applied to the
    Executive Success Programs Bates
17    stamped P000003648 through 3661  126
18  Raniere-7  Executive Success Programs, Inc.
    Student Enrollment Application of
19    Stephanie Franco Bates stamped
    P000004105   141
20
21  Raniere-8  A Critical Analysis of the Executive
    Success Programs Inc., Bates stamped
    P000003674 through 3682  146
22
  Raniere-9  Document headed Persistence Bates
23    stamped SF00104 through 149
24  Raniere-10  Document headed Rules and Rituals
    Bates stamped SF00033 through 40  152
25    (Exhibits attached.)

Page 5

1
2           INFORMATION REQUESTED
3    (Request.)         Page 48
     (Request.)         Page 101
4    (Request.)         Page 106
     (Request.)         Page 113
5    (Request.)         Page 140
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1        (Document headed Biography on Keith
2    Raniere, Founder & Developer of Rational Inquiry,
3    Highly Confidential Bates stamped P000004995 was
4    received and marked Defendant's Exhibit Raniere-1
5    for Identification.)
6            THE VIDEOGRAPHER:  Today's date is March
7    11, 2009, at the time indicated on the video screen.
8    We're here in Florham Park, New Jersey, to take the
9    deposition of Keith Raniere in the matter of NXIVM
10   v. Sutton.
11           At this time, will the attorneys please
12   identify themselves and the clients they represent.
13           MR. KOFMAN:  Harold Kofman from Riker
14   Danzig Scherer Hyland Perretti LLP and Anthony J.
15   Sylvester from Riker Danzig Scherer Hyland Perretti
16   LLP representing Morris Sutton, Rochelle Sutton and
17   Stephanie Franco.
18           MR. LANDY:  Robert Landy from Friedman
19   Kaplan Seiler & Adelman LLP on behalf of Interfor,
20   Incorporated and Juval Aviv.
21           MR. SKOLNIK:  Peter Skolnik and Thomas
22   Dolan of Lowenstein Sandler representing Rick Ross,
23   The Ross Institute, Paul Martin and Wellspring.
24           MR. CAMPION:  Thomas Campion and Robert
25   Leonard, Drinker Biddle & Reath, representing the

Page 7

1    witness, Keith Raniere.
2            MR. McGUIRE:  William McGuire, Tompkins
3    McGuire Wachenfeld & Barry representing NXIVM, Nancy
4    Salzman and Kristin Keeffe.
5            MR. LEONARD:  Okay.  Before we begin, on
6    behalf of Keith Raniere, we are taking the position
7    that this entire deposition is confidential.  It
8    should be maintained that way for at least 30 days
9    pending whatever application either we make or the
10   portions that we may designate if it's less than the
11   whole thing, so I assume that's in accordance with
12   our order and practice and that there should be no
13   problem.
14           MR. KOFMAN:  We have no objection.
15           THE VIDEOGRAPHER:  Please swear in the
16   witness.
17           MR. McGUIRE:  Wait a minute.
18           MR. LANDY:  We don't object to having
19   the transcript being held confidential for the next
20   30 days in its entirety.  However, we would request
21   that by the end of that 30-day period counsel for
22   the witness designate which portions of the
23   transcript they intend to keep confidential for the
24   entirety of the litigation.  If you choose to
25   designate the entirety, send a letter saying so.

Page 8

1            MR. LEONARD:  That's fine.
2            MR. SKOLNIK:  I join in Mr. Landy's
3    position that maintaining confidentiality for 30
4    days is acceptable.  At the end of 30 days, we'll
5    expect that the portions of deposition that you
6    intend to keep confidential are so designated; and
7    we reserve our right to make any objections.
8
9    K E I T H   A L A N   R A N I E R E, residing at
10   3 Flintlock Lane, Clifton Park, New York 12065,
11   is duly sworn and testifies on his oath as follows:
12
13   DIRECT EXAMINATION BY MR. KOFMAN:
14      Q.  Good morning, Mr. Raniere.  My name is
15   Harold Kofman.  I'm representing Morris Sutton,
16   Rochelle Sutton, and Stephanie Franco in the lawsuit
17   that was initiated by NXIVM Corp. And First
18   Principles, Inc.
19           I'm going to be taking your deposition today.
20   Have you ever had your deposition taken before?
21      A.  Yes.
22      Q.  On how many occasions?
23      A.  Two, I think.
24      Q.  And when did you have your deposition taken?
25      A.  The date?

1    Q.  Approximately.
2    A.  1993.  Maybe it was the spring -- I'm not
3  sure -- and I think later than that.  I think it was
4  1995.
5    Q.  Were those depositions in connection with
6  Consumers' Buyline?
7    A.  Yes.
8    Q.  I'm going to just run --
9    A.  I'm sorry.  There was a third deposition.
10    Q.  When was that?
11    A.  That was also -- I believe that was 1994.
12    Q.  And was that also in connection with
13  Consumers' Buyline?
14    A.  Yes.
15    Q.  Mr. Raniere, I'm just going to run over a
16  few of the ground rules of the deposition since it's
17  been awhile since you've had your deposition taken.
18    I'm going to be asking you a series of
19  questions today.  My questions and your answers are
20  being recorded by the court reporter sitting to my
21  right.  In addition, there's a videographer who's
22  recording this deposition.
23    It's important that you wait till I finish
24  my question before answering.  It makes a cleaner
25  record, and also that way I can be sure that you

1  understand my question.  If you don't understand my
2  question, please let me know, and I'll try and
3  rephrase it if I can.
4    You're being represented by counsel today.
5  If your counsel makes an objection, stop and wait
6  for your counsel to finish the objection.  It's
7  important that you answer verbally, since the court
8  reporter can't take down shrugs and so forth.
9    Finally, if you need a break at any point
10  today, please let me know, and I'll be happy to take
11  a break at a convenient moment.
12    MR. LEONARD:  Mr. Kofman, just for the
13  record, Mr. Rick Ross has joined the deposition; and
14  I would ask that his counsel advise him of the
15  confidentiality that we've previously discussed and
16  he's agreed to on his behalf.
17    MR. SKOLNIK:  I will do so.
18    MR. LEONARD:  Thank you.
19  BY MR. KOFMAN:
20    Q.  Okay.  Mr. Raniere, I'd like to show you a
21  document that we've marked as Raniere-1, and I've
22  got additional copies for counsel here.
23    MR. KOFMAN:  For the record, this
24  document --
25    MR. SYLVESTER:  Wait.  Wait.  Let me

1  have those.
2    MR. KOFMAN:  For the record, this
3  document is Bates stamped P000004995 and P000004996.
4  It's a document that was produced to my client in
5  discovery.
6  BY MR. KOFMAN:
7    Q.  Sir, do you recognize this document?
8    A.  Not directly, but documents of this similar
9  form.
10    Q.  Okay, meaning -- and what is this document?
11    A.  It looks like a biography of me.
12    Q.  Do you know who prepared this biography?
13    A.  No.
14    Q.  Have you reviewed this or similar biographies
15  prepared by NXIVM?
16    A.  I haven't reviewed this one.  I have seen
17  similar biographies.
18    Q.  Okay, and did you review similar biographies?
19    A.  Yes.
20    Q.  And did you review them to make sure they
21  were accurate?
22    A.  Yes.
23    Q.  Is there anything on this biography -- and
24  you can take the time to read it -- that is
25  inaccurate?

1    A.  Before finishing the document, there are a
2  number of things that if I were asked to approve
3  this I would not.
4    Q.  Can you give me examples?
5    A.  Problem-solving ability is better than 1 in
6  425 million, it would have to say "estimated";
7  things along those lines.  Also, there are things of
8  -- I don't -- people write a number of different
9  things.  I think factually this is true so far, but
10  I can say I probably did not review this one.
11    Q.  Okay.  How about the reference about halfway
12  down to you having total retention?
13    A.  Uh-huh.
14    Q.  Is that something that you would consider
15  accurate?
16    A.  Yes, as far as what some someone who would
17  measure retention.  Does that mean that I remember
18  everything?  No.  I go to the supermarket and forget
19  things like everyone else.
20    Q.  Do you know what -- whether this document was
21  used by NXIVM?
22    A.  No.
23    Q.  Okay.  Just out of curiosity, the symbols
24  that appear on the left-hand column, do you know
25  what they are?

1    A.  The Executive Success Programs, to the best
2  of my knowledge, yes.
3    Q.  Okay.
4    A.  My suspicion -- well, continue.
5    Q.  Okay.  That's all the questions I have right
6  now about that document.
7       Mr. Raniere, have you ever met Morris Sutton?
8    A.  Yes.
9    Q.  When did you meet Morris Sutton?
10    A.  In the courtroom when we were all together.
11    Q.  Would that have been sometime in 2007-2008?
12    A.  Yeah.
13    Q.  Did you ever meet him before that?
14    A.  No.
15    Q.  Have you ever spoken to him?
16    A.  No.
17    Q.  Have you ever met Rochelle Sutton?
18    A.  No.
19    Q.  Have you ever spoken to Rochelle Sutton?
20    A.  No.
21    Q.  Are you aware as you sit here today that
22  Nancy Salzman visited the home of Morris and
23  Rochelle Sutton at some point in time?
24    A.  I believe that's true.
25    Q.  When did you become aware of that?

1    A.  I think it was slightly after it happened.
2  It is my recollection she was invited to a party.
3  Should I -- 'cause Nancy is in the room, my tendency
4  would be to look to see if that's so, but that's
5  what my recollection is.
6    Q.  Okay, and did Nancy Salzman tell you that she
7  had gone to the Sutton's home?
8    A.  I don't recall.
9    Q.  Did you know who invited her to the party?
10    A.  No.
11    Q.  Do you know what was discussed there?
12    A.  I believe, amongst other social things,
13  enrolling some people in taking a course, although
14  I'm not positive of that.  I have a recollection
15  that there actually was a course taught.
16    Q.  Are you aware that at some point a course
17  was taught at the home of Aaron and Leslie Kassin?
18    A.  I don't know where, but I do have a
19  recollection that there was a course taught, yes.
20    Q.  Do you know what course was taught?
21    A.  Not specifically.
22    Q.  Did you attend the teaching of the course
23  down in New Jersey at the home of the Kassin's?
24    A.  No.
25    Q.  Are you familiar with Stephanie Franco?

1    A.  Yes.
2    Q.  When did you first become familiar with
3  Ms. Franco?
4    A.  I think I was told that she was attending an
5  Intensive.  I'm not sure if it was before that point
6  that I had heard or actually while she was at the
7  Intensive.
8    Q.  Okay.  And who told that you she was
9  attending an Intensive?
10    A.  I'm not sure.
11    Q.  Was it Nancy Salzman?
12    A.  I don't think so.  My suspicion is it was
13  Michael Sutton.
14    Q.  Okay, and is it your understanding that
15  Michael Sutton is the half-brother of Stephanie
16  Franco?
17    A.  Yes.
18    Q.  And am I correct that at the time Michael
19  Sutton was a student of Executive Success Programs?
20    A.  To the best of my knowledge.
21    Q.  Do you recall what Michael told you about
22  Stephanie Franco at the time?
23    A.  I seem to remember that she had a therapy
24  practice, and she was either -- some sort of an
25  educator at Rutgers University.

1    Q.  And what did Michael tell you at the time
2  about Ms. Franco's therapy practice?
3    A.  I'm not sure if it was Michael.
4    Q.  It might have been somebody else?
5    A.  Yeah, and I don't have any details other than
6  that she had a minor therapy practice which when
7  someone comes to the Intensive requires further
8  review.
9    Q.  Okay.  This is something that -- you were
10  told about her therapy practice either before or at
11  the time she attended the Intensive?
12    A.  Yes.
13    Q.  What -- you mentioned that when somebody has
14  a therapy practice, it requires further review.
15  What is the nature of the review that is required?
16    A.  I'm not sure of all the details, but we want
17  to guard trade secrets and things that are important
18  and confidential so they want -- there is a review
19  so that there's no conflict of interests and no
20  future conflict of interests.
21    Q.  Do you know who performs the review?
22    A.  No.
23    Q.  Do you know what the nature of the review
24  would be?
25    A.  Not exactly, except for what I mentioned.

Page 17

1    Q.  Okay.  Is it -- does the review involve a
2  discussion with the student?
3    A.  I think sometimes.
4    Q.  Do you know who does those discussions?
5    A.  No.  I think various people.
6    Q.  Is that something that you're involved with?
7    A.  No.
8    Q.  Do you know whether a review was done in the
9  case of Stephanie Franco?
10    A.  Yes.
11    Q.  Do you know who did the review?
12    A.  Not exactly.  I know the results of the
13  review because I spoke to Stephanie Franco
14  afterwards.
15    Q.  Okay, and when did you speak with Stephanie
16  Franco?
17    A.  I think it was Day 5 of the Intensive.  It
18  might have been Day 4.
19    Q.  Did you attend the Intensive that she was
20  participating in?
21    A.  Not directly.  I may have given a
22  question-and-answer session, but I'm not positive.
23    Q.  Okay.  Do you recall if the year was 2001
24  that this Intensive took place?
25    A.  I don't recall.

Page 18

1    Q.  Do you have a recollection as to --
2    A.  I think it was --
3    Q.  -- what year it was?
4    A.  I think it was 2001.
5    Q.  Do you remember the time of year?
6    A.  I think it was spring.
7    Q.  Okay.  Now, you say you spoke to Stephanie on
8  the -- I think you said the fifth day of the
9  Intensive.
10    A.  Fourth or fifth.
11    Q.  Where did that discussion take place?
12    A.  At the 455 New Karner Road Center.
13    Q.  And is that a training center for Executive
14  Success Programs?
15    A.  Yes, amongst other things, I think.
16    Q.  Okay.  Is it also the headquarters of NXIVM?
17    A.  I think it might serve as that function in
18  part, but no.  They have other meetings other than
19  trainings there.
20    Q.  Okay.  Who was present when you spoke to
21  Ms. Franco?
22    A.  I think Nancy was present, although I'm not
23  positive.  There may have been other people in the
24  room but not directly involved in the conversation.
25    Q.  Okay.  So the people you recall being

Page 19

1  involved in the conversation were yourself,
2  Stephanie Franco, and possibly Nancy Salzman?
3    A.  Correct.
4    Q.  How long did the discussion -- how long did
5  the discussion take place?
6    A.  I'm just guessing a relatively short time,
7  maybe a half hour.
8    Q.  Was this during a break in the training
9  session?
10    A.  Yes, I believe so.
11    Q.  What was discussed?
12    A.  Stephanie Franco wanted to apologize.  She
13  expressed -- originally coming into the training she
14  was concerned about the nondisclosure agreement, the
15  long form; and my understanding is that NXIVM gave
16  her the ability to go and discuss it with an
17  attorney and take time with it -- I would not meet
18  with her until that form was signed -- which she did
19  and then apologized for the delay, but I had felt at
20  the time the delay is perfectly reasonable.
21        She was seemingly very excited about the
22  material and said that she wanted to go and become a
23  trainer with us.  We also spoke of -- she said that
24  she was a seeker and wanted to find out the way, you
25  know, the human mind and all works to some degree

Page 20

1  and found this an interesting supplement.
2    Q.  Okay.  At any time before the fifth day of
3  the Intensive when you spoke to Stephanie Franco,
4  were you aware of an issue involving the
5  confidentiality agreement and Stephanie Franco?
6    A.  Could you repeat the beginning of that
7  question?
8    Q.  Prior to meeting with Stephanie on the fifth
9  day of the Intensive, were you aware of any issue
10  that had arisen concerning her signing the
11  nondisclosure confidentiality agreement?
12    A.  I believe it was before that point because
13  specifically I would not meet with her unless she
14  signed it, so I think it was somewhere around the
15  second day I heard that she had questions.
16    Q.  From who did you hear that she had questions?
17    A.  I'm not sure.  I would suspect it was Nancy.
18    Q.  Okay, and did you have any further
19  discussions between the second day and the fifth day
20  about Stephanie and the long form confidentiality
21  agreement?
22    A.  No.  It's my recollection that I was asked
23  what my opinion was in general with someone who
24  wants to consider something like that.  I think
25  they should.

1    Q.  Did you speak to -- when you spoke to
2  Stephanie on the fifth day, did you speak about her
3  thera -- to her about her therapy practice?
4    A.  Not specifically.  I believe she mentioned
5  her therapy practice, although I'm not positive that
6  she did.  More that she was looking to help people,
7  and she felt that we had some interesting tools.
8    Q.  During this discussion with Stephanie or
9  possibly during the question-and-answer session you
10  may have done, was there any discussion about your
11  view of paying taxes?
12    A.  I don't know.  That has come up a number of
13  times, but I don't remember if it was in that
14  discussion.
15    Q.  What is -- what do you state about your view
16  of paying taxes?
17    A.  I think people should consider paying taxes.
18  I think they should question if they believe in such
19  a system or not.  I'm a believer in paying taxes,
20  but I don't believe in believing without question.
21    Q.  Do you believe payment of taxes should be
22  compulsory?
23    A.  I guess I don't -- I think it's ethical.
24    Q.  I'm sorry.  You believe it is ethical to
25  compel the payment of taxes?

1    A.  No.  I think it's ethical to pay taxes.
2    Q.  Oh, okay.  Did you discuss with Stephanie
3  either during this private discussion or during
4  question-and-answer your views on the institution of
5  marriage?
6    A.  I don't believe so.  I wouldn't.
7    Q.  Okay.  Other than this one conversation with
8  Stephanie Franco on the fifth day of the Intensive,
9  have you had any other discussions with Ms. Franco?
10    A.  I'm not sure.  I don't think so.
11    Q.  Have you ever seen the -- strike that.
12    You said that it's your understanding that
13  Stephanie Franco had signed the long form
14  confidentiality agreement.
15    What's the basis for that understanding?
16    A.  She told me so.
17    Q.  What did she specifically say, if you recall?
18    A.  "I apologize for taking so long to sign this
19  agreement.  I felt I needed to consider it, and I
20  did, and I am very happy that I've signed it."
21    Also, I would not have met with her if she
22  didn't go through that portion of it.
23    Q.  Have you ever seen the long form
24  confidentiality agreement that she signed?
25    A.  No.

1    Q.  Back in 2001, what was your role in NXIVM?
2    A.  I'm the philosophical founder and the person
3  who answers the questions relating to -- the
4  ultimate questions relating to the education, the
5  philosophy.  I also help solve problems within the
6  organization.
7    Q.  Do you hold a title in the organization?
8    A.  Yes.
9    Q.  And what's the title?
10    A.  Vanguard.
11    Q.  Do you hold any other titles in the
12  organization?
13    A.  No.
14    Q.  Are you an officer in NXIVM?
15    A.  No.
16    Q.  Have you ever been an officer?
17    A.  No.
18    Q.  Okay.  Were you employed by NXIVM in 2001?
19    A.  No.
20    Q.  Have you ever been employed by NXIVM?
21    A.  No.
22    Q.  How about First Principles?  Have you ever
23  been employed by First Principles?
24    A.  No.
25    Q.  Was it common -- strike that.

1    Was it common for you to -- in 2001 to attend
2  in part Intensives?
3    A.  At times.
4    Q.  How frequently would you be consulted back in
5  2001 on issues of philosophy or questions that --
6  about NXIVM?
7    A.  You know, I'm not sure at that point in time.
8  I suspect maybe once a month in a question-answer
9  type of forum or someone asking a direct question.
10    Q.  What type of issues would be brought to your
11  attention about NXIVM?
12    You mentioned the issue about Stephanie and
13  the confidentiality agreement.  What are some of the
14  other types of issues that were brought -- would be
15  brought to your attention by someone at NXIVM?
16    A.  I'm trying to go back to that time period.
17    Normally they're questions of ethics,
18  things -- for example, NXIVM has a sales force.  If
19  two salespeople have approached the same client,
20  what are the guidelines to try to handle that sort
21  of a thing or what guidelines would I suggest, that
22  sort of a thing.
23    Q.  What are you -- who are the people who would
24  consult you about those things or who would at that
25  period of time?

Page 25

1    A. Nancy, some of the people that I know
2 indirectly. I don't know the specific. I -- for
3 example, if I answered questions at an Intensive or
4 something like that or I walked into the building,
5 anyone that asked me questions I would answer them.
6    Q. Okay. How many hours a month were you
7 devoting to NXIVM during let's say 2001?
8    A. I don't know. I would estimate maybe 20.
9    Q. Twenty?
10    A. Yes.
11    Q. And was most of that attending these
12 question-and-answer things or answering issues that
13 came up?
14    A. Yes, I would say so.
15    Q. Has that involvement of 20 hours a month
16 changed since 2001?
17    A. Yeah. It's gone down.
18    Q. Okay. Was there ever a period during which
19 it increased?
20    A. No.
21    Q. What would you say -- what would you estimate
22 at -- in 2007 and 2008 how much time would you spend
23 on NXIVM-related issues?
24    A. 2007-2008?
25    Q. On a monthly basis.

Page 26

1    A. I want to amend something I said. When you
2 say "NXIVM-related issues," can you be more
3 specific?
4    Q. Sure. Issues relating to the operation of
5 the Intensives --
6    A. Okay.
7    Q. -- or the operations of the Executive Success
8 Programs.
9    A. I don't know, maybe -- maybe that much or
10 less. I'm thinking more like 10 hours a week; not a
11 week. I mean a month.
12    Q. Sure. Do you -- in 2001, were you still
13 developing modules or programs for NXIVM to use?
14    A. Yes.
15    Q. And is that included in the 10 to 20 hours?
16    A. To some degree. I walk around thinking about
17 these things a lot, so that's part of why I feel I
18 can't adequately answer your question. I teach
19 voice lessons to people who are in NXIVM, piano,
20 various activities like that which I don't count in
21 there.
22    Q. Okay. Do you still -- in 2007, 2008, were
23 you still involved in developing course material?
24    A. Yes.
25    Q. And that's something you're presently

Page 27

1 involved with --
2    A. Yes.
3    Q. -- as well?
4    A. Yes.
5    Q. And how much time would you say you spend on
6 a monthly basis developing course material?
7    A. I walk around thinking about it a lot, but
8 the actual formal time?
9    Q. Uh-huh.
10    A. If we put out, say, one Intensive a year, and
11 let's say an Intensive is 80 hours, probably 40
12 hours a year devoted to that.
13    Q. When you say, "We put out one Intensive,"
14 what do you mean by that?
15    A. In other words, I'm looking over the past
16 few years; and I'm thinking of the curriculum that
17 has been created, and I estimate we've in the past
18 few years introduced one Intensive a year.
19    Q. That would be one new set of course --
20 courses?
21    A. The particular ones that have been in the
22 past few years have been eight-day seminars.
23    Q. Okay.
24    A. There have been a few occasions where there
25 have been modules, single two-hour. We offer all of

Page 28

1 our curriculum, per se, in two-hour blocks. I don't
2 think there has been one of those in the past year.
3    Q. Mr. Raniere, do you know why you were
4 consulted about the issue involving Stephanie Franco
5 and the long form confidentiality agreement?
6        MR. McGUIRE: Object to the form.
7    Q. Did whoever told you about the issue tell
8 you why they were bringing this to your attention?
9    A. No.
10    Q. Do you have any understanding as to why you
11 were called upon to give advice?
12        MR. McGUIRE: Same objection.
13    Q. You may answer if you can.
14    A. Okay. Often when there are ethics questions,
15 they're brought to me for an opinion.
16    Q. Would you also handle questions about
17 procedure, what procedure NXIVM should follow?
18    A. If there was an ethics question involved, I
19 might.
20    Q. Wouldn't -- would you consider this to have
21 been an ethics question?
22    A. Stephanie Franco and the -- yes.
23    Q. And why would you consider this an ethics
24 question?
25    A. Because if NXIVM has a rule that all people

1   must sign the long form on the first day, but yet
2   there's a reasonable, seemingly reasonable reason
3   why someone would not want to do that, any time you
4   question breaking a rule you have to consult the
5   ethic of the rule to get the spirit, the intent of
6   the rule.
7      Q.  And that's something that you would be most
8   familiar with in NXIVM?
9      A.  Well, I think I add good opinion.
10     Q.  Okay.  Do you know -- you mentioned that a
11  review would have been done because Stephanie took
12  -- indicated that she had a small therapy practice.
13     Do you know what the results of the review
14  were?
15     A.  No.  I -- I do know that she was allowed to
16  take the Intensive, so whatever you would call;
17  favorable or nonconflicting, I guess, because if it
18  was a conflict of interest, she would not have been
19  allowed to take the Intensive.
20     Q.  In 2001 were you told or made aware that
21  Stephanie had taken classes with Taibbi Kahler
22  Associates?
23     A.  No.
24     Q.  Are you familiar with Taibbi Kahler
25  Associates?

1      A.  Somewhat now.
2      Q.  Were you familiar back in 2001?
3      A.  No.
4      Q.  Do you know what course material Stephanie
5   was provided at NXIVM?
6      A.  Not specifically.
7      Q.  Has anyone ever told you what she was
8   provided?
9      A.  I've seen lists; and I know that she was a
10  coach, which means there is certain course materials
11  she was exposed to.  I also know that she was
12  selected to be in a facilitator training, which I
13  did also see a document that referenced.
14     Q.  You stated that she was a coach.  Is it your
15  understanding that Stephanie Franco was a coach at
16  NXIVM?
17     A.  Yes.
18     Q.  What are the re -- what were the requirements
19  in 2001 for becoming a coach at NXIVM?
20     A.  I don't remember exactly; but they have to
21  express a willingness to want to coach people,
22  mentor people, learn the curriculum.  I don't know
23  how that procedure was handled.
24     Q.  Who is the person at NXIVM who has an
25  understanding as to how people become coaches or in

1   2001 how they became coaches?
2      A.  I don't know.
3      Q.  Would that be Nancy Salzman's responsibility
4   for overseeing the making of coaches?
5      A.  Well, I think she could find that out.  I
6   don't -- she is not the person who would directly do
7   that I don't believe.
8      Q.  But that's not something you were involved
9   with in 2001?
10     A.  Correct.
11     Q.  Who told you that or how did you come to
12  learn that Stephanie Franco was a coach?
13     A.  'Cause I heard that she was going to Mexico
14  to coach an Intensive.  I also heard that I believe that
15  she didn't show up, and I don't know what -- there
16  was some concern that I recall.  I don't know if
17  they were relying on her, didn't get off the plane,
18  or I don't know what the details are.
19     Q.  Who told you that Nancy -- that -- I'm sorry
20  -- that Stephanie had become a coach?
21     A.  I don't remember.
22     Q.  Who told you that she was going to Mexico?
23     A.  I don't remember.
24     Q.  Okay.  Who told you that she didn't show up
25  in Mexico?

1      A.  I assume it's probably the same person.  I
2   don't remember.
3      Q.  Okay.  Have you ever seen any documents that
4   indicate that Stephanie was a coach at NXIVM?
5      A.  I've seen that she had coach notes and
6   facilitator notes; and by reason of the fact that
7   in order to get those one must be a coach, I assume
8   she is.  I've also heard that there was a video
9   segment of her coach promotion in this legal
10  proceeding.
11     Q.  Have you seen that video?
12     A.  No.
13     Q.  When did you learn that Stephanie had left
14  NXIVM?
15     A.  I think it must have been shortly after she
16  didn't show up to Mexico.
17     Q.  Do you remem -- was that 2001?
18     A.  If that's when she took her In -- her first
19  Intensive that year, in that spring, I think I
20  recall that it was that fall.
21     Q.  Okay.  Do you know on how many -- how many
22  Intensives Stephanie participated in?
23     A.  I think at least two.
24     Q.  Okay.  Do you know whether she completed the
25  second Intensive that she took?

Page 33

1   A. No.
2   Q. Would someone be made a coach if they hadn't
3   completed a second Intensive in 2001?
4   A. I don't know.
5   Q. Did you have any responsibility for designing
6   -- for creating the procedure or the requirements
7   for making of coaches?
8   A. Initially.
9   Q. When was that?
10  A. 1997, I think.
11  Q. How about in 2001?
12  A. No. It evolved from there, and I don't know.
13  Q. Do you know if there were any changes -- so
14  there were changes in the procedure for making
15  coaches between 1997 and 2001?
16  A. I believe so.
17  Q. Do you know what they are?
18  A. No.
19  Q. Other than being told that Stephanie hadn't
20  shown up in Mexico, did you have any other
21  discussions about her ending her relationship with
22  NXIVM?
23  A. I think after that point at one point Michael
24  mentioned that she was discontent. I think that is
25  so.

Page 34

1   Q. Did he mention that to you?
2   A. Yes.
3   Q. Do you remember when that --
4   A. I think that was so.
5   Q. Sorry to interrupt you.
6      Do you remember when that conversation took
7   place with Michael?
8   A. No.
9   Q. How much -- how long after the fall of 2001
10  did that take place?
11  A. I'm not really sure. I would imagine it
12  would be in the fall of 2001. What I imagine would
13  have gone on is I would have heard that Stephanie
14  did not go to the Intensive, did not show up. I
15  have an image of Michael saying she was discontent
16  in my mind. That's why I think I had that
17  conversation.
18     I probably would follow up to find out what
19  happened with Stephanie. And because Michael is her
20  half-brother, I might have asked him.
21  Q. Where did this conversation with Michael take
22  place?
23  A. I don't know.
24  Q. Was it at 455 Karner Road?
25  A. I don't know.

Page 35

1   Q. Do you know why Michael brought this to your
2   attention?
3   A. I might have brought it to his attention
4   because she didn't show up at the Intensive,
5   although I'm not sure. Michael and I are friends.
6   Q. Okay, and were friends in 2001?
7   A. Yes.
8   Q. Okay. Did Michael explain to you why
9   Stephanie was discontent?
10  A. No. I -- I can try to reconstruct, but I
11  don't think he gave me much detail. I think Michael
12  speaks very honorably; and I think he would just
13  say, well, she didn't -- it didn't work out. It's
14  something she didn't want to do.
15  Q. When he said she was discontent or didn't
16  want to do it, did you ask why?
17  A. I probably wouldn't. I don't remember.
18  Q. Okay. How long have you known Michael
19  Sutton?
20  A. Since probably about 2001.
21  Q. Okay, and have you been friends with him
22  continuously since that time?
23  A. Yes.
24  Q. How did you become friendly with Michael
25  Sutton?

Page 36

1   A. I don't remember exactly. He has an interest
2   in technology. He has an interest in business and
3   business ventures, so that's what we speak about.
4   Q. How often do you talk to Michael Sutton?
5   A. Now, once or twice a year maybe.
6   Q. Was there ever a time when Michael Sutton
7   moved up to the -- from -- strike that.
8      Were you aware that when Michael started
9   taking the classes he would have been in the New
10  York City area?
11  A. I was aware he lived downstate.
12  Q. Was there ever a time that he moved up to the
13  Albany area?
14  A. Yes.
15  Q. And do you know when that was?
16  A. No.
17  Q. Did you ever talk to him about his reasons
18  for moving up to the Albany area?
19  A. No.
20  Q. After your discussion with Michael in the
21  fall of 2001, when's the next time you had a
22  discussion with him about Stephanie Franco?
23  A. I don't really remember.
24  Q. Did you have any other discussions with him
25  about Stephanie Franco?

1    A.  I think over the years because of this
2  litigation there have been mention.  I recall -- I
3  don't know if it was with him and someone else or
4  with someone else.  It came to NXIVM either before
5  the litigation or during the litigation; and because
6  the litigation affected his father, the question was
7  should he be consulted.  What are the ethics around
8  that, so it was my belief that he should be asked
9  certainly in the least his opinion on going forward
10  with such a lawsuit.
11    Q.  And so at some -- if I understand you
12  correctly, at some point in time, the issue was
13  raised as to whether or not Michael should be
14  consulted about a lawsuit being brought against his
15  father?
16    A.  Yes.
17    Q.  Who brought that to your attention?
18    A.  I don't remember.
19    Q.  And your response was he should be consulted?
20    A.  Uh-huh.
21    Q.  And what was Mich -- I'm sorry.  You have to
22  answer verbally.
23    A.  Oh, yes.
24    Q.  And what was Michael -- were you present when
25  that discussion took place with Michael?

1    A.  No.
2    Q.  Do you know what Michael's response was?
3    A.  My understanding is that he believed that the
4  lawsuit should go forward.
5    Q.  I represent to you that the lawsuit was
6  initially brought in August of 2003.
7        Were you consulted about bringing the
8  lawsuit?
9    A.  I believe so, yes.
10    Q.  By whom?  And I don't want conversations with
11  attorneys.
12    A.  Then I don't -- I think it might have been.
13        MR. CAMPION:  Okay, that's it then.
14    Q.  You can tell me who the -- who did you have
15  the conversation with?
16        MR. CAMPION:  You may tell him who.
17    A.  Arlen Olsen.
18    Q.  And did he represent you individually?
19    A.  Yes.
20    Q.  And did you discuss with anyone else the
21  bringing of the lawsuit?
22    A.  I think after that point, yes.
23    Q.  Did -- before it was filed, did you discuss
24  with anyone besides Arlen Olsen the desirability of
25  bringing a lawsuit?

1    A.  Yeah.  I'm sure that was -- that I was asked
2  my opinion on that.
3    Q.  Who was present when that conversation took
4  place?
5    A.  I don't remember.
6    Q.  Did you have a retainer agreement with
7  Arlen Olsen at that time?
8        MR. CAMPION:  I think that's privileged.
9        MR. KOFMAN:  I disagree.
10  BY MR. KOFMAN:
11    Q.  Was he representing you in connection with
12  this lawsuit or this dispute?
13    A.  I'm not a party.  I was not a party to this
14  lawsuit or dispute, as far as I know.
15    Q.  Was he discussing with you as a
16  representative -- was he discussing the issue with
17  you as a representative of NXIVM?
18        MR. CAMPION:  Read the question again.
19        (The following was read back by the
20  reporter:
21        "Was he discussing with you as a
22  representative -- was he discussing the issue with
23  you as a representative of NXIVM?")
24        MR. CAMPION:  I think that goes to the
25  business of privilege.

1        MR. KOFMAN:  I don't believe that the
2  existence of a retainer agreement is subject to
3  privilege.  I think I'm entitled to know whether
4  Arlen was representing Keith Raniere or NXIVM at the
5  time, since there appears to be a distinction.
6        MR. CAMPION:  Why don't you and I
7  discuss this point at a break, okay.
8        MR. KOFMAN:  We can agree to discuss
9  this at a break.
10  BY MR. KOFMAN:
11    Q.  Mr. Raniere, when did you -- did there come a
12  point in time where you learned that Rick Ross had
13  been hired in connection with Michael Sutton?
14    A.  Yes.
15    Q.  When did you first learn that?
16    A.  I believe it is my recollection that Michael
17  was to meet with Rick Ross in Florida.  I believe
18  before that point, Michael had a conversation with
19  me.  I recall him saying, "My family wants me to
20  talk with this guy about NXIVM," and he described a
21  little bit relating to the -- what Rick Ross does
22  and said to me, "What do you think?"
23    Q.  Were you familiar with Rick Ross at that
24  time?
25    A.  No.

Page 41

1    Q.  Did you do any research about him at that
2  time?
3    A.  No.
4    Q.  What did you tell Michael?
5    A.  "Sure."
6    Q.  So you advised Michael that he should meet
7  with Rick Ross?
8    A.  Yeah.  I think people should meet with anyone
9  they want to.
10    Q.  Did you ask anybody at NXIVM to -- to check
11  out who Rick Ross was?
12    A.  No.
13    Q.  What was the next con -- or next discussion
14  you had with Michael about Rick Ross?
15    A.  Michael had mentioned to me -- and this must
16  have been after they had their meeting/meetings --
17  that Rick Ross had said to him that if I was in the
18  Guinness Book of World Records, he would take the
19  16-day Intensive; and then when it turned out that
20  indeed I was, Rick Ross denied that that was ever
21  said allegedly.
22    Q.  By the way, have you ever spoken to
23  Rick Ross?
24    A.  No.
25    Q.  Would you have allowed Rick Ross to take the

Page 42

1  16-day Intensive?
2    A.  Potentially.  We wanted the Forbes reporter
3  to take the 16-day Intensive.
4    Q.  Would Rick Ross have had to sign any
5  documents before taking the 16-day Intensive?
6    A.  Yes.
7    Q.  Such as?
8    A.  What every other student signs.
9    Q.  Other than conversations with Michael about
10  Rick Ross, did you have -- strike that.
11        Do you remember any other conversations that
12  you had with Michael about Rick Ross?
13    A.  I only remember a comment.  I don't know if
14  it was a separate conversation.  Michael thought
15  Rick Ross was a nice guy.
16    Q.  Do you remember having any discussions with
17  anybody else about the fact that Rick Ross was
18  meeting with Michael?
19    A.  No.
20    Q.  Did you ever have any discussions with
21  Aaron Kassin about Rick Ross?
22    A.  Yes.
23    Q.  When did that take place?
24    A.  Aaron Kassin came up to Albany -- I think it
25  was to sign an Affidavit -- and he just affirmed

Page 43

1  that he believed in what he was doing.
2    Q.  Were you present when he signed his
3  Affidavit?
4    A.  No, I don't think so.
5    Q.  Did you meet with him before he signed the
6  Affidavit?
7    A.  No, I think it was in passing.
8    Q.  I'm sorry.  It was in passing you met with
9  him?
10    A.  I think I was either at 455 New Karner Road
11  or somewhere like that and ran into him.
12    Q.  And what was said?
13    A.  I don't remember.  It was casual.
14    Q.  Was -- have you had any other conversations
15  with Aaron Kassin about Rick Ross?
16    A.  I believe so.  I have a recollection of him
17  saying that Rick Ross wanted our confidential
18  materials.  It is difficult for me to ascertain if
19  that was a true conversation because I've also read
20  that in the papers.
21    Q.  So at this point, you don't have any
22  independent recollection of the conversation?
23    A.  No.
24    Q.  Mr. Raniere, did you -- are you aware as you
25  sit here today that Michael Sutton tape recorded a

Page 44

1  telephone conversation he had with Stephanie Franco?
2    A.  Yes.
3    Q.  How did you become aware of that?
4    A.  I think I had heard that there was a question
5  of how the materials came to Rick Ross and that
6  there's one rendition of it, one whatever it is,
7  recitation of it where the materials went from
8  Stephanie to her brother or half -- I'm not sure if
9  it's brother or half-brother, and that brother gave
10  the materials to Rick Ross.
11        There's another rendition that Stephanie most
12  directly either gave it immediately through her
13  brother or to Rick Ross, and I think that tape
14  recording says that Rick Ross -- that she intended
15  to give the materials to Rick Ross.
16    Q.  Have you ever heard the tape recording?
17    A.  No.
18    Q.  Have you ever read a transcript of the tape
19  recording?
20    A.  No.
21    Q.  What's your basis -- what's your -- what's
22  the basis of your understanding of the tape
23  recording?
24    A.  I believe Michael might have mentioned it
25  in conversations, and I believe Kristin might have

Page 45

1    mentioned it; Kristin Keeffe.
2        Q. Did you -- were you aware before the tape
3    recording -- strike that.
4        Did you have a conversation with Michael
5    Sutton about the subject of his tape recording a
6    conversation with his sister?
7        A. Not that I recollect.
8        Q. Did Michael Sutton ask for your advice as to
9    whether or not he should tape record a conversation
10   with his sister?
11       A. I don't know.  It's --
12           MR. SYLVESTER:  Pardon me?
13       A. It's possible.  That's something that he --
14   someone would bring to ask me.
15       Q. And do you recall what you said to him about
16   that?
17       A. I don't recall the conversation.
18       Q. As you sit here today, what would your
19   recommendation have been?
20       A. I think it depends on what the subject matter
21   of the conversation is.  Do I believe in the taping
22   of phone calls?  I think in states where it is legal
23   that is an option, depending on how a person feels
24   about the situation.  So I would, one, suggest that
25   he find out if it's legal; and, two, I would suggest

Page 46

1    that he look at why he wants to do that and if he
2    wanted it to be concealed -- and I assume this tape
3    was concealed, that Stephanie did not know about it
4    or she claims that she did not know about it.
5        Q. I can't answer your question, sir.
6        A. Okay.  I would suggest that he consider all
7    of those factors.
8        Q. Would you consider the taping of a
9    conversation or the concealed taping of a
10   conversation with a relative to be an ethical act?
11       A. It depends on the context.
12       Q. In this context.
13       A. I don't know enough about the context to make
14   that assessment.
15       Q. Okay.  Did you ever see the tape that was
16   made?
17       A. I don't think so.
18       Q. Do you know what was done with the tape --
19   what Michael did with the tape that he made?
20       A. Well, my understanding is that one of the
21   NXIVM attorneys named Kevin Luibrand had a copy of
22   the tape.
23       Q. And what's the basis for that understanding?
24       A. I think Kevin Luibrand had said something
25   about it at one point.  I also heard that I think it

Page 47

1    was Kristin, that the subject of this tape -- this
2    tape is either lost or -- well, it sounds like this
3    tape is lost but that there's a transcript that
4    Kevin Luibrand had or something like that in his
5    files, and I heard something about that.
6        Q. Kevin Luibrand -- Luibrand told you that he
7    had a copy of the tape?
8        A. I'm not sure.
9            MR. KOFMAN:  We can take just a couple
10   minute break.
11           MR. CAMPION:  Sure.
12           (At this point, there was a short
13   recess.)
14           THE VIDEOGRAPHER:  This is the beginning
15   of Tape Number 2.  The time is 11:35.
16   BY MR. KOFMAN:
17       Q. Okay.  Mr. Raniere, before we took a break I
18   had asked you a couple of questions about Arlen
19   Olsen.
20       When you spoke with Mr. Olsen, were you
21   seeking legal advice from him?
22       A. I don't believe I was seeking legal advice.
23       Q. Did he provide you with legal advice?
24       A. I believe you'd call it that.
25       Q. And was that for you on an individual basis?

Page 48

1        A. I would -- I would interpret it that way.
2        Q. Okay.  Did you have a written retainer
3    agreement with Mr. Olsen?
4        A. I'm not sure.
5            MR. KOFMAN:  Okay.  I'd like to make a
6    document request -- and I can follow up with a
7    letter -- for a copy of the written retainer
8    agreement between Mr. Raniere and Arlen Olsen.
9            MR. CAMPION:  If there is one.
10           MR. KOFMAN:  Okay.
11           (Request.)
12   BY MR. KOFMAN:
13       Q. Mr. Raniere, did you meet with counsel
14   prior to today's deposition to prepare for your
15   deposition?
16       A. Yes.
17       Q. And was that with Mr. Campion and
18   Mr. Leonard?
19       A. Yes.
20       Q. Was there anyone else present?
21       A. Yes.
22       Q. And who was that?
23       A. Nancy was present at one of the meetings,
24   although I'm not sure if you'd call that deposition
25   prep.  They came up to meet me.

Page 49

1    Q. Do you have -- we were talking a little bit
2  about Michael Sutton and your relationship with him.
3  You mentioned that you were friends.
4    A. I'm sorry. Nancy was also there, yes, the
5  other meeting, just to be clear.
6    Q. Okay. Did you see him on -- do you see him
7  or have you seen him in the past on a social basis?
8    A. Michael Sutton?
9    Q. Yes.
10   A. Yes.
11   Q. Do you have any business relationship with
12 Michael Sutton?
13   A. No.
14   Q. During the --
15   A. Not that I know of.
16   Q. During the 2002-2003-2004 time period, how
17 frequently would you see Michael Sutton?
18   A. I don't know, once a month maybe.
19   Q. And would that -- in what context? Would
20 that be social visits or something related to NXIVM?
21   A. Volleyball. He would come to volleyball at
22 times.
23   Q. Okay, and you would have discussions with him
24 at that time?
25   A. Yeah.

Page 50

1    Q. And would NXIVM and this lawsuit be one of
2  the things that was discussed?
3    A. I imagine it would be mentioned at times, but
4  that was not a major topic of discussion.
5    Q. Are you aware that Michael Sutton has paid
6  some portion of NXIVM's legal fees in this matter?
7    A. No, I'm not specifically aware of that.
8    Q. Did you have any discussions with him about
9  payment of legal fees?
10   A. Legal fees, no.
11   Q. Has Michael Sutton given any gifts to you?
12   A. No. He's loaned money but not a -- not a
13 gift, as far as I know.
14   Q. He's loaned money to you personally?
15   A. No, it wasn't to me. I believe it was to
16 NXIVM but it was -- I was doing some patent work,
17 so to speak, or things that we were thinking of
18 patenting which I ended up not relating to
19 commodities market, stock market, things like that.
20   Q. Okay. Do you remember how much he loaned to
21 NXIVM?
22   A. No.
23   Q. Did you sign any loan documents --
24   A. I don't --
25   Q. -- with Michael?

Page 51

1    A. I don't know if it was NXIVM. I think it was
2  First Principles, but I'm not positive.
3    Q. Okay. Do you know if he's given any gifts to
4  NXIVM or First Principles?
5    A. I don't know if it's a gift, no. I don't
6  know.
7    Q. When you say you don't know that it's a gift,
8  are you referring to the loan or --
9    A. Right.
10   Q. Okay. Do you know if he's given any gifts to
11 Nancy Salzman?
12   A. No, I don't know.
13      THE VIDEOGRAPHER: Somebody turn off
14 their BlackBerries. It's coming through very
15 strong. Thank you.
16      (A discussion was held off the record.)
17 BY MR. KOFMAN:
18   Q. When was the last time you spoke to Michael
19 Sutton about this case?
20   A. About this case? I think it was mentioned
21 during Vanguard Week this year.
22   Q. What is "Vanguard Week"?
23   A. It's a corporate retreat where people from
24 all over the world, the different areas where we
25 teach education can come and be friends -- have, you

Page 52

1  know, common interests.
2    Q. And does that coincide with your birthday?
3    A. Yes.
4    Q. When was the -- at that -- at Vanguard Week
5  when you spoke to Michael, did you discuss the case?
6    A. I think it literally went, "How's it going?"
7       "Okay, as far as I know."
8       There were other issues that he was
9  discussing.
10   Q. Do you remember what those were?
11   A. Yes.
12   Q. What were they?
13   A. There are other business ventures that he and
14 another person are involved in. There is science
15 that he is keenly interested in, and he has
16 representations from some scientists relating to
17 some technology; and he wanted my opinion on not
18 only how to evaluate the science but create tests so
19 that he could evaluate the science of these things.
20   Q. Without getting into details that I won't
21 understand, what's the nature of the science that
22 he's developing?
23   A. I told him that I won't speak to anyone of
24 this.
25      Do you want me to -- I mean, I can try to

Page 53

1  give you a general thing without violating a
2  confidence with him.
3      Q.  If you -- if you could.
4      A.  Um, there -- there is products that have
5  been brought to him that claims have been made.
6  His question is how can he verify that the products
7  can do the things that are claimed, so I gave him
8  some principles as to how to create double-blind
9  testing type of procedures and gave him some
10  understanding of the sorts of things that can go
11  wrong with these.
12     Q.  Who is the person -- do you know the name
13  of the person with whom he's looking to go into
14  business?
15     A.  Yes.
16     Q.  And what is the person's name?
17     A.  I also have a confidence.  I -- I told him I
18  would not speak to anyone about these things.
19     Q.  Is the person a NXIVM student?
20     A.  Can you define what you mean by "NXIVM
21  student"?
22     Q.  Is it someone who has taken NXIVM courses in
23  the past?
24     A.  Yes.
25     Q.  Is it someone who presently or who is a

Page 54

1  member of NXIVM?
2      A.  How do you define that?
3      Q.  Is it somebody who presently takes courses
4  from NXIVM?
5      A.  Can I say something that's important?
6      Q.  Sure.
7      A.  There is a person who took a NXIVM course
8  eight years ago.  They come to volleyball now and
9  then.  They're a friend.  Are they part of NXIVM?  I
10  mean, that's -- that's -- this is a person that has
11  taken NXIVM courses, has not taken NXIVM courses in
12  a long time, is a friend of mine.
13     Q.  Does the person hold a rank in NXIVM?
14     A.  Yes.
15     Q.  What's the rank?
16     A.  They're a proctor.
17     Q.  Have they had any proctor duties in eight
18  years?
19     A.  I don't know in eight years, but it's been a
20  number of years.
21     Q.  Okay.  I'm going to have to ask for the name
22  of -- and, again, the deposition transcript is
23  confidential and will be marked as confident --
24     A.  Uh-huh.
25     Q.  -- confidential, so can you tell me the name

Page 55

1  of the individual?
2      A.  The student?
3      Q.  Yes.
4      A.  I'm trying to think of his full -- I call him
5  "Maximus."  I'm trying to think.
6         Do you mind if I ask Nancy what his full name
7  is?
8         MR. KOFMAN:  Yeah.  Go ahead.
9         THE WITNESS:  Nancy, what's Maximus'
10  full name?
11        MS. SALZMAN:  Sarzen.
12        THE WITNESS:  Sarzen.  Thank you.  I was
13  going to call him Serzen.
14  BY MR. KOFMAN:
15     Q.  Okay.  Mr. Raniere, did it come to your
16  attention at some point that Rick Ross had posted
17  articles by John Hochman and Paul Martin on his
18  websites?
19     A.  Yes.
20     Q.  When did that come to your attention?
21     A.  I think it was sometime shortly thereafter,
22  yes.
23     Q.  I'm sorry.  When you say "shortly
24  thereafter" --
25     A.  I think within a month of when they were

Page 56

1  posted.
2      Q.  And do you remember what year that was?
3      A.  It was 2003, I think.
4      Q.  Okay.  How did it come to your -- how did you
5  learn that articles had been posted?
6      A.  Someone told me.
7      Q.  Do you remember who it was?
8      A.  I don't because I think there were several
9  people that told me.
10     Q.  Do you remember any of the people who told
11  you that the articles had been posted?
12     A.  I think Kristin told me, I think -- I don't
13  know if Nancy told me, but I'm pretty sure Kristin
14  told me.
15     Q.  At any point before the articles were posted,
16  had you done any investigation into who Rick Ross
17  was?
18     A.  I believe Michael -- well, Michael had told
19  me previous to his deprogramming or meeting or
20  whatever you call it that Rick Ross was a -- I
21  believe a deprogrammer or someone like that.
22        I don't know if it was before the website
23  went up that I heard more information relating to
24  Rick Ross, but it was somewhere thereabouts.
25        I also recall -- I recall hearing that there

Page 57

1    might -- he might publish something about us, and I
2    went I believe on his website and looked and did not
3    find ES -- it was Executive Success Programs, ESP or
4    my name at that period.
5       Q. Do you remember when that was?
6       A. It must have been before whenever the date
7    was that the site went up.
8       Q. Did you ever have any discussions with
9    Michael Sutton about the possibility of retaining
10   an independent expert to evaluate NXIVM?
11      A. I think I had suggested that that would be a
12   good thing and that I thought it was a good thing.
13      Q. When did you suggest that?  This was before
14   he met -- I'm sorry.
15        Did you suggest that before he met with Rick
16   Ross?
17      A. I don't think so.  No, I think this was
18   later.
19      Q. Do you remember roughly what year?
20      A. I imagine it was probably a year after the
21   website went off or somewhere -- up or somewhere in
22   that.
23      Q. So was it a year after the website went up?
24      A. You know, I'm not really sure.  The
25   website -- the lawsuit poses interesting problems,

Page 58

1    ethical issues relating to that so...
2       Q. At approximately the time Michael told you he
3    was meeting with Rick Ross, did you have any
4    discussions with him about retaining an expert to
5    evaluate NXIVM?
6       A. All right.  I -- I do remember speaking to
7    Michael Sutton -- it might have been right after the
8    intervention or I'm not sure of the timing -- asking
9    who Rick Ross suggested would be people who could
10   give other opinions, second opinions.
11      Q. Okay, and what did Michael say?
12      A. I think he said he would ask.
13      Q. Did you ever hear anything further about the
14   names of people who might evaluate NXIVM?
15      A. I remem -- I don't know the names, but I
16   remember that I believe Michael was given a number
17   of names.
18      Q. Did you check on any of the names?
19      A. No.
20      Q. Were you familiar with any of the names?
21      A. I wouldn't be.
22      Q. Do you know if anyone from NXIVM checked on
23   any of the names?
24      A. No, I don't know.
25      Q. What happened?  Do you know if Michael

Page 59

1    approved any of the names?
2       A. Approved for what?
3       Q. Did Michael -- strike that.
4         Did NXIVM indicate that it would be
5    comfortable having any of the people named by
6    Ross evaluate the program?
7       A. I don't -- I don't think it was either way.
8    I don't know.  I don't remember.
9       Q. What happened -- did anything happen after
10   Michael gave NXIVM the list of names that he had
11   gotten from Ross?
12      A. I don't know.  I don't know what happened.
13      Q. You mentioned that there were ethical issues
14   or problems relating to the website after the
15   litigation was filed.  Can you elaborate?
16      A. Yes.  The question is if Ross is malintended
17   or not.  If Ross is malintended, then there are
18   certain procedures or -- I shouldn't say
19   procedures -- strategies that are best used.  If
20   someone is not -- if a person is not malintended,
21   then there are a different set of strategies.
22        The malintended person is not a seeker of
23   truth.  The malintender seeks to destroy.  So if you
24   give someone with bad intent information, they're
25   not looking to take that information and see what's

Page 60

1    true.  They're looking to hurt you.  The difference
2    between a skeptic and a cynic I -- I say, you know,
3    a skeptic is someone who looks to turn magic into
4    science.  A cynic is someone who looks to turn good
5    to bad.
6         So if you hope to go into any sort of a
7    dialogue with someone who is malintended, it best
8    suits you not to give information.  If someone's not
9    malintended, then it suits you to give information.
10      Q. Were these considerations that you had before
11   or after the filing of the lawsuit?
12      A. These are considerations in general in any
13   sort of a human interaction like that.
14      Q. Is this something you thought -- you
15   considered with respect to Ross before the lawsuit
16   was filed?
17      A. I'm not sure.
18      Q. Did you --
19      A. I mean --
20      Q. Have you come to the conclusion that Ross is
21   malintended?
22      A. Not specifically.
23      Q. Okay.  Have you come to any conclusion about
24   Morris and Rochelle Sutton, as to whether they're
25   malintended?

Page 61

1    A. No, not specifically.  I don't know in both
2  cases.
3    Q. Okay.  Have you had any consideration of --
4    A. I'm sorry.  I said or in all three, 'cause
5  he mentioned three people, but I took them as two
6  parties.
7    Q. Has there been any consideration by you of
8  allowing Ross to have someone evaluate the course
9  now?
10    A. It's always a consideration.
11    Q. Have you discussed this with anyone not --
12  not your attorneys, but anyone within NXIVM?
13    A. I think that's always an option.  That's
14  always -- if people ask my opinion on things, that
15  is so.  If they believe that Ross is malintended, it
16  would be a bad idea.
17    Q. Have you discussed with Nancy Salzman whether
18  she thinks he's malintended?
19    A. No.
20    Q. Okay.  You said at some point you learned
21  about the Hochman and Martin articles.  You were
22  told that by perhaps several people.
23    What did you do after you were told about the
24  Hochman and Martin articles?
25    A. I read them.

Page 62

1    Q. Did you get them from the website?
2    A. I think I did.  I'm not positive.
3    Q. Do you remember -- do you own a computer?
4    A. Yes.
5    Q. Is this a computer at NXIVM's offices, or is
6  it at your home?
7    A. No.  It's at home.
8    Q. Okay.  Did you print out the articles?
9    A. At some point, I did; not when I initially
10  read them.  I later printed them out over the years.
11    Q. Have you -- did you make any notes on the
12  articles?
13    A. I have made notes, yeah.
14    Q. Have you -- do you remember when you made
15  notes?
16    A. Not specifically.  There were a few
17  occasions.
18    Q. Was it before or after the filing of the
19  lawsuit?
20    A. I believe it was after.
21    Q. Have you retained those notes?
22    A. I -- I assume that they are somewhere.  Most
23  of the things that I write on are retained.  I have
24  them in boxes sometimes in storage areas, sometimes
25  -- sometimes other people retain them.  I have some

Page 63

1  piles of paper that are sort of useful past scrap
2  paper.  They may be in there.
3    Q. Where do you -- where do you keep these
4  files?
5    A. Well, there are some files in the house.
6  There are some other people who have had files
7  collected, things of mine that I don't know where
8  they are.
9    Q. Has anyone asked you for these files during
10  the course of this litigation?
11    A. I don't think so, although I did look for
12  papers that were related to the thing and did not
13  find any.
14    Q. Where did you look?
15    A. I looked in my house.  I looked through my
16  piles.
17    Q. Did Kristin Keeffe ever ask you to look for
18  documents relating to this lawsuit?
19    A. I think she asked me if I knew if certain
20  ones existed.
21    Q. What documents did she ask you about?
22    A. She asked me about e-mail accounts that I
23  might have.
24    Q. And were you able to locate documents
25  relating to e-mail accounts?

Page 64

1    A. No.
2    Q. Did she ask you to look through your files
3  for anything relating to this matter?
4    A. She asked me -- she asked me about e-mail.  I
5  think she asked me if I had any notes relating to
6  the Hochman reports and the Paul Martin reports,
7  which I did not find any 'cause I did look for them,
8  but I don't remember her asking specifically.
9    Q. Okay.  Do you recall what your notes on the
10  Hochman and Martin articles stated?
11    A. Yeah.  The -- not so much the Martin article.
12  The Hochman article has a number of logical
13  inconsistencies and a number of factual
14  inconsistencies.  I think there are something like
15  in the two-page article I think there are 20 or
16  something like that factual inconsistencies and over
17  80 logical inconsistencies.
18    Q. Did you ever -- did you ever give your notes
19  to an attorney?
20    A. I'm not sure.  There was one point where one
21  of the attorney firms wanted me to analyze the
22  articles, and I said that I would like to see their
23  analysis first; and I did not end up analyzing the
24  article for them.  I do have, you know, thoughts on
25  it but...

1    Q.  Do you remember which firm that was?
2    A.  Proskauer, I believe.
3    Q.  Do you believe you gave Proskauer any
4  documents relating to the articles?
5    A.  I don't know if in the end I did.  It -- I
6  may well have, but originally I wanted them to do
7  it first; and I wanted to see what they thought
8  because I'm -- I'm a logic person.  I know facts
9  relating to NXIVM, but I'm not a legal person, and
10  my analysis of the article is highly tedious.
11    Q.  Do you recall what you gave to Proskauer?
12    A.  If I gave anything -- and I don't recall,
13  per se -- I probably would have given just the Word
14  documents of each of the sentences and the analysis
15  and the logical flow and stuff like that.
16    Q.  And do you remember who at Proskauer you
17  would have given that to?
18    A.  No, I --
19       MR. McGUIRE:  Object to the form.
20    Q.  If you gave the documents, do you know who at
21  Proskauer you would have given them to?
22    A.  No.  I wasn't a client of Proskauer's.  I
23  ultimately would have given them to either Nancy or
24  to Kristin or someone like that, and they would have
25  given them to Proskauer.

1    Q.  I'm sorry.  You had said you were not a
2  client of Proskauer?
3    A.  Of Proskauer's, right.
4    Q.  Did you meet with Proskauer on any occasions?
5    A.  I was introduced to attorneys from Proskauer.
6    Q.  Did you discuss the substance of the case
7  with them?
8    A.  No.
9       MR. KOFMAN:  Okay.  I'd like to -- would
10  you please mark this as Raniere-2.
11       (Affidavit of Keith Raniere signed
12  8/18/03 consisting of six pages was received and
13  marked Defendant's Exhibit Raniere-2 for
14  Identification.)
15  BY MR. KOFMAN:
16    Q.  Mr. Raniere, I'd like you to take a look at
17  a document that's been marked as Raniere-2 entitled
18  Affidavit.
19       Please take a look at that.
20    A.  Okay.
21       (Witness complies.)
22    Q.  Do you recognize that document?
23    A.  It looks like my Affidavit.  Hold on.
24    Q.  Turning to the last page of this, which is
25  Page 6 --

1    A.  Yes.
2    Q.  -- is that your signature?
3    A.  It appears to be.  That's what I just
4  checked.
5    Q.  Did you review -- did you draft this
6  document?
7    A.  I don't believe I drafted it, but I certainly
8  if I signed it looked at it and approved it.
9    Q.  Okay.  Was this drafted by one of your
10  attorneys?
11    A.  I'm not sure.
12    Q.  Okay, but you're certain you looked at it to
13  make sure it was accurate?
14    A.  Yes.
15    Q.  Okay.  Did you have any changes to what you
16  were presented by your attorneys?
17    A.  I don't know.  I sometimes do.
18    Q.  Okay.  Do you recall whether you did in this
19  situation?
20    A.  No, I don't know.
21    Q.  Okay.  Turning to Paragraph 2 of your
22  Affidavit, which is actually on the first page, it
23  contains the sentence, "Rick Ross was hired to
24  discredit us and by using a series of false facts
25  has created an avalanche of false bad press."

1       Who did you -- when you say, "Rick Ross was
2  hired to discredit us," what was your understanding
3  as to who hired Rick Ross?
4    A.  I think it was Moe Sutton.
5    Q.  Moe Sutton?
6    A.  I believe so.
7    Q.  What's the basis for your contention that
8  Morris Sutton hired Rick Ross to discredit -- strike
9  that.
10       When you say "us," to whom are you referring?
11    A.  NXIVM -- what is now NXIVM, what is ESP,
12  myself, Nancy Salzman, whoever was discredited.
13    Q.  Okay.  What's the basis for your statement
14  that Moe Sutton hired Ross to discredit you?
15    A.  Because that's what I was told.  I was told
16  that he hired Ross; and I was told that Moe Sutton
17  wanted to take Michael, if you will, the phrasing I
18  think is away from NXIVM, wanted Michael to be in
19  his family business, did not want certain family
20  secrets revealed and because Michael wanted to
21  reveal those things wanted to discredit us.
22    Q.  Who told you all about these things?
23    A.  I believe Michael did.
24    Q.  But was your source for this statement that
25  "Rick Ross was hired to discredit us" anybody

1  besides Michael?
2       Did you have another source for that besides
3  what Michael told you?
4    A. I -- I don't think so because I don't know
5  anyone else who would have firsthand knowledge.
6    Q. Did Michael Sutton tell you what the basis
7  of his understanding of why Rick Ross was hired?
8    A. I believe he did.
9    Q. Do you recall him telling you?
10   A. I recall over a period of several
11  conversations him saying a number of things, yes.
12   Q. And was that all prior to August 18, 2003,
13  the date of this Certification?
14   A. I don't know if it was all prior, but there
15  must have been sufficient prior. Otherwise, I
16  wouldn't have signed this.
17   Q. So what specifically did Michael tell you
18  about why his family -- why -- strike that.
19      Did Michael indicate that Rochelle Sutton had
20  hired Ross to discredit you?
21   A. No. I believe -- and when you say "hired,"
22  there's a difference I think between the person who
23  pays and the person who hires. It was Michael's
24  strong impression because of what was going on with
25  their family that his father hired Rick Ross.

1    Q. Okay, and who do you understood paid
2  Rick Ross?
3    A. I don't know.
4    Q. Okay. Did Michael indicate to you at all
5  that Rochelle Sutton had hired Rick Ross?
6    A. No.
7    Q. Did he say anything to you about his mother
8  -- at all about his mother during these
9  conversations?
10   A. It wasn't the main focus.
11   Q. Did he --
12   A. I think he --
13   Q. Strike that.
14      Did he mention her at all?
15   A. Probably.
16   Q. Do you recall one way or the other?
17   A. No. I know that he has I think in his mind a
18  stronger relationship with his mother than with his
19  father; so he has spoken of going to lunch with his
20  mother over the years, things like that.
21      I don't remember if he specifically spoke of
22  his mother back then.
23   Q. Okay, but did he indicate whether Stephanie
24  Franco had hired -- had been responsible for hiring
25  Rick Ross?

1    A. No, I don't remember.
2    Q. Do you have any knowledge one way or the
3  other as to whether Stephanie Franco was responsible
4  for the hiring of Rick Ross?
5    A. No, I don't know.
6    Q. Okay. What did he tell -- what did then
7  Michael tell you about the reasons that he
8  understood Morris Sutton had hired Rick Ross?
9    A. This is confidential, yes?
10   Q. Yes.
11   A. Michael Sutton has a child out of wedlock.
12  In his community, there is a rule I guess that if
13  you have a child out of wedlock you must shun them
14  and shun the woman that you had the child with.
15      He originally came to NXIVM because this
16  was a conflict in his life. And when he decided to
17  support that child, he told me that -- things like
18  he didn't want to be walking in the city and have
19  his little girl come up to him and have to ignore
20  her so he -- he said that his father was very upset.
21      He told his father that he wanted to embrace
22  his child. His father told him that he would, from
23  what I understand, disown him. And I even think in
24  the end he was pushed or strongly inspired to be out
25  of the family business.

1      It is my understanding he was considered a
2  most eligible bachelor within their community and
3  that this was disgraceful, and it is my
4  understanding that the father would do anything to
5  uphold their family position within this community
6  and that we were seen as an obstruction to this.
7    Q. Did -- and this is what Michael told you over
8  the series of several conversations?
9    A. Yeah. It's been -- at times, I have met his
10  -- the mother of his child. He's asked me questions
11  about his child and his relationship and things like
12  that as a friend.
13   Q. How did the subject of why his parents --
14  of why Morris Sutton hired Rick Ross come up?
15      Who raised it, you or Michael?
16   A. I think probably Michael.
17   Q. Where did you have these -- this discussion?
18   A. I don't know. I mean, there are numerous
19  places I have spoken with Michael.
20   Q. Was anybody else present at any of these
21  conversations?
22   A. Over the years, there have been other people
23  present. I don't know if during this time period
24  there was anyone present.
25   Q. Who else has been present during these

Page 73

1   conversations?
2       A. Kristin has been present, Nancy has been
3   present, Tom Sarzen has been present. I think there
4   have been a few others.
5       Q. Did Michael -- so I'm trying to focus. What
6   did Michael specifically say about why Morris hired
7   Rick Ross?
8       A. I -- I had heard originally that Morris hired
9   Rick Ross to destroy us were the words. I have
10  heard recently that that is stronger than Michael
11  believes.
12      Q. When you say you had heard that Michael had
13  hired --
14      A. Moe.
15      Q. -- Rick Ross to destroy you, from who did you
16  hear that?
17      A. I meant Moe. If I said Michael, I meant Moe.
18      Q. Strike that.
19          From who did you hear that Michael had hired
20  -- that Morris Sutton had hired Rick Ross to destroy
21  you?
22      A. I believe Michael. Now, I --
23      Q. Did he?
24      A. Now, I did see recently that Michael or hear
25  recently that Michael does not use that strong of a

Page 74

1   word. So although my recollection might be that,
2   I'm open to the fact that maybe it would be more
3   Moe Sutton would do anything in his power to get
4   Michael back, even if it meant destroying us.
5       Q. Okay. Did Michael use the word "destroy" in
6   your con -- "destroy" NXIVM in your conversations in
7   2003?
8       A. To the best of my recollection.
9       Q. Did he use the word "discredit"?
10      A. I think, yes. I am pretty sure. I'm more
11  sure of "discredit" than "destroy."
12      Q. Uh-huh.
13      A. Michael told me that Moe Sutton is a very
14  powerful man, the type of man that has senators
15  over for dinner I believe is what the phrase was.
16      Q. Did Michael indicate back in 2003 that his
17  father was concerned about his involvement with
18  NXIVM?
19      A. Yes. I would consider saying what I remember
20  him saying expressing concern.
21      Q. Did Michael indicate that the -- in 2003 that
22  the reason his father had hired Rick Ross was to get
23  him to separate from NXIVM?
24      A. I believe that was the gist of the
25  conversation.

Page 75

1       Q. Did he indicate anything about -- strike
2   that.
3           Did he indicate how Morris Sutton's -- strike
4   that.
5           Did he indicate why he believed Morris Sutton
6   would try to destroy or discredit NXIVM? Strike
7   that. Let me rephrase the question.
8           Did he indicate what the source of his
9   understanding of Morris Sutton's intent was?
10      A. I believe social embarrassment.
11      Q. Did he --
12      A. That is my opinion.
13      Q. Did he indicate that Morris Sutton had told
14  him that he wanted to destroy or discredit NXIVM?
15      A. I believe so.
16      Q. Okay. Did he quote his father?
17      A. I believe so.
18      Q. You didn't take any notes of any of these
19  conversations, did you?
20      A. No.
21      Q. If you had to draft this same sentence today,
22  would you change anything?
23      A. Which one?
24      Q. The one that said, "Rick Ross was hired to
25  discredit us."

Page 76

1       A. I still believe in what Michael told; and
2   also with some of the additional language that Rick
3   Ross has used on his site, I would fortify this, so
4   I do believe that Rick Ross was hired to discredit
5   us.
6           I might add because of what I have heard
7   recently that it is my opinion because there is some
8   conflict as to whether Moe Sutton said, "I will
9   destroy NXIVM" or "I will do anything in my power to
10  get you back, even if it means destroying NXIVM"
11  so...
12      Q. Have you read -- are you aware that Michael
13  Sutton was deposed in this case?
14      A. Yes.
15      Q. Have you read the transcript of his
16  deposition?
17      A. No.
18      Q. Is it your contention that Morris Sutton is
19  responsible for the content of Rick Ross' website as
20  it pertains to NXIVM?
21          MR. McGUIRE: Object to the form of that
22  question. It calls for a legal conclusion.
23      A. Can you please define what you mean by
24  "responsible"?
25      Q. Is it your understanding that Morris Sutton

Page 77

1  has been involved in selecting the content or what
2  is posted on Rick Ross' website about NXIVM?
3      A.  I can only offer my opinion.  I don't believe
4  that Moe Sutton selects everything that is on Rick
5  Ross' website related to NXIVM.  I don't know what
6  his involvement is.
7      Q.  Do you understand -- do you have any
8  understanding as to whether Morris Sutton has
9  selected anything for placement on Rick Ross'
10  website?
11      A.  I'm not sure.
12      Q.  Do you have any understanding as to whether
13  Morris Sutton has any control over what Rick Ross
14  puts on his website?
15      A.  My assumption is that he doesn't have full
16  control of what Rick Ross puts on his website.
17      Q.  You said "full control."
18          Do you have any understanding as to whether
19  he has any control?
20      A.  I don't know.  I don't know what the relation
21  -- the full relationship is between Rick Ross and
22  Moe Sutton.
23      Q.  So a little while ago you said that based on
24  what appears on the website you could make certain
25  conclusions about what Morris Sutton's intent was.

Page 78

1          How can you make an assumption about Morris
2  Sutton's intent based on the website if you don't
3  know what role Morris Sutton has with respect to the
4  website?
5      A.  I -- I don't remember saying that.
6          Could you please repeat what I said so I can
7  comment on it?
8      Q.  Well, the transcript will be clear but do you
9  -- that's fine.  We can move on.
10          When you say that you understand now that
11  Michael Sutton's words have changed, that based
12  on conversations you've had with Michael?
13          MR. CAMPION:  I object to the form of
14  that question.
15          Go ahead and answer it.
16      A.  I'm not sure completely.
17      Q.  Do you have any -- strike that.
18          Has Michael Sutton indicated to you that his
19  perception has changed about why Morris Sutton hired
20  Rick Ross?
21      A.  No.
22      Q.  Is this something you've heard from third --
23  from someone other than Morris -- than Michael
24  Sutton?
25      A.  I heard that Michael Sutton had signed or

Page 79

1  had an Affidavit somehow prepared and that there
2  was something that needed to be changed because he
3  didn't agree with it relating to this issue.
4      Q.  Do you know when that was?
5      A.  No.
6          MR. SYLVESTER:  What do you guys want to
7  do about lunch breaks?
8          MR. CAMPION:  Why don't we break at
9  12:30.
10          MR. KOFMAN:  What time is it now?
11          MR. CAMPION:  Twenty after.
12          MR. KOFMAN:  Give me about five minutes
13  and then we'll break.
14          MR. CAMPION:  Sure, okay.
15          (A discussion was held off the record.)
16
17  BY MR. KOFMAN:
18      Q.  Mr. Raniere, you mentioned that you were
19  asked to search for e-mail accounts.
20          What e-mail accounts have you maintained
21  since 2001?
22      A.  Maintained all the way through?
23      Q.  Strike that.
24          What e-mail accounts have you had access to
25  and used?

Page 80

1      A.  There's the Kunterre@nycap.rr.com, which I
2  have a shared access to.  There were one or two
3  Yahoo accounts.  I think there was one that was
4  Honor and Ethics.  There is a current account that
5  has been created recently, which is there's a -- I
6  have a Facebook account and a Yahoo account which is
7  my name.  I believe there was a Yahoo account,
8  Vanguard 2000 that someone created for me, and I
9  don't know if I can get e-mail on the NXIVM server.
10  I believe that I can, although I don't recall
11  getting any e-mail at Vanguard@NXIVM.com.
12      Q.  Have you -- at any time since the litigation
13  was filed, have you searched these e-mail accounts
14  to locate any documents relevant to this litigation?
15      A.  Yes.
16      Q.  When did you perform that search?
17      A.  The last time or --
18      Q.  The first time.
19      A.  'Cause there were a few times.
20      Q.  The first time.
21      A.  The first time, I don't remember.  It was a
22  discovery request a bit back.  I think it was
23  Kristin that asked me.
24      Q.  And did you locate anything at that time?
25      A.  No.

Page 81

1    Q.  Okay.  Have you searched since then?
2    A.  Yes.
3    Q.  In response to other discovery requests?
4    A.  Or the same one.  I'm not sure.
5    Q.  Have you located any documents from your
6    e-mail accounts?
7    A.  No.
8    Q.  From any of these e-mail accounts?
9    A.  I have to say there have been several
10   computers in between.  The NXIVM -- the Nycap server
11   and also -- the Nycap server is different than, say,
12   the Yahoo server.  The Yahoo server keeps your mail
13   on the server, and you can access it from anyplace
14   whereas the Nycap server downloads to the specific
15   computer and does not retain any of the e-mails, so
16   I have limitations.  The last time I searched my
17   computers, which was at the request of my attorneys,
18   I was only able to search back a few months.
19        MR. KOFMAN:  Let's take a break now.
20        MR. CAMPION:  Sure.
21        MR. KOFMAN:  Thank you.
22
23        (Witness excused.)
24        (At this point, the luncheon recess was
25   taken.)

Page 82

1         A F T E R N O O N   S E S S I O N
2
3         THE VIDEOGRAPHER:  This is the beginning
4    of Tape Number 3.  We're on.
5         MR. KOFMAN:  What's the time?
6         THE VIDEOGRAPHER:  2:51.
7
8    K E I T H  A L A N  R A N I E R E, previously
9    sworn, resumed the stand and testifies on his oath
10   as follows:
11
12   CONTINUED DIRECT EXAMINATION BY MR. KOFMAN:
13   Q.  Back on the record, Mr. Raniere.  Have you
14   ever heard of something called neuro linguistic
15   programming?
16   A.  Yes.
17   Q.  Have you ever taken any classes in
18   neurolinguistic programming?
19   A.  Yes.
20   Q.  When did you take those classes?
21   A.  Long ago, early -- mid-'80s maybe, something
22   like that.  I took one class.
23   Q.  Okay.  How long was the class, if you recall?
24   A.  No.
25   Q.  Did you get any materials from the class?

Page 83

1    A.  No.
2    Q.  Have you ever attended any meetings or
3    sessions of Scien -- the Church of Scientology?
4    A.  I'm not sure if you'd call it a meeting or a
5    session.  I have a number of friends who are
6    Scientologists.
7    Q.  Have you ever attended any events sponsored
8    by the Church of Scientology?
9    A.  No, not that I know of.
10   Q.  Okay.  Did you have friends who were members
11   of the Church of Scientology prior to 1998?
12   A.  Prior to 1998, yes, I think so.
13   Q.  Okay.  Have you ever discussed with them the
14   tenets of Scientology?
15   A.  Not in detail, philosophically.
16   Q.  Have you ever reviewed any Scientology
17   materials?
18   A.  Yes.
19   Q.  What type of mat -- what materials?
20   A.  I have this book.  Dianetics is what they
21   call it.  I started reading that.
22   Q.  Did you read that before 1998?
23   A.  I'm not sure.  I think so.
24   Q.  Okay.  Mr. Raniere, what's the Rational
25   Inquiry Method in general terms?

Page 84

1    A.  It's a mathematical method of analyzing data;
2    any human discipline, athletics, the arts, whatever.
3    Q.  Is the Rational Inquiry Method what is taught
4    by NXIVM in its Intensives?
5    A.  I would say some of the Rational Inquiry.  Is
6    the method itself taught in the Intensives?  I would
7    say results of the method are taught in the
8    Intensive.
9    Q.  Do the materials that NXIVM provides to
10   students at Intensives, are those part of the
11   Rational Inquiry Method?
12   A.  I think some are, some aren't.
13   Q.  What parts of the materials are part of the
14   Rational Inquiry Method?
15   A.  I think it's important to distinguish the
16   Rational Inquiry Method as a tool and then the
17   results of what that tool does.
18        Do you consider the results of what that tool
19   does part of the method?
20   Q.  What do you define as the method?
21   A.  I would say the theoretical procedure and
22   procedures involved in the creation of certain
23   results.  I look at the Rational Inquiry Method as a
24   tool.
25   Q.  Okay, and the results are what is taught in

Page 85

1  NXIVM Intensives?
2    A.  Some of them.
3    Q.  What would you characterize as the results
4  that are taught in the Rational Inquiry -- in NXIVM
5  Intensives?
6    A.  A specific ordering of questions, a specific
7  ordering of philosophical concepts; things like
8  that.
9    Q.  So is it my understanding that NXIVM
10  Intensives do not teach the full Rational Inquiry
11  Method?
12    A.  In other words, do all of the Intensives
13  together teach all of Rational Inquiry, no.
14    Q.  Are there any courses that -- available that
15  teach the entire Rational Inquiry Method?
16    A.  I wouldn't say the entire method as it exists
17  today.
18    Q.  Are you the sole author of the Rational
19  Inquiry Method?
20    A.  I am the sole creator of it.
21      When you say "author," what do you mean?
22    Q.  Did you develop the Rational Inquiry Method?
23    A.  Yes.
24    Q.  Did anyone assist you in developing it?
25    A.  Can you be specific about "assist"?

Page 86

1    Q.  Did anyone work with you in developing the
2  Rational Inquiry Method?
3    A.  To some degree.
4    Q.  Who?
5    A.  Nancy to some degree.
6    Q.  Did you consult with any source materials
7  when you created the Rational -- when you and with
8  the assistance of Ms. Salzman created the Rational
9  Inquiry Method?
10    A.  No, not that I know of.
11    Q.  Were there any books that you referenced?
12    A.  I mean, there are a lot of different things
13  that I reference.
14    Q.  Any books that you consulted in the draft --
15  in the creation of the method?
16    A.  I guess I'm not understanding in full.
17      How would that look?
18    Q.  When you drafted the method or committed pen
19  to paper, were there any -- did you make use of any
20  books?
21    A.  I did -- you're assuming I put pen to paper
22  to do the method.  There is a patent related to the
23  Rational Inquiry Method.  There are products from
24  the Rational Inquiry Method that are in writing.
25  There are teaching methodologies that aren't

Page 87

1  written.  The whole Rational Inquiry Method is not
2  committed to writing.
3    Q.  Okay.
4    A.  And in the patent, I mean, there is like a --
5  all the related works type of things.
6      MR. SKOLNIK:  Can I get that last answer
7  back.
8      THE WITNESS:  In the patent -- oh, I'm
9  sorry.
10      (The following was read back by the
11  reporter:
12      "I did -- you're assuming I put pen to
13  paper to do the method.  There is a patent related
14  to the Rational Inquiry Method.  There are products
15  from the Rational Inquiry Method that are in
16  writing.  There are teaching methodologies that
17  aren't written.  The whole Rational Inquiry Method
18  is not committed to writing.
19      QUESTION:  Okay.
20      ANSWER:  And in the patent, I mean,
21  there is like a -- all the related works type of
22  things.")
23  BY MR. KOFMAN:
24    Q.  What source materials did you use to create
25  the Rational Inquiry Method?

Page 88

1    A.  None specific that I can think of.
2    Q.  Did you incorporate anything from
3  neurolinguistic programming into the Rational
4  Inquiry Method?
5    A.  No, I don't think so.
6    Q.  How about from the Church of Scientology?
7    A.  I don't believe so.
8    Q.  Is the term "suppressive" something that's
9  used in the Rational Inquiry Method?
10    A.  I don't know if that's part of the method.
11  That's a label used for a certain type of behavior
12  pattern.
13    Q.  And what is the label?  What behavior pattern
14  is it used for?
15    A.  Someone that is acting out of a type of
16  emotion that is negative.
17    Q.  Okay.  Do you have an understanding one way
18  or the other as to whether the term "suppressive" is
19  used by Scientology?
20    A.  I think they use something similar.  I was
21  told they have something called suppressive person.
22  I don't find them similar in my conversations with a
23  friend that knows about that.
24    Q.  When did you learn that Scientology used
25  something called suppressive person?

Page 89

1    A. I'm not sure. It might have been out of the
2  book Dianetics -- I didn't read that much of that
3  book -- or it might have been from one of my
4  friends.
5    Q. Okay. Do you remember the name of the friend
6  who talked to you about suppressive persons?
7    A. Well, the name that -- the person that comes
8  to mind is Sean Bergeron.
9    Q. Okay. Is he also a member -- is he also a
10  student at NXIVM?
11    A. Yes.
12    Q. Did you consult any of the works of Ayn Rand
13  when you were developing Rational Inquiry Method?
14    A. I wouldn't call them "consult." I greatly
15  appreciate Ayn Rand's works, what I've read of them.
16    Q. Did you incorporate any of her philosophy
17  into Rational Inquiry Method?
18    A. Not in the method, but some of the patterns
19  within her philosophy -- some of the things within
20  her philosophy I think are very good.
21    Q. And were they incorporated into the materials
22  that NXIVM provides?
23    A. Yes.
24    Q. Can you give some example?
25    A. I can only think of one primarily.

Page 90

1    Q. What's that?
2    A. Certain things within the Money module are a
3  tribute to her work.
4    Q. I'm sorry. You said a tribute to her work?
5    A. To her work.
6    Q. Is she cited in the Money module?
7    A. At one time, she was. I don't know if that's
8  the case now.
9    Q. Do you have any documents -- strike that.
10      Did you create any documents when you were
11  developing the Rational Inquiry Method?
12    A. Can you be more specific?
13    Q. Are there any -- did you take notes or when
14  you were -- or have any drafts of materials that
15  were incorporated into the Rational Inquiry Method?
16    A. I apologize. Understand, I believe the
17  Rational Inquiry Method was developed over 30 years.
18  You're asking me if I've drafted any materials over
19  the past 30 years or have any notes over the past
20  30 years, I'm sure I did, but I guess I'm not
21  understanding your question other than that.
22    Q. Okay. I'm going to move a little bit to
23  something related.
24      First of all, you mentioned patent. Did you
25  apply for a patent for the Rational Inquiry Method?

Page 91

1    A. Yes, if I'm -- I'm speaking as a lay person.
2    Q. Okay. What was -- what's the status of that
3  patent application?
4    A. I believe it's pending.
5    Q. When did you file -- first file an
6  application for the Rational Inquiry Method, a
7  patent application?
8    A. I'm guessing, 1999-2000, somewhere in there.
9    Q. When was the last time any action was taken
10  by the Patent Office?
11    A. I'm not sure.
12    Q. Are you aware as to whether the Patent Office
13  has expressed any opinions as to whether or not it
14  will issue a patent?
15    A. Well, there have been ongoing back and forth
16  with it.
17      THE WITNESS: Am I -- I don't know.
18  Does this -- I don't want to do anything that goes
19  against attorney-client privilege with my --
20      MR. CAMPION: To the extent there are
21  public pronouncements by the patent office, counsel
22  is inquiring certainly about that.
23      MR. KOFMAN: Yes.
24    A. I don't know if they're public or not. My
25  understanding is it's an ongoing thing.

Page 92

1    Q. Who is representing you in connection with
2  the patent application?
3    A. Arlen Olsen.
4    Q. And do you know when the last time the Patent
5  Office contacted Mr. Olsen about your application?
6      MR. CAMPION: You can answer that.
7    A. No.
8    Q. Did the -- do you have a recollection that
9  in 2004 the Patent Office issued what it termed was
10  a final denial of the patent application for
11  Rational Inquiry Method?
12    A. I am --
13      THE WITNESS: How much can I say without
14  violating attorney-client privilege?
15      MR. CAMPION: Okay. If I understand the
16  question correctly, you're asking whether the
17  witness is familiar with some document that came
18  from the Patent Office?
19      MR. KOFMAN: Correct.
20      MR. CAMPION: All right. Why don't you
21  show him the document and inquire that way.
22      THE WITNESS: Would it be helpful if we
23  took a break and I told you what I know, and then
24  you can decide the best way so I can give him the
25  information?

Page 93

1    MR. CAMPION:  Counsel, what's your
2  position on that?
3    MR. KOFMAN:  I think I'd rather show him
4  the documents and --
5    THE WITNESS:  Okay.
6    MR. KOFMAN:  Please mark this as
7  Raniere-3.
8    (United States Patent and Trademark
9  Office documents Bates stamped P00000209 through
10  231 were received and marked Defendant's Exhibit
11  Raniere-3 for Identification.)
12    MR. KOFMAN:  For the record, Raniere-3
13  is a document that was produced to my firm in
14  discovery.  It bears Bates stamp numbers P209
15  through P231, and it bears a Bates stamp from the
16  firm of Schmeiser, Olsen & Watts LLP dated August
17  26, 2004.
18  BY MR. KOFMAN:
19    Q.  Have you seen this document before, sir?
20    A.  I'm not sure.  I'm not sure.
21    Q.  Would looking at the document refresh your
22  recollection as to whether you saw it before or not?
23    A.  No.
24    Q.  Okay.  Do you recall the Patent Office taking
25  the position that the Rational Inquiry Method was

Page 94

1  not patentable?
2    A.  No.
3    Q.  Do you have any reason to believe your
4  attorney didn't share, Mr. Olsen didn't share the
5  Patent Office's conclusions with you?
6    A.  No.
7    Q.  Did it ever come to your attention -- strike
8  that.
9    Was part of what you were trying to patent
10  the scarves and sashes that NXIVM students wear?
11    A.  That's one of a series of patents, yes.
12    Q.  Did it come to your attention that the Patent
13  Office had stated that scarves and sashes were not
14  patentable as a showing of rank, since the Boy
15  Scouts use the same thing?
16    A.  No.
17    Q.  Okay.  What's the last --
18    Aren't they patented?
19    Q.  What's the last information you've heard from
20  the Patent Office or you're aware of from the Patent
21  Office as to the status of your application for
22  Rational Inquiry Method?
23    A.  It's being examined.
24    Q.  When was the last time you had a
25  communication about the status of the patent?

Page 95

1    A.  Rational Inquiry?
2    Q.  Yes.
3    A.  When I meet with Arlen, we go through all of
4  the -- all of the patents, so I guess within the
5  past few months I've met with him.
6    Q.  Does he copy you on documents that he files
7  with the Patent Office?
8    A.  I think most of the time.  I don't read them.
9  There are a lot of them.
10    Q.  How did you come to be called "vanguard"?
11    A.  You want to know the process?
12    Q.  Yes.
13    A.  I had believed that it would be a good idea
14  in the school to have titles.  I got together with a
15  group of people, four or five friends, and we got a
16  thesaurus out and went through all the titles that
17  could be for the different things, whether it be
18  coach, proctor, counselor, prefect, vanguard, as
19  they are today.  There were a lot of different
20  suggestions.
21    There were two suggestions that I did not
22  want to be called.  I did not want to be called
23  "master," and although in martial arts they always
24  refer to people; Master Pai, Master Fong, I didn't
25  want that.  I also didn't want to be called anything

Page 96

1  like what they do in the Elks Club, which is Grand
2  Exalted Ruler.  I thought that was a little extreme.
3  I wanted a title that had a functional relationship
4  to my role.
5    So people put in things.  All five people put
6  in a bunch of alternatives, and everyone ranked
7  them -- I believe it was the top five -- and ranked
8  them from one to five, and we added the ranks
9  together; and "vanguard" had the highest score.  It
10  was not my number one choice.
11    Q.  Does the name derive at all from Ayn Rand or
12  Ayn Rand?
13    A.  No.
14    Q.  What was your number one choice?
15    A.  "Founder," I believe.
16    Q.  Does NXIVM -- do you know if NXIVM presently
17  represents that Rational Inquiry Method is patent
18  pending?
19    A.  I believe it is.
20    MR. KOFMAN:  Mark this, please, as
21  Raniere-4.
22    THE WITNESS:  Are we done with this
23  document?
24    MR. KOFMAN:  We are.
25    (Document entitled Assignment Bates

Page 97

1  stamped P000000689 was received and marked
2  Defendant's Exhibit Raniere-4 for Identification.)
3       THE WITNESS: I'm about to cough. Is
4  that okay?
5       THE VIDEOGRAPHER: That's okay.
6       THE WITNESS: Sorry.
7  BY MR. KOFMAN:
8    Q. Mr. Raniere, the document I'm showing you --
9       MR. CAMPION: Let me have the document.
10      MR. KOFMAN: Oh, I'm sorry.
11   A. Is this for me?
12   Q. Yeah. The document I'm showing you, sir,
13  which has been marked as Raniere-4 is a single-page
14  document produced in discovery Bates stamped P689.
15      Is that your signature at the bottom of the
16  document?
17   A. It appears to be.
18   Q. Was this a document that you signed to assign
19  your rights in Rational Inquiry Method to First
20  Principles?
21   A. I believe so.
22   Q. And why did you assign your rights to
23  Rational Inquiry Method to First Principles?
24   A. So that First Principles could develop,
25  ultimately develop curriculum.

Page 98

1    Q. Do you receive any money for Rational Inquiry
2  Method from either NXIVM or First Principles?
3    A. No.
4    Q. Do you receive money for Rational Inquiry
5  Method from any source?
6    A. No.
7    Q. Do you -- are you employed anywhere at
8  present?
9    A. No.
10   Q. Did you -- what was the consideration that
11  you gave -- or strike that.
12      Did -- what did First Principles pay for the
13  assignment of the rights to Rational Inquiry Method?
14   A. There's a 10 percent royalty that's supposed
15  to go to a foundation to study human potential, and
16  an additional condition is they are to develop
17  principles -- develop curriculum in a way that does
18  not go outside of what I would want with the
19  property.
20   Q. Okay. When you say they donate 10 percent to
21  the foundation, to what foundation are you
22  referring?
23   A. I don't believe the 10 percent has ever been
24  actualized.
25   Q. Was your under -- they did -- there was some

Page 99

1  discussion at the time of this assignment that they
2  would donate money to a foundation?
3    A. There was supposed to be a 10 percent, I
4  guess you would call it a donation to a foundation
5  to study the method, to study things relating to the
6  method.
7    Q. What was the name of the foundation that
8  was --
9    A. It was not specified.
10   Q. Okay, and has any money ever been donated to
11  a foundation to study the method?
12   A. I don't know.
13   Q. Do you know why that is?
14   A. There has been money donated to a foundation
15  to study the method. I don't know if the 10 percent
16  has been donated to study the method.
17   Q. What's the name of the foundation to which
18  the money has been donated?
19   A. Oh, what was it called? The Ethical
20  Foundation I think is the name.
21   Q. Are you an officer or director of the Ethical
22  Foundation?
23   A. No.
24   Q. Are you an employee of the Ethical
25  Foundation?

Page 100

1    A. No.
2    Q. Do you have any relationship at all with the
3  Ethical Foundation?
4    A. No.
5    Q. Do you know who is an officer and director of
6  the Ethical Foundation?
7    A. Joe O'Hara was. I don't know who is
8  currently.
9    Q. Is Ms. Salzman?
10   A. I don't know. I --
11   Q. Do you know if Ms. Keeffe is?
12   A. I don't believe so, but I don't know.
13   Q. Have you ever seen any results of the Ethical
14  Foundation's study of the method?
15   A. I'm not sure if it's the Ethical Foundation
16  that did the studies.
17   Q. Do you know of any studies that have looked
18  at the results of the Eth -- of the Rational Inquiry
19  Method?
20   A. Yes.
21   Q. What's the name -- what studies have been
22  done?
23   A. There's an ongoing study done with people
24  coming in and taking the courses, and after the
25  course and a certain number of -- amount of time

Page 101

1  after the course and things like that.
2     Q.  Who is conducting that study?
3     A.  His first name is Sheldon.
4     Q.  Is it Sheldon Solomon?
5     A.  Yes.
6     Q.  Have you seen any documents generated by
7  Mr. Solomon's study?
8     A.  I've seen a few.
9         MR. KOFMAN:  And, Bill, do you know if
10  all those documents have been produced in discovery?
11  I've seen some, but do you know if all of the
12  documents from Mr. Solomon have been produced?
13        MR. McGUIRE:  As far as I know, but you
14  know I wasn't involved at that time.
15        MR. KOFMAN:  Sure.  I'll make -- put a
16  request on the record and follow up with a letter
17  just to confirm that.
18        MR. McGUIRE:  Fair enough.
19        (Request.)
20     Q.  Have you personally received any -- strike
21  that.
22        Is Mr. Solomon employed by NXIVM or First
23  Principles?
24     A.  I don't believe so.
25     Q.  Is he employed by the Ethical Foundation?

Page 102

1     A.  I don't know.
2     Q.  Has he been hired or as a contractor by the
3  Ethical Foundation?
4     A.  I don't know who or what.
5     Q.  How do you earn a living, Mr. Raniere?
6     A.  I have money.  I don't earn it in a normal
7  sense.
8     Q.  How do you earn it?
9     A.  Well, during my day, I teach piano and voice
10  and solve problems; but I don't get money for those
11  things.  I have a certain amount of money, and
12  that's how I live.
13     Q.  Well, are these savings of yours?
14     A.  Yes.
15     Q.  Has Ms. Salzman purchased a townhouse on your
16  behalf?
17     A.  No.
18     Q.  Okay.  Do you receive grants from any source?
19     A.  Not that I know of.  Now, I have to say as
20  far as purchasing a townhouse, I don't know all the
21  purchases either.  I would think if it was on my
22  behalf I would know it but...
23     Q.  Do you own the address at which you live?
24     A.  Yes, half.
25     Q.  You're a co-owner?

Page 103

1     A.  Yes.
2     Q.  And did you put up money for the purchase?
3     A.  Originally, yes.
4     Q.  When was that?
5     A.  1987.
6     Q.  Now, putting aside the Rational Inquiry
7  Method, you indicated to me that the curriculum --
8     A.  Done with this?
9     Q.  -- that's taught by NXIVM is separate from
10  the Rational Inquiry Method.
11        Are you the author of the modules that are
12  taught at NXIVM?
13     A.  Can you be specific what you mean by
14  "author"?
15     Q.  Did you -- did you create all of the modules
16  that NXIVM teaches?
17     A.  I created the concep -- concepts and the
18  order of the concepts.  I did not author the text
19  relating to the modules.  I did not write it.
20     Q.  But you -- the concepts were developed --
21  that are contained there are developed by you?
22     A.  Yes.
23     Q.  Who -- who wrote or took those concepts and
24  wrote the modules?
25     A.  Various people.  I don't know all of them.

Page 104

1     Q.  Can you give me the names of the people you
2  do recall?
3     A.  Um, I think Nancy might have.  I'm not sure.
4  I think Ivy Nevarez might have.  She does a lot of
5  the writing for NXIVM and also authorship.  I can't
6  think of anyone else.
7     Q.  Can you explain to me the process by which
8  your concepts are translated into the modules or how
9  the modules came to be written?
10     A.  Normally I would sit down with someone like
11  Nancy and talk about the module, talk about the
12  questions, sometimes give an ordering of the
13  questions or at the time talk it through and come
14  up with an ordering of the questions; and I'm not
15  exactly sure how that gets translated ultimately
16  into the module.
17     Q.  Would you review the modules before they were
18  taught to make sure that they accurately reflected
19  your concepts?
20     A.  In the beginning, I did.  Now I do not.
21     Q.  When you say, "In the beginning," to what
22  time period are you referring?
23     A.  The first few months of NXIVM I'd say, first
24  three months maybe.
25     Q.  When was the last time you reviewed a module?

Page 105

1   A. Reviewed one?
2   Q. Yeah -- yes.
3   A. I don't know, eight years ago or something;
4   a long time ago.
5   Q. Are you still -- but are you still involved
6   in the process of creating modules?
7   A. Yes.
8   Q. And do you use the same procedure that you
9   just described for me in the creation of a module?
10  A. Yes.
11  Q. The person who's writing these modules, do
12  they work from any notes that you've provided or is
13  it discussed orally?
14  A. Normally discussed orally. There may have
15  been occasions where notes have been provided.
16  There are times that during the oral discussion
17  notes are created.
18      THE WITNESS: If some of this process
19  becomes what I think is secret, how should I handle
20  this?
21      MR. CAMPION: I believe that's covered
22  by the confidentiality arrangement which is in place
23  agreed to by all parties and counsel at the
24  beginning of today's deposition.
25  A. Continue.

Page 106

1   Q. Do you have in your possession any of the
2   notes that you created relating to the creation of
3   these modules?
4   A. I may have some -- some notes that I made of
5   or relating to the concepts from which the modules
6   are created. Often I'll think about things and make
7   notes and from those notes derive things like
8   modules or articles or things like that.
9       MR. KOFMAN: Okay. I'd like to have the
10  transcript marked, and I'm going to make a request
11  for notes relating to the creation of modules for
12  teaching at NXIVM Intensives, and I'll follow up
13  with a letter.
14      (Request.)
15      MR. CAMPION: We'll respond in time.
16      MR. KOFMAN: Thanks.
17  BY MR. KOFMAN:
18  Q. Is it your understanding, Mr. Raniere, that
19  the modules that are taught at NXIVM contain trade
20  secrets?
21  A. Yes.
22  Q. So we're clear on terminology, how would you
23  define a trade secret?
24  A. I'm a lay person. So from my perspective, a
25  trade secret is something that we believe is unique,

Page 107

1   that we keep as a secret, and something that if it
2   were not a secret would be a disadvantage to us.
3       MR. KOFMAN: I'd like to have this
4   marked as Raniere-5, please.
5       (Three-page document entitled A Forensic
6   Psychiatrist Evaluates ESP was received and marked
7   Defendant's Exhibit Raniere-5 for Identification.)
8       THE WITNESS: Is this -- are we done
9   with this?
10      MR. KOFMAN: Yes, we are.
11  BY MR. KOFMAN:
12  Q. The document I'm showing you marked Raniere-5
13  is a three-page document entitled "A Forensic
14  Psychiatrist Evaluates ESP," dated February 2003 by
15  Dr. -- by John Hochman, M.D.
16      Mr. Raniere, I believe you indicated that you
17  read this article previously.
18  A. Yes.
19  Q. And is this one of the articles that appears
20  on the Rick Ross websites?
21  A. Yes.
22  Q. Does -- is it your understanding that this
23  article contains trade secrets belonging to NXIVM?
24  A. I'm not particularly sure.
25  Q. Have you ever reviewed the article to

Page 108

1   determine whether it contains any NXIVM trade
2   secrets?
3   A. Actually, I haven't reviewed it for that.
4   Q. Are you familiar with what portion of the
5   NXIVM materials constitutes trade secrets?
6   A. Not specifically. I'm more familiar with
7   things that are very important to NXIVM that we keep
8   as secret.
9   Q. Would those things be what you consider trade
10  secrets, or is there something that's a trade secret
11  in addition to what you say is very important to
12  NXIVM?
13  A. You know, I don't -- I don't know for sure.
14  I think that would have to be someone who knows
15  about that to make that evaluation.
16  Q. Does this article contain information that
17  NXIVM con -- that you consider unique to NXIVM, kept
18  as a secret by NXIVM, and would be a disadvantage to
19  NXIVM if it were disclosed?
20      MR. CAMPION: Could the reporter just
21  read that question again, please.
22      (The following was read back by the
23  reporter:
24      "Does this article contain information
25  that NXIVM con -- that you consider unique to NXIVM,

Page 109

```
 1   kept as a secret by NXIVM, and would be a
 2   disadvantage to NXIVM if it were disclosed?")
 3            MR. CAMPION:  In fairness to the
 4   witness, counsel, can he read the document now?
 5            MR. KOFMAN:  Yes.
 6   BY MR. KOFMAN:
 7       Q.  I'd like to you read the document because
 8   then I'm going to have some specific questions about
 9   the document.  So you can take your time, sir, to
10   read it.
11       A.  (Witness complies.)
12            Okay.
13            (A discussion was held off the record.)
14            MR. CAMPION:  The question pending had
15   multiple parts.
16            Could you have the question reread,
17   please.
18       Q.  Let me strike the question.
19            First of all, have you had an opportunity to
20   read the article?
21       A.  Yes.
22       Q.  Okay.  Does this article contain what you
23   consider to be trade secrets of NXIVM using the
24   definition of trade secret that you previously gave
25   to me?
```

Page 110

```
 1       A.  Can I -- I need to say two things with
 2   respect to the article.
 3            The article is a reflection of someone who
 4   claims to say they read our trade secret
 5   materials or at least some of them.  Speaking from
 6   that authority in my mind is something that in
 7   violation of the confidentiality agreements violates
 8   letting, if you will, secrets out of the bag.  In
 9   other words, if there's some trade secret that you
10   have and I go and just for the sake of argument I
11   get it inappropriately, and then I say, "I have this
12   trade secret I know.  And, therefore, this is so,
13   this is so, this is so," they're benefitting from
14   the trade secret and are able to affect potentially
15   other people either knowing the trade secret or not
16   through what they say, so there are multi facets
17   here.
18            In the letter of what is said, there may be a
19   few things that -- certainly there are things here
20   that I think are important and secret.  I think that
21   this is -- has a lot of factual problems and logical
22   problems.
23       Q.  Okay.  We'll take it in two steps.  First,
24   can you tell me what is disclosed by this article
25   that is important and secret?
```

Page 111

```
 1       A.  There was a statement relating to anger and a
 2   conflict of values.
 3       Q.  Actually, can you -- it might be helpful if
 4   you circle this as well.  I'll circle along with
 5   you, but on the Exhibit you can mark it up what you
 6   -- first of all --
 7       A.  I'm having trouble seeing it.  I'm sorry.
 8       Q.  Oh, okay.  I have the same problem, but if
 9   you can circle what you think is important and
10   secret for NXIVM.
11       A.  Okay, and I do have to say I can't say that
12   I will circle everything 'cause I'm not an expert;
13   and I also need to go through the logical truth and
14   fallacy in this article, and depending on what the
15   logical constructions are that makes a difference in
16   my mind as to what should be secret or not.
17       Q.  Okay.  Well, first I'd just like to have you
18   identify what you consider to be a trade secret
19   using your definition.
20       A.  I'll scan through and find the anger
21   statement.
22            "All anger is created as a result of conflict
23   in values."  That's the one statement that I --
24       Q.  Where is that statement found?
25       A.  Page 2, first paragraph under "Cult-Like
```

Page 112

```
 1   Elements of the ESP Intensive," subparagraph
 2   "Pretensions to Science."
 3       Q.  Yes.
 4       A.  It's an e.g. in parentheses.
 5       Q.  "All anger is created as a result of a
 6   conflict in values"?
 7       A.  Uh-huh.
 8       Q.  What module is that contained in?
 9       A.  I suspect it's the Anger module, Anger
10   Sourcing.
11       Q.  And is that a module that you developed the
12   concepts for?
13       A.  Yes.
14       Q.  And it's your understanding that the concept
15   expressed here is unique to NXIVM?
16       A.  Yes --
17       Q.  How does --
18       A.  -- the concept as expressed here.
19       Q.  How does this concept give NXIVM a
20   competitive advantage over competitors?
21       A.  If we understand anger, we can help in
22   business certainly understand the way people act.
23   In personal relationships, it gives a greater degree
24   of compassion in understanding how people act; and
25   for people who want to explore within themselves,
```

1    they can explore that.
2         Q.  Is the information that's presented here
3    about anger in this parenthetical sufficient for
4    someone to replicate NXIVM's teachings about anger?
5         A.  I believe that it may.  I'm not sure.
6         Q.  Are you aware of any competitors who've used
7    that information since the publication of this
8    article?
9         A.  No.  There have been people who I believe
10   have threatened to or said they would who are --
11   have never been in NXIVM, but I don't know off the
12   top of my head of any competitor that has.
13        Q.  Who's threatened to use this information?
14        A.  Oh, there's in public forums, in debates, in
15   e-mails.  Sometimes I've had in the past threatening
16   e-mails people said such things.
17        Q.  Have you saved any of these e-mails?
18        A.  There might be a few.  Some of the older
19   ones, no; some of the newer ones, I may have.
20            MR. KOFMAN:  I'd like to mark this part
21   of the transcript and make a request for any
22   information or for any of these e-mails.
23            (Request.)
24   BY MR. KOFMAN:
25        Q.  Mr. Raniere, the people who sent these

1    e-mails, were they critics of the group or do you
2    know who they were?
3         A.  No.
4         Q.  Okay.  What was the -- are there any other
5    trade secrets as you define the term that are
6    contained in this article?
7         A.  Well, I had seen a few things; and it's not
8    just what is contained in the letter of the article.
9    It's contained in the implication of the article.
10        Q.  Okay.  What's contained in the implication of
11   the article that you consider -- first, is there
12   anything else in the letter of the article that you
13   see?
14        A.  There was another thing relating to -- they
15   were primarily quotes that were taken.  I would say
16   any of the quotes in here are suspect except, of
17   course, things like "thank" and "vanguard" and stuff
18   like that.
19        Q.  Do you consider the 12 point Mission
20   Statement to contain trade secrets?
21        A.  I consider it to contain secret things that
22   are very important to NXIVM, yes.
23        Q.  Has the -- has NXIVM ever put the 12 point
24   Mission Statement or made it available on its
25   website?

1         A.  I don't know.  That may have happened.  There
2    were times when articles or things from modules were
3    almost in the very beginning put on the websites.  I
4    don't know if it ever happened.  I don't believe so.
5    One of concerns was the Mission Statement because
6    there were people who felt that it was a good
7    recruiting tool.
8         Q.  So you're not certain, but it may have
9    appeared on the website at some point in time?
10        A.  Uh-huh.  If it appeared on the website, I
11   would acknowledge then it's not a trade secret in a
12   normal sense, but I don't know if it did.
13            MR. SYLVESTER:  Can I hear that answer
14   back, please.
15            (The following was read back by the
16   reporter:
17        "Uh-huh.  If it appeared on the website,
18   I would acknowledge then it's not a trade secret in
19   a normal sense, but I don't know if it did.")
20            MR. SYLVESTER:  Thank you.
21   BY MR. KOFMAN:
22        Q.  Are you aware that some modules were put on
23   the website?
24        A.  No.
25        Q.  Do you believe that any modules were put on

1    the website?
2         A.  No.
3         Q.  What's your recollection or what's the basis
4    for your statement that they may have been put on
5    the website?
6         A.  There were excerpts from the modules that I
7    thought may have been put on the website.  Initially
8    each module and letter had an introduction; and
9    there at one point were some people that believed
10   those were good things, if you will, as selling
11   points so I don't believe any of those things went
12   on the website.  Certainly no module, the questions
13   in its entirety was on the website.
14        Q.  Do you remember the names of the people who
15   thought it was a good selling point to put some of
16   the mod -- parts of the modules on the website?
17        A.  No, I don't.
18        Q.  Are they still involved with NXIVM?
19        A.  No.
20        Q.  So as you sit here today, you don't remember
21   the names of any of these people?
22        A.  There were a lot of people who were involved
23   in NXIVM in the very beginning who are no longer
24   involved.
25        Q.  Does NXIVM have any records of what was put

Page 117

1  on its website?
2      A. I'm not sure.
3      Q. Who created NXIVM's website at the -- when
4  the organization was founded?
5      A. I don't know.
6      Q. Okay. Getting back to the article, I need
7  you to underline every other trade secret that you
8  feel is contained in the letter of the document.
9  You have identified the one concerning anger.
10     A. Uh-huh.
11        It's hard for me to delineate if someone
12 hears something if they can derive or if, for
13 example, in the future it would help them derive.
14 If I hear a trade secret or I hear -- I'm sorry --
15 if I hear part of a trade secret and then hear
16 additional information afterwards or additional
17 parts of the trade secret, I might get the trade
18 secret in parts. So, for example, when they say
19 "shifter strategies" in here, in itself that
20 represents something that is a deeper trade secret,
21 I believe.
22        The name to some degree is self-explanatory.
23 If in another article someone were to publish
24 something else that was not completely that trade
25 secret using both of the articles, I could possibly

Page 118

1  derive it.
2        So do you want what I see also as parts?
3      Q. Yes. I want either parts or whole, whatever
4  is in here.
5      A. Oh, okay.
6        THE VIDEOGRAPHER: Excuse me. We have
7  to change tapes.
8        MR. KOFMAN: Okay.
9        THE WITNESS: So you want me to stop
10 reading?
11        MR. SYLVESTER: You can continue.
12        MR. KOFMAN: Just don't speak until
13 he's --
14        THE WITNESS: Okay.
15        (A discussion was held off the record.)
16        THE VIDEOGRAPHER: We're back on the
17 record at 3:49.
18        THE WITNESS: Can I ask you for a
19 clarification?
20        MR. KOFMAN: When we get back on the
21 record. Actually, is it --
22        THE WITNESS: Are we on?
23        THE VIDEOGRAPHER: We're on.
24        THE WITNESS: We're on the record.
25

Page 119

1  BY MR. KOFMAN:
2      Q. Okay. Back on.
3      A. I'm underlining a number of things which, for
4  example, if I believe Concept A is trade secret, if
5  I tell you a little bit about Concept A here, even
6  true or false; a little bit about Concept A here; a
7  little bit about Concept A there, that helps you
8  derive Concept A. That helps tell you. I can
9  ultimately give you a full description of Concept A
10 if I write enough or write different essays or -- do
11 you understand? So -- and there's -- I think
12 there's even some things I'm missing that by logical
13 construction I can derive information about Concept
14 A.
15     Q. Okay, understood. Thanks. Thank you for the
16 clarification.
17        (A discussion was held off the record.)
18        (At this point, Richard A. Ulsamer
19 entered the deposition room; Mr. McGuire was
20 excused.)
21 Continuing...
22     A. In some of -- in some of these cases, I'm
23 looking at this in a theoretical way, for example,
24 if he says a false statement about something, it
25 tells you about that something; and even if we by

Page 120

1  necess -- either choose to say what the truth is,
2  then that starts to release a trade secret; and if
3  we don't say what the truth is, it damages us.
4        And as I'm going through this more and the
5  more I'm thinking of it, the more I'm outlining more
6  and more.
7        Is there some way we can summarize this or I
8  can do this for you?
9      Q. No. I'm looking -- my question I think was
10 pretty straightforward as to what trade secrets are
11 disclosed, and you've put in clarifications as to
12 how you under -- what you understand the disclosure
13 entails.
14     A. Uh-huh.
15     Q. So I think, you know, it's important for me
16 to get every trade secret that you consider
17 important to be disclosed.
18     A. Well, have you ever played 20 questions with
19 someone and they can disclose something without
20 saying directly what it is?
21     Q. And as we go -- as we follow up, you can
22 explain to me that that's what you're doing.
23        MR. CAMPION: Counsel, you're in control
24 of the deposition.
25        I do note that the witness appears to

Page 121

1  have finished underlining the section entitled "Mind
2  Control"; and if you wanted to start to do that part
3  first, that's certainly your option.  Otherwise,
4  he'll finish doing the whole document.
5          MR. SYLVESTER:  Why don't you have him
6  do the whole document.
7          MR. CAMPION:  All right, fine.
8          MR. SYLVESTER:  Why stop the pen.
9          MR. CAMPION:  Okay.
10         Hal, is it okay if we take our last
11  break at 4:15?
12         MR. KOFMAN:  Yes.
13         MR. CAMPION:  Okay, fine.
14         THE WITNESS:  Done.
15  BY MR. KOFMAN:
16     Q.  Okay.  Can I take a quick look, and then I'll
17  give it back to you, sir?
18     A.  Yes.
19         MR. CAMPION:  We'll have copies made at
20  the recess.
21         MR. KOFMAN:  That sounds good.  That's
22  good.
23         THE WITNESS:  What time is it?
24         MR. CAMPION:  Almost.
25

Page 122

1  BY MR. KOFMAN:
2     Q.  Mr. Raniere, can you identify for me each
3  trade secret that you've underlined and tell me why
4  it constitutes a trade secret?
5     A.  I don't -- I'm not qualified to say what is
6  or not a trade secret, but what I started to
7  understand even more as I read the essay, by a
8  person having the trade secrets and having the
9  manual and then making comments, either true or
10  false, it puts us in a situation and NXIVM in a
11  situation where NXIVM either has to be damaged by
12  the release of their trade secrets or release it
13  themselves.
14         And, you know, there are in almost every
15  sentence there are parts of things that are trade
16  secrets or what I'm calling trade secrets.  I should
17  say things that are secret and essential to ESP and
18  things that are not true that beg the question of
19  what is true and essential to ESP.
20         If this were written by a person that did not
21  have the manual, it would be a whole different
22  issue, so I can start to explain what each of these
23  things imply or don't imply; but anyone who reads
24  this article starts to not only get the pieces and
25  maybe a lot of the pieces, maybe enough of the

Page 123

1  pieces, but also it puts us in a situation so I'm
2  not sure -- I don't know if I did the assignment
3  right.
4     Q.  Well, let's -- okay.  What are the trade
5  secrets that are disclosed, starting from the top?
6     A.  I don't want to say what the trade secrets
7  are per se, but, for example --
8     Q.  No.  Please identify each and every trade
9  secret.
10         THE WITNESS:  Am I supposed to be able
11  to identify trade secrets, and it will be fine?
12         MR. CAMPION:  Do the best you can.
13     Q.  Using your definition.
14     A.  Okay.  It says, "I have reviewed a manual for
15  a 16 day," ten hour day (sic); "large group
16  awareness training called 'Executive Success
17  Programs,' which also calls itself 'ESP.'"
18         What's -- the large group awareness training
19  program is really a mischaracterization of something
20  that is taken as an individual.  This takes the
21  Intensive and muddles it with ESP.  So now what we
22  must begin to do is define what is an Intensive.
23  What is the curriculum like of ESP specifically.
24  What does it mean to have a module.  How long are
25  those modules.

Page 124

1          So some of the things, for example, the
2  actual structure of the modules, that they are
3  interchangeable, that they are like puzzle pieces,
4  that there is an overview order to them so that you
5  can create things like Intensives.  You can create
6  -- any sort of thing is a trade secret.  The nature
7  of that structure was in the curriculum or is, I
8  should say a secret.  This starts to confuse the
9  issue in such a way that, one, it starts to cause
10  us to beg or begs an explanation; but, two, it
11  starts to say things about how the curriculum is
12  structured.
13     Q.  What would your compet -- what in this
14  sentence is secret, the fact that it's 16 days?
15     A.  It's not one single fact.  I mean, what the
16  -- what he is saying in this sentence is that he's
17  reviewed a manual, okay, so he gives himself
18  authority of having these trade secrets.  These
19  trade secrets are in the manual.  He's reviewed it,
20  and 16 day ten hour a day, he is characterizing it
21  as a large group awareness training called Executive
22  Success Programs, which also calls itself ESP.
23         Executive Success Programs is not a large
24  group awareness training.  You know, Executive
25  Success also has -- if you call the Intensive a

Page 125

1  large group awareness training, it also has Origins,
2  it also has Ethos, it also has the Ethicist
3  training, it also has Parenting.  It has many, many
4  different curricula and ways of dispensing them.
5     Q.  What in this sentence is secret?
6     A.  In itself, it's only part of a secret.  The
7  sentence doesn't contain any secret.
8     Q.  Okay.  What's the next thing that you've
9  underlined?
10        MR. SYLVESTER:  Wait.  Let me hear that
11  last answer back.
12        MR. KOFMAN:  Could you read that?
13     A.  The sentence I don't think contains --
14        MR. SYLVESTER:  That's all right.  If he
15  wants to restate it, that makes life easy.
16        Go ahead, sir.
17  Continuing...
18     A.  I did not think the sentence contained a
19  secret.  The sentence was part of a secret.
20     Q.  Okay.  What's the next thing you've
21  underlined?
22        MR. CAMPION:  It's 20 of -- 20 after 4
23  now.  Let's take a short break, okay.
24        MR. SYLVESTER:  Mr. Campion, maybe if we
25  can have a copy of that made.

Page 126

1        MR. KOFMAN:  Are we off?
2        (At this point, there was a short
3  recess.)
4        THE VIDEOGRAPHER:  We're back on the
5  record at 4:34.
6  BY MR. KOFMAN:
7     Q.  Okay.  Mr. Raniere, I want to show you and
8  mark a document Raniere-6.
9        (Robert Jay Lifton's eight criteria of
10  thought reform as applied to the Executive Success
11  Programs Bates stamped P000003648 through 3661 was
12  received and marked Defendant's Exhibit Raniere-6
13  for Identification.)
14  BY MR. KOFMAN:
15     Q.  Okay.  Mr. Raniere, just going back to
16  Raniere-5 for one moment, I just want to make clear
17  that I had instructed you to underline everything
18  that you considered to be a trade secret using your
19  definition; and that is what you've underlined,
20  correct?
21     A.  No.  If I have a trade secret -- and I was
22  thinking about this, how to describe it.  If I have
23  a trade secret that's an elephant and I tell you,
24  well, it has a trunk, it has four legs, has a tail,
25  is big, is a mammal, the trade secrets are revealed

Page 127

1  by those things.  So what I underlined were the
2  things that I found that were indicating shadows,
3  if you will, of the trade secret; not necessarily
4  have called it a secret.  It's a secret, not a trade
5  secret.  I don't know what a trade secret is.
6     Q.  Well, again, when I say "trade secret," I'm
7  using the definition you gave me.
8     A.  Yeah, my definition.
9     Q.  So you gave me either what is in itself a
10  trade secret or indicates a trade secret?
11     A.  Uh-huh.  Like, for example, the next thing I
12  underlined which is, "There is much in the content
13  and format of ESP" --
14     Q.  Yes.
15        THE WITNESS:  Can I say things that I
16  feel are secret here?
17        MR. CAMPION:  Covered by the
18  confidentiality arrangement.
19        THE WITNESS:  Thank you.
20  BY MR. KOFMAN:
21     Q.  You're looking at which paragraph now, sir?
22     A.  It is under "Introduction."  It's the last
23  paragraph.  "There is much in the content and
24  format" --
25        The trade secret nature of the curriculum

Page 128

1  stems in part from the actual order of the
2  curriculum as on the gross level.  It is like a
3  puzzle.  Each piece is a two-hour module.  Those
4  pieces can be interlocked in specific ways and only
5  specific ways.  Within each two-hour module, there
6  are questions.  Those questions can be interlocked
7  in only certain ways; likewise, even sometimes the
8  wordings within a question.  One of the things that
9  makes us very unique is we can take those two-hour
10  modules and because we have a specific relationship
11  of all of them, how they interrelate with each other
12  philosophically, like a puzzle piece, you can put a
13  training together with great facility and with great
14  consistency.
15        The nature of that is secret and a
16  competitive advantage.  And every time people start
17  to hint at, well, this came first, this came second
18  or this is what this question was, this is what that
19  question was, it chisels away even at that concept.
20     Q.  Is there anything that's disclosed in this
21  sentence, "There is much in the content and format
22  of ESP that is not at all original, and is quite
23  similar to aspects of a number of cults and
24  cult-like organizations with which I am familiar"
25  that you consider to be a trade secret?

Page 129

1    A. Included within the sentence?
2    Q. Yes --
3    A. No.
4    Q. -- anything in that sentence.
5    A. Included within the sentence, no, but I
6  believe that the inaccuracy of the sentence and the
7  fact that here is a person that has taken our trade
8  secret module and is commenting on it starts to say
9  it has a trunk, it doesn't have three legs, it has
10  four legs, so no. In answer to your question, no,
11  not contained within the sentence.
12    Q. Okay. You've underlined -- I think the next
13  thing -- you have a check mark next to "Long hours."
14    Was that indicating that that paragraph
15  contains trade secret?
16    A. Let me see.
17    I think I was questioning the sentence, "ESP
18  Intensive participants are signing up for sixteen
19  ten-hour days, which will either be experienced
20  successively, or in five-day segments. Although
21  three hours a day are allotted for lunch and dinner
22  breaks," as giving insight to the structure and the
23  way things are structured. So I didn't underline
24  it. Maybe I should have from that theory.
25    Q. Is it your understanding that a competitor

Page 130

1  would be able to use the fact that you have 16-hour
2  days or that it can be done in 5-day segments with
3  3-hour breaks to their competitive advantage and
4  your disadvantage?
5    A. In isolation, no.
6    Q. Okay. You've underlined the sentence -- it's
7  on the next to last paragraph.
8    "Participants are told to promise not to tell
9  non-participants of what they learn in the
10  Intensive, as well as its methods."
11    A. Uh-huh.
12    Q. Does that contain a trade secret?
13    A. Within that, no.
14    Q. Why did you underline it?
15    A. Because, again, I believe it is beginning to
16  sculpt away at the elephants if the elephants are
17  trade secrets.
18    Q. And would the same go for the bottom of the
19  first page, the last paragraph you've underlined,
20  "Participants are told to promise not to share with
21  non-participants their recollection of content or
22  methods of the Intensive. Participants are mislead
23  (sic) into feeling guilty for being a 'promise
24  breaker.'"
25    A. Yes.

Page 131

1    Q. Does that disclose a trade secret?
2    A. Those things are again either statements that
3  are false that need to be proven false for us to be
4  viable or part of a trade secret; but, no, they do
5  not in themselves contain trade secrets.
6    Q. Is it your understanding that you would have
7  to reveal a trade secret to prove that statement
8  false?
9    A. I would have to reveal more of a trade
10  secret.
11    Q. I'd like to show you the document we've
12  marked as Raniere-6, which is entitled "Robert Jay
13  Lifton's eight criteria of thought reform as applied
14  to the Executive Success Programs" and --
15    A. Are we done with this document?
16    Q. For now, yeah.
17    First of all, have you seen this document
18  before?
19    A. Yes.
20    Q. Is this one of the documents that it was
21  posted on the Ross websites?
22    A. Yes.
23    Q. And have you ever reviewed this document to
24  determine whether it contains trade secrets as you
25  define the term?

Page 132

1    A. I've looked at it generally for that. In
2  this particular case, this is more on point to
3  containing more direct trade secrets.
4    Q. Okay. When did you look at this to see if it
5  contains trade secrets?
6    A. Years ago.
7    Q. Okay. I'd like you to do the same exercise
8  and underline for me all of the trade secrets that
9  are disclosed in this article as you define the term
10  trade secret.
11    A. Does this include also the parts, as I did
12  with this one?
13    Q. Yes, whatever you feel is appropriate to
14  answer the question.
15    A. Maybe I don't understand the question. I
16  feel like I'm trying to give you an understanding
17  of my understanding of this. I will go through that
18  exercise, but everything that implies trade secrets
19  to me I will underline.
20    Q. Okay. I'd like you to underline for me
21  everything that is -- that you contend is unique to
22  NXIVM, that NXIVM keeps as a secret, and would be
23  disadvantageous to NXIVM to have disclosed.
24    A. Even if it's a partial fact?
25    Q. Correct.

Page 133

1    A. Partial, okay.
2    Q. Thank you.
3       THE VIDEOGRAPHER: Excuse me. I'm going
4  to change tapes.
5       THE WITNESS: You want me to stop?
6       MR. KOFMAN: No, you can keep going.
7       THE VIDEOGRAPHER: We're back on the
8  record at 5:01.
9  BY MR. KOFMAN:
10    Q. Are you finished, Mr. Raniere?
11    A. I'm just checking.
12    Q. Okay.
13       MR. KOFMAN: Tom, I'll ask for a copy of
14  this before I leave.
15       MR. CAMPION: Sure.
16    Q. Mr. Raniere, I noticed on this article, the
17  page that's Bates stamped P3659, about midway
18  through, it said "Cult - this is a label that
19  conveys no meaning but devalues the group. It is
20  designed to keep people away from the group without
21  saying what is wrong with it. Example: 'That's a
22  cult.'"
23       And I take it that's a quote from the module
24  entitled Parasite/Producer III - Practice.
25    A. Yes.

Page 134

1    Q. And that's a concept that you created?
2    A. Yes.
3    Q. Is it your contention there is -- there are
4  no such things as cults?
5    A. No.
6    Q. What is -- how would you define a cult?
7    A. I don't have a definition nor have I found a
8  definition.
9    Q. In broad strokes, what would you term to be a
10  cult?
11    A. I would like to answer this in two parts.
12    Q. Sure.
13    A. It's my belief that the common person, the
14  person on the street who is -- has not gone and
15  specifically looked at cults, investigate cults,
16  believes that cult is a negative term.
17       I believe that cult is some sort of a --
18  second part of the question -- some sort of a
19  description that is used in the hopes of classifying
20  people as a group without being able to state often
21  what the common element is. Sometimes in a
22  historical sense that's useful because cults -- they
23  say cults can become culture. They say, you know,
24  most groups or communities could be considered a
25  cult; and then it therefore develops.

Page 135

1       I believe sometimes terms, their technical
2  meanings can influence people because, well, people
3  don't know the technical meaning. They just know
4  the more common meaning.
5    Q. So is it your understanding that the term
6  cult is neither a positive or pejorative?
7    A. In a technical sense, because I've seen no
8  definition of the term. The dictionary definition
9  of the word is -- can be negative, can be positive;
10  yeah.
11    Q. For example, are you familiar with the
12  Peoples Temple?
13    A. No. I can imagine what it is but --
14    Q. They were the group that committed mass
15  suicide in Jonestown, Guyana, in the late '70s.
16    A. Okay, yes.
17    Q. Would you characterize them as a cult?
18    A. I don't know. I would call them a
19  destructive group.
20    Q. Okay. Shifting gears just a little bit, do
21  you recall that Forbes magazine published an article
22  about you and NXIVM in --
23    A. Yes.
24    Q. -- 2003?
25    A. Yes.

Page 136

1    Q. Did you meet with the reporter from Forbes
2  magazine before the article was published?
3    A. Yes.
4    Q. On how many occasions?
5    A. One.
6    Q. Do you know what led Forbes to write an
7  article about you and NXIVM?
8    A. I'm not exactly sure. The reporter implied
9  at first that it was Rick Ross, and then the
10  reporter stuttered and stammered a bit and retracted
11  that so I don't know.
12    Q. What did he say that implied it was
13  Rick Ross?
14    A. When asked, "Why us?" He said, "Well, I had
15  a meeting with Rick Ross and I decide -- well" --
16  I'd say he sort of -- he started some sentence,
17  implying seemingly that the article was instigated,
18  or I shouldn't say instigated, that the seminal
19  meeting for the article occurred with Rick Ross.
20    Q. Had NXIVM filed the lawsuit before that,
21  before you met with that reporter?
22    A. I believe so.
23    Q. Okay. Did you tape record or -- strike that.
24       Was the meeting with the reporter tape
25  recorded or videotaped?

Page 137

1      A.  We had wanted to videotape it.  The reporter
2  said he did not want it videotaped but that
3  audiotaping was okay.  They tried to use the audio
4  on the video recorder, and I don't know if it
5  actually worked because from what I've understood,
6  the tape doesn't seem to exist.
7      Q.  When you say "They tried to," who is "they"?
8      A.  Nancy was there.  Arlen Olsen was there.  I
9  think there might have been one or two other people
10  there.
11      Q.  Was Kristin Keeffe there?
12      A.  You know, I don't know.
13      Q.  Who was operating the tape machine?
14      A.  You know, I -- it might have been set up
15  originally by someone like Arlen and then left
16  unattended because we were sitting.
17      Q.  When did you discover that the -- strike
18  that.
19         Is it your understanding that nothing was
20  ever recorded?
21      A.  I'm not sure.  I discovered just recently
22  that there seemed not to be a recording of that.
23      Q.  Okay.  At the time, it was your understanding
24  that it was being recorded?
25      A.  I thought it was.

Page 138

1      Q.  Did you ever hear the tape?
2      A.  No.
3      Q.  Okay.  Did -- did you or anyone at NXIVM give
4  the reporter any materials to look at?
5      A.  I'm not sure.  He was at least given a
6  confidentiality agreement.
7      Q.  Okay.  Do you know one way or the other as
8  you sit here whether he received any modules?
9      A.  I don't believe so.  I don't know.
10      Q.  Was he allowed to observe anything at NXIVM?
11      A.  Yes.  He went to the NXIVM Center.
12      Q.  What did he -- was he allowed to observe?
13      A.  I don't know exactly.  I was not there.  I
14  know he spoke to several people.
15      Q.  Okay.  Did he -- do you know if he sat in on
16  a class?
17      A.  I don't believe so.  I believe he refused to
18  sign the confidentiality agreement, therefore would
19  not be allowed to sit in on a class.
20      Q.  Do you know who accompanied him as he visited
21  the center?
22      A.  No.
23      Q.  Do you know who he spoke to from NXIVM?
24      A.  I know of one person specifically.
25      Q.  Who is that?

Page 139

1      A.  Emiliano Salinas.  I think at the end of the
2  Forbes article there is a quote from Sara Bronfman,
3  although I'm not sure.  So if that be the case, then
4  he probably spoke to her there.
5      Q.  Okay.  Have you had any conversations with
6  him at any time after that ar -- after the art --
7  that one meeting prior to the article's publication?
8      A.  No, I don't believe so.
9      Q.  Did you have an opinion as to --
10      A.  No.  Hold on.
11      Q.  Strike that.
12      A.  They did a fact-checking type of phone call
13  so, yes, there was a conversation.  It was a woman
14  that was doing it, though, not him.
15      Q.  Do you remember her name?
16      A.  No.
17      Q.  And was this a call made to you?
18      A.  Yes, I believe so.
19      Q.  And do you remember what facts she wanted to
20  check?
21      A.  No.  It was a series of representations.
22  Some of them seemed accurate; some of them seemed
23  not accurate.
24      Q.  Did you correct what you considered to be
25  inaccurate?

Page 140

1      A.  To the best of my ability.  There was an
2  additional communication.  I ended up faxing I
3  think him answers to two questions which were he
4  wanted my response with something with respect to
5  Toni Natalie.
6      Q.  And did you fax him information?
7      A.  Just a simple response.
8      Q.  Did you save a copy of the fax?
9      A.  No.
10      Q.  Where was it faxed from?
11      A.  I think it was faxed from my residence.
12      Q.  Did you put the fax into a file or the papers
13  that you faxed into a file someplace?
14      A.  No.
15      Q.  Did you discard them?
16      A.  They were probably discarded.
17         MR. KOFMAN:  I'll make a request for
18  anything that was faxed to Forbes.
19         (Request.)
20      Q.  Have you ever spoken to reporters from the
21  Albany Times-Union?
22      A.  Yes.
23      Q.  On how many occasions?
24      A.  May I clarify?
25      Q.  Yes.

Page 141

1    A. Before NXIVM. After NXIVM, I don't believe I
2  have.
3    Q. Have you ever met with Dennis Yusko?
4    A. No.
5    Q. Okay. Did you consider the Forbes article
6  to be positive or negative towards NXIVM?
7    A. I considered the Forbes article to be
8  negative and untrue towards NXIVM.
9      MR. KOFMAN: I'd like to you mark this
10  as Raniere-7.
11      (Executive Success Programs, Inc.
12  Student Enrollment Application of Stephanie Franco
13  Bates stamped P000004105 was received and marked
14  Defendant's Exhibit Raniere-7 for Identification.)
15      MR. KOFMAN: For the record -- I'm sorry
16  -- Raniere-7 is a one-page document that was
17  produced to us in discovery. It's Bates stamped
18  P4105, and it purports to be Student Enrollment
19  Application of Stephanie Franco.
20  BY MR. KOFMAN:
21    Q. Mr. Raniere, have you ever seen this form of
22  document before?
23    A. Yes.
24    Q. Have you ever seen the Student Terms and
25  Conditions at the bottom?

Page 142

1    A. Oh, you mean the four points, the four --
2  ending with "Disclaimer"?
3    Q. Yes.
4    A. Yes.
5    Q. Did you draft those?
6    A. I -- I participated in drafting some of it, I
7  think, because some of it came from a past company
8  that I had. I believe the attorneys, whoever they
9  were at the time, drafted them.
10    Q. The attorneys from the past company drafted
11  them?
12    A. No, NXIVM. I -- it might have been Arlen
13  Olsen. I'm not sure.
14    Q. And when were these drafted?
15    A. I don't know. Does it have a revision date
16  on the bottom?
17    Q. It says "Copyright 2000."
18    A. I don't know which version or when these were
19  drafted but 2000 or before.
20    Q. What was the prior company that had similar
21  Student Terms and Conditions?
22    A. Well, there were similar -- there weren't
23  Student Terms and Conditions, but it was Consumers'
24  Buyline.
25    Q. Okay. Did you sit down with Arlen Olsen

Page 143

1  and participate in the drafting?
2    A. No.
3    Q. What was your involvement in the drafting of
4  these terms and conditions?
5    A. Suggesting certain things. I think at one
6  point I read an initial draft and asked for
7  potential changes or what would happen if something
8  went one way or another.
9    Q. Did anybody else review the potential draft
10  besides you?
11    A. I don't know.
12    Q. Anyone else from NXIVM?
13    A. I don't know.
14    Q. Why were you the person from NXIVM who was
15  reviewing the Student Terms and Conditions?
16    A. Because I have some lay legal experience
17  because of some of the -- my lay legal experience of
18  the past.
19    Q. Does it say anywhere in these Student Terms
20  and Conditions that a person cannot take Executive
21  Success Programs if they've ever taken a course with
22  a competitor?
23    A. I don't know. I'd have to read this, and is
24  this the full -- is this a two-sided form or a
25  one-sided form?

Page 144

1    Q. It's my understanding that this is the
2  complete document.
3    A. Okay. Do you want me to read it to see if it
4  says that?
5    Q. Yes.
6    A. Okay.
7      MR. CAMPION: Go ahead.
8    A. Do you mind if I use a set of binoculars?
9      MR. KOFMAN: What's that?
10      MR. CAMPION: I circled a word there.
11      THE WITNESS: Do you want me to
12  continue?
13      MR. KOFMAN: Yes, please do.
14      Oh, I see.
15      MR. CAMPION: Okay.
16      MR. KOFMAN: I'll bring something
17  tomorrow.
18  Continuing...
19    A. This refers to back of this application, by
20  the way.
21      It says, "See important cancellation notice
22  on the back of this application," so it appears
23  there might be writing.
24    Q. All right. I'll have to take a look.
25      If you can just look at the Student Terms and

Page 145

1  Conditions.
2      A. Can I read the top, also?
3      Q. Excuse me?
4      A. Can I read the top, also?
5      Q. Yes, of course.
6      A. I'm having trouble reading this. I'm so
7  sorry.
8      Q. Well, if you're having trouble reading it, I
9  can try and bring a clearer copy, you know, blow it
10  up a little tomorrow.
11      A. That would be helpful, although I did note on
12  the top where it says "I understand if I choose to
13  leave ESP, I must return all course related
14  materials and that making use of such materials
15  after leaving constitutes fraud."
16      That speaks to what you had asked but not as
17  -- it's not it directly.
18      Q. Does that speak to whether someone can come
19  to take NXIVM classes if they had taken a class with
20  a competitor before?
21      A. No.
22      Do you want me to continue this now, or would
23  you like to do that tomorrow?
24      Q. We can do that tomorrow if you're having
25  trouble -- difficulty reading it.

Page 146

1      A. Yes.
2      Q. And I'll bring back a clearer copy so that
3  we can -- 'cause I have a few questions about the
4  document.
5      A. Thank you.
6      MR. KOFMAN: Off the record.
7      (A discussion was held off the record.)
8      MR. KOFMAN: All right.
9      While I've got you, you've marked --
10      I'd like to have this marked as Raniere
11  -- Raniere-8.
12      THE WITNESS: Should I put this aside
13  for now?
14      MR. KOFMAN: Yes, please.
15      (A Critical Analysis of the Executive
16  Success Programs Inc., Bates stamped P000003674
17  through 3682 was received and marked Defendant's
18  Exhibit Raniere-8 for Identification.)
19      MR. KOFMAN: For the record, Raniere-8
20  is a document -- is an article or a document
21  entitled A Critical Analysis of the Executive
22  Success Programs Inc.
23  BY MR. KOFMAN:
24      Q. Do you recognize this document, sir?
25      A. Yes.

Page 147

1      Q. Is this one of the articles that was posted
2  on the Rick Ross websites?
3      A. I believe so.
4      Q. Okay. I'd like you, and I understand that we
5  may not get through it but -- strike that.
6      Did you read this at approximately the time
7  that it was posted?
8      A. Yes. I'm assuming this is the other
9  Paul Martin article, authored by him.
10      Q. Okay, and did you read it to determine
11  whether it revealed trade secrets?
12      A. I believe I did, although more that -- I want
13  to be sure I know which document this is.
14      Well, I believe so.
15      Q. I'd like you to undertake the same exercise
16  with respect to identifying the trade secrets that,
17  as you define the term, that are disclosed in this
18  article with the remaining time we have today; and
19  if you're not finished, we can pick it up tomorrow.
20      MR. CAMPION: Would it be of value if he
21  did it overnight? You can move into something else
22  now.
23      MR. KOFMAN: We can agree to do it
24  overnight, as long as a representation that he won't
25  consult with anyone since this is basically part of

Page 148

1  the testimony.
2      THE WITNESS: I won't.
3      MR. KOFMAN: Okay.
4      MR. CAMPION: So you'll mark it up and
5  bring it in tomorrow.
6      THE WITNESS: Yup. Am I allowed to take
7  something with this stamp on it out?
8      MR. KOFMAN: Yeah.
9      THE WITNESS: Okay.
10      MR. CAMPION: You can take it out.
11  We're going to Xerox it once it's marked up by you.
12  BY MR. KOFMAN:
13      Q. I'd like you to take a look at the document
14  we marked as Raniere-2, which is your August 18TH
15  Affidavit.
16      A. Raniere-2, yes.
17      Q. Paragraph 3 you discuss the -- something in
18  the John Hochman article concerning the need for
19  students to make daily brief phone calls to check in
20  with their coaches.
21      A. Uh-huh.
22      Q. To your knowledge, are there any courses at
23  NXIVM or any programs at NXIVM that would require a
24  student to make -- to check in daily with their
25  coach?

Page 149

1    A. No.
2    Q. Okay. Is there --
3    A. Can I be more specific?
4    Q. Sure, if you need to to answer the question.
5    A. Modules -- there is one module that suggests
6  a daily practice and a check-in and it is not --
7  there's no such thing, if you will, as a
8  requirement.
9    Q. Okay. What's the name of that module?
10   A. Persistence.
11   Q. Okay. What about --
12   A. Motivated state, I believe, Persistency in
13 motivated state.
14   Q. What about for students who are taking
15 advanced courses in NXIVM? Are they required to
16 have daily check-ins?
17   A. No.
18       MR. KOFMAN: Mark this, please, as
19 Raniere-9. Is it 9?
20       (Document headed Persistence Bates
21 stamped SF00104 through 108 was received and marked
22 Defendant's Exhibit Raniere-9 for Identification.)
23 BY MR. KOFMAN:
24   Q. Mr. Raniere, is the document we've marked as
25 Raniere-9 a copy of the module, the Persistence

Page 150

1  module to which you just referred?
2    A. It appears to be that.
3    Q. Okay. Looking under the word "Arranging for
4  Coaching support" --
5    A. Uh-huh.
6    Q. This is about two-thirds of the way.
7        MR. LANDY: I think you didn't pass it
8  around.
9        MR. KOFMAN: Oh, I'm sorry. I
10 apologize, guys.
11 BY MR. KOFMAN:
12   Q. Do you see the sentence under "Arranging for
13 Coaching support" where it says, "It is your
14 responsibility to set a time with your coach on a
15 daily basis for check-in"?
16   A. Uh-huh.
17   Q. Is there anything about that sentence that
18 suggests that it's op -- that daily check-ins are
19 optional?
20   A. No.
21   Q. Okay. Based on that, does that change your
22 testimony that it's only optional for students to
23 check in with coaches daily?
24   A. No.
25   Q. Do coaches or the person teaching it say,

Page 151

1  guys, where we say it's your responsibility to set a
2  time, we really don't mean that?
3    A. No.
4    Q. How about where it says, "Students must speak
5  to contact either by phone or in person daily"? Is
6  that an optional -- does that say that it's
7  optional?
8    A. No.
9    Q. Is that a mandatory requirement?
10   A. No.
11   Q. How would you characterize it where it says,
12 "Students must speak to contact either by phone or
13 in person daily"?
14   A. If you choose to do this practice, then that
15 is what you would do.
16   Q. And what in the terms, "Students must speak
17 to contact either by phone or in person daily"
18 suggests that it's optional?
19   A. In that, if you choose to do the practice,
20 that isn't optional.
21   Q. When you say, "If you choose to do the
22 practice," which means if you choose to take the
23 course?
24   A. No.
25   Q. If you choose to do the Persistence module?

Page 152

1    A. No. If you choose to do a Persistency. If
2  you take the Persistency module, persistency is
3  presented as a tool that can be used. If you choose
4  to do Persistency, you do it and do a daily check-in
5  as you do it.
6    Q. Do all students who take the 16-day Intensive
7  take the Persistency module?
8    A. Yes, I believe.
9        MR. KOFMAN: Okay. Please mark this as
10 Raniere-10.
11       (Document headed Rules and Rituals
12 Bates stamped SF00033 through 40 was received and
13 marked Defendant's Exhibit Raniere-10 for
14 Identification.)
15 BY MR. KOFMAN:
16   Q. Is -- are you familiar with the document
17 we've marked as Raniere-10?
18   A. I don't have it yet.
19   Q. Oh, I'm sorry.
20     Are you familiar with the document we've
21 marked as Raniere-10?
22   A. Not directly, but I know such a document
23 exists.
24   Q. Did you create the concepts that are
25 incorporated in the Rules and Rituals module?

Page 153

1    A. I believe most of them, if not all of them.
2    Q. Okay, and is this one of the first modules
3    that's taught in the school?
4    A. In certain programs.
5    Q. Which programs?
6    A. Ethos and the Level 1 Intensive.
7    Q. Okay. Turning your attention to Page 4 of
8    this document, the paragraph numbered 9, "Phone
9    tree."
10    A. Uh-huh.
11    Q. Can you read for me the last sentence of
12    this?
13    A. "Students involved in the more advanced
14    aspects of ESP will speak to their Coaches at least
15    once a day."
16    Q. What are the more advanced aspects to which
17    you refer?
18    A. Higher ranks is I believe what was
19    contemplated at the time.
20    Q. High -- which ranks? From which ranks on
21    up?
22    A. I believe proctor and maybe coaches.
23    Q. Looking at Page 3 of this document under the
24    paragraph that -- the first paragraph that says
25    "Stripes."

Page 154

1    A. Uh-huh.
2    Q. The second sentence says, "Membership in
3    ESP's buying coalition is signified by one diagonal
4    stripe on the right side of the scarf."
5    A. Yes.
6    Q. What is "ESP's buying coalition"?
7    A. It is no longer in existence; but it was an
8    optional program where people could get food,
9    vitamins, things like that. And it was a membership
10    in a store.
11    Q. When was -- at what periods in time was that
12    buying coalition in existence?
13    A. I think it ended 1999. It might be a little
14    later but not much.
15    Q. Okay --
16    A. In fact, I'm pretty sure it was 1999.
17    Q. This revision is dated 12/2000. Is it
18    possible it was still in existence at that time?
19    A. I don't think so. I think a lot of these
20    materials were never updated.
21    Q. Who made the decision to discontinue the
22    buying coalition?
23    A. The person who headed up the buying coalition
24    severed the relationship with us so that there was
25    no more buying coalition.

Page 155

1    Q. Who was that?
2    A. Toni Natalie.
3    Q. And did ESP receive a percentage of what
4    students bought, of the money that was paid by
5    students?
6    A. No, I don't believe so.
7    Q. Where was the store operated from?
8    A. There was one in Clifton Park, and later on
9    there was also one in Saratoga.
10    Q. Were students encouraged to use the buying
11    coalition?
12    A. To some degree. If it -- if it suited them.
13    Q. Did you encourage students to use the buying
14    coalition?
15    A. Um, if it suited them.
16    Q. Okay.
17    A. I was a believer in it.
18    Q. Okay. I'd like you to look back -- going
19    back to Raniere-2, your Affidavit from August 18th,
20    looking at Paragraph 4. You state that, "Promotion
21    is based on a committee with the students input."
22        Who is on the committee that decides on --
23    strike that.
24        In 2001-2002, who was on the committee that
25    decided on promotion of students?

Page 156

1    A. I don't know.
2    Q. Were you on that committee?
3    A. No.
4    Q. How did you know what the procedure was for
5    promotion?
6    A. Well, I created them initially. I don't know
7    with specificity now what is the case, but it is
8    important that it's more of a democratic process.
9    Q. Okay. Have you ever been on a committee that
10    decides on promotion?
11    A. No.
12    Q. Do you know if Nancy Salzman has?
13    A. Nancy does decide ultimately certain high
14    level promotions, but that is also decided by a
15    committee that makes recommendations to her. I
16    don't know if -- I don't think she's on the
17    committee, per se.
18    Q. And as you sit here today, do you know the
19    names of anyone who has been on that committee at
20    any point in time?
21    A. I would think Barbara Jeske was, I would
22    think Pam Cafritz was, Lauren Salzman probably.
23    Q. Okay. Looking at the last section -- strike
24    that.
25        Do they make the decisions based on rules for

Page 157

1  promotion that you had originally drafted or
2  created?
3      A.  No.  I think the -- those were the initial
4  rules or guidelines.  I think they've evolved, so
5  I don't know all the criteria they use.
6      Q.  Okay.  The last sentence of Paragraph 4 says,
7  "I am the highest rank in the structure and I have
8  been overridden numerous times and always can be."
9          When you say you're the highest rank in the
10  structure, what do you mean?
11     A.  I wear a double white long sash.  So with
12  respect to who has, if you will, the most knowledge
13  relating to the ESP philosophy and who has the
14  ultimate authority to explain that philosophy or
15  answer the questions, I am the highest rank.
16     Q.  Okay.  Can you give me examples of when
17  you've been overridden in decision-making at NXIVM?
18     A.  I could probably give you a number of
19  examples.
20     Q.  Okay.
21         THE WITNESS:  What do I do if they
22  involve a legal case?
23         MR. CAMPION:  If they involve a legal
24  case, you're not going to do it.  You and I will
25  discuss it.  I'll make a determination as to whether

Page 158

1  a privilege is involved, and then you can supplement
2  the answer tomorrow if I conclude that privilege is
3  not involved; but as to matters which do not relate
4  to the legal case, please answer.
5         THE WITNESS:  Okay.
6  Continuing...
7      A.  There have been in the past either people
8  that I thought were good for a promotion from what
9  I had seen and how they had spoken and things like
10  that or not, and there have been instances where
11  it's gone both ways.  The way the NXIVM business is
12  run, the systems that I suggest often are either not
13  done or not executed.
14     Q.  Are they rejected, or they're just not
15  implemented?
16     A.  Both.  They're rejected and sometimes not
17  implemented.
18     Q.  Can you think of an example of a suggestion
19  you've made that's been rejected?
20     A.  Yeah.  I had thought that it would be good to
21  have a way of having the phone tree, using a system
22  of personal contacts where we have people calling
23  through the whole organization and then having a
24  series of feedback loops to know if the data had
25  gone through; and I think it turned out to be

Page 159

1  unfeasible.  It's not done.  There is a phone tree,
2  but they don't do it the way I had thought it would
3  be done.
4      Q.  And was that because someone concluded it
5  could not be implemented?
6      A.  I don't know exactly.
7      Q.  Who was the person who told you it was
8  infeasible?
9      A.  I think I was told by a number of people.
10     Q.  Can you think of any other examples in
11  which your decisions have been rejected or your
12  suggestions have been rejected?
13     A.  Yeah.  There have been times where I
14  suggested that we might have either a certain type
15  of curriculum or an event at a certain time.  For
16  example, I had thought it would be good to have a
17  winter festival this -- this year and really thought
18  that was important; but the people within NXIVM had
19  other priorities, and it was not done.
20         And at first, it was rejected, and then they
21  said, well, maybe we could try to do it later; and
22  then they decided it was unfeasible.
23     Q.  Do they say how it was unfeasible?
24     A.  They felt because of the Dalai Lama event --
25  we have the Dalai Lama coming and spending five days

Page 160

1  with us -- that the preparations that they need to
2  do, there have to be ethical boards put together
3  because there are a series of panels in different
4  areas that are doing public discussions.  And also
5  because of some of the situations that are going on
6  in Mexico, I founded a peace movement in Mexico
7  because of the situation.  And I have a number of
8  friends that have been adversely affected.  People
9  are kidnapped.  I have one friend who was kidnapped,
10  held at knifepoint, another friend who in the past
11  had both of their ears cut off and one of their
12  fingers.  And this is somewhat of a common
13  occurrence in Mexico, and it's come to the point
14  where I think there's a lot of civil unrest.  So the
15  people in Mexico cannot devote the time to doing
16  something like a winter fest when there's other
17  important things.
18     Q.  The -- you indicated that the Dalai Lama was
19  going to be staying with NXIVM for five days?
20     A.  No.  He's doing an event with us.
21     Q.  What kind -- where is the event being held?
22     A.  We're not exactly sure.  Part of it's being
23  held in an arena called The Times-Union Arena.
24     Q.  Is that in Albany?
25     A.  Yes.  The rest is somewhere near Albany.

Page 161

1   We're not sure of the settings because we are having
2   a series of panels doing not only ethics discussions
3   but ethical plan implementations.
4       Q.  Are you co -- are you sponsoring the event,
5   or what's the nature of your involvement and the
6   Dalai Lama's involvement?
7       A.  I'm the ideological founder, and the Dalai
8   Lama sent a representative to examine us and go
9   through our curriculum; and what we offer on the
10  basis of ethics and things like that were something
11  that this representative felt was extremely
12  valuable.
13      Q.  What was the name of the representative of
14  the Dalai Lama that came and --
15      A.  We call him Lama Tenzin.  He's the personal
16  peace emissary of the Dalai Lama.
17      Q.  Did he sign a confidentiality agreement?
18      A.  I believe so.  I'm not positive.
19      Q.  And when are these events taking place?
20      A.  April 19th is the large public event.  We
21  have trainings to train in the ethical tools before
22  that point.  April 18th I believe is when the first
23  panel starts.
24          MR. KOFMAN:  This might be a good time
25  to break.

Page 162

1           MR. CAMPION:  Just about 6:00, anyway.
2           MR. KOFMAN:  Yeah.
3           MR. CAMPION:  Are you all agreeable to
4   starting at 9:30 tomorrow morning?
5           MR. KOFMAN:  Happy to.
6           THE WITNESS:  Fine with me.  I have my
7   homework.
8           MR. KOFMAN:  You'll take that?
9           THE WITNESS:  I will.
10          MR. KOFMAN:  Thank you.
11  Thank you very much.
12          THE VIDEOGRAPHER:  Going off the record
13  at 5:56.
14
15          (Witness excused.)
16          (The deposition was adjourned for the
17  day at 5:56 p.m.)
18
19
20
21
22
23
24
25

Page 163

1                    J U R A T
2           I, KEITH A. RANIERE, do hereby
3   certify that I have read the foregoing transcript of
4   my testimony taken on March 11, 2009, and have
5   signed it subject to the following changes:
6   PAGE      LINE        CORRECTION
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21  DATE:              _____
22  Sworn and subscribed to before me on this     day
    of
23
24  NOTARY PUBLIC
    _____.
25

Page 164

1
2           C E R T I F I C A T E
2
3
4       I, CHERYL McGANN, a Certified Court
5   Reporter and Certified Realtime Reporter of the
6   State of New Jersey, authorized to administer
7   oaths pursuant to R.S.41:2-2, do hereby certify
8   that prior to the commencement of the examination,
9   the witness was sworn by me to testify to the truth,
10  the whole truth, and nothing but the truth.
11          I DO FURTHER CERTIFY that the foregoing
12  is a true and accurate transcript of the testimony
13  that was taken stenographically by and before me at
14  the time, place, and on the date hereinbefore set
15  forth.
16          I DO FURTHER CERTIFY that I am neither
17  a relative nor employee nor attorney nor counsel
18  of any of the parties to this action and that I am
19  not interested in the action.
20
21
22
        CHERYL McGANN
23      C.C.R. License No. XI000918
24

**A**

**aaron**
14:17 42:21,24
43:15
**ability**
12:5 19:16 140:1
**able**
63:24 81:18
110:14 123:10
130:1 134:20
**aboveentitled**
2:10
**acceptable**
8:4
**access**
79:24 80:2 81:13
**accompanied**
138:20
**account**
80:4,6,6,7
**accounts**
63:22,25 79:19,20
79:24 80:3,13
81:6,8
**accurate**
11:21 12:15 67:13
139:22,23 164:12
**accurately**
104:18
**acknowledge**
115:11,18
**act**
46:10 112:22,24
**acting**
88:15
**action**
91:9 164:18,19
**activities**
26:20
**actual**
27:8 124:2 128:1
**actualized**
98:24
**add**
29:9 76:6
**added**
96:8
**addition**
9:21 108:11

**additional**
10:22 76:2 98:16
117:16,16 140:2
**address**
102:23
**adelman**
3:18 6:19
**adequately**
26:18
**adjourned**
162:16
**administer**
164:6
**advanced**
149:15 153:13,16
**advantage**
112:20 128:16
130:3
**adversely**
160:8
**advice**
28:11 45:8 47:21
47:22,23
**advise**
10:14
**advised**
41:6
**affect**
110:14
**affidavit**
4:9 42:25 43:3,6
66:11,18,23 67:22
79:1 148:15
155:19
**affirmed**
42:25
**ago**
54:8 77:23 82:21
105:3,4 132:6
**agree**
40:8 79:3 147:23
**agreeable**
162:3
**agreed**
10:16 105:23
**agreement**
19:14 20:5,11,21
22:14,19,24 24:13
28:5 39:6 40:2
48:3,8 138:6,18

161:17
**agreements**
110:7
**ahead**
55:8 78:15 125:16
144:7
**alan**
4:3
**albany**
36:13,18 42:24
140:21 160:24,25
**allegedly**
41:21
**allotted**
129:21
**allowed**
29:15,19 41:25
138:10,12,19
148:6
**allowing**
61:8
**alternatives**
96:6
**amend**
26:1
**amount**
100:25 102:11
**analysis**
4:20 64:23 65:10
65:14 146:15,21
**analyze**
64:21
**analyzing**
64:23 84:1
**anger**
111:1,20,22 112:5
112:9,9,21 113:3
113:4 117:9
**anna**
1:14 2:2
**answer**
10:7 25:5 26:18
28:13 37:22 46:5
78:15 87:6,20
92:6 115:13
125:11 129:10
132:14 134:11
149:4 157:15
158:2,4
**answered**

25:3
**answering**
9:24 25:12
**answers**
9:19 23:3 140:3
**anthony**
3:9 6:14
**anybody**
41:10 42:17 68:25
72:20 143:9
**anyplace**
81:13
**anyway**
162:1
**apologize**
19:12 22:18 90:16
150:10
**apologized**
19:19
**appear**
12:24
**appeared**
115:9,10,17
**appears**
40:5 67:3 77:24
97:17 107:19
120:25 144:22
150:2
**application**
4:18 7:9 91:3,6,7
92:2,5,10 94:21
141:12,19 144:19
144:22
**applied**
4:16 126:10
131:13
**apply**
90:25
**appreciate**
89:15
**approached**
24:19
**appropriate**
132:13
**approve**
12:2
**approved**
59:1,2 67:8
**approximately**
9:1 58:2 147:6

**april**
161:20,22
**ar**
139:6
**area**
36:10,13,18
**areas**
51:24 62:24 160:4
**arena**
160:23,23
**argument**
110:10
**arisen**
20:10
**arlen**
38:17,24 39:7
40:4 47:18 48:8
92:3 95:3 137:8
137:15 142:12,25
**arrangement**
105:22 127:18
**arranging**
150:3,12
**art**
139:6
**article**
64:11,12,15,24
65:10 107:17,23
107:25 108:16,24
109:20,22 110:2,3
110:24 111:14
113:8 114:6,8,9
114:11,12 117:6
117:23 122:24
132:9 133:16
135:21 136:2,7,17
136:19 139:2
141:5,7 146:20
147:9,18 148:18
**articles**
55:17 56:5,11,15
61:21,24 62:8,12
64:10,22 65:4
106:8 107:19
115:2 117:25
139:7 147:1
**arts**
84:2 95:23
**ascertain**
43:18

**aside**
103:6 146:12
**asked**
12:2 20:22 25:5
34:20 37:8 39:1
47:18 63:9,19,22
64:4,4,5 72:10
79:19 80:23
136:14 143:6
145:16
**asking**
9:18 24:9 58:8
64:8 90:18 92:16
**aspects**
128:23 153:14,16
**assessment**
46:14
**assign**
97:18,22
**assignment**
4:12 96:25 98:13
99:1 123:2
**assist**
85:24,25
**assistance**
86:8
**associates**
29:22,25
**assume**
7:11 32:1,7 46:2
62:22
**assuming**
86:21 87:12 147:8
**assumption**
77:15 78:1
**athletics**
84:2
**attached**
4:25
**attend**
14:22 17:19 24:1
**attended**
16:11 83:2,7
**attending**
15:4,9 25:11
**attention**
24:11,15 28:8
35:2,3 37:17
55:16,20 94:7,12
153:7

**attorney**
19:17 64:19,21
94:4 164:17
**attorneyclient**
91:19 92:14
**attorneys**
2:24 3:7,12,17,21
6:11 38:11 46:21
61:12 66:5 67:10
67:16 81:17 142:8
142:10
**audio**
137:3
**audiotaping**
137:3
**august**
38:6 69:12 93:16
148:14 155:19
**author**
85:18,21 103:11
103:14,18
**authored**
147:9
**authority**
110:6 124:18
157:14
**authorized**
164:6
**authorship**
104:5
**available**
85:14 114:24
**avalanche**
67:25
**avenue**
1:23 3:10,15
**aviv**
1:14 2:2 3:21
6:20
**aware**
13:21,25 14:16
20:4,9 29:20 36:8
36:11 43:24 44:3
45:2 50:5,7 76:12
91:12 94:20 113:6
115:22
**awareness**
123:16,18 124:21
124:24 125:1
**awhile**

9:17
**ayn**
89:12,15 96:11,12

———————————
**B**
**bachelor**
72:2
**back**
23:1 24:4,16 30:2
39:19 70:22 74:4
74:16 76:10 80:22
81:18 82:13 87:7
87:10 91:15
108:22 115:14,15
117:6 118:16,20
119:2 121:17
125:11 126:4,15
133:7 144:19,22
146:2 155:18,19
**bad**
59:24 60:5 61:16
67:25
**bag**
110:8
**barbara**
156:21
**barry**
2:21 7:3
**based**
77:23 78:2,11
150:21 155:21
156:25
**basically**
147:25
**basis**
22:15 25:25 27:6
44:21,22 46:23
47:25 49:7 68:7
68:13 69:6 116:3
150:15 161:10
**bates**
4:8,11,12,16,19
4:21,22,24 6:3
11:3 93:9,14,15
96:25 97:14
126:11 133:17
141:13,17 146:16
149:20 152:12
**bears**
93:14,15

**becoming**
30:19
**beg**
122:18 124:10
**beginning**
20:6 47:14 82:3
104:20,21 105:24
115:3 116:23
130:15
**begs**
124:10
**behalf**
6:19 7:6 10:16
102:16,22
**behavior**
88:11,13
**belief**
37:8 134:13
**believe**
9:11 13:24 14:12
19:10 20:12 21:4
21:18,20,21,24
22:6 31:7,14
33:16 38:9 40:1
40:16,17 43:16
44:24,25 45:21
47:22,24 50:15
56:18,21 57:2
58:16 61:15 62:20
65:2,3 67:7 68:6
68:23 69:8,21
73:22 74:15,24
75:10,15,17 76:1
76:4 77:3 80:7,10
88:7 90:16 91:4
94:3 96:7,15,19
97:21 98:23
100:12 101:24
105:21 106:25
107:16 113:5,9
115:4,25 116:11
117:21 119:4
129:6 130:15
134:17 135:1
136:22 138:9,17
138:17 139:8,18
141:1 142:8 147:3
147:12,14 149:12
152:8 153:1,18,22
155:6 161:18,22

**becoming**
30:19

**believed**
38:3 43:1 75:5
95:13 116:9
**believer**
21:19 155:17
**believes**
73:11 134:16
**believing**
21:20
**belonging**
107:23
**benefitting**
110:13
**bergeron**
89:8
**best**
13:1 15:20 59:19
60:7 74:8 92:24
123:12 140:1
**better**
12:5
**biddle**
2:14 3:3 6:25
**big**
126:25
**bill**
101:9
**binoculars**
144:8
**biographies**
11:14,17,18
**biography**
4:6 6:1 11:11,12
11:23
**birthday**
52:2
**bit**
40:21 49:1 80:22
90:22 119:5,6,7
135:20 136:10
**blackberries**
51:14
**blocks**
28:1
**blow**
145:9
**boards**
160:2
**book**
41:18 83:20 89:2

89:3
**books**
86:11,14,20
**bottom**
97:15 130:18
141:25 142:16
**bought**
155:4
**boxes**
62:24
**boy**
94:14
**break**
10:9,11 19:8 40:7
40:9 47:10,17
79:8,13 91:19
92:23 121:11
125:23 161:25
**breaker**
130:24
**breaking**
29:4
**breaks**
79:7 129:22 130:3
**brief**
148:19
**bring**
45:14 144:16
145:9 146:2 148:5
**bringing**
28:8 38:7,21,25
**broad**
134:9
**broadway**
3:19
**bronfman**
139:2
**brother**
44:8,9,9,13
**brought**
24:10,14,15 28:15
35:1,3 37:14,17
38:6 53:5
**building**
25:4
**bunch**
96:6
**business**
36:2,3 39:25
49:11 52:13 53:14

68:19 71:25
112:22 158:11
**buying**
154:3,6,12,22,23
154:25 155:10,13
**buyline**
9:6,13 142:24

———————————
**C**
**cafritz**
156:22
**call**
29:16 47:24 48:24
55:4,13 56:20
83:4,21 89:14
99:4 124:25
135:18 139:12,17
161:15
**called**
28:11 82:14 88:21
88:25 95:10,22,22
95:25 99:19
123:16 124:21
127:4 160:23
**calling**
122:16 158:22
**calls**
45:22 76:22
123:17 124:22
148:19
**campion**
3:5 6:24,24 38:13
38:16 39:8,18,24
40:6 47:11 48:9
48:17 78:13 79:8
79:11,14 81:20
91:20 92:6,15,20
93:1 97:9 105:21
106:15 108:20
109:3,14 120:23
121:7,9,13,19,24
123:12 125:22,24
127:17 133:15
144:7,10,15
147:20 148:4,10
157:23 162:1,3
**campus**
2:15 3:5
**cancellation**
144:21

**caption**
1:17
**case**
17:9 51:19,20
52:5 66:6 76:13
90:8 132:2 139:3
156:7 157:22,24
158:4
**cases**
61:2 119:22
**casual**
43:13
**cause**
14:3 31:13 61:4
64:7 80:19 111:12
124:9 146:3
**center**
1:23 2:23 18:12
18:13 138:11,21
**certain**
30:10 59:18 63:19
67:12 68:19 77:24
84:22 88:11 90:2
100:25 102:11
115:8 128:7 143:5
153:4 156:13
159:14,15
**certainly**
37:9 67:7 91:22
110:19 112:22
116:12 121:3
**certification**
69:13
**certified**
2:12,12 164:4,5
**certify**
163:3 164:7,11,16
**change**
75:22 118:7 133:4
150:21
**changed**
25:16 78:11,19
79:2
**changes**
33:13,14 67:15
143:7 163:5
**characterize**
85:3 135:17
151:11
**characterizing**

124:20
**check**
41:10 58:18
129:13 139:20
148:19,24 150:23
**checked**
58:22 67:4
**checkin**
149:6 150:15
152:4
**checking**
133:11
**checkins**
149:16 150:18
**cheryl**
2:11 164:4,22
**child**
71:11,13,14,17,22
72:10,11
**chisels**
128:19
**choice**
96:10,14
**choose**
7:24 120:1 145:12
151:14,19,21,22
151:25 152:1,3
**church**
83:3,8,11 88:6
**circle**
111:4,4,9,12
**circled**
144:10
**cited**
90:6
**city**
36:10 71:18
**civil**
160:14
**claimed**
53:7
**claims**
46:4 53:5 110:4
**clarification**
118:19 119:16
**clarifications**
120:11
**clarify**
140:24
**class**

82:22,23,25
138:16,19 145:19
**classes**
29:21 36:9 82:17
82:20 145:19
**classifying**
134:19
**cleaner**
9:24
**clear**
49:5 78:8 106:22
126:16
**clearer**
145:9 146:2
**client**
11:4 24:19 65:22
66:2
**clients**
6:12
**clifton**
8:10 155:8
**club**
96:1
**coach**
30:10,14,15,19,21
31:12,14,20 32:4
32:5,7,9 33:2
95:18 148:25
150:14
**coaches**
30:25 31:1,4 33:7
33:15 148:20
150:23,25 153:14
153:22
**coaching**
150:4,13
**coalition**
154:3,6,12,22,23
154:25 155:11,14
**coincide**
52:2
**collected**
63:7
**column**
12:24
**com**
80:1,11
**come**
21:12 31:11 40:11
49:21 51:25 54:8

55:15,20 56:4
60:20,23 71:19
72:14 94:7,12
95:10 104:13
145:18 160:13
**comes**
16:7 89:7
**comfortable**
59:5
**coming**
19:13 51:14
100:24 159:25
**commencement**
164:8
**commencing**
2:16
**comment**
42:13 78:7
**commenting**
129:8
**comments**
122:9
**committed**
86:18 87:2,18
135:14
**committee**
155:21,22,24
156:2,9,15,17,19
**commodities**
50:19
**common**
23:25 24:1 52:1
134:13,21 135:4
160:12
**communication**
94:25 140:2
**communities**
134:24
**community**
71:12 72:2,5
**company**
142:7,10,20
**compassion**
112:24
**compel**
21:25
**compet**
124:13
**competitive**
112:20 128:16

130:3
**competitor**
113:12 129:25
143:22 145:20
**competitors**
112:20 113:6
**complete**
144:2
**completed**
32:24 33:3
**completely**
78:16 117:24
**complies**
66:21 109:11
**compulsory**
21:22
**computer**
62:3,5 81:15
**computeraided**
1:22
**computers**
81:10,17
**con**
41:13 74:6 108:17
108:25
**concealed**
46:2,3,9
**concep**
103:17
**concept**
112:14,18,19
119:4,5,6,7,8,9,13
128:19 134:1
**concepts**
85:7 103:17,18,20
103:23 104:8,19
106:5 112:12
152:24
**concern**
31:16 74:20
**concerned**
19:14 74:17
**concerning**
20:10 117:9
148:18
**concerns**
115:5
**conclude**
158:2
**concluded**

159:4
**conclusion**
60:20,23 76:22
**conclusions**
77:25 94:5
**condition**
98:16
**conditions**
141:25 142:21,23
143:4,15,20 145:1
**conducting**
101:2
**confidence**
53:2,17
**confident**
54:23
**confidential**
1:18 4:7 6:3 7:7
7:19,23 8:6 16:18
43:17 54:23,25
71:9
**confidentiality**
8:3 10:15 20:5,11
20:20 22:14,24
24:13 28:5 105:22
110:7 127:18
138:6,18 161:17
**confirm**
101:17
**conflict**
16:19,20 29:18
71:16 76:8 111:2
111:22 112:6
**confuse**
124:8
**connection**
9:5,12 39:11
40:13 92:1
**consider**
12:14 20:24 21:17
22:19 28:20,23
46:6,8 74:19
84:18 108:9,17,25
109:23 111:18
114:11,19,21
120:16 128:25
141:5
**consideration**
61:3,7,10 98:10
**considerations**

60:10,12
**considered**
60:15 72:1 126:18
134:24 139:24
141:7
**consistency**
128:14
**consisting**
4:9 66:12
**constitutes**
108:5 122:4
145:15
**construction**
119:13
**constructions**
111:15
**consult**
24:24 29:4 86:6
89:12,14 147:25
**consulted**
24:4 28:4 37:7,14
37:19 38:7 86:14
**consumers**
9:6,13 142:23
**contact**
151:5,12,17
**contacted**
92:5
**contacts**
158:22
**contain**
106:19 108:16,24
109:22 114:20,21
125:7 130:12
131:5
**contained**
103:21 112:8
114:6,8,9,10
117:8 125:18
129:11
**containing**
132:3
**contains**
67:23 107:23
108:1 125:13
129:15 131:24
132:5
**contemplated**
153:19
**contend**

132:21
**content**
76:19 77:1 127:12
127:23 128:21
130:21
**contention**
68:7 76:18 134:3
**context**
46:11,12,13 49:19
**continue**
13:4 105:25
118:11 144:12
145:22
**continued**
1:17 2:1 3:2
82:12
**continuing**
119:21 125:17
144:18 158:6
**continuously**
35:22
**contractor**
102:2
**control**
77:13,16,17,19
120:23 121:2
**convenient**
10:11
**conversation**
18:24 19:1 22:7
34:6,17,21 38:15
39:3 40:18 42:14
43:19,22 44:1
45:4,6,9,17,21
46:9,10 74:25
139:13
**conversations**
38:10 42:9,11
43:14 44:25 69:11
70:9 72:8,21 73:1
74:6 75:19 78:12
88:22 139:5
**conveys**
133:19
**coowner**
102:25
**copies**
10:22 121:19
**copy**
46:21 47:7 48:7

95:6 125:25
133:13 140:8
145:9 146:2
149:25
**copyright**
142:17
**corp**
2:25 8:17
**corporate**
51:23
**corporation**
1:3 2:5
**correct**
15:18 19:3 31:10
92:19 126:20
132:25 139:24
**correction**
163:6
**correctly**
37:12 92:16
**cough**
97:3
**counsel**
7:21 10:4,5,6,14
10:22 48:13 91:21
93:1 105:23 109:4
120:23 164:17
**counselor**
95:18
**count**
26:20
**counterclaimdef...**
1:16
**counterclaimplai...**
1:11
**couple**
47:9,18
**course**
14:13,15,16,19,20
14:22 26:23 27:6
27:19 30:4,10
54:7 61:8 63:10
100:25 101:1
114:17 143:21
145:5,13 151:23
**courses**
27:20 53:22 54:3
54:11,11 85:14
100:24 148:22
149:15

**court**
1:1 2:12 9:20
10:7 164:4
**courtroom**
13:10
**covered**
105:21 127:17
**create**
52:18 53:8 87:24
90:10 103:15
124:5,5 152:24
**created**
27:17 67:25 80:5
80:8 86:7,8
103:17 105:17
106:2,6 111:22
112:5 117:3 134:1
156:6 157:2
**creating**
33:6 105:6
**creation**
84:22 86:15 105:9
106:2,11
**creator**
85:20
**criteria**
4:15 126:9 131:13
157:5
**critical**
4:20 146:15,21
**critics**
114:1
**cross**
4:2
**crossclaim**
2:7,24
**crossclaimants**
2:3
**cult**
133:18,22 134:6
134:10,16,17,25
135:6,17
**cultlike**
111:25 128:24
**cults**
128:23 134:4,15
134:15,22,23
**culture**
134:23
**curiosity**

12:23
**current**
80:4
**currently**
100:8
**curricula**
125:4
**curriculum**
27:16 28:1 30:22
97:25 98:17 103:7
123:23 124:7,11
127:25 128:2
159:15 161:9
**cut**
160:11
**cynic**
60:2,4

───────────────
**D**
───────────────

**daily**
148:19,24 149:6
149:16 150:15,18
150:23 151:5,13
151:17 152:4
**dalai**
159:24,25 160:18
161:6,7,14,16
**damaged**
122:11
**damages**
120:3
**danzig**
3:8 6:14,15
**data**
84:1 158:24
**date**
1:20 6:6 8:25
57:6 69:13 142:15
163:21 164:14
**dated**
93:16 107:14
154:17
**day**
17:17,18 18:8
20:2,9,15,19,19
21:2 22:8 29:1
102:9 123:15,15
124:20,20 129:21
153:15 162:17
163:22

**days**
7:8,20 8:4,4
124:14 129:19
130:2 159:25
160:19
**debates**
113:14
**decide**
92:24 136:15
156:13
**decided**
71:16 155:25
156:14 159:22
**decides**
155:22 156:10
**decision**
154:21
**decisionmaking**
157:17
**decisions**
156:25 159:11
**deeper**
117:20
**defendants**
1:9 2:7,25 6:4
66:13 93:10 97:2
107:7 126:12
141:14 146:17
149:22 152:13
**define**
53:20 54:2 76:23
84:20 106:23
114:5 123:22
131:25 132:9
134:6 147:17
**definition**
109:24 111:19
123:13 126:19
127:7,8 134:7,8
135:8,8
**degree**
19:25 26:16 86:3
86:5 112:23
117:22 155:12
**delay**
19:19,20
**delineate**
117:11
**democratic**
156:8

**denial**
92:10
**denied**
41:20
**dennis**
141:3
**depending**
45:23 111:14
**depends**
45:20 46:11
**deposed**
76:13
**deposition**
1:19 6:9 7:7 8:5
8:19,20,24 9:9,16
9:17,22 10:13
48:14,15,24 54:22
76:16 105:24
119:19 120:24
162:16
**depositions**
9:5
**deprogrammer**
56:21
**deprogramming**
56:19
**derive**
96:11 106:7
117:12,13 118:1
119:8,13
**describe**
126:22
**described**
40:20 105:9
**description**
4:5 119:9 134:19
**designate**
7:10,22,25
**designated**
8:6
**designed**
133:20
**designing**
33:5
**desirability**
38:24
**destroy**
59:23 73:9,15,20
74:5,6,11 75:6,14
76:9

**destroying**
74:4 76:10
**destructive**
135:19
**detail**
35:11 83:15
**details**
16:5,16 31:18
52:20
**determination**
157:25
**determine**
108:1 131:24
147:10
**devalues**
133:19
**develop**
85:22 97:24,25
98:16,17
**developed**
90:17 103:20,21
112:11
**developer**
4:7 6:2
**developing**
26:13,23 27:6
52:22 85:24 86:1
89:13 90:11
**develops**
134:25
**devote**
160:15
**devoted**
27:12
**devoting**
25:7
**diagonal**
154:3
**dialogue**
60:7
**dianetics**
83:20 89:2
**dictionary**
135:8
**difference**
60:1 69:22 111:15
**different**
12:8 51:24 59:21
81:11 86:12 95:17
95:19 119:10

**122:21 125:4**
160:3
**difficult**
43:18
**difficulty**
145:25
**dinner**
74:15 129:21
**direct**
4:2 8:13 24:9
82:12 132:3
**directly**
11:8 17:21 18:24
31:6 44:12 120:20
145:17 152:22
**director**
99:21 100:5
**disadvantage**
107:2 108:18
109:2 130:4
**disadvantageous**
132:23
**disagree**
39:9
**discard**
140:15
**discarded**
140:16
**discipline**
84:2
**disclaimer**
142:2
**disclose**
120:19 131:1
**disclosed**
108:19 109:2
110:24 120:11,17
123:5 128:20
132:9,23 147:17
**disclosure**
120:12
**discontent**
33:24 34:15 35:9
35:15
**discontinue**
154:21
**discover**
137:17
**discovered**
137:21

**discovery**
11:5 80:22 81:3
93:14 97:14
101:10 141:17
**discredit**
67:24 68:2,8,14
68:21,25 69:20
74:9,11 75:6,14
75:25 76:4
**discredited**
68:12
**discuss**
19:16 22:2 38:20
38:23 40:7,8 52:5
66:6 148:17
157:25
**discussed**
10:15 14:11 19:11
50:2 61:11,17
83:13 105:13,14
**discussing**
39:15,16,21,22
52:9
**discussion**
17:2 18:11 19:4,5
21:8,10,14 22:3
36:20,22 37:25
41:13 50:4 51:16
72:17 79:15 99:1
105:16 109:13
118:15 119:17
146:7
**discussions**
17:4 20:19 22:9
33:21 36:24 42:16
42:20 49:23 50:8
57:8 58:4 160:4
161:2
**disgraceful**
72:3
**disown**
71:23
**dispensing**
125:4
**dispute**
39:12,14
**distinction**
40:5
**distinguish**
84:15

**district**
1:1,1
**dmc**
1:5
**document**
4:6,12,14,22,24
6:1 10:21,24 11:3
11:4,7,10 12:1,20
13:6 30:13 48:6
66:17,22 67:6
92:17,21 93:13,19
93:21 96:23,25
97:8,9,12,14,16
97:18 107:5,12,13
109:4,7,9 117:8
121:4,6 126:8
131:11,15,17,23
141:16,22 144:2
146:4,20,20,24
147:13 148:13
149:20,24 152:11
152:16,20,22
153:8,23
**documents**
4:11 11:8 32:3
42:5 50:23 63:18
63:21,24 65:4,14
65:20 80:14 81:5
90:9,10 93:4,9
95:6 101:6,10,12
131:20
**doe**
1:14
**doing**
43:1 50:16 120:22
121:4 139:14
160:4,15,20 161:2
**dolan**
3:15 6:22
**donate**
98:20 99:2
**donated**
99:10,14,16,18
**donation**
99:4
**double**
157:11
**doubleblind**
53:8
**downloads**

**81:14**
**downstate**
36:11
**dr**
107:15
**draft**
67:5 75:21 86:14
142:5 143:6,9
**drafted**
67:7,9 86:18
90:18 142:9,10,14
142:19 157:1
**drafting**
142:6 143:1,3
**drafts**
90:14
**drinker**
2:14 3:3 6:25
**drive**
2:15 3:5
**duly**
8:11
**duties**
54:17

_____
**E**
_____
**early**
82:21
**earn**
102:5,6,8
**ears**
160:11
**easy**
125:15
**education**
23:4 51:25
**educator**
15:25
**eight**
4:15 54:8,17,19
105:3 126:9
131:13
**eightday**
27:22
**either**
7:9 15:24 16:10
22:3 37:4 43:10
44:12 47:2 59:7
65:23 98:2 102:21
110:15 118:3

120:1 122:9,11
127:9 129:19
131:2 151:5,12,17
158:7,12 159:14
**elaborate**
59:15
**element**
134:21
**elements**
112:1
**elephant**
126:23
**elephants**
130:16,16
**eligible**
72:2
**elks**
96:1
**email**
63:22,25 64:4
79:19,20,24 80:9
80:11,13 81:6,8
**emails**
81:15 113:15,16
113:17,22 114:1
**embarrassment**
75:10
**embrace**
71:21
**emiliano**
139:1
**emissary**
161:16
**emotion**
88:16
**employed**
23:18,20,23 98:7
101:22,25
**employee**
99:24 164:17
**encourage**
155:13
**encouraged**
155:10
**ended**
50:18 140:2
154:13
**enrolling**
14:13
**enrollment**

4:18 141:12,18
**entails**
120:13
**entered**
119:19
**entire**
7:7 85:15,16
**entirety**
7:20,24,25 116:13
**entitled**
4:12,14 40:3
66:17 96:25 107:5
107:13 121:1
131:12 133:24
146:21
**es**
57:3
**esp**
4:14 57:3 68:11
107:6,14 112:1
122:17,19 123:17
123:21,23 124:22
127:13 128:22
129:17 145:13
153:14 155:3
157:13
**esps**
154:3,6
**esq**
2:21,22 3:4,5,8,9
3:14,15,19
**essay**
122:7
**essays**
119:10
**essential**
122:17,19
**estimate**
25:8,21 27:17
**estimated**
12:6
**eth**
100:18
**ethic**
29:5
**ethical**
21:23,24 22:1
46:10 58:1 59:13
99:19,21,24 100:3
100:6,13,15

101:25 102:3
160:2 161:3,21
**ethicist**
125:2
**ethics**
24:17 28:14,18,21
28:23 37:7 80:4
161:2,10
**ethos**
125:2 153:6
**evaluate**
52:18,19 57:10
58:5,14 59:6 61:8
**evaluates**
4:14 107:6,14
**evaluation**
108:15
**event**
159:15,24 160:20
160:21 161:4,20
**events**
83:7 161:19
**evolved**
33:12 157:4
**exactly**
16:25 17:12 30:20
36:1 104:15 136:8
138:13 159:6
160:22
**exalted**
96:2
**examination**
8:13 82:12 164:8
**examine**
161:8
**examined**
94:23
**example**
24:18 25:3 89:24
117:13,18 119:4
119:23 123:7
124:1 127:11
133:21 135:11
158:18 159:16
**examples**
12:4 157:16,19
159:10
**excerpts**
116:6
**excited**

19:21
**excuse**
118:6 133:3 145:3
**excused**
81:23 119:20
162:15
**executed**
158:13
**executive**
1:3 4:16,18,20
13:1 15:19 18:13
26:7 57:3 123:16
124:21,23,24
126:10 131:14
141:11 143:20
146:15,21
**exercise**
132:7,18 147:15
**exhibit**
4:5 6:4 66:13
93:10 97:2 107:7
111:5 126:12
141:14 146:18
149:22 152:13
**exhibits**
4:25
**exist**
137:6
**existed**
63:20
**existence**
40:2 154:7,12,18
**exists**
85:16 152:23
**expect**
8:5
**experience**
143:16,17
**experienced**
129:19
**expert**
57:10 58:4 111:12
**explain**
35:8 104:7 120:22
122:22 157:14
**explanation**
124:10
**explore**
112:25 113:1
**exposed**

30:11
**express**
30:21
**expressed**
19:13 91:13
112:15,18
**expressing**
74:20
**extent**
91:20
**extreme**
96:2
**extremely**
161:11

**F**

**facebook**
80:6
**facets**
110:16
**facilitator**
30:12 32:6
**facility**
128:13
**fact**
32:6 42:17 74:2
124:14,15 129:7
130:1 132:24
154:16
**factchecking**
139:12
**factors**
46:7
**facts**
65:8 67:24 139:19
**factual**
64:13,16 110:21
**factually**
12:9
**fair**
101:18
**fairness**
109:3
**fall**
32:20 34:9,12
36:21
**fallacy**
111:14
**false**
67:24,25 119:6,24

122:10 131:3,3,8
**familiar**
  14:25 15:2 29:8
  29:24 30:2 40:23
  58:20 92:17 108:4
  108:6 128:24
  135:11 152:16,20
**family**
  40:19 68:19,19
  69:18,25 71:25
  72:5
**far**
  12:9,16 39:14
  50:13 52:7 101:13
  102:20
**father**
  37:6,15 69:25
  70:19 71:20,21,22
  72:4 74:17,22
  75:16
**favorable**
  29:17
**fax**
  1:25 140:6,8,12
**faxed**
  140:10,11,13,18
**faxing**
  140:2
**february**
  107:14
**feedback**
  158:24
**feel**
  26:17 117:8
  127:16 132:13,16
**feeling**
  130:23
**feels**
  45:23
**fees**
  50:6,9,10
**felt**
  19:19 21:7 22:19
  115:6 159:24
  161:11
**fest**
  160:16
**festival**
  159:17
**fifth**

18:8,10 20:2,8,19
21:2 22:8
**file**
  91:5,5 140:12,13
**filed**
  38:23 59:15 60:16
  80:13 136:20
**files**
  47:5 63:4,5,6,9
  64:2 95:6
**filing**
  60:11 62:18
**final**
  92:10
**finally**
  10:9
**find**
  19:24 31:5 34:18
  45:25 57:3 63:13
  64:7 88:22 111:20
**fine**
  8:1 78:9 121:7,13
  123:11 162:6
**fingers**
  160:12
**finish**
  9:23 10:6 121:4
**finished**
  121:1 133:10
  147:19
**finishing**
  12:1
**firm**
  65:1 93:13,16
**firms**
  64:21
**first**
  1:4 8:17 15:2
  23:22,23 29:1
  32:18 40:15 51:2
  51:4 64:23 65:7
  67:22 80:18,20,21
  90:24 91:5 97:19
  97:23,24 98:2,12
  101:3,22 104:23
  104:23 109:19
  110:23 111:6,17
  111:25 114:11
  121:3 128:17
  130:19 131:17

136:9 153:2,24
159:20 161:22
**firsthand**
  69:5
**fitzsimmons**
  1:23
**five**
  79:12 95:15 96:5
  96:7,8 159:25
  160:19
**fiveday**
  129:20
**flintlock**
  8:10
**florham**
  2:15 3:6 6:8
**florida**
  40:17
**flow**
  65:15
**focus**
  70:10 73:5
**follow**
  28:17 34:18 48:6
  101:16 106:12
  120:21
**following**
  1:17 39:19 87:10
  108:22 115:15
  163:5
**follows**
  8:11 82:10
**fong**
  95:24
**food**
  154:8
**forbes**
  42:2 135:21 136:1
  136:6 139:2
  140:18 141:5,7
**force**
  24:18
**foregoing**
  163:3 164:11
**forensic**
  4:14 107:5,13
**forget**
  12:18
**form**
  11:9 19:15,18

20:20 22:13,23
28:5,6 29:1 65:19
76:21 78:13
141:21 143:24,25
**formal**
  27:8
**format**
  127:13,24 128:21
**formerly**
  1:3
**forth**
  10:8 91:15 164:15
**fortify**
  76:3
**forum**
  24:9
**forums**
  113:14
**forward**
  37:9 38:4
**found**
  20:1 111:24 127:2
  134:7
**foundation**
  98:15,21,21 99:2
  99:4,7,11,14,17
  99:20,22,25 100:3
  100:6,15 101:25
  102:3
**foundations**
  100:14
**founded**
  117:4 160:6
**founder**
  4:7 6:2 23:2
  96:15 161:7
**four**
  95:15 126:24
  129:10 142:1,1
**fourth**
  18:10
**franco**
  1:8 3:12 4:19
  6:17 8:16 14:25
  15:3,16,22 17:9
  17:13,16 18:21
  19:2,12 20:3,5
  22:8,9,13 28:4,22
  30:15 31:12 36:22
  36:25 44:1 70:24

71:3 141:12,19
**francos**
  16:2
**fraud**
  145:15
**frequently**
  24:4 49:17
**friedman**
  3:18 6:18
**friend**
  54:9,12 72:12
  88:23 89:5 160:9
  160:10
**friendly**
  35:24
**friends**
  35:5,6,21 49:3
  51:25 83:5,10
  89:4 95:15 160:8
**full**
  55:4,6,10 77:15
  77:17,21 85:10
  86:16 119:9
  143:24
**function**
  18:17
**functional**
  96:3
**further**
  16:7,14 20:18
  58:13 164:11,16
**future**
  16:20 117:13

――――――――
**G**
――――――――
**gateway**
  2:23
**gears**
  135:20
**general**
  20:23 53:1 60:12
  83:25
**generally**
  132:1
**generated**
  101:6
**getting**
  52:20 80:11 117:6
**gift**
  50:13 51:5,7

**gifts**
  50:11 51:3,10
**girl**
  71:19
**gist**
  74:24
**give**
  12:4 28:11 44:15
  53:1 58:10 59:24
  60:8,9 64:18
  79:12 89:24 92:24
  104:1,12 112:19
  119:9 121:17
  132:16 138:3
  157:16,18
**given**
  17:21 50:11 51:3
  51:10 58:16 65:13
  65:17,21,23,25
  138:5
**gives**
  112:23 124:17
**giving**
  129:22
**go**
  12:18 19:16,22
  22:22 24:16 34:14
  38:4 53:10,13
  55:8 60:6 78:15
  95:3 98:15,18
  110:10 111:13
  120:21 125:16
  130:18 132:17
  144:7 161:8
**goes**
  39:24 91:18
**going**
  8:19 9:8,15,18
  31:13,22 37:9
  52:6 54:21 55:13
  69:24 70:19 90:22
  106:10 109:8
  120:4 126:15
  133:3,6 148:11
  155:18 157:24
  160:5,19 162:12
**good**
  8:14 29:9 57:12
  57:12 60:4 89:20
  95:13 115:6

  116:10,15 121:21
  121:22 158:8,20
  159:16 161:24
**gotten**
  59:11
**grand**
  96:1
**grants**
  102:18
**great**
  128:13,13
**greater**
  112:23
**greatly**
  89:14
**gross**
  128:2
**ground**
  9:16
**group**
  95:15 114:1
  123:15,18 124:21
  124:24 125:1
  133:19,20 134:20
  135:14,19
**groups**
  134:24
**guard**
  16:17
**guess**
  21:23 29:17 71:12
  86:16 90:20 95:4
  99:4
**guessing**
  19:6 91:8
**guidelines**
  24:20,21 157:4
**guilty**
  130:23
**guinness**
  41:18
**guy**
  40:20 42:15
**guyana**
  135:15
**guys**
  79:6 150:10 151:1

  ────────────
        **H**
  ────────────
**hal**

  121:10
**half**
  19:7 44:8 102:24
**halfbrother**
  15:15 34:20 44:9
**halfway**
  12:11
**handle**
  24:20 28:16
  105:19
**handled**
  30:23
**happen**
  59:9 143:7
**happened**
  14:1 34:19 58:25
  59:9,12 115:1,4
**happy**
  10:10 22:20 162:5
**hard**
  117:11
**harold**
  3:8 6:13 8:15
**head**
  113:12
**headed**
  4:6,22,24 6:1
  149:20 152:11
  154:23
**headquarters**
  3:10 18:16
**hear**
  20:16 58:13 73:16
  73:19,24 115:13
  117:14,14,15,15
  125:10 138:1
**heard**
  15:6 20:15 31:13
  31:14 32:8 34:13
  44:4,16 46:25
  47:5 56:23 73:8
  73:10,12 76:6
  78:22,25 82:14
  94:19
**hearing**
  56:25
**hears**
  117:12
**held**
  2:13 7:19 51:16

  79:15 109:13
  118:15 119:17
  146:7 160:10,21
  160:23
**hell**
  121:4
**help**
  21:6 23:5 112:21
  117:13
**helpful**
  92:22 111:3
  145:11
**helps**
  119:7,8
**hereinbefore**
  164:14
**high**
  153:20 156:13
**higher**
  153:18
**highest**
  96:9 157:7,9,15
**highly**
  4:7 6:3 65:10
**hint**
  128:17
**hired**
  40:13 67:23 68:2
  68:3,8,14,16,25
  69:7,20,21,25
  70:5,24 71:8
  72:14 73:6,8,13
  73:19,20 74:22
  75:24 76:4 78:19
  102:2
**hires**
  69:23
**hiring**
  70:24 71:4
**historical**
  134:22
**hochman**
  55:17 61:21,24
  64:6,10,12 107:15
  148:18
**hold**
  23:7,11 54:13
  66:23 139:10
**home**
  13:22 14:7,17,23

  62:6,7
**homework**
  162:7
**honor**
  80:4
**honorably**
  35:12
**hope**
  60:6
**hopes**
  134:19
**hour**
  19:7 123:15
  124:20
**hours**
  25:6,15 26:10,15
  27:11,12 129:13
  129:21
**house**
  63:5,15
**hows**
  52:6
**human**
  19:25 60:13 84:2
  98:15
**hurt**
  60:1
**hyland**
  3:8 6:14,15

  ────────────
        **I**
  ────────────
**idea**
  61:16 95:13
**identification**
  4:5 6:5 66:14
  93:11 97:2 107:7
  126:13 141:14
  146:18 149:22
  152:14
**identified**
  117:9
**identify**
  6:12 111:18 122:2
  123:8,11
**identifying**
  147:16
**ideological**
  161:7
**ignore**
  71:19

**iii**
133:24
**image**
34:15
**imagine**
34:11,12 50:3
57:20 135:13
**immediately**
44:12
**implementations**
161:3
**implemented**
158:15,17 159:5
**implication**
114:9,10
**implied**
136:8,12
**implies**
132:18
**imply**
122:23,23
**implying**
136:17
**important**
9:23 10:7 16:17
54:5 84:15 108:7
108:11 110:20,25
111:9 114:22
120:15,17 144:21
156:8 159:18
160:17
**impression**
69:24
**inaccuracy**
129:6
**inaccurate**
11:25 139:25
**inappropriately**
110:11
**include**
132:11
**included**
26:15 129:1,5
**inconsistencies**
64:13,14,16,17
**incorporate**
88:2 89:16
**incorporated**
6:20 89:21 90:15
152:25

**increased**
25:19
**independent**
43:22 57:10
**indicate**
32:4 59:4 69:19
70:4,23 74:16,21
75:1,3,5,8,13
**indicated**
6:7 29:12 78:18
103:7 107:16
160:18
**indicates**
127:10
**indicating**
127:2 129:14
**indirectly**
25:2
**individual**
47:25 55:1 123:20
**individually**
38:18
**infeasible**
159:8
**influence**
135:2
**information**
5:2 56:23 59:24
59:25 60:8,9
92:25 94:19
108:16,24 113:2,7
113:13,22 117:16
119:13 140:6
**initial**
143:6 157:3
**initially**
33:8 38:6 62:9
116:7 156:6
**initiated**
8:17
**input**
155:21
**inquire**
92:21
**inquiring**
91:22
**inquiry**
4:7 6:2 83:25
84:3,5,11,14,16
84:23 85:4,10,13

85:15,19,22 86:2
86:9,23,24 87:1
87:14,15,17,25
88:4,9 89:13,17
90:11,15,17,25
91:6 92:11 93:25
94:22 95:1 96:17
97:19,23 98:1,4
98:13 100:18
103:6,10
**insight**
129:22
**inspired**
71:24
**instances**
158:10
**instigated**
136:17,18
**institute**
1:7 3:17 6:23
**institution**
22:4
**instructed**
126:17
**intend**
7:23 8:6
**intended**
44:14
**intensive**
15:5,7,9 16:7,11
17:17,19,24 18:9
20:3,9 22:8 25:3
27:10,11,13,18
29:16,19 31:14
32:19,25 33:3
34:14 35:4 41:19
42:1,3,5 84:8
112:1 123:21,22
124:25 129:18
130:10,22 152:6
153:6
**intensives**
24:2 26:5 32:22
84:4,6,10 85:1,5
85:10,12 106:12
124:5
**intent**
29:5 59:24 75:9
77:25 78:2
**interaction**

60:13
**interchangeable**
124:3
**interest**
29:18 36:1,2
**interested**
52:15 164:19
**interesting**
20:1 21:7 57:25
**interests**
16:19,20 52:1
**interfor**
1:14 2:2 3:21
6:19
**interlocked**
128:4,6
**interpret**
48:1
**interrelate**
128:11
**interrupt**
34:5
**intervention**
58:8
**introduced**
27:18 66:5
**introduction**
116:8 127:22
**investigate**
134:15
**investigation**
56:16
**invited**
14:2,9
**involve**
17:1 157:22,23
**involved**
17:6 18:24 19:1
26:23 27:1 28:18
31:8 52:14 77:1
84:22 101:14
105:5 116:18,22
116:24 153:13
158:1,3
**involvement**
25:15 74:17 77:6
143:3 161:5,6
**involving**
20:4 28:4
**isolation**

130:5
**issue**
20:4,9 24:12 28:4
28:7 37:12 39:16
39:22 79:3 91:14
122:22 124:9
**issued**
92:9
**issues**
24:5,10,14 25:12
25:23 26:2,4 52:8
58:1 59:13
**ivy**
104:4

**J**

**jane**
1:14
**jay**
4:15 126:9 131:12
**jersey**
1:1,24 2:13,15,24
3:6,11,16 6:8
14:23 164:6
**jeske**
156:21
**joe**
100:7
**john**
1:15 55:17 107:15
148:18
**join**
8:2
**joined**
10:13
**jonestown**
135:15
**just**
9:8,15 10:12
12:23 19:6 35:12
42:25 47:9 49:5
65:13 67:3 101:17
105:9 108:20
110:10 111:17
114:8 118:12
126:15,16 133:11
135:3,20 137:21
140:7 144:25
150:1 158:14
162:1

juval
  1:14 2:2 3:21
  6:20

**K**
kahler
  29:21,24
kaplan
  3:18 6:19
karl
  3:24
karner
  18:12 34:24 43:10
kassin
  14:17 42:21,24
  43:15
kassins
  14:23
keeffe
  1:14 2:6,25 7:4
  45:1 63:17 100:11
  137:11
keenly
  52:15
keep
  7:23 8:6 63:3
  107:1 108:7 133:6
  133:20
keeps
  81:12 132:22
keith
  1:13,19 2:5 3:7
  4:3,6,9 6:1,9 7:1,6
  40:4 66:11 163:2
kept
  108:17 109:1
kevin
  46:21,24 47:4,6
kidnapped
  160:9,9
kind
  160:21
knew
  63:19
knifepoint
  160:10
know
  10:2,10 11:12
  12:20,24 14:9,11
  14:18,20 16:21,23

17:4,8,11,12
19:25 21:12 24:7
25:1,2,8 26:9 28:3
29:10,13,15 30:4
30:9,11,22 31:2
31:15,16,18 32:21
32:24 33:4,12,13
33:17 34:23,25
35:1 36:15 37:3
38:2 39:14 40:3
42:13 45:11 46:3
46:4,13,18 49:15
49:18 50:13 51:1
51:3,5,6,7,10,12
52:1,7 53:12
54:19 56:13,22
57:24 58:15,22,24
58:25 59:8,12,12
60:2 61:1 63:7
64:24 65:5,8,20
67:17,20 69:4,14
70:3,17 71:5
72:18,23 77:5,20
77:20 78:3 79:4
80:9 83:9 86:10
88:10 90:7 91:17
91:24 92:4,23
95:11 96:16 99:12
99:13,15 100:5,7
100:10,11,12,17
101:9,11,13,14
102:1,4,19,20,22
103:25 105:3
108:13,13 110:12
113:11 114:2
115:1,4,12,19
117:5 120:15
122:14 123:2
124:24 127:5
134:23 135:3,3,18
136:6,11 137:4,12
137:12,14 138:7,9
138:13,14,15,20
138:23,24 142:15
142:18 143:11,13
143:23 145:9
147:13 152:22
156:1,4,6,12,16
156:18 157:5
158:24 159:6

knowing
  110:15
knowledge
  13:2 15:20 69:5
  71:2 148:22
  157:12
known
  1:3 35:18
knows
  88:23 108:14
kofman
  3:8 4:3 6:13,13
  7:14 8:13,15
  10:12,19,23 11:2
  11:6 39:9,10 40:1
  40:8,10 47:9,16
  48:5,10,12 51:17
  55:8,14 66:9,15
  79:10,12,17 81:19
  81:21 82:5,12
  87:23 91:23 92:19
  93:3,6,12,18
  96:20,24 97:7,10
  101:9,15 106:9,16
  106:17 107:3,10
  107:11 109:5,6
  113:20,24 115:21
  118:8,12,20 119:1
  121:12,15,21
  122:1 125:12
  126:1,6,14 127:20
  133:6,9,13 140:17
  141:9,15,20 144:9
  144:13,16 146:6,8
  146:14,19,23
  147:23 148:3,8,12
  149:18,23 150:9
  150:11 152:9,15
  161:24 162:2,5,8
  162:10
kristin
  1:14 2:6,25 7:4
  44:25 45:1 47:1
  56:12,13 63:17
  65:24 73:2 80:23
  137:11
kunterre
  80:1

**L**

label
  88:11,13 133:18
lama
  159:24,25 160:18
  161:8,14,15,16
lamas
  161:6
landy
  3:19 6:18,18 7:18
  150:7
landys
  8:2
lane
  8:10
language
  76:2
large
  123:15,18 124:21
  124:23 125:1
  161:20
late
  135:15
lauren
  156:22
lawsuit
  8:16 37:10,14
  38:4,5,8,21,25
  39:12,14 50:1
  57:25 60:11,15
  62:19 63:18
  136:20
lay
  91:1 106:24
  143:16,17
learn
  30:22 31:12 32:13
  40:15 56:5 88:24
  130:9
learned
  40:12 61:20
leave
  133:14 145:13
leaving
  145:15
led
  136:6
left
  32:13 137:15
lefthand
  12:24

legal
  32:9 45:22,25
  47:21,22,23 50:6
  50:9,10 65:9
  76:22 143:16,17
  157:22,23 158:4
legs
  126:24 129:9,10
leonard
  3:4 6:25 7:5 8:1
  10:12,18 48:18
leslie
  14:17
lessons
  26:19
letter
  7:25 48:7 101:16
  106:13 110:18
  114:8,12 116:8
  117:8
letting
  110:8
level
  128:2 153:6
  156:14
license
  164:23
life
  71:16 125:15
liftons
  4:15 126:9 131:13
likewise
  128:7
limitations
  81:16
line
  163:6
lines
  12:7
linguistic
  82:14
list
  59:10
lists
  30:9
literally
  52:6
litigation
  7:24 37:2,5,5,6
  59:15 63:10 80:12

80:14
**little**
40:21 49:1 71:19
77:23 90:22 96:2
119:5,6,7 135:20
145:10 154:13
**live**
102:12,23
**lived**
36:11
**living**
102:5
**livingston**
1:24 3:15
**llp**
2:14,21 3:3,8,18
6:14,16,19 93:16
**loan**
50:23 51:8
**loaned**
50:12,14,20
**locate**
63:24 80:14,24
**located**
81:5
**logic**
65:8
**logical**
64:12,17 65:15
110:21 111:13,15
119:12
**long**
19:4,4,15 20:20
22:13,18,23 28:5
29:1 34:9 35:18
54:12 82:21,23
105:4 123:24
129:13 147:24
157:11
**longer**
116:23 154:7
**look**
14:4 46:1 63:11
63:14,17 64:2,7
66:16,19 84:23
86:17 121:16
132:4 138:4
144:24,25 148:13
155:18
**looked**

**looking**
57:2 63:15,15
67:8,12 100:17
132:1 134:15
21:6 27:15 53:13
59:25 60:1 93:21
119:23 120:9
127:21 150:3
153:23 155:20
156:23
**looks**
11:11 60:3,4
66:23
**loops**
158:24
**lost**
47:2,3
**lot**
26:17 27:7 86:12
95:9,19 104:4
110:21 116:22
122:25 154:19
160:14
**lowenstein**
3:13 6:22
**luibrand**
46:21,24 47:4,6,6
**lunch**
70:19 79:7 129:21
**luncheon**
81:24

**M**

**machine**
137:13
**magazine**
135:21 136:2
**magic**
60:3
**mail**
81:12
**main**
70:10
**maintained**
7:8 79:20,22
**maintaining**
8:3
**major**
50:4
**making**

31:4 33:7,14
122:9 145:14
**malintended**
59:16,17,20,22
60:7,9,21,25
61:15,18
**malintender**
59:23
**mammal**
126:25
**man**
74:14,14
**mandatory**
151:9
**manual**
122:9,21 123:14
124:17,19
**march**
1:20 2:16 6:6
163:4
**mark**
66:10 93:6 96:20
111:5 113:20
126:8 129:13
141:9 148:4
149:18 152:9
**marked**
6:4 10:21 54:23
66:13,17 93:10
97:1,13 106:10
107:4,6,12 126:12
131:12 141:13
146:9,10,17
148:11,14 149:21
149:24 152:13,17
152:21
**market**
50:19,19
**marriage**
22:5
**martial**
95:23
**martin**
1:8 3:17 6:23
55:17 61:21,24
64:6,10,11 147:9
**mass**
135:14
**master**
95:23,24,24

**mat**
83:19
**material**
19:22 26:23 27:6
30:4
**materials**
30:10 43:18 44:5
44:7,10,15 82:25
83:17,19 84:9,13
86:6 87:24 89:21
90:14,18 108:5
110:5 138:4
145:14,14 154:20
**mathematical**
84:1
**matter**
2:11 6:9 45:20
50:6 64:3
**matters**
158:3
**maximus**
55:5,9
**mcgann**
2:11 164:4,22
**mcguire**
2:21,21 7:2,2,3,17
28:6,12 65:19
76:21 101:13,18
119:19
**mean**
12:17 26:11 27:14
52:25 53:20 54:10
60:19 72:18 76:23
85:21 86:12 87:4
87:20 103:13
123:24 124:15
142:1 151:2
157:10
**meaning**
11:10 133:19
135:3,4
**meanings**
135:2
**means**
30:10 76:10
151:22
**meant**
73:17,17 74:4
**measure**
12:17

**meet**
13:9,13 19:17
20:13 40:17 41:6
41:8 43:5 48:13
48:25 66:4 95:3
136:1
**meeting**
20:8 41:16 42:18
49:5 56:19 58:3
83:4 136:15,19,24
139:7
**meetings**
18:18 41:16 48:23
83:2
**member**
54:1 89:9
**members**
83:10
**membership**
154:2,9
**mention**
34:1 37:2 70:14
**mentioned**
16:13,25 21:4
24:12 29:10 33:24
41:15 44:24 45:1
49:3 50:3 51:20
59:13 61:5 79:18
90:24
**mentor**
30:22
**met**
13:7,17 22:21
43:8 57:14,15
72:9 95:5 136:21
141:3
**method**
83:25 84:1,3,6,7
84:11,14,16,19,20
84:23 85:11,15,16
85:19,22 86:2,9
86:15,18,22,23,24
87:1,13,14,15,17
87:25 88:4,9,10
89:13,17,18 90:11
90:15,17,25 91:6
92:11 93:25 94:22
96:17 97:19,23
98:2,5,13 99:5,6
99:11,15,16

100:14,19 103:7
103:10
**methodologies**
86:25 87:16
**methods**
130:10,22
**mexico**
31:13,22,25 32:16
33:20 160:6,6,13
160:15
**mf**
1:5
**mich**
37:21
**michael**
15:13,15,18,21
16:1,3 33:23 34:7
34:15,19,21 35:1
35:5,8,11,18,24
36:4,6,8,20 37:13
37:24,25 40:13,16
40:18 41:4,6,14
41:15 42:9,12,14
42:18 43:25 44:24
45:4,8 46:19 49:2
49:8,12,17 50:5
50:11,25 51:18
52:5 56:18,18
57:9 58:2,7,11,16
58:25 59:3,10
68:17,18,20,23
69:1,3,6,17,19
70:4 71:7,11 72:7
72:15,16,19 73:5
73:6,10,12,17,19
73:22,24,25 74:4
74:5,13,16,21
76:1,12 78:11,12
78:18,23,25
**michaels**
38:2 69:23
**mid80s**
82:21
**midway**
133:17
**million**
12:6
**mind**
19:25 34:16 55:6
70:17 89:8 110:6

111:16 121:1
144:8
**mine**
54:12 63:7
**minor**
16:6
**minute**
7:17 47:10
**minutes**
79:12
**mischaracterizat...**
123:19
**mislead**
130:22
**missing**
119:12
**mission**
114:19,24 115:5
**mod**
116:16
**module**
90:2,6 104:11,16
104:25 105:9
112:8,9,11 116:8
116:12 123:24
128:3,5 129:8
133:23 149:5,9,25
150:1 151:25
152:2,7,25
**modules**
26:13 27:25
103:11,15,19,24
104:8,9,17 105:6
105:11 106:3,5,8
106:11,19 115:2
115:22,25 116:6
116:16 123:25
124:2 128:10
138:8 149:5 153:2
**moe**
68:4,5,14,16
73:14,17,17 74:3
74:13 76:8 77:4
77:22
**moment**
10:11 126:16
**money**
50:12,14 90:2,6
98:1,4 99:2,10,14
99:18 102:6,10,11

103:2 155:4
**month**
24:8 25:6,15
26:11 49:18 55:25
**monthly**
25:25 27:6
**months**
81:18 95:5 104:23
104:24
**moody**
1:14 2:2
**morning**
8:14 162:4
**morris**
1:7 3:12 6:16
8:15 13:7,9,22
60:24 68:8 71:8
72:14 73:6,8,20
75:3,5,9,13 76:18
76:25 77:8,13,25
78:1,3,19,23
**morristown**
3:11
**mother**
70:7,8,18,20,22
72:10
**motivated**
149:12,13
**mount**
1:23
**move**
78:9 90:22 147:21
**moved**
36:7,12
**movement**
160:6
**moving**
36:18
**muddles**
123:21
**mulberry**
2:23
**multi**
110:16
**multiple**
109:15

---

## N

**name**
8:14 53:12,16

54:21,25 55:6,10
57:4 80:7 89:5,7
96:11 99:7,17,20
100:21 101:3
117:22 139:15
149:9 161:13
**named**
46:21 59:5
**names**
58:14,15,17,18,20
58:23 59:1,10
104:1 116:14,21
156:19
**nancy**
1:13 2:6,25 3:23
7:3 13:22 14:3,6
15:11 18:22 19:2
20:17 25:1 31:3
31:19 48:23 49:4
51:11 55:6,9
56:13 61:17 65:23
68:12 73:2 86:5
104:3,11 137:8
156:12,13
**natalie**
140:5 155:2
**nature**
16:15,23 52:21
124:6 127:25
128:15 161:5
**near**
160:25
**necess**
120:1
**necessarily**
127:3
**need**
10:9 110:1 111:13
117:6 131:3
148:18 149:4
160:1
**needed**
22:19 79:2
**negative**
88:16 134:16
135:9 141:6,8
**neither**
135:6 164:16
**neuro**
82:14

**neurolinguistic**
82:18 88:3
**nevarez**
104:4
**never**
113:11 154:20
**new**
1:1,24 2:13,15,24
3:6,11,16,20,20
6:8 8:10 14:23
18:12 27:19 36:9
43:10 164:6
**newark**
2:24
**newer**
113:19
**nice**
42:15
**nonconflicting**
29:17
**nondisclosure**
19:14 20:11
**nonparticipants**
130:9,21
**normal**
102:6 115:12,19
**normally**
24:17 104:10
105:14
**notary**
163:24
**note**
120:25 145:11
**notes**
2:10 32:5,6 62:11
62:13,15,21 64:5
64:9,18 75:18
90:13,19 105:12
105:15,17 106:2,4
106:7,7,11
**notice**
144:21
**noticed**
133:16
**number**
12:2,8 21:12
47:15 54:20 58:16
64:12,13 69:11
82:4 83:5 96:10
96:14 100:25

119:3 128:23
157:18 159:9
160:7
**numbered**
153:8
**numbers**
93:14
**numerous**
72:18 157:8
**nxivm**
1:3 2:5,25 6:9 7:3
8:17 11:15 12:21
18:16 19:15 23:1
23:14,18,20 24:6
24:11,15,18 25:7
26:13,19 28:17,25
29:8 30:5,16,19
30:24 32:4,14
33:22 37:4 39:17
39:23 40:4,20
41:10 46:21 49:20
50:1,16,21 51:1,4
53:19,20,22 54:1
54:4,7,9,11,11,13
57:10 58:5,14,22
59:4,10 61:12
65:9 68:11,11,18
71:15 74:6,18,23
75:6,14 76:9,10
76:20 77:2,5 80:9
80:11 81:10 84:4
84:9 85:1,4,9
89:10,22 94:10
96:16,16 98:2
101:22 103:9,12
103:16 104:5,23
106:12,19 107:23
108:1,5,7,12,17
108:17,18,19,25
108:25 109:1,2,23
111:10 112:15,19
113:11 114:22,23
116:18,23,25
122:10,11 132:22
132:22,23 135:22
136:7,20 138:3,10
138:11,23 141:1,1
141:6,8 142:12
143:12,14 145:19
148:23,23 149:15

157:17 158:11
159:18 160:19
**nxivmrelated**
25:23 26:2
**nxivms**
50:6 62:5 113:4
117:3
**nycap**
80:1 81:10,11,14

---

**O**

**oath**
8:11 82:9
**oaths**
164:7
**object**
7:18 28:6 65:19
76:21 78:13
**objection**
7:14 10:5,6 28:12
**objections**
8:7
**observe**
138:10,12
**obstruction**
72:6
**occasions**
8:22 27:24 62:17
66:4 105:15 136:4
140:23
**occurred**
136:19
**occurrence**
160:13
**offer**
27:25 77:3 161:9
**office**
4:11 91:10,12,21
92:5,9,18 93:9,24
94:13,20,21 95:7
**officer**
23:14,16 99:21
100:5
**offices**
2:14 62:5 94:5
**oh**
22:2 37:23 87:8
97:10 99:19 111:8
113:14 118:5
142:1 144:14

150:9 152:19
**ohara**
100:7
**okay**
7:5 10:20 11:10
11:18 12:11,23
13:3,5 14:6 15:8
15:14 16:9 17:1
17:15,23 18:7,16
18:20,25 20:2,18
22:2,7 23:18 25:6
25:18 26:6,22
27:23 28:14 29:10
31:24 32:3,21,24
35:6,8,18,21
38:13 40:7 46:6
46:15 47:17 48:2
48:5,10 49:6,23
50:20 51:3,10
52:7 54:21 55:15
56:4 58:11 60:23
61:3,20 62:8 64:9
66:9,20 67:9,12
67:15,18,21 68:13
70:1,4,23 71:6
74:5 75:16 79:14
81:1 82:23 83:10
83:13,24 84:25
87:3,19 88:17
89:5,9 90:22 91:2
92:15 93:5,24
94:17 97:4,5
98:20 99:10
102:18 106:9
109:12,22 110:23
111:8,11,17 114:4
114:10 117:6
118:5,8,14 119:2
119:15 121:9,10
121:13,16 123:4
123:14 124:17
125:8,20,23 126:7
126:15 129:12
130:6 132:4,7,20
133:1,12 135:16
135:20 136:23
137:3,23 138:3,7
138:15 139:5
141:5 142:25
144:3,6,15 147:4

147:10 148:3,9
149:2,9,11 150:3
150:21 152:9
153:2,7 154:15
155:16,18 156:9
156:23 157:6,16
157:20 158:5
**older**
113:18
**olsen**
38:17,24 39:7
47:19,20 48:3,8
92:3,5 93:16 94:4
137:8 142:13,25
**once**
24:8 36:5 49:18
148:11 153:15
**onepage**
141:16
**ones**
27:21 63:20
113:19,19
**onesided**
143:25
**ongoing**
91:15,25 100:23
**op**
150:18
**open**
74:2
**operated**
155:7
**operating**
137:13
**operation**
26:4
**operations**
26:7
**opinion**
20:23 28:15 29:9
37:9 39:2 52:17
61:14 75:12 76:7
77:3 139:9
**opinions**
58:10,10 91:13
**opportunity**
109:19
**option**
45:23 61:13 121:3
**optional**

150:19,22 151:6,7
151:18,20 154:8
**oral**
105:16
**orally**
105:13,14
**order**
7:12 32:7 103:18
124:4 128:1
**ordering**
85:6,7 104:12,14
**organization**
23:6,7,12 117:4
158:23
**organizations**
128:24
**original**
128:22
**originally**
19:13 65:6 71:15
73:8 103:3 137:15
157:1
**origins**
125:1
**outlining**
120:5
**outside**
98:18
**overnight**
147:21,24
**overridden**
157:8,17
**overseeing**
31:4
**overview**
124:4

---

**P**

**p000000689**
4:13 97:1
**p000000209**
4:11 93:9
**p000003648**
4:17 126:11
**p000003674**
4:21 146:16
**p000004105**
4:19 141:13
**p000004995**
6:3 11:3

**p0000049954996**
4:8
**p000004996**
11:3
**p209**
93:14
**p231**
93:15
**p3659**
133:17
**p4105**
141:18
**p689**
97:14
**page**
1:17 5:3,3,4,4,5
66:24,25 67:22
111:25 130:19
133:17 153:7,23
163:6
**pages**
4:9 66:12
**pai**
95:24
**paid**
50:5 70:1 155:4
**pam**
156:22
**panel**
161:23
**panels**
160:3 161:2
**paper**
63:1,2 86:19,21
87:13
**papers**
43:20 63:12
140:12
**paragraph**
67:21 111:25
127:21,23 129:14
130:7,19 148:17
153:8,24,24
155:20 157:6
**parasite**
133:24
**pardon**
45:12
**parentheses**
112:4

**parenthetical**
113:3
**parenting**
125:3
**parents**
72:13
**park**
2:15 3:6 6:8 8:10
155:8
**part**
18:18 24:2 26:17
54:9 84:10,13,19
88:10 94:9 113:20
117:15 121:2
125:6,19 128:1
131:4 134:18
147:25 160:22
**partial**
132:24 133:1
**participants**
129:18 130:8,20
130:22
**participate**
143:1
**participated**
32:22 142:6
**participating**
17:20
**particular**
27:21 132:2
**particularly**
107:24
**parties**
61:6 105:23
164:18
**parts**
84:13 109:15
116:16 117:17,18
118:2,3 122:15
132:11 134:11
**party**
14:2,9 39:13,13
**pass**
150:7
**passing**
43:7,8
**patent**
4:10 50:16 86:22
87:4,8,13,20
90:24,25 91:3,7

91:10,12,14,21
92:2,4,9,10,18
93:8,24 94:5,9,12
94:20,20,25 95:7
96:17
**patentable**
94:1,14
**patented**
94:18
**patenting**
50:18
**patents**
94:11 95:4
**pattern**
88:12,13
**patterns**
89:18
**paul**
1:8 3:17 6:23
55:17 64:6 147:9
**pay**
22:1 98:12
**paying**
21:11,16,17,19
**payment**
21:21,25 50:9
**pays**
69:23
**pc**
3:13
**peace**
160:6 161:16
**pejorative**
135:6
**pen**
86:18,21 87:12
121:8
**pending**
7:9 91:4 96:18
109:14
**people**
12:8 14:13 17:5
18:23,25 21:6,17
24:23 25:1 26:19
28:25 30:21,22,25
41:8 51:23 56:9
56:10 58:9,14
59:5 61:5,14,22
62:25 63:6 72:22
95:15,24 96:5,5

100:23 103:25
104:1 110:15
112:22,24,25
113:9,16,25 115:6
116:9,14,21,22
128:16 133:20
134:20 135:2,2
137:9 138:14
154:8 158:7,22
159:9,18 160:8,15
**peoples**
135:12
**percent**
98:14,20,23 99:3
99:15
**percentage**
155:3
**perception**
78:19
**perfectly**
19:20
**perform**
80:16
**performs**
16:21
**period**
7:21 24:16,25
25:18 49:16 57:4
69:10 72:23
104:22
**periods**
154:11
**perretti**
3:8 6:14,15
**persistence**
4:22 149:10,20,25
151:25
**persistency**
149:12 152:1,2,2
152:4,7
**person**
23:2 30:24 31:6
32:1 45:23 52:14
53:12,13,19 54:7
54:10,13 59:20,22
65:8,9 69:22,23
88:21,25 89:7
91:1 105:11
106:24 122:8,20
129:7 134:13,14

138:24 143:14,20
150:25 151:5,13
151:17 154:23
159:7
**personal**
112:23 158:22
161:15
**personally**
50:14 101:20
**persons**
53:16 89:6
**perspective**
106:24
**pertains**
76:20
**peter**
3:14 6:21
**petry**
3:24
**ph**
1:8
**philosophical**
23:2 85:7
**philosophically**
83:15 128:12
**philosophy**
23:5 24:5 89:16
89:19,20 157:13
157:14
**phone**
1:24 45:22 139:12
148:19 151:5,12
151:17 153:8
158:21 159:1
**phrase**
74:15
**phrasing**
68:17
**piano**
26:19 102:9
**pick**
147:19
**piece**
128:3,12
**pieces**
122:24,25 123:1
124:3 128:4
**piles**
63:1,16
**place**

17:24 18:11 19:5
34:7,10,22 37:25
39:4 42:23 105:22
161:19 164:14
**placement**
77:9
**places**
72:19
**plaintiffs**
1:5 2:24
**plan**
161:3
**plane**
31:17
**played**
120:18
**plaza**
3:10
**pleasant**
1:23
**please**
6:11 7:15 10:2,10
66:10,19 76:23
78:6 93:6 96:20
107:4 108:21
109:17 115:14
123:8 144:13
146:14 149:18
152:9 158:4
**point**
10:9 13:23 14:16
15:5 20:12 24:7
33:23,23 37:12
38:22 40:7,12,18
43:21 46:25 47:12
55:16 56:15 61:20
62:9 64:20 81:24
114:19,23 115:9
116:9,15 119:18
126:2 132:2 143:6
156:20 160:13
161:22
**points**
116:11 142:1
**portion**
22:22 50:6 108:4
**portions**
7:10,22 8:5
**poses**
57:25

**position**
7:6 8:3 72:5 93:2
93:25
**positive**
14:14 17:22 18:23
21:5 51:2 62:2
135:6,9 141:6
161:18
**possession**
106:1
**possibility**
57:9
**possible**
45:13 154:18
**possibly**
19:2 21:9 117:25
**posted**
55:16 56:1,5,11
56:15 77:2 131:21
147:1,7
**potential**
98:15 143:7,9
**potentially**
42:2 110:14
**power**
74:3 76:9
**powerful**
74:14
**practice**
7:12 15:24 16:2,6
16:10,14 21:3,5
29:12 133:24
149:6 151:14,19
151:22
**prefect**
95:18
**prep**
48:25
**preparations**
160:1
**prepare**
48:14
**prepared**
1:22 11:12,15
79:1
**present**
3:22 18:20,22
37:24 39:3 43:2
48:20,23 72:20,23
72:24,25 73:2,3,3

98:8
**presented**
67:16 113:2 152:3
**presently**
26:25 53:25 54:3
96:16
**press**
67:25
**pretensions**
112:2
**pretty**
56:13 74:10
120:10 154:16
**previous**
56:19
**previously**
10:15 82:8 107:17
109:24
**primarily**
89:25 114:15
**principles**
1:4 8:18 23:22,23
51:2,4 53:8 97:20
97:23,24 98:2,12
98:17 101:23
**print**
62:8
**printed**
62:10
**prior**
20:8 48:14 69:12
69:14,15 83:11,12
139:7 142:20
164:8
**priorities**
159:19
**private**
22:3
**privilege**
39:25 40:3 91:19
92:14 158:1,2
**privileged**
39:8
**probably**
12:10 27:11 32:1
34:18 35:17,20
57:20 65:13 70:15
72:16 139:4
140:16 156:22
157:18

**problem**
7:13 111:8
**problems**
23:5 57:25 59:14
102:10 110:21,22
**problemsolving**
12:5
**procedure**
28:17,17 30:23
33:6,14 84:21
105:8 156:4
**procedures**
53:9 59:18,19
84:22
**proceeding**
32:10
**proceedings**
2:10
**process**
95:11 104:7 105:6
105:18 156:8
**proctor**
54:16,17 95:18
153:22
**produced**
11:4 93:13 97:14
101:10,12 141:17
**producer**
133:24
**products**
53:4,6 86:23
87:14
**program**
59:6 123:19 154:8
**programming**
82:15,18 88:3
**programs**
1:3 4:16,18,21
13:1 15:19 18:14
26:8,13 57:3
123:17 124:22,23
126:11 131:14
141:11 143:21
146:16,22 148:23
153:4,5
**promise**
130:8,20,23
**promotion**
32:9 155:20,25
156:5,10 157:1

158:8
**promotions**
156:14
**pronouncements**
91:21
**property**
98:19
**proskauer**
65:2,3,11,16,21
65:25 66:2,4,5
**proskauers**
65:22 66:3
**prove**
131:7
**proven**
131:3
**provide**
47:23
**provided**
30:5,8 105:12,15
**provides**
84:9 89:22
**psychiatrist**
4:14 107:6,14
**public**
91:21,24 113:14
160:4 161:20
163:24
**publication**
113:7 139:7
**publish**
57:1 117:23
**published**
135:21 136:2
**purchase**
103:2
**purchased**
102:15
**purchases**
102:21
**purchasing**
102:20
**purports**
141:18
**pursuant**
164:7
**pushed**
71:24
**put**
27:10,13 86:21

87:12 96:5,5
101:15 103:2
114:23 115:3,22
115:25 116:4,7,15
116:25 120:11
128:12 140:12
146:12 160:2
**puts**
77:14,16 122:10
123:1
**putting**
103:6
**puzzle**
124:3 128:3,12

**Q**

**qualified**
122:5
**question**
9:24 10:1,2 20:7
21:18,20 24:9
26:18 28:18,21,24
29:4 37:6 39:18
44:4 46:5 53:6
59:16 75:7 76:22
78:14 87:19 90:21
92:16 108:21
109:14,16,18
120:9 122:18
128:8,18,19
129:10 132:14,15
134:18 149:4
**questionandans...**
17:22 21:9 22:4
25:12
**questionanswer**
24:8
**questioning**
129:17
**questions**
9:19,19 13:5
20:15,16 23:3,4
24:5,17 25:3,5
28:14,16 47:18
72:10 85:6 104:12
104:13,14 109:8
116:12 120:18
128:6,6 140:3
146:3 157:15
**quick**

121:16
**quite**
128:22
**quote**
75:16 133:23
139:2
**quotes**
114:15,16

**R**

**raised**
37:13 72:15
**ran**
43:11
**rand**
89:12 96:11,12
**rands**
89:15
**raniere**
1:13,19 2:5 3:7
4:3,7,9 6:2,9 7:1,6
8:14 9:15 10:20
13:7 28:3 40:4,11
43:24 47:17 48:8
48:13 55:15 66:11
66:16 79:18 82:13
83:24 97:8 102:5
106:18 107:16
113:25 122:2
126:7,15 133:10
133:16 141:21
146:10 149:24
163:2
**raniere1**
4:6 6:4 10:21
**raniere10**
4:24 152:10,13,17
152:21
**raniere2**
4:9 66:10,13,17
148:14,16 155:19
**raniere3**
4:10 93:7,11,12
**raniere4**
4:12 96:21 97:2
97:13
**raniere5**
4:14 107:4,7,12
126:16
**raniere6**

4:15 126:8,12
131:12
**raniere7**
4:18 141:10,14,16
**raniere8**
4:20 146:11,18,19
**raniere9**
4:22 149:19,22,25
**rank**
54:13,15 94:14
157:7,9,15
**ranked**
96:6,7
**ranks**
96:8 153:18,20,20
**rational**
4:7 6:2 83:24
84:3,5,11,14,16
84:23 85:4,10,13
85:15,18,22 86:2
86:7,8,23,24 87:1
87:14,15,17,25
88:3,9 89:13,17
90:11,15,17,25
91:6 92:11 93:25
94:22 95:1 96:17
97:19,23 98:1,4
98:13 100:18
103:6,10
**read**
11:24 39:18,19
43:19 44:18 61:25
62:10 76:12,15
83:22 87:10 89:2
89:15 95:8 107:17
108:21,22 109:4,7
109:10,20 110:4
115:15 122:7
125:12 143:6,23
147:6,10 153:11
163:3
**reading**
83:21 118:10
145:6,8,25
**reads**
122:23
**really**
34:11 36:23 57:24
123:19 151:2

159:17
**realtime**
2:12 164:5
**reason**
29:2 32:6 74:22
94:3
**reasonable**
19:20 29:2,2
**reasons**
36:17 71:7
**reath**
2:14 3:3 6:25
**recall**
14:8 15:21 17:23
17:25 18:25 22:17
31:16 32:20 37:2
40:19 45:15,17
56:25,25 64:9
65:11,12 67:18
69:9,10 70:16
80:10 82:23 93:24
104:2 135:21
**receive**
98:1,4 102:18
155:3
**received**
6:4 66:12 93:10
97:1 101:20 107:6
126:12 138:8
141:13 146:17
149:21 152:12
**recess**
47:13 81:24
121:20 126:3
**recitation**
44:7
**recognize**
11:7 66:22 146:24
**recollect**
45:7
**recollection**
14:2,5,14,19 18:1
20:22 40:16 43:16
43:22 74:1,8 92:8
93:22 116:3
130:21
**recommendation**
45:19
**recommendations**
156:15

**reconstruct**
35:10
**record**
9:25 10:13,23
11:2 45:9 51:16
79:15 82:13 93:12
101:16 109:13
118:15,17,21,24
119:17 126:5
133:8 136:23
141:15 146:6,7,19
162:12
**recorded**
9:20 43:25 136:25
137:20,24
**recorder**
137:4
**recording**
9:22 44:14,16,19
44:23 45:3,5
137:22
**records**
41:18 116:25
**recruiting**
115:7
**redirect**
4:2
**refer**
95:24 153:17
**reference**
12:11 86:13
**referenced**
30:13 86:11
**referred**
150:1
**referring**
51:8 68:10 98:22
104:22
**refers**
144:19
**reflected**
104:18
**reflection**
110:3
**reform**
4:16 126:10
131:13
**refresh**
93:21
**refused**

138:17
**rejected**
158:14,16,19
159:11,12,20
**relate**
158:3
**related**
49:20 63:12 77:5
86:22 87:5,13,21
90:23 145:13
**relating**
23:3,4 26:4 40:21
50:18 52:16 56:23
58:1 59:14 63:18
63:25 64:3,5 65:4
65:9 79:3 99:5
103:19 106:2,5,11
111:1 114:14
157:13
**relation**
77:20
**relationship**
33:21 49:2,11
70:18 72:11 77:21
96:3 100:2 128:10
154:24
**relationships**
112:23
**relative**
46:10 164:17
**relatively**
19:6
**release**
120:2 122:12,12
**relevant**
80:14
**relying**
31:17
**remaining**
147:18
**remem**
32:17 58:15
**remember**
12:17 15:23 18:5
21:13 30:20 31:21
31:23 32:2 34:3,6
35:17 36:1,23
37:18 39:5 42:11
42:13,16 43:13
50:20 52:10 56:2

56:7,10 57:5,19
58:6,16 59:8 62:3
62:14 64:8 65:1
65:16 70:21 71:1
74:19 78:5 80:21
89:5 116:14,20
139:15,19
**rendition**
44:6,11
**repeat**
20:6 78:6
**rephrase**
10:3 75:7
**replicate**
113:4
**reporter**
2:12,13 9:20 10:8
39:20 42:2 87:11
108:20,23 115:16
136:1,8,10,21,24
137:1 138:4 164:5
164:5
**reporters**
140:20
**reporting**
1:23
**reports**
64:6,6
**represent**
6:12 38:5,18
**representation**
147:24
**representations**
52:16 139:21
**representative**
39:16,17,22,23
161:8,11,13
**represented**
10:4
**representing**
6:16,22,25 7:3
8:15 39:11 40:4
92:1
**represents**
96:17 117:20
**request**
5:3,3,4,4,5 7:20
48:6,11 80:22
81:17 101:16,19
106:10,14 113:21

113:23 140:17,19
**requested**
5:2
**requests**
81:3
**require**
148:23
**required**
16:15 149:15
**requirement**
149:8 151:9
**requirements**
30:18 33:6
**requires**
16:7,14
**reread**
109:16
**research**
41:1
**reserve**
8:7
**residence**
140:11
**residing**
8:9
**respect**
60:15 78:3 110:2
140:4 147:16
157:12
**respond**
106:15
**response**
37:19 38:2 81:3
140:4,7
**responsibility**
31:3 33:5 150:14
151:1
**responsible**
70:24 71:3 76:19
76:24
**rest**
160:25
**restate**
125:15
**result**
111:22 112:5
**results**
17:12 29:13 84:7
84:17,18,23,25
85:3 100:13,18

**resumed**
82:9
**retain**
62:25 81:15
**retained**
62:21,23
**retainer**
39:6 40:2 48:2,7
**retaining**
57:9 58:4
**retention**
12:12,17
**retracted**
136:10
**retreat**
1:8 3:17 51:23
**return**
145:13
**reveal**
68:21 131:7,9
**revealed**
68:20 126:25
147:11
**review**
11:18,20 12:10
16:8,14,15,18,21
16:23 17:1,8,11
17:13 29:11,13
67:5 104:17 143:9
**reviewed**
11:14,16 83:16
104:25 105:1
107:25 108:3
123:14 124:17,19
131:23
**reviewing**
143:15
**revision**
142:15 154:17
**richard**
2:22 119:18
**rick**
1:7,10 3:17,24
6:22 10:13 40:12
40:17,21,23 41:7
41:11,14,17,20,23
41:25 42:4,10,12
42:15,17,21 43:15
43:17 44:5,10,13
44:14,15 55:16

56:16,20,24 57:15
58:3,9 67:23 68:1
68:3,8,25 69:7,25
70:2,5,25 71:4,8
72:14 73:7,9,15
73:20 74:22 75:24
76:2,4,19 77:2,4,9
77:13,16,21 78:20
107:20 136:9,13
136:15,19 147:2
**ricky**
1:7
**right**
8:7 9:21 13:5
51:9 58:6,7 66:3
92:20 121:7 123:3
125:14 144:24
146:8 154:4
**rights**
97:19,22 98:13
**riker**
3:8 6:13,15
**rituals**
4:24 152:11,25
**road**
18:12 34:24 43:10
**robert**
3:4,19 4:15 6:18
6:24 126:9 131:12
**rochelle**
1:7 3:12 6:16
8:16 13:17,19,23
60:24 69:19 70:5
**role**
23:1 78:3 96:4
**room**
14:3 18:24 119:19
**roseland**
3:16
**ross**
1:7,7,8,10 3:17,17
3:24 6:22,23
10:13 40:12,17,21
40:23 41:7,11,14
41:17,20,23,25
42:4,10,12,15,17
42:21 43:15,17
44:5,10,13,14,21
55:16 56:16,20,24
57:16 58:3,9 59:6

59:11,16,17 60:15
60:20 61:8,15
67:23 68:1,3,8,14
68:16,25 69:7,20
69:25 70:2,5,25
71:4,8 72:14 73:7
73:9,15,20 74:22
75:24 76:3,4,19
77:2,5,9,13,16,21
78:20 107:20
131:21 136:9,13
136:15,19 147:2
**roughly**
57:19
**royalty**
98:14
**rr**
80:1
**rule**
28:25 29:4,5,6
71:12
**ruler**
96:2
**rules**
4:24 9:16 152:11
152:25 156:25
157:4
**run**
9:8,15 158:12
**rutgers**
15:25

**S**

**sake**
110:10
**sales**
24:18
**salespeople**
24:19
**salinas**
139:1
**salzman**
1:13 2:6,25 3:23
7:4 13:22 14:6
15:11 19:2 51:11
55:11 61:17 68:12
86:8 100:9 102:15
156:12,22
**salzmans**
31:3

**sandler**
3:13 6:22
**sara**
139:2
**saratoga**
155:9
**sarzen**
55:11,12 73:3
**sash**
157:11
**sashes**
94:10,13
**sat**
138:15
**save**
140:8
**saved**
113:17
**savings**
102:13
**saw**
93:22
**saying**
7:25 34:15 40:19
43:17 69:11 74:19
74:20 78:5 120:20
124:16 133:21
**says**
44:14 110:4
119:24 123:14
142:17 144:4,21
145:12 150:13
151:4,11 153:24
154:2 157:6
**scan**
111:20
**scarf**
154:4
**scarves**
94:10,13
**scherer**
3:8 6:14,15
**schmeiser**
93:16
**school**
95:14 153:3
**scien**
83:3
**science**
52:14,18,19,21

60:4 112:2
**scientists**
52:16
**scientologists**
83:6
**scientology**
83:3,8,11,14,16
88:6,19,24
**score**
96:9
**scouts**
94:15
**scrap**
63:1
**screen**
6:7
**sculpt**
130:16
**se**
28:1 65:13 123:7
156:17
**sean**
89:8
**search**
79:19 80:16 81:18
**searched**
80:13 81:1,16
**second**
20:15,19 32:25
33:3 58:10 128:17
134:18 154:2
**secret**
105:19 106:23,25
107:1,2 108:8,10
108:18 109:1,24
110:4,9,12,14,15
110:20,25 111:10
111:16,18 114:21
115:11,18 117:7
117:14,15,17,18
117:20,25 119:4
120:2,16 122:3,4
122:6,17 123:9
124:6,8,14 125:5
125:6,7,19,19
126:18,21,23
127:3,4,4,5,5,6,10
127:10,16,25
128:15,25 129:8
129:15 130:12

131:1,4,7,10
132:10,22
**secrets**
16:17 68:20
106:20 107:23
108:2,5,10 109:23
110:8 114:5,20
120:10 122:8,12
122:16,16 123:5,6
123:11 124:18,19
126:25 130:17
131:5,24 132:3,5
132:8,18 147:11
147:16
**section**
121:1 156:23
**see**
14:4 30:13 46:15
49:6,6,17 59:25
64:22 65:7 73:24
114:13 118:2
129:16 132:4
144:3,14,21
150:12
**seeing**
111:7
**seeker**
19:24 59:22
**seeking**
47:21,22
**seeks**
59:23
**seemingly**
19:21 29:2 136:17
**seen**
11:16 22:11,23
30:9 32:3,5,11
49:7 72:6 93:19
100:13 101:6,8,11
114:7 131:17
135:7 141:21,24
158:9
**segment**
32:9
**segments**
129:20 130:2
**seiler**
3:18 6:19
**selected**
30:12 77:9

**selecting**
77:1
**selects**
77:4
**selfexplanatory**
117:22
**selling**
116:10,15
**seminal**
136:18
**seminars**
27:22
**senators**
74:14
**send**
7:25
**sense**
102:7 115:12,19
134:22 135:7
**sent**
113:25 161:8
**sentence**
67:23 75:21
122:15 124:14,16
125:5,7,13,18,19
128:21 129:1,4,5
129:6,11,17 130:6
136:16 150:12,17
153:11 154:2
157:6
**sentences**
65:14
**separate**
42:14 74:23 103:9
**series**
9:18 67:24 72:8
94:11 139:21
158:24 160:3
161:2
**serve**
18:17
**server**
80:9 81:10,11,12
81:12,13,14
**serzen**
55:13
**session**
17:22 19:9 21:9
83:5
**sessions**

83:3
**set**
27:19 59:21
137:14 144:8
150:14 151:1
164:14
**settings**
161:1
**severed**
154:24
**sf00033**
4:24 152:12
**sf00104**
4:23 149:21
**shadows**
127:2
**share**
94:4,4 130:20
**shared**
80:2
**sheldon**
101:3,4
**shifter**
117:19
**shifting**
135:20
**short**
19:6 47:12 125:23
126:2
**shortly**
32:15 55:21,23
**show**
10:20 31:15,24
32:16 34:14 35:4
92:21 93:3 126:7
131:11
**showing**
94:14 97:8,12
107:12
**shown**
33:20
**shrugs**
10:8
**shun**
71:13,14
**sic**
123:15 130:23
**side**
154:4
**sign**

22:18 29:1 42:4
42:25 50:23
138:18 161:17
**signature**
67:2 97:15
**signed**
4:9 19:18 20:14
22:13,20,24 43:2
43:5 66:11 67:8
69:16 78:25 97:18
163:5
**signified**
154:3
**signing**
20:10 129:18
**signs**
42:8
**similar**
11:8,14,17,18
88:20,22 128:23
142:20,22
**simple**
140:7
**single**
27:25 124:15
**singlepage**
97:13
**sir**
11:7 46:5 93:19
97:12 109:9
121:17 125:16
127:21 146:24
**sister**
45:6,10
**sit**
13:21 43:25 45:18
104:10 116:20
138:8,19 142:25
156:18
**site**
57:7 76:3
**sitting**
9:20 137:16
**situation**
45:24 67:19
122:10,11 123:1
160:7
**situations**
160:5
**six**

4:9 66:12
**sixteen**
129:18
**skeptic**
60:2,3
**skolnik**
3:14 6:21,21 8:2
10:17 87:6
**slightly**
14:1
**small**
29:12
**social**
14:12 49:7,20
75:10
**sole**
85:18,20
**solomon**
101:4,12,22
**solomons**
101:7
**solve**
23:5 102:10
**somebody**
16:4,13 51:13
54:3
**someones**
60:8
**someplace**
140:13
**somewhat**
30:1 160:12
**sorry**
9:9 21:24 31:19
34:5 37:21 43:8
49:4 55:23 57:14
61:4 66:1 87:9
90:4 97:6,10
111:7 117:14
141:15 145:7
150:9 152:19
**sort**
15:24 24:20,22
60:6,13 63:1
124:6 134:17,18
136:16
**sorts**
53:10
**sounds**
47:2 121:21

**source**
68:24 69:2 75:8
86:6 87:24 98:5
102:18
**sourcing**
112:10
**speak**
17:15 21:1,2 36:3
50:17 52:23 53:18
118:12 145:18
151:4,12,16
153:14
**speaking**
58:6 91:1 110:5
**speaks**
35:12 145:16
**specific**
25:2 26:3 81:14
85:6,6,25 88:1
90:12 103:13
109:8 128:4,5,10
149:3
**specifically**
14:21 20:13 21:4
22:17 30:6 50:7
60:22 61:1 62:16
64:8 69:17 70:21
73:6 108:6 123:23
134:15 138:24
**specificity**
156:7
**specified**
99:9
**speedwell**
3:10
**spend**
25:22 27:5
**spending**
159:25
**spirit**
29:5
**spoke**
17:13 18:7,20
19:23 20:3 21:1
47:20 51:18 52:5
70:21 138:14,23
139:4
**spoken**
13:15,19 41:22
70:19 72:19

140:20 158:9
**sponsored**
83:7
**sponsoring**
161:4
**spring**
9:2 18:6 32:19
**stammered**
136:10
**stamp**
93:14,15 148:7
**stamped**
4:8,11,13,17,19
4:21,23,24 6:3
11:3 93:9 97:1,14
126:11 133:17
141:13,17 146:16
149:21 152:12
**stand**
82:9
**start**
121:2 122:22
128:16
**started**
36:8 83:21 122:6
136:16
**starting**
123:5 162:4
**starts**
120:2 122:24
124:8,9,11 129:8
161:23
**state**
2:13 21:15 134:20
149:12,13 155:20
164:6
**stated**
30:14 64:10 94:13
**statement**
68:13,24 111:1,21
111:23,24 114:20
114:24 115:5
116:4 119:24
131:7
**statements**
131:2
**states**
1:1 4:10 45:22
93:8
**status**

91:2 94:21,25
**staying**
160:19
**stems**
128:1
**stenographic**
2:9
**stenographically**
164:13
**stephanie**
1:8 3:12 4:19
6:17 8:16 14:25
15:15,22 17:9,13
17:15 18:7 19:2
19:12 20:3,5,8,20
21:2,8 22:2,8,13
24:12 28:4,22
29:11,21 30:4,15
31:12,20 32:4,13
32:22 33:19 34:13
34:19 35:9 36:22
36:25 44:1,8,11
46:3 70:23 71:3
141:12,19
**steps**
110:23
**stock**
50:19
**stop**
10:5 118:9 121:8
133:5
**storage**
62:24
**store**
154:10 155:7
**straightforward**
120:10
**strategies**
59:19,21 117:19
**street**
2:23 134:14
**strike**
22:11 23:25 36:7
42:10 45:3 59:3
68:8 69:18 70:13
73:18 75:1,3,6
78:17 79:23 90:9
94:7 98:11 101:20
109:18 136:23
137:17 139:11

147:5 155:23
156:23
**stripe**
154:4
**stripes**
153:25
**strokes**
134:9
**strong**
51:15 69:24 73:25
**stronger**
70:18 73:10
**strongly**
71:24
**structure**
124:2,7 129:22
157:7,10
**structured**
124:12 129:23
**student**
4:18 15:19 17:2
42:8 53:19,21
55:2 89:10 141:12
141:18,24 142:21
142:23 143:15,19
144:25 148:24
**students**
84:10 94:10
148:19 149:14
150:22 151:4,12
151:16 152:6
153:13 155:4,5,10
155:13,21,25
**studies**
100:16,17,21
**study**
98:15 99:5,5,11
99:15,16 100:14
100:23 101:2,7
**stuff**
65:15 114:17
**stuttered**
136:10
**subject**
40:2 45:5,20 47:1
72:13 163:5
**subparagraph**
112:1
**subscribed**
163:22

**substance**
66:6
**success**
1:3 4:16,18,21
13:1 15:19 18:14
26:7 57:3 123:16
124:22,23,25
126:10 131:14
141:11 143:21
146:16,22
**successively**
129:20
**sufficient**
69:15 113:3
**suggest**
24:21 45:24,25
46:6 57:13,15
158:12
**suggested**
57:11 58:9 159:14
**suggesting**
143:5
**suggestion**
158:18
**suggestions**
95:20,21 159:12
**suggests**
149:5 150:18
151:18
**suicide**
135:15
**suited**
155:12,15
**suits**
60:8,9
**summarize**
120:7
**supermarket**
12:18
**supplement**
20:1 158:1
**support**
71:17 150:4,13
**supposed**
98:14 99:3 123:10
**suppressive**
88:8,18,21,25
89:6
**sure**
9:3,25 11:20 15:5

15:10 16:3,16
20:17 22:10 24:7
26:4,12 34:11
35:5 39:1 41:5
44:8 47:8,11 48:4
48:24 54:6 56:13
57:24 58:8 60:17
64:20 67:11,13
74:10,11 77:11
78:16 79:14 81:4
81:20 83:4,23
89:1 90:20 91:11
93:20,20 100:15
101:15 104:3,15
104:18 107:24
108:13 113:5
117:2 123:2
133:15 134:12
136:8 137:21
138:5 139:3
142:13 147:13
149:4 154:16
160:22 161:1
**suspect**
20:17 24:8 112:9
114:16
**suspicion**
13:4 15:12
**sutton**
1:7,7 3:12,12 6:10
6:16,16 8:15,16
13:7,9,17,19,23
15:13,15,19 35:19
35:25 36:4,6
40:13 43:25 45:5
45:8 49:2,8,12,17
50:5,11 51:19
57:9 58:7 60:24
68:4,5,8,14,16
69:6,19 70:5 71:8
71:11 72:14 73:20
74:3,13 75:5,13
76:8,13,18,25
77:4,8,13,22 78:3
78:18,19,24,25
**suttons**
14:7 75:3,9 77:25
78:2,11
**swear**
7:15

**sworn**
8:11 82:9 163:22
164:9
**sylvester**
3:9 6:15 10:25
45:12 79:6 115:13
115:20 118:11
121:5,8 125:10,14
125:24
**symbols**
12:23
**system**
21:19 158:21
**systems**
158:12

───────────

**T**

**taibbi**
29:21,24
**tail**
126:24
**take**
6:8 10:8,10 11:24
18:11 19:5,17
29:16,19 34:10,21
41:18,25 42:3,23
47:9 59:25 66:16
66:19 68:17 75:18
81:19 82:20 90:13
109:9 110:23
121:10,16 125:23
128:9 133:23
143:20 144:24
145:19 148:6,10
148:13 151:22
152:2,6,7 162:8
**taken**
1:20 2:11 8:20,24
9:17 29:21 53:22
54:11,11 81:25
82:17 91:9 114:15
123:20 129:7
143:21 145:19
163:4 164:13
**takes**
54:3 123:20
**talk**
36:4,17 40:20
104:11,11,13
**talked**

89:6
**talking**
49:1
**tape**
43:25 44:13,16,18
44:22 45:2,5,9
46:2,15,18,19,22
47:1,2,3,7,15 82:4
136:23,24 137:6
137:13 138:1
**tapes**
118:7 133:4
**taping**
45:21 46:8,9
**taught**
14:15,17,19,20
84:3,6,7,25 85:4
103:9,12 104:18
106:19 153:3
**taxes**
21:11,16,17,19,21
21:25 22:1
**teach**
26:18 51:25 85:10
85:13,15 102:9
**teaches**
103:16
**teaching**
14:22 86:25 87:16
106:12 150:25
**teachings**
113:4
**technical**
135:1,3,7
**technology**
36:2 52:17
**tedious**
65:10
**telephone**
44:1
**tell**
14:6 16:1 28:7
38:14,16 41:4
54:25 69:6,17
71:6,7 110:24
119:5,8 122:3
126:23 130:8
**telling**
69:9
**tells**

**119:25**
**temple**
135:12
**ten**
123:15 124:20
**tendency**
14:3
**tenets**
83:14
**tenhour**
129:19
**tenzin**
161:15
**term**
88:8,18 114:5
131:25 132:9
134:9,16 135:5,8
147:17
**termed**
92:9
**terminology**
106:22
**terms**
83:25 135:1
141:24 142:21,23
143:4,15,19
144:25 151:16
**testifies**
8:11 82:9
**testify**
164:9
**testimony**
148:1 150:22
163:4 164:12
**testing**
53:9
**tests**
52:18
**text**
103:18
**thank**
10:18 51:15 55:12
81:21 114:17
115:20 119:15
127:19 133:2
146:5 162:10,11
**thanks**
106:16 119:15
**theoretical**
84:21 119:23

**theory**
129:24
**thera**
21:3
**therapy**
15:23 16:2,6,10
16:14 21:3,5
29:12
**thereabouts**
56:24
**thesaurus**
95:16
**thing**
7:11 24:21,22
53:1 57:12,12
63:12 91:25 94:15
114:14 124:6
125:8,20 127:11
129:13 149:7
**things**
12:2,7,7,9,19
14:12 16:17 18:15
24:18,24 25:12
26:17 50:2,17,19
52:19 53:7,10,18
61:14 62:23 63:7
68:21,22 69:11
70:20 71:17 72:11
85:7 86:12 87:5
87:22 89:19 90:2
95:17 96:5 99:5
101:1 102:11
106:6,7,8 108:7,9
110:1,19,19
113:16 114:7,17
114:21 115:2
116:10,11 119:3
119:12 122:15,17
122:18,23 124:1,5
124:11 127:1,2,15
128:8 129:23
131:2 134:4 143:5
154:9 158:9
160:17 161:10
**think**
8:23 9:3,3 12:9
14:1 15:4,12 17:3
17:5,17 18:2,4,6,8
18:15,17,22 20:14
20:24 21:17,18,23

22:1,10 28:2 29:9
31:5 32:15,19,23
33:10,23,24 34:4
34:16 35:11,11,12
37:1 38:12,22
39:8,24 40:3,22
41:8 42:24 43:4,7
43:10 44:4,13
45:20,22 46:17,24
46:25 51:1,20
52:6 55:4,5,21,25
56:3,8,12,12
57:11,17,17 58:12
59:7 61:13 62:2
63:11,19 64:5,14
64:15 68:4,18
69:4,22 70:12,17
71:23 72:16 73:3
74:10 80:3,22
83:12,23 84:12,15
88:1,5,20 89:20
89:25 93:3 95:8
99:20 102:21
104:3,4,6 105:19
106:6 108:14
110:20,20 111:9
119:11 120:9,15
125:13,18 129:12
129:17 137:9
139:1 140:3,11
142:7 143:5 150:7
154:13,19,19
156:16,21,22
157:3,4 158:18,25
159:9,10 160:14
**thinking**
26:10,16 27:7,16
50:17 120:5
126:22
**thinks**
61:18
**third**
9:9 78:22
**thomas**
3:5,15 6:21,24
**thought**
4:16 42:14 57:12
60:14 65:7 96:2
116:7,15 126:10
131:13 137:25

158:8,20 159:2,16
159:17
**thoughts**
64:24
**threatened**
113:10,13
**threatening**
113:15
**three**
61:4,5 104:24
129:9,21
**threepage**
4:14 107:5,13
**till**
9:23
**time**
6:7,11 11:24
13:23 15:18,22
16:1,11 18:5 19:6
19:17,20 20:2
24:7,16,25 25:22
27:5,8 29:3 35:22
36:6,12,21 37:12
39:7 40:5,12,24
41:2 47:15 49:16
49:24 51:18 54:12
58:2 72:23 79:10
80:12,17,18,20,21
80:24 81:16 82:5
90:7 91:9 92:4
94:24 95:8 99:1
100:25 101:14
104:13,22,25
105:4 106:15
109:9 115:9
121:23 128:16
137:23 139:6
142:9 147:6,18
150:14 151:2
153:19 154:11,18
156:20 159:15
160:15 161:24
164:14
**times**
21:13 24:3 49:22
50:3 72:9 80:19
105:16 115:2
157:8 159:13
**timesunion**
140:21 160:23

**timing**
58:8
**title**
23:7,9 96:3
**titles**
23:11 95:14,16
**today**
8:19 9:19 10:4,10
13:21 43:25 45:18
75:21 85:17 95:19
116:20 147:18
156:18
**todays**
6:6 48:14 105:24
**told**
15:4,8,21 16:10
22:16 28:7 29:20
30:7 31:11,19,22
31:24 33:19 47:6
52:23 53:17 56:6
56:9,10,12,13,14
56:18 58:2 61:22
61:23 68:15,15,16
68:22 69:3 71:17
71:21,22 72:7
74:13 75:13 76:1
88:21 92:23 130:8
130:20 159:7,9
**tom**
73:3 133:13
**tomorrow**
144:17 145:10,23
145:24 147:19
148:5 158:2 162:4
**tompkins**
2:21 7:2
**toni**
140:5 155:2
**tool**
84:16,17,18,24
115:7 152:3
**tools**
21:7 161:21
**top**
96:7 113:12 123:5
145:2,4,12
**topic**
50:4
**total**
12:12

**townhouse**
102:15,20
**trade**
16:17 106:19,23
106:25 107:23
108:1,5,9,10
109:23,24 110:4,9
110:12,14,15
111:18 114:5,20
115:11,18 117:7
117:14,15,17,17
117:20,24 119:4
120:2,10,16 122:3
122:4,6,8,12,15
122:16 123:4,6,8
123:11 124:6,18
124:19 126:18,21
126:23,25 127:3,4
127:5,6,10,10,25
128:25 129:7,15
130:12,17 131:1,4
131:5,7,9,24
132:3,5,8,10,18
147:11,16
**trademark**
4:10 93:8
**train**
161:21
**trainer**
19:23
**training**
18:13 19:8,13
30:12 123:16,18
124:21,24 125:1,3
128:13
**trainings**
18:19 161:21
**transcript**
1:22 7:19,23
44:18 47:3 54:22
76:15 78:8 106:10
113:21 163:3
164:12
**translated**
104:8,15
**tree**
153:9 158:21
159:1
**tribute**
90:3,4

**tried**
137:3,7
**trouble**
111:7 145:6,8,25
**true**
12:9 13:24 43:19
60:1 119:6 122:9
122:18,19 164:12
**trunk**
126:24 129:9
**truth**
59:23 111:13
120:1,3 164:9,10
164:10
**try**
10:2 24:20 35:10
52:25 75:6 145:9
159:21
**trying**
24:16 55:4,5 73:5
94:9 132:16
**turn**
51:13 60:3,4
**turned**
41:19 158:25
**turning**
66:24 67:21 153:7
**twenty**
25:9 79:11
**twice**
36:5
**two**
8:23 24:19 32:23
45:25 61:5 80:2
95:21 110:1,23
124:10 134:11
137:9 140:3
**twohour**
27:25 28:1 128:3
128:5,9
**twopage**
64:15
**twosided**
143:24
**twothirds**
150:6
**type**
24:9,10 53:9
74:14 83:19 87:5
87:21 88:11,15

139:12 159:14
**types**
24:14

――――――――――
**U**
――――――――――
**uhhuh**
12:13 27:9 37:20
54:24 74:12 112:7
115:10,17 117:10
120:14 127:11
130:11 148:21
150:5,16 153:10
154:1
**ulsamer**
2:22 119:18
**ultimate**
23:4 157:14
**ultimately**
65:23 97:25
104:15 119:9
156:13
**um**
53:4 104:3 155:15
**unattended**
137:16
**underline**
117:7 126:17
129:23 130:14
132:8,19,20
**underlined**
122:3 125:9,21
126:19 127:1,12
129:12 130:6,19
**underlining**
119:3 121:1
**understand**
10:1,1 37:11
52:21 71:23 77:7
78:10 90:16 92:15
112:21,22 119:11
120:12 122:7
132:15 145:12
147:4
**understanding**
15:14 19:15 22:12
22:15 28:10 30:15
30:25 38:3 44:22
46:20,23 53:10
68:2 69:7 72:1,4
75:9 76:25 77:8

77:12,18 85:9
86:16 88:17 90:21
91:25 106:18
107:22 112:14,24
129:25 131:6
132:16,17 135:5
137:19,23 144:1
**understood**
70:1 71:8 119:15
137:5
**undertake**
147:15
**unfeasible**
159:1,22,23
**unique**
106:25 108:17,25
112:15 128:9
132:21
**united**
1:1 4:10 93:8
**university**
15:25
**unrest**
160:14
**untrue**
141:8
**updated**
154:20
**uphold**
72:5
**upset**
71:20
**use**
26:13 73:25 74:5
74:9 86:19 87:24
88:20 94:15 105:8
113:13 130:1
137:3 144:8
145:14 155:10,13
157:5
**useful**
63:1 134:22

――――――――――
**V**
――――――――――
**valuable**
161:12
**value**
147:20
**values**
111:2,23 112:6

**vanguard**
23:10 51:21,22
52:4 80:8,11
95:10,18 96:9
114:17
**various**
17:5 26:20 103:25
**ventures**
36:3 52:13
**verbally**
10:7 37:22
**verify**
53:6
**version**
142:18
**viable**
131:4
**video**
6:7 32:8,11 137:4
**videoconference**
1:23
**videographer**
3:24 6:6 7:15
9:21 47:14 51:13
82:3,6 97:5 118:6
118:16,23 126:4
133:3,7 162:12
**videotape**
137:1
**videotaped**
1:19 136:25 137:2
**view**
21:11,15
**views**
22:4
**violates**
110:7
**violating**
53:1 92:14
**violation**
110:7
**visited**
13:22 138:20
**visits**
49:20
**vitamins**
154:9
**voice**
26:19 102:9
**volleyball**

49:21,21 54:8
**volume**
1:20
**vs**
1:6,12 2:4
_____
**W**
**wachenfeld**
2:21 7:3
**wait**
7:17 9:23 10:5,25
10:25 125:10
**walk**
26:16 27:7
**walked**
25:4
**walking**
71:18
**want**
16:16,18 26:1
29:3 30:21 35:14
35:16 38:10 41:9
52:25 68:19 71:18
79:6 91:18 95:11
95:22,22,25,25
98:18 112:25
118:2,3,9 123:6
126:7,16 133:5
137:2 144:3,11
145:22 147:12
**wanted**
19:12,22,24 42:2
43:17 46:2 52:17
64:21 65:6,7
68:17,18,20,21
71:21 75:14 96:3
121:2 137:1
139:19 140:4
**wants**
20:24 40:19 46:1
125:15
**watts**
93:16
**way**
7:8 9:25 19:24
41:22 48:1 59:7
70:16 71:2 79:22
88:17 92:21,24
98:17 112:22
119:23 120:7

124:9 129:23
138:7 143:8
144:20 150:6
158:11,21 159:2
**ways**
125:4 128:4,5,7
158:11
**wear**
94:10 157:11
**website**
56:22 57:2,21,23
57:25 59:14 62:1
76:19 77:2,5,10
77:14,16,24 78:2
78:4 114:25 115:9
115:10,17,23
116:1,5,7,12,13
116:16 117:1,3
**websites**
55:18 107:20
115:3 131:21
147:2
**wedlock**
71:11,13
**wednesday**
1:20 2:16
**week**
26:10,11 51:21,22
52:4
**wellspring**
1:8 3:17 6:23
**went**
44:7 52:6 56:23
57:2,7,21,23
95:16 116:11
138:11 143:8
**west**
1:23
**weve**
10:15,21 27:17
131:11 149:24
152:17,20
**whens**
36:21
**white**
157:11
**whove**
113:6
**william**
2:21 7:2

**willingness**
30:21
**winter**
159:17 160:16
**witness**
4:2 7:1,16,22 55:9
55:12 66:21 81:23
87:8 91:17 92:11
92:17,22 93:5
96:22 97:3,6
105:18 107:8
109:4,11 118:9,14
118:18,22,24
120:25 121:14,23
123:10 127:15,19
133:5 144:11
146:12 148:2,6,9
157:21 158:5
162:6,9,15 164:9
**woman**
71:14 139:13
**word**
65:13 74:1,5,9
135:9 144:10
150:3
**wordings**
128:8
**words**
27:15 73:9 78:11
85:12 110:9
**work**
35:13 50:16 86:1
90:3,4,5 105:12
**worked**
137:5
**works**
19:25 87:5,21
89:12,15
**world**
41:18 51:24
**write**
12:8 62:23 103:19
119:10,10 136:6
**writing**
86:24 87:2,16,18
104:5 105:11
144:23
**written**
48:2,7 87:1,17
104:9 122:20

**wrong**
53:11 133:21
**wrote**
103:23,24
_____
**X**
**xerox**
148:11
**xi000918**
164:23
_____
**Y**
**yahoo**
80:3,6,7 81:12,12
**yeah**
13:12 16:5 25:17
39:1 41:8 49:25
55:8 62:13 64:11
72:9 97:12 105:2
127:8 131:16
135:10 148:8
158:20 159:13
162:2
**year**
17:23 18:3,5
27:10,12,18 28:2
32:19 36:5 51:21
56:2 57:19,20,23
159:17
**years**
27:16,18,22 37:1
54:8,18,19,20
62:10 70:20 72:22
90:17,19,20 105:3
132:6
**york**
3:20,20 8:10
36:10
**yup**
148:6
**yusko**
141:3
_____
**Z**
_____
**0**
_____
**00**
162:1
**01**
133:8

**03**
  4:9 66:12
**06cv01051**
  1:4
**07039**
  1:24
**07068**
  3:16
**07102**
  2:24
**079321047**
  3:6
**079621981**
  3:11

**1**

**1**
  12:5 153:6
**10**
  2:17 26:10,15
  98:14,20,23 99:3
  99:15
**100**
  2:23
**100196708**
  3:20
**101**
  5:3
**106**
  5:4
**107**
  4:14
**108**
  4:23 149:21
**11**
  1:20 2:16 6:7
  47:15 163:4
**110**
  1:15
**113**
  5:4
**12**
  79:9 114:19,23
  154:17
**12065**
  8:10
**126**
  4:17
**140**
  5:5

**141**
  4:19
**146**
  4:21
**149**
  4:23
**15**
  121:11
**152**
  4:24
**16**
  123:15 124:14,20
**1633**
  3:19
**16day**
  41:19 42:1,3,5
  152:6
**16hour**
  130:1
**18**
  4:9 66:12 69:12
**18th**
  148:14 155:19
  161:22
**1987**
  103:5
**1993**
  9:2
**1994**
  9:11
**1995**
  9:4
**1997**
  33:10,15
**1998**
  83:11,12,22
**1999**
  154:13,16
**19992000**
  91:8
**19th**
  161:20

**2**

**2**
  1:4 47:15 67:21
  82:6 111:25
**20**
  25:8,15 26:15
  64:15 120:18

  125:22,22
**2000**
  80:8 142:17,19
  154:17
**2001**
  17:23 18:4 23:1
  23:18 24:1,5 25:7
  25:16 26:12 29:20
  30:2,19 31:1,9
  32:17 33:3,11,15
  34:9,12 35:6,20
  36:21 79:21
**20012002**
  155:24
**200220032004**
  49:16
**2003**
  38:6 56:3 69:12
  74:7,16,21 107:14
  135:24
**2004**
  92:9 93:17
**2007**
  25:22 26:22
**20072008**
  13:11 25:24
**2008**
  25:22 26:22
**2009**
  1:20 2:16 6:7
  163:4
**212**
  3:20
**22**
  164:7
**231**
  4:11 93:10
**24**
  2:17
**26**
  93:17

**3**

**3**
  8:10 82:4 118:17
  148:17 153:23
**30**
  7:8,20 8:3,4 79:9
  90:17,19,20 162:4
**30day**

  7:21
**34**
  126:5
**35**
  47:15
**3661**
  4:17 126:11
**3682**
  4:21 146:17
**3hour**
  130:3

**4**

**4**
  2:23 17:18 121:11
  125:22 126:5
  153:7 155:20
  157:6
**40**
  4:24 27:11 152:12
**41**
  164:7
**425**
  12:6
**455**
  18:12 34:24 43:10
**48**
  5:3
**49**
  118:17

**5**

**5**
  17:17 133:8
  162:13,17
**500**
  2:15 3:5
**51**
  82:6
**5380800**
  3:11
**5497370**
  3:6
**56**
  162:13,17
**570**
  1:23
**5972508**
  3:16
**5day**

  130:2

**6**

**6**
  4:8 66:25 162:1
**65**
  3:15
**66**
  4:9

**7**

**70s**
  135:15

**8**

**8**
  4:3,9 66:12
**80**
  27:11 64:17
**8331100**
  3:20

**9**

**9**
  149:19 153:8
  162:4
**93**
  4:11
**97**
  4:13
**973**
  1:24,25 3:6,11,16
**9943510**
  1:24
**9943621**
  1:25