# In The Matter Of:

*NXIVM CORPORATION v.*
*MORRIS SUTTON*

---

*KEITH A. RANIERE*
*Vol. III*
*May 13, 2009*

---

*FITZSIMMONS REPORTING & VIDEOCONFERENCE*
*CENTER*
*570 W. Mt. Pleasant Avenue  Suite 102*
*Livingston, New Jersey 07039*
*PHONE:  (973) 994-3510  FAX:  (973)-994-3621*
*www.Fitzsimmonsreporting.com*

Original File 051309_1.TXT
**Min-U-Script® with Word Index**

# This Page Intentionally Left Blank

---

**Page 427**

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
 2
     ------------------------------------*
 3   NXIVM CORPORATION, formerly known as
     EXECUTIVE SUCCESS PROGRAMS, INC. and
 4   FIRST PRINCIPLES, INC.,
 5           Plaintiffs,            No. 2:06-cv-01051
                                        (DMC/MF)
 6       vs.
 7   MORRIS SUTTON, ROCHELLE SUTTON, THE
     ROSS INSTITUTE, RICK ROSS a/k/a "RICKY"
 8   ROSS, STEPHANIE FRANCO, PAUL MARTIN,
     Ph.D., and WELLSPRING RETREAT, INC.,
 9
             Defendants.
10   ------------------------------------*
     RICK ROSS,
11
           Counterclaim-Plaintiff,
12
         vs.
13
     KEITH RANIERE, NANCY SALZMAN,
14   KRISTIN KEEFFE INTERFOR, INC.,
     JUVAL AVIV, ANNA MOODY, JANE DOE
15   and JOHN DOES 1-10,
16          Counterclaim-Defendants.
     ------------------------------------*
17   (Caption continued on following page)
18             CONFIDENTIAL
19   VIDEOTAPED DEPOSITION OF:  KEITH A. RANIERE
20              (Volume III)
21     DATE TAKEN:  WEDNESDAY, MAY 13, 2009
22
     FITZSIMMONS REPORTING & VIDEOCONFERENCE CENTER
23        570 West Mount Pleasant Avenue
            Livingston, New Jersey 07039
24        PHONE:   (973) 994-3510
          FAX:     (973) 994-3621
25
```

---

**Page 428**

```
 1   (Continued)
 2   INTERFOR, INC., JUVAL AVIV, and
     ANNA MOODY,
 3
            Cross-Claimants,
 4
         vs.
 5
     NXIVM CORPORATION, KEITH RANIERE,
 6   NANCY SALZMAN and KRISTIN KEEFFE,
 7          Cross-Claim Defendants.
     ------------------------------------*.
 8
         T R A N S C R I P T of the stenographic
 9
     notes of the proceedings in the above-entitled
10
     matter, as taken by and before CHERYL McGANN, a
11
     Certified Court Reporter and Certified Realtime
12
     Reporter of the State of New Jersey, held at the
13
     offices of DRINKER BIDDLE & REATH LLP, 500 Campus
14
     Drive, Florham Park, New Jersey, on Wednesday,
15
     May 13, 2009, commencing at 10:04 a.m.
16
17
18
19   A P P E A R A N C E S :
20
         TOMPKINS McGUIRE WACHENFELD & BARRY LLP
21       BY:  WILLIAM B. McGUIRE, ESQ.
                4 Gateway Center
22              100 Mulberry Street
                Newark, New Jersey  07102
23       Attorneys for Plaintiffs and Cross-Claim
         Defendants, NXIVM Corp., Nancy Salzman
24       and Kristin Keeffe
25
```

---

**Page 429**

```
 1   A P P E A R A N C E S (Continued) :
 2
 3       DRINKER BIDDLE & REATH LLP
         BY:  ROBERT M. LEONARD, ESQ.
 4               -and-
             THOMAS F. CAMPION, ESQ.
 5           500 Campus Drive
             Florham Park, New Jersey  07932-1047
 6           (973) 549-7370
         Attorneys for Keith Raniere
 7
         RIKER DANZIG SCHERER HYLAND PERRETTI LLP
 8       BY:  HAROLD L. KOFMAN, ESQ.
             Headquarters Plaza
 9           One Speedwell Avenue
             Morristown, New Jersey  07962-1981
10           (973) 538-0800
         Attorneys for Morris Sutton, Rochelle Sutton,
11       Stephanie Franco
12       LOWENSTEIN SANDLER PC
         BY:  PETER L. SKOLNIK, ESQ.
13           65 Livingston Avenue
             Roseland, New Jersey  07068
14           (973) 597-2508
         Attorneys for The Ross Institute, Rick Ross,
15       Paul Martin and Wellspring Retreat, Inc.
16       FRIEDMAN KAPLAN SEILER & ADELMAN LLP
         BY:  DANIEL IAN MEE, ESQ.
17           1633 Broadway
             New York, New York  10019-6708
18           (212) 833-1100
         Attorneys for Interfor, Inc., Juval Aviv
19
20   ALSO PRESENT:
21       Mary Knodel
           LOWENSTEIN SANDLER PC
22       Nancy Salzman
           Karl Petry, Videographer
23
24
25
```

---

**Page 430**

```
 1                   I N D E X
 2   WITNESS         CROSS     REDIRECT    RECROSS
                              (Cont'd)
 3   KEITH ALAN RANIERE
         By Mr. Skolnik:  433                 625
 4       By Mr. Kofman:              608
 5                 E X H I B I T S
 6   Exhibit       Description        For Identification
 7   Raniere-18  One-page U.S. Copyright Office
                 document entitled Public Catalog    521
 8
     Raniere-19  Application for Letters Patent Bates
 9               stamped P000000685 through 768       539
10   Raniere-20  Confidentiality Agreement Effective
                 5/13/06 Bates stamped SP1013-2030    554
11
     Raniere-21  5/10/04 Memorandum Bates stamped
12               SP1163-1165                          556
13   Raniere-22  Note to Keith with attachments Bates
                 stamped SP0903-0907                  556
14
     Raniere-23  1/26/05 e-mail Bates stamped SP0480  556
15
     Raniere-24  8/7/04 e-mail Bates stamped SP1284   556
16
     Raniere-25  11/28/04 e-mail Bates stamped SP1814 556
17
     Raniere-26  Memorandum to K. Russell Bates
18               stamped SP0429                       557
19   Raniere-27  4/8/04 Memorandum Bates stamped
                 SP0432                               557
20
     Raniere-28  Confidential and Legal Product
21               Memorandum to K. Russell from J.J.
                 O'Hara Bates stamped SP0518          557
22
     Raniere-29  12/9/04 e-mail Bates stamped NXR00079
23               through 80                           594
24   Raniere-30  4/27/09 letter, Campion from Kofman  608
25   Raniere-31  Odin and the Sphinx by Keith Raniere
```

KEITH A. RANIERE - Vol. III
May 13, 2009

Page 431

```
1        *        *        *
2               (Exhibits attached.)
3            INFORMATION REQUESTED
4
5      (Request)          Page 467
6      (Request)          Page 506
7      (Request)          Page 530
8      (Request)          Page 608
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 432

1        THE VIDEOGRAPHER: Today's date is
2 May 13, 2009, at the time indicated on the video
3 screen. We're here in Florham Park, New Jersey, to
4 take the continuing deposition of Keith Raniere in
5 the matter of NXIVM versus Morris Sutton.
6        At this time, would the attorneys please
7 identify themselves and the clients they represent.
8        MR. SKOLNIK: Yeah. I'm Peter Skolnik
9 of Lowenstein Sandler. I represent all of the Ross
10 parties.
11        MR. KOFMAN: Harold Kofman from Riker
12 Danzig. I represent Stephanie Franco, Morris Sutton
13 and Rochelle Sutton.
14        MR. McGUIRE: Tompkins McGuire
15 representing NXIVM, Nancy Salzman, and Kristin
16 Keeffe.
17        MR. LEONARD: Robert Leonard and Tom
18 Campion -- Thomas Campion on behalf of Keith
19 Raniere.
20        MR. SKOLNIK: Would you swear the
21 witness.
22
23 K E I T H   A L A N   R A N I E R E, residing at
24 3 Flintlock Lane, Clifton Park, New York 12065,
25 is duly sworn and testifies on his oath as follows:

Page 433

1
2 CONTINUED CROSS-EXAMINATION BY MR. SKOLNIK:
3    Q. Mr. Raniere, before we begin, to avoid any
4 possible confusion I want to put on the record the
5 agreement that I have reached with counsel for you
6 and for NXIVM.
7        That agreement is that counsel will not
8 instruct you not to answer questions concerning the
9 Interfor report, the purported sting and
10 communications with Joseph O'Hara about those two
11 subjects. We have further agreed that counsel for
12 you and NXIVM reserve all of their rights with
13 respect to the admissibility of such testimony as
14 well as their rights to challenge the findings and
15 conclusions of the opinions by Judge Treece and all
16 of their rights to the applicability of the
17 attorney-client and work product privileges to
18 questions that are not covered by that above
19 agreement.
20        Do you understand that?
21    A. I wasn't aware of that but --
22        MR. LEONARD: That's correct.
23    A. -- okay. Then yes.
24    Q. Are you today under the influence of any
25 drugs or any other substance that would prevent you

Page 434

1 from answering my questions fully and truthfully?
2    A. No.
3    Q. You told us last time that the statement in
4 your bio, which was Raniere-1, saying that you have
5 total retention is accurate as far as how someone
6 would measure retention.
7        Do you remember that testimony?
8    A. To some degree, yes.
9    Q. Okay. How would you measure retention?
10    A. Oh, I have no idea. I guess I would seek to
11 have the test that they use to measure retention. I
12 think they show people different cards and see how
13 they remember them or I think there are things with
14 digital span so I don't know.
15    Q. Have you taken that test?
16    A. I've taken tests like that.
17    Q. So what is the basis for your statement that
18 you have total retention, as far as that's the way
19 you measure retention?
20    A. When I was a child I was tested, and I had
21 seen a report that said I had had total retention.
22 I was told by guidance counselors in school that had
23 seen those reports. That's -- I mean, I think there
24 are other things -- other people along the way who
25 had been somehow associated with those tests that

Page 435

1 had said similar things.
2 Q. Okay. Over what kind of materials or
3 information do you have total retention?
4 A. I have no idea. I --
5 Q. Do you have total retention of books or
6 articles that you read?
7 A. I don't understand "total retention" other
8 than what I've been told.
9 Q. Well, do you believe that you retain
10 virtually everything that you read in books and
11 articles?
12 A. No.
13 Q. What about the results of research that
14 you've conducted? Do you have total retention over
15 that?
16 A. I don't know what you mean by "total
17 retention," but if you say do I remember every bit
18 of sensory input I've had with respect to something
19 like that, I would say no.
20 Q. What about the contents of lectures that
21 you've attended?
22 A. Depending if I'm paying attention, I'll have
23 more or less retention.
24 Q. Conversations?
25 A. The same thing.

Page 436

1 Q. You may -- you may retain all of it,
2 depending upon whether you're paying attention?
3 A. Actually, I don't know if I would say I
4 retain all of it. You know, the label total
5 retention or the assessment total retention was not
6 something I gave to myself. I -- you know, I don't
7 know if there's such a thing as a total retention, a
8 what I would call like a video memory.
9 Q. Well, I'm still trying to understand why you
10 told us that the statement on your own bio that says
11 that you have total retention, that you told us that
12 that's accurate.
13 A. I believe that's true.
14 Q. But what does total retention mean to you?
15 A. It's something that I was told, I was
16 assessed by psychologists and that I scored as
17 having total retention.
18 Q. So your belief comes from what you were told
19 by other people?
20 A. Yes.
21 Q. Okay. Do you by any chance recall how many
22 times you testified "I don't recall" during the
23 prior two days of your deposition?
24 A. No, I don't recall.
25 Q. When was First Principles established?

Page 437

1 A. I think it was pretty early on. I'm not
2 sure. I'm not sure. I don't know the exact date.
3 Q. Can you give us an approximate date?
4 A. That's why I'm trying to think because I
5 wasn't involved in it. I'm thinking on where I have
6 seen the name. I've seen the name on the back of
7 the Ethos brochure, so no. I don't know even the
8 year.
9 Q. Do you know why First Principles was
10 established?
11 A. Yeah. It's my understanding that First
12 Principles is -- controls, if you will, the
13 deployment of the information in the patents, and I
14 think they have the patents or different trademarks
15 or things like that assigned to them, although I'm
16 not sure if that's how it is currently.
17 Q. Okay. Do you know what First Principles is?
18 A. It's a corporation.
19 Q. And you believe that it's the assignee of
20 rights in patents?
21 A. Yeah. I believe it's a recipient of
22 royalties. I believe that it is the recipient of
23 assignment of rights of certain patents and
24 trademarks, but I'm not sure of the extent.
25 Q. What royalties is it the recipient of?

Page 438

1 A. I believe it is the recipient of royalties of
2 the Executive Success/NXIVM curriculum. I think
3 there is a certain percentage of the total business
4 that goes to First Principles.
5 Q. And do you know what First Principles does
6 with that income?
7 A. Not exactly, although I do believe that some
8 of the expenses for patent work and things like that
9 may come out of it.
10 Q. Anything else that you know comes out of the
11 money that goes into First Principles?
12 A. Well, there is a royalty that's supposed to
13 go to me. I don't know how exactly that's handled.
14 Ultimately that's to be paid to a foundation for
15 scientific research.
16 Q. A royalty that is meant to be paid to you
17 goes to someone else?
18 A. A royalty that is on the technology that I
19 have created is meant to go to a scientific
20 foundation.
21 Q. What is that foundation?
22 A. I don't know what it is currently. I think
23 originally it was the one that Joe O'Hara was
24 involved with.
25 Q. But you don't know where that money goes

Page 439

1 today?
2 A. No, I don't know.
3 Q. Do you know what that foundation is meant to
4 do?
5 A. It's supposed to conduct research relating
6 to the technology of Rational Inquiry and try to
7 examine it from the scientific model.
8 Q. What is it that generates the royalty income?
9 A. The curriculum, I believe the sale of
10 courses.
11 Q. The sale of courses. In other words -- and
12 is this the same 10 percent royalty that you told us
13 about last time?
14 A. Yes.
15 Q. And, in other words, 10 percent of all of the
16 income that NXIVM receives from courses goes to --
17 is a royalty payable to a foundation on your behalf?
18 A. I'm not sure if that's quite how it's framed;
19 but I believe that's so, yes.
20 Q. Do you know why the RIM patent was assigned
21 to First Principles rather than to ESP or NXIVM?
22 A. The RIM?
23 Q. Rational Inquiry method patent.
24 A. Yeah, because Executive Success Programs is
25 an administrator of curriculum. They don't put

Page 440

1 together the curriculum. First Principles handles
2 from what I understand the patents and the
3 information. Ultimately the curriculum that is put
4 together is what ESP delivers, so ESP wouldn't have
5 that patent.
6 Q. What about NXIVM? Why wouldn't the patent be
7 assigned to NXIVM?
8 A. I think they're the same companies, ESP and
9 NXIVM. I'm sorry if I'm -- when I say "ESP," I mean
10 NXIVM at this point.
11 Q. Do you use those terms interchangeably?
12 A. I have.
13 Q. Do you think of them as the same?
14 A. No, not exactly. I think of NXIVM as a
15 broader thing. I think of ESP specifically as the
16 Intensive curriculums. Sometimes I think of some --
17 there are some other curriculums that might be
18 offered through ESP that are not the traditional
19 Intensives.
20 Q. Now, you told us I think that you're under
21 the impression that the patents and trademarks have
22 been assigned to First Principles.
23 What about the copyrights?
24 A. I think the copyrights, some of them are
25 assigned to Executive Success Programs because

Page 441

1 materials that Executive Success Programs uses
2 specifically I think the decision was made to assign
3 them there. There have been some things like the
4 Mission Statement which is assigned to me 'cause I
5 wrote that. I think depending on whose -- who owns
6 or uses the material, they may be assigned. I think
7 there are some materials that are copyright First
8 Principles, although I'm not sure.
9 Q. And you're under the impression that the
10 Mission Statement is copyrighted in your name?
11 A. I believe so now.
12 Q. Has the patent that was held by First
13 Principles, has that ever been reassigned to NXIVM?
14 A. A patent -- which patent that was held by
15 First Principles?
16 Q. The Rational Inquiry method patent.
17 A. I don't think so.
18 Q. Okay. Do you know who or what entity
19 currently owns the Rational Inquiry method patent?
20 A. No.
21         MR. KOFMAN: Objection to form.
22 Q. Let's turn to the Exhibit that was previously
23 marked as Raniere-11.
24         And for the record, this is an Affidavit of
25 Keith Raniere dated August 18, 2003.

Page 442

1         MR. CAMPION: What was the date?
2         MR. SKOLNIK: August 18, 2003.
3         MR. CAMPION: I have August 22 on Page
4 15. I think it makes no difference, frankly.
5         THE WITNESS: I have August 22 on this
6 version as the sworn date. I don't know what --
7         MR. CAMPION: It doesn't matter. The
8 witness has the Exhibit.
9 BY MR. SKOLNIK:
10 Q. All right. August of 2003. And,
11 Mr. Raniere, if you'd turn to Page 15 and just
12 confirm that that's your signature.
13 A. Yes.
14 Q. Okay.
15 A. That is my signature --
16 Q. All right.
17 A. -- I believe.
18 Q. In Paragraph 1 you say, "I am the founder of
19 NXIVM Corporation formerly known as Executive
20 Success Programs, Inc. ('NXIVM')."
21 A. Uh-huh.
22 Q. Are you also the founder of Executive Success
23 Programs?
24 A. Yes. I believe so, yeah.
25 Q. And does Executive Success Programs still

Page 443

```
 1  exist?
 2     A. It exists at least as a DBA. I don't know if
 3  it exists as a separate corporation.
 4     Q. Do you know whether the corporation has been
 5  dissolved?
 6     A. No, I don't know.
 7     Q. Are you the founder of First Principles?
 8     A. You know, I'm not sure. I never thought of
 9  it. Being a founder is not so much of a legal title
10  in my estimation.
11     Q. So you don't know whether you're the founder
12  of First Principles?
13     A. Yeah. I don't think it was my idea that
14  First Principles be formed.
15     Q. Does -- does First Principles utilize the
16  Rational Inquiry method?
17     A. I'm not really sure because I'm not sure of
18  everything that First Principles does.
19     Q. But as far as you know, First Principles
20  still exists?
21     A. Yes.
22     Q. Were you actively involved in Executive
23  Success Programs when it became NXIVM?
24     A. Can you tell me what you mean by "actively
25  involved"?
```

Page 444

```
 1     Q. Well, let me ask a different question.
 2        At the point when Executive Success Programs
 3  became NXIVM, what was your role with either or both
 4  of those entities?
 5     A. I created curriculum. From time to time, I
 6  gave forums. I answered philosophical and ethical
 7  questions. Sometimes I gave opinion on any sort of
 8  problems that came up.
 9     Q. So is it fair to say that you were not out
10  of the picture of ESP and NXIVM at that point?
11     A. I would say that's correct.
12     Q. In what way are you the founder of NXIVM
13  Corporation?
14     A. The idea for such a curriculum, the idea of
15  having a school or I should say a -- not really a
16  school; it's a program -- and even sometimes the
17  ideas of having different types of programs come
18  from me.
19     Q. Do you consider anyone else to be a founder
20  of NXIVM?
21     A. Nancy Salzman could be considered possibly a
22  founder, depending on if you're talking about a
23  philosophical founder or a business founder.
24     Q. Well, what kind of founder are you talking
25  about in Paragraph 1?
```

Page 445

```
 1     A. I assume I'm a philosophical, yes. I said
 2  I'm the founder of NXIVM Corporation, formerly
 3  Executive -- I'm the philosophical founder of that.
 4     Q. Is anyone else a philosophical founder of
 5  NXIVM?
 6     A. I don't believe so, no.
 7     Q. If you turn to Paragraph 34 of your
 8  Affidavit, you say, "In 1998 I met Nancy Salzman.
 9  She was an international authority on human
10  potential. She had trained over 25,000 people in
11  communication methods and she had studied with many
12  of the top people in the world in this field. I
13  determined she was ideal person to learn, duplicate
14  and apply my model."
15        Is Rational Inquiry method the model that you
16  were referring to?
17     A. Part of it. At that point in time, I had
18  developed certain techniques and certain models of
19  human behavior, which I had not found anyone that I
20  felt I would want to or could co-experiment with me
21  on how to develop that model, and I felt that she
22  was the person.
23     Q. Was the Rational Inquiry model fully formed
24  at that point?
25     A. No.
```

Page 446

```
 1     Q. You continued to develop it after you met
 2  Nancy Salzman?
 3     A. Yes.
 4     Q. When you say that you determined that she
 5  was the ideal person to learn, duplicate and apply
 6  my model, was this the start of ESP and NXIVM?
 7     A. No. We did work before, before we created
 8  ESP/NXIVM.
 9     Q. In other words, you met her, you did work;
10  and it was some time later that you formed ESP and
11  NXIVM?
12     A. Yes.
13     Q. Did Nancy Salzman sign a confidentiality
14  agreement before beginning to learn, duplicate and
15  apply your model?
16     A. She signed a confidentiality agreement
17  relating to another company at that time. She also
18  made confidentiality assertions which I think at the
19  time were videoed, so, yes. She affirmed a
20  confidentiality, and she did sign a confidentiality
21  agreement at the time.
22     Q. You say she signed a confidentiality
23  agreement with another company.
24        What company was that?
25     A. National Health Network.
```

Page 447

1   Q. And what is the relationship of National
2   Health Network to NXIVM or ESP?
3   A. Well, National Health Network became a buying
4   organization within NXIVM/ESP, but National Health
5   Network was a health company, and people who entered
6   into that company signed confidentiality agreements
7   with respect to information that they came in
8   contact with.
9   Q. Would that confidentiality agreement have
10  encompassed all of the methods and training in
11  NXIVM?
12  A. No.
13  Q. What specifically did you do to mentor
14  Nancy Salzman?
15  A. We would have meetings. We would discuss
16  different issues that came up. She was doing work
17  in the human performance field. I would help her
18  solve problems. I would teach her techniques which
19  she would practice and then come back and we would
20  talk about them.
21  Q. The model that you refer to in Paragraph 34,
22  was that model written down?
23  A. There were parts. There's one part of the
24  model in particular that was written down. The rest
25  was not.

Page 448

1   Q. Did you provide Nancy Salzman with any
2   written materials or books?
3   A. Yes. I provided her that one piece of
4   written material.
5   Q. Is that all you provided her?
6   A. As far as written materials, yes.
7   Q. Did you and Nancy Salzman co-own ESP?
8   A. No.
9   Q. Who owned ESP?
10  A. Nancy Salzman owns ESP.
11  Q. And did she always own ESP?
12  A. Yes.
13  Q. Did you put up any money?
14  A. No.
15  Q. Was Rational Inquiry your contribution to ESP
16  rather than cash?
17  A. I -- I don't know how contributions to ESP
18  worked, but I certainly did contribute the
19  technology of Rational Inquiry to be utilized within
20  the curriculum of ESP.
21  Q. Were you ever a director or an officer of
22  ESP?
23  A. Not that I know of, no.
24  Q. Did Nancy Salzman put up money for the
25  foundation of ESP?

Page 449

1   A. I'm not sure. I believe she would have had
2   to, but I don't know.
3   Q. Why do you say she would have had to?
4   A. Because I think when you create a corporation
5   it costs money.
6   Q. Do you know if anyone else put up any money
7   for the formation of ESP?
8   A. No, I do not know.
9   Q. You don't know?
10  A. I don't know.
11  Q. Was anyone else involved in the opening or
12  the creation of ESP other than you and Nancy
13  Salzman?
14  A. Yes. We had a group of people that we
15  brought through some initial curriculum and, yeah,
16  there was a small group of people.
17  Q. This was before ESP was formed as a
18  corporation?
19  A. I believe it was after, but I'm not positive.
20  Q. Well, I'm asking whether or not anybody else
21  was involved with the actual formation of the
22  corporation other than you and Nancy.
23  A. Oh, not that I know of.
24  Q. And Nancy Salzman is the President and sole
25  shareholder of NXIVM?

Page 450

1   A. Yes, to my knowledge.
2   Q. And she was the sole shareholder of ESP?
3   A. Yes, to my knowledge.
4   Q. Now, you told us last time that you have
5   never been employed by NXIVM or First Principles;
6   is that right?
7   A. I believe so.
8   Q. Well, wouldn't you know whether you were
9   ever an employee of either of those entities?
10  A. I don't know what the legal definition of
11  "employee." I have never earned any money in the
12  form of a salary or I have not had any job
13  description that I knew of per se.
14  Q. What about ESP? Were you ever an employee of
15  ESP?
16  A. Same thing. No, not to the best of my
17  knowledge.
18  Q. Have you ever had a financial or other
19  ownership interest in NXIVM?
20  A. No.
21  Q. What about in ESP?
22  A. No. The only direct interest is the royalty
23  that's supposed to go to a foundation, so I don't --
24  I don't know how you'd consider that, but I don't
25  consider that having an interest in the corporation.

Page 451

1   Q. And that royalty comes from First Principles?
2   **A. I believe it does.**
3   Q. As far as you know, has that royalty been
4   paid?
5   **A. I don't think it's been paid. I don't think**
6   **there's been any profits.**
7   Q. Oh, the 10 percent royalty is only paid when
8   there are profits?
9   **A. Originally the 10 percent royalty was**
10  **supposed to be paid after ESP reached a certain**
11  **success and was supposed to be paid out of profits.**
12  **The 10 percent royalty is not supposed to ever**
13  **endanger the business' functioning, so I don't think**
14  **there's been any profit so I don't know how that's**
15  **handled.**
16  Q. So when you say you don't think there's ever
17  been any profits, you're saying that NXIVM has never
18  been a profitable corporation?
19  **A. To my knowledge, I don't think it has.**
20  Q. So other than the 10 percent share of
21  profits, you have no current ownership interest in
22  NXIVM or ESP or First Principles; is that right?
23  **A. It's not a 10 percent share of profits. It's**
24  **a 10 percent royalty to be paid from profits; but to**
25  **answer your question, no, I do not.**

Page 452

1   Q. Do you own any interest in any
2   NXIVM-affiliated company?
3   **A. Not that I know of, no.**
4   Q. Have you personally ever derived income of
5   any sort from NXIVM?
6   **A. No, not that I know of.**
7   Q. Well, again, you say not that you know of.
8   Wouldn't you know if you had derived income?
9   **A. Depending on how you define "income." I**
10  **have gone over to Nancy's house on some mornings,**
11  **and she makes me omelettes and things like that.**
12  **No. I would answer your question squarely with**
13  **respect to money, things like that, no.**
14  Q. And is that also true of ESP and First
15  Principles?
16  **A. Yes.**
17  Q. Who do you believe holds the copyright on the
18  Rational Inquiry modules?
19  **A. I'm not sure. I think ESP holds the**
20  **copyrights on the modules directly, but I'm not**
21  **positive of that. I'd have to look -- look at the**
22  **bottom of the modules.**
23  Q. Now, is it accurate that you created the
24  concepts and the order of the concepts in the
25  modules, but you did not actually write them?

Page 453

1   **A. Yes.**
2   Q. Who actually -- who actually wrote the
3   modules?
4   **A. I'm not sure.**
5   Q. You don't know who any of the authors of the
6   modules are?
7   **A. I know who some of them might have been, and**
8   **I believe it's changed over time.**
9   Q. Who are some of the people who you believe
10  might have been the authors of the modules?
11  **A. Nancy Salzman, Lauren Salzman, Ivy Nevares.**
12  **I think there are a few other people, but I'm not**
13  **sure. It's whoever can write.**
14  Q. When a module is written, does it come to you
15  for review?
16  **A. Most of the time, no.**
17  Q. And has that been true from the beginning?
18  **A. In the beginning, I did review more of the**
19  **modules. I don't believe I reviewed every one, but**
20  **I think of the basic 20 modules ultimately I had**
21  **reviewed probably all of them.**
22  Q. Okay. Did you assist or participate in the
23  writing process of any of the modules?
24  **A. Yes.**
25  Q. Which ones?

Page 454

1   **A. I don't know. It was very long ago. I think**
2   **I helped edit the Tribute module. I might have**
3   **helped with writing one or two of the intros to show**
4   **how to give a -- sort of an introduction or a flavor**
5   **to the modules.**
6   Q. Now, you say that it was long ago. Would
7   your involvement in the writing process of modules
8   be restricted to the core 20 modules that you
9   referred to?
10  **A. Mostly. There may have been some outside of**
11  **that, but that was where I was primarily involved in**
12  **the writing.**
13  Q. Did you ever have any written agreement with
14  the authors of the modules?
15  **A. Other than the confidentiality agreements, I**
16  **don't think so. I didn't.**
17  Q. You didn't?
18  **A. I did not have an agreement with them other**
19  **than the confidentiality agreements.**
20  Q. What about an oral agreement with them?
21  **A. I think there are a lot of oral agreements.**
22  **Whenever someone writes a module, those things are**
23  **to be kept in strict confidence. And, as I said,**
24  **there would only be very few people who would write**
25  **the modules. As I said, I know of Nancy Salzman,**

Page 455

1  Lauren Salzman and Ivy. Nancy may know of a few
2  other people, but I don't think there have been that
3  many.
4      Q. Do you know how -- well, I think you told us
5  that whoever it is that owns the copyrights on the
6  modules, it was not the actual authors of the
7  modules. Is that your understanding?
8      A. That is my understanding.
9      Q. So how did the current owner of the
10 copyrights become the owner of the copyrights if
11 they were not the authors?
12     A. I think the authors were assigned by Nancy
13 Salzman who is owner of, to my knowledge, both First
14 Principles and Executive Success Programs, and I
15 don't think the auth -- the modules weren't
16 necessarily authored by any one person. I don't
17 know the details of how or why choices are made to
18 copyright in different situations necessarily.
19     Q. So as far as you know, whoever it is that
20 actually wrote the modules did that as a work for
21 hire for Nancy?
22     A. I don't know the term, but I suppose. It's
23 as directed through Nancy.
24     Q. And do you know for what entity they were
25 creating the modules?

Page 456

1      A. In general, the modules were created to be
2  used by ESP. That's the best I know.
3      Q. So as far as you know, the authors assigned
4  their copyrights to ESP?
5      A. I don't know if they had copyrights to
6  assign. If they did, I suspect they would have.
7      Q. Okay. Now, do you know whether or not ESP
8  assigned the copyrights to NXIVM?
9      A. No, I don't know.
10     Q. Do you receive any money personally from
11 NXIVM followers?
12     A. No, not that I know of. No.
13     Q. Do you receive any money from Sara Bronfman?
14     A. No, not that I know of.
15     Q. Well, again, you say not that you know of.
16 Wouldn't you know if you receive money?
17     A. I'm being general. I -- no, I do not receive
18 any monies, dollars. My concern is, for example, if
19 Sara Bronfman pays for part of Vanguard Week and
20 part of Vanguard Week is a celebration of my
21 birthday, is that considered my receiving monies
22 from Sara Bronfman?
23         If you're asking in a traditional sense do I
24 receive from Sara Bronfman, no, nor have I.
25     Q. What about from Claire Bronfman?

Page 457

1      A. No.
2      Q. Do either Sara or Claire Bronfman cover any
3  of your living expenses?
4      A. No.
5      Q. Does the Rational Inquiry method address
6  lying?
7      A. Yes, to some degree.
8      Q. What does the Rational Inquiry method teach
9  about lying?
10     A. Well, I don't know if it teaches anything
11 specific. The Rational Inquiry method is a method
12 of analyzing human behavior and decision making. So
13 if a decision does not match with a certain aspect
14 of reality, I guess you would consider that a lie,
15 so it addresses lying.
16     Q. Pursuant to the Rational Inquiry method, are
17 there any circumstances when lying is acceptable?
18     A. The method would not address that but the
19 curriculum would; and within the curriculum, I
20 believe there is one example we use where lying is
21 acceptable.
22     Q. And what is that? What is the circumstance
23 when lying is acceptable?
24     A. I believe if you -- in the extreme, if you
25 are in Nazi Germany and you have your family

Page 458

1  upstairs and a Nazi soldier comes to the door and
2  you believe because you've seen the Nazi soldiers
3  enter other houses and kill the families that if you
4  are asked, "Is your family here?" and you say "no"
5  as a lie, that is a strategic lie that is valuable.
6      Q. So the training incorporates the notion of
7  strategic lies. What about white lies?
8      A. I don't know what you mean by "white lies."
9      Q. Let me ask a different question. Under
10 NXIVM's teaching, is lying ever acceptable to
11 protect the executive enterprise?
12     A. The executive -- you mean ESP?
13     Q. Well, yes.
14     A. I don't think that would be addressed. We
15 address ethics. Lying -- things like lying, things
16 like how you make a decision are tools that people
17 use, so the use of those -- the tools themselves are
18 one thing, but the use of the tools is what ethics
19 would address.
20     Q. Under NXIVM's ethical constructs, is it ever
21 acceptable to use the tools to conclude that lying
22 is appropriate?
23     A. I would imagine lying could be appropriate in
24 certain circumstances.
25     Q. Give me some examples.

Page 459

1  A. Well, as I said, Nazi Germany; someone comes
2  to your house. I think in a circumstance where
3  someone is -- has bad intent, is looking to destroy
4  especially other human life or human values, if you
5  are put in a circumstance that is what you would say
6  an immoral circumstance, then strategic lies are
7  sometimes utilized or good. I can't think of
8  examples off the top of my head.
9  Q. Well, let me ask you this. I think you've
10  told us that you think that Rick Ross has malintent,
11  haven't you?
12  A. I said I think Rick Ross may have bad intent.
13  Q. Okay. In your view then, would it be
14  acceptable for you or Nancy or Kristin Keeffe to lie
15  under oath because of what you view as Rick Ross'
16  intention to harm NXIVM?
17  A. I doubt it. I would have to see the
18  circumstance. I have not lied under oath. I don't
19  know what their ethics or what their circumstances
20  are, but the reason why we're going through legal
21  proceedings is because of the ethics of the law
22  so...
23  Q. In your view, is lying under oath ever
24  acceptable?
25  A. I suspect I could derive a situation under

Page 460

1  which -- under which lying under oath would be
2  acceptable.
3  Q. Now, you have a personal code of ethics?
4  A. Yes.
5  Q. What does your personal code of ethics say
6  about lying?
7  A. Well, in every decision I try to be mindful
8  and weigh out what the best thing to do is.
9  Q. And sometimes the best thing to do is to lie?
10  A. I would say that's a very rare circumstance.
11  I don't think of myself as lying very much.
12  Q. Did you read the deposition transcript of
13  Kristin Keeffe?
14  A. No.
15  Q. You never read it?
16  A. I don't believe so, no.
17  Q. Did she talk to you about the deposition?
18  A. I don't recall right off specifically. She
19  mentioned she was deposed. I don't believe she
20  talked to me about any of the content.
21  Q. Did she say anything to you about whether
22  she had told the truth during her deposition?
23  A. I don't think that was mentioned.
24  Q. It wasn't mentioned?
25  A. No.

Page 461

1  Q. Okay. In our prior deposition sessions we
2  were working with your definition of a trade secret,
3  and I want to be sure that we're talking about the
4  same thing today.
5  I believe you told us that a trade secret is
6  something we believe is unique that we keep as a
7  secret and if it were not kept secret would be a
8  disadvantage to us.
9  Do I have that right?
10  A. I think that's an overview of it, but I --
11  again, I don't believe I necessarily know what a
12  trade secret is so that's a -- what I would say was
13  my on-the-moment lay definition.
14  Q. And will it serve as your definition for
15  today?
16  A. For now, yeah.
17  Q. To the best of your knowledge, does NXIVM
18  consider all of its modules and materials
19  proprietary and confidential?
20  A. Yes.
21  Q. Do you?
22  A. Yes, except those that for some reason NXIVM
23  would decide to release in a more public setting
24  or...
25  Q. Do you have a contract or confidentiality

Page 462

1  agreement with NXIVM?
2  A. I don't believe I have anything other than
3  the other -- the agreements that I have signed. I'm
4  not sure if any of the agreements incorporate my
5  confidentiality, although I take that as part of the
6  agreement.
7  Q. What agreements have you signed?
8  A. Well, there's student agreements. There are
9  things that I've signed at Arlen's office, things
10  relating to either patents or I don't know if I've
11  specifically signed one with respect to assignment
12  of royalties and things like that but all of
13  whatever those agreements are.
14  Q. But as far as you know, you've never signed
15  anything that was specifically a confidentiality
16  agreement?
17  A. I don't know if I've signed specifically a
18  confidentiality agreement.
19  Q. You are in a small circle of people who know
20  all of NXIVM's trade secrets, isn't that right?
21  A. I am not sure if I know all of NXIVM's trade
22  secrets because I'm not sure I know what trade
23  secrets are. I know a set of important trade
24  secrets relating to Rational Inquiry.
25  Q. And is it a small group of people who know

Page 463

1 that group of trade secrets?
2 **A. Most of them are either known by myself,**
3 **myself and Nancy only. There may be one or two**
4 **other people that know some of the trade secrets.**
5 Q. Who are those people?
6 **A. Karen Unterreiner is one of them;**
7 **Lauren Salzman is another.**
8 Q. So is the group that knows --
9 **A. I'm sorry. Kristin Keeffe may know some,**
10 **also.**
11 Q. Okay. So the group that knows most of
12 NXIVM's trade secrets is you, Nancy Salzman, Kristin
13 Keeffe, Lauren Salzman, and Karen Unterreiner?
14 **A. I would say that's the group that knows the**
15 **most of the trade secrets. The -- for example,**
16 **people who are trainers and people who are coaches**
17 **and people who are facilitators all know some trade**
18 **secrets; but when you talk about who has the most**
19 **robust knowledge of the trade secrets, it would be**
20 **those people.**
21 Q. Okay. Now, you conducted what you have
22 identified as in-depth scientific research during
23 your development of the Rational Inquiry method.
24 Has any of your research been published in any
25 peer-reviewed journals?

Page 464

1 **A. I don't think any of the direct research**
2 **relating to Rational Inquiry has been published in**
3 **any peer-reviewed journals. Some of the research I**
4 **have done in my career may have been published. I**
5 **do not know.**
6 Q. You don't know whether it's been published?
7 **A. Correct.**
8 Q. During the course of your development of the
9 Rational Inquiry method, did you write up your
10 research?
11 **A. I have not written up my research relating to**
12 **the Rational Inquiry method yet.**
13 Q. You haven't written it up --
14 **A. Written yet.**
15 Q. Yet?
16 **A. Relating to the Rational Inquiry method**
17 **itself.**
18 Q. So all of your research related to the
19 Rational Inquiry method is stored in your head?
20 **A. No. The research that I did before I**
21 **discovered the Rational Inquiry method, which aided**
22 **in my understanding human behavior which aided in my**
23 **understanding computers and things like that, was**
24 **not all stored in my head. The things that are**
25 **related to Rational Inquiry are primarily stored in**

Page 465

1 my head, yes.
2 Q. What materials were not stored in your head?
3 **A. Computer programs that I had written, data**
4 **analysis that I had written relating to the gamma pi**
5 **project that I worked on. There were some things**
6 **when I taught computers and things like that that**
7 **were written.**
8 Q. Now, I assume that you consider the Rational
9 Inquiry method a trade secret.
10 **A. I think it's a big thing, so yes, although I**
11 **-- I suspect, yes, I would consider it a trade**
12 **secret.**
13 Q. And you consider it proprietary?
14 **A. Yes.**
15 Q. Who has access to the Rational Inquiry
16 method?
17 **A. The full method?**
18 Q. Yeah.
19 **A. Nancy Salzman. She's the main person.**
20 Q. Is the Rational Inquiry method the basis or
21 foundation for all of NXIVM's trade secrets and
22 modules and materials?
23 **A. I don't know.**
24 Q. What is your understanding of the degree to
25 which the Rational Inquiry method is the basis for

Page 466

1 NXIVM's modules?
2 **A. I think relating to the human behavior model,**
3 **Rational Inquiry is the basis of that. Some of the**
4 **things within the corporation which may be trade**
5 **secrets I don't know, either business methods or**
6 **other mechanizations that are unique probably are**
7 **trade secrets; but I don't know if they have**
8 **anything to do directly with the Rational Inquiry**
9 **method.**
10 Q. Well, putting aside business techniques and
11 focusing only on the training, the NXIVM training,
12 is the Rational Inquiry method the basis of all of
13 that training?
14 **A. I believe so.**
15 Q. Did you give Nancy Salzman any documents
16 reflecting or memorializing the Rational Inquiry
17 method to assist her in developing the modules or
18 in working with others to develop the modules?
19 **A. No, not that I know of at all.**
20 Q. So was all of the information conveyed
21 orally?
22 **A. Yes. There have been a few charts that I've**
23 **written that are used in some of the advanced**
24 **courses. There may have been a few other things,**
25 **but in general it was conveyed orally.**

Page 467

1    Q.  So when you were working with -- with Nancy
2  or with other authors in anticipation of the
3  creation of a module, you would simply talk to them;
4  and then they would go off and write the module?
5    A.  Yes.  I think that would be a general way of
6  putting it, yes.
7    Q.  Did Nancy take any notes in your presence?
8    A.  Yes.
9    Q.  What about the other authors that you met
10  with?
11    A.  There are not many people who have -- well,
12  with respect to Rational Inquiry within NXIVM, the
13  only other people that have aided in any way in
14  authoring a module are Karen Unterreiner and
15  Lauren Salzman.
16    Q.  And did they take notes?
17    A.  Yes, I believe so.
18    Q.  Okay.
19        MR. SKOLNIK: Let the record reflect a
20  request for any notes taken by Nancy Salzman, Karen
21  Unterreiner or Lauren Salzman.
22        (Request.)
23        MR. McGUIRE: Is that consistent with
24  your position that the discovery period is over and
25  you're not entitled to that?

Page 468

1        MR. SKOLNIK: It is because it's already
2  been asked for, Bill.
3        MR. McGUIRE: Oh, it's already been
4  asked for?
5        MR. SKOLNIK: Yeah.
6        MR. McGUIRE: Okay.
7  BY MR. SKOLNIK:
8    Q.  Let me ask you to turn to Paragraph 37 of
9  your Affidavit.
10    A.  Yes.
11    Q.  And in Paragraph 37 you told us, "When
12  someone signs up for a program, they sign a
13  confidentiality agreement.  The first module they
14  take is 'Rules and Rituals.'"
15    A.  Uh-huh.
16    Q.  "Within this module they learn of the
17  12 point Mission Statement."
18    A.  Uh-huh.
19    Q.  Did I read that accurately?
20    A.  Yes.
21    Q.  So am I correct to assume that Rules and
22  Rituals is a key module?
23    A.  I don't know what you mean by "key module."
24  It is an important module, and it is one of the
25  first modules taken.

Page 469

1    Q.  Okay.
2    A.  I want to say that it is one of the first
3  modules taken in certain programs within the NXIVM
4  purview.
5    Q.  There are some programs where Rules and
6  Rituals is not one of the first modules?
7    A.  Correct.
8    Q.  Okay.  Is it one of the first modules in the
9  Intensive?
10    A.  Yes.
11    Q.  I'm going to give you a list of concepts
12  contained in certain NXIVM modules and ask you to
13  tell me if that concept is a trade secret or if
14  NXIVM considers it proprietary or confidential.
15        These concepts come from the Rules and
16  Rituals module.  Sashes and scarves.
17    A.  I can't speak for what NXIVM thinks is
18  confidential.  I think that the sashes and scarves
19  have certain confidential aspects to them.
20    Q.  Is there something in the nature of a trade
21  secret about secrets (sic) and scarves?
22    A.  About sashes and scarves?  I think if people
23  were to disclose all the things relating to sashes
24  and scarves and how they are used, there may be
25  trade secrets disclosed; and certainly it would be

Page 470

1  undesirable for us because that is confidential
2  information, private property.
3    Q.  What about promotion?  Is that also
4  confidential information, private property?
5    A.  Yes.
6    Q.  Pictures of founders in the class?
7    A.  Yes.  Those don't exist, though.
8    Q.  Removal of shoes.
9    A.  Depending -- the actual removal of shoes is
10  not a trade secret, per se, but it is how it is used
11  and why.  There are trade secrets that are I believe
12  confidential information involved with that.
13    Q.  Are there trade secret aspects to bowing?
14    A.  I would imagine that is so, also, yes.
15    Q.  What about standing when high rank enters?
16  Is that in the nature of a trade secret?
17    A.  I -- it in itself is just a window into
18  confidential information and trade secrets, but
19  standing when a certain person enters a room is a
20  custom I believe that's practiced in many contexts.
21    Q.  But the way in which it's employed within
22  NXIVM is in the nature of a trade secret?
23    A.  I think it is involved with some of the trade
24  secrets.
25    Q.  What about the ESP handshake?

Page 471

1    A. The same thing. I would classify it the same
2 way.
3    Q. There is something of the nature of a trade
4 secret about it?
5    A. I think it may be a window to trade secrets;
6 and certainly certain things as to how it's used,
7 why it's used are confidential and important to us.
8    Q. And when you say it's a window to trade
9 secrets, in what way is it a window?
10    A. Well, if you have -- if you have trade secret
11 information and you give various aspects of the
12 trade secret information out without giving the
13 trade secret, per se, you can transmit the trade
14 secret; so inasmuch as something can be used to
15 transmit a trade secret when you have the trade
16 secret, it becomes a window.
17    Q. So is the entire Rules and Rituals module a
18 trade secret, and all of these different parts of
19 the Rules and Rituals module are windows into the
20 overall trade secret?
21    A. When you say "the entire Rules and Rituals
22 module," there's the written portion of the Rules
23 and Rituals module. There's the practice portion of
24 the Rules and Rituals module. There's the
25 conceptual portion of the Rules and Rituals module.

Page 472

1 Depending on how much of those things one has, it
2 starts to create a window, more of a window into
3 possibly smaller or even larger trade secrets.
4    Q. So the written portion is only a portion of
5 the trade secret?
6    A. That is correct.
7    Q. So someone couldn't reconstruct or reverse
8 engineer the trade secret just from the written
9 portion, is that right?
10    A. Oh, I don't know that. I -- someone may be
11 that clever.
12    Q. Well, if they didn't have any experience of
13 the way it's taught and what actually goes on in the
14 session --
15    A. Uh-huh.
16    Q. -- but only had the written materials, could
17 they reverse engineer the entire process?
18    A. I'm not sure. They might be able to.
19    Q. What about stripes signifying rank? Is that
20 in the nature of a trade secret?
21    A. That's similar again to the sashes, although
22 different types of stripes and demarcations in
23 general culture signify different types of ranks, so
24 that in itself is not. The fact that that is part
25 of the puzzle may create a window.

Page 473

1    Q. Recitation of the Mission Statement. What is
2 that in the nature of?
3    A. A similar thing.
4    Q. How about use of phone trees?
5    A. I would say a similar thing, yes.
6    Q. The confidentiality of materials?
7    A. I would say, again, these are all pieces.
8    Q. They're all windows into the trade secret
9 that is the entirety of the Rules and Rituals
10 module?
11    A. Potential windows.
12    Q. And the wearing of standard business attire,
13 same thing?
14    A. Yes. That could be classified the same
15 thing.
16    Q. Okay. What did you do to come up with these
17 Rules and Rituals?
18    A. I guess I'm not exactly sure what you're
19 asking.
20    Q. Well, were you the one who conceived all of
21 these Rules and Rituals?
22    A. I believe so.
23    Q. Okay. What I'm asking is how you conceived
24 them. What, if any, research did you do; or did you
25 just sit and think? What was the basis of your

Page 474

1 conception of these Rules and Rituals?
2    A. Different Rules and Rituals come from
3 different things, and depending on -- in some cases,
4 some of what I had studied, in some cases some of
5 what I have observed, in some cases, some of what
6 I've read, those experiences are embodied in the
7 Rules and Rituals, and each of them have a purpose
8 and a meaning based on those things.
9         THE VIDEOGRAPHER: Excuse me. We have
10 to change tapes.
11         MR. SKOLNIK: Okay. Well, why don't we
12 take a short break.
13         (At this point, there was a short
14 recess.)
15         THE VIDEOGRAPHER: This is the beginning
16 of Tape Number 2. The time is 11:13.
17
18 CONTINUED CROSS-EXAMINATION BY MR. SKOLNIK:
19    Q. Mr. Raniere, we were talking about the
20 various Rules and Rituals.
21         Did you spend any money developing the Rules
22 and Rituals?
23    A. I think over my lifetime I've spent money for
24 my experience, but did I spend money to develop
25 those things directly at the moment I developed

Page 475

1 them, no.
2 Q. Okay. Do these Rules and Rituals give NXIVM
3 an advantage over its competitors?
4 A. I believe they do.
5 Q. How?
6 A. I believe that the Rules and Rituals act to
7 some degree as a protection and a swording as does
8 the patent and the copyright and things like that so
9 that people who are likely to want to take the ESP
10 curriculum will and people who are not likely to
11 either want to take the curriculum will not.
12 Q. Well, you've described why you think that
13 they are important; but my question is in what way
14 they give NXIVM an advantage over its competitors.
15 A. If I'm a corporation and I have a way of
16 selecting clients that is superior to the way my
17 competitors select clients, I have a competitive
18 advantage.
19 Q. Do the Rules and Rituals inform how NXIVM
20 selects clients?
21 A. The Rules and Rituals aid in NXIVM selecting
22 clients.
23 Q. Aren't clients only exposed to the Rules and
24 Rituals once they have selected NXIVM?
25 A. To some degree, but there are clients who

Page 476

1 leave at Rules and Rituals; and there are clients
2 who hear about certain aspects of the Rules and
3 Rituals that we have released that may never come
4 because of those.
5 Q. Do any of NXIVM's competitors use these Rules
6 and Rituals?
7 A. I don't know. I suspect NXIVM's competitors
8 use Rules and Rituals of their own.
9 Q. But not NXIVM's Rules and Rituals?
10 A. Well, I'm not sure.
11 Q. You have no knowledge of any competitor using
12 NXIVM's Rules and Rituals?
13 A. Um, I have knowledge I think of competitors
14 or what you might call competitors using similar
15 devices to NXIVM's that may serve them.
16 Q. Give me some examples.
17 A. Take, for example, if you -- depending on how
18 you view it, the Elks Club. If that is considered
19 in some ways a competitor for people's time with
20 NXIVM, they have a title from what I've heard. The
21 head of their areas -- and it might be the lodge;
22 I'm not sure -- is called the Grand Exalted Ruler.
23 That serves a purpose within that organization which
24 I'm not privy to, but there are certainly people who
25 will thrive with something like that and people who

Page 477

1 will not; than is a type of selection device I
2 suspect the Elks Club uses to have people who are
3 Elks or not.
4 Q. But the Elks Club didn't get the Rules and
5 Rituals from NXIVM, did it?
6 A. In that case, I don't know. That concept,
7 though, is applied in a way but not from us.
8 Q. And you consider the Elks Club a competitor
9 of NXIVM's?
10 A. If you're looking at the Elks Club as an
11 organization to which people may develop their time
12 or believe it increases their joy, betterment --
13 their betterment in life, their feeling of that,
14 then it is because NXIVM looks to help people
15 increase their joy and increase their ability to
16 make ethical decisions. I think the Elks Club does
17 the same thing.
18 Q. So any organization that helps people
19 increase their joy or make ethical decisions is a
20 competitor of NXIVM's?
21 A. I think could be considered a competitor of
22 NXIVM's for people's time certainly and maybe even
23 also commerce.
24 Q. Do you know whether or not any direct
25 competitors in the sense of teaching executive

Page 478

1 training use these Rules and Rituals?
2 A. Um, I think there are organizations like
3 maybe in General Electric that use some sort of a
4 ranking system. I think they have like black belts,
5 green belts or some such thing like that. I know
6 that there have been martial arts organizations that
7 have translated over to do corporate training and
8 executive performance training. They certainly use
9 titles and ranks to some degree. Now, I don't know
10 exactly how they use them or why they use them.
11 That would be their trade secrets. So, yes, I mean,
12 I imagine a number of them.
13 Q. Is it your understanding that they developed
14 these trade secrets independently and not from
15 NXIVM?
16 A. I wouldn't know. I mean, the older ones
17 developed them independently of NXIVM I'm sure.
18 Q. You told us last time when we were discussing
19 Paragraph 38 of Raniere-11 that the 12 point Mission
20 Statement is the foundational principle and
21 principles from which everything else is ultimately
22 derived and that in some way, shape or form all ESP,
23 NXIVM flows from the 12 point Mission Statement.
24 Is that right?
25 A. I don't know if that's precisely what I said.

---

**Page 479**

1    Do you have the deposition transcript?
2    Q. Well, let me ask you if you think that that's
3    a true statement?
4    A. Could you repeat it?
5    Q. The 12 point Mission Statement is the
6    foundational principle and principles from which
7    everything else is ultimately derived.
8        MR. McGUIRE: What are you reading from,
9    Mr. Skolnik, what paragraph?
10       MR. SKOLNIK: I'm not reading from any
11   paragraph, Bill.
12       MR. McGUIRE: Are you reading from a
13   transcript?
14       MR. SKOLNIK: I'm --
15       MR. McGUIRE: Oh, I'm sorry. I thought
16   you were quoting something. I beg your pardon.
17       MR. SKOLNIK: I'm quoting Mr. Raniere's
18   testimony at his last deposition.
19       MR. McGUIRE: Okay.
20   A. And I can't see that?
21   Q. That the 12 point Mission Statement is the
22   foundational principle and principles from which
23   everything else is ultimately derived; and in some
24   way, shape or form all of ESP, NXIVM flows from the
25   12 point Mission Statement.

---

**Page 480**

1    A. Okay. What I would say is that the 12 point
2    Mission Statement embodies some bas -- some of the
3    very basic principles, the starting principles of
4    all of ESP, NXIVM. I even think there have been
5    other principles certainly developed after that, but
6    the very start of ESP, NXIVM -- now NXIVM was a
7    certain type of discovery and understanding. That
8    discovery and understanding was embodied in part in
9    the 12 point Mission Statement, yes, so I think that
10   is a foundational document.
11   Q. Okay. So Rules and Rituals and the Mission
12   Statement are important and valuable trade secrets
13   for NXIVM, is that right?
14   A. Well, I don't know about the 12 point Mission
15   Statement being a trade secret. The 12 point
16   Mission Statement is a copyrighted work of mine.
17   Rules and Rituals is a different thing. Rules and
18   Rituals is a whole module. There's the actual
19   statement, the copyrighted module, and then there's
20   the practices of it, and then there's the concepts
21   behind it. I think when you talk about Rules and
22   Rituals, it's a much more robust thing.
23   Q. What about the module called Tribute? Is
24   that an important and valuable trade secret of
25   NXIVM's?

---

**Page 481**

1    A. I think the module Tribute -- are you talking
2    about the written form of the module?
3    Q. The written form of the module.
4    A. As I said with the written form of the module
5    of Rules and Rituals, I think that is an important
6    thing. I think that it acts -- can act as a window
7    into the trade secrets. You know, I think it is a
8    very important aspect -- asset to ESP.
9    Q. When you say they could act as a window,
10   are you saying that you don't think that Rules and
11   Rituals -- the written module Rules and Rituals is
12   itself a trade secret?
13   A. I don't know if I could evaluate that, and I
14   guess I would -- if we decided to go the copy route
15   -- copyrighting it, inasmuch as it's disclosed for
16   copyrighting purposes, I guess the written portion
17   of it is not, but it becomes -- see, if someone
18   takes material that they should not have, they waive
19   a certain right. They actually have a certain
20   responsibility.
21       I might say if I've stolen the trade secret
22   of say Coca-Cola, the formula, are any of the
23   letters trade secrets, no, but because I know the
24   trade secret the way I orchestrate them in my
25   transmission of information could give away the

---

**Page 482**

1    trade secrets. So the letter of Rules and Rituals
2    inasmuch as it is copywritten is not in itself a
3    trade secret but wielded by someone who has the
4    trade secrets can become a window to see those trade
5    secrets.
6    Q. Wielded by someone who has the trade secret.
7    How has that person come into possession of the
8    trade secret?
9    A. Well, in the particular case here, I believe
10   that the trade secrets, the confidential manuals,
11   things that are our property were taken and utilized
12   improperly. And when you take someone else's
13   property, you are given abilities to disclose things
14   about that property that you wouldn't have if you
15   didn't have the property.
16   Q. Coming back to the Tribute module. Is the --
17   is the written portion of the Tribute module a trade
18   secret, a NXIVM trade secret?
19   A. Well, inasmuch as the written portion of the
20   module has been published through the copyright
21   process so that it is generally available to people,
22   those actual words in themselves are not a trade
23   secret but can be used by someone who has the trade
24   secrets to reveal the trade secrets.
25   Q. Is the Tribute module also foundational?

---

---

**Page 483**

1    A. I think it is a very important module.
2    Q. What about Face of the Universe? Is Face of
3  the Universe foundational?
4    A. That's even more confidential and
5  foundational.
6    Q. And, once again, the written portion of Face
7  of the Universe is a trade secret or is not?
8    A. Well, as with any of the modules but
9  especially with Face of the Universe there are
10  several versions. There's the module that's in the
11  Intensive. There's the student notes. With Face of
12  the Universe, there's also facilitator notes. There
13  are also coach notes. Those are different works, if
14  you will. So with a module where we may have
15  something registered in the copyright office which
16  is the version that the student receives in the
17  course, something like Face of the Universe has much
18  more behind it and other written portions behind it.
19    Q. You're the sole author of the Mission
20  Statement, is that correct?
21    A. Yes.
22    Q. Did you transfer or assign your rights to ESP
23  or NXIVM?
24    A. At one point, it was copyright, I believe,
25  Executive Success Programs; and then I believe I had

---

**Page 484**

1  it transferred back to me.
2    Q. Are you the sole author of Rules and Rituals?
3    A. No, I don't think so.
4    Q. What about Tribute?
5    A. I don't think so.
6    Q. Work and value?
7    A. I don't think so.
8    Q. Face of the Universe?
9    A. No, I don't think so.
10    Q. Are you a joint author on any of those works?
11    A. I may be certainly Tribute, I believe. I
12  don't know if the current version or the version
13  that your client received, assuming they received
14  such a version -- I believe they did -- was authored
15  at all by me, but the initial version of Tribute
16  certainly had some of the words that I put together
17  in the final product. That's what I mean by
18  "author."
19    Q. And, again, with respect to any of those
20  modules, did you transfer or assign your rights to
21  ESP or NXIVM?
22    A. I believe those modules are copyright ESP and
23  NXIVM, the words.
24    Q. But to the extent that you wrote some of
25  them, did you transfer or assign your copyright

---

**Page 485**

1  interests to NXIVM or ESP?
2    A. I don't know if I had copyright interest.
3    Q. Did you write any of them?
4    A. I wrote parts of them. Does -- I have a
5  question of law. If I write a sentence, does that
6  give me copyright interest in a chapter or a
7  document?
8    Q. Well, you can ask your counsel about that.
9      Have you entered into a written transfer or
10  assignment to ESP of your rights to any materials
11  that you've created?
12    A. I think I have.
13    Q. What do you believe that you have transferred
14  to ESP in a written assignment?
15    A. ESP, I'm not sure. I think there may have --
16  at one point, I think the Mission Statement was
17  theirs. I don't know if I actually signed a written
18  transference. I know that First Principles has a
19  number of the copyrights -- no copyrights --
20  patents assigned to them, and I did sign those
21  assignments. I've signed a number of different
22  assignments. I don't know what they all are.
23    Q. Let me ask you to turn to Paragraph 40 of
24  your Affidavit.
25    A. Uh-huh.

---

**Page 486**

1    Q. And you say, "We also created a Persistency
2  and Motivational State module which contained the
3  psycho-physical motivational portion of my model
4  (the experiential learning of motivation). I had
5  started to develop this in 1989 and had tested it
6  with success through my corporate marketing and
7  sales experiences. This foundational module taught
8  people the experiential learning of motivation.
9  This is one of the copyrighted modules that is being
10  given away and disparaged."
11    A. Uh-huh.
12    Q. Did I read that correctly?
13    A. Yes.
14    Q. How is this module foundational?
15    A. Well, one of the important aspects of
16  behavior is motivation. It's also important in
17  decisions. This module represents a portion of how
18  a person can learn motivation, can alter their
19  motivation, so that allows them to alter their
20  behavior and alter their decisions. They can
21  become, if you will, more the author of their
22  behavior.
23    Q. How is this module being given away?
24    A. It is my understanding that your client has
25  the materials or some of the materials relating to

---

Case 2:06-cv-01051-KSH-CLW   Document 852-3   Filed 09/20/19   Page 18 of 79 PageID: 20907

Page 487

1 this module and that those were given to different
2 people to look at, to evaluate, to maybe even
3 disburse. I think that's how this material is being
4 given away.
5 Q. So, in other words, you're not talking about
6 it being given away to the general public?
7 A. Well, it may be given away to the general
8 public through these activities. They provide a
9 window into our private property
10 that we did not want.
11 Q. In Paragraph 41 you say, "We started our
12 company with 20 basic copyrighted modules and have
13 now grown to have over 250 modules. Work and value
14 was and is the foundational module for the whole
15 Ethos and Intensive curriculums. This is another
16 one of the copyrighted modules that is being given
17 away and disparaged."
18 A. Uh-huh.
19 Q. So Work and value is an important and
20 valuable trade secret of NXIVM's?
21 A. Work and value taken in its -- in its
22 entirety, meaning the written word, the practice of
23 it, how it's executed and the concepts behind it, is
24 an extremely important module.
25 Q. In what way is it foundational?

Page 488

1 A. If a person doesn't understand their values,
2 they can't make decisions based on them. The best
3 decis -- the best type of decision is if a person
4 understands their values and can make decisions
5 based on those values.
6 Q. And once again, how is -- how is this module
7 being given away?
8 A. Well, because -- and, again, I believe it is
9 one of the written expressions that your client has
10 -- to have that not only exposed but analyzed by
11 people who have the rest of the material, have the
12 rest of the manuals, the student notes, the
13 facilitator notes, things that aren't available,
14 that person can use it to provide a window; and even
15 the nature of having those materials changes their
16 expression.
17 Q. When you wrote in Paragraph 40 and 41 that
18 the modules were being given away, did you mean by
19 "given away" that Rick Ross gave these materials to
20 other people?
21 A. I think both directly and indirectly if
22 portions of Work and value are published on the
23 internet and this is our confidential information
24 that is not to be published, it's being given away.
25 Q. You say if portions of Work and value were

Page 489

1 being published on the internet. Do you know
2 whether or not portions of Work and value are, in
3 fact, being published on the internet?
4 A. I believe they were. I believe they're in
5 the Martin report, although I'm not positive at this
6 point.
7 Q. What about Persistency and Motivational
8 State?
9 A. I believe the same thing. I think they are
10 part of the Martin report; but when it comes
11 especially to things like values and things like
12 motivation, to have a psychiatrist write a report
13 who has that information starts to give windows into
14 our private property that are not appropriate.
15 Q. So you believe that the Martin articles
16 provide windows into the trade secret of Persistency
17 and Motivational State and Work and value?
18 A. I believe that -- yes, I believe that's
19 likely true.
20 Q. Let me ask you to turn to Paragraph 43. And
21 in Paragraph 43 you say, "To become a facilitator
22 requires earning the right to be a coach, being
23 observed over a period of months, meeting rigorous
24 standards to be promoted and reaffirming the
25 confidentiality of the material. This process can

Page 490

1 take more than a year. The facilitator is then
2 given access to the facilitator projective training.
3 Our written information for this course is stored
4 offsite in a single computer with only 3 people who
5 have access: Myself (the creator of the material),
6 Nancy Salzman, (the president of NXIVM Corporation)
7 and Loreta Garza (Nancy Salzman's personal
8 assistant). This trade secret, possibly the most
9 valuable trade secret in our company, is being
10 displayed on the internet."
11 Did I read that accurately?
12 A. I believe so, yes.
13 Q. Okay. Your last sentence says, "This trade
14 secret, possibly the most valuable trade secret in
15 our company, is being displayed on the internet."
16 What precisely is the trade secret you're
17 referring to in that sentence?
18 A. The confidential property that was taken.
19 Q. Can you be more specific about what you mean
20 by "this trade secret"?
21 A. What I wrote in this paragraph I gave some
22 background as to how someone gets access to this
23 material, and this material was never to even have
24 left the center, the facilitator notes for Face of
25 the Universe projective training. And those notes

**Page 491**

1  were taken.  Those notes were incorporated into an
2  amalgamation of different things, the manual,
3  facilitator notes, coach's notes, student notes and
4  were given to Rick Ross, your client, who gave those
5  materials to be evaluated and to be commented upon;
6  and I believe it was Paul Martin that actually
7  printed some of those materials and put them in a
8  report that is on the web.  Yes.
9     Q.  What is the facilitator projective training?
10    A.  It's a training.  Can you be more specific?
11    Q.  Well, you say in this paragraph, "The
12  facilitator is then given access to the facilitator
13  projective training."
14    A.  Yes.
15    Q.  So I'm asking you to tell us what that means.
16    A.  Oh.  It's a special training in -- actually
17  in the specific case here, there was a very special
18  facilitator projective training that was given to I
19  think maybe only 25 people in the whole history of
20  the company; and it was a special training on the
21  materials, the use of the materials, things about
22  the materials.  It's a training.
23    Q.  Does the facilitator projective training have
24  a written component?
25    A.  Yes, I believe it does.

**Page 492**

1     Q.  And is that written component information
2  for the course that students take to become
3  facilitators?
4     A.  The specific facilitator projective training,
5  the written portion of that is used only for that
6  training.
7     Q.  And the training you're talking about is the
8  training to become a facilitator?
9     A.  Yes, yes.
10    Q.  Have the copyrights been registered in any of
11  those written materials?
12    A.  I believe they are copywritten by the indicia
13  or whatever on the bottom.  I don't think they have
14  been registered with the copyright office.  I'm not
15  sure.
16    Q.  Okay.  Were you involved in developing the
17  security protocol for the facilitator projective
18  training?
19    A.  Was I involved?  Not so directly.  I believe
20  that was done by attorneys.
21    Q.  Where is the information stored?
22    A.  Well, at this time it was stored in a single
23  computer.  I think it is still stored in a single
24  computer offsite, but I don't know.  I haven't
25  accessed that information in many years.

**Page 493**

1     Q.  Are there hard copies of the written
2  information?
3     A.  I don't believe there are unregistered hard
4  copies, but I'm not sure.
5     Q.  Well, whether registered or not, do you know
6  whether or not there are hard copies of the
7  material?
8     A.  I do not know.
9     Q.  Do you know whether or not there is a backup
10  of the material that's stored on the computer?
11    A.  I would imagine there is a backup that would
12  be offsite from where the computer is, but I'm not
13  sure.
14    Q.  Have all of the people who have access to
15  this training signed confidentiality agreements?
16    A.  Yes.
17    Q.  Now, in the beginning of Paragraph 43 you
18  talk about becoming a facilitator requires meeting
19  rigorous standards.
20        What are the rigorous standards to being
21  promoted?
22    A.  Without knowing all of the specifics, the
23  person has to be observed.  They have to be skilled
24  at interacting with people, using certain tools.
25  They have to make assertions relating to what they

**Page 494**

1  want to do within the program and keeping the
2  information confidential, those sort of things and
3  meet, if you will, the approval of the people or
4  person teaching this course to be allowed in.
5     Q.  Now, a part of earning the right to be a
6  coach requires bringing in new students to NXIVM;
7  isn't that right?
8     A.  I believe so, yes.
9     Q.  Okay.  Well, taking all of the rigorous
10  standards that you just described for us as well as
11  bringing in new students, which of those rigorous
12  standards for promotion did Stephanie Franco meet?
13    A.  My assumption is her being in the facilitator
14  program means she met all of the standards.
15    Q.  You make that assumption?
16    A.  Uh-huh.
17    Q.  Do you know that for a fact?
18    A.  I didn't see the process.
19    Q.  But is it your understanding that if she
20  hadn't satisfied all of those rigorous standards she
21  would not have been given access to the facilitator
22  projective training?
23    A.  That is my understanding, yeah.
24    Q.  I'm going to read you a few quotes from the
25  Martin and Hochman articles and ask you some

---

Page 495

1  questions about the quotes.
2  **A. Can I read along with you or can I --**
3  Q. Well, if you want to try and find it. I
4  don't think you're going to need to.
5  **A. Okay.**
6  Q. The first quote is from Parasite/producer I.
7  The quote is, "Parasites unable to take care of
8  themselves. They depend on others for their very
9  survival. Parasite strategies keep people dependent
10 on others and lower self-esteem."
11     Are those passages trade secrets?
12 **A. I would say they're certainly windows to**
13 **trade secrets.**
14 Q. Again, windows rather than trade secrets
15 themselves?
16 **A. That may be a trade secret. I don't know.**
17 **Our -- I believe our understanding of self-esteem is**
18 **extremely unique and valuable.**
19 Q. Well, does NXIVM consider those statements
20 confidential and proprietary?
21 **A. I don't know what NXIVM considers them, and I**
22 **don't know if those statements are registered in the**
23 **copyright office available to the public. I don't**
24 **know.**
25 Q. Do you consider them confidential?

---

Page 496

1  **A. The statements themselves?**
2  Q. Yeah.
3  **A. If they are not released to the public, I do**
4  **consider them confidential.**
5  Q. Well, putting aside whether they've been
6  released to the public, do you consider them secrets
7  of NXIVM's?
8  **A. I can't answer that because if they're**
9  **released to the public, they're not secrets.**
10 Q. Okay. What do you consider unique about
11 those statements?
12 **A. I consider the relationship between**
13 **self-esteem and parasite strategies something that**
14 **is unique to a great degree. I believe that our**
15 **training relating to self-esteem is highly**
16 **confidential and valuable.**
17 Q. What about the statement itself, the
18 statement, "Unable to take care of themselves.
19 Parasites depend on others for their very survival"?
20 Is there anything unique about that statement?
21 **A. Well, you're starting to describe something**
22 **under the label of parasite and relating it to**
23 **self-esteem. Self-esteem is a very commercially**
24 **valuable concept. People look to increase**
25 **self-esteem and often can't even define it. As you**

---

Page 497

1  start to define self-esteem by our methods and our
2  materials, you start to give away information that's
3  extremely valuable to us.
4  Q. The next quote is from Building an excited
5  state. The quote is, "Enthusiastic people are
6  better able to communicate and even sell their ideas
7  with ease."
8     Is that statement a trade secret?
9  **A. Well, like all of the other statements in**
10 **themselves, it starts to provide a window into the**
11 **technology; and if someone has the manuals and the**
12 **trade secrets there or some of them, they can**
13 **utilize that statement to begin to transmit our**
14 **confidential property.**
15 Q. Is there anything that you consider unique
16 about that statement?
17 **A. I'm not sure. The first thing, if that -- if**
18 **it has been decided that that statement was released**
19 **to the public in an exchange for copyright**
20 **protection, I couldn't say that that statement is**
21 **any longer secret. The objective in releasing any**
22 **statements through copyright was to maximize the**
23 **protection of our property. Much like the formula**
24 **of Coke: If it's carbon, hydrogen and nitrogen, I**
25 **don't know if carbon is a trade secret, but I can**

---

Page 498

1  use it to present a trade secret. So that specific
2  quote could be used, but I don't know if that quote
3  contains a trade secret per se.
4  Q. My question was whether or not you consider
5  anything unique about the statement, "Enthusiastic
6  people are better able to communicate and even sell
7  their ideas with ease."
8  **A. I may have heard that elsewhere. I think it**
9  **seems somewhat obvious on face value, but then**
10 **sometimes obvious things are very unique. I -- I**
11 **haven't studied that in the rest of the world.**
12    **I think it's a good statement.**
13 Q. Do you think it's a unique statement?
14 **A. I don't know if it's unique.**
15 Q. The next quote is from Crime and punishment.
16 The quote is, "Ethics are well-formed consistent
17 postulates by which we live. Ethics is an internal
18 guide, something that we have personally derived
19 from our experience and is personal to us."
20    Is that passage a trade secret?
21 **A. I think that passage represents a window**
22 **into trade secrets, and I think some of the ideas**
23 **presented there are likely very unique and**
24 **proprietary.**
25 Q. Who do you consider to be NXIVM's direct

---

Page 499

1 competitors?
2 A. I guess I don't know what you mean by "direct
3 competitors."
4 Q. Competitors who train executives and train
5 individuals about better ways to live their lives.
6 A. Gosh, that's a very broad field. I think --
7 I guess I wouldn't define direct competitor like
8 that. I would say anyone that increases -- where an
9 executive has a choice between spending time or
10 resources focusing on something to do with NXIVM to
11 get more joy in their life and be a more joyous
12 person and focusing on an -- or focusing on another
13 program that other program is directly competing
14 with that executive's time, focus, resources so...
15 Q. Are you familiar with the concept large group
16 awareness training?
17 A. Yes, to some degree.
18 Q. Is NXIVM a large group awareness training
19 organization?
20 A. I don't think so.
21 Q. You don't think so?
22 A. No.
23 Q. Who do you consider to be a large group
24 awareness training organization?
25 A. Well, I heard that Landmark Forum is a large

Page 500

1 group awareness training. I've actually looked
2 superficially for a definition of large group
3 awareness training. I've seen a few, and in those
4 I think Landmark would probably fall into that or at
5 least some of their programs. Anthony Robbins
6 maybe. I'm not that well familiar with the
7 different trainings that are around that would be
8 large group awareness trainings.
9 Q. Any others that you can think of beside
10 Landmark and Anthony Robbins?
11 A. I'm not sure if Tabi Kahler is. I can't
12 think off the top of my head of any more.
13 Q. Is Landmark Education a competitor of
14 NXIVM's?
15 A. I would say so.
16 Q. What about Anthony Robbins? Is he a
17 competitor of NXIVM's?
18 A. I would say so.
19 Q. Tabi Kahler?
20 A. I would say so.
21 Q. What would a competitor have to do to
22 duplicate a NXIVM module?
23 A. I don't know. I think depending on the
24 cleverness of the competitor or their motivation
25 there could be either a lot or a little depending on

Page 501

1 what materials they have.
2 Q. In addition to having access to written
3 materials, would they need to take the course in
4 order to duplicate a module?
5 A. I don't know.
6 Q. Do you think someone could duplicate a NXIVM
7 module without taking the course?
8 A. I'm not sure. It's hard for me to judge the
9 cleverness of people trying to infiltrate your
10 organization.
11 Q. Well, you're a clever guy. Do you think you
12 could duplicate a NXIVM module if you had never --
13 if you were an outsider just taking written
14 materials and not taking the course?
15 MR. CAMPION: Object to the form of the
16 question, the characterization of clever.
17 You may answer the question.
18 A. I wouldn't try so I don't know.
19 Q. Is it possible for a person to compete with
20 NXIVM by using only what was disclosed in the
21 articles?
22 A. I believe so.
23 Q. Are you aware of any NXIVM competitor who
24 has used the information from the manual that was
25 included in the Martin and Hochman articles to

Page 502

1 compete with NXIVM?
2 A. Yes.
3 Q. Who?
4 A. Rick Ross.
5 Q. Anyone else other than Rick Ross?
6 A. I -- yes. I could certainly say Forbes, the
7 newspapers, yes.
8 Q. You consider Forbes a competitor?
9 A. Yes. Inasmuch as Forbes looks to have people
10 believe in what they say and find what they say
11 valuable, Forbes has put themselves at least in some
12 people's minds that either that person is to believe
13 Forbes and be more, if you will, a Forbes type of
14 member or come to our courses. They've certainly
15 competed with certain people's attentions with us.
16 Q. And the same for newspapers that have written
17 about NXIVM?
18 A. Some.
19 Q. And in what way is Rick Ross a competitor?
20 A. Well, for example, with Michael Sutton, Rick
21 Ross was hired to dissuade Michael Sutton from being
22 involved with NXIVM. He was competing with his
23 authority compared to our authority. Even he earned
24 money by being able to hopefully dissuade Michael
25 Sutton from being with us so it came down to one of

Page 503

1  efforts, attentions. In some cases, Rick Ross
2  selling videos through his sites, for example, may
3  compete with us because he sells videos on critical
4  thinking. We sell programs on critical thinking.
5  Someone who decides to choose one or the other would
6  see them as competitors I imagine. I do.
7      Q. Are you aware -- let me rephrase my question.
8      Are you aware of any NXIVM competitor who
9  offers training who has used the information from
10 the manual that was included in the articles to
11 compete with NXIVM?
12     A. I think Rick Ross offers training.
13     Q. You think so?
14     A. He does what he calls exit interviews similar
15 to our coaching sessions, similar to different
16 programs that we run. People come to him to achieve
17 certain objectives within their personality. I
18 assume people come to him at times to be more
19 joyful. People come to us for that, too. People
20 pay good money, I believe, for that. And if it's a
21 choice -- for example, if someone is -- I'm going to
22 use in something that Rick Ross calls a cult or a
23 destructive group or something that Rick Ross has
24 studied and that person wants advice on how to
25 handle their experience in that group, they can

Page 504

1  choose to either hire Rick Ross or hire us. We sit
2  as competitors.
3      Q. Other than Rick Ross, is there any -- a
4  competitor who offers training who you believe has
5  used the information that was in the articles to
6  compete with NXIVM?
7      A. Off the top of my head, I don't think so,
8  although I do classify both Paul Martin and John
9  Hochman as people who do offer trainings and do
10 offer similar services in some ways to us. They
11 sell videos for people, they give informational
12 seminars that people pay to come to; and in some
13 ways, some people would say they're even in -- are
14 active in giving seminars and so do we.
15     Q. Are you aware of any competitor who has
16 reverse engineered or reconstructed or mimicked or
17 duplicated the Rational Inquiry method or any other
18 NXIVM training methods using only the materials
19 disclosed on the Ross website?
20     A. Not that I am aware of.
21     Q. Do you know of anyone who stopped taking
22 NXIVM courses because of the posting of the Hochman
23 and Martin articles on the Ross website?
24     A. I -- yes, I do, and I have -- I should say I
25 have heard of and heard that there are written

Page 505

1  reports of people who have stopped taking NXIVM
2  courses for various reasons relating to what is on
3  the Ross site, and I believe some of them
4  specifically relate to the Hochman and Martin
5  articles.
6      Q. Well, that's -- my question is specifically
7  the Martin and Hochman articles.
8      A. Yes. I believe I have heard of such people.
9  I even believe I have spoken to such people
10 potentially. I can't think of who they are off the
11 top of my head. There have been hundreds of people
12 or thousands.
13     Q. Thousands of people who have said that they
14 stopped taking NXIVM's courses because of the Martin
15 and Hochman articles and have said that to you?
16     A. I -- no. I believe that there are thousands
17 of people who have not become involved with ESP
18 because of the negative PR generated from the Ross
19 site. The subset of how many of those people
20 specifically did not take ESP because of the Hochman
21 and Martin articles I don't know, and it's certainly
22 I don't believe thousands, but I don't know.
23     Q. And you say that you believe that there are
24 some written materials where people talk about not
25 taking the course because of the Martin and Hochman

Page 506

1  articles?
2      A. I believe so.
3      Q. Okay.
4          MR. SKOLNIK: Those have certainly been
5  requested in prior production, and we have received
6  no such, so I would call for their production.
7          (Request.)
8      Q. Do you know of anyone who did not start
9  taking NXIVM courses because of the posting of the
10 Martin and Hochman articles?
11     A. I don't know specifically. I have not spoken
12 specifically to any such people.
13     Q. Now, you understand that my earlier question
14 was about people who started taking NXIVM and then
15 stopped --
16     A. Right.
17     Q. -- because of the articles.
18     A. Right.
19     Q. And you're saying that there are some such
20 people, as far as you know?
21     A. I believe so, but I don't know of any that
22 I've had direct contact or seen direct contact who
23 were intending on taking a course and saying, "Well,
24 now I have not because of these articles," although
25 certainly such people may exist.

NXIVM CORPORATION, v.
MORRIS SUTTON

KEITH RANIERE, Vol. III
May 13, 2009

Page 507

1   Q. Would you agree that if NXIVM has lost any
2   business or any money from the Martin and Hochman
3   articles it's not because anyone has used those
4   articles to compete with NXIVM other than Ross and
5   Martin and Hochman but because those articles
6   disparage NXIVM?
7   A. I don't know enough about what you mean by
8   "disparage," but I don't think I would agree with
9   that statement because I think Forbes, things like
10  that, as I have explained, have dissuaded people
11  from taking NXIVM courses and probably to some
12  degree have even boosted subscriptions. I don't
13  know.
14  Q. But, again, the loss of business would be
15  attributable to what it is that Forbes said about
16  NXIVM that was disparaging?
17  A. I don't know if I would say that's the only
18  reason the business was lost.
19  Q. What else -- what else about Forbes would
20  have led to the loss of business?
21  A. I guess it depends on what you say as
22  disparaging, but if Forbes goes and prints
23  confidential material and someone believes the
24  confidential material is out, so to speak, the cat
25  out of the bag, I imagine there may be some people

Page 508

1   who say, well, I don't have to go to NXIVM. This is
2   probably out and distributed and nothing new,
3   nothing unique.
4   Q. Do you believe that Forbes printed
5   confidential material?
6   A. I don't recall completely the Forbes article,
7   although I do recall that it had an excerpt from the
8   Hochman report and referenced it. So inasmuch as
9   the Hochman report and leading then to the Ross site
10  prints confidential information, I guess Forbes
11  directing people either directly or indirectly to
12  that does that.
13  Q. Would you agree that each of the following
14  is an aspect of NXIVM training; harnessing your
15  personal power?
16  A. I would like to think that's part of the
17  NXIVM training.
18  Q. How about taking responsibility for your
19  choices?
20  A. Well, I think these are general effects
21  hopefully of the NXIVM training. I don't know if
22  it's what I'd call part of the NXIVM training. It
23  sounds like something that would be desirable
24  effects, yes.
25  Q. Is it an aspect of the training?

Page 509

1   A. I wouldn't say it's an aspect of the
2   training. That's -- I think they're effects of the
3   training, hopefully.
4   Q. Hopefully, effects of the training?
5   A. Hopefully.
6   Q. What about doing everything with integrity?
7   A. I don't -- I think an effect of any ethics
8   training program we would hope that people have more
9   integrity.
10  Q. What about gaining the ability to virtually
11  take control of any situation? Is that an aspect of
12  the NXIVM training?
13  A. I would say when you say take control of a
14  situation, that would have to have an ethics thought
15  in it. I would hope that it would be an effect of
16  the ethics training or the NXIVM training that
17  people would believe they have more control of their
18  destiny and their lives.
19  Q. Let me read you some quotes, and then when
20  I'm done I'll ask you to tell me if you recognize
21  the quotes and if you know who said them.
22      The first quote is, "In essence, if we want
23  to direct our lives, we must take control of our
24  consistent actions. It's not what we do once in
25  awhile that shapes our lives but what we do

Page 510

1   consistently."
2       Now, let me read you another. "Our programs
3   focus on creating consistency in all areas."
4       And another: "Beliefs have the power to
5   create and the power to destroy. Human beings have
6   the awesome ability to take any experience of their
7   lives and create a meaning that disempowers them or
8   one that can literally save their lives."
9       Another: "The will that transforms our ideas
10  into actions with our guiding beliefs forms our
11  emotional constitution. You'll experience the joy
12  and power of taking control of your life and look
13  ahead to a future in which all things are possible."
14      Then a final pair: "Knowing what to do is
15  useless without the emotional strength to do what
16  you know.
17      And finally, "It's not knowing what to do.
18  It's doing what you know."
19  A. Okay.
20  Q. Do you recognize those quotes?
21  A. Well, I think the one before the last is from
22  me. I don't know. Some of those quotes are very
23  nice. I don't recognize them, per se. They seem
24  like they reflect some important human values.
25  Q. Any others that you recognize that you were

**Page 511**

1   the author of?
2   A. I might have been authors of the other -- no,
3   not off the top of my head, though.
4   Q. What about, "Our programs focus on creating
5   consistency in all areas." Do you know who said
6   that?
7   A. It could have been me, but I think it could
8   have been others.
9   Q. What about, "In essence, if we want to direct
10  our lives, we must take control of our consistent
11  actions. It's not what we do once in awhile that
12  shapes our lives but what we do consistently"?
13  A. I don't know if I would have said that. I
14  think that in a broader context that's good, but I
15  do think someone can do a single decision and shape
16  -- help shape their lives, also, so I'm not sure I
17  completely agree with the quote as it is extracted.
18  Q. What about, "Beliefs have the power to create
19  and the power to destroy. Human beings have the
20  awesome ability to take any experience of their
21  lives and create a meaning that disempowers them or
22  one that can literally save their lives"?
23  Do you know who says that?
24  A. I don't. I think it's an interesting quote.
25  Q. What about this one: "The will that

**Page 512**

1   transforms our ideals into ac -- our ideas into
2   actions with our guiding beliefs forms our emotional
3   constitution. You'll experience the joy and power
4   of taking control of your life and look ahead to a
5   future in which all things are possible"?
6   A. That might be something in like an Ethos
7   brochure or something, but I think it's an
8   optimistic quote.
9   Q. You don't know who wrote it?
10  A. Not off the top of my head.
11  Q. Well, you did.
12  A. Oh. Thank you, I guess.
13  Q. How about, "It's not knowing what to do.
14  It's doing what you know"?
15  A. I've written similar things like that. I
16  think in a broad context, that's good. In a limited
17  context, it may be problematic; I mean, if you're
18  talking about a killer.
19  THE VIDEOGRAPHER: Excuse me. We have
20  to change tapes.
21  THE VIDEOGRAPHER: This is the beginning
22  of Tape Number 3. The time is 12:13.
23  BY MR. SKOLNIK:
24  Q. What about the quote, "Knowing what to do is
25  useless without the emotional strength to do what

**Page 513**

1   you know"?
2   A. I think that's a quote in one of the
3   brochures, but I'm not positive.
4   Q. And who wrote that quote?
5   A. I think I wrote that at some point.
6   Q. So some of the quotes that I've read you
7   you identify as things that you wrote, and others
8   you don't know who wrote them; is that right?
9   A. Correct.
10  Q. You know who Anthony Robbins is, don't you?
11  A. Yes.
12  Q. You attended Tony Robbins' seminars before
13  you formed ESP, NXIVM?
14  A. No.
15  Q. You didn't?
16  A. I've never attended an Anthony Robbins
17  seminar.
18  Q. You met with Mr. Robbins personally at least
19  once, isn't that so?
20  A. Yes.
21  Q. And it's also true that both Anthony Robbins
22  and Nancy Salzman once taught neuro-linguistic
23  programming, isn't that right?
24  A. I believe so. I don't know if Anthony
25  Robbins taught neuro-linguistic programming. I know

**Page 514**

1   he was schooled in neuro-linguistic programming.
2   Q. And it's also true, isn't it, that just like
3   ESP and NXIVM, Robbins uses the title "coach"?
4   A. I wasn't aware of that.
5   Q. Let's look at Paragraph 3 of your Affidavit.
6   It says, "The expression of the work in the
7   copyrights of NXIVM has been drafted in a very
8   meticulous fashion such that words, the order of
9   words, questions and the order of questions used in
10  the copyrights are critical to the success of the
11  organization."
12  Can you give us an example of what you're
13  talking about here?
14  A. In a module the order of the questions makes
15  a difference as to how people think about the
16  different concepts. Being inductive as opposed to
17  deductive, in the copywritten materials some of the
18  -- not only just the order of the concepts but even
19  the way the questions are phrased themselves can be
20  more open so that people will not import certain
21  assumptions.
22  Q. And all of that as reflected in the written
23  work is critical to the success of the organization?
24  A. That's a sweeping statement.
25  Are you saying that if the organization did

Page 515

1 not have any written work then we could not be
2 successful, would not be able to innovate to be
3 successful?
4 Q. Well, I'm just trying to understand what you
5 mean in Paragraph 3. The phrase "critical to the
6 success of the organization" is yours.
7 A. Uh-huh. Well, if you're asking me about the
8 question, the order of the questions used in the
9 copyright are critical to the success of the
10 organization. As those copyrights are used within
11 the organization, it has garnered a certain degree
12 of success. That success is in part not only
13 attributable to those orders, but I believe the
14 order of those words and those questions is critical
15 to the success that the organization at this point
16 in time had.
17 Q. In turning to Paragraph 4, Paragraph 4 has a
18 subtitle, "Damage and Irreparable Harm." You say,
19 "Three of the copyrighted materials currently posted
20 on the internet: 12 point Mission Statement, Work
21 and value and Face of the Universe reveal the
22 content and methodologies that are critical to the
23 heart of the entire coursework. Whole passages of
24 these copyrights have been literally copied by
25 defendants."

Page 516

1 A. Uh-huh.
2 Q. "The wholesale copying of the copyrighted
3 materials of NXIVM through posting them on the
4 internet and other means reveals the heart of what
5 is important to the consumer and thus damages
6 NXIVM's ability to, among other things, sell
7 coursework to new consumers. Consumers that read
8 the passages may no longer desire to attend a course
9 wherein the material has been freely given to them.
10 Additionally, if the questions are known ahead of
11 time, the entire process is damaged. It is similar
12 to being told the punch line of a joke. The desired
13 effect is irreparably damaged. Our copyrighted
14 questions are designed to be answered without
15 knowledge of the next question. Knowledge of the
16 next question compromises and alters the answer to
17 the current question."
18 Now, I assume that those are true statements
19 and you stand by them?
20 A. Yes, I believe so.
21 Q. What is the basis for your statement,
22 "Consumers that related the passages may no longer
23 desire to attend a course wherein the material has
24 been freely given to them"?
25 A. Because I think there may be some consumers

Page 517

1 who read the material, read the passages and make a
2 judgment based on those passages.
3 Q. Can you give an example of where knowledge of
4 the next question compromises and alters the answer
5 to the current question?
6 A. A lot of different jokes, a lot of different
7 brain teasers. I could probably come up with a joke
8 that does something like that, but I think there are
9 a lot of situations in which knowing what comes next
10 changes what comes before. For example, the movie
11 The Sixth Sense, if you go to that movie and you
12 know ahead of time he is dead throughout the whole
13 movie, it changes your experience of the movie.
14 That's why they have plot spoiler alerts and things
15 like that.
16 Q. I'm really asking about what you mean in the
17 context of NXIVM's copyrights.
18 A. Okay. I don't have all of them in front of
19 me; but in some of them, if I remember correctly,
20 there were orders of concepts given. And if
21 someone, for example, knows that they are going to
22 be thinking about a certain concept next, it alters
23 the way they think of the concept that they are
24 thinking about at the time.
25 Q. And revealing the order of those questions

Page 518

1 causes damage and irreparable harm to NXIVM?
2 A. I believe so.
3 Q. Now, you told us last time that you
4 acknowledge that you don't believe NXIVM can claim
5 trade secret status for any NXIVM materials that it
6 has made available to the public through its own
7 actions; right?
8 A. That NXIVM -- when NXIVM makes materials
9 available to the public what is specifically
10 contained in those materials from my understanding
11 of trade secret are no longer trade secret. That
12 does not mean that those materials do not have
13 anything to do whatsoever with the effects of the
14 trade secrets.
15 Q. And you went on to explain that if the
16 materials embody specifics of a trade secret, sort
17 of the cat is out of the bag.
18 Do you recall that testimony?
19 A. Well, I mean, I could imagine I would say
20 that. What I -- to clarify it, you can release
21 specifics relating to a trade secret and still not
22 release the trade secret. If I have the formula for
23 Coke and I say it has carbon in it, I haven't
24 released a trade secret, but I have made a
25 compromise.

Page 519

1    Q. Well, I think a minute ago you acknowledged
2  that if the order of the questions, for example, is
3  revealed, that causes damage and irreparable harm to
4  NXIVM.
5    A. It can.
6    Q. Would you agree that if NXIVM has itself
7  placed the 12 point Mission Statement, Work and
8  value, and Face of the Universe on the internet or
9  otherwise made them publicly available that it has
10  caused itself the damage and irreparable harm that
11  you were discussing in that paragraph?
12    A. I think it's NXIVM's right to choose what it
13  does with its property. If NXIVM has placed things
14  on the internet, there is a downside, but then
15  there's an upside for NXIVM. For someone else to do
16  that is stealing the upside while executing the
17  downside.
18    Q. What's the upside to NXIVM for placing this
19  material on the internet?
20    A. Well, in the case, for example, when material
21  is stolen and someone else is publishing, taking
22  your right of first publication or whatever it is
23  away, you may have to make the compromise. You may
24  be forced to publish where you would not want to
25  publish, sustaining a short range or even a

Page 520

1  long-range damage to try to protect from an even
2  greater damage of someone else who has deprived you
3  of that right. So, you know, I don't know
4  specifically what you're talking about as far as
5  which things may or may not have been published; but
6  I suspect the decisions, because all of the NXIVM
7  material has been carefully guarded to the fullest
8  extent I think of the law with trademarks,
9  copyrights, patents, confidentiality, all that
10  stuff, those are hard decisions when someone takes
11  your property.
12    Q. Now, you're aware, aren't you, that when a
13  work is registered with the copyright office you
14  have to provide a copy of the work which is then
15  publicly available to anybody who wants to review
16  it?
17    A. I am aware now. I also think there are --
18  and I'm not sure of this -- that there are ways in
19  certain circumstances to register part of a work,
20  but I don't know.
21    Q. You don't know the details of that mechanism?
22    A. No.
23    Q. But as a general matter, you know that when
24  works are registered you deposit a copy that's made
25  available to the public?

Page 521

1    A. Now, I believe that is true, yes.
2      MR. SKOLNIK: 42.
3      (One-page United States Copyright Office
4  document entitled Public Catalog was received and
5  marked Defendant's Exhibit Raniere-18 for
6  Identification.)
7  BY MR. SKOLNIK:
8    Q. Mr. Raniere, Exhibit 18 is a printout from
9  the Copyright Office catalog listing all of NXIVM's
10  registered copyrights.
11    A. Okay.
12    Q. Were you aware that NXIVM had made each of
13  the 22 modules listed here available to anyone who
14  might want to compete with NXIVM or duplicate its
15  programs?
16    A. I was aware that NXIVM had made a number of
17  these available. It was a sad decision because of
18  the theft but, yes, I was aware that at least a
19  number of these, the student versions had been made
20  available.
21    Q. Now, are you aware also that court filings
22  are publicly available on the internet unless they
23  are submitted and accepted under seal by the Court?
24    A. I'm not sure if I'm completely aware of that.
25  I do believe that there are a lot of court

Page 522

1  procedures that are available. I don't know what --
2  I think there are some that aren't, but I don't
3  know.
4    Q. Were you aware that NXIVM attached copies of
5  Rules and Rituals, Tribute, 12-point mission
6  statement, Work and value and the Face of the
7  Universe to its court filings and that those modules
8  are available to anyone who might want to compete
9  with NXIVM or duplicate its programs?
10    A. I was under the impression that whatever was
11  attached to the court filings was either protected
12  in some way, had been filed with the copyright
13  office or had been submitted by the other side. I
14  also believe that the versions of Face of the
15  Universe because there's a student version, a
16  coaching version and a facilitator version, that not
17  all of them are so submitted. That's my
18  understanding.
19    Q. Do you have any understanding about whether
20  or not the excerpts from any module that are quoted
21  in the Martin or Hochman articles come from the
22  versions that are posted at the copyright office and
23  on the internet?
24    A. I think there are some things in those
25  articles that come from the copyright office and are

Page 523

1  posted on the internet. I'm not sure -- I don't
2  believe all of them are. In particular, I think
3  the version of Face of the Universe that is posted
4  on the Martin article I think it is may be
5  different.
6     Q. And is it your understanding that it's
7  different in a way that is more revelatory of
8  NXIVM's trade secrets in the article as opposed to
9  at the copyright office?
10    A. I think even the fact that Martin had the
11 trade secret information makes that so but I would
12 -- I believe so, yes.
13       MR. SKOLNIK: Now would be a good time
14 to break, Tom.
15       MR. CAMPION: Sure.
16
17       (Witness excused.)
18       (At this point, the luncheon recess was
19 taken.)
20
21
22
23
24
25

Page 524

1       A F T E R N O O N   S E S S I O N
2
3       THE VIDEOGRAPHER: We're back on the
4  record at 1:20.
5
6  K E I T H   A L A N   R A N I E R E, previously
7  sworn, resumed the stand and testifies on his oath
8  as follows:
9
10 CONTINUED CROSS-EXAMINATION BY MR. SKOLNIK:
11    Q. Mr. Raniere, let me ask you to turn to
12 Paragraph 5 of your Affidavit.
13    A. Yes.
14    Q. And in Paragraph 5 before listing various
15 items you say, "False statement damage as of 8/8/03.
16 Additionally, a multitude of factually false
17 statements surrounded by logically invalid
18 conclusions are used to disparage and damage us."
19    Did I read that correctly?
20    A. I think so.
21    Q. Okay. So am I correct to understand that
22 what you are referring to in Paragraph 5 is damage
23 that you believe stems from false statements that
24 disparage you and/or NXIVM rather than damage from
25 misuse of NXIVM's trade secrets or copyrights?

Page 525

1     A. I think there's that aspect to it. There's
2  an additional aspect to it, too. If I haven't
3  published something, a curriculum, and you take that
4  curriculum and publish false facts about it, I'm put
5  in a position even if the false facts don't directly
6  damage me per se, being disparagement, I either have
7  to allow the public to have a false impression or
8  must publish the true facts in order to either
9  counter or add to whatever is out there.
10    Being forced to publish, in my estimation,
11 can be very damaging.
12    Q. But in the instances you're talking about in
13 Paragraph 5 you're being forced to publish by virtue
14 of false and disparaging statements made about you
15 or NXIVM, is that correct?
16    A. I'm sorry. I'm having trouble reading it.
17 That's why -- "Additionally, a multitude of
18 factually false statements surrounded by logically
19 invalid conclusions are used to" damage us (sic) --
20 or "disparage and damage us." So I think there's
21 damage outside of the disparagement.
22    Q. And what is that damage?
23    A. Forcing us to publish where we wouldn't want
24 to publish.
25    Q. Okay. In other words, damage that flows from

Page 526

1  a decision that you or NXIVM make to publish?
2     A. Yeah. That's part of it, I think, yes.
3     Q. Well, you say "part of it." What else is it?
4     A. Well, I -- at the time I wrote this, it was
5  awhile ago. I would contemplate more. Let's see.
6  There are damages from disparagement, damages from
7  false -- forcing to publish. I suspect there's also
8  damages if someone says something that's inaccurate
9  that doesn't necessarily disparage you but misleads
10 people in interacting with you. For example, if
11 you're a plastic surgeon and I publish that you only
12 do some other type of operation, and that's the only
13 information that could be out there, people who
14 might use you as a plastic surgeon, although not
15 thinking badly of you, may not use you. And,
16 therefore, you would be damaged by a non-disparaging
17 false published statement.
18    So I think when I said "damages," I was also
19 talking about a greater universe than just
20 disparagement.
21    Q. All right. But this is not damage that flows
22 from the publication of NXIVM's trade secrets or
23 copyrights, is that right --
24    A. No, I think it could.
25    Q. -- in Paragraph 5?

Page 527

1    A. No, I think it could.
2    Q. How could it?
3    A. Well, if they're publishing things that are
4  not only just the copywritten materials but they
5  say, I have NXIVM's manual. I am a psychiatrist
6  which implies -- or a professor, whatever it is,
7  which implies I have certain earned authority, I
8  render these opinions, the opinions themselves may
9  not be disparaging but may mislead potential
10  customers to think we're a gynecologist instead of a
11  plastic surgeon or...
12    Q. So the statements may be misleading, but are
13  they revelations of NXIVM's trade secrets or
14  copyrights?
15    A. They can be. That's in addition.
16    Q. I'm talking about what you're addressing in
17  Paragraph 5.
18    A. Okay. The additional things or when it says,
19  "Additionally, a multitude of factually false
20  statements surrounded by invalid conclusions are
21  used to disparage and damage us"?
22    Are you asking me is it possible that a
23  multitude of factually false statements surrounded
24  by logically invalid conclusions could aid or reveal
25  trade secrets?

Page 528

1    Q. No. I'm asking you whether or not the
2  specific examples that you list here --
3    A. Okay. I didn't read them. I'm sorry. Do
4  you want me to?
5    Q. Yes.
6    A. I have to switch.
7    Okay. So your question, please.
8    MR. SKOLNIK: Would you read the
9  question back, please.
10    (A discussion was held off the record.
11    The following was read back by the
12  reporter:
13    "So the statements may be misleading,
14  but are they revelations of NXIVM's trade secrets or
15  copyrights.")
16    A. I think when you say revelations of
17  copyrights, I'm not exactly sure what you mean.
18  They certainly utilize our copyrighted information.
19  I think there are a number of mechanisms under which
20  this causes revelation of trade secrets; and I think
21  some of these statements certainly, even false
22  statements, can provide a window into trade secrets
23  so...
24    Q. Okay. Under "Mail and email" in Paragraph 5
25  you say, "An information pack has been sent to key

Page 529

1  people interfacing with our organization containing
2  these false facts and our copyrighted material and I
3  have received messages and a threatening e-mail
4  addressed from a neighbor."
5    What information pack are you referring to?
6    A. There were information packs and have been
7  that were put together with information from the
8  Ross site. I also had heard that Rick Ross had an
9  information pack that he gave to people like Michael
10  Sutton.
11    Q. Who did you hear that from?
12    A. I heard that from Michael Sutton, and I had
13  also heard rumor one of the neighbors that were
14  opposing one of the NXIVM building projects said
15  that an information pack from Rick Ross that could
16  be just information from the Ross site was passed
17  around.
18    Q. Have you ever seen any of these information
19  packs?
20    A. Yes, I have. I've seen at least two of them.
21    Q. Have they been produced in this lawsuit?
22    A. I don't know.
23    MR. SKOLNIK: Well, let me request on
24  the record that these are encompassed by our prior
25  document demands and I would ask for their

Page 530

1  production.
2    MR. McGUIRE: Send us a letter to that
3  effect indicating where they were mentioned in
4  document demands.
5    MR. SKOLNIK: Well, among other things,
6  Harold's letter of March 27th asked for a copy of
7  any information pack that Mr. Raniere has received
8  that relates to NXIVM. This is the third time, as
9  far as I'm concerned, that we are asking for this.
10    MR. LEONARD: If you ask Mr. Raniere if
11  he had any, which is the next logical question,
12  he'll tell you.
13    MR. SKOLNIK: That request is addressed
14  to NXIVM as well as Mr. Raniere. Mr. Raniere said
15  that he has seen them, and I am asking for them to
16  be produced.
17    (Request.)
18  BY MR. SKOLNIK:
19    Q. What about the messages and e-mail that you
20  referred to? Were those produced?
21    A. I don't know. I cannot produce them.
22    Q. Do you know who sent the information pack
23  that you're referring to in Paragraph 5?
24    A. There are several of them. No, I do not know
25  where most of the information packs that I have

Page 531

1  heard of originated, although Michael Sutton said
2  Rick Ross gave him that information pack directly.
3  Q.  Other than Michael Sutton's claim that
4  Rick Ross gave him an information pack, do you know
5  who sent any of the other information packs that you
6  are referring to in Paragraph 5?
7  A.  No, I do not.
8  Q.  Under, "Loss of key people," you say, "We
9  have lost a 4 year veteran Principal Coach - damage
10  that is beyond direct calculation - because of these
11  things.  Goldie Hawn cancelled her engagement with
12  us next week because of the false press.  A
13  billionaire network founder who had claimed
14  extensive involvement with us has left because of
15  the false reports.  Key people have said they feel
16  vulnerable and, knowing the falsehood of the
17  information and knowing Rick Ross's criminal record
18  (published on the internet and defended in his
19  site), fear being attacked similarly.  They are
20  scared of being attacked because they support us."
21     Did I read that correctly?
22  A.  I believe so.
23  Q.  Now, again, in this paragraph the damage here
24  flows from the false statements and disparagement?
25  A.  I think the damage flows from the taking of

Page 532

1  the material and all of the damages relating to that
2  which are multifaceted.
3  Q.  What's the name of the four-year veteran
4  principal coach who left?
5  A.  Peter Fallon.
6  Q.  And what is the basis for your belief that
7  Mr. Fallon left because of the Ross website?
8  A.  Conversations that I had with him.  He said
9  he left because his wife had a phone call with
10  Rick Ross.  He believed it originated from reading
11  the website, that he's a local business person --
12  which he is -- and felt he couldn't afford to have
13  his reputation relating to us or being related to us
14  because of the things that are on the website.
15  Q.  Did he specifically mention the Martin or
16  Hochman articles?
17  A.  Yes.
18  Q.  What did he say about them?
19  A.  He felt that it looked pretty bad that a
20  person of the authority of John Hochman, who in the
21  article it's titled I guess he's an assistant or an
22  associate professor and a psychiatrist, would say
23  such things about us, true or untrue.
24  Q.  Did Mr. Fallon tell you that he believed any
25  of the information in the articles?

Page 533

1  A.  He didn't say.  I don't think he -- he does,
2  but I don't know.
3  Q.  What is the name -- I'm sorry.  What is the
4  basis for the statement, "Goldie Hawn cancelled her
5  engagement with us next week because of the false
6  press"?
7  A.  It was my understanding that Goldie Hawn was
8  concerned having her representation or having her
9  reputation associated with us and because although
10  she thought -- and this is hearsay -- that it was
11  outrageous or seemingly exaggerated, she did not
12  want to engage in that engagement.
13  Q.  Did you speak to her?
14  A.  No, I did not.
15  Q.  Okay.  So everything that you know about what
16  she had to say is hearsay, is that right?
17  A.  Yes, absolutely.
18  Q.  Let me ask you to turn to Paragraph 44 of
19  your Affidavit and specifically to subparagraph (d)
20  like David.
21     And in subparagraph (d) you say, "Here is the
22  quote, 'Unsubstantiated extravagant claims:  As
23  'proof' of the value of their 'technology,' the
24  group claims unprecedented results training over
25  400,000 individuals.  Yet their website only comes

Page 534

1  up with a few dozen testimonials.  That's about one
2  testimonial for every 10,000 participants.  Here is
3  the fact: in my biography it states as part of my
4  past credentials, 'Built an organization that
5  started with 5 people in his living room and grew to
6  almost 400,000.'  It is true that I trained almost
7  400,000 in my past company (Consumers' Buyline.)
8  This is because I created the training program, I
9  made the training videos, etc.  This has nothing to
10  do with NXIVM.  NXIVM Corporation has trained about
11  3700 people.  This untrue statement just serves to
12  discredit us and make us look bad."
13     Did I read that correctly?
14  A.  I believe so.
15  Q.  Okay.  Would you agree that the quote that
16  you repeat in Paragraph 44 doesn't disclose any
17  NXIVM trade secrets?
18  A.  I'm sorry.  Let me switch glasses so I could
19  read it specifically.
20     I would say that that statement again is
21  possibly a window that could be used in for trade
22  secrets, but I don't see that as disclosing any
23  trade secret because in itself I don't think it
24  comes directly from the manual.  I think he is
25  claiming to have read the manual and studied us and

---

**Page 535**

1  giving insight based on seeing the stolen materials
2  or the trade secret materials. It appears he's
3  trying to give his readers insight to potentially
4  the trade secret information.
5  Q. Well, the specific quote addresses the claim
6  of 400,000 individuals and attempts to debunk that
7  by saying that there were only a few.
8      None of that is a trade secret, is it?
9  A. Not that I see in itself.
10  Q. Okay. So if it's damaging, it's because it's
11  false?
12  A. It also can be damaging because we need to
13  publish material to counter it if it is in some ways
14  deflecting business. It also could be damaging
15  because -- and I don't -- I cannot second guess how
16  people would reverse engineer or solve problems, but
17  for all I know, something in there could be used to
18  reverse engineer.
19  Q. Well, look at the quote, Mr. Raniere, and
20  tell me what in the quote could be used to
21  re-engineer, to reverse engineer anything.
22  A. I can't tell you that. If I were to use this
23  quote to reverse engineer -- and I thought about it
24  for a long time -- I don't know if I would find
25  anything. I do not see anything apparently that

---

**Page 536**

1  could be used to reverse engineer.
2  Q. Okay. In Paragraph 44(f) you say,
3  "Pre-emptive neutralization of criticism of the
4  group by participants and their family/friends early
5  on: What the group calls 'shifter strategies' is
6  given much attention in the Intensive. It is
7  clearly taught that these represent undesirable
8  behaviors that should be met with disapproval by
9  other group members. The end result is that if a
10  participant criticizes things that the group does,
11  he is a 'suppressive.' Again, Hochman is attempting
12  to prove we are an authoritarian container cult.
13  Firstly, we teach most if not all people have
14  suppressive tendencies - both people who have taken
15  our course and not. Its is natural. Secondly,
16  suppression has nothing to do with rational
17  criticism. It is an act of destruction based on
18  hate. Thirdly, we believe it is dishonorable to
19  call someone a 'suppressive.' This paragraph goes
20  against the fabric of conduct in our organization."
21      Did I read that correctly?
22  A. I believe so.
23  Q. So since you are disputing Hochman's
24  observations and believe that it goes against the
25  fabric of conduct in NXIVM, would you agree that

---

**Page 537**

1  this quote doesn't disclose any genuine NXIVM trade
2  secrets?
3  A. I can't say that it can't be used as a
4  window. I do not -- I see where it uses the term
5  "shifter strategies." That's something that is
6  unique to us and important and self-descriptive.
7  Someone who understands game theory even from that
8  may be able to derive some of what we're talking
9  about. This I think is more revealing than the last
10  paragraph we spoke of.
11  Q. In what way is the phrase "shifter
12  strategies" self-descriptive?
13  A. I'll give you a basic example of a -- a
14  shifter strategy is someone who is shifting value in
15  order to steal it. When they are winning, they are
16  not cheating; and when they are cheating, they are
17  not winning.
18      There are many examples of a shifter
19  strategy. For example, I can say -- I can go on the
20  news and say, you know, it's -- it's not that John
21  was accused of killing 10 people. I don't believe
22  that report at all. You can look it up and see that
23  it's public data, but I don't believe it whatsoever,
24  and I'm certainly not going to say that. In a
25  sense, I am.

---

**Page 538**

1  Q. But none of that is contained within the
2  quote, is it?
3  A. I think that someone who certainly
4  understands game theories and strategies could start
5  to think, oh, some of these strategies you could
6  call shifter or shifting. What an interesting name
7  and --
8  Q. But when you say "some of these strategies,"
9  they would have to come up with the strategies. The
10  strategies are not stated in the quote, are they?
11  A. I was talking about the strategies of game
12  theory.
13  Q. NXIVM's shifter strategies --
14  A. Uh-huh.
15  Q. -- are not identified or described at all in
16  that quote, are they?
17  A. Not in completion or not directly, but I
18  think that this affords a window, especially for
19  certain elements of education within the population,
20  to derive things about us and derive things that are
21  confidential and important.
22  Q. Is the foundation of the Rational Inquiry
23  method embodied in the patent application?
24  A. The foundation of the Rational Inquiry method
25  -- I don't know. I wouldn't say the foundation of

---

Page 539

1  the Rational Inquiry method is embodied in the
2  patent application because we're patenting features
3  from the Rational Inquiry method. Some of the
4  things within the Rational Inquiry method may not
5  even be patentable. I don't know. Some of them are
6  -- I don't know if all confidential or trade secret
7  information is necessarily patentable.
8  Q. Is the entirety of the Rational Inquiry
9  method memorialized in any documents?
10  A. I don't think so.
11  Q. Did you prepare any drafts of different
12  versions of the Rational Inquiry method over the 30
13  years that you were developing it?
14  A. I don't believe so.
15      (Document entitled Application for
16  Letters Patent Bates stamped P000000685 through 768
17  was received and marked Defendant's Exhibit
18  Raniere-19 for Identification.)
19  BY MR. SKOLNIK:
20  Q. Mr. Raniere, do you recognize what has been
21  marked as Raniere-19?
22  A. No. I mean, I can ascertain what it is.
23  Q. Have you ascertained what it is?
24  A. I think it's a patent application, but I do
25  notice there's an assignment in here that I signed.

Page 540

1  Other than that, I don't know if I've seen any of
2  this before.
3  Q. Okay. Well, let me represent for the record
4  that it is a copy of the patent application and
5  related materials for the Rational Inquiry method
6  that was produced in this litigation as Document
7  Number P000000685 through P000000768, and let me ask
8  you to turn to the page with the number in the right
9  P000000711.
10      Do you know who drafted this patent
11  application?
12  A. I believe Arlen Olsen, but I'm not positive.
13  Q. Were you involved at all in the drafting and
14  assembling of the application?
15  A. I believe to some degree.
16  Q. Once it was completed, did you review it?
17  A. I know I reviewed parts of it. I'm not sure
18  if I reviewed this whole application, and I believe
19  the original application was far more than this
20  so...
21  Q. Far more than this?
22  A. Yeah. This is -- I think there were a bunch
23  of information that was provided to the patent
24  office as some sort of basis for certain things.
25  Q. Okay. Did you have any understanding about

Page 541

1  the importance of accuracy and precision and
2  completeness in patent applications?
3  A. With respect to patents, I believe so.
4  Q. Okay. Now, you're aware that this
5  application is available on the internet?
6  A. I have heard that there is either the
7  international version or Canadian version or
8  something available, but if it is, it is.
9  Q. Okay. Let me ask you to turn to Page 712
10  which is called "Summary of the Invention."
11  A. Yes.
12  Q. And, again, you reviewed -- you reviewed this
13  application before it was filed?
14  A. I am not positive, especially this version.
15  This may be a version that was submitted for
16  international submission or different countries, and
17  I probably did not review it then.
18  Q. Is it your understanding that the version
19  submitted for other countries was different than the
20  one submitted in the United States?
21  A. I think there are differences, although I'm
22  not positive.
23  Q. Okay.
24  A. This is certainly less information in my
25  understanding than what was submitted to the patent

Page 542

1  office.
2  Q. So, if anything, the patent office was given
3  more information?
4  A. Uh -- yes, I'm sorry.
5  Q. Let me ask you to just -- well, can you tell
6  me whether or not the section entitled "Summary of
7  the Invention" does, in fact, present a fair and
8  accurate summary of the Rational Inquiry method?
9  A. I would have to read it. I doubt it presents
10  a complete summary of, if you will, the complete
11  method. I suspect it presents a summary of the
12  invention in part derived from the invention and
13  parts of the invention and effects of the invention
14  that we want to patent.
15  Q. Okay, and then at Page 715 there's a section
16  headed "Detailed Description of the Invention."
17  Right?
18  A. Yes.
19  Q. Okay, and is it your understanding that the
20  application was put together to present a fair and
21  precise and detailed description of the Rational
22  Inquiry method?
23  A. I believe the application was put together to
24  have a fair and detailed description of the
25  invention that we want to patent, which was not all

Page 543

1 of the Rational Inquiry method nor all of the trade
2 secrets.
3 Q. Okay. And would you turn to Page 716, and
4 let me ask you to read into the record the text
5 beginning at Line 5 and running through the end of
6 that paragraph.
7 A. I don't have a -- P760, 60?
8 Q. 716.
9 A. Oh, I'm sorry.
10 Beginning at which? I'm sorry.
11 Q. At Line 5.
12 A. Line 5: "A portion of the disclosure of this
13 patent document contains material which is subject
14 to copyright protection. The copyright owner has no
15 objection to facsimile (or) reproduction by anyone
16 of the patent disclosure as it appears in the Patent
17 and Trademark Office public patent files or records,
18 but otherwise reserves all copyrights." (sic)
19 Q. Okay, so --
20 A. -- "all copyright rights."
21 Q. So you were aware that the Patent and
22 Trademark Office maintains public files and records,
23 is that right?
24 A. I've never seen that paragraph before, as far
25 as I know, but I guess they do.

Page 544

1 Q. Okay, and are you aware that anyone might be
2 able to arrange for a facsimile or reproduction of
3 the patent disclosure?
4 A. It is my understanding that because this
5 patent originally was filed before -- it's either
6 some date in 1999 or 2000 -- it remained what was
7 considered submerged and not public information up
8 until a certain point. So when this was filed, if
9 this is the original application, it was my
10 understanding that it was not going to be published.
11 Q. Well, I'm not talking now about publication.
12 I'm talking about --
13 A. Or available.
14 Q. -- facsimile or reproduction.
15 A. Right.
16 Q. So, in other words, the statement in Lines 5
17 through 11 that you just read comes as news to you?
18 A. Yes.
19 Q. Okay. And now if you'd turn to Page 719 and
20 read for the record the paragraph beginning at
21 Line 3.
22 A. 3. "ESP 52 module 1 includes a Rules and
23 Rituals and Scripting module. The Rules and Rituals
24 and Scripting module includes handshaking, Rules and
25 Rituals, an introduction to the basic modules 64 and

Page 545

1 Scripting. The purpose of the Rules and Rituals and
2 Scripting module is for students to develop a deep
3 appreciation and understanding of ESP 52. The
4 coaches ask students to think of as many
5 organizations as they can that require their members
6 to wear some sort of garment to meetings or uniform
7 to work. The coaches ask students to name 3
8 professions in which a title is used in addressing
9 the professional. The coaches ask students to think
10 of 3 situations in which certain rituals are used at
11 the start of the activity or meeting. The coaches
12 ask students to name 3 situations where groups begin
13 a meeting or session by reciting a statement."
14 Q. Okay. And now would you please turn to Page
15 729 and read for the record the detailed description
16 of ESP 52 module 10.
17 A. Oh, is that starting at the top?
18 Q. Yes.
19 A. "ESP 52 module 10 includes the parasite/
20 producer concepts module. The purpose of this
21 module is for students to understand and identify
22 parasite and effort strategies, so they can rid
23 themselves of parasite patterns, employ all effort
24 strategies raising capability and self-esteem and to
25 protect against being manipulated or taken advantage

Page 546

1 of by others. The coaches lead the students to
2 learn about the parasites. Parasite strategies keep
3 people dependent on others and lower self-esteem.
4 Effort strategies create independence and raise
5 self-esteem. The parasite is dependent on the
6 world. Parasites are nice when the chips are down
7 or when life is hard" on them -- "hard for them.
8 When things are good, they don't need anything they
9 have a tendency to change, they can become mean,
10 abusive or self-destructive. A producer's internal
11 state is separate and distinct from conditions in
12 the outside world, therefore they remain the same
13 whether life is easy or difficult with regard to how
14 they treat others. The term parasite is not a value
15 judgment. A positive meaning of manipulation is to
16 move by hand in a skillful manner, to manage or
17 utilize skillfully. A negative meaning of
18 manipulation is to control or play upon by artful,
19 unfair or insidious means so as to serve" -- hold on
20 -- "one's own advantage. In this definition there
21 is covert intention to move someone in an
22 underhanded fashion."
23 Q. Okay. Would you agree that the descriptions
24 that you just read are intended to be clear and to
25 provide the reader with the information necessary to

Page 547

1   understand the invention?
2   A. I think they are written to be clear enough
3   so that the invention could be patented, yes.
4   Q. And to provide the reader with the
5   information necessary to understand the invention?
6   A. I don't -- if the reader is assumed to be a
7   patent examiner, yes. I don't know if this was
8   written in such a way that the public should
9   necessarily be able to read it. I don't know what
10  the law is on that. I didn't write this.
11  Q. Okay. And the invention we're talking about
12  is the Rational Inquiry method, isn't it?
13  A. The invention that we're talking about is
14  aspects and effects from the Rational Inquiry method
15  but not the whole Rational Inquiry method.
16  Q. Right. But, again, if you -- if you look at
17  Page 711, the invention is called the Rational
18  Inquiry method; isn't it?
19  A. Hold on. It says Rational Inquiry method on
20  top, yes.
21  Q. Okay and --
22  A. I don't know if that means the invention is
23  called that, by the way. It's the title on the top
24  of the page.
25  Q. All right. You don't know whether or not

Page 548

1   it's called that?
2   A. Right.
3   Q. All right. Let me ask you finally to turn to
4   Page 762, and in addition to the detailed
5   description of some of the modules that we just
6   read, there's a list of all 21 modules for which the
7   application has provided the reader with the
8   information necessary to understand the invention;
9   right?
10  A. I don't know if that's true. There is a list
11  here of 21 modules. I don't know what of each of
12  these modules was provided, I don't, but enough is
13  provided of these modules to hopefully provide a
14  basis for granting a patent.
15  Q. And enough information for the reader to
16  understand the invention, at least a sophisticated
17  reader; right?
18  A. Yeah, whatever is necessary.
19  Q. Okay. Is it possible for a person to compete
20  with NXIVM by using only what is disclosed in the
21  patent application?
22  A. I imagine that could be true. I don't know
23  what the law is related to patent pending
24  information; and at the time when this was released,
25  which I don't know when that was, I don't know if it

Page 549

1   was public.
2   THE VIDEOGRAPHER: Excuse me. We have
3   to change tapes.
4   (At this point, there was a short
5   recess.)
6   THE VIDEOGRAPHER: This is the beginning
7   of Tape Number 4. We're on.
8   BY MR. SKOLNIK:
9   Q. Mr. Raniere, which do you believe gives a
10  more complete and accurate insight into the Rational
11  Inquiry method and NXIVM's modules, the Martin
12  Hochman articles or NXIVM's patent application?
13  A. I think they're both different, and I think
14  the patent application is something that we chose to
15  pursue with our property. The Hochman report is
16  not. I think the Hochman report seeks to disclose
17  possibly as much as it can or the heart. I think
18  the patent application seeks to disclose what we're
19  looking to patent as an invention and protect. My
20  understanding is that the patent application
21  discloses to protect, so I think it's apples to
22  oranges. I don't know which discloses more about
23  the stuff that we want to protect as private. I
24  think this is stuff that we don't want to protect as
25  private so much.

Page 550

1   Q. Let me ask my question again.
2   Which gives a more complete insight into
3   Rational Inquiry, the Martin Hochman articles or the
4   NXIVM patent application?
5   A. I can't evaluate that completely. I will say
6   the NXIVM patent application certainly contains a
7   lot more information.
8   Q. Okay. Which reveals more of NXIVM's trade
9   secrets, the Martin Hochman articles or NXIVM's
10  patent application?
11  A. Well, I would think the Martin article or the
12  Hochman article would.
13  Q. Why is that?
14  A. 'Cause if we're patenting something, it's not
15  a trade secret.
16  Q. You talked both last time and frequently
17  today about the articles and statements in the
18  articles providing windows into NXIVM's trade
19  secrets.
20  A. Uh-huh.
21  Q. Which provides more windows into NXIVM's
22  trade secrets, the Martin Hochman articles or
23  NXIVM's patent application?
24  A. It's hard to discern.
25  Q. Is it?

Page 551

1    A. For me because the patent applications are
2 crafted to protect certain things and not disclose
3 others, and it's geared to protect. It's geared to
4 uphold. It's geared for a purpose of positive
5 protection.
6    The Hochman articles and the Martin articles
7 were geared to disclose, were geared to disparage,
8 let's say were not -- I doubt it is Hochman's or
9 Martin's mindset to say, I want to positively
10 protect all of NXIVM's material, since they had
11 materials inappropriately.
12    Q. I'm not asking you about the intent or what
13 the different pieces were geared to. I'm asking you
14 whether or not more windows into NXIVM's trade
15 secrets are revealed in the patent application than
16 in the Martin and Hochman articles.
17    A. I understand. And what I'm saying is with a
18 patent application you're specifically trying not
19 to provide windows. You're trying to protect
20 something. The way this is worded, the way what
21 you're calling the windows are presented to me seem
22 less so. In the Hochman and Martin articles, they
23 have a manual. They're quoting orders of concepts
24 and words and page references.
25    In here, I don't see the orders being quoted

Page 552

1 the same way at all, and in the description of the
2 invention it looks like care has been taken not to
3 do that.
4    Q. Didn't you just read descriptions of modules
5 that went point by point about the way the module is
6 organized?
7    A. No. It said content of what was in the
8 modules to some degree. I don't even know if that
9 was the specific order. I -- well, I don't know.
10 It might be the specific order. I don't think so.
11    Q. Okay.
12    A. The order was not important for this
13 application.
14    Q. Isn't it a fact, Mr. Raniere, that someone
15 who is sufficiently intelligent and motivated and
16 who wants to compete with NXIVM or duplicate its
17 training would be able to do that far more easily
18 and quickly by studying the entire RIM patent
19 application that NXIVM has placed on the internet
20 and the entire modules that NXIVM has made available
21 at the copyright office and through its online court
22 records than through the excerpts contained in the
23 Martin and Hochman articles?
24    A. I don't agree with that because especially in
25 the Martin articles there were excerpts from the

Page 553

1 facilitator notes which were very confidential and
2 he -- if what I read was correct -- duplicated those
3 things exactly. None of that is at all in the
4 purview of this patent application. These are only
5 the 21 modules of the students; not the coaching
6 notes, not the facilitator notes, not any of those
7 things. And it's being used for a specific purpose
8 of quantifying certain inventions.
9    Q. Do you have an office at NXIVM headquarters?
10    A. No.
11    Q. From 2003 to the present, have you held any
12 position at all with NXIVM?
13    A. Other than the titular position of Vanguard,
14 no.
15    Q. Right. What about First Principles or ESP?
16    A. No.
17    Q. And is that true also of the period prior to
18 2003?
19    A. Yes.
20    THE WITNESS: Are we done with the
21 patent application or the deposition -- or the
22 Affidavit?
23    MR. SKOLNIK: Well, keep them at hand.
24    THE WITNESS: I'll just put them here.
25    (Confidentiality Agreement Effective

Page 554

1 5/13/06 Bates stamped Confidential SP1013 through
2 2030 was received and marked Defendant's Exhibit
3 Raniere-20 for Identification.)
4 BY MR. SKOLNIK:
5    Q. Mr. Raniere, can you identify what has been
6 marked as Raniere ---
7    THE REPORTER: 20.
8    Q. -- 20?
9    A. It appears to be a Confidentiality Agreement
10 for Michael Sutton.
11    Q. And it's dated effective May 13, 2006; is
12 that right?
13    A. Yes. That's what it says.
14    Q. And it lists the parties entering into the
15 Confidentiality Agreement.
16    Do you notice that NXIVM is not listed?
17    A. Where? In the beginning?
18    Q. In the beginning.
19    A. (Witness reads to himself.)
20    I don't know what the legality is with
21 respect to Executive Success Programs, Inc., if that
22 represents NXIVM or not and I don't know -- well, it
23 lists First Principles, Inc., Executive Success
24 Programs, Inc., Nancy Salzman with residence, Keith
25 Raniere with residence or principal place of

Page 555

1  business.
2  Q. Okay. Now, this agreement was executed in
3  2006. Why are you listed on the agreement?
4  **A. Because I think I've been on the agreement**
5  **all along and because I created the intellectual**
6  **property I think the attorneys felt it was important**
7  **that I be on there.**
8  Q. Are you on current agreements?
9  **A. I don't know.**
10  Q. Did you know that Joseph O'Hara was not
11  licensed in New York when he was hired by NXIVM?
12  **A. No.**
13  Q. Were you involved in the decision to hire
14  Joe O'Hara?
15  **A. To some degree, I voiced opinion.**
16  Q. What was your involvement in that decision?
17  **A. My understand -- well, I had met Joe O'Hara.**
18  **He seemed to be a person that was a lawyer and also**
19  **a business person and could be a lead in-house**
20  **corporate counsel of sorts and could provide very**
21  **valuable information on law and business to Nancy**
22  **and Executive Success Programs, NXIVM.**
23  **MR. SKOLNIK:** Okay. I think this is a
24  good time to take a short break.
25  **MR. CAMPION:** Sure.

Page 556

1  **MR. SKOLNIK:** But let me say that when
2  we come back from the break I will have asked the
3  reporter to mark several documents, and for each of
4  those documents, I'm going to ask you to identify
5  the document if you can and to tell us if you
6  received it.
7  **THE WITNESS:** Okay.
8  **THE VIDEOGRAPHER:** We're off.
9  (At this point, there was a short
10  recess.)
11  (May 10, 2004, Memorandum Bates stamped
12  SP1163 through 1165 was received and marked
13  Defendant's Exhibit Raniere-21 for Identification.
14  Note to Keith with attachments Bates
15  stamped SP0903 through 0907 was received and marked
16  Defendant's Exhibit Raniere-22 for Identification.
17  1/26/05 e-mail Bates stamped SP0480 was
18  received and marked Defendant's Exhibit Raniere-23
19  for Identification.
20  8/7/04 e-mail Bates stamped SP1284 was
21  received and marked Defendant's Exhibit Raniere-24
22  for Identification.
23  11/28/04 e-mail Bates stamped SP1814 was
24  received and marked Defendant's Exhibit Raniere-25
25  for Identification.)

Page 557

1  Memorandum to Kathy Russell Bates
2  stamped SP0429 was received and marked Defendant's
3  Exhibit Raniere-26 for Identification.
4  April 8, 2004, Memorandum Bates stamped
5  SP0432 was received and marked Defendant's Exhibit
6  Raniere-27 for Identification.
7  Confidential and Legal Product
8  Memorandum to Kathy Russell from Joseph J. O'Hara
9  Bates stamped SP0518 was received and marked
10  Defendant's Exhibit Raniere-28 for Identification.)
11  **THE VIDEOGRAPHER:** We're back on the
12  record at 2:34.
13  BY MR. SKOLNIK:
14  Q. Mr. Raniere, do you have Exhibits Raniere-21
15  through 28 in front of you?
16  **A. No, I do not.**
17  **(A discussion was held off the record.**
18  **At this point, there was a short**
19  **recess.)**
20  **THE VIDEOGRAPHER:** We're back on the
21  record at 2:43.
22  BY MR. SKOLNIK:
23  Q. Mr. Raniere, as I mentioned before we took
24  our break, I'm showing you now several documents,
25  and what I'm going to do is I'm just going to

Page 558

1  identify the document; and my only question for
2  you is to tell us whether or not you received the
3  document.
4  Raniere-21 is a memo dated May 10, 2004, from
5  Joe O'Hara to you and Nancy Salzman about Proposed
6  New Financial Arrangements Between NXIVM and The
7  O'Hara Group.
8  **A. Okay. I don't know if I received this.**
9  Q. When Joe O'Hara sent things to you, did you
10  generally receive them?
11  **MR. CAMPION:** Object to the form of that
12  question.
13  **MR. McGUIRE:** Object to the form of the
14  question.
15  **MR. CAMPION:** You can answer.
16  **A. I have no idea. If I didn't receive them, I**
17  **wouldn't know I didn't receive them. I did not**
18  **receive many documents from Joe O'Hara.**
19  Q. Okay. Do you have any reason to believe that
20  you did not receive this document?
21  **A. This document, I have to understand what it**
22  **is.**
23  **I did see a document relating to finances at**
24  **one point. I do not trust any documents from Joe**
25  **O'Hara, so I don't know if this is the document I**

Page 559

1 saw. The subject matter seems somewhat familiar.
2 Q. Okay. How about Raniere-22, which is an
3 undated draft agreement addressed to "Keith"
4 attaching a strategic plan, a proposed strategic
5 plan for NXIVM?
6 A. Undated? On the top it says, "As of
7 September 22, 2003"?
8 Q. Right.
9 A. I don't know if I received this either. Some
10 of the subject matter looks familiar, in particular,
11 I don't know who boxed in "Riker/Danzig." It was
12 something that Joe had told me at one point, that
13 Riker Danzig was an important firm in New Jersey and
14 that we should continue to consider hiring them, so
15 that was not available.
16 Q. You don't recognize the document as something
17 that you received, is that right?
18 A. No, I don't. I may have received it.
19 Q. You may have received it?
20 A. Yeah.
21 Q. Okay. What about Raniere-23, which is a
22 January 26, 2005, e-mail? The subject is Re:
23 Sitrick, and it's addressed to an e-mail address
24 Sage11 with copies to kunterre@nycap.rr.com, Nancy
25 Salzman and Kristin Keeffe, and it concerns a

Page 560

1 fully-executed letter agreement with Toga and NXIVM.
2     MR. McGUIRE: Peter, would you have an
3 extra copy of that? I don't have a copy of 23.
4     MR. SKOLNIK: I don't, Bill.
5 A. I don't recall receiving this, and if I had
6 received it, I probably wouldn't have read it.
7 Q. Why do you say you probably wouldn't have
8 read it?
9 A. If it's sent to the kunterre@nycap.rr.com,
10 that is an e-mail that I have shared with others.
11 This letter is addressed to Kathy. So if I had
12 received something and I saw it was addressed to
13 Kathy, I wouldn't read it.
14 Q. And who do you understand Kathy to be?
15 A. I suspect it's Kathy Russell because her
16 e-mail address is Sage11.
17 Q. Okay. What about Raniere-24, which is an
18 e-mail dated August 7, 2004? The subject is
19 "Confidential Material," and this is from the e-mail
20 address kunterre to Joe O'Hara, and it is signed
21 "Keith."
22 A. I probably wrote it then. I'm not sure, but
23 if it came truly from kunterre and signed it
24 "Keith," I'm the only Keith at that address so...
25 Q. Okay. Raniere-25, an e-mail dated November

Page 561

1 28, 2004, from Joe O'Hara to the kunterre e-mail
2 address and addressed "Keith."
3 A. Uh-huh. I don't know if I received this
4 e-mail. I am somewhat familiar with the subject
5 matter, though.
6 Q. Do you have any reason to believe you didn't
7 receive the e-mail?
8 A. 1) That I don't trust Joe O'Hara; 2) That I
9 don't specifically remember this. So I may have
10 received it but not read it 'cause I spoke to him
11 relating to this building, and I don't know who
12 John Naftzger is so...
13 Q. Well, when you say you don't trust
14 Joe O'Hara, that mistrust had not developed by
15 November 28, 2004, had it?
16 A. Unfortunately, but he has done I think a lot
17 of very improper things before I lost trust in him,
18 and I do believe that he creates things so...
19 Q. Raniere-26, this is a memo dated November 18,
20 2004, from Joe O'Hara to Kathy Russell, CC to you
21 and Nancy Salzman with attachments, and it concerns
22 an Employment Agreement for Nancy Salzman.
23 A. Oh, I doubt I received this.
24 Q. You doubt you received it?
25 A. Yeah.

Page 562

1 Q. You would not have received an Employment
2 Agreement for Nancy?
3 A. I don't know, but also where would he carbon
4 copy me on this? Did he hand it to me supposedly or
5 e-mail it to me or...
6 Q. Do you remember receiving it, Mr. Raniere?
7 A. No, I don't.
8 Q. Okay. Do you have any reason to believe you
9 didn't receive it?
10 A. Yes.
11 Q. And what is that reason?
12 A. I can't figure out how he would have gotten
13 it to me. It doesn't say he e-mailed it to me so I
14 don't -- I wouldn't have received it otherwise.
15 Q. Did Mr. O'Hara ever mail anything to you?
16 A. No, not that I know of.
17 Q. Did he ever deliver things to you personally?
18 A. I think there was one document that he
19 delivered in a meeting, but it wasn't labeled. It
20 was a thing relating to the land and the change of
21 the financial agreement.
22 Q. Did he ever leave documents for you at NXIVM
23 with the assumption that you would pick them up?
24 A. I doubt that 'cause I wouldn't get them.
25 Q. Did he ever deliver things to you through

---

Page 563

1 Nancy Salzman and Kristin Keeffe or someone else?
2 **A. I don't think so, no.**
3 Q. Okay. Raniere-27, it's a memo dated April 8,
4 2004, from Joe O'Hara to you and Nancy Salzman about
5 Reputation Renewal.
6 **A. Okay. I don't think I received this. I**
7 **don't remember it.**
8 Q. It doesn't look familiar to you?
9 **A. No, it does not.**
10 Q. So you're basically saying that you don't
11 remember receiving any of these documents from
12 Mr. O'Hara?
13 **A. Well, yeah, I don't think I remembered any**
14 **single one of these documents.**
15 Q. Okay. And finally, Number 28, Raniere-28, a
16 memo dated October 29, 2004, from Joe O'Hara to
17 Kathy Russell with a BCC at the top of the next page
18 to you and Nancy Salzman, and it concerns NXIVM's
19 corporate registration in Puerto Rico.
20 **A. I don't think I received this.**
21 Q. It doesn't look familiar?
22 **A. No, it does not.**
23 Q. Okay. Prior to your being named as a
24 counterclaim defendant, what was the nature of your
25 involvement in this litigation?

---

Page 564

1 **A. Well, I think I was only superficially**
2 **involved. There were times when, for example, I met**
3 **Juval Aviv. I don't know if you consider that being**
4 **involved. I had met at times some of NXIVM's**
5 **attorneys when they came up. There were some**
6 **attorneys I think that sat in a forum I did at one**
7 **point; and various questions have been brought to me**
8 **at times, problems, things like that. I think**
9 **superficially I was involved.**
10 Q. Were you involved in any decisions about what
11 claims to assert in this litigation?
12 **A. No, I don't believe so. I think I gave input**
13 **on it but, no, I wasn't directly involved in that**
14 **decision.**
15 Q. So when you say you gave input, who asked you
16 for input and what was the nature of your input?
17 **A. Since it is my property, I tend not to be**
18 **litigious. A lot of times -- the question is if**
19 **someone does something that either violates a**
20 **confidentiality agreement or things like that, if**
21 **you do not pursue it, do you lose rights. So those**
22 **are the sort of things if the property is to be**
23 **protected what has to be pursued. Those are the**
24 **sort of inputs. You know, I want the property**
25 **protected; but I also see -- and I've obviously**

---

Page 565

1 **learned since -- that litigations can go on a very**
2 **long time and be very expensive.**
3 Q. Were you specifically consulted about filing
4 a defamation claim?
5 **A. Yes. I did -- I signed an Affidavit relating**
6 **to that, I believe, and I -- you know, I believe**
7 **that there were things that were said that were**
8 **damaging, untrue, so yes.**
9 Q. Did you approve the filing of a defamation
10 claim?
11 **A. Approve? I don't -- in no legal sense. I**
12 **was convinced that it was a good idea ultimately by**
13 **the attorneys.**
14 Q. Were you asked whether or not a defamation
15 claim should be asserted?
16 **A. I don't believe so.**
17 Q. If you had said that a defamation claim
18 should not have been asserted, would it have been?
19 **A. It might have been.**
20 Q. What about the copyright claim? Were you
21 consulted about filing a copyright claim?
22 **A. Yes, I believe I was.**
23 Q. And did you approve filing a copyright claim?
24 **MR. McGUIRE: We're not waiving any**
25 privilege along these lines either, are we?

---

Page 566

1 **MR. SKOLNIK: No.**
2 **A. When you say "approve," I believe I voiced**
3 **an opinion with questions, but I don't think what I**
4 **said is followed or not followed. In fact, I**
5 **believe at times it isn't followed, what I say.**
6 Q. What opinion did you voice?
7 **A. Well, the first question I asked was what**
8 **was the nature of how you evaluate a copyright**
9 **evaluation -- a copyright claim, and how could it**
10 **help address the wrongs of what I considered a**
11 **theft and a misuse of property.**
12 Q. Did you discuss what claims would be included
13 in the litigation with anyone other than your
14 attorneys?
15 **A. Not that I recall.**
16 Q. You didn't have any discussions with
17 Nancy Salzman about claims in the litigation?
18 **A. I don't know specifically --**
19 **MR. McGUIRE: Is this with or without**
20 the participation of counsel?
21 **A. I don't know enough about the claims per se.**
22 **I did discuss with Nancy that I thought our property**
23 **had been stolen and that we were being damaged. As**
24 **far as the specifics of what are in the claims or**
25 **how that is voiced or framed legally, I don't know**

Page 567

1  that, and often it seems to me that attorneys don't
2  frame the issues as I would see them.
3  Q. In addition to Nancy, did you discuss the
4  filing of these claims with Kristin Keeffe?
5  A. Well, I don't agree that I discussed the
6  claims per se. And, yes, I mentioned and certainly
7  discussed what I felt were certain damaging aspects
8  of what had happened; but I didn't discuss the
9  specifics of the claims, as far as I know.
10 Q. What about with Joe O'Hara?
11 A. Likewise, Joe would give me more advice at
12 times on how things are framed legally compared to
13 how things are as seen by a common person like
14 myself.
15 Q. Did you specifically -- were you specifically
16 consulted about the filing of the trade secret
17 claim?
18 A. I discovered I believe looking through a
19 book at one point that there was an advertisement or
20 something to do with Tabi Kahler. I'm not sure if I
21 was the person who discovered that Stephanie Franco
22 was involved with Tabi Kahler, but I think I was
23 involved in that.
24 Q. Involved in what?
25 A. The discovery that Stephanie Franco was

Page 568

1  involved with Tabi Kahler. At one point, I also saw
2  -- I was shown a website, I believe it was by
3  Kristin Keeffe, where Stephanie Franco was listed
4  as a master trainer on a Tabi Kahler website which I
5  was surprised and felt that that was inappropriate,
6  and I voiced that opinion to her.
7  Q. And what did your discoveries with respect to
8  Tabi Kahler and Stephanie Franco have to do with the
9  decision to file a trade secret claim?
10 A. I don't know exactly. I don't know when the
11 trade secret claim was filed, and I don't know much
12 about the trade secret claim per se.
13 Q. You were not consulted about filing a trade
14 secret claim, is that right?
15 A. I don't -- I don't believe so.
16 Q. Were you consulted about transferring the
17 case from New York to New Jersey?
18 A. Yes.
19 Q. Who consulted you?
20 A. I think one of the lawyers from Nolan &
21 Heller and Joe O'Hara. I was assured I would never
22 have to come to New Jersey; and I was assured since
23 I had no business, no dealings with Jersey for many,
24 many years, that what is happening would not happen.
25 So I said it didn't matter, as far as I was

Page 569

1  concerned.
2  Q. So much for legal advice.
3  Did you make any decisions for NXIVM
4  regarding this litigation?
5  A. Did I make any final decisions, no. I don't
6  believe I have the authority to.
7  Q. So other than counsel, who made those
8  decisions?
9  A. I have no idea. I think counsel made the
10 decisions.
11 Q. Well, counsel was working for a client. Who
12 spoke for the client?
13 A. Then I guess Nancy would.
14 Q. Do you view your individual interests as
15 aligned with NXIVM's interests in the litigation?
16 A. As far as I know, yes.
17 Q. Because throughout your August 23 Affidavit
18 that we've looked at you frequently refer to
19 yourself and NXIVM as "we" and "us," isn't that so?
20 A. Uh-huh, yes.
21 Q. Why do you use the term "we" or "us" if you
22 are not affiliated with NXIVM and are not involved
23 in supervising the litigation?
24 A. Because they used my property, and it's my
25 property or it's my invention.

Page 570

1  Q. So why are you not named as a plaintiff?
2  MR. McGUIRE: It calls for a legal
3  conclusion, doesn't it?
4  Q. Well, let me ask you your opinion.
5  A. I guess they felt it wasn't -- I wasn't as
6  directly involved. Since I derive no income from
7  NXIVM, there is no direct damages measurable to me
8  personally, from what I understand, and I prefer to
9  stay out of litigations to a degree. I did not
10 completely agree with going into a large litigation.
11 Q. Was it your decision not to be a plaintiff?
12 A. Well, in some aspects, it was. If I was
13 asked to be a plaintiff, I probably would have said
14 no, but I don't even believe I was asked.
15 Q. The e-mail address kunterre@nycap.rr.com --
16 A. Yes.
17 Q. -- who else uses that address?
18 A. Karen Unterreiner.
19 Q. And who is Karen Unterreiner?
20 A. She's a long-time friend of mine and business
21 associate.
22 Q. What, if any, is her position at NXIVM?
23 A. I don't know. I believe she's a trainer; and
24 I think she does work within the finance department
25 and computer department, although I'm not sure.

Page 571

1  Q. When an e-mail is received at the kunterre
2  e-mail address, who reads it?
3  A. Well, Karen might read it. I might read it.
4  I'm not sure if anyone else in general would have
5  read it. That's mainly Karen's account which is
6  derived from her name, and that would be pretty much
7  it; either myself or Karen.
8  Q. If an e-mail comes to that address that on
9  its face is clearly for your attention rather than
10  hers, will she let you know that the e-mail has
11  arrived?
12  A. I often --
13           MR. McGUIRE: Object to the form of that
14  question, but go ahead.
15  A. I often don't read e-mails at that account.
16  That account gets lots of spam and other things like
17  that so...
18  Q. To your knowledge, does Karen delete e-mails
19  that come to that account that are addressed to you?
20  A. I don't think so.
21  Q. What role did you play in decisions about
22  who would represent NXIVM on your appeal to the
23  United States Supreme Court in this case?
24  A. Well, I told Kristin and Joe. And Joe also
25  had advised me that we should get an attorney or a

Page 573

1  to think if I saw anything in writing relating to
2  the Supreme Court. I don't recall.
3  Q. Do you remember receiving any e-mails
4  concerning the Second Circuit's copyright decision
5  in this case?
6  A. No, not off the top of my head.
7  Q. Do you remember any discussions or meetings
8  with Joe O'Hara about that decision?
9  A. It was discussed on a few different
10  occasions.
11  Q. Do you recall having a strategy session with
12  Joe O'Hara to discuss how to proceed with the trade
13  secret claims?
14  A. No. Although I well may have strategized
15  with Joe O'Hara relating to various legal issues, I
16  don't specifically recall trade secret.
17  Q. Did you review the various briefs that NXIVM
18  filed with the Second Circuit and the Supreme Court?
19  A. I've seen copies of some of them, but I think
20  it might have even been after the fact. I've seen
21  copies of certain legal documents. There was one
22  point where I think they wanted to get my thinking
23  on a certain document, but I don't believe the
24  document ever made it to me.
25  Q. Did you review any of the briefs filed with

Page 572

1  firm that had a lot of experience representing,
2  petitioning or whatever it is to the Supreme Court;
3  and I believe Joe found that firm, and I think he
4  had a -- I saw on a website once the attorney who is
5  doing it had a very strong record. I don't remember
6  exactly what it was, but X number of times in front
7  of the Supreme Court and that sort of a thing.
8  Q. Did you meet with Joe O'Hara about the appeal
9  to the Supreme Court?
10  A. Did I meet with him? I had spoken with him
11  about it and about aspects of it. I don't know if I
12  met with him specifically about it.
13  Q. Do you recall any meetings with Joe O'Hara
14  and Nancy Salzman to discuss finalized plans for the
15  appeal to the Supreme Court?
16  A. Finalized plans, I mean, I imagine that Joe,
17  Nancy and myself conversed about the appeal to the
18  Supreme Court. I do remember that they had to
19  decide to either petition the Second Circuit for an
20  en banc I think it's called appeal or go up to the
21  Supreme Court so there were conversations about
22  that, yes.
23  Q. Do you recall receiving any e-mails
24  concerning the appeal to the Supreme Court?
25  A. I don't recall receiving e-mails. I'm trying

Page 574

1  the Second Circuit or the Supreme Court before they
2  were filed?
3  A. I don't know.
4  Q. You don't know?
5  A. I don't know.
6  Q. When did you meet Kristin Keeffe?
7  A. 1990.
8  Q. How did you meet her?
9  A. In a corporation that I created and I was the
10  primary shareholder and CEO, she was recruited as a
11  sales rep.
12  Q. What is her role at NXIVM?
13  A. My understanding is she's -- she handles
14  legal information. She's sort of a liaison to get
15  like paperwork information together. I think she
16  may have all the filing, also, of all the legal
17  documents and motions, like that.
18  Q. Who would you say at NXIVM is in charge of
19  the litigation?
20  A. Probably Nancy. Kristin is like -- she
21  handles all the information from what I understand
22  of the legal things.
23  Q. Who decided that Kristin would be the person
24  to handle all of the information about the
25  litigation?

**Page 575**

1  A. I don't know. Maybe it was Joe. I'm not
2  sure.
3  Q. Did you ever tutor Kristin Keeffe about how
4  to research legal issues for the litigation?
5  A. I wouldn't say I tutored her on how to
6  research legal issues. I tutored her in critical
7  thinking.
8  Q. You didn't give her any specific instructions
9  about how to research legal issues?
10  A. I think she knows better than I do.
11  Q. Now, you told us last time that you never
12  discussed with anyone the propriety of NXIVM
13  arranging to interview Rick Ross through Interfor
14  while a lawsuit against him was pending.
15  Do you recall that testimony?
16  A. Not specifically. Do you have it so I could
17  read it, the testimony?
18  Q. Let me just show you Page 360.
19  MR. LEONARD: 360?
20  MR. SKOLNIK: 360.
21  A. Okay. Starting at the top?
22  Q. Well, it's really in the middle of the page,
23  but read as much of the page as you need.
24  A. Okay. I see where the testimony is. I'm not
25  sure I understand it but --

**Page 576**

1  Q. Well, I'm just asking you to confirm that
2  your testimony was that you never discussed with
3  anyone the propriety of --
4  A. I don't believe I did.
5  Q. Okay. Let me just finish my question so the
6  record is clear.
7  You never discussed with anyone the propriety
8  of NXIVM arranging to interview Rick Ross through
9  Interfor while a lawsuit was pending?
10  A. Correct, because I -- I'm not sure I was
11  aware that that was going on like that. Yes, I
12  believe that is true.
13  Q. Okay.
14  MR. McGUIRE: Let the record show I
15  object to the form of that question belatedly.
16  Q. Whether or not you discussed it with anyone,
17  did you in your own mind question the ethics of
18  conducting those interviews?
19  A. No. It was always my assumption because
20  there were so many attorneys involved on not only
21  with Joe O'Hara and Nolan & Heller, but Juval had
22  attorneys in his office and things like that, that
23  they knew what they were doing. I mean, that's a
24  general belief I have of them.
25  Q. Let me ask you to turn to the Exhibit that

**Page 577**

1  was marked last time as Raniere-16.
2  (A discussion was held off the record.)
3  BY MR. SKOLNIK:
4  Q. And Exhibit 16, for the record, is Keith
5  Raniere's Responses to Defendant Rick Ross' First
6  Amended Set of Interrogatories to NXIVM Corporation.
7  And would you just turn to Page 13 and confirm for
8  us again that that's your signature.
9  A. Yes.
10  Q. Now, the actual responses begin on Page 5.
11  The first response is on Page 6. And Interrogatory
12  Number 1 concerns, among other things,
13  communications with Interfor regarding Rick Ross;
14  and in your response, the second paragraph, you say,
15  "Mr. Raniere states that he never spoke to
16  Interfor."
17  A. Hold on. Where is that?
18  Q. The second sentence or the last clause of the
19  second paragraph in your response on Page 6.
20  A. "Mr. Raniere states that he never spoke to
21  Interfor."
22  Yes, I did speak to Juval Aviv.
23  Q. Okay. So when you said, "Mr. Raniere states
24  that he never spoke to Interfor," were you not
25  including Juval Aviv?

**Page 578**

1  A. I met him socially, so I did not think of
2  that as corporate or anything to do with this.
3  Q. When you met him socially, did you discuss
4  the work that Interfor was doing for NXIVM?
5  A. Not really. He told me a lot about himself,
6  and we didn't discuss specifically what Interfor was
7  doing.
8  Q. Did you discuss generally what Interfor was
9  doing?
10  A. No, not that I remember. It was a social
11  occasion, and he was telling me about his past and
12  the sort of things he did.
13  Q. Did you ask or advise anyone else to speak to
14  Interfor?
15  MR. McGUIRE: Could I have that read
16  back, please? I'm sorry.
17  (The following was read back by the
18  reporter:
19  "Did you ask or advise anyone else to
20  speak to Interfor?")
21  A. I don't believe so.
22  Q. Did you provide any advice or instructions
23  about what Interfor should investigate concerning
24  Rick Ross or how they should go about it?
25  A. No, I don't believe so.

Page 579

1   Q. When you say you don't believe so, is there
2   some uncertainty in your mind about whether you had
3   such discussions?
4   A. I don't remember offhand all of my
5   discussions. I don't remember any such discussion.
6   I don't have reason to believe I would have had such
7   a discussion. Numerous problems and concerns are
8   brought to me over time which I speak about, but I
9   don't recall any of them dealing with Interfor.
10   Q. Did you ask or advise anyone to send any
11   communications to Interfor?
12   A. I doubt it. I don't think so.
13   Q. Were you copied, including BCC'ed, on any
14   communications with Interfor?
15   A. Not that I know of.
16   Q. Did you discuss the Interfor investigation of
17   Ross with Joe O'Hara?
18   A. I'm not sure. I discussed a number of things
19   with respect to Ross over time with Joe O'Hara.
20   Joe O'Hara had a lot of things that he felt should
21   be done. I may have.
22   Q. What was the nature of your first discussion
23   with Joe O'Hara about Rick Ross?
24   A. I'm not really sure. I'm making a
25   hypothesis. I don't know.

Page 580

1   Q. Do you remember any of the substance of that
2   discussion?
3   A. No.
4   Q. What were the ideas that you say Joe O'Hara
5   had about Rick Ross?
6   A. Well, he believed that Rick Ross was not a
7   good person. He believed that Rick Ross -- it
8   sounded like he believed Rick Ross should be stopped
9   no matter what. He believed that Rick Ross was
10   doing a lot of things that we didn't know about,
11   Nancy or myself. He believed that I was innocent or
12   ignorant as to how things worked in the world and
13   that he felt I think that we were not nearly active
14   enough in changing things. I think he wanted to
15   catch Rick Ross doing bad things and things that we
16   had heard he was doing and other things that Joe
17   hypothesized he was doing, and those are the sort of
18   comments.
19   Q. And how did he propose you go about catching
20   Rick Ross?
21   A. I believe at one point he wanted to have
22   either some sort of a tape or record of Rick Ross
23   making false representations to our clients.
24   Q. And how did he propose that you would go
25   about obtaining such a tape of false

Page 581

1   representations?
2   A. I don't remember specifically. I know at
3   one point he had wanted to either tape record a
4   phone call or phone calls with Rick Ross. I don't
5   know if he was the person that came up with the idea
6   of having some sort of interview with Ross, although
7   he at times voiced far more aggressive strategies
8   that I don't agree with.
9   Q. Who was meant to have a phone call -- phone
10   conversation with Rick Ross?
11   A. I don't think that was determined.
12   Q. The notion of having phone conversations or a
13   meeting with Rick Ross, were these ideas that Joe
14   O'Hara discussed with you before they took place?
15   A. I don't know.
16   Q. But they might have?
17   A. Yes. Certainly Rick -- Joe had said things
18   relating to Rick Ross before there was any sort of
19   engagement with Rick Ross.
20   Q. Did Joe O'Hara recommend that a private
21   investigation firm be retained to conduct some
22   investigation of Rick Ross?
23   A. I know he spoke of that. I -- he may have
24   been the first one to say that. I don't know if he
25   was the first one to think that, but certainly.

Page 582

1   Q. And that would have been again before the
2   private investigation was put in place?
3   A. Yeah, I would assume so.
4   Q. Did you give Joe O'Hara any instructions or
5   advice about any aspect of the investigation of
6   Rick Ross?
7   A. No. I don't know much about that field.
8   Q. Well, separately from how to go about it,
9   did you give Mr. O'Hara any suggestions about what
10   you wanted to learn or accomplish?
11   A. No. I -- I didn't want to learn in
12   particular anything, but I believe that if there is
13   going to be a lawsuit or actions done that people
14   should have as much data as is available, so if I
15   said anything about how an investigator should be
16   used, it would be from that perspective.
17   Q. And what do you recall saying about how an
18   investigator should be used?
19   A. I don't recall saying anything.
20   THE VIDEOGRAPHER: Excuse me. We have
21   to change tapes.
22   (At this point, there was a short
23   recess.)
24   THE VIDEOGRAPHER: This is the start of
25   Tape Number 5. The time is 3:44.

KEITH RANIERE - VOL II
May 13, 2009

NXIVM CORPORATION v. 20931
MORRIS SUTTON

Page 583
Page 584
Page 585
Page 586

**Page 583**

BY MR. SKOLNIK:

1 Q. Mr. Raniere, did you speak to Kristin Keeffe
2 about the Interfor investigation of Rick Ross?
3 A. I think at some times I have, yeah.
4 Q. Did you first discuss that investigation
5 before it commenced?
6 A. I don't believe so.
7 Q. What do you recall as being your first
8 discussion with Kristin Keeffe about what Interfor
9 was doing?
10 A. I'm not sure if it's the first, but I
11 remember hearing that and which affirmed also what
12 was mentioned before, that Juval had a relationship
13 with Ross and that Juval felt that he could get good
14 information and things that would be helpful with
15 Ross saying slanderous things.
16 Q. And you would have heard this from Kristin
17 Keeffe before Juval was retained, isn't that right?
18 MR. McGUIRE: I object to the form of
19 that question.
20 A. I -- I don't think I would have heard that
21 before Juval was retained.
22 Q. Okay. There are several documents in the
23 record indicating that Kristin Keeffe had various
24 telephone conversations and meetings with Interfor.

**Page 584**

1 Would she report back to you? Did she report
2 back to you after those meetings with Interfor?
3 A. Not generally.
4 Q. Do you remember any reports that you received
5 from her about her discussions or meetings with
6 Interfor?
7 A. I remember that she had taken a long walk
8 with Juval Aviv at a monastery; and she was talking
9 about Buddhism, I think. The specifics of meetings
10 and the specifics of when they were and things like
11 that I did not know.
12 Q. Did she tell you anything about her
13 conversations or meetings with Anna Moody?
14 MR. MEE: Objection.
15 MR. CAMPION: Answer the question.
16 A. I don't believe so.
17 Q. What about with Abby Barrish?
18 A. Who is Abby Barrish?
19 Q. That name doesn't ring a bell to you at all?
20 A. No.
21 Q. Okay. Do you recall any other conversations
22 you had with Kristin Keeffe about what Interfor was
23 doing?
24 A. Yes. I recall Kristin saying that Juval Aviv
25 had a neighbor who knew Al Damato. I recall that

**Page 585**

1 Kristin Keeffe said that Juval Aviv felt that
2 Kristin Snyder was likely alive and probably in
3 witness protection. Kristin told me also that
4 Juval Aviv was involved in the astro projection
5 intelligence unit of -- I don't know if it was the
6 United States or Israel or and that some of his data
7 supposedly came from that, which I found to be very
8 disturbing.
9 Those are the things I remember off the top
10 of my head.
11 Q. Did Kristin Keeffe tell you about any of the
12 meetings that she participated in at Interfor's
13 offices with Rick Ross?
14 A. No, not that I know of at all.
15 Q. Did you give Kristin Keeffe any instructions
16 or advice about any aspect of Interfor's
17 investigation of Rick Ross?
18 A. Specifically his investigation of Rick Ross,
19 I don't believe so, but when she was telling me
20 about the comments on the astro projection and also
21 when it appeared she was more of a personal friend
22 of his, I cautioned her that she shouldn't let -- if
23 she has a personal relationship with this man, she
24 shouldn't let her friendship interfere with good
25 judgment; and an investigation firm that's headed by

**Page 586**

1 someone who claims to be doing astro projection to
2 get their information is probably not something
3 worth paying for.
4 Q. In your response to Interrogatory Number 1 in
5 Raniere-16, about halfway through the third
6 paragraph you say, "At some point during the course
7 of this litigation Mr. Raniere became aware of a
8 copy of a written communication from Interfor,
9 entitled 'Status Report' that was the report on the
10 status of an investigation into Rick Ross. "
11 A. Yes.
12 Q. "Mr. Raniere does not believe there were any
13 other communications."
14 A. Communications. Oh, okay.
15 Q. Okay. How did you become aware of the status
16 report document?
17 A. Kristin I believe told me that there was a
18 document that Juval Aviv gave her that was a bunch
19 of information that she thought he downloaded from
20 the internet and that she felt it wasn't worth
21 anything.
22 There is something else. There was an
23 article written in Metroland that mentioned
24 something about financial information out of the
25 status report which surprised me. I think it's this

Page 587

1  status report, but it is mentioned within that
2  article.
3  Q. You hadn't heard anything about that from
4  Kristin Keeffe?
5  A. No.
6  Q. What about from Joe O'Hara?
7  A. No.
8  Q. Did you have any conversations at all with
9  Joe O'Hara about the status report?
10  A. I think he might have mentioned that Juval
11  has prepared a report. I didn't have any extensive
12  conversations, no.
13  Q. What do you remember him telling you about
14  the report?
15  A. I don't think he told me much of the content,
16  just that it was a comprehensive informational
17  report.
18  Q. Did you ask him about the contents?
19  A. No.
20  Q. Did you ask him what conclusions anybody
21  could draw from the report?
22  A. Well, I think he thought the report wasn't
23  very good. I mean, I think he expressed the same
24  thing that Kristin did, that it was a very thick
25  report with a bunch of stuff that was downloaded off

Page 588

1  the internet.
2  Q. Was there any discussion of the fact that
3  the report contained Mr. Ross' financial
4  information?
5  A. No, no.
6  Q. Was there any discussion of the fact that it
7  contained his telephone records?
8  A. No.
9  Q. The statement we just read from your response
10  to Interrogatory 1 says, "Mr. Raniere does not
11  believe there were any other communications."
12  Do you recall receiving any copies of
13  agreements between NXIVM and Interfor?
14  A. I have seen them since or some, but at this
15  period of time I don't believe I had.
16  Q. Was it your idea to have Interfor conduct an
17  in-person meeting with Rick Ross?
18  A. No.
19  Q. Do you know whose idea it was?
20  A. No.
21  Q. Did you propose having Interfor conduct a
22  sting operation?
23  A. No.
24  Q. When did you become aware of the in-person
25  meetings with Rick Ross?

Page 589

1  A. I'm not exactly sure. I do remember hearing
2  that there was a tape or a conversation or something
3  that said that Rick Ross had pictures, a lot of
4  pictures of me even I think they said something like
5  pictures in the shower and that I was having sex
6  with -- pictures of me having sex with students and
7  things like that.
8  Q. Who told you that?
9  A. I believe that was Kristin.
10  Q. And when did she tell you that?
11  A. I don't know. I have since -- because I was
12  deposed in part on the issues and seen some of it,
13  I'm not exactly sure but -- no, I don't know when it
14  was exactly.
15  Q. Did she tell you that shortly after she
16  attended the meeting where those statements were
17  made?
18  MR. McGUIRE: Object to the form of that
19  question.
20  A. I don't know when that meeting happened.
21  Q. When Kristin Keeffe told you about those
22  comments, was she telling you that she had heard
23  this recently or quite some time ago?
24  A. I don't know. I think -- I couldn't tell.
25  My assumption is it would be pretty recent, though,

Page 590

1  I mean I would say certainly within a month.
2  Q. Within a month of the time when she heard it?
3  A. I would assume so, yes.
4  Q. When did you become aware of the proposed
5  sting operation?
6  A. I don't know exactly because Joe O'Hara had
7  been proposing things like that for a long time. I
8  don't know exactly even to date when the sting
9  operation happened.
10  Sorry, I don't know.
11  Q. When Joe O'Hara proposed something like a
12  sting operation, what did you say to him?
13  A. Well, Joe O'Hara had proposed many sort of
14  initiatives from close to the first time I met him.
15  A lot of the times I objected to what Joe O'Hara
16  said with respect to such actions.
17  Q. Did you object to the suggestion of a sting
18  operation?
19  A. I wouldn't call it a sting operation. Joe
20  O'Hara attempting to legitimately get Rick Ross on
21  tape saying false and disparaging things to our
22  students or to people who were potential students, I
23  think that might be something that was fine; and I
24  would have agreed to do that, as long as it was
25  proper.

Page 591

1  Q. Did Joe O'Hara or Kristin Keeffe or anyone
2  else ever propose to you that Rick Ross be
3  approached about deprogramming a fictitious NXIVM
4  student?
5  A. I don't think so.
6  Q. Have you ever heard that that was done?
7  A. Was that done? No, I haven't heard that that
8  was done.
9      Wait. I'm thinking about what I read here.
10  I think I read it in the materials to this case,
11  that there is -- I don't think that was done,
12  though. I think I read that it was never carried
13  out.
14  Q. But anything that you know about that attempt
15  you only learned from reading about it in the
16  materials to this case?
17  A. I believe so.
18  Q. You were never told about that by anyone at
19  the time or within a few months of the time that it
20  took place?
21  A. No, I don't believe so.
22  Q. Were you ever given a copy of the status
23  report that we were discussing a few minutes ago?
24  A. No, I don't believe so.
25  Q. So you've never read it?

Page 592

1  A. That is correct.
2  Q. Let's turn to your response to Interrogatory
3  Number 3, and Interrogatory Number 3 generally
4  addresses communications with Sitrick or about
5  Sitrick. And your response says, "Mr. Raniere
6  states that he never spoke to Sitrick."
7  A. Uh-huh.
8  Q. Did you ask or advise anyone else to speak to
9  Sitrick?
10  A. I had heard that Sitrick was a PR agency and
11  that Sitrick I think is the person who runs it had a
12  close relationship with Forbes and that they could
13  produce a positive article. At some point, I gave
14  responses I think it was to Kristin to a series of
15  questions relating to, you know, what NXIVM tries to
16  do and things like that to presumably be used for
17  PR.
18  Q. Were you consulted about the retention of
19  Sitrick?
20  A. No.
21  Q. Did you have any input into what Sitrick
22  would undertake with respect to Rick Ross?
23  A. No.
24  Q. Did you send any communications, letters or
25  e-mails to Sitrick?

Page 593

1  A. I don't believe so, no.
2  Q. Did you ask or advise anyone else to send any
3  communications to Sitrick?
4  A. I don't believe so, no.
5  Q. Were you copied, including BCC'ed, on any
6  communications with Sitrick?
7  A. I don't know, not that I received.
8  Q. But you were aware that someone at NXIVM was
9  dealing with Sitrick, is that right?
10  A. Yes, I would say so.
11  Q. When did you become aware of that?
12  A. I'm not really sure. I don't know if it was
13  before they were hired or after they were hired.
14  I'm not sure when.
15  Q. But you became aware at some point while they
16  were retained by NXIVM?
17  A. Uh-huh.
18  Q. And who was it who told you about NXIVM's
19  dealings with Sitrick?
20  A. Um, probably Nancy and/or Kristin.
21  Q. What about Joe O'Hara? Did he discuss that
22  with you?
23  A. Oh, Joe probably discussed it. I don't -- I
24  don't know if -- I guess they were contemporaneous.
25  Joe would have discussed it probably, also.

Page 594

1  Q. Did you participate in any discussions about
2  how Sitrick should proceed or what Sitrick should
3  do?
4  A. No.
5  Q. Were you aware that someone at Interfor was
6  dealing with Sitrick?
7  A. No.
8  Q. Were you ever told anything about Interfor's
9  dealings with Sitrick?
10  A. No.
11      (A discussion was held off the record.)
12      (12/9/04 e-mail Bates stamped NXR00079
13  through 80 was received and marked Defendant's
14  Exhibit Raniere-29 for Identification.)
15  BY MR. SKOLNIK:
16  Q. Mr. Raniere, the Exhibit marked Raniere-29 is
17  a -- it contains an e-mail from Kristin Keeffe to
18  Steven Goldberg and Jeff Lloyd. Jeff Lloyd at the
19  top is Lloyd@sitrick.com.
20      So this is an e-mail from Kristin Keeffe to
21  Sitrick?
22  A. Yes.
23  Q. And if you notice in the middle paragraph she
24  says, "Nancy came in from Ireland this morning, and
25  I have spoken to Keith to keep him abreast of the

Page 595

1    list of points that need deciding on for you
2    (Sitrick) to move forward."
3        A. Okay.
4        Q. What points did Kristin Keeffe keep you
5    abreast of?
6        A. What I remember is that there were things
7    that I gave Kristin relating to Rational Inquiry,
8    sort of the what we do in ESP and NXIVM. I think
9    there might have even been a list of questions she
10   went through, but I gave that series of responses to
11   her.
12       Q. So what decisions had to be made for Sitrick
13   to move forward?
14       A. I think -- from my perspective, I don't know
15   of any decisions per se that I made. I do know of
16   information that I gave.
17       Q. Do you remember any other conversations with
18   Kristin Keeffe about Sitrick and its work?
19       A. Not off the top of my head, no. There was --
20   I'm sorry. When NXIVM was going to arbitrate with
21   Sitrick, there was the fact -- I had asked about how
22   much was paid and Kristin -- and what was produced
23   for that money, and Kristin told me that there was
24   no work ever produced from Sitrick which I found to
25   be -- I thought we should have won the arbitration

Page 596

1    then based on that, but we did not.
2        Q. Your response -- well, Interrogatory Number 4
3    in Raniere-16 asks about suggestions, requests and
4    instructions by you, Nancy Salzman and Kristin
5    Keeffe about the acquisition of Ross and Soedarpo's
6    banking, financial and telephone records.
7            And your response to Interrogatory Number 4
8    says only, "Mr. Raniere made no such suggestions,
9    requests and gave no instructions responsive to this
10   request."
11           Do you know if Ross and Soedarpo's banking
12   information and telephone records were obtained?
13       A. No, I don't. But gathering from the
14   Metroland article and what you said a little
15   earlier, you represented that there were telephone
16   records. And this is for Interfor? Yeah. No, I
17   gave no such instructions.
18       Q. The question asks you about suggestions,
19   requests or instructions by you or by any of the
20   other NXIVM counterclaim defendants, which would be
21   Nancy Salzman and Kristin Keeffe.
22       A. Uh-huh.
23       Q. Do you know whether or not Nancy Salzman or
24   Kristin Keeffe made any such suggestion, request or
25   instructions?

Page 597

1        A. No, I don't know.
2        Q. Do you know if anyone at NXIVM asked Interfor
3    to obtain that information?
4        A. No, I don't know.
5        Q. Interrogatory Number 5 asks about
6    suggestions, requests and instructions by you,
7    Nancy Salzman or Kristin Keeffe about the
8    acquisition of Ross and Soedarpo's garbage or trash,
9    and your response to Interrogatory Number 5 says
10   only, "Mr. Raniere believes that he made no such
11   suggestions, requests and gave no instructions
12   responsive to this request."
13           Why does your response to Interrogatory
14   Number 4 state categorically that you made no such
15   suggestions, requests and gave no instructions
16   responsive to this request; but your response to
17   Interrogatory Number 5 says that you believe that
18   you made no suggestions, requests and gave no
19   instructions responsive to the request?
20       A. I don't know. I -- I don't think it -- I
21   don't believe in either case I did.
22       Q. You were not prepared then to say
23   categorically that you gave no such instructions?
24       A. I think I would say for each of these
25   responses, 5 and 6, that I respond to them equally

Page 598

1    and with equal force.
2        Q. So you didn't draw any distinction in your
3    own response, one saying that there were no such
4    and the other saying I believe there were no such?
5        A. Correct.
6        Q. Do you know whether or not Mr. Ross and
7    Mr. Soedarpo's garbage was, in fact, obtained?
8        A. No, I do not know.
9        Q. Do you know whether or not anyone at NXIVM
10   asked Interfor to obtain Mr. Ross and Mr. Soedarpo's
11   garbage?
12       A. No.
13       Q. Did you ever discuss the obtaining of
14   Mr. Ross' garbage with Joe O'Hara?
15       A. No, no.
16       Q. Interrogatory Number 6 asks about the
17   information that you, Nancy Salzman or Kristin
18   Keeffe wanted to learn by having Interfor conduct
19   in-person meetings and telephone conferences with
20   Ross; and part of your response to Interrogatory
21   Number 6 says, "He personally was not aware of these
22   events at the time they were taking place and
23   therefore cannot, nor does not, believe that any
24   actions or communications concerning Interfor and
25   Ross were made on his behalf."

---

**Page 599**

1  You say that you were not aware of these
2  events at the time they were taking place. When did
3  you become aware of these events?
4  A. I'm not really sure. I think when this was
5  created, I probably had a clearer understanding of
6  the sequence of events, but sometime after.
7  Q. And who did you learn about the events from?
8  A. I think Kristin. I did hear at some point
9  that Joe had some garbage or something at his
10 office that he wanted picked up, so I don't know if
11 that's --
12 Q. So you did learn that Interfor had collected
13 Mr. Ross' garbage?
14 A. I don't know if it was Mr. Ross' garbage.
15 Q. Oh. So you think you learned about these
16 events from Kristin Keeffe and with some
17 conversations with Joe O'Hara?
18 A. Potentially. I'm not sure which or how, but
19 yes.
20 Q. What about with Nancy Salzman? Any
21 discussions with her about these events?
22 A. I don't think so. I don't know, but I don't
23 think so.
24 Q. Interrogatory Number 8 asks about the plan
25 and purpose of the sting operation. And in your

---

**Page 600**

1  response to Interrogatory Number 8 you omit your
2  communications with O'Hara but, as you know, by
3  agreement with your counsel, you're now required to
4  tell me about those communications with O'Hara, so
5  please do so.
6  A. Relating to?
7  Q. The sting operation.
8  A. Okay. I don't know --
9  THE WITNESS: Is it true that?
10 MR. CAMPION: Yes, there has been a
11 waiver.
12 Read Interrogatory 8 to yourself and
13 then answer the question with respect to O'Hara,
14 please.
15 THE WITNESS: Okay.
16 A. I can't speak for NXIVM, but I didn't know
17 anything about these things.
18 Q. You had no conversations at all with
19 Mr. O'Hara about any aspect of what's inquired
20 about in Number 8?
21 A. Yeah. I -- a lot of this stuff I found out
22 from this lawsuit. Yeah. No, I didn't --
23 Q. Well, when you say you found out about it
24 from this lawsuit, this lawsuit was already pending
25 at the time when these events were taking place.

---

**Page 601**

1  A. What I'm saying is I don't believe that
2  the information in this lawsuit about the sting
3  operation existed in this lawsuit till after the
4  sting operation.
5  Q. Well, put aside whether it existed in the
6  lawsuit.
7  A. Right, I don't be --
8  Q. What information did you have about it?
9  A. I don't believe I had anything outside of
10 what I've learned from this lawsuit.
11 Q. So you don't recall any conversations at
12 all with Joe O'Hara about the sting operation?
13 A. No.
14 Q. Or any conversations with Kristin Keeffe
15 about the sting operation?
16 A. I've mentioned what I remember with Kristin
17 Keeffe, but no. At a later point, I had asked her
18 about what was meant when I read the stuff in this
19 lawsuit about a cruise ship. I think Kristin thinks
20 that's absurd, but I don't know. It sounds like a
21 silly thing.
22 Q. Your response to Interrogatory Number 8 also
23 says, "The details of the alleged 'plan' were
24 attended to by others, and Mr. Raniere only learned
25 of them subsequent to Interfor's attempted

---

**Page 602**

1  implementation. Mr. Raniere has no documents
2  responsive to this request and learned all of the
3  above information well after the events transpired
4  and only in the context of this lawsuit."
5  A. Where does it say that? I'm sorry.
6  MR. CAMPION: It's on the next page.
7  THE WITNESS: Okay.
8  A. I still believe that to be true.
9  Q. And when you learned about them in the
10 context of this lawsuit, who did you learn about
11 them from?
12 A. Well, I read some of the documents. I had
13 spoken to Kristin Keeffe. As a matter of fact, I
14 remember pretty recently Kristin said that she
15 thinks it was Ross' idea about the cruise ship or
16 something like that, but I think Kristin, reading
17 the documentation. That's pretty much it.
18 Q. What about Joe O'Hara? Any conversations
19 with him about the sting?
20 A. I think there was possibly mentioned at a
21 later point, but already at whatever point these
22 conversations were happening things with -- I didn't
23 communicate much with Joe. Things were not good, so
24 I don't think that was so.
25 Q. In fact, one of the reasons that Mr. O'Hara

---

Page 603

1  decided to resign from NXIVM was because he
2  disapproved of the sting operation; isn't that
3  right?
4         MR. CAMPION: Object to the form.
5         MR. McGUIRE: So do I.
6  A. I think that's not true.
7  Q. Okay. Interrogatory Number 13 asks you to
8  identify all of your e-mail accounts, and in
9  response you say, "Mr. Raniere states that he has
10  partial use of the e-mail address
11  kunterre@nycap.rr.com and honorandethics@yahoo.com.
12  He has had no other accounts from January 2003 to
13  present."
14         Is that a true statement?
15  A. At that time, yes.
16  Q. Is it true today?
17  A. No.
18  Q. What other e-mail accounts do you have today?
19  A. Keithraniere@yahoo.com. I have a Face Book
20  account which can receive e-mails. I can't think of
21  any others. Those are the ones that I've had more
22  contact with.
23  Q. Have you received any e-mail communications
24  relating to this litigation at the
25  Keithraniere@yahoo.com address?

Page 604

1  A. I don't believe so. No, that is not true. I
2  have received communications with --
3         MR. CAMPION: Mr. Raniere, you're
4  not to answer the question with respect to
5  communications with counsel for these new e-mail
6  addresses, okay.
7         THE WITNESS: Okay.
8         MR. CAMPION: Otherwise, you can answer.
9  Continuing...
10  A. Other than that, not that I know of, no.
11  Q. So only communications with counsel?
12  A. Yes.
13  Q. Okay.
14  A. I believe so, yes.
15  Q. In a November 2004 e-mail from Kristin Keeffe
16  to Interfor she said that she was setting up
17  Hushmail accounts for you and Nancy Salzman.
18         Did she set up a Hushmail account for you?
19  A. Not that I know of.
20  Q. Have you ever had a Hushmail account?
21  A. No.
22  Q. Who else, if anyone, uses the
23  honorandethics@yahoo.com e-mail address?
24  A. I believe I'm the only one that used that.
25  Q. And are you the only one who uses the

Page 605

1  Keithraniere@yahoo.com?
2  A. Yes.
3  Q. So from January 2003 to the present if
4  someone wanted to contact you by e-mail, which
5  account would you give them?
6  A. Probably the Keithraniere@yahoo.com.
7  Q. And when did you establish that account?
8  A. It wasn't that long ago, maybe a year ago.
9  Q. When did you establish the or when did
10  Ms. Unterreiner establish the kunterre account?
11  A. I don't -- I don't know. That came with the
12  cable service. That's why it has her name encoded
13  in the front. I don't know when that was
14  established.
15  Q. What about the honorandethics@yahoo.com
16  address? When was that established?
17  A. That was years ago. I don't know exactly
18  when.
19  Q. Do you use your various e-mail addresses for
20  different functions?
21  A. No.
22  Q. Do you back up your e-mails?
23  A. No.
24  Q. Do you save them in folders?
25  A. Sometimes, yes.

Page 606

1  Q. Do you print them out?
2  A. No.
3  Q. Do you delete e-mails?
4  A. I have on occasion. I don't delete a lot.
5  Q. Did anyone ever advise you to retain
6  documents and e-mails regarding the subject matter
7  of this litigation?
8  A. I don't think so, but I didn't have many
9  e-mails relating to this litigation; and even ones
10  that may have come to the kunterre account I'm
11  either like a copied person or something like that,
12  so I wouldn't look at them.
13  Q. Well, you've been involved in other
14  litigations beside this one; haven't you?
15  A. Yes.
16  Q. And are you aware from those other
17  litigations about the general requirement to retain
18  e-mails and documents related to a litigation?
19         MR. CAMPION: Object to the form of the
20  question.
21  A. No, but I wouldn't say I delete those things.
22  Q. Have you deleted any e-mails related in any
23  way to this litigation since it began?
24  A. I don't believe so.
25  Q. Since our prior session, have you found any

## Page 607

1  of the notes that you told us that you took about
2  or on the three Martin and Hochman articles?
3  **A. I don't have any of those things in my**
4  **possession.**
5  Q. Do you know in whose possession they are?
6  **A. I believe NXIVM has them.**
7  Q. Who at NXIVM has them?
8  **A. I think Nancy Salzman.**
9      MR. SKOLNIK: Weren't those called for,
10  Harold, by your letter to Mr. McGuire?
11      MR. KOFMAN: They were Item Number 2 in
12  my letter to Mr. Campion.
13      MR. SKOLNIK: To Mr. Campion.
14      MR. KOFMAN: But they would have been
15  called for by previous document requests to NXIVM.
16      MR. SKOLNIK: Absolutely. Well,
17  we'll --
18      MR. LEONARD: Mr. Raniere just told you
19  he doesn't have them. He doesn't have them. Mr.
20  Raniere told you he does not have them.
21      MR. SKOLNIK: But NXIVM does.
22      MR. LEONARD: I can't speak for NXIVM.
23      MR. SKOLNIK: Well, bill, given that
24  these were absolutely called for by prior requests,
25  we would request them of NXIVM.

## Page 608

1      MR. McGUIRE: Would you send me a letter
2  to that effect, please.
3      MR. SKOLNIK: Put that on the record.
4      (Request.)
5      MR. SKOLNIK: Give me just two minutes
6  to consult with my colleagues here.
7      (At this point, there was a short
8  recess.)
9      THE VIDEOGRAPHER: We're back on the
10  record.
11      MR. SKOLNIK: Mr. Raniere, I have no
12  further questions for you.
13  Thank you.
14      THE WITNESS: Oh. Thank you.
15      MR. KOFMAN: Mr. Raniere, I have a few
16  follow-up questions.
17  Can we mark this, please, as Raniere-30.
18      (March 27, 2009, two-page letter to
19  Thomas F. Campion, Jr., Esq. from Harold L. Kofman
20  was received and marked Defendant's Exhibit
21  Raniere-30 for Identification.)
22
23  **REDIRECT EXAMINATION BY MR. KOFMAN:**
24  Q. Okay. Mr. Raniere, I should just put on the
25  record, if you don't recall from last time, my name

## Page 609

1  is Harold Kofman, I represent the Suttons and
2  Ms. Franco in this matter.
3      The document we've marked as Raniere-30 is a
4  copy of my March 27, 2009, letter to Mr. Campion.
5      Do you have that in front of you?
6  **A. Yes, I do.**
7  Q. In this letter I request 12 categories of
8  documents. This was a follow-up to requests I made
9  on the record at your deposition in March.
10      Did you search for the materials that I
11  requested?
12  **A. Yes.**
13  Q. What did that search entail?
14  **A. Well, what I gave over and -- well, that was**
15  **the product. I looked through my things. I looked**
16  **through what computer stuff I had access to. A lot**
17  **of these documents I don't have in my possession,**
18  **and there was no -- I called Arlen Olsen and asked**
19  **him if there was a written retainer agreement, and**
20  **there is none.**
21  Q. Okay. Did you ask NXIVM if they had any of
22  these documents in their possession?
23  **A. Well, I did ask relating because I was**
24  **curious about the Hochman things; and NXIVM has**
25  **those, yes.**

## Page 610

1  Q. Okay. Did anybody help you do the search for
2  documents?
3  **A. Actually, yes. I was trying to locate an old**
4  **computer I had that might have been refurbished, but**
5  **it wasn't to be found. Other than that, no.**
6  Q. Who helped you look for the old computer?
7  **A. I actually asked Karen Unterreiner to find**
8  **out what happened to it.**
9  Q. Am I correct that the only document you have
10  that's responsive to any of these 12 categories is
11  the copy of the book Odin and the Sphinx?
12  **A. I believe so. Hold on a second.**
13      (A discussion was held off the record.)
14  **Continuing...**
15  **A. Except for Article 10, I believe that is**
16  **correct.**
17  Q. With respect to Article 10, you have -- that
18  requested copies of articles that you had written
19  or cowritten for Conocimiento magazine?
20  **A. Yes.**
21  Q. Did you have documents or copies of articles?
22  **A. I have copies of articles that I have written**
23  **within the last year that were translated and**
24  **published in this magazine. They have not been**
25  **published beyond that. I don't know.**

Page 611

1    MR. LEONARD: We could produce them if
2  we need to. I'd like some kind of showing of how
3  they could possibly be relevant. They're in
4  Spanish, as I understand it. I mean, I'll work with
5  you on it, but I don't quite understand.
6    MR. KOFMAN: The question is going to be
7  whether or not they disclose anything that's claimed
8  as a trade secret, whether or not it's something
9  publicly available that contains trade secrets.
10    MR. LEONARD: I had hoped to have a
11 chance to look at these. I haven't. We'll take a
12 look at them, but they're published years after the
13 alleged, you know, sort of after the disclosure
14 tracing in this case so I don't think they have any
15 bearing on this case.
16    We could work with you on that.
17    MR. KOFMAN: Okay. If we could mark
18 this as NXIVM -- I'm sorry -- as Raniere-31.
19    (Odin and the Sphinx written by Keith
20 Raniere and Ivy Nevares was received and marked
21 Defendant's Exhibit Raniere-31 for Identification.)
22 BY MR. KOFMAN:
23    Q. Mr. Raniere, is that a copy of the book
24 Odin and the Sphinx that you referred to in your
25 deposition in March?

Page 612

1    A. I believe so, yes.
2    Q. Earlier today, Mr. Raniere, you mentioned
3  to or you told Mr. Skolnik in response to one of his
4  questions that the Rules and Rituals had been --
5  that certain information or that the Rules and
6  Rituals had been released to the public -- or strike
7  that. Let me say that.
8    I believe you said that the Rules and Rituals
9  performed a selective function for NXIVM.
10    A. That was part of it, yes.
11    Q. And I believe you said there that people --
12 the way it performed a selective function was people
13 either heard about certain elements of Rules and
14 Rituals or certain elements were made public, and
15 that would either persuade or dissuade people to
16 join the group, NXIVM.
17    A. That was a potential of the Rules and
18 Rituals. We have, for example, made known that
19 people wear sashes and have rank; but more when
20 someone comes and actually takes the Rules and
21 Rituals, that serves as a selecting function.
22    Q. How did you make known that people wear
23 sashes?
24    A. Well, we have design patents on them; and I
25 think that's the main way.

Page 613

1    I think we've also said that we have ranks
2  and are fashioned after a martial arts type of
3  school.
4    Q. Is that something that prospective students
5  are told before they attend?
6    A. There have been times when that was the case.
7  I don't think that is the case recently.
8    Q. Do you know what is told to prospective
9  customers or prospective students of NXIVM now?
10    A. No, I don't.
11    Q. Have you had any -- ever had any role in --
12 strike that.
13    Has NXIVM ever made public any of the Rules
14 and Rituals in order to perform this selective
15 functioning, other than the sashes and the scarves?
16    A. I don't think so.
17    Q. Okay. You mentioned in response to one of
18 Mr. Skolnik's questions that only approximately 25
19 people have had access to facilitator notes.
20    Do you recall that testimony?
21    A. The specific facilitator training, the
22 projective facilitator training that Stephanie
23 Franco took, yes.
24    Q. And is it the case that there have only been
25 25 facilitators that NXIVM has had?

Page 614

1    A. No.
2    Q. Who is given -- strike that.
3    How is it determined who is given access to
4  that projective facilitator training?
5    A. At the time, it was an evaluation of people's
6  demonstrated motivation, people's willingness to, if
7  you will, uphold the mission of Executive Success
8  Programs and keep confidence over the materials.
9    Q. Who did that evaluation?
10    A. I believe Nancy Salzman, Lauren Salzman,
11 Karen Unterreiner was probably involved.
12    Q. Did you have any role in doing an evaluation
13 of Stephanie Franco as to whether she should get the
14 facilitator projective materials?
15    A. No.
16    Q. Did Peter Fallon receive facilitator
17 projective materials?
18    A. I don't know.
19    Q. You referred numerous times today to the
20 theft of materials. Is it your contention that
21 Stephanie Franco stole the materials?
22    A. I believe that the materials were stolen,
23 as evidenced by the fact that they ended up in hands
24 that are not authorized to have them. I don't know
25 the exact mechanism.

---

Page 615

1  Q. Did you understand that Stephanie Franco was
2  given the materials as part of taking NXIVM courses?
3  A. I believe they were leased to her, I think.
4  Q. Was she ever asked to return the materials?
5  A. I don't know.
6  Q. Was Peter Fallon ever asked to return the
7  materials after he stopped attending -- after he
8  severed his relationship with NXIVM?
9  A. I don't know.
10  Q. Do you know if NXIVM makes it a practice of
11  asking students to return materials after they stop
12  taking classes?
13  A. I don't know.
14  Q. How about coaches after they've left, coaches
15  or facilitators?  Are they asked to return
16  materials?
17  A. I'm not sure.
18  Q. You mentioned also today that there was a --
19  that Nancy Salzman was videotaped affirming the
20  confidentiality of materials.
21  A. No, Nancy -- my meetings with Nancy initially
22  were videotaped.
23  Q. And who videotaped those meetings?
24  A. Actually, I did.
25  Q. Okay.

---

Page 616

1  A. Well, I mean, I had a video camera there.
2  Q. I'm sorry.  What was that last?
3  A. The meetings between Nancy and myself were
4  only between Nancy and myself, and I set up a video
5  camera that taped the table.
6  Q. What was the purpose of that?
7  A. To record it.
8  Q. Why did you want to record it?
9  A. One, for historical sake; two, for
10  confidentiality sake.
11  Q. Did you retain copies of those videotapes?
12  A. No.
13  Q. What did you do with them?
14  A. Well, they were taken by Toni Natalie; and I
15  believe they were destroyed in a flood in her
16  basement, but I don't have access to those
17  materials.
18  Q. Okay.  Last time you mentioned that the Dalai
19  Lama was going to be attending an event or was
20  scheduled to attend an event that was being put on
21  by -- what was the name of the organization that was
22  sponsoring it?
23  A. I believe it's the World Ethical Foundation
24  Consortium.
25  Q. And are you the founder of that consortium?

---

Page 617

1  A. I'm a conceptual founder, yes.
2  Q. You're the conceptual founder.
3     Did the event with the Dalai Lama take place?
4  A. Yes.
5  Q. Are you aware that at some point the Dalai
6  Lama indicated that he would not attend an event
7  sponsored by the World Ethical Historical
8  Consortium?
9  A. No, I wasn't aware of that.
10  Q. You weren't aware that at some point he
11  indicated that he would not attend -- would not
12  attend or would not speak in Albany?
13  A. No.
14  Q. Were you involved with the planning of this
15  consorti -- of this event?
16  A. To some degree, yes.
17  Q. And were you aware that the Dalai Lama had to
18  be persuaded -- had to be persuaded to change his
19  mind -- strike that.
20     Are you aware that the Dalai Lama cancelled
21  the event at one point?
22  A. No.
23  Q. Who was responsible for the planning of this
24  event?
25  A. Well, Claire Bronfman, Sara Bronfman, in part

---

Page 618

1  myself.
2  Q. Were you aware that the Dalai Lama had
3  concerns about bad publicity involving you and
4  NXIVM?
5     MR. CAMPION: I'm going to object to
6  the form of the question simply because of lack of
7  foundation, but go ahead and answer it.
8  A. Yes.
9  Q. How did you become aware of that?
10  A. There is a representative sent from Darmsala
11  who came and interviewed Nancy and myself and the
12  newspaper and a number of people in the Albany area,
13  I think some of the people at the universities; and
14  that's when I was aware of it.  I didn't -- that
15  wasn't the first time I had actually heard from one
16  of the lamas.  Lama Tenzin who is the personal
17  emissary I believe is his title for the Dalai Lama
18  who had said there were concerns and this other
19  person was coming to interview us.
20  Q. Who was the person who came to interview you?
21  A. Tenzin Takla I believe is his name.
22  Q. Did you ever travel to Darmsala to discuss
23  this matter with the Dalai Lama or any of his
24  representatives?
25  A. Yes.

Page 619

1    Q. When did you do that?
2    A. I don't know. It was probably -- it was like
3    the second week in April, I believe. I'd have to
4    take a look at what the date was.
5    Q. Okay, and did you meet with the Dalai Lama?
6    A. Yes.
7    Q. And in any of your discussions with the
8    Dalai Lama or his representatives, did you discuss
9    this case?
10   A. Yes.
11   Q. Did you discuss Stephanie Franco, Morris
12   Sutton or Rochelle Sutton?
13   A. Yes.
14   Q. What did you say?
15   A. They had Michael Sutton's deposition. They
16   wanted to know if I believed that that was true.
17   They asked me what I felt the source of this
18   disagreement was. I said that Morris Sutton is from
19   a devout religious community and that his son was
20   considered a very eligible bachelor and that that
21   community has an edict or a type of rule that does
22   not allow people to have children outside of the
23   community with people outside of the community, if
24   they did that they would be asked to disown the
25   child and the why wife or mate or whatever, and that

Page 620

1    Michael Sutton had come to us with a dilemma because
2    he had had a child outside of the community and was
3    being asked to reject that child and disown that
4    child.
5        And after coming to our course, he had
6    resolved in himself that he would not disown the
7    child and would accept the child and that that was
8    likely seen as a threat by Moe Sutton, threatening
9    his way of life, his way of thinking.
10   Q. Anything else?
11   A. I believe that the -- the negative PR that we
12   have is earned but not accurate.
13   Q. What do you mean by "earned but not
14   accurate"?
15   A. Well, I would be foolish to say that I didn't
16   participate in any way. I would be foolish to say
17   that I didn't help start the school, that I'm not
18   involved in any way now in this lawsuit, that a
19   whole series of choices where, for example, I
20   haven't spoken out much in public or choose to speak
21   out in public. Those things are my responsibility.
22   I have tried to minimize the damages that have gone
23   on in this lawsuit, so I take responsibility for my
24   actions but that I think the damages are awful and
25   that I think that what is said is wrongful and

Page 621

1    inaccurate because I believe our materials were
2    ultimately taken improperly.
3    Q. Did you indicate --
4        THE VIDEOGRAPHER: Excuse me. We have
5    to change tapes.
6        MR. KOFMAN: Okay.
7        (A discussion was held off the record.)
8        THE VIDEOGRAPHER: This is the beginning
9    of Tape Number 6. We're on.
10   BY MR. KOFMAN:
11   Q. Just to back up a little bit, you mentioned
12   that you gave a copy of Michael Sutton's deposition
13   transcript to --
14   A. I did not.
15   Q. -- someone. Strike that, okay. You did not.
16       Did they have -- did someone from the Dalai
17   Lama's -- one of Dalai Lama's representatives have a
18   copy of that?
19   A. Yes.
20   Q. How did they obtain it?
21   A. I don't know.
22   Q. Do you know if someone from NXIVM gave that
23   to them?
24   A. I don't know; might have, but they also had
25   -- it appeared they had everything that's been on

Page 622

1    the web, everything that is publicly available. It
2    looked like they had a lot of files; and from what I
3    understand, they have been studying us and studying
4    this for quite some time.
5    Q. And so you don't know one way or the other
6    whether -- strike that.
7        Is it your understanding that the deposition
8    of Michael Sutton is publicly available?
9    A. I think it's his Affidavit, and I don't know.
10   Q. It was his Affidavit, not his deposition?
11   A. Not his -- I'm sorry. If I said deposition,
12   I meant Affidavit.
13   Q. Okay. Who was present when you had that
14   conversation about Moe Sutton with -- strike that.
15       First of all, was that a conversation you
16   had with the Dalai Lama or with one of his
17   representatives?
18   A. The Dalai Lama was there, and I was speaking
19   to a representative.
20   Q. Who else was there?
21   A. There were a number of monks. I don't know
22   who they were. There was a translator. Tenzin
23   Takla was there. His boss was there. There was a
24   gentleman who was head of the New York Center,
25   Robert Thurman. His Holiness, the Dalai Lama was

**Page 623**

1  there. Nancy Salzman was there. Sara Bronfman was
2  there, and Tenzin -- Lama Tenzin was there.
3  Q. Did you tell -- did you state at this time
4  that Morris Sutton was responsible for negative
5  things that had been published about NXIVM?
6  A. I don't believe I stated that.
7  Q. What did -- what was the relevance of talking
8  about Morris Sutton to the Dalai Lama?
9  A. Because I was asked. I was asked about the
10  Affidavit, if it was true, and what I believed were
11  the motivations.
12  Q. I'm sorry. What you believed were the
13  motivations of who?
14  A. The motivations behind some of the
15  negativity.
16  Q. And did you tell the Dalai Lama that some of
17  the negativity was caused by Morris Sutton's upset
18  about his son's decision to acknowledge his child?
19  A. I think I said that it was my opinion that a
20  lot of the disagreements between Michael Sutton and
21  Moe Sutton were caused by that and that that was a
22  motivation. I don't think I said that directly he
23  caused it.
24  Q. Did you indicate that Morris Sutton was
25  responsible for negative articles being published?

**Page 624**

1  A. I don't think I indicated that.
2  Q. Did you indicate that it was your
3  understanding that Morris Sutton was -- wanted to
4  destroy NXIVM?
5  A. I don't know if I said that.
6  Q. Did you say anything about Rick Ross?
7  A. I don't think so.
8  Q. Anything about Rochelle Sutton?
9  A. No, I don't believe so.
10  Q. Anything about Stephanie Franco?
11  A. I don't believe so.
12  Q. Did -- what did the Dalai Lama's
13  representatives say in response to what you told
14  them?
15  A. He said that I have been patient for a very
16  long time.
17  Q. Did they indicate that they were satisfied
18  with your statements?
19  A. I don't think they indicated either way, but
20  they said that it is important that I do everything
21  I can to get the truth out.
22  Q. So the Dalai -- and ultimately the Dalai Lama
23  chose to attend an event with which you were
24  associated?
25  A. Yes.

**Page 625**

1  Q. Did anyone from NXIVM, including the
2  Bronfmans, pay any money to the Dalai Lama or to
3  an organization with which the Dalai Lama was
4  associated?
5  A. Not that I know of.
6     MR. KOFMAN: I have no further questions
7  at this time.
8     THE WITNESS: Thank you.
9     MR. SKOLNIK: Just one follow-up.
10
11  RECROSS-EXAMINATION MR. SKOLNIK:
12  Q. Is it your testimony that in that meeting
13  that you had with the Dalai Lama and his associates
14  there was no discussion of Rick Ross?
15  A. I'm not absolutely sure. The focus of the
16  discussion, from my interpretation of it, was me.
17  And I tend not to focus on others, what my
18  participation is and what I'm going to do, so I
19  don't remember that. It wasn't my focus in
20  thinking.
21  Q. But you said that they had a lot of materials
22  related to the litigation, is that right?
23  A. Uh-huh.
24  Q. But they didn't ask you questions about that?
25  A. Correct.

**Page 626**

1     MR. KOFMAN: Just one further question.
2
3  FURTHER REDIRECT EXAMINATION BY MR. KOFMAN:
4  Q. Why did you travel to Darmsala?
5  A. Originally I had heard that the Dalai Lama
6  wanted to see me. I think that was a misconstruction
7  potentially from that he would see me. My traveling
8  to Darmsala was based on the belief that he would --
9  that he wanted to see me. I found him very generous
10  with his time with me, and he did see me twice so...
11     MR. KOFMAN: Okay. Thank you very much.
12     THE WITNESS: You're welcome.
13
14     (Witness excused.)
15     (The deposition was concluded at 5:00
16  p.m.)
17
18
19
20
21
22
23
24
25

Page 627

```
 1            J U R A T
 2            I, KEITH A. RANIERE, do hereby
 3   certify that I have read the foregoing transcript of
 4   my testimony taken on May 13, 2009, and have signed
 5   it subject to the following changes:
 6   PAGE        LINE            CORRECTION
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21   DATE:                    _____
22   Sworn and subscribed to before me on this      day
23   of
24   NOTARY PUBLIC
25                   _____.
```

Page 628

```
 1
 2            C E R T I F I C A T E
 3
 4
 5            I, CHERYL McGANN, a Certified Court
 6   Reporter and Certified Realtime Reporter of the
 7   State of New Jersey, authorized to administer
 8   oaths pursuant to R.S.41:2-2, do hereby certify
 9   that prior to the commencement of the examination,
10   the witness was sworn by me to testify to the truth,
11   the whole truth, and nothing but the truth.
12            I DO FURTHER CERTIFY that the foregoing
13   is a true and accurate transcript of the testimony
14   that was taken stenographically by and before me at
15   the time, place, and on the date hereinbefore set
16   forth.
17            I DO FURTHER CERTIFY that I am neither
18   a relative nor employee nor attorney nor counsel
19   of any the parties to this action and that I am
20   not interested in the action.
21
22
23
24   CHERYL McGANN
     C.C.R. License No. XI000918
25
```

**This Page Intentionally Left Blank**

## 0

**0907 (1)**
556:15

## 1

**1 (7)**
442:18;444:25;
544:22;561:8;
577:12;586:4;588:10
**1/26/05 (1)**
556:17
**1:20 (1)**
524:4
**10 (15)**
439:12,15;451:7,9,
12,20,23,24;537:21;
545:16,19;556:11;
558:4;610:15,17
**10,000 (1)**
534:2
**11 (1)**
544:17
**11/28/04 (1)**
556:23
**11:13 (1)**
474:16
**1165 (1)**
556:12
**12 (14)**
468:17;478:19,23;
479:5,21,25;480:1,9,
14,15;515:20;519:7;
609:7;610:10
**12/9/04 (1)**
594:12
**12:13 (1)**
512:22
**12065 (1)**
432:24
**12-point (1)**
522:5
**13 (4)**
432:2;554:11;
577:7;603:7
**15 (2)**
442:4,11
**16 (1)**
577:4
**18 (4)**
441:25;442:2;
521:8;561:19
**1989 (1)**
486:5
**1990 (1)**
574:7
**1998 (1)**
445:8
**1999 (1)**
544:6

## 2

**2 (3)**
474:16;561:8;
607:11
**2:34 (1)**
557:12
**2:43 (1)**
557:21
**20 (5)**
453:20;454:8;
487:12;554:7,8
**2000 (1)**
544:6
**2003 (8)**
441:25;442:2,10;
553:11,18;559:7;
603:12;605:3
**2004 (10)**
556:11;557:4;
558:4;560:18;561:1,
15,20;563:4,16;
604:15
**2005 (1)**
559:22
**2006 (2)**
554:11;555:3
**2009 (3)**
432:2;608:18;
609:4
**2030 (1)**
554:2
**21 (3)**
548:6,11;553:5
**22 (4)**
442:3,5;521:13;
559:7
**23 (2)**
560:3;569:17
**25 (3)**
491:19;613:18,25
**25,000 (1)**
445:10
**250 (1)**
487:13
**26 (1)**
559:22
**27 (2)**
608:18;609:4
**27th (1)**
530:6
**28 (4)**
557:15;561:1,15;
563:15
**29 (1)**
563:16

## 3

**3 (12)**
432:24;490:4;
512:22;514:5;515:5;

544:21,22;545:7,10,
12;592:3,3
**3:44 (1)**
582:25
**30 (1)**
539:12
**34 (2)**
445:7;447:21
**360 (3)**
575:18,19,20
**37 (2)**
468:8,11
**3700 (1)**
534:11
**38 (1)**
478:19

## 4

**4 (7)**
515:17,17;531:9;
549:7;596:2,7;
597:14
**40 (2)**
485:23;488:17
**400,000 (3)**
533:25;534:7;
535:6
**400,000' (1)**
534:6
**41 (2)**
487:11;488:17
**42 (1)**
521:2
**43 (3)**
489:20,21;493:17
**44 (2)**
533:18;534:16
**44f (1)**
536:2

## 5

**5 (20)**
524:12,14,22;
525:13;526:25;
527:17;528:24;
530:23;531:6;534:5;
543:5,11,12;544:16;
577:10;582:25;
597:5,9,17,25
**5/13/06 (1)**
554:1
**5:00 (1)**
626:15
**52 (4)**
544:22;545:3,16,
19

## 6

**6 (6)**
577:11,19;597:25;

598:16,21;621:9
**60 (1)**
543:7
**64 (1)**
544:25

## 7

**7 (1)**
560:18
**711 (1)**
547:17
**712 (1)**
541:9
**715 (1)**
542:15
**716 (2)**
543:3,8
**719 (1)**
544:19
**729 (1)**
545:15
**762 (1)**
548:4
**768 (1)**
539:16

## 8

**8 (7)**
557:4;563:3;
599:24;600:1,12,20;
601:22
**8/7/04 (2)**
556:20
**8/8/03 (1)**
524:15
**80 (1)**
594:13

## A

**Abby (2)**
584:17,18
**abilities (1)**
482:13
**ability (5)**
477:15;509:10;
510:6;511:20;516:6
**able (9)**
472:18;497:6;
498:6;502:24;515:2;
537:8;544:2;547:9;
552:17
**above (2)**
433:18;602:3
**abreast (2)**
594:25;595:5
**absolutely (4)**
533:17;607:16,24;
625:15
**absurd (1)**
601:20

**abusive (1)**
546:10
**ac (1)**
512:1
**accept (1)**
620:7
**acceptable (8)**
457:17,21,23;
458:10,21;459:14,
24;460:2
**accepted (1)**
521:23
**access (2)**
465:15;490:2,5,22;
491:12;493:14;
494:21;501:2;
609:16;613:19;
614:3;616:16
**accessed (1)**
492:25
**accomplish (1)**
582:10
**account (11)**
571:5,15,16,19;
603:20;604:18,20;
605:5,7,10;606:10
**accounts (4)**
603:8,12,18;
604:17
**accuracy (1)**
541:1
**accurate (7)**
434:5;436:12;
452:23;542:8;
549:10;620:12,14
**accurately (2)**
468:19;490:11
**accused (1)**
537:21
**achieve (1)**
503:16
**acknowledge (2)**
518:4;623:18
**acknowledged (1)**
519:1
**acquisition (2)**
596:5;597:8
**act (4)**
475:6;481:6,9;
536:17
**actions (9)**
509:24;510:10;
511:11;512:2;518:7;
582:13;590:16;
598:24;620:24
**active (2)**
504:14;580:13
**actively (2)**
443:22,24
**activities (1)**
487:8
**activity (1)**
545:11

acts (1)
  481:6
actual (6)
  449:21;455:6;
  470:9;480:18;
  482:22;577:10
Actually (16)
  436:3;452:25;
  453:2,2;455:20;
  472:13;481:19;
  485:17;491:6,16;
  500:1;610:3,7;
  612:20;615:24;
  618:15
add (1)
  525:9
addition (4)
  501:2;527:15;
  548:4;567:3
additional (4)
  525:2;527:18
Additionally (4)
  516:10;524:16;
  525:17;527:19
address (18)
  457:5,18;458:15,
  19;559:23;560:16,
  20,24;561:2;566:10;
  570:15,17;571:2,8;
  603:10,25;604:23;
  605:16
addressed (9)
  458:14;529:4;
  530:13;559:3,23;
  560:11,12;561:2;
  571:19
addresses (5)
  457:15;535:5;
  592:4;604:6;605:19
addressing (2)
  527:16;545:8
administrator (1)
  439:25
admissibility (1)
  433:13
advanced (1)
  466:23
advantage (5)
  475:3,14,18;
  545:25;546:20
advertisement (1)
  567:19
advice (6)
  503:24;567:11;
  569:2;578:22;582:5;
  585:16
advise (6)
  578:13,19;579:10;
  592:8;593:2;606:5
advised (1)
  571:25
Affidavit (14)
  441:24;445:8;

468:9;485:24;514:5;
524:12;533:19;
553:22;565:5;
569:17;622:9,10,12;
623:10
affiliated (1)
  569:22
affirmed (2)
  446:19;583:12
affirming (1)
  615:19
afford (1)
  532:12
affords (1)
  538:18
again (19)
  452:7;456:15;
  461:11;472:21;
  473:7;483:6;484:19;
  488:6,8;495:14;
  507:14;531:23;
  534:20;536:11;
  541:12;547:16;
  550:1;577:8;582:1
against (4)
  536:20,24;545:25;
  575:14
agency (1)
  592:10
aggressive (1)
  581:7
ago (9)
  454:1,6;519:1;
  526:5;589:23;
  591:23;605:8,8,17
agree (12)
  507:1,8;508:13;
  511:17;519:6;
  534:15;536:25;
  546:23;552:24;
  567:5;570:10;581:8
agreed (2)
  433:11;590:24
agreement (30)
  433:5,7,19;446:14,
  16,21,23;447:9;
  454:13,18,20;462:1,
  6,16,18;468:13;
  553:25;554:9,15;
  555:2,3,4;559:3;
  560:1;561:22;562:2,
  21;564:20;600:3;
  609:19
agreements (12)
  447:6;454:15,19,
  21;462:3,4,7,8,13;
  493:15;555:8;588:13
ahead (6)
  510:13;512:4;
  516:10;517:12;
  571:14;618:7
aid (2)
  475:21;527:24

aided (3)
  464:21,22;467:13
AI (1)
  584:25
Albany (2)
  617:12;618:12
alerts (1)
  517:14
aligned (1)
  569:15
alive (1)
  585:2
alleged (2)
  601:23;611:13
allow (2)
  525:7;619:22
allowed (1)
  494:4
allows (1)
  486:19
almost (2)
  534:6,6
along (4)
  434:24;495:2;
  555:5;565:25
alter (3)
  486:18,19,20
alters (3)
  516:16;517:4,22
although (17)
  437:15;438:7;
  441:8;462:5;465:10;
  472:21;489:5;504:8;
  506:24;508:7;
  526:14;531:1;533:9;
  541:21;570:25;
  573:14;581:6
always (5)
  448:11;576:19
amalgamation (1)
  491:2
Amended (1)
  577:6
among (3)
  516:6;530:5;
  577:12
analysis (1)
  465:4
analyzed (1)
  488:10
analyzing (1)
  457:12
and/or (2)
  524:24;593:20
Anna (1)
  584:13
answered (2)
  444:6;516:14
Anthony (7)
  500:5,10,16;
  513:10,16,21,24
anticipation (1)
  467:2

apparently (1)
  535:25
appeal (6)
  571:22;572:8,15,
  17,20,24
appeared (2)
  585:21;621:25
appears (3)
  535:2;543:16;
  554:9
apples (1)
  549:21
applicability (1)
  433:16
application (30)
  538:23;539:2,15,
  24;540:4,11,14,18,
  19;541:5,13;542:20,
  23;544:9;548:7,21;
  549:12,14,18,20;
  550:4,6,10,23;
  551:15,18;552:13,
  19;553:4,21
applications (2)
  541:2;551:1
applied (1)
  477:7
apply (3)
  445:14;446:5,15
appreciation (1)
  545:3
approached (1)
  591:3
appropriate (3)
  458:22,23;489:14
approval (1)
  494:3
approve (4)
  565:9,11,23;566:2
approximate (1)
  437:3
approximately (1)
  613:18
April (3)
  557:4;563:3;619:3
arbitrate (1)
  595:20
arbitration (1)
  595:25
area (1)
  618:12
areas (3)
  476:21;510:3;
  511:5
Arlen (2)
  540:12;609:18
Arlen's (1)
  462:9
around (2)
  500:7;529:17
arrange (1)
  544:2
Arrangements (1)

558:6
arranging (2)
  575:13;576:8
arrived (1)
  571:11
artful (1)
  546:18
article (12)
  508:6;523:4,8;
  532:21;550:11,12;
  586:23;587:2;
  592:13;596:14;
  610:15,17
articles (41)
  435:6,11;489:15;
  494:25;501:21,25;
  503:10;504:5,23;
  505:5,7,15,21;506:1,
  10,17,24;507:3,4,5;
  522:21,25;532:16,
  25;549:12;550:3,9,
  17,18,22;551:6,6,16,
  22;552:23,25;607:2;
  610:18,21,22;623:25
arts (2)
  478:6;613:2
ascertain (1)
  539:22
ascertained (1)
  539:23
aside (3)
  466:10;496:5;
  601:5
aspect (11)
  457:13;481:8;
  508:14,25;509:1,11;
  525:1,2;582:5;
  585:16;600:19
aspects (9)
  469:19;470:13;
  471:11;476:2;
  486:15;547:14;
  567:7;570:12;572:11
assembling (1)
  540:14
assert (1)
  564:11
asserted (2)
  565:15,18
assertions (2)
  446:18;493:25
assessed (1)
  436:16
assessment (1)
  436:5
asset (1)
  481:8
assign (5)
  441:2;456:6;
  483:22;484:20,25
assigned (11)
  437:15;439:20;
  440:7,22,25;441:4,6;

455:12;456:3,8;
485:20
**assignee (1)**
437:19
**assignment (5)**
437:23;462:11;
485:10,14;539:25
**assignments (2)**
485:21,22
**assist (2)**
453:22;466:17
**assistant (2)**
490:8;532:21
**associate (2)**
532:22;570:21
**associated (4)**
434:25;533:9;
624:24;625:4
**associates (1)**
625:13
**assume (7)**
445:1;465:8;
468:21;503:18;
516:18;582:3;590:3
**assumed (1)**
547:6
**assuming (1)**
484:13
**assumption (5)**
494:13,15;562:23;
576:19;589:25
**assumptions (1)**
514:21
**assured (2)**
568:21,22
**astro (3)**
585:4,20;586:1
**attached (2)**
522:4,11
**attaching (1)**
559:4
**attachments (2)**
556:14;561:21
**attacked (2)**
531:19,20
**attempt (1)**
591:14
**attempted (1)**
601:25
**attempting (2)**
536:11;590:20
**attempts (1)**
535:6
**attend (8)**
516:8,23;613:5;
616:20;617:6,11,12;
624:23
**attended (5)**
435:21;513:12,16;
589:16;601:24
**attending (2)**
615:7;616:19
**attention (4)**

435:22;436:2;
536:6;571:9
**attentions (2)**
502:15;503:1
**attire (1)**
473:12
**attorney (2)**
571:25;572:4
**attorney-client (1)**
433:17
**attorneys (10)**
432:6;492:20;
555:6;564:5,6;
565:13;566:14;
567:1;576:20,22
**attributable (2)**
507:15;515:13
**August (7)**
441:25;442:2,3,5,
10;560:18;569:17
**auth (1)**
455:15
**author (6)**
483:19;484:2,10,
18;486:21;511:1
**authored (2)**
455:16;484:14
**authoring (1)**
467:14
**authoritarian (1)**
536:12
**authority (6)**
445:9;502:23,23;
527:7;532:20;569:6
**authorized (1)**
614:24
**authors (10)**
453:5,10;454:14;
455:6,11,12;456:3;
467:2,9;511:2
**available (23)**
482:21;488:13;
495:23;518:6,9;
519:9;520:15,25;
521:13,17,20,22;
522:1,8;541:5,8;
544:13;552:20;
559:15;582:14;
611:9;622:1,8
**Aviv (8)**
564:3;577:22,25;
584:8,24;585:1,4;
586:18
**avoid (1)**
433:3
**aware (39)**
433:21;501:23;
503:7,8;504:15,20;
514:4;520:12,17;
521:12,16,18,21,24;
522:4;541:4;543:21;
544:1;576:11;586:7,
15;588:24;590:4;

593:8,11,15;594:5;
598:21;599:1,3;
606:16;617:5,9,10,
17,20;618:2,9,14
**awareness (6)**
499:16,18,24;
500:1,3,8
**away (13)**
481:25;486:10,23;
487:4,6,7,17;488:7,
18,19,24;497:2;
519:23
**awesome (1)**
510:6;511:20
**awful (1)**
620:24
**awhile (3)**
509:25;511:11;
526:5

---

## B

**bachelor (1)**
619:20
**back (17)**
437:6;447:19;
482:16;484:1;524:3;
528:9,11;556:2;
557:11,20;578:16,
17;584:1,2;605:22;
608:9;621:11
**background (1)**
490:22
**backup (2)**
493:9,11
**bad (6)**
459:3,12;532:19;
534:12;580:15;618:3
**badly (1)**
526:15
**bag (2)**
507:25;518:17
**banc (1)**
572:20
**banking (2)**
596:6,11
**Barrish (2)**
584:17,18
**bas (1)**
480:2
**based (8)**
474:8;488:2,5;
517:2;535:1;536:17;
596:1;626:8
**basement (1)**
616:16
**basic (5)**
453:20;480:3;
487:12;537:13;
544:25
**basically (1)**
563:10
**basis (11)**

434:17;465:20,25;
466:3,12;473:25;
516:21;532:6;533:4;
540:24;548:14
**Bates (11)**
539:16;554:1;
556:11,14,17,20,23;
557:1,4,9;594:12
**BCC (1)**
563:17
**BCC'ed (2)**
579:13;593:5
**bearing (1)**
611:15
**became (4)**
443:23;444:3;
447:3;586:7;593:15
**become (14)**
455:10;482:4;
486:21;489:21;
492:2,8;505:17;
546:9;586:15;
588:24;590:4;
593:11;599:3;618:9
**becomes (2)**
471:16;481:17
**becoming (1)**
493:18
**beg (1)**
479:16
**began (1)**
606:23
**begin (4)**
433:3;497:13;
545:12;577:10
**beginning (13)**
446:14;453:17,18;
474:15;493:17;
512:21;543:5,10;
544:20;549:6;
554:17,18;621:8
**behalf (3)**
432:18;439:17;
598:25
**behavior (7)**
445:19;457:12;
464:22;466:2;
486:16,20,22
**behaviors (1)**
536:8
**behind (5)**
480:21;483:18,18;
487:23;623:14
**beings (2)**
510:5;511:19
**belatedly (1)**
576:15
**belief (4)**
436:18;532:6;
576:24;626:8
**Beliefs (2)**
510:4,10;511:18;
512:2

**believes (2)**
507:23;597:10
**bell (1)**
584:19
**belts (2)**
478:4,5
**beside (2)**
500:9;606:14
**best (7)**
450:16;456:2;
460:8,9;461:17;
488:2,3
**better (4)**
497:6;498:6;
499:5;575:10
**betterment (2)**
477:12,13
**beyond (2)**
531:10;610:25
**big (1)**
465:10
**Bill (4)**
468:2;479:11;
560:4;607:23
**billionaire (1)**
531:13
**bio (2)**
434:4;436:10
**biography (1)**
534:3
**birthday (1)**
456:21
**bit (2)**
435:17;621:11
**black (1)**
478:4
**book (4)**
567:19;603:19;
610:11;611:23
**books (2)**
435:5,10;448:2
**boosted (1)**
507:12
**boss (1)**
622:23
**both (8)**
444:3;455:13;
488:21;504:8;
513:21;536:14;
549:13;550:16
**bottom (2)**
452:22;492:13
**bowing (1)**
470:13
**boxed (1)**
559:11
**brain (1)**
517:7
**break (5)**
474:12;523:14;
555:24;556:2;557:24
**briefs (2)**
573:17,25

Case 2:06-cv-01051-KSH-CLW   Document 852-3   Filed 09/20/19   Page 58 of 79 PageID: 20947

**bringing (2)**
494:6,11

**broad (2)**
499:6;512:16

**broader (2)**
440:15;511:14

**brochure (2)**
437:7;512:7

**brochures (1)**
513:3

**Bronfman (9)**
456:13,19,22,24,
25;457:2;617:25,25;
623:1

**Bronfmans (1)**
625:2

**brought (3)**
449:15;564:7;
579:8

**Buddhism (1)**
584:9

**Building (3)**
497:4;529:14;
561:11

**Built (1)**
534:4

**bunch (3)**
540:22;586:18;
587:25

**business (16)**
438:3;444:23;
466:5,10;473:12;
507:2,14,18,20;
532:11;535:14;
555:1,19,21;568:23;
570:20

**business' (1)**
451:13

**buying (1)**
447:3

**Buyline (1)**
534:7

**C**

**cable (1)**
605:12

**calculation (1)**
531:10

**call (10)**
436:8;476:14;
506:6;508:22;532:9;
536:19;538:6;581:4,
9;590:19

**called (7)**
476:22;480:23;
541:10;547:17,23;
548:1;572:20;607:9,
15,24;609:18

**calling (1)**
551:21

**calls (5)**
503:14,22;536:5;

**came (12)**
444:8;447:7,16;
502:25;560:23;
564:5;581:5;585:7;
594:24;605:11;
618:11,20

**camera (2)**
616:1,5

**Campion (22)**
432:18,18;442:1,3,
7;501:15;523:15;
555:25;558:11,15;
584:15;600:10;
602:6;603:4;604:3,8;
606:19;607:12,13;
608:19;609:4;618:5

**Can (53)**
437:3;443:24;
453:13;471:13,14;
481:6;482:4,23;
485:8;486:18,18,20;
488:4,14;489:25;
490:19;491:10;
495:2,2;497:12,25;
500:9;503:25;510:8;
511:15,22;514:12,
19;517:3;518:4,20;
519:5;525:11;
527:15;528:22;
535:12;537:19,19,
22;539:22;542:5;
545:5,22;546:9;
549:17;554:5;556:5;
558:15;565:1;
603:20;604:8;
608:17;624:21

**Canadian (1)**
541:7

**cancelled (2)**
531:11;533:4;
617:20

**capability (1)**
545:24

**carbon (4)**
497:24,25;518:23;
562:3

**cards (1)**
434:12

**care (3)**
495:7;496:18;
552:2

**career (1)**
464:4

**carefully (1)**
520:7

**carried (1)**
591:12

**case (16)**
477:6;482:9;
491:17;519:20;
568:17;571:23;
573:5;591:10,16;

**597:21;611:14,15;**
613:6,7,24;619:9

**cases (4)**
474:3,4,5;503:1

**cash (1)**
448:16

**cat (2)**
507:24;518:17

**Catalog (2)**
521:4,9

**catch (1)**
580:15

**catching (1)**
580:19

**categorically (2)**
597:14,23

**categories (2)**
609:7;610:10

**cause (4)**
441:4;550:14;
561:10;562:24

**caused (4)**
519:10;623:17,21,
23

**causes (3)**
518:1;519:3;
528:20

**cautioned (1)**
585:22

**CC (1)**
561:20

**celebration (1)**
456:20

**center (2)**
490:24;622:24

**CEO (1)**
574:10

**certain (36)**
437:23;438:3;
445:18,18;451:10;
457:13;458:24;
469:3,12,19;470:19;
471:6;476:2;480:7;
481:19,19;493:24;
502:15;503:17;
514:20;515:11;
517:22;520:19;
527:7;538:19;
540:24;544:8;
545:10;551:2;553:8;
567:7;573:21,23;
612:5,13,14

**certainly (25)**
448:18;469:25;
471:6;476:24;
477:22;478:8;480:5;
484:11,16;495:12;
502:6,14;505:21;
506:4,25;528:18,21;
537:24;538:3;
541:24;550:6;567:6;
581:17,25;590:1

**challenge (1)**

**433:14**

**chance (2)**
436:21;611:11

**change (8)**
474:10;512:20;
546:9;549:3;562:20;
582:21;617:18;621:5

**changed (1)**
453:8

**changes (3)**
488:15;517:10,13

**changing (1)**
580:14

**chapter (1)**
485:6

**characterization (1)**
501:16

**charge (1)**
574:18

**charts (1)**
466:22

**cheating (2)**
537:16,16

**child (8)**
434:20;619:25;
620:2,3,4,7,7;623:18

**children (1)**
619:22

**chips (1)**
546:6

**choice (2)**
499:9;503:21

**choices (3)**
455:17;508:19;
620:19

**choose (4)**
503:5;504:1;
519:12;620:20

**chose (2)**
549:14;624:23

**circle (1)**
462:19

**Circuit (3)**
572:19;573:18;
574:1

**Circuit's (1)**
573:4

**circumstance (6)**
457:22;459:2,5,6,
18;460:10

**circumstances (4)**
457:17;458:24;
459:19;520:19

**claim (16)**
518:4;531:3;
535:5;565:4,10,15,
17,20,21,23;566:9;
567:17;568:9,11,12,
14

**claimed (2)**
531:13;611:7

**claiming (1)**
534:25

**claims (12)**
533:22,24;564:11;
566:12,17,21,24;
567:4,6,9;573:13;
586:1

**Claire (3)**
456:25;457:2;
617:25

**clarify (1)**
518:20

**class (1)**
470:6

**classes (1)**
615:12

**classified (1)**
473:14

**classify (2)**
471:1;504:8

**clause (1)**
577:18

**clear (3)**
546:24;547:2;
576:6

**clearer (1)**
599:5

**clearly (1)**
536:7;571:9

**clever (3)**
472:11;501:11,16

**cleverness (2)**
500:24;501:9

**client (6)**
484:13;486:24;
488:9;491:4;569:11,
12

**clients (9)**
432:7;475:16,17,
20,22,23,25;476:1;
580:23

**Clifton (1)**
432:24

**close (2)**
590:14;592:12

**Club (6)**
476:18;477:2,4,8,
10,16

**coach (6)**
483:13;489:22;
494:6;514:3;531:9;
532:4

**coaches (8)**
463:16;545:4,7,9,
11;546:1;615:14,14

**coaching (3)**
503:15;522:16;
553:5

**coach's (1)**
491:3

**Coca-Cola (1)**
481:22

**code (2)**
460:3,5

**co-experiment (1)**

445:20
**Coke (2)**
497:24;518:23
**colleagues (1)**
608:6
**collected (1)**
599:12
**Coming (3)**
482:16;618:19;
620:5
**commenced (1)**
583:6
**commented (1)**
491:5
**comments (3)**
580:18;585:20;
589:22
**commerce (1)**
477:23
**commercially (1)**
496:23
**common (1)**
567:13
**communicate (3)**
497:6;498:6;
602:23
**communication (2)**
445:11;586:8
**communications (18)**
433:10;577:13;
579:11,14;586:13,
14;588:11;592:4,24;
593:3,6;598:24;
600:2,4;603:23;
604:2,5,11
**community (5)**
619:19,21,23,23;
620:2
**companies (1)**
440:8
**company (11)**
446:17,23,24;
447:5,6;452:2;
487:12;490:9,15;
491:20;534:7
**compared (2)**
502:23;567:12
**compete (10)**
501:19;502:1;
503:3,11;504:6;
507:4;521:14;522:8;
548:19;552:16
**competed (1)**
502:15
**competing (2)**
499:13;502:22
**competitive (1)**
475:17
**competitor (16)**
476:11,19;477:8,
20,21;499:7;500:13,
17,21,24;501:23;
502:8,19;503:8;

504:4,15
**competitors (13)**
475:3,14,17;476:5,
7,13,14;477:25;
499:1,3,4;503:6;
504:2
**complete (4)**
542:10,10;549:10;
550:2
**completed (1)**
540:16
**completely (5)**
508:6;511:17;
521:24;550:5;570:10
**completeness (1)**
541:2
**completion (1)**
538:17
**component (2)**
491:24;492:1
**comprehensive (1)**
587:16
**compromise (2)**
518:25;519:23
**compromises (2)**
516:16;517:4
**Computer (10)**
465:3;490:4;
492:23,24;493:10,
12;570:25;609:16;
610:4,6
**computers (2)**
464:23;465:6
**conceived (2)**
473:20,23
**concept (6)**
469:13;477:6;
496:24;499:15;
517:22,23
**conception (1)**
474:1
**concepts (11)**
452:24,24;469:11,
15;480:20;487:23;
514:16,18;517:20;
545:20;551:23
**conceptual (3)**
471:25;617:1,2
**concern (1)**
456:18
**concerned (3)**
530:9;533:8;569:1
**concerning (5)**
433:8;572:24;
573:4;578:23;598:24
**concerns (7)**
559:25;561:21;
563:18;577:12;
579:7;618:3,18
**conclude (1)**
458:21
**concluded (1)**
626:15

conclusion (1)
570:3
**conclusions (6)**
433:15;524:18;
525:19;527:20,24;
587:20
**conditions (1)**
546:11
**conduct (7)**
439:5;536:20,25;
581:21;588:16,21;
598:18
**conducted (2)**
435:14;463:21
**conducting (1)**
576:18
**conferences (1)**
598:19
**confidence (2)**
454:23;614:8
**confidential (29)**
461:19;469:14,18,
19;470:1,4,12,18;
471:7;482:10;483:4;
488:23;490:18;
494:2;495:20,25;
496:4,16;497:14;
507:23,24;508:5,10;
538:21;539:6;553:1;
554:1;557:7;560:19
**confidentiality (25)**
446:13,16,18,20,
20,22;447:6,9;
454:15,19;461:25;
462:5,15,18;468:13;
473:6;489:25;
493:15;520:9;
553:25;554:9,15;
564:20;615:20;
616:10
**confirm (3)**
442:12;576:1;
577:7
**confusion (1)**
433:4
**Conocimiento (1)**
610:19
**consider (22)**
444:19;450:24,25;
457:14;461:18;
465:8,11,13;477:8;
495:19,25;496:4,6,
10,12;497:15;498:4,
25;499:23;502:8;
559:14;564:3
**considered (7)**
444:21;456:21;
476:18;477:21;
544:7;566:10;619:20
**considers (2)**
469:14;495:21
**consistency (2)**
510:3;511:5

consistent (4)
467:23;498:16;
509:24;511:10
**consistently (2)**
510:1;511:12
**consorti (1)**
617:15
**Consortium (3)**
616:24,25;617:8
**constitution (2)**
510:11;512:3
**constructs (1)**
458:20
**consult (1)**
608:6
**consulted (7)**
565:3,21;567:16;
568:13,16,19;592:18
**consumer (1)**
516:5
**Consumers (4)**
516:7,7,22,25
**Consumers' (1)**
534:7
**contact (5)**
447:8;506:22,22;
603:22;605:4
**contained (7)**
469:12;486:2;
518:10;538:1;
552:22;588:3,7
**container (1)**
536:12
**containing (1)**
529:1
**contains (5)**
498:3;543:13;
550:6;594:17;611:9
**contemplate (1)**
526:5
**contemporaneous (1)**
593:24
**content (4)**
460:20;515:22;
552:7;587:15
**contention (1)**
614:20
**contents (2)**
435:20;587:18
**context (6)**
511:14;512:16,17;
517:17;602:4,10
**contexts (1)**
470:20
**continue (1)**
559:14
**CONTINUED (4)**
433:2;446:1;
474:18;524:10
**continuing (3)**
432:4;604:9;
610:14
**contract (1)**

461:25
**contribute (1)**
448:18
**contribution (1)**
448:15
**contributions (1)**
448:17
**control (8)**
509:11,13,17,23;
510:12;511:10;
512:4;546:18
**controls (1)**
437:12
**conversation (4)**
581:10;589:2;
622:14,15
**Conversations (16)**
435:24;532:8;
572:21;581:12;
583:25;584:13,21;
587:8,12;595:17;
599:17;600:18;
601:11,14;602:18,22
**conversed (1)**
572:17
**conveyed (1)**
466:20,25
**convinced (1)**
565:12
**co-own (1)**
448:7
**copied (4)**
515:24;579:13;
593:5;606:11
**copies (12)**
493:1,4,6;522:4;
559:24;573:19,21;
588:12;610:18,21,
22;616:11
**copy (12)**
481:14;520:14,24;
530:6;540:4;560:3,3;
562:4;586:8;591:22;
609:4;610:11;
611:23;621:12,18
**copying (1)**
516:2
**copyright (33)**
441:7;452:17;
455:18;475:8;
482:20;483:15,24;
484:22,25;485:2,6;
492:14;495:23;
497:19,22;515:9;
520:13;521:3,9;
522:12,22,25;523:9;
543:14,14,20;
552:21;565:20,21,
23;566:8,9;573:4
**copyrighted (11)**
441:10;480:16,19;
486:9;487:12,16;
515:19;516:2,13;

528:18;529:2
**copyrighting (2)**
481:15,16
**copyrights (25)**
440:23,24;452:20;
455:5,10,10;456:4,5,
8;485:19,19;492:10;
514:7,10;515:10,24;
517:17;520:9;
521:10;524:25;
526:23;527:14;
528:15,17;543:18
**copywritten (4)**
482:2;492:12;
514:17;527:4
**core (1)**
454:8
**corporate (5)**
478:7;486:6;
555:20;563:19;578:2
**corporation (17)**
437:18;442:19;
443:3,4;444:13;
445:2;449:4,18,22;
450:25;451:18;
466:4;475:15;490:6;
534:10;574:9;577:6
**correctly (4)**
486:12;517:19;
524:19;531:21;
534:13;536:21
**costs (1)**
449:5
**counsel (12)**
433:5,7,11;485:8;
555:20;566:20;
569:7,9,11;600:3;
604:5,11
**counselors (1)**
434:22
**counter (2)**
525:9;535:13
**counterclaim (2)**
563:24;596:20
**countries (2)**
541:16,19
**course (15)**
464:8;483:17;
490:3;492:2;494:4;
501:3,7,14;505:25;
506:23;516:8,23;
536:15;586:6;620:5
**courses (11)**
439:10,11,16;
466:24;502:14;
504:22;505:2,14;
506:9;507:11;615:2
**coursework (2)**
515:23;516:7
**court (17)**
521:21,23,25;
522:7,11;552:21;
571:23;572:2,7,9,15,

18,21,24;573:2,18;
574:1
**cover (1)**
457:2
**covered (1)**
433:18
**covert (1)**
546:21
**cowritten (1)**
610:19
**crafted (1)**
551:2
**create (3)**
449:4;472:2,25;
510:5,7;511:18,21;
546:4
**created (11)**
438:19;444:5;
446:7;452:23;456:1;
485:11;486:1;534:8;
555:5;574:9;599:5
**creates (1)**
561:18
**creating (3)**
455:25;510:3;
511:4
**creation (2)**
449:12;467:3
**creator (1)**
490:5
**credentials (1)**
534:4
**Crime (1)**
498:15
**criminal (1)**
531:17
**critical (9)**
503:3,4;514:10,23;
515:5,9,14,22;575:6
**criticism (2)**
536:3,17
**criticizes (1)**
536:10
**CROSS-EXAMINATION (3)**
433:2;474:18;
524:10
**cruise (2)**
601:19;602:15
**cult (2)**
503:22;536:12
**culture (1)**
472:23
**curious (1)**
609:24
**current (6)**
451:21;455:9;
484:12;516:17;
517:5;555:8
**currently (4)**
437:16;438:22;
441:19;515:19
**curriculum (15)**
438:2;439:9,25;

440:1,3;444:5,14;
448:20;449:15;
457:19,19;475:10,
11;525:3,4
**curriculums (3)**
440:16,17;487:15
**custom (1)**
470:20
**customers (2)**
527:10;613:9

**D**

**Dalai (24)**
616:18;617:3,5,17,
20;618:2,17,23;
619:5,8;621:16,17;
622:16,18,25;623:8,
16;624:12,22,22;
625:2,3,13;626:5
**Damage (21)**
515:18;518:1;
519:3,10;520:1,2;
524:15,18,22,24;
525:6,19,20,21,22,
25;526:21;527:21;
531:9,23,25
**damaged (4)**
516:11,13;526:16;
566:23
**damages (9)**
516:5;526:6,6,8,
18;532:1;570:7;
620:22,24
**damaging (6)**
525:11;535:10,12,
14;565:8;567:7
**Damato (1)**
584:25
**Danzig (2)**
432:12;559:13
**Darmsala (4)**
618:10,22;626:4,8
**data (4)**
465:3;537:23;
582:14;585:6
**date (8)**
432:1;437:2,3;
442:1,6;544:6;590:8;
619:4
**dated (8)**
441:25;554:11;
558:4;560:18,25;
561:19;563:3,16
**David (1)**
533:20
**days (1)**
436:23
**DBA (1)**
443:2
**dead (1)**
517:12
**dealing (3)**

579:9;593:9;594:6
**dealings (3)**
568:23;593:19;
594:9
**debunk (1)**
535:6
**decide (2)**
461:23;572:19
**decided (4)**
481:14;497:18;
574:23;603:1
**decides (1)**
503:5
**deciding (1)**
595:1
**decis (1)**
488:3
**decision (17)**
441:2;457:12,13;
458:16;460:7;488:3;
511:15;521:17;
526:1;555:13,16;
564:14;568:9;
570:11;573:4,8;
623:18
**decisions (16)**
477:16,19;486:17,
20;488:2,4;520:6,10;
564:10;569:3,5,8,10;
571:21;595:12,15
**deductive (1)**
514:17
**deep (1)**
545:2
**defamation (4)**
565:4,9,14,17
**defendant (2)**
563:24;577:5
**defendants (2)**
515:25;596:20
**Defendant's (14)**
521:5;539:17;
554:2;556:13,16,18,
21,24;557:2,5,10;
594:13;608:20;
611:21
**defended (1)**
531:18
**define (4)**
452:9;496:25;
497:1;499:7
**definition (6)**
450:10;461:2,13,
14;500:2;546:20
**deflecting (1)**
535:14
**degree (15)**
434:8;457:7;
465:24;475:7,25;
478:9;496:14;
499:17;507:12;
515:11;540:15;
552:8;555:15;570:9;

617:16
**delete (4)**
571:18;606:3,4,21
**deleted (1)**
606:22
**deliver (2)**
562:17,25
**delivered (1)**
562:19
**delivers (1)**
440:4
**demands (2)**
529:25;530:4
**demarcations (1)**
472:22
**demonstrated (1)**
614:6
**department (2)**
570:24,25
**depend (2)**
495:8;496:19
**dependent (2)**
495:9;546:3,5
**Depending (11)**
435:22;436:2;
441:5;444:22;452:9;
470:9;472:1;474:3;
476:17;500:23,25
**depends (1)**
507:21
**deployment (1)**
437:13
**deposed (2)**
460:19;589:12
**deposit (1)**
520:24
**deposition (17)**
432:4;436:23;
460:12,17,22;461:1;
479:1,18;553:21;
609:9;611:25;
619:15;621:12;
622:7,10,11;626:15
**deprived (1)**
520:2
**deprogramming (1)**
591:3
**derive (5)**
459:25;537:8;
538:20,20;570:6
**derived (8)**
452:4,8;478:22;
479:7,23;498:18;
542:12;571:6
**describe (1)**
496:21
**described (3)**
475:12;494:10;
538:15
**description (7)**
450:13;542:16,21,
24;545:15;548:5;
552:1

**descriptions (2)**
546:23;552:4
**design (1)**
612:24
**designed (1)**
516:14
**desirable (1)**
508:23
**desire (2)**
516:8,23
**desired (1)**
516:12
**destiny (1)**
509:18
**destroy (4)**
459:3;510:5;
511:19;624:4
**destroyed (1)**
616:15
**destruction (1)**
536:17
**destructive (1)**
503:23
**Detailed (5)**
542:16,21,24;
545:15;548:4
**details (3)**
455:17;520:21;
601:23
**determined (4)**
445:13;446:4;
581:11;614:3
**develop (7)**
445:21;446:1;
466:18;474:24;
477:11;486:5;545:2
**developed (6)**
445:18;474:25;
478:13,17;480:5;
561:14
**developing (4)**
466:17;474:21;
492:16;539:13
**development (2)**
463:23;464:8
**device (1)**
477:1
**devices (1)**
476:15
**devout (1)**
619:19
**difference (2)**
442:4;514:15
**differences (1)**
541:21
**different (31)**
434:12;437:14;
444:1,17;447:16;
455:18;458:9;
471:18;472:22,23;
474:2,3;480:17;
483:13;485:21;
487:1;491:2;500:7;

503:15;514:16;
517:6,6;523:5,7;
539:11;541:16,19;
549:13;551:13;
573:9;605:20
**difficult (1)**
546:13
**digital (1)**
434:14
**dilemma (1)**
620:1
**direct (12)**
450:22;464:1;
477:24;498:25;
499:2,7;506:22,22;
509:23;511:9;
531:10;570:7
**directed (1)**
455:23
**directing (1)**
508:11
**directly (14)**
452:20;466:8;
474:25;488:21;
492:19;499:13;
508:11;525:5;531:2;
534:24;538:17;
564:13;570:6;623:22
**director (1)**
448:21
**disadvantage (1)**
461:8
**disagreement (1)**
619:18
**disagreements (1)**
623:20
**disapproval (1)**
536:8
**disapproved (1)**
603:2
**disburse (1)**
487:3
**discern (1)**
550:24
**disclose (9)**
469:23;482:13;
534:16;537:1;
549:16,18;551:2,7;
611:7
**disclosed (5)**
469:25;481:15;
501:20;504:19;
548:20
**discloses (2)**
549:21,22
**disclosing (1)**
534:22
**disclosure (4)**
543:12,16;544:3;
611:13
**discovered (3)**
464:21;567:18,21
**discoveries (1)**

568:7
**discovery (4)**
467:24;480:7,8;
567:25
**discredit (1)**
534:12
**discuss (17)**
447:15;566:12,22;
567:3,8;572:14;
573:12;578:3,6,8;
579:16;583:5;
593:21;598:13;
618:22;619:8,11
**discussed (11)**
567:5,7;573:9;
575:12;576:2,7,16;
579:18;581:14;
593:23,25
**discussing (3)**
478:18;519:11;
591:23
**discussion (15)**
528:10;557:17;
577:2;579:5,7,22;
580:2;583:9;588:2,6;
594:11;610:13;
621:7;625:14,16
**discussions (8)**
566:16;573:7;
579:3,5;584:5;594:1;
599:21;619:7
**disempowers (2)**
510:7;511:21
**dishonorable (1)**
536:18
**disown (3)**
619:24;620:3,6
**disparage (8)**
507:6,8;524:18,24;
525:20;526:9;
527:21;551:7
**disparaged (2)**
486:10;487:17
**disparagement (5)**
525:6,21;526:6,20;
531:24
**disparaging (5)**
507:16,22;525:14;
527:9;590:21
**displayed (2)**
490:10,15
**disputing (1)**
536:23
**dissolved (1)**
443:5
**dissuade (3)**
502:21,24;612:15
**dissuaded (1)**
507:10
**distinct (1)**
546:11
**distinction (1)**
598:2

**distributed (1)**
508:2
**disturbing (1)**
585:8
**document (24)**
480:10;485:7;
521:4;529:25;530:4;
539:15;540:6;
543:13;556:5;558:1,
3,20,21,23,25;
559:16;562:18;
573:23,24;586:16,
18;607:15;609:3;
610:9
**documentation (1)**
602:17
**documents (22)**
466:15;539:9;
556:3,4;557:24;
558:18,24;562:22;
563:11,14;573:21;
574:17;583:23;
602:1,12;606:6,18;
609:8,17,22;610:2,
21
**dollars (1)**
456:18
**done (11)**
464:4;492:20;
509:20;553:20;
561:16;579:21;
582:13;591:6,7,8,11
**door (1)**
458:1
**doubt (7)**
459:17;542:9;
551:8;561:23,24;
562:24;579:12
**down (4)**
447:22,24;502:25;
546:6
**downloaded (2)**
586:19;587:25
**downside (2)**
519:14,17
**dozen (1)**
534:1
**draft (1)**
559:3
**drafted (2)**
514:7;540:10
**drafting (1)**
540:13
**drafts (1)**
539:11
**draw (2)**
587:21;598:2
**drugs (1)**
433:25
**duly (1)**
432:25
**duplicate (10)**
445:13;446:5,14;

500:22;501:4,6,12;
521:14;522:9;552:16
**duplicated (2)**
504:17;553:2
**during (5)**
436:22;460:22;
463:22;464:8;586:6

**E**

**earlier (3)**
506:13;596:15;
612:2
**early (2)**
437:1;536:4
**earned (5)**
450:11;502:23;
527:7;620:12,13
**earning (2)**
489:22;494:5
**ease (2)**
497:7;498:7
**easily (1)**
552:17
**easy (1)**
546:13
**edict (1)**
619:21
**edit (1)**
454:2
**Education (2)**
500:13;538:19
**effect (5)**
509:7,15;516:13;
530:3;608:2
**Effective (2)**
553:25;554:11
**effects (7)**
508:20,24;509:2,4;
518:13;542:13;
547:14
**effort (3)**
545:22,23;546:4
**efforts (1)**
503:1
**either (28)**
444:3;450:9;
457:2;462:10;463:2;
466:5;475:11;
500:25;502:12;
504:1;508:11;
522:11;525:6,8;
541:6;544:5;559:9;
564:19;565:25;
571:7;572:19;
580:22;581:3;
597:21;606:11;
612:13,15;624:19
**Electric (1)**
478:3
**elements (3)**
538:19;612:13,14
**eligible (1)**

619:20

**Elks (7)**
476:18;477:2,3,4,
8,10,16

**else (29)**
438:10,17;444:19;
445:4;449:6,11,20;
478:21;479:7,23;
502:5;507:19,19;
519:15,21;520:2;
526:3;563:1;570:17;
571:4;578:13,19;
586:22;591:2;592:8;
593:2;604:22;
620:10;622:20

**else's (1)**
482:12

**elsewhere (1)**
498:8

**email (1)**
528:24

**e-mail (33)**
529:3;530:19;
556:17,20,23;
559:22,23;560:10,
16,18,19,25;561:1,4,
7;562:5;570:15;
571:1,2,8,10;594:12,
17,20;603:8,10,18,
23;604:5,15,23;
605:4,19

**e-mailed (1)**
562:13

**e-mails (13)**
571:15,18;572:23,
25;573:3;592:25;
603:20;605:22;
606:3,6,9,18,22

**embodied (4)**
474:6;480:8;
538:23;539:1

**embodies (1)**
480:2

**embody (1)**
518:16

**emissary (1)**
618:17

**emotional (4)**
510:11,15;512:2,
25

**employ (1)**
545:23

**employed (2)**
450:5;470:21

**employee (3)**
450:9,11,14

**Employment (2)**
561:22;562:1

**en (1)**
572:20

**encoded (1)**
605:12

**encompassed (2)**

447:10;529:24

**end (2)**
536:9;543:5

**endanger (1)**
451:13

**ended (1)**
614:23

**engage (1)**
533:12

**engagement (4)**
531:11;533:5,12;
581:19

**engineer (7)**
472:8,17;535:16,
18,21,23;536:1

**engineered (1)**
504:16

**enough (6)**
507:7;547:2;
548:12,15;566:21;
580:14

**entail (1)**
609:13

**enter (1)**
458:3

**entered (2)**
447:5;485:9

**entering (1)**
554:14

**enterprise (1)**
458:11

**enters (2)**
470:15,19

**Enthusiastic (2)**
497:5;498:5

**entire (7)**
471:17,21;472:17;
515:23;516:11;
552:18,20

**entirety (3)**
473:9;487:22;
539:8

**entities (2)**
444:4;450:9

**entitled (5)**
467:25;521:4;
539:15;542:6;586:9

**entity (2)**
441:18;455:24

**equal (1)**
598:1

**equally (1)**
597:25

**ESP (59)**
439:21;440:4,4,8,
9,15,18;444:10;
446:6,10;447:2;
448:7,9,10,11,15,17,
20,22,25;449:7,12,
17;450:2,14,15,21;
451:10,22;452:14,
19;456:2,4,7;458:12;
470:25;475:9;

478:22;479:24;
480:4,6;481:8;
483:22;484:21,22;
485:1,10,14,15;
505:17,20;513:13;
514:3;544:22;545:3,
16,19;553:15;595:8

**ESP/NXIVM (1)**
446:8

**especially (6)**
459:4;483:9;
489:11;538:18;
541:14;552:24

**Esq (1)**
608:19

**essence (2)**
509:22;511:9

**establish (3)**
605:7,9,10

**established (4)**
436:25;437:10;
605:14,16

**estimation (2)**
443:10;525:10

**etc (1)**
534:9

**ethical (6)**
444:6;458:20;
477:16,19;616:23;
617:7

**ethics (12)**
458:15,18;459:19,
21;460:3,5;498:16,
17;509:7,14,16;
576:17

**Ethos (3)**
437:7;487:15;
512:6

**evaluate (4)**
481:13;487:2;
550:5;566:8

**evaluated (1)**
491:5

**evaluation (4)**
566:9;614:5,9,12

**even (31)**
437:7;444:16;
472:3;477:22;480:4;
483:4;487:2;488:14;
490:23;496:25;
497:6;498:6;502:23;
504:13;505:9;
507:12;514:18;
519:25;520:1;
523:10;525:5;
528:21;537:7;539:5;
552:8;570:14;
573:20;589:4;590:8;
595:9;606:9

**event (8)**
616:19,20;617:3,6,
15,21,24;624:23

**events (9)**

598:22;599:2,3,6,
7,16,21;600:25;
602:3

**evidenced (1)**
614:23

**exact (2)**
437:2;614:25

**exactly (15)**
438:7,13;440:14;
473:18;478:10;
528:17;553:3;
568:10;572:6;589:1,
13,14;590:6,8;
605:17

**exaggerated (1)**
533:11

**Exalted (1)**
476:22

**EXAMINATION (2)**
608:23;626:3

**examine (1)**
439:7

**examiner (1)**
547:7

**example (19)**
456:18;457:20;
463:15;476:17;
502:20;503:2,21;
514:12;517:3,10,21;
519:2,20;526:10;
537:13,19;564:2;
612:18;620:19

**examples (5)**
458:25;459:8;
476:16;528:2;537:18

**except (2)**
461:22;610:15

**excerpt (1)**
508:7

**excerpts (3)**
522:20;552:22,25

**exchange (1)**
497:19

**excited (1)**
497:4

**Excuse (5)**
474:9;512:19;
549:2;582:20;621:4

**excused (2)**
523:17;626:14

**executed (2)**
487:23;555:2

**executing (1)**
519:16

**Executive (21)**
438:2;439:24;
440:25;441:1;
442:19,22,25;
443:22;444:2;445:3;
455:14;458:11,12;
477:25;478:8;
483:25;499:9;
554:21,23;555:22;

614:7

**executives (1)**
499:4

**executive's (1)**
499:14

**Exhibit (20)**
441:22;442:8;
521:5,8;539:17;
554:2;556:13,16,18,
21,24;557:3,5,10;
576:25;577:4;
594:14,16;608:20;
611:21

**Exhibits (1)**
557:14

**exist (3)**
443:1;470:7;
506:25

**existed (2)**
601:3,5

**exists (3)**
443:2,3,20

**exit (1)**
503:14

**expenses (2)**
438:8;457:3

**expensive (1)**
565:2

**experience (10)**
472:12;474:24;
498:19;503:25;
510:6,11;511:20;
512:3;517:13;572:1

**experiences (2)**
474:6;486:7

**experiential (2)**
486:4,8

**explain (1)**
518:15

**explained (1)**
507:10

**exposed (2)**
475:23;488:10

**expressed (1)**
587:23

**expression (2)**
488:16;514:6

**expressions (1)**
488:9

**extensive (2)**
531:14;587:11

**extent (3)**
437:24;484:24;
520:8

**extra (1)**
560:3

**extracted (1)**
511:17

**extravagant (1)**
533:22

**extreme (1)**
457:24

**extremely (3)**

487:24;495:18;
497:3

**F**

**fabric (2)**
536:20,25
**Face (16)**
483:2,2,6,9,11,17;
484:8;490:24;498:9;
515:21;519:8;522:6,
14;523:3;571:9;
603:19
**facilitator (27)**
483:12;488:13;
489:21;490:1,2,24;
491:3,9,12,12,18,23;
492:4,8,17;493:18;
494:13,21;522:16;
553:1,6;613:19,21,
22;614:4,14,16
**facilitators (4)**
463:17;492:3;
613:25;615:15
**facsimile (3)**
543:15;544:2,14
**fact (16)**
472:24;489:3;
494:17;523:10;
534:3;542:7;552:14;
566:4;573:20;588:2,
6;595:21;598:7;
602:13,25;614:23
**facts (4)**
525:4,5,8;529:2
**factually (4)**
524:16;525:18;
527:19,23
**fair (4)**
444:9;542:7,20,24
**fall (1)**
500:4
**Fallon (5)**
532:5,7,24;614:16;
615:6
**False (22)**
524:15,16,23;
525:4,5,7,14,18;
526:7,17;527:19,23;
528:21;529:2;
531:12,15,24;533:5;
535:11;580:23,25;
590:21
**falsehood (1)**
531:16
**familiar (7)**
499:15;500:6;
559:1,10;561:4;
563:8,21
**families (1)**
458:3
**family (2)**
457:25;458:4

**family/friends (1)**
536:4
**far (20)**
434:5,18;443:19;
448:6;451:3;455:19;
456:3;462:14;
506:20;520:4;530:9;
540:19,21;543:24;
552:17;566:24;
567:9;568:25;
569:16;581:7
**fashion (2)**
514:8;546:22
**fashioned (1)**
613:2
**fear (1)**
531:19
**features (1)**
539:2
**feel (1)**
531:15
**feeling (1)**
477:13
**felt (14)**
445:20,21;532:12,
19;555:6;567:7;
568:5;570:5;579:20;
580:13;583:14;
585:1;586:20;619:17
**few (13)**
453:12;454:24;
455:1;466:22,24;
494:24;500:3;534:1;
535:7;573:9;591:19,
23;608:15
**fictitious (1)**
591:3
**field (4)**
445:12;447:17;
499:6;582:7
**figure (1)**
562:12
**file (1)**
568:9
**filed (8)**
522:12;541:13;
544:5,8;568:11;
573:18,25;574:2
**files (3)**
543:17,22;622:2
**filing (8)**
565:3,9,21,23;
567:4,16;568:13;
574:16
**filings (3)**
521:21;522:7,11
**final (3)**
484:17;510:14;
569:5
**finalized (2)**
572:14,16
**finally (3)**
510:17;548:3;

563:15
**finance (1)**
570:24
**finances (1)**
558:23
**financial (6)**
450:18;558:6;
562:21;586:24;
588:3;596:6
**find (4)**
495:3;502:10;
535:24;610:7
**findings (1)**
433:14
**fine (1)**
590:23
**finish (1)**
576:5
**firm (5)**
559:13;572:1,3;
581:21;585:25
**First (48)**
436:25;437:9,11,
17;438:4,5,11;
439:21;440:1,22;
441:7,12,15;443:7,
12,14,15,18,19;
450:5;451:1,22;
452:14;455:13;
468:13,25;469:2,6,8;
485:18;495:6;
497:17;509:22;
519:22;553:15;
554:23;566:7;577:5,
11;579:22;581:24,
25;583:5,8,11;
590:14;618:15;
622:15
**Firstly (1)**
536:13
**flavor (1)**
454:4
**Flintlock (1)**
432:24
**flood (1)**
616:15
**Florham (1)**
432:3
**flows (6)**
478:23;479:24;
525:25;526:21;
531:24,25
**focus (6)**
499:14;510:3;
511:4;625:15,17,19
**focusing (4)**
466:11;499:10,12,
12
**folders (1)**
605:24
**followed (3)**
566:4,4,5
**followers (1)**

456:11
**following (3)**
508:13;528:11;
578:17
**follows (2)**
432:25;524:8
**follow-up (3)**
608:16;609:8;
625:9
**foolish (2)**
620:15,16
**Forbes (14)**
502:6,8,9,11,13,
13;507:9,15,19,22;
508:4,6,10;592:12
**force (1)**
598:1
**forced (3)**
519:24;525:10,13
**Forcing (2)**
525:23;526:7
**form (17)**
441:21;450:12;
478:22;479:24;
481:2,3,4;501:15;
558:11,13;571:13;
576:15;583:19;
589:18;603:4;
606:19;618:6
**formation (2)**
449:7,21
**formed (5)**
443:14;445:23;
446:10;449:17;
513:13
**formerly (2)**
442:19;445:2
**forms (2)**
510:10;512:2
**formula (3)**
481:22;497:23;
518:22
**Forum (2)**
499:25;564:6
**forums (1)**
444:6
**forward (2)**
595:2,13
**found (9)**
445:19;572:3;
585:7;595:24;
600:21,23;606:25;
610:5;626:9
**foundation (13)**
438:14,20,21;
439:3,17;448:25;
450:23;465:21;
538:22,24,25;
616:23;618:7
**foundational (11)**
478:20;479:6,22;
480:10;482:25;
483:3,5;486:7,14;

**founder (18)**
442:18,22;443:7,9,
11;444:12,19,22,23,
23,24;445:2,3,4;
531:13;616:25;
617:1,2
**founders (1)**
470:6
**four-year (1)**
532:3
**frame (1)**
567:2
**framed (3)**
439:18;566:25;
567:12
**Franco (13)**
432:12;494:12;
567:21,25;568:3,8;
609:2;613:23;
614:13,21;615:1;
619:11;624:10
**frankly (1)**
442:4
**freely (2)**
516:9,24
**frequently (2)**
550:16;569:18
**friend (2)**
570:20;585:21
**friendship (1)**
585:24
**front (5)**
517:18;557:15;
572:6;605:13;609:5
**full (1)**
465:17
**fullest (1)**
520:7
**fully (2)**
434:1;445:23
**fully-executed (1)**
560:1
**function (3)**
612:9,12,21
**functioning (2)**
451:13;613:15
**functions (1)**
605:20
**further (5)**
433:11;608:12;
625:6;626:1,3
**future (2)**
510:13;512:5

**G**

**gaining (1)**
509:10
**game (3)**
537:7;538:4,11
**gamma (1)**
465:4

garbage (7)
597:8;598:7,11,14;
599:9,13,14
garment (1)
545:6
garnered (1)
515:11
Garza (1)
490:7
gathering (1)
596:13
gave (25)
436:6;444:6,7;
488:19;490:21;
491:4;529:9;531:2,4;
564:12,15;586:18;
592:13;595:7,10,16;
596:9,17;597:11,15,
18,23;609:14;
621:12,22
geared (6)
551:3,3,4,7,7,13
general (13)
456:1,17;466:25;
467:5;472:23;478:3;
487:6,7;508:20;
520:23;571:4;
576:24;606:17
generally (5)
482:21;558:10;
578:8;584:3;592:3
generated (1)
505:18
generates (1)
439:8
generous (1)
626:9
gentleman (1)
622:24
genuine (1)
537:1
Germany (2)
457:25;459:1
gets (2)
490:22;571:16
given (27)
482:13;486:10,23;
487:1,4,6,7,16;488:7,
18,19,24;490:2;
491:4,12,18;494:21;
516:9,24;517:20;
536:6;542:2;591:22;
607:23;614:2,3;
615:2
gives (2)
549:9;550:2
giving (3)
471:12;504:14;
535:1
glasses (1)
534:18
goes (9)
438:4,11,17,25;

439:16;472:13;
507:22;536:19,24
Goldberg (1)
594:18
Goldie (1)
531:11;533:4,7
good (14)
459:7;498:12;
503:20;511:14;
512:16;523:13;
546:8;555:24;
565:12;580:7;
583:14;585:24;
587:23;602:23
Gosh (1)
499:6
Grand (1)
476:22
granting (1)
548:14
great (1)
496:14
greater (1)
520:2;526:19
green (1)
478:5
grew (1)
534:5
group (22)
449:14,16;462:25;
463:1,8,11,14;
499:15,18,23;500:1,
2,8;503:23,25;
533:24;536:4,5,9,10;
558:7;612:16
groups (1)
545:12
grown (1)
487:13
guarded (1)
520:7
guess (16)
434:10;457:14;
473:18;481:14,16;
499:2,7;507:21;
508:10;512:12;
532:21;535:15;
543:25;569:13;
570:5;593:24
guidance (1)
434:22
guide (1)
498:18
guiding (2)
510:10;512:2
guy (1)
501:11
gynecologist (1)
527:10

H

halfway (1)

586:5
hand (3)
546:16;553:23;
562:4
handle (2)
503:25;574:24
handled (2)
438:13;451:15
handles (3)
440:1;574:13,21
hands (1)
614:23
handshake (1)
470:25
handshaking (1)
544:24
happen (1)
568:24
happened (4)
567:8;589:20;
590:9;610:8
happening (2)
568:24;602:22
hard (8)
493:1,3,6;501:8;
520:10;546:7,7;
550:24
harm (5)
459:16;515:18;
518:1;519:3,10
harnessing (1)
508:14
Harold (4)
432:11;607:10;
608:19;609:1
Harold's (1)
530:6
hate (1)
536:18
Hawn (3)
531:11;533:4,7
head (15)
459:8;464:19,24;
465:1,2;476:21;
500:12;504:7;
505:11;511:3;
512:10;573:6;
585:10;595:19;
622:24
headed (2)
542:16;585:25
headquarters (1)
553:9
Health (5)
446:25;447:2,3,4,5
hear (3)
476:2;529:11;
599:8
heard (23)
476:20;498:8;
499:25;504:25,25;
505:8;529:8,12,13;
531:1;541:6;580:16;

583:17,21;587:3;
589:22;590:2;591:6,
7;592:10;612:13;
618:15;626:5
hearing (2)
583:12;589:1
hearsay (2)
533:10,16
heart (3)
515:23;516:4;
549:17
held (9)
441:12,14;528:10;
553:11;557:17;
577:2;594:11;
610:13;621:7
Heller (2)
568:21;576:21
help (6)
447:17;477:14;
511:16;566:10;
610:1;620:17
helped (3)
454:2,3;610:6
helpful (1)
583:15
helps (1)
477:18
high (1)
470:15
highly (1)
496:15
himself (3)
554:19;578:5;
620:6
hire (4)
455:21;504:1,1;
555:13
hired (4)
502:21;555:11;
593:13,13
hiring (1)
559:14
historical (2)
616:9;617:7
history (1)
491:19
Hochman (31)
494:25;501:25;
504:9,22;505:4,7,15,
20,25;506:10;507:2,
5;508:8,9;522:21;
532:16,20;536:11;
549:12,15,16;550:3,
9,12,22;551:6,16,22;
552:23;607:2;609:24
Hochman's (2)
536:23;551:8
hold (4)
546:19;547:19;
577:17;610:12
holds (2)
452:17,19

Holiness (1)
622:25
honorandethics@yahoocom (3)
603:11;604:23;
605:15
hope (2)
509:8,15
hoped (1)
611:10
hopefully (6)
502:24;508:21;
509:3,4,5;548:13
house (2)
452:10;459:2
houses (1)
458:3
human (11)
445:9,19;447:17;
457:12;459:4,4;
464:22;466:2;510:5,
24;511:19
hundreds (1)
505:11
Hushmail (3)
604:17,18,20
hydrogen (1)
497:24
hypothesis (1)
579:25
hypothesized (1)
580:17

I

idea (12)
434:10;435:4;
443:13;444:14,14;
558:16;565:12;
569:9;581:5;588:16,
19;602:15
ideal (1)
445:13;446:5
ideals (1)
512:1
ideas (8)
444:17;497:6;
498:7,22;510:9;
512:1;580:4;581:13
Identification (14)
521:6;539:18;
554:3;556:13,16,19,
22,25;557:3,6,10;
594:14;608:21;
611:21
identified (2)
463:22;538:15
identify (7)
432:7;513:7;
545:21;554:5;556:4;
558:1;603:8
ignorant (1)
580:12
imagine (9)

458:23;470:14;
478:12;493:11;
503:6;507:25;
518:19;548:22;
572:16
**immoral (1)**
459:6
**implementation (1)**
602:1
**implies (2)**
527:6,7
**import (1)**
514:20
**importance (1)**
541:1
**important (21)**
462:23;468:24;
471:7;475:13;
480:12,24;481:5,8;
483:1;486:15,16;
487:19,24;510:24;
516:5;537:6;538:21;
552:12;555:6;
559:13;624:20
**impression (4)**
440:21;441:9;
522:10;525:7
**improper (1)**
561:17
**improperly (2)**
482:12;621:2
**inaccurate (2)**
526:8;621:1
**inappropriate (1)**
568:5
**inappropriately (1)**
551:11
**inasmuch (6)**
471:14;481:15;
482:2,19;502:9;
508:8
**Inc (4)**
442:20;554:21,23,
24
**included (3)**
501:25;503:10;
566:12
**includes (3)**
544:22,24;545:19
**including (4)**
577:25;579:13;
593:5;625:1
**income (7)**
438:6;439:8,16;
452:4,8,9;570:6
**incorporate (1)**
462:4
**incorporated (1)**
491:1
**incorporates (1)**
458:6
**increase (4)**
477:15,15,19;

496:24
**increases (2)**
477:12;499:8
**independence (1)**
546:4
**independently (2)**
478:14,17
**in-depth (1)**
463:22
**indicate (4)**
621:3;623:24;
624:2,17
**indicated (5)**
432:2;617:6,11;
624:1,19
**indicating (2)**
530:3;583:24
**indicia (1)**
492:12
**indirectly (2)**
488:21;508:11
**individual (1)**
569:14
**individuals (3)**
499:5;533:25;
535:6
**inductive (1)**
514:16
**infiltrate (1)**
501:9
**influence (1)**
433:24
**inform (1)**
475:19
**information (74)**
435:3;437:13;
440:3;447:7;466:20;
470:2,4,12,18;
471:11,12;481:25;
488:23;489:13;
490:3;492:1,21,25;
493:2;494:2;497:2;
501:24;503:9;504:5;
508:10;523:11;
526:13;528:18,25;
529:5,6,7,9,15,16,18;
530:7,22,25;531:2,4,
5,17;532:25;535:4;
539:7;540:23;
541:24;542:3;544:7;
546:25;547:5;548:8,
15,24;550:7;555:21;
574:14,15,21,24;
583:15;586:2,19,24;
588:4;595:16;
596:12;597:3;
598:17;601:2,8;
602:3;612:5
**informational (1)**
504:11;587:16
**in-house (1)**
555:19
**initial (2)**

449:15;484:15
**initially (1)**
615:21
**initiatives (1)**
590:14
**innocent (1)**
580:11
**innovate (1)**
515:2
**in-person (3)**
588:17,24;598:19
**input (6)**
435:18;564:12,15,
16,16;592:21
**inputs (1)**
564:24
**inquired (1)**
600:19
**Inquiry (52)**
439:6,23;441:16,
19;443:16;445:15,
23;448:15,19;
452:18;457:5,8,11,
16;462:24;463:23;
464:2,9,12,16,19,21,
25;465:9,15,20,25;
466:3,8,12,16;
467:12;504:17;
538:22,24;539:1,3,4,
8,12;540:5;542:8,22;
543:1;547:12,14,15,
18,19;549:11;550:3;
595:7
**insidious (1)**
546:19
**insight (4)**
535:1,3;549:10;
550:2
**instances (1)**
525:12
**instead (1)**
527:10
**instruct (1)**
433:8
**instructions (14)**
575:8;578:22;
582:4;585:15;596:4,
9,17,19,25;597:6,11,
15,19,23
**integrity (2)**
509:6,9
**intellectual (1)**
555:5
**intelligence (1)**
585:5
**intelligent (1)**
552:15
**intended (1)**
546:24
**intending (1)**
506:23
**Intensive (5)**
440:16;469:9;

483:11;487:15;536:6
**Intensives (1)**
440:19
**intent (3)**
459:3,12;551:12
**intention (2)**
459:16;546:21
**interacting (2)**
493:24;526:10
**interchangeably (1)**
440:11
**interest (7)**
450:19,22,25;
451:21;452:1;485:2,
6
**interesting (2)**
511:24;538:6
**interests (3)**
485:1;569:14,15
**interfacing (1)**
529:1
**interfere (1)**
585:24
**Interfor (35)**
433:9;575:13;
576:9;577:13,16,21,
24;578:4,6,8,14,20,
23;579:9,11,14,16;
583:3,9,25;584:2,6,
22;586:8;588:13,16,
21;594:5;596:16;
597:2;598:10,18,24;
599:12;604:16
**Interfor's (4)**
585:12,16;594:8;
601:25
**internal (2)**
498:17;546:10
**international (3)**
445:9;541:7,16
**internet (18)**
488:23;489:1,3;
490:10,15;515:20;
516:4;519:8,14,19;
521:22;522:23;
523:1;531:18;541:5;
552:19;586:20;588:1
**interpretation (1)**
625:16
**Interrogatories (1)**
577:6
**Interrogatory (18)**
577:11;586:4;
588:10;592:2,3;
596:2,7;597:5,9,13,
17;598:16,20;
599:24;600:1,12;
601:22;603:7
**interview (5)**
575:13;576:8;
581:6;618:19,20
**interviewed (1)**
618:11

**interviews (2)**
503:14;576:18
**into (30)**
438:11;447:6;
470:17;471:19;
472:2;473:8;481:7;
482:7;485:9;487:9;
489:13,16;491:1;
497:10;498:22;
500:4;510:10;512:1,
1;528:22;543:4;
549:10;550:2,18,21;
551:14;554:14;
570:10;586:10;
592:21
**introduction (2)**
454:4;544:25
**intros (1)**
454:3
**invalid (3)**
524:17;525:19;
527:20,24
**Invention (20)**
541:10;542:7,12,
12,13,13,16,25;
547:1,3,5,11,13,17,
22;548:8,16;549:19;
552:2;569:25
**inventions (1)**
553:8
**investigate (1)**
578:23
**investigation (11)**
579:16;581:21,22;
582:2,5;583:3,5;
585:17,18,25;586:10
**investigator (2)**
582:15,18
**involved (32)**
437:5;438:24;
443:22,25;449:11,
21;454:11;470:12,
23;492:16,19;
502:22;505:17;
540:13;555:13;
564:2,4,9,10,13;
567:22,23,24;568:1;
569:22;570:6;
576:20;585:4;
606:13;611:11;
617:14;620:18
**involvement (4)**
454:7;531:14;
555:16;563:25
**involving (1)**
618:3
**Ireland (1)**
594:24
**Irreparable (4)**
515:18;518:1;
519:3,10
**irreparably (1)**
516:13

**Israel (1)**
585:6

**issues (7)**
447:16;567:2;
573:15;575:4,6,9;
589:12

**Item (1)**
607:11

**items (1)**
524:15

**Ivy (3)**
453:11;455:1;
611:20

**J**

**January (3)**
559:22;603:12;
605:3

**Jeff (2)**
594:18,18

**Jersey (5)**
432:3;559:13;
568:17,22,23

**job (1)**
450:12

**Joe (56)**
438:23;555:14,17;
558:5,9,18,24;
559:12;560:20;
561:1,8,14,20;563:4,
16;567:10,11;
568:21;571:24,24;
572:3,8,13,16;573:8,
12,15;575:1;576:21;
579:17,19,20,23;
580:4,16;581:13,17,
20;582:4;587:6,9;
590:6,11,13,15,19;
591:1;593:21,23,25;
598:14;599:9,17;
601:12;602:18,23

**John (4)**
504:8;532:20;
537:20;561:12

**join (1)**
612:16

**joint (1)**
484:10

**joke (2)**
516:12;517:7

**jokes (1)**
517:6

**Joseph (3)**
433:10;555:10;
557:8

**journals (2)**
463:25;464:3

**joy (6)**
477:12,15,19;
499:11;510:11;512:3

**joyful (1)**
503:19

**joyous (1)**
499:11

**Jr (1)**
608:19

**Judge (2)**
433:15;501:8

**judgment (3)**
517:2;546:15;
585:25

**Juval (14)**
564:3;576:21;
577:22,25;583:13,
14,18,22;584:8,24;
585:1,4;586:18;
587:10

**K**

**Kahler (7)**
500:11,19;567:20,
22;568:1,4,8

**Karen (11)**
463:6,13;467:14,
20;570:18,19;571:3,
7,18;610:7;614:11

**Karen's (1)**
571:5

**Kathy (8)**
557:1,8;560:11,13,
14,15;561:20;563:17

**Keeffe (36)**
432:16;459:14;
460:13;463:9,13;
559:25;563:1;567:4;
568:3;574:6;575:3;
583:2,9,18,24;
584:22;585:1,11,15;
587:4;589:21;591:1;
594:17,20;595:4,18;
596:5,21,24;597:7;
598:18;599:16;
601:14,17;602:13;
604:15

**keep (7)**
461:6;495:9;
546:2;553:23;
594:25;595:4;614:8

**keeping (1)**
494:1

**Keith (13)**
432:4,18;441:25;
554:24;556:14;
559:3;560:21,24,24;
561:2;577:4;594:25;
611:19

**Keithraniere@yahoocom (4)**
603:19,25;605:1,6

**kept (2)**
454:23;461:7

**key (5)**
468:22,23;528:25;
531:8,15

**kill (1)**

**458:3**

**killer (1)**
512:18

**killing (1)**
537:21

**kind (3)**
435:2;444:24;
611:2

**knew (3)**
450:13;576:23;
584:25

**knowing (8)**
493:22;510:14,17;
512:13,24;517:9;
531:16,17

**knowledge (13)**
450:1,3,17;451:19;
455:13;461:17;
463:19;476:11,13;
516:15,15;517:3;
571:18

**known (5)**
442:19;463:2;
516:10;612:18,22

**knows (5)**
463:8,11,14;
517:21;575:10

**Kofman (18)**
432:11,11;441:21;
607:11,14;608:15,
19,23;609:1;611:6,
17,22;621:6,10;
625:6;626:1,3,11

**Kristin (54)**
432:15;459:14;
460:13;463:9,12;
559:25;563:1;567:4;
568:3;571:24;574:6,
20,23;575:3;583:2,9,
17,24;584:22,24;
585:1,2,3,11,15;
586:17;587:4,24;
589:9,21;591:1;
592:14;593:20;
594:17,20;595:4,7,
18,22,23;596:4,21,
24;597:7;598:17;
599:8,16;601:14,16,
19;602:13,14,16;
604:15

**kunterre (6)**
560:20,23;561:1;
571:1;605:10;606:10

**kunterre@nycaprrcom (4)**
559:24;560:9;
570:15;603:11

**L**

**label (2)**
436:4;496:22

**labeled (1)**
562:19

**lack (1)**
618:6

**Lama (22)**
616:19;617:3,6,17,
20;618:2,16,17,23;
619:5,8;622:16,18,
25;623:2,8,16;
624:22;625:2,3,13;
626:5

**lamas (1)**
618:16

**Lama's (3)**
621:17,17;624:12

**land (1)**
562:20

**Landmark (4)**
499:25;500:4,10,
13

**Lane (1)**
432:24

**large (7)**
499:15,18,23,25;
500:2,8;570:10

**larger (1)**
472:3

**last (17)**
434:3;439:13;
450:4;478:18;
479:18;490:13;
510:21;518:3;537:9;
550:16;575:11;
577:1,18;608:25;
610:23;616:2,18

**later (3)**
446:10;601:17;
602:21

**Lauren (7)**
453:11;455:1;
463:7,13;467:15,21;
614:10

**law (6)**
459:21;485:5;
520:8;547:10;
548:23;555:21

**lawsuit (16)**
529:21;575:14;
576:9;582:13;
600:22,24,24;601:2,
3,6,10,19;602:4,10;
620:18,23

**lawyer (1)**
555:18

**lawyers (1)**
568:20

**lay (1)**
461:13

**lead (2)**
546:1;555:19

**leading (1)**
508:9

**learn (12)**
445:13;446:5,14;
468:16;486:18;

**546:2;582:10,11;**
598:18;599:7,12;
602:10

**learned (7)**
565:1;591:15;
599:15;601:10,24;
602:2,9

**learning (2)**
486:4,8

**leased (1)**
615:3

**least (7)**
443:2;500:5;
502:11;513:18;
521:18;529:20;
548:16

**leave (2)**
476:1;562:22

**lectures (1)**
435:20

**led (1)**
507:20

**left (6)**
490:24;531:14;
532:4,7,9;615:14

**legal (15)**
443:9;450:10;
459:20;557:7;
565:11;569:2;570:2;
573:15,21;574:14,
16,22;575:4,6,9

**legality (1)**
554:20

**legally (2)**
566:25;567:12

**legitimately (1)**
590:20

**Leonard (9)**
432:17,17;433:22;
530:10;575:19;
607:18,22;611:1,10

**less (3)**
435:23;541:24;
551:22

**letter (11)**
482:1;530:2,6;
560:1,11;607:10,12;
608:1,18;609:4,7

**letters (3)**
481:23;539:16;
592:24

**liaison (1)**
574:14

**licensed (1)**
555:11

**lie (5)**
457:14;458:5,5;
459:14;460:9

**lied (1)**
459:18

**lies (4)**
458:7,7,8;459:6

**life (8)**

459:4;477:13;
499:11;510:12;
512:4;546:7,13;
620:9

**lifetime (1)**
474:23

**likely (6)**
475:9,10;489:19;
498:23;585:2;620:8

**Likewise (1)**
567:11

**limited (1)**
512:16

**line (5)**
516:12;543:5,11,
12;544:21

**Lines (2)**
544:16;565:25

**list (6)**
469:11;528:2;
548:6,10;595:1,9

**listed (4)**
521:13;554:16;
555:3;568:3

**listing (2)**
521:9;524:14

**lists (2)**
554:14,23

**literally (3)**
510:8;511:22;
515:24

**litigation (19)**
540:6;563:25;
564:11;566:13,17;
569:4,15,23;570:10;
574:19,25;575:4;
586:7;603:24;606:7,
9,18,23;625:22

**litigations (4)**
565:1;570:9;
606:14,17

**litigious (1)**
564:18

**little (3)**
500:25;596:14;
621:11

**live (2)**
498:17;499:5

**lives (11)**
499:5;509:18,23,
25;510:7,8;511:10,
12,16,21,22

**living (2)**
457:3;534:5

**Lloyd (2)**
594:18,18

**Lloyd@sitrickcom (1)**
594:19

**local (1)**
532:11

**locate (1)**
610:3

**lodge (1)**

476:21

**logical (1)**
530:11

**logically (3)**
524:17;525:18;
527:24

**long (9)**
454:1,6;535:24;
565:2;584:7;590:7,
24;605:8;624:16

**longer (4)**
497:21;516:8,22;
518:11

**long-range (1)**
520:1

**long-time (1)**
570:20

**look (18)**
452:21,21;487:2;
496:24;510:12;
512:4;514:5;534:12;
535:19;537:22;
547:16;563:8,21;
606:12;610:6;
611:11,12;619:4

**looked (6)**
500:1;532:19;
569:18;609:15,15;
622:2

**looking (4)**
459:3;477:10;
549:19;567:18

**looks (4)**
477:14;502:9;
552:2;559:10

**Loreta (1)**
490:7

**lose (1)**
564:21

**loss (3)**
507:14,20;531:8

**lost (4)**
507:1,18;531:9;
561:17

**lot (21)**
454:21;500:25;
517:6,6,9;521:25;
550:7;561:16;
564:18;572:1;578:5;
579:20;580:10;
589:3;590:15;
600:21;606:4;
609:16;622:2;
623:20;625:21

**lots (1)**
571:16

**Lowenstein (1)**
432:9

**lower (2)**
495:10;546:3

**luncheon (1)**
523:18

**lying (15)**

457:6,9,15,17,20,
23;458:10,15,15,21,
23;459:23;460:1,6,
11

# M

**magazine (2)**
610:19,24

**Mail (2)**
528:24;562:15

**main (2)**
465:19;612:25

**mainly (1)**
571:5

**maintains (1)**
543:22

**makes (6)**
442:4;452:11;
514:14;518:8;
523:11;615:10

**making (3)**
457:12;579:24;
580:23

**malintent (1)**
459:10

**man (1)**
585:23

**manage (1)**
546:16

**manipulated (1)**
545:25

**manipulation (2)**
546:15,18

**manner (1)**
546:16

**manual (7)**
491:2;501:24;
503:10;527:5;
534:24,25;551:23

**manuals (3)**
482:10;488:12;
497:11

**many (15)**
436:21;445:11;
455:3;467:11;
470:20;492:25;
505:19;537:18;
545:4;558:18;
568:23,24;576:20;
590:13;606:8

**March (5)**
530:6;608:18;
609:4,9;611:25

**mark (3)**
556:3;608:17;
611:17

**marked (20)**
441:23;521:5;
539:17,21;554:2,6;
556:12,15,18,21,24;
557:2,5,9;577:1;
594:13,16;608:20;

609:3;611:20

**marketing (1)**
486:6

**martial (2)**
478:6;613:2

**Martin (31)**
489:5,10,15;491:6;
494:25;501:25;
504:8,23;505:4,7,14,
21,25;506:10;507:2,
5;522:21;523:4,10;
532:15;549:11;
550:3,9,11,22;551:6,
16,22;552:23,25;
607:2

**Martin's (1)**
551:9

**master (1)**
568:4

**match (1)**
457:13

**mate (1)**
619:25

**material (26)**
441:6;448:4;
481:18;487:3;
488:11;489:25;
490:5,23,23;493:7,
10;507:23,24;508:5;
516:9,23;517:1;
519:19,20;520:7;
529:2;532:1;535:13;
543:13;551:10;
560:19

**materials (58)**
435:2;441:1,7;
448:2,6;461:18;
465:2,22;472:16;
473:6;485:10;
486:25,25;488:15,
19;491:5,7,21,21,22;
492:11;497:2;501:1,
3,14;504:18;505:24;
514:17;515:19;
516:3;518:5,8,10,12,
16;527:4;535:1,2;
540:5;551:11;
591:10,16;609:10;
614:8,14,17,20,21,
22;615:2,4,7,11,16,
20;616:17;621:1;
625:21

**matter (12)**
432:5;442:7;
520:23;559:1,10;
561:5;568:25;580:9;
602:13;606:6;609:2;
618:23

**maximize (1)**
497:22

**May (58)**
432:2;436:1,1;
438:9;441:6;454:10;

455:1;459:12;463:3,
9;464:4;466:4,24;
469:24;471:5;
472:10,25;476:3,15;
477:11;483:14;
484:11;485:15;
487:7;495:16;498:8;
501:17;503:2;
506:25;507:25;
512:17;516:8,22,25;
519:23,23;520:5,5;
523:4;526:15;527:8,
9,12;528:13;537:8;
539:4;541:15;
554:11;556:11;
558:4;559:18,19;
561:9;573:14;
574:16;579:21;
581:23;606:10

**maybe (7)**
477:22;478:3;
487:2;491:19;500:6;
575:1;605:8

**McGuire (23)**
432:14,14;467:23;
468:3,6;479:8,12,15,
19;530:2;558:13;
560:2;565:24;
566:19;570:2;
571:13;576:14;
578:15;583:19;
589:18;603:5;
607:10;608:1

**mean (30)**
434:23;435:16;
436:14;440:9;
443:24;458:8,12;
468:23;478:11,16;
484:17;488:18;
490:19;499:2;507:7;
512:17;515:5;
517:16;518:12,19;
528:17;539:22;
546:9;572:16;
576:23;587:23;
590:1;611:4;616:1;
620:13

**meaning (6)**
474:8;487:22;
510:7;511:21;
546:15,17

**means (5)**
491:15;494:14;
516:4;546:19;547:22

**meant (6)**
438:16,19;439:3;
581:9;601:18;622:12

**measurable (1)**
570:7

**measure (4)**
434:6,9,11,19

**mechanism (2)**
520:21;614:25

**mechanisms (1)**
528:19
**nechanizations (1)**
466:6
**MEE (1)**
584:14
**meet (7)**
494:3,12;572:8,10;
574:6,8;619:5
**meeting (10)**
489:23;493:18;
545:11,13;562:19;
581:13;588:17;
589:16,20;625:12
**meetings (15)**
447:15;545:6;
572:13;573:7;
583:25;584:2,5,9,13;
585:12;588:25;
598:19;615:21,23;
616:3
**member (1)**
502:14
**members (2)**
536:9;545:5
**memo (4)**
558:4;561:19;
563:3,16
**Memorandum (4)**
556:11;557:1,4,8
**memorialized (1)**
539:9
**memorializing (1)**
466:16
**memory (1)**
436:8
**mention (1)**
532:15
**mentioned (17)**
460:19,23,24;
530:3;557:23;567:6;
583:13;586:23;
587:1,10;601:16;
602:20;612:2;
613:17;615:18;
616:18;621:11
**mentor (1)**
447:13
**messages (2)**
529:3;530:19
**met (14)**
445:8;446:1,9;
467:9;494:14;
513:18;536:8;
555:17;564:2,4;
572:12;578:1,3;
590:14
**method (44)**
439:23;441:16,19;
443:16;445:15;
457:5,8,11,11,16,18;
463:23;464:9,12,16,
19,21;465:9,16,17,

20,25;466:9,12,17;
504:17;538:23,24;
539:1,3,4,9,12;
540:5;542:8,11,22;
543:1;547:12,14,15,
18,19;549:11
**methodologies (1)**
515:22
**methods (5)**
445:11;447:10;
466:5;497:1;504:18
**meticulous (1)**
514:8
**Metroland (2)**
586:23;596:14
**Michael (13)**
502:20,21,24;
529:9,12;531:1,3;
554:10;619:15;
620:1;621:12;622:8;
623:20
**middle (2)**
575:22;594:23
**might (25)**
440:17;453:7,10;
454:2;472:18;
476:14,21;481:21;
511:2;512:6;521:14;
522:8;526:14;544:1;
552:10;565:19;
571:3,3;573:20;
581:16;587:10;
590:23;595:9;610:4;
621:24
**mimicked (1)**
504:16
**mind (3)**
576:17;579:2;
617:19
**mindful (1)**
460:7
**minds (1)**
502:12
**mindset (1)**
551:9
**mine (2)**
480:16;570:20
**minimize (1)**
620:22
**minute (1)**
519:1
**minutes (2)**
591:23;608:5
**misconstruance (1)**
626:6
**mislead (1)**
527:9
**misleading (2)**
527:12;528:13
**misleads (1)**
526:9
**Mission (20)**
441:4,10;468:17;

473:1;478:19,23;
479:5,21,25;480:2,9,
11,14,16;483:19;
485:16;515:20;
519:7;522:5;614:7
**mistrust (1)**
561:14
**misuse (2)**
524:25;566:11
**model (12)**
439:7;445:14,15,
21,23;446:6,15;
447:21,22,24;466:2;
486:3
**models (1)**
445:18
**module (58)**
453:14;454:2,22;
467:3,4,14;468:13,
16,22,23,24;469:16;
471:17,19,22,23,24,
25;473:10;480:18,
19,23;481:1,2,3,4,11;
482:16,17,20,25;
483:1,10,14;486:2,7,
14,17,23;487:1,14,
24;488:6;500:22;
501:4,7,12;514:14;
522:20;544:22,23,
24;545:2,16,19,20,
21;552:5
**modules (52)**
452:18,20,22,25;
453:3,6,10,19,20,23;
454:5,7,8,14,25;
455:6,7,15,20,25;
456:1;461:18;
465:22;466:1,17,18;
468:25;469:3,6,8,12;
483:8;484:20,22;
486:9;487:12,13,16;
488:18;521:13;
522:7;544:25;548:5,
6,11,12,13;549:11;
552:4,8,20;553:5
**Moe (3)**
620:8;622:14;
623:21
**moment (1)**
474:25
**monastery (1)**
584:8
**money (19)**
438:11,25;448:13,
24;449:5,6;450:11;
452:13;456:10,13,
16;474:21,23,24;
502:24;503:20;
507:2;595:23;625:2
**monies (2)**
456:18,21
**monks (1)**
622:21

**month (2)**
590:1,2
**months (2)**
489:23;591:19
**Moody (1)**
584:13
**more (38)**
435:23;453:18;
461:23;472:2;
480:22;483:4,18;
486:21;490:1,19;
491:10;499:11,11;
500:12;502:13;
503:18;509:8,17;
514:20;523:7;526:5;
537:9;540:19,21;
542:3;549:10,22;
550:2,7,8,21;551:14;
552:17;567:11;
581:7;585:21;
603:21;612:19
**morning (1)**
594:24
**mornings (1)**
452:10
**Morris (9)**
432:5,12;619:11,
18;623:4,8,17,24;
624:3
**Most (7)**
453:16;463:2,11,
15,18;490:8,14;
530:25;536:13
**Mostly (1)**
454:10
**motions (1)**
574:17
**motivated (1)**
552:15
**motivation (9)**
486:4,8,16,18,19;
489:12;500:24;
614:6;623:22
**Motivational (4)**
486:2,3;489:7,17
**motivations (3)**
623:11,13,14
**move (4)**
546:16,21;595:2,
13
**movie (4)**
517:10,11,13,13
**much (21)**
443:9;460:11;
472:1;480:22;
483:17;497:23;
536:6;549:17,25;
568:11;569:2;571:6;
575:23;582:7,14;
587:15;595:22;
602:17,23;620:20;
626:11
**multifaceted (1)**

532:2
**multitude (4)**
524:16;525:17;
527:19,23
**must (3)**
509:23;511:10;
525:8
**myself (13)**
436:6;460:11;
463:2,3;490:5;
567:14;571:7;
572:17;580:11;
616:3,4;618:1,11

## N

**Naftzger (1)**
561:12
**name (14)**
437:6,6;441:10;
532:3;533:3;538:6;
545:7,12;571:6;
584:19;605:12;
608:25;616:21;
618:21
**named (2)**
563:23;570:1
**Nancy (66)**
432:15;444:21;
445:8;446:2,13;
447:14;448:1,7,10,
24;449:12,22,24;
453:11;454:25;
455:1,12,21,23;
459:14;463:3,12;
465:19;466:15;
467:1,7,20;490:6,7;
513:22;554:24;
555:21;558:5;
559:24;561:21,22;
562:2;563:1,4,18;
566:17,22;567:3;
569:13;572:14,17;
574:20;580:11;
593:20;594:24;
596:4,21,23;597:7;
598:17;599:20;
604:17;607:8;
614:10;615:19,21,
21;616:3,4;618:11;
623:1
**Nancy's (1)**
452:10
**Natalie (1)**
616:14
**National (4)**
446:25;447:1,3,4
**natural (1)**
536:15
**nature (11)**
469:20;470:16,22;
471:3;472:20;473:2;
488:15;563:24;

Case 2:06-cv-01051-KSH-CLW   Document 852-3   Filed 09/20/19   Page 69 of 79 PageID: 26952
NXIVM CORPORATION, v.   KEITH RANIERE, et al., Vol. III
MORRIS SUTTON                                                         May 13, 2009

564:16;566:8;579:22
**Nazi (4)**
  457:25;458:1,2;
  459:1
**nearly (1)**
  580:13
**necessarily (6)**
  455:16,18;461:11;
  526:9;539:7;547:9
**necessary (4)**
  546:25;547:5;
  548:8,18
**need (7)**
  495:4;501:3;
  535:12;546:8;
  575:23;595:1;611:2
**negative (5)**
  505:18;546:17;
  620:11;623:4,25
**negativity (2)**
  623:15,17
**neighbor (2)**
  529:4;584:25
**neighbors (1)**
  529:13
**Network (5)**
  446:25;447:2,3,5;
  531:13
**neuro-linguistic (3)**
  513:22,25;514:1
**neutralization (1)**
  536:3
**Nevares (2)**
  453:11;611:20
**New (14)**
  432:3,24;494:6,11;
  508:2;516:7;555:11;
  558:6;559:13;
  568:17,17,22;604:5;
  622:24
**news (2)**
  537:20;544:17
**newspaper (1)**
  618:12
**newspapers (2)**
  502:7,16
**next (12)**
  497:4;498:15;
  516:15,16;517:4,9,
  22;530:11;531:12;
  533:5;563:17;602:6
**nice (2)**
  510:23;546:6
**nitrogen (1)**
  497:24
**Nolan (2)**
  568:20;576:21
**non-disparaging (1)**
  526:16
**None (4)**
  535:8;538:1;
  553:3;609:20
**nor (3)**

456:24;543:1;
  598:23
**Note (1)**
  556:14
**notes (19)**
  467:7,16,20;
  483:11,12,13;
  488:12,13;490:24,
  25;491:1,3,3,3;
  553:1,6,6;607:1;
  613:19
**notice (3)**
  539:25;554:16;
  594:23
**notion (2)**
  458:6;581:12
**November (4)**
  560:25;561:15,19;
  604:15
**Number (36)**
  474:16;478:12;
  485:19,21;512:22;
  521:16,19;528:19;
  540:7,8;549:7;
  563:15;572:6;
  577:12;579:18;
  582:25;586:4;592:3,
  3;596:2,7;597:5,9,
  14,17;598:16,21;
  599:24;600:1,20;
  601:22;603:7;
  607:11;618:12;
  621:9;622:21
**Numerous (2)**
  579:7;614:19
**NXIVM (192)**
  432:5,15;433:6,12;
  439:16,21;440:6,7,9,
  10,14;441:13;
  442:19;443:23;
  444:3,10,12,20;
  445:2,5;446:6,11;
  447:2,11;449:25;
  450:5,19;451:17,22;
  452:5;456:8,11;
  459:16;461:17,22;
  462:1;466:11;
  467:12;469:3,12,14,
  17;470:22;475:2,14,
  19,21,24;476:20;
  477:5,14;478:15,17,
  23;479:24;480:4,6,6,
  13;482:18;483:23;
  484:21,23;485:1;
  490:6;494:6;495:19,
  21;499:10,18;
  500:22;501:6,12,20,
  23;502:1,17,22;
  503:8,11;504:6,18,
  22;505:1;506:9,14;
  507:1,4,6,11,16;
  508:1,14,17,21,22;
  509:12,16;513:13;

514:3,7;516:3;518:1,
  4,5,8,8;519:4,6,13,
  15,18;520:6;521:12,
  14,16;522:4,9;
  524:24;525:15;
  526:1;529:14;530:8,
  14;534:10,10,17;
  536:25;537:1;
  548:20;550:4,6;
  552:16,19,20;553:9,
  12;554:16,22;
  555:11,22;558:6;
  559:5;560:1;562:22;
  569:3,19,22;570:7,
  22;571:22;573:17;
  574:12,18;575:12;
  576:8;577:6;578:4;
  588:13;591:3;
  592:15;593:8,16;
  595:8,20;596:20;
  597:2;598:9;600:16;
  603:1;607:6,7,15,21,
  22,25;609:21,24;
  611:18;612:9,16;
  613:9,13,25;615:2,8,
  10;618:4;621:22;
  623:5;624:4;625:1

─────────

**'NXIVM' (1)**
  442:20

─── **N** ───

**NXIVM/ESP (1)**
  447:4
**NXIVM-affiliated (1)**
  452:2
**NXIVM's (46)**
  458:10,20;462:20,
  21;463:12;465:21;
  466:1;476:5,7,9,12,
  15;477:9,20,22;
  480:25;487:20;
  496:7;498:25;
  500:14,17;505:14;
  516:6;517:17;
  519:12;521:9;523:8;
  524:25;526:22;
  527:5,13;528:14;
  538:13;549:11,12;
  550:8,9,18,21,23;
  551:10,14;563:18;
  564:4;569:15;593:18
**NXR00079 (1)**
  594:12

─── **O** ───

**oath (6)**
  432:25;459:15,18,
  23;460:1;524:7

**Object (11)**
  501:15;558:11,13;
  571:13;576:15;
  583:19;589:18;
  590:17;603:4;
  606:19;618:5
**objected (1)**
  590:15
**Objection (3)**
  441:21;543:15;
  584:14
**objective (1)**
  497:21
**objectives (1)**
  503:17
**observations (1)**
  536:24
**observed (3)**
  474:5;489:23;
  493:23
**obtain (3)**
  597:3;598:10;
  621:20
**obtained (2)**
  596:12;598:7
**obtaining (2)**
  580:25;598:13
**obvious (2)**
  498:9,10
**obviously (1)**
  564:25
**occasion (2)**
  578:11;606:4
**occasions (1)**
  573:10
**October (1)**
  563:16
**Odin (3)**
  610:11;611:19,24
**off (19)**
  459:8;460:18;
  467:4;500:12;504:7;
  505:10;511:3;
  512:10;528:10;
  556:8;557:17;573:6;
  577:2;585:9;587:25;
  594:11;595:19;
  610:13;621:7
**offer (2)**
  504:9,10
**offered (1)**
  440:18
**offers (3)**
  503:9,12;504:4
**offhand (1)**
  579:4
**office (20)**
  462:9;483:15;
  492:14;495:23;
  520:13;521:3,9;
  522:13,22,25;523:9;
  540:24;542:1,2;
  543:17,22;552:21;

553:9;576:22;599:10
**officer (1)**
  448:21
**offices (1)**
  585:13
**offsite (3)**
  490:4;492:24;
  493:12
**often (4)**
  496:25;567:1;
  571:12,15
**O'Hara (55)**
  433:10;438:23;
  555:10,14,17;557:8;
  558:5,7,9,18,25;
  560:20;561:1,8,14,
  20;562:15;563:4,12,
  16;567:10;568:21;
  572:8,13;573:8,12,
  15;576:21;579:17,
  19,20,23;580:4;
  581:14,20;582:4,9;
  587:6,9;590:6,11,13,
  15,20;591:1;593:21;
  598:14;599:17;
  600:2,4,13,19;
  601:12;602:18,25
**old (2)**
  610:3,6
**older (1)**
  478:16
**Olsen (2)**
  540:12;609:18
**omelettes (1)**
  452:11
**omit (1)**
  600:1
**once (9)**
  475:24;483:6;
  488:6;509:24;
  511:11;513:19,22;
  540:16;572:4
**one (62)**
  438:23;447:23;
  448:3;453:19;454:3;
  455:16;457:20;
  458:18;462:11;
  463:3,6;468:24;
  469:2,6,8;472:1;
  473:20;483:24;
  485:16;486:9,15;
  487:16;488:9;
  502:25;503:5;510:8,
  21;511:22,25;513:2;
  529:13,14;534:1;
  541:20;558:24;
  559:12;562:18;
  563:14;564:6;
  567:19;568:1,20;
  573:21;580:21;
  581:3,24,25;598:3;
  602:25;604:24,25;
  606:14;612:3;

613:17;616:9;
617:21;618:15;
621:17;622:5,16;
625:9;626:1
**One-page (1)**
521:3
**ones (4)**
453:25;478:16;
603:21;606:9
**one's (1)**
546:20
**online (1)**
552:21
**only (41)**
450:22;451:7;
454:24;463:3;
466:11;467:13;
472:4,16;475:23;
488:10;490:4;
491:19;492:5;
501:20;504:18;
507:17;514:18;
515:12;526:11,12;
527:4;533:25;535:7;
548:20;553:4;558:1;
560:24;564:1;
576:20;591:15;
596:8;597:10;
601:24;602:4;
604:11,24,25;610:9;
613:18,24;616:4
**on-the-moment (1)**
461:13
**open (1)**
514:20
**opening (1)**
449:11
**operation (14)**
526:12;588:22;
590:5,9,12,18,19;
599:25;600:7;601:3,
4,12,15;603:2
**opinion (7)**
444:7;555:15;
566:3,6;568:6;570:4;
623:19
**opinions (3)**
433:15;527:8,8
**opposed (2)**
514:16;523:8
**opposing (1)**
529:14
**optimistic (1)**
512:8
**oral (2)**
454:20,21
**orally (2)**
466:21,25
**oranges (1)**
549:22
**orchestrate (1)**
481:24
**order (16)**

452:24;501:4;
514:8,9,14,18;515:8,
14;517:25;519:2;
525:8;537:15;552:9,
10,12;613:14
**orders (4)**
515:13;517:20;
551:23,25
**organization (19)**
447:4;476:23;
477:11,18;499:19,
24;501:10;514:11,
13,25;515:6,10,11,
15;529:1;534:4;
536:20;616:21;625:3
**organizations (3)**
478:2,6;545:5
**organized (1)**
552:6
**original (2)**
540:19;544:9
**originally (4)**
438:23;451:9;
544:5;626:5
**originated (2)**
531:1;532:10
**others (16)**
466:18;495:8,10;
496:19;500:9;
510:25;511:8;513:7;
546:1,3,14;551:3;
560:10;601:24;
603:21;625:17
**otherwise (4)**
519:9;543:18;
562:14;604:8
**out (23)**
438:9,10;444:9;
451:11;460:8;
471:12;507:24,25;
508:2;518:17;525:9;
526:13;562:12;
570:9;586:24;
591:13;600:21,23;
606:1;610:8;620:20,
21;624:21
**outrageous (1)**
533:11
**outside (7)**
454:10;525:21;
546:12;601:9;
619:22,23;620:2
**outsider (1)**
501:13
**Over (18)**
435:2,14;445:10;
452:10;453:8;
467:24;474:23;
475:3,14;478:7;
487:13;489:23;
533:24;539:12;
579:8,19;609:14;
614:8

**overall (1)**
471:20
**overview (1)**
461:10
**own (8)**
436:10;448:11;
452:1;476:8;518:6;
546:20;576:17;598:3
**owned (1)**
448:9
**owner (4)**
455:9,10,13;
543:14
**ownership (2)**
450:19;451:21
**owns (4)**
441:5,19;448:10;
455:5

## P

**P000000685 (2)**
539:16;540:7
**P000000711 (1)**
540:9
**P000000768 (1)**
540:7
**P760 (1)**
543:7
**pack (8)**
528:25;529:5,9,15;
530:7,22;531:2,4
**packs (4)**
529:6,19;530:25;
531:5
**Page (21)**
442:3,11;540:8;
541:9;542:15;543:3;
544:19;545:14;
547:17,24;548:4;
551:24;563:17;
575:18,22,23;577:7,
10,11,19;602:6
**paid (9)**
438:14,16;451:4,5,
7,10,11,24;595:22
**pair (1)**
510:14
**paperwork (1)**
574:15
**Paragraph (44)**
442:18;444:25;
445:7;447:21;468:8,
11;478:19;479:9,11;
485:23;487:11;
488:17;489:20,21;
490:21;491:11;
493:17;514:5;515:5,
17,17;519:11;
524:12,14,22;
525:13;526:25;
527:17;528:24;
530:23;531:6,23;

533:18;534:16;
536:2,19;537:10;
543:6,24;544:20;
577:14,19;586:6;
594:23
**Parasite (8)**
495:9;496:13,22;
545:22,23;546:2,5,
14
**parasite/ (1)**
545:19
**Parasite/producer (1)**
495:6
**Parasites (4)**
495:7;496:19;
546:2,6
**pardon (1)**
479:16
**Park (2)**
432:3,24
**Part (22)**
445:17;447:23;
456:19,20;462:5;
472:24;480:8;
489:10;494:5;
508:16,22;515:12;
520:19;526:2,3;
534:3;542:12;
589:12;598:20;
612:10;615:2;617:25
**partial (1)**
603:10
**participant (1)**
536:10
**participants (2)**
534:2;536:4
**participate (3)**
433:22;594:1;
620:16
**participated (1)**
585:12
**participation (1)**
566:20;625:18
**particular (5)**
447:24;482:9;
523:2;559:10;582:12
**parties (2)**
432:10;554:14
**parts (5)**
447:23;471:18;
485:4;540:17;542:13
**passage (2)**
498:20,21
**passages (6)**
495:11;515:23;
516:8,22;517:1,2
**passed (1)**
529:16
**past (3)**
534:4,7;578:11
**patent (49)**
438:8;439:20,23;
440:5,6;441:12,14,

14,16,19;475:8;
538:23;539:2,16,24;
540:4,10,23;541:2,
25;542:2,14,25;
543:13,16,16,17,21;
544:3,5;547:7;
548:14,21,23;
549:12,14,18,19,20;
550:4,6,10,23;551:1,
15,18;552:18;553:4,
21
**patentable (2)**
539:5,7
**patented (1)**
547:3
**patenting (2)**
539:2;550:14
**patents (11)**
437:13,14,20,23;
440:2,21;462:10;
485:20;520:9;541:3;
612:24
**patient (1)**
624:15
**patterns (1)**
545:23
**Paul (2)**
491:6;504:8
**pay (3)**
503:20;504:12;
625:2
**payable (1)**
439:17
**paying (3)**
435:22;436:2;
586:3
**pays (1)**
456:19
**peer-reviewed (2)**
463:25;464:3
**pending (4)**
548:23;575:14;
576:9;600:24
**people (100)**
434:12,24;436:19;
445:10,12;447:5;
449:14,16;453:9,12;
454:24;455:2;
458:16;462:19,25;
463:4,5,16,16,17,20;
467:11,13;469:22;
475:9,10;476:24,25;
477:2,11,14,18;
482:21;486:8;487:2;
488:11,20;490:4;
491:19;493:14,24;
494:3;495:9;496:24;
497:5;498:6;501:9;
502:9;503:16,18,19,
19;504:9,11,12,13;
505:1,8,9,11,13,17,
19,24;506:12,14,20,
25;507:10,25;

508:11;509:8,17;
514:15,20;526:10,
13;529:1,9;531:8,15;
534:5,11;535:16;
536:13,14;537:21;
546:3;582:13;
590:22;612:11,12,
15,19,22;613:19;
618:12,13;619:22,23
**people's (6)**
476:19;477:22;
502:12,15;614:5,6
**per (10)**
450:13;470:10;
471:13;498:3;
510:23;525:6;
566:21;567:6;
568:12;595:15
**percent (8)**
439:12,15;451:7,9,
12,20,23,24
**percentage (1)**
438:3
**perform (1)**
613:14
**performance (2)**
447:17;478:8
**performed (2)**
612:9,12
**period (4)**
467:24;489:23;
553:17;588:15
**Persistency (3)**
486:1;489:7,16
**person (31)**
445:13,22;446:5;
455:16;465:19;
470:19;482:7;
486:18;488:1,3,14;
493:23;494:4;
499:12;501:19;
502:12;503:24;
532:11,20;548:19;
555:18,19;567:13,
21;574:23;580:7;
581:5;592:11;
606:11;618:19,20
**personal (8)**
460:3,5;490:7;
498:19;508:15;
585:21,23;618:16
**personality (1)**
503:17
**personally (7)**
452:4;456:10;
498:18;513:18;
562:17;570:8;598:21
**perspective (2)**
582:16;595:14
**persuade (1)**
612:15
**persuaded (2)**
617:18,18

**Peter (5)**
432:8;532:5;
560:2;614:16;615:6
**petition (1)**
572:19
**petitioning (1)**
572:2
**philosophical (5)**
444:6,23;445:1,3,4
**phone (7)**
473:4;532:9;
581:4,4,9,9,12
**phrase (2)**
515:5;537:11
**phrased (1)**
514:19
**pi (1)**
465:4
**pick (1)**
562:23
**picked (1)**
599:10
**picture (1)**
444:10
**Pictures (5)**
470:6;589:3,4,5,6
**piece (1)**
448:3
**pieces (2)**
473:7;551:13
**place (8)**
554:25;581:14;
582:2;591:20;
598:22;599:2;
600:25;617:3
**placed (3)**
519:7,13;552:19
**placing (1)**
519:18
**plaintiff (3)**
570:1,11,13
**plan (3)**
559:4,5;599:24
**plan' (1)**
601:23
**planning (2)**
617:14,23
**plans (2)**
572:14,16
**plastic (3)**
526:11,14;527:11
**play (2)**
546:18;571:21
**please (9)**
432:6;528:7,9;
545:14;578:16;
600:5,14;608:2,17
**plot (1)**
517:14
**pm (1)**
626:16
**point (50)**
440:10;444:2,10;

445:17,24;468:17;
474:13;478:19,23;
479:5,21,25;480:1,9,
14,15;483:24;
485:16;489:6;513:5;
515:15,20;519:7;
523:18;544:8;549:4;
552:5,5;556:9;
557:18;558:24;
559:12;564:7;
567:19;568:1;
573:22;580:21;
581:3;582:22;586:6;
592:13;593:15;
599:8;601:17;
602:21,21;608:7;
617:5,10,21
**points (2)**
595:1,4
**population (1)**
538:19
**portion (14)**
471:22,23,25;
472:4,4,9;481:16;
482:17,19;483:6;
486:3,17;492:5;
543:12
**portions (4)**
483:18;488:22,25;
489:2
**position (5)**
467:24;525:5;
553:12,13;570:22
**positive (10)**
449:19;452:21;
489:5;513:3;540:12;
541:14,22;546:15;
551:4;592:13
**positively (1)**
551:9
**possession (5)**
482:7;607:4,5;
609:17,22
**possible (6)**
433:4;501:19;
510:13;512:5;
527:22;548:19
**possibly (8)**
444:21;472:3;
490:8,14;534:21;
549:17;602:20;611:3
**posted (4)**
515:19;522:22;
523:1,3
**posting (3)**
504:22;506:9;
516:3
**postulates (1)**
498:17
**potential (5)**
445:10;473:11;
527:9;590:22;612:17
**potentially (4)**

505:10;535:3;
599:18;626:7
**power (7)**
508:15;510:4,5,12;
511:18,19;512:3
**PR (4)**
505:18;592:10,17;
620:11
**practice (4)**
447:19;471:23;
487:22;615:10
**practiced (1)**
470:20
**practices (1)**
480:20
**precise (1)**
542:21
**precisely (2)**
478:25;490:16
**precision (1)**
541:1
**Pre-emptive (1)**
536:3
**prefer (1)**
570:8
**prepare (1)**
539:11
**prepared (2)**
587:11;597:22
**presence (1)**
467:7
**present (7)**
498:1;542:7,20;
553:11;603:13;
605:3;622:13
**presented (2)**
498:23;551:21
**presents (2)**
542:9,11
**President (2)**
449:24;490:6
**press (2)**
531:12;533:6
**presumably (1)**
592:16
**pretty (6)**
437:1;532:19;
571:6;589:25;
602:14,17
**prevent (1)**
433:25
**previous (1)**
607:15
**previously (2)**
441:22;524:6
**primarily (1)**
454:11;464:25
**primary (1)**
574:10
**Principal (3)**
531:9;532:4;
554:25
**principle (3)**

478:20;479:6,22
**Principles (33)**
436:25;437:9,12,
17;438:4,5,11;
439:21;440:1,22;
441:8,13,15;443:7,
12,14,15,18,19;
450:5;451:1,22;
452:15;455:14;
478:21;479:6,22;
480:3,3,5;485:18;
553:15;554:23
**print (1)**
606:1
**printed (2)**
491:7;508:4
**printout (1)**
521:8
**prints (2)**
507:22;508:10
**prior (8)**
436:23;461:1;
506:5;529:24;
553:17;563:23;
606:25;607:24
**private (8)**
470:2,4;487:9;
489:14;549:23,25;
581:20;582:2
**privilege (1)**
565:25
**privileges (1)**
433:17
**privy (1)**
476:24
**probably (21)**
453:21;466:6;
500:4;507:11;508:2;
517:7;541:17;560:6,
7,22;570:13;574:20;
585:2;586:2;593:20,
23,25;599:5;605:6;
614:11;619:2
**problematic (1)**
512:17
**problems (5)**
444:8;447:18;
535:16;564:8;579:7
**procedures (1)**
522:1
**proceed (2)**
573:12;594:2
**proceedings (1)**
459:21
**process (7)**
453:23;454:7;
472:17;482:21;
489:25;494:18;
516:11
**produce (3)**
530:21;592:13;
611:1
**produced (6)**

529:21;530:16,20;
540:6;595:22,24
**producer (1)**
545:20
**producer's (1)**
546:10
**product (4)**
433:17;484:17;
557:7;609:15
**production (3)**
506:5,6;530:1
**professional (1)**
545:9
**professions (1)**
545:8
**professor (2)**
527:6;532:22
**profit (1)**
451:14
**profitable (1)**
451:18
**profits (7)**
451:6,8,11,17,21,
23,24
**program (8)**
444:16;468:12;
494:1,14;499:13,13;
509:8;534:8
**programming (3)**
513:23,25;514:1
**Programs (25)**
439:24;440:25;
441:1;442:20,23,25;
443:23;444:2,17;
455:14;465:3;469:3,
5;483:25;500:5;
503:4,16;510:2;
511:4;521:15;522:9;
554:21,24;555:22;
614:8
**project (1)**
465:5
**projection (3)**
585:4,20;586:1
**projective (13)**
490:2,25;491:9,13,
18,23;492:4,17;
494:22;613:22;
614:4,14,17
**projects (1)**
529:14
**promoted (2)**
489:24;493:21
**promotion (2)**
470:3;494:12
**proof' (1)**
533:23
**proper (1)**
590:25
**property (22)**
470:2,4;482:11,13,
14,15;487:9;489:14;
490:18;497:14,23;

519:13;520:11;
549:15;555:6;
564:17,22,24;
566:11,22;569:24,25
**propose (1)**
580:19,24;588:21;
591:2
**Proposed (5)**
558:5;559:4;
590:4,11,13
**proposing (1)**
590:7
**proprietary (5)**
461:19;465:13;
469:14;495:20;
498:24
**propriety (3)**
575:12;576:3,7
**prospective (3)**
613:4,8,9
**protect (11)**
458:11;520:1;
545:25;549:19,21,
23,24;551:2,3,10,19
**protected (3)**
522:11;564:23,25
**protection (6)**
475:7;497:20,23;
543:14;551:5;585:3
**protocol (1)**
492:17
**prove (1)**
536:12
**provide (13)**
448:1;487:8;
488:14;489:16;
497:10;520:14;
528:22;546:25;
547:4;548:13;
551:19;555:20;
578:22
**provided (6)**
448:3,5;540:23;
548:7,12,13
**provides (1)**
550:21
**providing (1)**
550:18
**psychiatrist (3)**
489:12;527:5;
532:22
**psychologists (1)**
436:16
**psycho-physical (1)**
486:3
**public (24)**
461:23;487:6,8;
495:23;496:3,6,9;
497:19;518:6,9;
520:25;521:4;525:7;
537:23;543:17,22;
544:7;547:8;549:1;
612:6,14;613:13;

620:20,21
**publication (3)**
519:22;526:22;
544:11
**publicity (1)**
618:3
**publicly (6)**
519:9;520:15;
521:22;611:9;622:1,
8
**publish (12)**
519:24,25;525:4,8,
10,13,23,24;526:1,7,
11;535:13
**published (19)**
463:24;464:2,4,6;
482:20;488:22,24;
489:1,3;520:5;525:3;
526:17;531:18;
544:10;610:24,25;
611:12;623:5,25
**publishing (2)**
519:21;527:3
**Puerto (1)**
563:19
**punch (1)**
516:12
**punishment (1)**
498:15
**purported (1)**
433:9
**purpose (8)**
474:7;476:23;
545:1,20;551:4;
553:7;599:25;616:6
**purposes (1)**
481:16
**Pursuant (1)**
457:16
**pursue (2)**
549:15;564:21
**pursued (1)**
564:23
**purview (2)**
469:4;553:4
**put (20)**
433:4;439:25;
440:3;448:13,24;
449:6;459:5;484:16;
491:7;502:11;525:4;
529:7;542:20,23;
553:24;582:2;601:5;
608:3,24;616:20
**putting (3)**
466:10;467:6;
496:5
**puzzle (1)**
472:25

**Q**

**quantifying (1)**
553:8

**quickly (1)**
552:18
**quite (4)**
439:18;589:23;
611:5;622:4
**quote (25)**
495:6,7;497:4,5;
498:2,2,15,16;
509:22;511:17,24;
512:8,24;513:2,4;
533:22;534:15;
535:5,19,20,23;
537:1;538:2,10,16
**quoted (2)**
522:20;551:25
**quotes (7)**
494:24;495:1;
509:19,21;510:20,
22;513:6
**quoting (3)**
479:16,17;551:23

**R**

**raise (1)**
546:4
**raising (1)**
545:24
**range (1)**
519:25
**Raniere (45)**
432:4,19;433:3;
441:25;442:11;
474:19;521:8;
524:11;530:7,10,14,
14;535:19;539:20;
549:9;552:14;554:5,
6,25;557:14,23;
562:6;577:15,20,23;
583:2;586:7,12;
588:10;592:5;
594:16;596:8;
597:10;601:24;
602:1;603:9;604:3;
607:18,20;608:11,
15,24;611:20,23;
612:2
**Raniere-1 (1)**
434:4
**Raniere-11 (2)**
441:23;478:19
**Raniere-16 (3)**
577:1;586:5;596:3
**Raniere-18 (1)**
521:5
**Raniere-19 (2)**
539:18,21
**Raniere-20 (1)**
554:3
**Raniere-21 (3)**
556:13;557:14;
558:4
**Raniere-22 (2)**

556:16;559:2
**Raniere-23 (2)**
556:18;559:21
**Raniere-24 (2)**
556:21;560:17
**Raniere-25 (2)**
556:24;560:25
**Raniere-26 (2)**
557:3;561:19
**Raniere-27 (2)**
557:6;563:3
**Raniere-28 (2)**
557:10;563:15
**Raniere-29 (2)**
594:14,16
**Raniere-30 (3)**
608:17,21;609:3
**Raniere-31 (2)**
611:18,21
**Raniere's (2)**
479:17;577:5
**rank (3)**
470:15;472:19;
612:19
**ranking (1)**
478:4
**ranks (3)**
472:23;478:9;
613:1
**rare (1)**
460:10
**rather (5)**
439:21;448:16;
495:14;524:24;571:9
**Rational (53)**
439:6,23;441:16,
19;443:16;445:15,
23;448:15,19;
452:18;457:5,8,11,
16;462:24;463:23;
464:2,9,12,16,19,21,
25;465:8,15,20,25;
466:3,8,12,16;
467:12;504:17;
536:16;538:22,24;
539:1,3,4,8,12;
540:5;542:8,21;
543:1;547:12,14,15,
17,19;549:10;550:3;
595:7
**Re (1)**
559:22
**reached (2)**
433:5;451:10
**read (55)**
435:6,10;460:12,
15;468:19;474:6;
486:12;490:11;
494:24;495:2;
509:19;510:2;513:6;
516:7;517:1,1;
524:19;528:3,8,11;
531:21;534:13,19,

25;536:21;542:9;
543:4;544:17,20;
545:15;546:24;
547:9;548:6;552:4;
553:2;560:6,8,13;
561:10;571:3,3,5,15;
575:17,23;578:15,
17;588:9;591:9,10,
12,25;600:12;
601:18;602:12

**reader (6)**
546:25;547:4,6;
548:7,15,17

**readers (1)**
535:3

**reading (7)**
479:8,10,12;
525:16;532:10;
591:15;602:16

**reads (2)**
554:19;571:2

**reaffirming (1)**
489:24

**reality (1)**
457:14

**really (8)**
443:17;444:15;
517:16;575:22;
578:5;579:24;
593:12;599:4

**reason (8)**
459:20;461:22;
507:18;558:19;
561:6;562:8,11;
579:6

**reasons (2)**
505:2;602:25

**reassigned (1)**
441:13

**recall (27)**
436:21,22,24;
460:18;508:6,7;
518:18;560:5;
566:15;572:13,23,
25;573:2,11,16;
575:15;579:9;
582:17,19;583:8;
584:21,24,25;
588:12;601:11;
608:25;613:20

**receive (14)**
456:10,13,16,17,
24;558:10,16,17,18,
20;561:7;562:9;
603:20;614:16

**received (41)**
484:13,13;506:5;
521:4;529:3;530:7;
539:17;554:2;556:6,
12,15,18,21,24;
557:2,5,9;558:2,8;
559:9,17,18,19;
560:6,12;561:3,10,

23,24;562:1,14;
563:6,20;571:1;
584:4;593:7;594:13;
603:23;604:2;
608:20;611:20

**receives (2)**
439:16;483:16

**receiving (8)**
456:21;560:5;
562:6;563:11;
572:23,25;573:3;
588:12

**recent (1)**
589:25

**recently (5)**
589:23;602:14;
613:7

**recess (7)**
474:14;523:18;
549:5;556:10;
557:19;582:23;608:8

**recipient (4)**
437:21,22,25;
438:1

**Recitation (1)**
473:1

**reciting (1)**
545:13

**recognize (6)**
509:20;510:20,23,
25;539:20;559:16

**recommend (1)**
581:20

**reconstruct (1)**
472:7

**reconstructed (1)**
504:16

**record (31)**
433:4;441:24;
467:19;524:4;
528:10;529:24;
531:17;540:3;543:4;
544:20;545:15;
557:12,17,21;572:5;
576:6,14;577:2,4;
580:22;581:3;
583:24;594:11;
608:3,10,25;609:9;
610:13;616:7,8;
621:7

**records (7)**
543:17,22;552:22;
588:7;596:6,12,16

**RECROSS-EXAMINATION (1)**
625:11

**recruited (1)**
574:10

**REDIRECT (2)**
608:23;626:3

**re-engineer (1)**
535:21

**refer (2)**
447:21;569:18

**referenced (1)**
508:8

**references (1)**
551:24

**referred (4)**
454:9;530:20;
611:24;614:19

**referring (6)**
445:16;490:17;
524:22;529:5;
530:23;531:6

**reflect (2)**
467:19;510:24

**reflected (1)**
514:22

**reflecting (1)**
466:16

**refurbished (1)**
610:4

**regard (1)**
546:13

**regarding (3)**
569:4;577:13;
606:6

**register (1)**
520:19

**registered (8)**
483:15;492:10,14;
493:5;495:22;
520:13,24;521:10

**registration (1)**
563:19

**reject (1)**
620:3

**relate (1)**
505:4

**related (9)**
464:18,25;516:22;
532:13;540:5;
548:23;606:18,22;
625:22

**relates (1)**
530:8

**relating (31)**
439:5;446:17;
462:10,24;464:2,11,
16;465:4;466:2;
469:23;486:25;
493:25;496:15,22;
505:2;518:21;532:1,
13;558:23;561:11;
562:20;565:5;573:1,
15;581:18;592:15;
595:7;600:6;603:24;
606:9;609:23

**relationship (6)**
447:1;496:12;
583:13;585:23;
592:12;615:8

**release (3)**
461:23;518:20,22

**released (8)**
476:3;496:3,6,9;

497:18;518:24;
548:24;612:6

**releasing (1)**
497:21

**relevance (1)**
623:7

**relevant (1)**
611:3

**religious (1)**
619:19

**remain (1)**
546:12

**remained (1)**
544:6

**remember (28)**
434:7,13;435:17;
517:19;561:9;562:6;
563:7,11;572:5,18;
573:3,7;578:10;
579:4,5;580:1;581:2;
583:12;584:4,7;
585:9;587:13;589:1;
595:6,17;601:16;
602:14;625:19

**remembered (1)**
563:13

**Removal (2)**
470:8,9

**render (1)**
527:8

**Renewal (1)**
563:5

**rep (1)**
574:11

**repeat (2)**
479:4;534:16

**rephrase (1)**
503:7

**report (26)**
433:9;434:21;
489:5,10,12;491:8;
508:8,9;537:22;
549:15,16;584:1,1;
586:9,16,25;587:1,9,
11,14,17,21,22,25;
588:3;591:23

**Report' (1)**
586:9

**reporter (4)**
528:12;554:7;
556:3;578:18

**reports (4)**
434:23;505:1;
531:15;584:4

**represent (7)**
432:7,9,12;536:7;
540:3;571:22;609:1

**representation (1)**
533:8

**representations (2)**
580:23;581:1

**representative (2)**
618:10;622:19

**representatives (5)**
618:24;619:8;
621:17;622:17;
624:13

**represented (1)**
596:15

**representing (2)**
432:15;572:1

**represents (3)**
486:17;498:21;
554:22

**reproduction (3)**
543:15;544:2,14

**reputation (3)**
532:13;533:9;
563:5

**request (15)**
467:20,22;506:7;
529:23;530:13,17;
596:10,24;597:12,
16,19;602:2;607:25;
608:4;609:7

**requested (3)**
506:5;609:11;
610:18

**requests (10)**
596:3,9,19;597:6,
11,15,18;607:15,24;
609:8

**require (1)**
545:5

**required (1)**
600:3

**requirement (1)**
606:17

**requires (3)**
489:22;493:18;
494:6

**research (15)**
435:13;438:15;
439:5;463:22,24;
464:1,3,10,11,18,20;
473:24;575:4,6,9

**reserve (1)**
433:12

**reserves (1)**
543:18

**residence (2)**
554:24,25

**residing (1)**
432:23

**resign (1)**
603:1

**resolved (1)**
620:6

**resources (2)**
499:10,14

**respect (16)**
433:13;435:18;
447:7;452:13;
462:11;467:12;
484:19;541:3;
554:21;568:7;

579:19;590:16;
592:22;600:13;
604:4;610:17
**respond (1)**
597:25
**response (20)**
577:11,14,19;
586:4;588:9;592:2,5;
596:2,7;597:9,13,16;
598:3,20;600:1;
601:22;603:9;612:3;
613:17;624:13
**Responses (9)**
577:5,10;592:14;
595:10;597:25
**responsibility (4)**
481:20;508:18;
620:21,23
**responsible (3)**
617:23;623:4,25
**responsive (6)**
596:9;597:12,16,
19;602:2;610:10
**rest (4)**
447:24;488:11,12;
498:11
**restricted (1)**
454:8
**result (1)**
536:9
**results (2)**
435:13;533:24
**resumed (1)**
524:7
**retain (6)**
435:9;436:1,4;
606:5,17;616:11
**retained (4)**
581:21;583:18,22;
593:16
**retainer (1)**
609:19
**retention (20)**
434:5,6,9,11,18,19,
21;435:3,5,7,14,17,
23;436:5,5,7,11,14,
17;592:18
**return (4)**
615:4,6,11,15
**reveal (3)**
482:24;515:21;
527:24
**revealed (2)**
519:3;551:15
**revealing (2)**
517:25;537:9
**reveals (2)**
516:4;550:8
**revelation (1)**
528:20
**revelations (3)**
527:13;528:14,16
**revelatory (1)**

523:7
**reverse (8)**
472:7,17;504:16;
535:16,18,21,23;
536:1
**review (7)**
453:15,18;520:15;
540:16;541:17;
573:17,25
**reviewed (6)**
453:19,21;540:17,
18;541:12,12
**Rick (56)**
459:10,12,15;
488:19;491:4;502:4,
5,19,20;503:1,12,22,
23;504:1,3;529:8,15;
531:2,4,17;532:10;
575:13;576:8;577:5,
13;578:24;579:23;
580:5,6,7,8,9,15,20,
22;581:4,10,13,17,
18,19,22;582:6;
583:3;585:13,17,18;
586:10;588:17,25;
589:3;590:20;591:2;
592:22;624:6;625:14
**Rico (1)**
563:19
**rid (1)**
545:22
**right (45)**
442:10,16;450:6;
451:22;460:18;
461:9;462:20;472:9;
478:24;480:13;
481:19;489:22;
494:5,7;506:16,18;
513:8,23;518:7;
519:12,22;520:3;
526:21,23;533:16;
540:8;542:17;
543:23;544:15;
547:16,25;548:2,3,9,
17;553:15;554:12;
559:8,17;568:14;
583:18;593:9;601:7;
603:3;625:22
**rights (10)**
433:12,14,16;
437:20,23;483:22;
484:20;485:10;
543:20;564:21
**rigorous (6)**
489:23;493:19,20;
494:9,11,20
**Riker (2)**
432:11;559:13
**Riker/Danzig (1)**
559:11
**RIM (3)**
439:20,22;552:18
**ring (1)**

584:19
**Rituals (52)**
468:22;469:6,16;
471:17,19,21,23,24,
25;473:9,17,21;
474:1,2,7,20,22;
475:2,6,19,21,24;
476:1,3,6,8,9,12;
477:5;478:1;480:11,
17,18,22;481:5,11,
11;482:1;484:2;
522:5;544:23,23,25;
545:1,10;612:4,6,8,
14,18,21;613:14
**Rituals' (1)**
468:14
**Robbins (9)**
500:5,10,16;
513:10,16,18,21,25;
514:3
**Robbins' (1)**
513:12
**Robert (2)**
432:17;622:25
**robust (2)**
463:19;480:22
**Rochelle (3)**
432:13;619:12;
624:8
**role (5)**
444:3;571:21;
574:12;613:11;
614:12
**room (2)**
470:19;534:5
**Ross (74)**
432:9;459:10,12;
488:19;491:4;502:4,
5,19,21;503:1,12,22,
23;504:1,3,19,23;
505:3,18;507:4;
508:9;529:8,8,15,16;
531:2,4;532:7,10;
575:13;576:8;
577:13;578:24;
579:17,19,23;580:5,
6,7,8,9,15,20,22;
581:4,6,10,13,18,19,
22;582:6;583:3,14,
16;585:13,17,18;
586:10;588:17,25;
589:3;590:20;591:2;
592:22;596:5,11;
597:8;598:6,10,20,
25;624:6;625:14
**Ross' (7)**
459:15;577:5;
588:3;598:14;
599:13,14;602:15
**Ross's (1)**
531:17
**route (1)**
481:14

royalties (4)
437:22,25;438:1;
462:12
**royalty (13)**
438:12,16,18;
439:8,12,17;450:22;
451:1,3,7,9,12,24
**rule (1)**
619:21
**Ruler (1)**
476:22
**Rules (52)**
468:14,21;469:5,
15;471:17,19,21,22,
24,25;473:9,17,21;
474:1,2,7,20,21;
475:2,6,19,21,23;
476:1,2,5,8,9,12;
477:4;478:1;480:11,
17,17,21;481:5,10,
11;482:1;484:2;
522:5;544:22,23,24;
545:1;612:4,5,8,13,
17,20;613:13
**rumor (1)**
529:13
**run (1)**
503:16
**running (1)**
543:5
**runs (1)**
592:11
**Russell (5)**
557:1,8;560:15;
561:20;563:17

---

**S**

**sad (1)**
521:17
**Sage11 (2)**
559:24;560:16
**sake (2)**
616:9,10
**salary (1)**
450:12
**sale (2)**
439:9,11
**sales (2)**
486:7;574:11
**Salzman (49)**
432:15;444:21;
445:8;446:2,13;
447:14;448:1,7,10,
24;449:13,24;
453:11,11;454:25;
455:1,13;463:7,12,
13;465:19;466:15;
467:15,20,21;490:6;
513:22;554:24;
558:5;559:25;
561:21,22;563:1,4,
18;566:17;572:14;

596:4,21,23;597:7;
598:17;599:20;
604:17;607:8;
614:10,10;615:19;
623:1
**Salzman's (1)**
490:7
**same (16)**
435:25;439:12;
440:8,13;450:16;
461:4;471:1,1;
473:13,14;477:17;
489:9;502:16;
546:12;552:1;587:23
**Sandler (1)**
432:9
**Sara (7)**
456:13,19,22,24;
457:2;617:25;623:1
**Sashes (8)**
469:16,18,22,23;
472:21;612:19,23;
613:15
**sat (1)**
564:6
**satisfied (2)**
494:20;624:17
**save (3)**
510:8;511:22;
605:24
**saw (5)**
559:1;560:12;
568:1;572:4;573:1
**saying (17)**
434:4;451:17;
481:10;506:19,23;
514:25;535:7;
551:17;563:10;
582:17,19;583:16;
584:24;590:21;
598:3,4;601:1
**scared (1)**
531:20
**scarves (6)**
469:16,18,21,22,
24;613:15
**scheduled (1)**
616:20
**school (5)**
434:22;444:15,16;
613:3;620:17
**schooled (1)**
514:1
**scientific (4)**
438:15,19;439:7;
463:22
**scored (1)**
436:16
**screen (1)**
432:3
**Scripting (4)**
544:23,24;545:1,2
**se (10)**

450:13;470:10;
471:13;498:3;
510:23;525:6;
566:21;567:6;
568:12;595:15
seal (1)
521:23
search (3)
609:10,13;610:1
second (10)
535:15;572:19;
573:4,18;574:1;
577:14,18,19;
610:12;619:3
Secondly (1)
536:15
secret (75)
461:2,5,7,7,12;
465:9,12;469:13,21;
470:10,13,16,22;
471:4,10,12,13,14,
15,16,18,20;472:5,8,
20;473:8;480:15,24;
481:12,21,24;482:3,
6,8,18,18,23;483:7;
487:20;489:16;
490:8,9,14,14,16,20;
495:16;497:8,21,25;
498:1,3,20;518:5,11,
11,16,21,22,24;
523:11;534:23;
535:2,4,8;539:6;
550:15;567:16;
568:9,11,12,14;
573:13,16;611:8
secrets (57)
462:20,22,23,24;
463:1,4,12,15,18,19;
465:21;466:5,7;
469:21,25;470:11,
18,24;471:5,9;472:3;
478:11,14;480:12;
481:7,23;482:1,4,5,
10,24,24;495:11,13,
14;496:6,9;497:12;
498:22;518:14;
523:8;524:25;
526:22;527:13,25;
528:14,20,22;
534:17,22;537:2;
543:2;550:9,19,22;
551:15;611:9
section (2)
542:6,15
security (1)
492:17
seeing (1)
535:1
seek (1)
434:10
seeks (2)
549:16,18
seem (2)

510:23;551:21
seemed (1)
555:18
seemingly (1)
533:11
seems (3)
498:9;559:1;567:1
select (1)
475:17
selected (1)
475:24
selecting (3)
475:16,21;612:21
selection (1)
477:1
selective (3)
612:9,12;613:14
selects (1)
475:20
self-descriptive (2)
537:6,12
self-destructive (1)
546:10
self-esteem (11)
495:10,17;496:13,
15,23,23,25;497:1;
545:24;546:3,5
sell (5)
497:6;498:6;
503:4;504:11;516:6
selling (1)
503:2
sells (1)
503:3
seminar (1)
513:17
seminars (3)
504:12,14;513:12
Send (5)
530:2;579:10;
592:24;593:2;608:1
sense (5)
456:23;477:25;
517:11;537:25;
565:11
sensory (1)
435:18
sent (6)
528:25;530:22;
531:5;558:9;560:9;
618:10
sentence (4)
485:5;490:13,17;
577:18
separate (2)
443:3;546:11
separately (1)
582:8
September (1)
559:7
sequence (1)
599:6
series (3)

592:14;595:10;
620:19
serve (3)
461:14;476:15;
546:19
serves (3)
476:23;534:11;
612:21
service (1)
605:12
services (1)
504:10
session (4)
472:14;545:13;
573:11;606:25
sessions (2)
461:1;503:15
set (4)
462:23;577:6;
604:18;616:4
setting (2)
461:23;604:16
several (5)
483:10;530:24;
556:3;557:24;583:23
severed (1)
615:8
sex (2)
589:5,6
shape (4)
478:22;479:24;
511:15,16
shapes (2)
509:25;511:12
share (2)
451:20,23
shared (1)
560:10
shareholder (3)
449:25;450:2;
574:10
shifter (7)
536:5;537:5,11,14,
18;538:6,13
shifting (2)
537:14;538:6
ship (2)
601:19;602:15
shoes (2)
470:8,9
short (9)
474:12,13;519:25;
549:4;555:24;556:9;
557:18;582:22;608:7
shortly (1)
589:15
show (4)
434:12;454:3;
575:18;576:14
shower (1)
589:5
showing (2)
557:24;611:2

shown (1)
568:2
sic (3)
469:21;525:19;
543:18
side (1)
522:13
sign (4)
446:13,20;468:12;
485:20
signature (3)
442:12,15;577:8
signed (16)
446:16,22;447:6;
462:3,7,9,11,14,17;
485:17,21;493:15;
539:25;560:20,23;
565:5
signify (1)
472:23
signifying (1)
472:19
signs (1)
468:12
silly (1)
601:21
similar (10)
435:1;472:21;
473:3,5;476:14;
503:14,15;504:10;
512:15;516:11
similarly (1)
531:19
simply (2)
467:3;618:6
single (5)
490:4;492:22,23;
511:15;563:14
sit (2)
473:25;504:1
site (6)
505:3,19;508:9;
529:8,16;531:19
sites (1)
503:2
Sitrick (24)
559:23;592:4,5,6,
9,10,11,19,21,25;
593:3,6,9,19;594:2,2,
6,9,21;595:2,12,18,
21,24
situation (3)
459:25;509:11,14
situations (4)
455:18;517:9;
545:10,12
Sixth (1)
517:11
skilled (1)
493:23
skillful (1)
546:16
skillfully (1)

546:17
Skolnik (52)
432:8,8,20;433:2;
442:2,9;467:19;
468:1,5,7;474:11,18;
479:9,10,14,17;
506:4;512:23;521:2,
7;523:13;524:10;
528:8;529:23;530:5,
13,18;539:19;549:8;
553:23;554:4;
555:23;556:1;
557:13,22;560:4;
566:1;575:20;577:3;
583:1;594:15;607:9,
13,16,21,23;608:3,5,
11;612:3;625:9,11
Skolnik's (1)
613:18
slanderous (1)
583:16
small (3)
449:16;462:19,25
smaller (1)
472:3
Snyder (1)
585:2
social (1)
578:10
socially (2)
578:1,3
Soedarpo's (5)
596:5,11;597:8;
598:7,10
soldier (1)
458:1
soldiers (1)
458:2
sole (4)
449:24;450:2;
483:19;484:2
solve (2)
447:18;535:16
somehow (1)
434:25
someone (42)
434:5;438:17;
454:22;459:1,3;
468:12;472:7,10;
481:17;482:3,6,12,
23;490:22;497:11;
501:6;503:5,21;
507:23;511:15;
517:21;519:15,21;
520:2,10;526:8;
536:19;537:7,14;
538:3;546:21;
552:14;563:1;
564:19;586:1;593:8;
594:5;605:4;612:20;
621:15,16,22
sometime (1)
599:6

**Sometimes (7)**
440:16;444:7,16;
459:7;460:9;498:10;
605:25
**somewhat (3)**
498:9;559:1;561:4
**son (1)**
619:19
**son's (1)**
623:18
**sophisticated (1)**
548:16
**sorry (18)**
440:9;463:9;
479:15;525:16;
528:3;533:3;534:18;
542:4;543:9,10;
578:16;590:10;
595:20;602:5;
611:18;616:2;
622:11;623:12
**sort (20)**
444:7;452:5;
454:4;478:3;494:2;
518:16;540:24;
545:6;564:22,24;
572:7;574:14;
578:12;580:17,22;
581:6,18;590:13;
595:8;611:13
**sorts (1)**
555:20
**sounded (1)**
580:8
**sounds (2)**
508:23;601:20
**source (1)**
619:17
**SP0429 (1)**
557:2
**SP0432 (1)**
557:5
**SP0480 (1)**
556:17
**SP0518 (1)**
557:9
**SP0903 (1)**
556:15
**SP1013 (1)**
554:1
**SP1163 (1)**
556:12
**SP1284 (1)**
556:20
**SP1814 (1)**
556:23
**spam (1)**
571:16
**span (1)**
434:14
**Spanish (1)**
611:4
**speak (13)**

469:17;507:24;
533:13;577:22;
578:13,20;579:8;
583:2;592:8;600:16;
607:22;617:12;
620:20
**speaking (1)**
622:18
**special (3)**
491:16,17,20
**specific (13)**
457:11;490:19;
491:10,17;492:4;
498:1;528:2;535:5;
552:9,10;553:7;
575:8;613:21
**specifically (29)**
440:15;441:2;
447:13;460:18;
462:11,15,17;505:4,
6,20;506:11,12;
518:9;520:4;532:15;
533:19;534:19;
551:18;561:9;565:3;
566:18;567:15,15;
572:12;573:16;
575:16;578:6;581:2;
585:18
**specifics (7)**
493:22;518:16,21;
566:24;567:9;584:9,
10
**spend (2)**
474:21,24
**spending (1)**
499:9
**spent (1)**
474:23
**Sphinx (3)**
610:11;611:19,24
**spoiler (1)**
517:14
**spoke (8)**
537:10;561:10;
569:12;577:15,20,
24;581:23;592:6
**spoken (6)**
505:9;506:11;
572:10;594:25;
602:13;620:20
**sponsored (1)**
617:7
**sponsoring (1)**
616:22
**squarely (1)**
452:12
**stamped (11)**
539:16;554:1;
556:11,15,17,20,23;
557:2,4,9;594:12
**stand (2)**
516:19;524:7
**standard (1)**

473:12
**standards (7)**
489:24;493:19,20;
494:10,12,14,20
**standing (2)**
470:15,19
**start (9)**
446:6;480:6;
497:1,2;506:8;538:4;
545:11;582:24;
620:17
**started (4)**
486:5;487:11;
506:14;534:5
**starting (4)**
480:3;496:21;
545:17;575:21
**starts (3)**
472:2;489:13;
497:10
**State (7)**
486:2;489:8,17;
497:5;546:11;
597:14;623:3
**stated (2)**
538:10;623:6
**statement (47)**
434:3,17;436:10;
441:4,10;468:17;
473:1;478:20,23;
479:3,5,21,25;480:2,
9,12,15,16,19;
483:20;485:16;
496:17,18,20;497:8,
13,16,18,20;498:5,
12,13;507:9;514:24;
515:20;516:21;
519:7;522:6;524:15;
526:17;533:4;
534:11,20;544:16;
545:13;588:9;603:14
**statements (21)**
495:19,22;496:1,
11;497:9,22;516:18;
524:17,23;525:14,
18;527:12,20,23;
528:13,21,22;
531:24;550:17;
589:16;624:18
**States (10)**
521:3;534:3;
541:20;571:23;
577:15,20,23;585:6;
592:6;603:9
**status (8)**
518:5;586:9,10,15,
25;587:1,9;591:22
**stay (1)**
570:9
**steal (1)**
537:15
**stealing (1)**
519:16

**stems (1)**
524:23
**Stephanie (12)**
432:12;494:12;
567:21,25;568:3,8;
613:22;614:13,21;
615:1;619:11;624:10
**Steven (1)**
594:18
**still (6)**
436:9;442:25;
443:20;492:23;
518:21;602:8
**sting (15)**
433:9;588:22;
590:5,8,12,17,19;
599:25;600:7;601:2,
4,12,15;602:19;
603:2
**stole (1)**
614:21
**stolen (5)**
481:21;519:21;
535:1;566:23;614:22
**stop (1)**
615:11
**stopped (6)**
504:21;505:1,14;
506:15;580:8;615:7
**stored (9)**
464:19,24,25;
465:2;490:3;492:21,
22,23;493:10
**strategic (5)**
458:5,7;459:6;
559:4,4
**strategies (16)**
495:9;496:13;
537:5,12;538:4,5,8,9,
10,11,13;545:22,24;
546:2,4;581:7
**strategies' (1)**
536:5
**strategized (1)**
573:14
**strategy (3)**
537:14,19;573:11
**strength (2)**
510:15;512:25
**strict (1)**
454:23
**strike (7)**
612:6;613:12;
614:2;617:19;
621:15;622:6,14
**stripes (2)**
472:19,22
**strong (1)**
572:5
**student (8)**
462:8;483:11,16;
488:12;491:3;
521:19;522:15;591:4

**students (17)**
492:2;494:6,11;
545:2,4,7,9,12,21;
546:1;553:5;589:6;
590:22,22;613:4,9;
615:11
**studied (5)**
445:11;474:4;
498:11;503:24;
534:25
**studying (3)**
552:18;622:3,3
**stuff (7)**
520:10;549:23,24;
587:25;600:21;
601:18;609:16
**subject (7)**
543:13;559:1,10,
22;560:18;561:4;
606:6
**subjects (1)**
433:11
**submerged (1)**
544:7
**submission (1)**
541:16
**submitted (7)**
521:23;522:13,17;
541:15,19,20,25
**subparagraph (2)**
533:19,21
**subscriptions (1)**
507:12
**subsequent (1)**
601:25
**subset (1)**
505:19
**substance (2)**
433:25;580:1
**subtitle (1)**
515:18
**Success (25)**
439:24;440:25;
441:1;442:20,22,25;
443:23;444:2;
451:11;455:14;
483:25;486:6;
514:10,23;515:6,9,
12,12,15;554:21,23;
555:22;614:7
**Success/NXIVM (1)**
438:2
**successful (1)**
515:2,3
**sufficiently (1)**
552:15
**suggestion (2)**
590:17;596:24
**suggestions (8)**
582:9;596:3,8,18;
597:6,11,15,18
**Summary (5)**
541:10;542:6,8,10,

11
superficially (3)
  500:2;564:1,9
superior (1)
  475:16
supervising (1)
  569:23
support (1)
  531:20
suppose (1)
  455:22
supposed (6)
  438:12;439:5;
  450:23;451:10,11,12
supposedly (2)
  562:4;585:7
suppression (1)
  536:16
suppressive (1)
  536:14
suppressive' (2)
  536:11,19
Supreme (11)
  571:23;572:2,7,9,
  15,18,21,24;573:2,
  18;574:1
sure (55)
  437:2,2,16,24;
  439:18;441:8;443:8,
  17,17;449:1;452:19;
  453:4,13;461:3;
  462:4,21,22;472:18;
  473:18;476:10,22;
  478:17;485:15;
  492:15;493:4,13;
  497:17;500:11;
  501:8;511:16;
  520:18;521:24;
  523:1,15;528:17;
  540:17;555:25;
  560:22;567:20;
  570:25;571:4;575:2,
  25;576:10;579:18,
  24;583:11;589:1,13;
  593:12,14;599:4,18;
  615:17;625:15
surgeon (3)
  526:11,14;527:11
surprised (1)
  568:5;586:25
surrounded (4)
  524:17;525:18;
  527:20,23
survival (2)
  495:9;496:19
suspect (9)
  456:6;459:25;
  465:11;476:7;477:2;
  520:6;526:7;542:11;
  560:15
sustaining (1)
  519:25
Sutton (24)

432:5,12,13;
  502:20,21,25;
  529:10,12;531:1;
  554:10;619:12,12,
  18;620:1,8;622:8,14;
  623:4,8,20,21,24;
  624:3,8
Suttons (1)
  609:1
Sutton's (4)
  531:3;619:15;
  621:12;623:17
swear (1)
  432:20
sweeping (1)
  514:24
switch (2)
  528:6;534:18
swording (1)
  475:7
sworn (3)
  432:25;442:6;
  524:7
system (1)
  478:4

T

Tabi (7)
  500:11,19;567:20,
  22;568:1,4,8
table (1)
  616:5
Takla (2)
  618:21;622:23
talk (7)
  447:20;460:17;
  463:18;467:3;
  480:21;493:18;
  505:24
talked (2)
  460:20;550:16
talking (21)
  444:22,24;461:3;
  474:19;481:1;487:5;
  492:7;512:18;
  514:13;520:4;
  525:12;526:19;
  527:16;537:8;
  538:11;544:11,12;
  547:11,13;584:8;
  623:7
Tape (10)
  474:16;512:22;
  549:7;580:22,25;
  581:3;582:25;589:2;
  590:21;621:9
taped (1)
  616:5
tapes (5)
  474:10;512:20;
  549:3;582:21;621:5
taught (6)

465:6;472:13;
  486:7;513:22,25;
  536:7
teach (3)
  447:18;457:8;
  536:13
teaches (1)
  457:10
teaching (3)
  458:10;477:25;
  494:4
teasers (1)
  517:7
techniques (3)
  445:18;447:18;
  466:10
technology (4)
  438:18;439:6;
  448:19;497:11
technology' (1)
  533:23
telephone (6)
  583:25;588:7;
  596:6,12,15;598:19
telling (4)
  578:11;585:19;
  587:13;589:22
tend (2)
  564:17;625:17
tendencies (1)
  536:14
tendency (1)
  546:9
Tenzin (5)
  618:16,21;622:22;
  623:2,2
term (4)
  455:22;537:4;
  546:14;569:21
terms (1)
  440:11
test (2)
  434:11,15
tested (2)
  434:20;486:5
testified (1)
  436:22
testifies (2)
  432:25;524:7
testimonial (1)
  534:2
testimonials (1)
  534:1
testimony (10)
  433:13;434:7;
  479:18;518:18;
  575:15,17,24;576:2;
  612:20;625:12
tests (2)
  434:16,25
theft (3)
  521:18;566:11;
  614:20

theirs (1)
  485:17
theories (1)
  538:4
theory (2)
  537:7;538:12
therefore (3)
  526:16;546:12;
  598:23
thick (1)
  587:24
thinking (11)
  437:5;503:4,4;
  517:22,24;526:15;
  573:22;575:7;591:9;
  620:9;625:20
third (2)
  530:8;586:5
Thirdly (1)
  536:18
Thomas (2)
  432:18;608:19
though (6)
  470:7;477:7;
  511:3;561:5;589:25;
  591:12
thought (9)
  443:8;479:15;
  509:14;533:10;
  535:23;566:22;
  586:19;587:22;
  595:25
thousands (4)
  505:12,13,16,22
threat (1)
  620:8
threatening (2)
  529:3;620:8
Three (2)
  515:19;607:2
thrive (1)
  476:25
throughout (2)
  517:12;569:17
Thurman (1)
  622:25
thus (1)
  516:5
till (1)
  601:3
times (14)
  436:22;503:18;
  564:2,4,8,18;566:5;
  567:12;572:6;581:7;
  583:4;590:15;613:6;
  614:19
title (6)
  443:9;476:20;
  514:3;545:8;547:23;
  618:17
titled (1)
  532:21
titles (1)

478:9
titular (1)
  553:13
today (10)
  433:24;439:1;
  461:4,15;550:17;
  603:16,18;612:2;
  614:19;615:18
Today's (1)
  432:1
Toga (1)
  560:1
together (7)
  440:1,4;484:16;
  529:7;542:20,23;
  574:15
told (38)
  434:3,22;435:8;
  436:10,11,15,18;
  439:12;440:20;
  450:4;455:4;459:10;
  460:22;461:5;
  468:11;478:18;
  516:12;518:3;
  559:12;571:24;
  575:11;578:5;585:3;
  586:17;587:15;
  589:8,21;591:18;
  593:18;594:8;
  595:23;607:1,18,20;
  612:3;613:5,8;
  624:13
Tom (2)
  432:17;523:14
Tompkins (1)
  432:14
Toni (1)
  616:14
Tony (1)
  513:12
took (5)
  557:23;581:14;
  591:20;607:1;613:23
tools (5)
  458:16,17,18,21;
  493:24
top (17)
  445:12;459:8;
  500:12;504:7;
  505:11;511:3;
  512:10;545:17;
  547:20,23;559:6;
  563:17;573:6;
  575:21;585:9;
  594:19;595:19
total (15)
  434:5,18,21;435:3,
  5,7,14,16;436:4,5,7,
  11,14,17;438:3
tracing (1)
  611:14
trade (126)
  461:2,5,12;462:20,

21,22,23;463:1,4,12,
15,17,19;465:9,11,
21;466:4,7;469:13,
20,25;470:10,11,13,
16,18,22,23;471:3,5,
8,10,12,13,13,15,15,
18,20;472:3,5,8,20;
473:8;478:11,14;
480:12,15,24;481:7,
12,21,23,24;482:1,3,
4,4,6,8,10,17,18,22,
23,24;483:7;487:20;
489:16;490:8,9,13,
14,16,20;495:11,13,
14,16;497:8,12,25;
498:1,3,20,22;518:5,
11,11,14,16,21,22,
24;523:8,11;524:25;
526:22;527:13,25;
528:14,20,22;
534:17,21,23;535:2,
4,8;537:1;539:6;
543:1;550:8,15,18,
22;551:14;567:16;
568:9,11,12,13;
573:12,16;611:8,9
**Trademark (2)**
543:17,22
**trademarks (4)**
437:14,24;440:21;
520:8
**traditional (2)**
440:18;456:23
**train (2)**
499:4,4
**trained (3)**
445:10;534:6,10
**trainer (2)**
568:4;570:23
**trainers (1)**
463:16
**training (54)**
447:10;458:6;
466:11,11,13;478:1,
7,8;490:2,25;491:9,
10,13,16,18,20,22,
23;492:4,6,7,8,18;
493:15;494:22;
496:15;499:16,18,
24;500:1,3;503:9,12;
504:4,18;508:14,17,
21,22,25;509:2,3,4,8,
12,16,16;533:24;
534:8,9;552:17;
613:21,22;614:4
**trainings (3)**
500:7,8;504:9
**transcript (4)**
460:12;479:1,13;
621:13
**transfer (4)**
483:22;484:20,25;
485:9

**transference (1)**
485:18
**transferred (2)**
484:1;485:13
**transferring (1)**
568:16
**transforms (2)**
510:9;512:1
**translated (2)**
478:7;610:23
**translator (1)**
622:22
**transmission (1)**
481:25
**transmit (3)**
471:13,15;497:13
**transpired (1)**
602:3
**trash (1)**
597:8
**travel (2)**
618:22;626:4
**traveling (1)**
626:7
**treat (1)**
546:14
**Treece (1)**
433:15
**trees (1)**
473:4
**Tribute (10)**
454:2;480:23;
481:1;482:16,17,25;
484:4,11,15;522:5
**tried (1)**
620:22
**tries (1)**
592:15
**trouble (1)**
525:16
**true (24)**
436:13;452:14;
453:17;479:3;
489:19;513:21;
514:2;516:18;521:1;
525:8;532:23;534:6;
548:10,22;553:17;
576:12;600:9;602:8;
603:6,14,16;604:1;
619:16;623:10
**truly (1)**
560:23
**trust (3)**
558:24;561:8,13,
17
**truth (2)**
460:22;624:21
**truthfully (1)**
434:1
**try (5)**
439:6;460:7;
495:3;501:18;520:1
**trying (9)**

436:9;437:4;
501:9;515:4;535:3;
551:18,19;572:25;
610:3
**turn (7)**
441:22;442:11;
445:7;468:8;485:23;
489:20;524:11;
533:18;540:8;541:9;
543:3;544:19;
545:14;548:3;
576:25;577:7;592:2
**turning (1)**
515:17
**tutor (1)**
575:3
**tutored (2)**
575:5,6
**twice (1)**
626:10
**two (7)**
433:10;436:23;
454:3;463:3;529:20;
608:5;616:9
**two-page (1)**
608:18
**type (7)**
477:1;480:7;
488:3;502:13;
526:12;613:2;619:21
**types (3)**
444:17;472:22,23

## U

**Uh (1)**
542:4
**Ultimately (9)**
438:14;440:3;
453:20;478:21;
479:7,23;565:12;
621:2;624:22
**Um (3)**
476:13;478:2;
593:20
**unable (2)**
495:7;496:18
**uncertainty (1)**
579:2
**undated (2)**
559:3,6
**under (17)**
433:24;440:20;
441:9;458:9,20;
459:15,18,23,25;
460:1,1;496:22;
521:23;522:10;
528:19,24;531:8
**underhanded (1)**
546:22
**understands (3)**
488:4;537:7;538:4
**undertake (1)**

592:22
**undesirable (2)**
470:1;536:7
**unfair (1)**
546:19
**Unfortunately (1)**
561:16
**uniform (1)**
545:6
**unique (14)**
461:6;466:6;
495:18;496:10,14,
20;497:15;498:5,10,
13,14,23;508:3;
537:6
**unit (1)**
585:5
**United (4)**
521:3;541:20;
571:23;585:6
**Universe (14)**
483:2,3,7,9,12,17;
484:8;490:25;
515:21;519:8;522:7,
15;523:3;526:19
**universities (1)**
618:13
**unless (1)**
521:22
**unprecedented (1)**
533:24
**unregistered (1)**
493:3
**Unsubstantiated (1)**
533:22
**Unterreiner (9)**
463:6,13;467:14,
21;570:18,19;
605:10;610:7;614:11
**untrue (3)**
532:23;534:11;
565:8
**up (26)**
444:8;447:16;
448:13,24;449:6;
464:9,11,13;468:12;
473:16;517:7;534:1;
537:22;538:9;544:7;
562:23;564:5;
572:20;581:5;
599:10;604:16,18;
605:22;614:23;
616:4;621:11
**uphold (2)**
551:4;614:7
**upon (3)**
436:2;491:5;
546:18
**upset (1)**
623:17
**upside (3)**
519:15,16,18
**upstairs (1)**

458:1
**use (25)**
434:11;440:11;
457:20;458:17,17,
18,21;473:4;476:5,8;
478:1,3,8,10,10;
488:14;491:21;
498:1;503:22;
526:14,15;535:22;
569:21;603:10;
605:19
**used (33)**
456:2;466:23;
469:24;470:10;
471:6,7,14;482:23;
492:5;498:2;501:24;
503:9;504:5;507:3;
514:9;515:8,10;
524:18;525:19;
527:21;534:21;
535:17,20;536:1;
537:3;545:8,10;
553:7;569:24;
582:16,18;592:16;
604:24
**useless (2)**
510:15;512:25
**uses (8)**
441:1,6;477:2;
514:3;537:4;570:17;
604:22,25
**using (6)**
476:11,14;493:24;
501:20;504:18;
548:20
**utilize (4)**
443:15;497:13;
528:18;546:17
**utilized (3)**
448:19;459:7;
482:11

## V

**valuable (12)**
458:5;480:12,24;
487:20;490:9,14;
495:18;496:16,24;
497:3;502:11;555:21
**value (15)**
484:6;487:13,19,
21;488:22,25;489:2,
17;498:9;515:21;
519:8;522:6;533:23;
537:14;546:14
**values (6)**
459:4;488:1,4,5;
489:11;510:24
**Vanguard (3)**
456:19,20;553:13
**various (9)**
471:11;474:20;
505:2;524:14;564:7;

NXIVM CORPORATION v.
MORRIS SUTTON

KEITH A. RANIERE - VOL. III
May 13, 2009

573:15,17;583:24;
605:19
**version (15)**
442:6;483:16;
484:12,12,14,15;
522:15,16,16;523:3;
541:7,7,14,15,18
**versions (5)**
483:10;521:19;
522:14,22;539:12
**versus (1)**
432:5
**veteran (2)**
531:9;532:3
**video (4)**
432:2;436:8;
616:1,4
**videoed (1)**
446:19
**VIDEOGRAPHER (16)**
432:1;474:9,15;
512:19,21;524:3;
549:2,6;556:8;
557:11,20;582:20,
24;608:9;621:4,8
**videos (4)**
503:2,3;504:11;
534:9
**videotaped (3)**
615:19,22,23
**videotapes (1)**
616:11
**view (5)**
459:13,15,23;
476:18;569:14
**violates (1)**
564:19
**virtually (2)**
435:10;509:10
**virtue (1)**
525:13
**voice (1)**
566:6
**voiced (5)**
555:15;566:2,25;
568:6;581:7
**vulnerable (1)**
531:16

**W**

**Wait (1)**
591:9
**waive (1)**
481:18
**waiver (1)**
600:11
**waiving (1)**
565:24
**walk (1)**
584:7
**wants (3)**
503:24;520:15;

552:16
**way (38)**
434:18,24;444:12;
467:5,13;470:21;
471:2,9;472:13;
475:13,15,16;477:7;
478:22;479:24;
481:24;487:25;
502:19;514:19;
517:23;522:12;
523:7;537:11;547:8,
23;551:20,20;552:1,
5;606:23;612:12,25;
620:9,9,16,18;622:5;
624:19
**ways (6)**
476:19;499:5;
504:10,13;520:18;
535:13
**wear (3)**
545:6;612:19,22
**wearing (1)**
473:12
**web (2)**
491:8;622:1
**website (9)**
504:19,23;532:7,
11,14;533:25;568:2,
4;572:4
**Week (5)**
456:19,20;531:12;
533:5;619:3
**weigh (1)**
460:8
**welcome (1)**
626:12
**well-formed (1)**
498:16
**weren't (3)**
455:15;607:9;
617:10
**What's (3)**
519:18;532:3;
600:19
**whatsoever (2)**
518:13;537:23
**Whenever (1)**
454:22
**wherein (2)**
516:9,23
**white (2)**
458:7,8
**whole (8)**
480:18;487:14;
491:19;515:23;
517:12;540:18;
547:15;620:19
**wholesale (1)**
516:2
**whose (3)**
441:5;588:19;
607:5
**wielded (2)**

482:3,6
**wife (2)**
532:9;619:25
**willingness (1)**
614:6
**window (20)**
470:17;471:5,8,9,
16;472:2,2,25;481:6,
9;482:4;487:9,9;
488:14;497:10;
498:21;528:22;
534:21;537:4;538:18
**windows (12)**
471:19;473:8,11;
489:13,16;495:12,
14;550:18,21;
551:14,19,21
**winning (2)**
537:15,17
**within (21)**
447:4;448:19;
457:19;466:4;
467:12;468:16;
469:3;470:21;
476:23;494:1;
503:17;515:10;
538:1,19;539:4;
570:24;587:1;590:1,
2;591:19;610:23
**without (7)**
471:12;493:22;
501:7;510:15;
512:25;516:14;
566:19
**witness (17)**
432:21;442:5,8;
523:17;553:20,24;
554:19;556:7;585:3;
600:9,15;602:7;
604:7;608:14;625:8;
626:12,14
**won (1)**
595:25
**word (1)**
487:22
**worded (1)**
551:20
**words (13)**
439:11,15;446:9;
482:22;484:16,23;
487:5;514:8,9;
515:14;525:25;
544:16;551:24
**work (31)**
433:17;438:8;
446:7,9;447:16;
455:20;480:16;
484:6;487:13,19,21;
488:22,25;489:2,17;
514:6,23;515:1,20;
519:7;520:13,14,19;
522:6;545:7;570:24;
578:4;595:18,24;

611:4,16
**worked (3)**
448:18;465:5;
580:12
**working (4)**
461:2;466:18;
467:1;569:11
**works (3)**
483:13;484:10;
520:24
**world (7)**
445:12;498:11;
546:6,12;580:12;
616:23;617:7
**worth (2)**
586:3,20
**write (9)**
452:5;453:13;
454:24;464:9;467:4;
485:3,5;489:12;
547:10
**writes (1)**
454:22
**writing (5)**
453:23;454:3,7,12;
573:1
**written (54)**
447:22,24;448:2,4,
6;453:14;454:13;
464:11,13,14;465:3,
4,7;466:23;471:22;
472:4,8,16;481:2,3,4,
11,16;482:17,19;
483:6,18;485:9,14,
17;487:22;488:9;
490:3;491:24;492:1,
5,11;493:1;501:2,13;
502:16;504:25;
505:24;512:15;
514:22;515:1;547:2,
8;586:8,23;609:19;
610:18,22;611:19
**wrongful (1)**
620:25
**wrongs (1)**
566:10
**wrote (14)**
441:5;453:2;
455:20;484:24;
485:4;488:17;
490:21;512:9;513:4,
5,7,8;526:4;560:22

**Y**

**year (5)**
437:8;490:1;
531:9;605:8;610:23
**years (5)**
492:25;539:13;
568:24;605:17;
611:12
**York (4)**

432:24;555:11;
568:17;622:24